AO 440 (Rev. 03/08) Civil Summons

# UNITED STATES DISTRICT COURT

for the

### Northern District of California

*E-filing*

| Sunnyside Development Company LLC | |
|---|---|
| Plaintiff | **CV 08    1780** |
| v. | Civil Action No. |
| Cambridge Display Technolgy Limited, et al. | |
| Defendant | |

**MEJ**

### Summons in a Civil Action

To:    See Parties Listed In Annex A

*(Defendant's name)*

A lawsuit has been filed against you.

Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, whose name and address are:

STIGLICH & HINCKLEY, LLP
The CCDS Building
502 Seventh Street
San Francisco, CA 94103

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

APR   3 2008

Date:   _____

Richard W. Wieking

*Name of clerk of court*

HELEN L. ALMACEN

*Deputy clerk's signature*

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*



MICHAEL HINCKLEY [CSBN 161645]
STIGLICH & HINCKLEY, LLP
The CCDS Building
502 Seventh Street
San Francisco, California 94103
Tel.:    (415) 865-2539
Fax:    (415) 865-2538
Email: hinckley@stiglichhinckley.com

Attorneys for Plaintiff
SUNNYSIDE DEVELOPMENT
COMPANY LLC

**E-filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUNNYSIDE DEVELOPMENT COMPANY LLC,

Plaintiff,

v.

CAMBRIDGE DISPLAY TECHNOLOGY LIMITED, CDT OXFORD LIMITED, OPSYS LIMITED, and JOHN DOES I through V,

Defendants.

**COMPLAINT**

Case No. CV 08 1780

JURY TRIAL REQUESTED

PLAINTIFF SUNNYSIDE DEVELOPMENT COMPANY LLC ("Sunnyside") hereby pleas

and alleges, as and for its Complaint as follows:

## SUMMARY OF THE ACTION

1.    Plaintiff Sunnyside holds a judgment against Opsys Limited, in the amount of

more than $4.9 million.  It seeks to reclaim property wrongfully transferred by Opsys Limited to

Cambridge Display Technology Limited ("CDT Ltd.") and CDT Oxford Limited, specifically,

Opsys Limited's 100% ownership stake in Opsys UK – worth, by CDT's admission,

approximately $26.9 million – that was transferred to CDT Ltd. in return for only $5 million.

These transfers of Opsys's valuable assets to CDT Ltd. and CDT Oxford Limited were structured

with an actual intention to place those assets beyond the reach of Opsys's creditors, including

1

Sunnyside. These transactions violated the California Fraudulent Conveyance Act, as Opsys did not receive equivalent value: "[t]he question is not, ... whether the [] defendants gave reasonably equivalent value; it is whether the debtor received reasonably equivalent value. . . . The debtor did not receive property, nor did the transfers satisfy a present or antecedent debt of the debtor. Therefore, the debtor did not receive 'value.'" *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995). As a result of defendants' fraudulent scheme, Sunnyside now holds a judgment against Opsys Limited, which received only $5 million, while being stripped of $26.9 million in assets that were transferred to CDT Ltd. and CDT Oxford Limited.

2.    This additional proceeding to recover the transfers to new parties is necessary because CDT, Inc. has failed to adhere to its prior representations to this Court that the transactions provided protection to Opsys and its creditors. When Sunnyside sought to avail itself of those supposed protections, and obtain the escrowed funds in New York, CDT, Inc. contested that creditors had received any protection. The United States District Court for the Southern District of New York ruled that Opsys received no interest in the $10 million payment, and specifically found that CDT, Inc.'s representations to this Court about the creditors' interest in the escrow funds were an "extravagant mischaracterization" and "mischaracterizations." A copy of that Decision and Order is attached hereto as Exhibit A.

## PARTIES

3.    Plaintiff Sunnyside Development Company LLC is a limited liability company organized under the laws of the State of California. Sunnyside has been a creditor of Opsys Limited since 2001.

4.    Defendant Opsys Limited is a company registered under the laws of the United Kingdom. It entered into the lease liability with Sunnyside in Fremont, California, and after a jury trial before the United States District Court for the Northern District of California, was

2

found liable for a judgment in the amount of $4.9 million plus additional attorneys' fees that have yet to be determined and assessed.

5.      Defendant Cambridge Display Technology Limited ("CDT Ltd.") is a company registered under the laws of the United Kingdom, and is a transferee, in 2002, of 98% of Opsys's profits and, in 2005, of Opsys's 100% stake in CDT Oxford Limited.

6.      Defendant CDT Oxford Limited is a company registered under the laws of the United Kingdom, and is a transferee (in 2002) of Opsys's IP and goodwill assets.  It was formerly known as Opsys UK Limited ("Opsys UK").  Upon information and belief, CDT Ltd. is the agent and representative for defendant CDT Oxford Limited in accordance with the 2002 Transaction Agreement.

7.      Each of the defendants are direct or indirect wholly-owned subsidiaries of CDT, Inc., which is a wholly-owned subsidiary of the Sumitomo Chemical Co., Ltd., which in turn is a wholly-owned subsidiary of Sumitomo Corporation, a diversified Japanese worldwide trading conglomerate with paid-in capital of over 219 billion yen.

8.      Defendants John Does I through V are fictitious persons or legal entities that received transfers of Opsys's assets, whose identities are presently unknown to the plaintiff, or against whom Sunnyside cannot presently proceed.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over these supplemental proceedings in accordance with Rule 69(a) of the Federal Rules of Civil Procedure, as it issued the judgment upon which relief is sought.  Further, this Court has jurisdiction under 28 U.S.C. § 1332, as there is complete diversity among the parties, and the action seeks recovery of assets with an aggregate value greater than $75,000.00.

10.     This Court has personal jurisdiction over the debtor/transferor Opsys Limited, and

COMPLAINT

1  the fraudulent transferees CDT Ltd., and CDT Oxford pursuant to California Civil Code, in that

2  Defendants purposefully availed themselves of the California forum by (1) contracting with

3  California residents, out of which this action arises, and (2) committed tortious actions outside of

4  the State targeted against plaintiff in California; Sunnyside felt the brunt of the economic harm

5  caused by the fraudulent transfers; and Defendants specifically aimed their conduct in a manner

6  to hinder, delay or avoid the claims of Opsys Limited's California creditors.

7      11.    The claims arise out of Defendants' transactions with California.  Specifically, the

8  transferor Opsys Limited, and the transferees CDT Ltd. and CDT Oxford Limited each entered

9  into three separate contracts with California residents Opsys US Corporation and Opsys 2

10  Corporation, namely: the (1) October 22, 2002 Transaction Agreement, (2) August 3, 2004

11  Settlement and Amendment Agreement, and (3) December 14, 2004 Amended Settlement and

12  Amendment Agreement between defendants and California residents.  The claims in this action

13  arise out of the transactions performed pursuant to those three agreements.

14      12.    Further, in October 2002, Opsys and the transferees specifically knew of Opsys

15  Limited's obligations to California creditors, including Sunnyside.  Defendants specifically

16  structured the 2002 transactions in a manner to deprive the California creditors – including

17  specifically Sunnyside – from obtaining recourse against the assets transferred by Opsys (or the

18  monies paid by CDT).  This intention is plainly disclosed in the defendants' Annual Report:

19
20
21              The terms of the Transaction Agreement were entered into by
               [defendants] so that it could gain control of and economic interest
22              in the UK assets and operations of Opsys (which had been
               transferred to Opsys UK immediately prior to the transaction) in
23              such a manner to avoid acquiring any interest in any other assets or
               liabilities of Opsys.
24
25  Defendants also entered into the 2005 transaction with knowledge of Sunnyside's

26  pending action, and with an intention to avoid the claims of the California creditors.

27      13.    The transactions arise out of California, as debtor/transferor Opsys Limited,

28

4

maintained business operations in California from 2001 to 2006, transacted business in California, and ultimately entered into contracts to make the transfers that are the subject of this litigation.

14.   The transferee defendants also conducted transactions in California through their agent and co-conspirator, Cambridge Display Technology, Inc., which acted on behalf of CDT Ltd. in negotiating the 2002 Transaction Agreement, through which CDT Ltd. acquired the assets of Opsys Limited, purportedly free of Sunnyside's claims.

15.   Defendants Opsys Limited, CDT Oxford and CDT Ltd. also have availed themselves of the California forum, and established continuous and systematic contacts with California.

16.   These contacts have taken the form of their travel to California, investments they have made in California, and by directing communications to, and receiving communications from, California.  Defendant CDT Ltd. licenses its IP to California companies, from which it derives substantial revenues.  Among the known contacts with California is a March 2005 "strategic alliance" and IP agreements with Add-Vision, Inc., a Scott Valley, California-based company, through which Add-Vision, Inc. licenses any of CDT Ltd.'s and CDT Oxford Limited's portfolio of intellectual property.  CDT Ltd. since has expanded that relationship with Add-Vision, Inc., as disclosed in CDT's public filings:

> On December 1, 2006, Cambridge Display Technology Limited ("CDT"), a subsidiary of Cambridge Display Technology, Inc. (the "Company"), entered into a material agreement to invest $249,950 in Add-Vision, Inc. ("Add-Vision"), one of its licensees, in the form of a convertible loan note. The Company has a 42% voting interest and, on an "as-converted" basis, a 55% ownership interest in Add-Vision.

CDT Ltd. has agreed to employ California as the law that shall govern its agreement with Add-Vision, Inc.

17.   Defendants CDT Oxford and CDT Ltd. also maintain other regular conduct with the

5

State, including through their work and licensing efforts. CDT Ltd. and CDT Oxford agents, officers and representatives (including the contacts of its manager, CDT Ltd.) have participated in business in California, including, but not limited to:

- Licensing IP to Next Sierra, Inc., a Mountain View, California-based hardware developer acquired by Defendants' parent, CDT, Inc. in January 2007. CDT Ltd. is working with CDT, Inc. and Next Sierra, in California by providing scientists and employees, including, but not limited to Michael Black, in California.

- Visits and participation in promotional work in the State, including participation in the 2007 and 2008 SID Conferences in Long Beach, California;

- Communications and licensing of CDT Oxford's and CDT Ltd.'s intellectual property to a former CDT subsidiary, Litrex, Inc., based in Pleasanton, California, including CDT Ltd.'s August 15, 2003 Joint Venture Agreement, with Litrex, Inc. and CDT Litd.'s Share Purchase Agreement with Litrex;

- Upon information and belief, CDT Ltd. also has entered into other licensee agreements with California based customers, including Philips Electronics in Santa Barbara, CA, and Epson America, Inc. in Long Beach, CA; and

- During the period 2002 to 2004, CDT Ltd. employed Mr. Suk Bae Cha as Commercial Director, previously with Philips Electronics in California. The contract with CDT Ltd. was executed by Mr. Cha in San Francisco, California. Upon information and belief, Mr. Cha continued to make business visits to California to develop, for CDT Ltd., licensing opportunities for the Defendants' IP.

18.    Venue is appropriate in this Court as the judgment that Sunnyside holds has been filed and docketed by this Court, which retains jurisdiction over supplemental proceedings.

6

## BACKGROUND ON SUNNYSIDE'S CLAIM AGAINST OPSYS LIMITED

19.    From the time of its founding in 1997 until the transactions with CDT described herein, Opsys Limited was a company engaged principally in the business of developing technology for flat panel displays.

20.    Opsys Limited's research and development efforts involved more than 25 scientists with respect to OLED technology.  Through that research and development work, Opsys Limited possessed significant intellectual property rights, particularly in the area of dendrimer solution processing.  This intellectual property consisted of patents acquired and developed by Opsys's scientists, several patent applications pending, ongoing knowledge of confidential and patentable information, the employment agreements with the scientists, as well as licenses and other trademarks.  In addition, Opsys Limited possessed an exclusive license to utilize dendrimer technology, granted by the University of Oxford, England.  This collection of intellectual property is referred herein as the "Opsys IP."

21.    The Opsys IP had significant value.  In its Registration Statement filed with the United States Securities and Exchange Commission on December 17, 2004 in conjunction with its IPO (the "IPO Prospectus"), CDT featured the Opsys IP assets, then owned by CDT Oxford (f/k/a Opsys UK), stating:

> CDT Oxford owns or controls a number of patents protecting the use of dendrimers to make small molecules processable in solution. CDT Oxford also has a large body of know-how concerning the development of solution processable phosphorescent materials. This allows us to develop and to patent materials that we believe have the potential to form the basis of a future generation of high-efficiency materials thus enhancing our IP portfolio with respect to the future market for OLED displays.

22.    Sunnyside is a judgment creditor of Opsys Limited.  In or about March 2001, Opsys Limited and Sunnyside entered into a lease agreement to allow Opsys Limited to use Sunnyside's Fremont, California property for its US design and manufacture operations.  The

COMPLAINT

1    lease liability was reduced to a judgment against Opsys Limited in the United States District

2    Court for the Northern District of California in 2007, in the amount of $4,853,017.00. Opsys

3    Limited also is liable for post-judgment interest and certain of Sunnyside's attorney's fees and

4    costs.

5    **The Fraudulent Transactions Diverting Opsys's Assets To CDT**

6        23.    This action seeks to reclaim for Opsys Limited its 100% stake in Opsys UK and

7    its IP – worth, by CDT's admission, approximately $26.9 million – that was transferred to CDT

8    in these transactions, in return for only $5 million.

9        24.    In 2002, CDT Ltd. paid $2 million for a license in the IP, and obtained the right to

10   manage CDT Oxford and its IP.

11

12       25.    In 2005 Opsys Limited assigned its 84% holding in Opsys UK to defendant CDT,

13   Ltd for no consideration.  CDT Ltd. subsequently received Opsys's 16% interest in Opsys UK

14   that was initially conveyed to CDT, Inc. in 2002 for $2.5 million.

15       26.    The combined effect of these transactions transferred 100% of Opsys UK to CDT

16   Ltd. with Opsys receiving a mere $5.0 million in the transactions.

17

18       27.    Beyond the mere $5 million that Opsys Limited received for assets worth more

19   than $20 million, these transactions provided no protection or benefits to Opsys Limited or its

20   creditors.  Instead, Opsys's former shareholders received $10 million unavailable to Opsys or its

21   creditors.

22       28.    In the earlier proceedings against CDT, Inc., CDT's witnesses insinuated that the

23   transactions provided Opsys Limited with some benefits, submitting sworn declarations claiming

24   that "[t]here was no purpose to place Opsys' creditors at any disadvantage.  To the contrary, …

25   steps were taken so that most of the consideration paid to Opsys and its shareholders would be

26   escrowed or placed in trust for the protection of Opsys' creditors."

27

28

COMPLAINT

29.    Those claims have been found to be untrue by the United States District Court for the Southern District of New York.  In proceedings before that Court to resolve whether or not Opsys and its creditors had received an interest in the $10 million CDT paid to Opsys's shareholders, the New York Court determined that Opsys had received no rights in the monies. It concluded that CDT's statements to this Court that Opsys and its creditors had received protection were an "extravagant mischaracterization" of the transaction.

**The October 24, 2002 Transaction With CDT Ltd. And Opsys UK**

30.    In 2002 CDT was pursuing an "IP expansion strategy."  Recognizing that dendrimer technology would be a key to the next-generation display technology, and the Opsys held the exclusive right to that technology through its patent, CDT sought to acquire the technology.  That strategy was described in its Annual Report as follows:

> In 2002, as part of our IP expansion strategy, we acquired control of CDT Oxford Limited (formerly known as Opsys UK Limited), which owns or controls a number of patents protecting the use of dendrimers to make solution processable phosphorescent materials. This allows us to develop proprietary materials which we believe have the potential to form the basis of a future generation of high efficiency green and red materials for solution-processed OLED displays.

31.    CDT touted the value of the dendrimer patent as being a central component of its transaction in its press release announcing the 2002 acquisition:

> "We believe that the dendrimer technology developed by Opsys has excellent potential as a basis for future generation materials for OLED displays," said David Fyfe, CEO of CDT. "This agreement with Opsys is in line with our strategy of consolidating IP in the OLED space in order to enhance the attractiveness of our technology offering to existing and prospective licensees. Of equal importance, we are adding over 25 highly-skilled scientists from Opsys to our team."

32.    Although CDT wanted Opsys's IP assets, it did not wish to have the IP subject to the claims of Opsys's creditors.

9

33.     In a scheme developed between CDT, Inc., CDT Ltd. and Opsys Limited, CDT designed a transaction by which it could acquire an interest in the Opsys IP used in Opsys Limited's UK operations through a series of asset transfers among insiders and related parties.

34.     A substantial purpose of Opsys's entry into the transaction was to place the Opsys IP out of the reach of Opsys's California creditors, including the $6 million liability to Sunnyside then pending against Opsys.  CDT acknowledged such an intention in its Financial Statements:

> The terms of the Transaction Agreement were entered into by
> [CDT] so that it could gain control of and economic interest in the
> UK assets and operations of Opsys (which had been transferred to
> Opsys UK immediately prior to the transaction) in such a manner
> to avoid acquiring any interest in any other assets or liabilities of
> Opsys.

35.     The corollary to CDT's desire to acquire the assets and "avoid acquiring" Opsys's US liabilities was Opsys's purpose to transfer those assets in a way that would transfer Opsys's assets beyond the reach of its California creditors, or prejudicing Opsys's creditors in obtaining recourse from those assets.

36.     As part of the scheme, on October 24, 2002, Opsys Limited restructured itself into a holding company, creating a wholly-owned operating subsidiary, Opsys UK.

37.     Simultaneously, Opsys Limited transferred to Opsys UK its UK assets and liabilities, consisting in large part of the valuable Opsys IP.

38.     As part of that transaction, Opsys Limited licensed the IP to CDT Ltd. in return for $2 million.

39.     The transaction agreement also provided CDT Ltd. with management control over Opsys UK, and the right to 98% of its profits.

40.     In separate components, CDT, Inc. paid $3 million, allocated as $2.5 million for the purchase from Opsys Limited of 16% of the shares of Opsys UK and $500,000 paid to Opsys to receive an option on Opsys UK.

41.    In total in these 2002 transactions, Opsys Limited received $2 million from CDT Ltd., and $3 million from CDT, Inc., while Opsys's shareholders received $10 million:



42.    Opsys UK (renamed after the transaction as "CDT Oxford") had value significantly greater than the $5 million that Opsys received.  As disclosed by CDT in the audited financial statements, and included in its 2004 IPO Prospectus:

> We have performed a valuation of CDT Oxford as of October 2002
> in order to fairly allocate the assets and liabilities as if CDT Oxford
> had been acquired in a business combination and the fair value of
> CDT Oxford was the full price payable….

43.    According to CDT's valuation, Opsys UK had "a fair value" of $26,894,000 as of October 2002, consisting of $12,200,000 in "In-process research and development" (the IP), $602,000 in net assets, and $14,092,000 in "goodwill" transferred to Opsys UK.  Defendants recorded the acquired assets in its audited financial statements based upon this fair value.

44.    Under Generally Accepted Accounting Practices, the "fair value" of an asset is the amount at which that asset could be bought or sold in a current transaction between willing parties, other than in a liquidation.

45.    Under Statement of Financial Accounting Standards ("SFAS") 121 and 142, CDT was required to monitor for financial accounting purposes the fair value of the goodwill and intangible assets assigned to CDT Oxford (f/k/a Opsys UK) and the Opsys IP.

46.     According to its 2004 IPO Prospectus filed with the SEC, Defendants reported that they "perform[ed] an annual impairment test on the value of goodwill and, to date, have concluded that no impairment is required."

47.     The value of CDT Oxford (f/k/a Opsys UK) remained essentially unchanged, and was not materially impaired.  In CDT's financial statements for the period ending September 30, 2004, included in CDT's 2004 IPO Prospectus, CDT reported that:

> We currently show $18.7 million as "Non-controlling interest –
> CDT Oxford" on our balance sheet. This is based on the fair value
> of [CDT, Inc.] stock as at October 2002. When we issue the
> 831,948 shares of our common stock as described above, based on
> the initial public offering price of $12.00 per share, the value of the
> stock will be $10.0 million, which together with the $1.2 million
> cash payment described above will result in the payment of
> consideration of $11.2 million in the aggregate. Since this amount
> is less than $18.7 million, we will reduce goodwill on our balance
> sheet to reflect this difference of $7.5 million.

48.     CDT's Chairman of the Board, David Fyfe, acknowledged in a sworn declaration that CDT Oxford (f/k/a Oxford UK)'s intellectual property had grown following the acquisition:

> This group conducted research that built upon and expanded both
> the research previously conducted by CDT Oxford and research
> conducted by CDT Ltd., thereby capturing the synergies from CDT
> Ltd.'s acquisition of control over CDT Oxford's intellectual
> property

49.     Similarly, CDT reported in its 2007 Annual Report that it had continued to evaluate the fair value of CDT Oxford (f/k/a/ Opsys UK) and that "have concluded that no impairment is required."

**The May 2005 Transfer By Opsys Limited of the Opsys UK Shares To CDT Ltd. for No Consideration**

50.     During the same November 2004 meetings between CDT Ltd., its attorneys, consultants and investment bankers, the parties agreed to an additional transaction.

12

51.     In or about May 2005, Opsys Limited divested itself of what was, upon information and belief, its last significant remaining asset: its 84% stake in CDT Oxford (f/k/a Opsys UK).

52.     CDT Ltd. and Opsys Limited did not even make a pretext of receiving fair value in the 2005 transaction.  Upon information and belief, as described in a May 7, 2007 declaration submitted by CDT Ltd. Board Member, and Opsys Limited Officer, Michael Black, Opsys Limited received **no** consideration or value in exchange for the transfer of its remaining 84% interest in CDT Oxford (f/k/a Opsys UK):



| CDT, Ltd. | $19 m of Opsys UK stock (84%) —→ ←— $0 | OPSYS LIMITED |

53.     Although CDT was a publicly traded company with disclosure obligations, it fraudulently concealed this conveyance by Opsys Limited.  CDT made no public contemporaneous disclosure of this multi-million dollar transaction, not has it ever publicly disclosed any details about the transaction.

54.     In the aggregate, between the 2002 and 2005 transactions, Opsys Limited has divested itself of its whole 100% interest in Opsys UK – which CDT placed a "fair value" of $26.9 million – in return for only $5 million.

55.     These transfers were made at a time that Opsys Limited was insolvent, or had unreasonably small capital.

56.     Further, the 2005 transfer was made at a time that Opsys Limited was a defendant in the *Sunnyside Development Company LLC v. Opsys Limited* action, which ultimately resulted in a $4.9 million judgment in favor of Sunnyside.

**Sumitomo's Current Use of the Opsys IP Assets**

57.     The 2005 transfer was made for the benefit of CDT, Inc., which was able to place the Opsys IP outside of the reach of Opsys Limited's creditors.  CDT, Inc. has benefited from the

13

transfer by becoming more valuable and being able to sell itself to Sumitomo Chemical Co. Ltd. in 2007. A central component of this transaction was Sumitomo's acquisition of the Opsys IP, which would not have been available had Sunnyside been able to levy against the Opsys IP to satisfy the judgment. CDT, Inc. benefited from the transfer by receiving $12.00 per share, for a total of $285 million

58.    Contemporaneously, on May 13, 2005 CDT Ltd. announced an intention to create a joint venture called Sumation with Sumitomo Chemical Company Ltd.   The Sumation joint venture was finalized on November 14, 2005.

59.    According to CDT, the 2005 joint venture agreement provided that the parties would "channel their existing P-OLED materials research and development activities into the new JV company, which will have access to the P-OLED material IP of the parent companies. . . . The joint venture will have access to the strongest materials set in the polymer OLED sector, including the current best-performing full colour P-OLED materials based on polyfluorene chemistry which CDT and Dow have separately developed over the last ten years. It also has exclusive access to 'next generation' high efficiency materials based on dendrimer chemistry which CDT gained through the acquisition of Opsys in 2002."

60.    In conjunction with the execution of the joint venture, CDT Oxford Limited (f/k/a/ Opsys UK) licensed materials intellectual property, owned by (or licensed to) CDT Oxford Limited, to Sumation, and CDT, Inc. executed amendments to existing licenses to Dow (now assigned to Sumitomo) and to Sumitomo to enable Sumitomo to sub-license this intellectual property to Sumation.

61.    Through the 2005 joint venture, Sumitomo Chemical and CDT Ltd. have exploited the Opsys IP, and have earned monies from the Opsys IP that rightfully belongs to Opsys Limited.

14

**COUNT ONE**
**(Violation of California Civ. Code §§3439.05 and 3439.07)**

62.    Plaintiff repeats and realleges the facts contained in paragraphs 1 through 61 of the complaint, as if set forth fully herein.

63.    Opsys Limited's ownership stake in Opsys UK had substantial value.

64.    In May 2005, Opsys Limited transferred to CDT Ltd. its 84% stake in Opsys UK, worth more than $10 million, for no consideration.

65.    In October 2002, Opsys Limited transferred to CDT Ltd. 98% of any Opsys UK's pre-tax profits and was not supported by fair consideration.

66.    In October 2002, Opsys Limited transferred to CDT Oxford its $26.9 million in IP, receiving in return only $2 million in consideration.

67.    In December 2004 Opsys Limited relinquished its Opsys UK Option for no consideration.

68.    The transfers of Opsys Limited's assets to CDT Ltd and to CDT Oxford, were in violation of California law (Cal. Civ. Code, § 3439 et seq.) as they were made for less than its reasonable equivalent value at a time that Opsys Limited was unable to satisfy all of its creditor claims.

69.    Transfer of an asset by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving "a reasonably equivalent value in exchange," and the debtor was at the time, or became as a result of the transfer, insolvent. (§ 3439.05.)

70.    Opsys Limited was insolvent within the meaning of Cal Civ. Code §3439.02(a) at the time of the transfers.

COMPLAINT

71.     Sunnyside requests that the transfer be set aside to the extent necessary to satisfy Sunnyside's claim, as provided in Cal Civ. Code §3439.07(a), or levy against the assets as provided in Cal. Civ. Code §3439.07(c).

72.     Alternatively, Sunnyside requests entry of judgment against the defendants.

**COUNT TWO**
**(Violation of California Civ. Code § 3439.04(a)(1))**

73.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 72 of the complaint, as if set forth fully herein.

74.     Opsys Limited's ownership stake in Opsys UK had substantial value.

75.     In May 2005, Opsys Limited transferred to CDT Ltd. its 84% stake in Opsys UK, worth more than $10 million, for no consideration.

76.     In October 2002, Opsys Limited transferred to CDT Ltd. 98% of any Opsys UK's pre-tax profits and was not supported by fair consideration.

77.     In October 2002, Opsys Limited transferred to CDT Oxford its $26.9 million in IP, receiving in return only $2 million in consideration.

78.     In December 2004 Opsys Limited relinquished its Opsys UK Option for no consideration.

79.     Opsys Limited made the transfers with actual intent to hinder, delay or defraud its creditors.

80.     Such intent is evidenced by several facts, including that the transfers to CDT were made to an insider, the transfer was made as Opsys Limited was being sued on the lease obligation, and the transfer was of all or almost all, of Opsys Limited's assets, were made for none, or minimal, consideration, the transfer was not disclosed publicly.

81.     The transfers violated California Civ. Code § 3439.04(a)(1), or, if applicable, other state fraudulent conveyance acts.

16

COMPLAINT

82.     Sunnyside requests that the transfer be set aside to the extent necessary to satisfy Sunnyside's claim, as provided in Cal Civ. Code §3439.07(a), or levy against the assets as provided in Cal. Civ. Code §3439.07(c), or, if applicable, other state fraudulent conveyance acts.

83.     Alternatively, Sunnyside requests entry of judgment against the defendants.

**COUNT THREE**
**(Violation of California Civ. Code § 3439.07(a)(1))**

84.     Plaintiff repeats and realleges the facts alleged in paragraphs 1 to 83, as if incorporated fully herein.

85.     By the provisions of California Civil Code § 3439.07, or other applicable state fraudulent conveyance acts, Plaintiff is entitled to the "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."

86.     Plaintiff asks that the transfers to CDT Ltd. and CDT Oxford Limited be set aside to the extent necessary to satisfy Sunnyside's claim.

87.     Alternatively, Sunnyside requests entry of judgment against the defendants.

**COUNT FOUR**
**(Violation of the UK Insolvency Act of 1986)**

88.     Plaintiff repeats and realleges the facts alleged in paragraphs 1 to 87, as if incorporated fully herein.

89.     In May 2005, Opsys Limited transferred to CDT Ltd. its 84% stake in Opsys UK, worth more than $10 million, for no consideration.

90.     In October 2002, Opsys Limited transferred to CDT Oxford its $26.9 million in IP, receiving in return only $2 million in consideration.

91.     Since October 2002, Opsys Limited has transferred to CDT Ltd. 98% of any Opsys UK's pre-tax profits, transfers not supported by fair consideration.

92.     In December 2004 Opsys Limited relinquished its Opsys UK Option for no consideration.

17

93.     The above referenced transactions were made for significantly less value of the consideration received in the transaction.

94.     These transactions violated Section 423(3) of the United Kingdom's Insolvency Act of 1986 assets, which provides:

> In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purposes - (a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or (b) of otherwise prejudicing the interest of such a person in relation to the claim which he is making or may make.

95.     These transactions also violated Section 423(1) of the United Kingdom's Insolvency Act of 1986, which provides:

> a person enters such a transaction with another person if -- (a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration; . . .[or]  (c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

96.     These transactions also violated Section 238 of the UK Insolvency Act of 1986, in that they were made for significantly less than the value of the consideration provided by Opsys.

97.     Opsys's inability to pay its liabilities following the October 2002 transactions, and Opsys's inability to pay its liability following the December 2004 and May 2005 transactions was the natural and probable consequence of Opsys's actions.

98.     In accordance with Section 241, 424 and 425 of the Insolvency Act, Plaintiff requests that the Court set aside the conveyances and restore Plaintiff to the position it held prior to the transactions, and release and discharge any encumbrances on the property.

COMPLAINT

**COUNT FIVE**
**(Common Law Fraud)**

99.    Plaintiff repeats and realleges the facts alleged in paragraphs 1 to 98, as if incorporated fully herein.

100.    As described herein, Defendants have engaged in a fraud with the purpose of placing Opsys Limited's assets beyond the reach of its creditors, all for their personal enrichment.

101.    As described herein, Defendants concealed the wrongful transfer of the assets during the relevant time period, including failing to disclose the lack of consideration payable in the 2005 transaction.

102.    Sunnyside has been injured by Defendants' actions.

**COUNT SIX**
**(Constructive Trust)**

103.    Plaintiff repeats and realleges the facts alleged in paragraphs 1 to 102, as if incorporated fully herein.

104.    Through the above-referenced fraudulent conveyance, CDT Oxford received Opsys's IP, and CDT Ltd. received Opsys's interest in CDT Oxford and profits.

105.    CDT Ltd. currently is exploiting the Opsys IP through its Sumation Joint Venture.

106.    The revenues being generated through licenses of the Opsys IP rightfully belongs to Opsys Limited.  The licensors of the Opsys IP therefore hold these receipts, in whatever form, as a constructive trustee for the benefit of Opsys Limited.

107.    Sunnyside seeks to have the interest or debt applied to the satisfaction of the money judgment pursuant to Cal. Civil Code §708.210 or, if applicable, other state fraudulent conveyance acts.

19

108.    As a creditor of Opsys Limited, Sunnyside is a beneficiary of the constructive trust.

## JURY DEMAND

Plaintiff requests a jury trial on each of these allegations.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully prays for a judgment awarding it the following relief:

1.    Setting aside, to the extent necessary to satisfy Sunnyside's claims, and levying upon the property, (i) the 2002 conveyance of the Opsys IP to CDT Oxford, and (ii) the 2005 conveyance of Opsys's 84% ownership stake in CDT Oxford;

2.    To the extent necessary, declaring void or setting aside any provisions of the 2002 Transaction Agreement transferring profits to CDT Ltd. that would impair the value of Opsys's shareholdings in CDT Oxford, or the 2004 Amendment relinquishing Opsys's rights;

3.    Awarding Plaintiff an amount sufficient to compensate it for the damages caused by Defendants' conduct;

4.    Imposing a trust upon the Opsys assets fraudulently conveyed, and upon any monies paid to Defendants by licensees in return for the Opsys assets;

5.    Awarding Plaintiff punitive damages based upon Defendants' bad faith conduct, including the breaches of their fiduciary duties;

6.    Taxing all costs of the Court and expenses of maintaining this suit;

7.    Awarding Plaintiff pre-judgment and post-judgment interest as may be allowed under law at the highest respective lawful rates;

20

COMPLAINT

8.    Awarding Plaintiff its reasonable attorneys' fees and expenses as provided for in the California or, if applicable, other state fraudulent conveyance acts, and by the underlying lease contract; and

9.    Such other and further relief as the Court may deem just and appropriate.

Dated: April 2, 2008

STIGLICH & HINCKLEY, LLP

By
Michael L. Hinckley

The CCDS Building
502 Seventh Street
San Francisco, CA 94103
Telephone: (415) 865-2539

TRAIGER & HINCKLEY LLP
George R. Hinckley, Jr. (GH-7511)
Christoph C. Heisenberg (CH-8736)

880 Third Ave. 9th Floor
New York, NY 10022-4730
Tel.: (212) 759-4933

21

COMPLAINT

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    |
SUNNYSIDE DEVELOPMENT COMPANY, LLC, |
                                    |
                Petitioner,         |          07 Civ. 8825 (LLS)
                                    |
        - against -                 |          **OPINION AND ORDER**
                                    |
BANK OF NEW YORK (as escrow agent), |
CAMBRIDGE DISPLAY TECHNOLOGY, INC.  |
and OPSYS MANAGEMENT LIMITED,       |
                                    |
                Respondents.        |
------------------------------------x

   Petitioner Sunnyside Development Company, LLC seeks to

enforce a $4,853,017 judgment that the U.S. District Court for

the Northern District of California awarded in its action

against respondent Opsys Limited.[1]  Although Opsys Limited

("Opsys") is now a remote subsidiary (i.e., a great-grand-

daughter company) of respondent Cambridge Display Technology,

Inc. ("Cambridge"), it was acquired directly in 2004 by

Cambridge in a stock-for-stock transaction, as part of which

Cambridge deposited $5,071,320 worth of Cambridge stock into an

escrow account which was set up to address the possibility of

unforeseen claims against Opsys.  Sunnyside claims that Opsys is

a beneficiary of the Escrow Agreement, and that as a judgment

_____

[1]   Sunnyside Development Company, LLC v. Opsys Limited, No. C
05-00553 MHP (N.D.Cal.)(Patel, J.).

creditor of Opsys, Sunnyside is entitled to apply the funds in the escrow account to satisfy its judgment against Opsys (which has no assets).

Cambridge moves to dismiss the turnover petition pursuant to 12(b)(6) for failure to state a claim upon which relief can be granted.[2]

### Function and Terms of the Escrow Agreement

As described by the Court in the <u>Sunnyside</u> case (<u>see</u> <u>supra</u> note 1), Cambridge paid over $11 million worth of stock when it acquired Opsys (<u>Sunnyside</u> Mem. and Order at 14, Aug. 29, 2007). Of the total amount (931,633 shares at $12 per share, equaling $11,179,596), Cambridge delivered 375,085 shares worth $4,501,020 to Opsys Management Limited ("OML"), an entity created to facilitate the carrying-out of the acquisition transaction, for ultimate distribution to Opsys's management and shareholders. Another 133,938 shares worth $1,607,256 of the purchase price were held back to cover known and identified liabilities of Opsys set forth in a list (which did not include the breached lease on which Sunnyside later recovered its

---

[2]     Cambridge also argues that Sunnyside lacks standing because it has no interest in the escrow account. But that depends on the outcome of this proceeding, which Cambridge has standing to bring.

judgment). (Id. at 6.)    Finally, the remaining 422,610 shares worth $5,701,020 were placed in the escrow account "as security for contingent and unidentified liabilities" of Opsys, (id. at 6), which "were ultimately the responsibility of Opsys" not of Cambridge, (id. at 11).    The "security" ran to Cambridge, protecting it against increases in its cost of acquisition, or receipt of less than full value, by indemnifying Cambridge for any of Opsys's contingent and unidentified liabilities which might later arise.    The shares in escrow covered "any loss or other cost" of Cambridge as a result of such claim (id. at 10-11);    Cambridge neither expressly nor impliedly assumed such liabilities. (Id. at 11.)    Hence, it would be anomalous to view the shares in the escrow as subject to a demand for turnover to Opsys or its creditor.

It is evident from the provisions and structure of the Escrow Agreement that it does not grant an interest in the escrow fund to Opsys or an Opsys creditor.    It provides that the Fund "shall be held in trust and shall not be subject to lien or attachment of any creditor of any party hereto" but used solely for the purposes it sets forth.    Id. § 2.    Opsys is not even a party to the Escrow Agreement;    obviously, there was no conception that the Agreement might give Opsys or its creditors any right to subject the funds to a lien or attachment.

Sections 4(e)-(f) of the Agreement provide (in more complex terms) that if any claim not among those previously listed is asserted against Opsys, Cambridge may inform the escrow agent and obtain from the escrow cash or stock sufficient to cover the claim and the estimated expense of resolving it. These provisions show that the escrow's operations lie between Cambridge, OML and the escrow agent only, and that its function is to secure Cambridge against the risk that otherwise the amount of its purchase price might be increased (or the value of Opsys diminished) by assertions of undisclosed claims against Opsys. It is not the function of the escrow to create security for Opsys's creditors. In respect to this escrow, Cambridge owed no solicitude to the creditors of Opsys; indeed, Section 6 of the Agreement provides for either Cambridge or OML to defend Opsys against them.

The Agreement's Section 11, which forbids Cambridge and OML from disposing of any portion of the Fund before its actual payment to them, shows no intent that the Fund was held for the benefit of any others. Its Section 13 lists those to whose benefit the Agreement inures: the successors, assigns and legal representatives of Cambridge, OML and the escrow agent.[3]

---

[3]    See Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998)("An inurement clause, when taken together with a prohibition of assignments, on the other hand, does suggest that the parties did not intend that third parties

There is in the Escrow Agreement no evidence of an intention to benefit Opsys, which is thus at most "a mere incidental beneficiary, with no enforceable rights under the contract." Stainless, Inc. v. Employers Fire Ins. Co., 69 A.D.2d 27, 33, 418 N.Y.S.2d 76, 80 (1st Dep't 1979)(citations omitted), aff'd, 49 N.Y.2d 924, 428 N.Y.S.2d 675 (1980):

> [U]nless it is established that there is an intention to benefit the third party, the third party will be held to be a mere incidental beneficiary, with no enforceable rights under the contract. The intention to benefit the third party must appear from the four corners of the instrument. The terms contained in the contract must clearly evince an intention to benefit the third person who seeks the protection of the contractual provisions.

Accord Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 43-46 (1985); Travelers Indemnity Co. of Conn. v. Losco Group, Inc., 150 F. Supp. 2d 556, 561 (S.D.N.Y. 2001)(quoting Stainless).

For all the above reasons it is clear that, as found by the Sunnyside Court, this escrowed portion of the Cambridge stock offered in exchange for the Opsys stock "would indemnify [Cambridge] for undisclosed or contingent liabilities" (id. at 6) and the security it provided was for the benefit of Cambridge, not Opsys's undisclosed and contingent creditors.

---

benefit from the contract. Language specifying that the benefit of a contract is to inure to the contract's signatories arguably is superfluous unless it serves to limit the categories of beneficiaries. This is the wisdom behind the maxim *expressio unus est exlusio alterus.*" (italics in original)).

-5-

## Judicial Estoppel

In post-verdict proceedings in the <u>Sunnyside</u> case, Cambridge made the statement in materials submitted to the Court that "the proceeds of the transactions were held in escrow and trust for the benefit of creditors, known and unkown", and other statements to similar effect. Sunnyside understandably points to those statements as concessions that the escrow fund was held for its benefit.

Such a statement may be a generally fair, even if rough, description of the $1,607,256 worth of shares set aside to cover the list of known and identified Opsys liabilities. That is not a matter before this Court. As regards the escrow account, such a statement is an extravagant mischaracterization, for the reasons explained above, and would normally be given little or no effect in applying such a carefully drafted and detailed instrument as the Escrow Agreement.

But Sunnyside's argument runs further. Those statements were not made in casual conversations: they were submitted to a court, in argument to affect the court's decision, and should not be allowed to be contradicted by their author in a different court to obtain a contrary decision. In legal terms, Sunnyside says Cambridge is "judicially estopped", or prevented, from contradicting its own earlier assertions.

But the legal doctrine of judicial estoppel is applied rather narrowly. It is not applied to every change of position by a party in successive litigations. On the contrary, and to limit the opportunity for abuse of the doctrine in cases of inconsequential shifts of position to meet changing aspects of successive litigations, the doctrine is applied only when the earlier argument was relied upon by the court to render a decision favoring its author. As recently stated by the Second Circuit, "judicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 120 (2d Cir. 2005)(quoting and citing cases).

The Sunnyside Court did not rely on Cambridge's mischaracterizations.[4] They were not germane to the decision Judge Patel reached. Sunnyside was arguing that Cambridge was liable for Opsys's debts as a successor to its business. Judge Patel held that, as a matter of California law, successor liability does not apply to a stock-for-stock acquisition like this, but only to purchases of all the assets of the debtor. (Sunnyside Mem. and Order at 9-10.)

---

[4]    Whether or not the statements applied to this escrow, Judge Patel neither adopted them as a basis for her decision, nor can her description of the escrow (see pp. 2-5 above) be reconciled with them.

Since the court to which the statements were addressed gave them no weight, and did not rely upon them its decision, the doctrine of judicial estoppel does not apply.

* * *

Sunnyside has at various times argued that unless the escrow fund is made available to Opsys's creditors the acquisition is vulnerable as being made for inadequate consideration.[5] Judge Patel dealt with that notion crisply (id. at 14-15):

> Plaintiff cites no authority for the proposition that in order for consideration to be sufficient the purchaser must pay off the seller's debts, rather than simply compensate the seller for its assets. Because [Cambridge] paid consideration which was adequate in light of the assets it received, plaintiff has failed to demonstrate inadequate consideration.

---

[5]    Sunnyside has withdrawn from this application its suggestion that the transaction was a fraudulent conveyance under N.Y. Debtor and Creditor Law § 273-a.

CONCLUSION

The motion to dismiss the turnover petition is granted.

The Clerk will enter judgment dismissing this action, with costs and disbursements to respondents according to law.

So ordered.

Dated: New York, NY
       February 15, 2008

_Louis L. Stanton_
Louis L. Stanton
U.S.D.J.