1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON #76342
2   ALICE KWONG MA HAYASHI #178522
    ELIANA P. KAIMOWITZ RODRIGUEZ #256712
3   50 Fremont Street
    Post Office Box 7880
4   San Francisco, CA  94120-7880
    Telephone:  (415) 983-1000
5   Facsimile:  (415) 983-1200
    bruce.ericson@pillsburylaw.com
6   alice.hayashi@pillsburylaw.com
    eliana.kaimowitz@pillsburylaw.com
7
    Attorneys for Defendants
8   CAMBRIDGE DISPLAY TECHNOLOGY LIMITED
    and CDT OXFORD LIMITED
9

10

11              UNITED STATES DISTRICT COURT

12           NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14

15  SUNNYSIDE DEVELOPMENT          No. C-08-1780-MHP
    COMPANY LLC,
16                                 **REQUEST FOR JUDICIAL NOTICE**
                       Plaintiff,  **IN SUPPORT OF DEFENDANTS**
17                                 **CAMBRIDGE DISPLAY**
         vs.                       **TECHNOLOGY LIMITED'S AND**
18                                 **CDT OXFORD LIMITED'S**
    CAMBRIDGE DISPLAY TECHNOLOGY   **MOTIONS TO DISMISS**
19  LIMITED, CDT OXFORD LIMITED,
    OPSYS LIMITED, and JOHN DOES I  Date:    September 8, 2008
20  through V,                     Time:    2:00 pm
                                   Courtroom 15, 18th Floor
21                     Defendants. Hon. Marilyn Hall Patel

22

23

24

25

26

27

28

1     Defendant **CAMBRIDGE DISPLAY TECHNOLOGY LIMITED** ("CDT Ltd.")

2 makes this request for judicial notice in support of its motion to dismiss complaint filed

3 herewith. Defendant **CDT OXFORD LIMITED** ("CDT Oxford") makes this request for

4 judicial notice in support of its motion to dismiss for lack of personal jurisdiction filed

5 herewith. CDT Ltd. and CDT Oxford join in this one request for judicial notice for the

6 convenience of the Court.

7     Pursuant to Rule 201 of the Federal Rules of Evidence, CDT Ltd. and CDT Oxford

8 respectfully request that the Court take judicial notice of the documents attached hereto as

9 Exhibits A through W. Exhibits A through V are documents that were filed with the Court

10 in *Sunnyside Development Co. v. Opsys Ltd.,* C-05-553 MHP (N.D. Cal.). Exhibit W is a

11 winding up petition filed January 15, 2008, in proceedings initiated by plaintiff Sunnyside

12 Development Company LLC against Opsys Limited in the United Kingdom. *In the Matter*

13 *of Opsys Ltd.,* No. 357 of 2008 (High Court of Justice, Companies Court).

14     Judicial notice may be taken of pleadings filed and orders rendered in other courts.

15 *See, e.g., Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank,* 136 F.3d 1360,

16 1364 (9th Cir. 1998). "In deciding whether to dismiss a claim under Fed. R. Civ. P.

17 12(b)(6), a court may look beyond the plaintiff's complaint to matters of public record."

18 *Shaw v. Hahn,* 56 F.3d 1128, 1129 n.1 (9th Cir. 1995) (taking judicial notice of district

19 court order in another case).

20

| Exhibit | Page | Document |
|---------|------|----------|
| A | 1 | Notice of Removal attaching original Complaint for Monetary Damages (*Sunnyside I* Dkt. 1; filed Feb. 7, 2005) |
| B | 19 | Memorandum of Points and Authorities in Opposition to Motion to Dismiss (*Sunnyside I* Dkt. 14; filed Mar. 21, 2005) |
| C | 33 | Memorandum & Order Re: Motion to Dismiss (*Sunnyside I* Dkt. 20; filed Apr. 22, 2005) |
| D | 40 | First Amended Complaint for Monetary Damages (*Sunnyside I* Dkt. 21; filed May 11, 2005) |

| Exhibit | Page | Document |
|---------|------|----------|
| E | 48 | Memorandum of Points and Authorities in Opposition to Motion to Dismiss (*Sunnyside I* Dkt. 32; filed Jun. 27, 2005) |
| F | 62 | Memorandum & Order Re: Defendants' Motion to Dismiss (*Sunnyside I* Dkt. 39; filed Aug. 8, 2005) |
| G | 73 | Notice of Motion and Motion for Leave to File a Second Amended Complaint and/or Join a Related Party as Successor-in-Interest; Memorandum of Points and Authorities in Support Thereof (*Sunnyside I* Dkt. 48; filed Nov. 2, 2005) |
| H | 89 | Memorandum & Order Re: Motion for Leave to File Second Amended Complaint (*Sunnyside I* Dkt. 57; filed Jan. 4, 2006) |
| I | 98 | Defendant Opsys Limited's Discovery Statement (*Sunnyside I* Dkt. 68; filed Oct. 26, 2006) |
| J | 100 | Plaintiff Sunnyside Development Company LLC's Discovery Statement (*Sunnyside I* Dkt. 69; filed Oct. 26, 2006) |
| K | 102 | Civil Pretrial Minutes [Telephonic Discovery Hearing] (*Sunnyside I* Dkt. 70; filed Oct. 27, 2006) |
| L | 103 | Verdict Form (*Sunnyside I* Dkt. 166; filed Mar. 12, 2007) |
| M | 105 | Plaintiff's Notice of Motion and Motion for Attorney's Fees Pursuant to the Parties' Contracts and Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 179; filed Apr. 2, 2007) |
| N | 136 | Declaration of Paul R. Ainslie re Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 180; filed Apr. 2, 2007) [exhibits omitted] |
| O | 141 | Declaration of Robert H. Bunzel re Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment, Exhibit M (*Sunnyside I* Dkts. 182 & 185-3, filed Apr. 2, 2007) |
| P | 175 | Declaration of Michael Black in Opposition to Plaintiff's Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 204; filed May 7, 2007) [exhibits omitted] |
| Q | 185 | Declaration of David Fyfe in Opposition to Plaintiff's Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 205; filed May 7, 2007) |
| R | 190 | Declaration of Alice K. M. Hayashi in Opposition to Plaintiff's Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 206; filed May 7, 2007) |

| Exhibit | Page | Document |
|---------|------|----------|
| S | 206 | Opposition of Cambridge Technology, Inc. to Plaintiff's Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 207; filed May 7, 2007) |
| T | 235 | Judgment (Fed. R. Civ. P. 58) (*Sunnyside I* Dkt. 213; filed May 29, 2007) |
| U | 236 | Transcript of Proceedings (*Sunnyside I* Dkt. 218; hearing held May 16, 2007 ) |
| V | 309 | Memorandum & Order Re: Plaintiff's Motion to Add Cambridge Display Technology, Inc. as a Party to Action and Judgment (*Sunnyside I* Dkt. 224; filed Aug. 29, 2007) |
| W | 327 | Winding Up Petition filed Jan. 15, 2008; *In the Matter of Opsys Ltd.,* No. 357 of 2008 (High Court of Justice, Companies Court) |

Dated:  July 28, 2008.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON
ALICE KWONG MA HAYASHI
ELIANA P. KAIMOWITZ RODRIGUEZ
50 Fremont Street
Post Office Box 7880
San Francisco, CA  94120-7880


By _____/s/ Alice Kwong Ma Hayashi_____
            Alice Kwong Ma Hayashi
Attorneys for Defendants
CAMBRIDGE DISPLAY TECHNOLOGY
LIMITED and CDT OXFORD LIMITED

Exhibits A-C to Request for Judicial Notice

# EXHIBIT A

1  JAMES E. BURNS, JR. (STATE BAR NO. 53250)
   JUSTIN MYER LICHTERMAN (STATE BAR NO. 225734)
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
3  405 Howard Street
   San Francisco, CA 94105-2669
4  Telephone:    415-773-5700
   Facsimile:    415-773-5759
5
6  Attorneys for Defendants
   OPSYS LIMITED, a United Kingdom Company,
   CDT LIMITED, a UK Company
7

ORIGINAL FILED
05 FEB -7 PM 2: 03
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12  SUNNYSIDE DEVELOPMENT                Case No.  C 05 00553
    COMPANY, LLC,
13                                        NOTICE OF REMOVAL
                 Plaintiff,               (28 U.S.C. § 1441(a))
14
         v.
15
    OPSYS LIMITED,  a United Kingdom
16  Company, CDT LIMITED, a UK Company,

17               Defendant.

18

19

20

21

22

23

24

25

26

27

28

1     To the Clerk of the Court, plaintiff Sunnyside Development Company, LLC

2 ("Sunnyside"), and plaintiff's attorney of record:

3     PLEASE TAKE NOTICE THAT defendants Opsys Limited ("Opsys") and Cambridge

4 Display Technology, Limited. ("CDT") hereby remove this action from the Superior Court of

5 California for the County of Alameda to this Court based on the following facts:

6     1.     On December 14, 2004, an action was commenced in the Superior Court of the

7 State of California in and for the County of Alameda, entitled *Sunnyside Development Company,*

8 *LLC, Plaintiffs, vs. Opsys Limited, a United Kingdom Company and CDT Limited, a UK*

9 *Company, Defendants*, as case number HG 04-189362.

10     2.     The first date upon which defendants Opsys and CDT received a copy of the said

11 complaint was January 10, 2005, when defendants were served with a copy of the said complaint

12 and a summons from the said state court. True and correct copies of the summons and complaint

13 are attached hereto as Exhibit A. The allegations of the complaint are incorporated by reference in

14 this notice without admitting the truth of any of them.

15                                           **JURISDICTION**

16     3.     This action is a civil action of which this Court has original jurisdiction under 28

17 U.S.C. section 1441(a), and is one that may be removed to this Court by defendants pursuant to

18 28 U.S.C. section 1332(a) in that it is a civil action between a citizen of a State and citizens or

19 subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest

20 and costs.

21     4.     Defendants are informed and believe that plaintiff Sunnyside was, and still is, a

22 citizen of the State of California. Defendant Opsys was, at the time of the filing of this action,

23 and still is a private corporation incorporated under the laws of the United Kingdom, its principle

24 place of business in Oxford in the United Kingdom. Defendant CDT was, at the time of the filing

25 of this action, and still is a corporation incorporated under the laws of the United Kingdom with

26 its principle place of business in Cambridge, England in the United Kingdom. Opsys and CDT

27 are the only defendants that have been served summons and complaint in this action.

28

DOCSSF1:797577.1
1-400004
    -1-
    NOTICE OF REMOVAL
CASE NO. _____

RJN 2

**GROUNDS FOR REMOVAL**

5.    This action is a civil action between a citizen of the State of California and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs because, according to the Complaint, plaintiff Sunnyside is a Limited Liability Company headquartered and doing business in California, and Defendants are English companies. Accordingly, defendants are informed and believe, and on that basis allege, that it is factually apparent from the complaint that this is a civil action between a citizen of a State and citizens or subjects of a foreign state.  The pleading caption on the complaint lists both Opsys and CDT as United Kingdom companies.

6.    This action meets the amount in controversy requirement of 28 U.S.C. 1332(a), as plaintiff alleges in the complaint that "plaintiff's damages demand exceeds the jurisdictional minimum and is in fact over $ 10 million" and prays for unpaid rent in an amount subject to proof, loss of value for the increased value of the property in an amount according to proof, costs to remediate toxic and environmental damage and fines and penalties according to proof, and punitive damages in the amount of $25 million  Accordingly, defendants are informed and believe, and on that basis allege, that it is factually apparent from the complaint that plaintiff claims damages in an amount in excess of $75,000 and, therefore, the amount in controversy in the action (exclusive of interests and costs) exceeds $75,000.

7.    Based on the foregoing, this action is subject to removal to this Court under 28 U.S.C. sections 1332(a) and 1441(a).

Dated: February 7, 2005

JAMES E. BURNS, JR.
JUSTIN MYER LICHTERMAN
Orrick, Herrington & Sutcliffe LLP


_____
Justin M. Lichterman.
Attorneys for Defendants
OPSYS LIMITED, a United Kingdom Company,
CDT LIMITED, a UK Company

Exhibit A

COPY FOR SERVICE

SFP 2005 167

**SUMMARY OF THE DOCUMENT TO BE SERVED**
*ELEMENTS ESSENTIELS DE L'ACTE*

Convention on the service abroad of judicial and extrajudicial documents in civil or commercial
matters, signed at The Hague, November 15, 1965.

*Convention relative 'a la signification et a la notffication ~ l'etranger des actes judiciaires et extrajudiciaries en
matiere civile ou commerciale, signgee a La Haye, le 15 Novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinea 4)*

**Name and address of the requesting authority:**
Nom et addressee de l'autorite requerante:

Stanley G. Hilton, SBN 65990, 2370 North First Street, Suite 200, San Jose, CA 95131, USA

**Particulars of the parties:**
Identite des parties:

Sunnyside Development Company, LLC v. CDT Ltd., & Opsys Ltd.

**JUDICIAL DOCUMENT**
*ACTE JUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:*

Summons / Complaint for Monetary Damages

**Nature and purpose of the proceedings and, where appropriate, the amount in dispute:**
*Nature et objet de l'instance le cas echeant le montant du litige.*

Breach of Contract, Fraud

**Date and place for entering appearance:**
*Date et lieu de la comparution:*

Within 20 Days, California Superior Court for Alameda County, 24405 Amador St., Hayward, California 94544, USA

**Court which has given judgment:\*\***
*Juridiction qui a rendu la decision:*

**Date of judgment:\*\***
*Date de la decision:*

**Time limits stated in the document:\*\***
*Indication des delias figurant dans l'acte:*

30 calendar days from service

**EXTRAJUDICIAL DOCUMENT**
*ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet l'acte:*

**Time limits stated in the document:\*\***
*Indication des delias figurant dans l'acte:*

**RJN 5**

**SUMMONS**
**(CITACION JUDICIAL)**

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
Opsys limited, a United Kingdom Company,
OST Limited, a UK Company

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTA DEMANDANDO EL DEMANDANTE):**
Sunnyside Development Company, LLC

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DIAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/español), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/español) o poniéndose en contacto con la corte o el colegio de abogados locales.

The name and address of the court is:
(El nombre y dirección de la corte es)        CASE NUMBER: **04-189362**
Superior Court of CA, Alameda County
1225 Fallon Street
Hayward, CA 94544    GSF

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)

DATE:    **DEC 14 2004**    SG HILTON    415-378-0142
(Fecha)                     PO BOX 27575
                            SAN FRANCISCO, CA 94127

Clerk, by _____, Deputy
(Secretario)                    (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date)

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. January 1, 2004)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

RJN 6



1  STANLEY G. HILTON, BAR NO. 65990
2  LAW OFFICES OF STANLEY G. HILTON
   2570 NORTH FIRST ST., SUITE 200
3  SAN JOSE, CA 95131
   Tel: (415) 378 6142
4  Fax: (415) 276 2388
   Attorney for Plaintiff
5  SUNNYSIDE DEVELOPMENT CO., LLC

6

ENDORSED
FILED
ALAMEDA COUNTY

DEC 1 4 2004

CLERK OF THE SUPERIOR COURT
By _____ DEBRA FURTADO
                    Deputy

7        SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY

8        SOUTHERN DIVISION (HAYWARD), UNLIMITED JURISDICTION

9

10

11                                    No. ℄ 0 4 - 1 8 9 3 6 2

12  SUNNYSIDE DEVELOPMENT
    COMPANY, LLC
13
                                    )    COMPLAINT FOR MONETARY
14                                  )    DAMAGES

15         v.                       )    JURY TRIAL DEMANDED
    Opsys Limited,  a United Kingdom Company,
16  CDT LIMITED, A UK COMPANY,
         Defendants.
17

18  FIRST CAUSE OF ACTION: BREACH OF CONTRACT (LEASE AGREEMENT)

19      1 Plaintiff is a Limited Liability Company headquartered in Saratoga, CA and doing

20  business in California.

21      2. Defendant Opsys Limited, a United Kingdom company,  is a British company

22  headquartered un England, which does business in California and has had offices in this district in

23  Fremont, CA. It is owned by defendant CDT, also a British company. Defendant signed a lease

24  agreement yielding to the personal jurisdiction of this court and thus agreed to be sued here.

25      3. JURY TRIAL DEMANDED: Plaintiff DEMANDS A JURY TRIAL IN THIS

26  CASE.

27      6. VENUE: Venue is proper here because all actions occurred in Fremont, CA in this

28

COMPLAINT
SUNNYSIDE VS OPSYS                                                            1

1  court's jurisdiction.

2      7. **JURISDICTION**: This court has jurisdiction over this whole case as plaintiff's

3  damages demand exceeds the jurisdictional minimum and is in fact over $ 10 million,

4  has supplemental jurisdiction of all the state torts herein, because they all arose out of the same

5  operative nucleus of facts as the federal claim. All defendants have "minimum contacts" in

6  California and in this county, as they do business here and have had offices and facilities in this

7  district, in Fremont, CA, during all times mentioned.

8      8. On or about February 15, 2001 plaintiff and defendant signed a single tenant lease

9  contract for seven years and three months (from May 1, 2001 through April 30, 2008, for rental of

10  space at 47375 Fremont Blvd., in Fremont, CA. Under the terms of this contract, defendant also

11  agreed to make certain capital improvements on the property, as consideration for the leased.

12  Defendant agreed to pay plaintiff a monthly base rent. The contract provides that defendant agreed

13  to be sued in this court and also provides that attorney fees and costs must be awarded to the

14  prevailing party in a lawsuit brought by plaintiff to enforce the lease, or for breach of contract

15  band fraud. As part of the terms and conditions of the lease, defendant agreed to pay all its bills to

16  all creditors and agreed not to allow a mechanics lien or other type of lien to be placed on the

17  property for its failure to pay money due creditors, and defendant also agreed that it would

18  conduct business in an environmentally safe manner complying with environmental laws of the

19  US and California and Alameda County. Defendant promised to maintain its premises in a clean

20  and environmentally-safe manner.    The agreement provided that if defendant defaulted or broke

21  the lease, and plaintiff sued and prevailed, plaintiff would be entitled to an award of attorney fees

22  and costs.

23      9. On or about May 1, 2001, the parties began performance on the lease. Defendant

24  moved into the premises and set up operations there, brought equipment and supplies and

25  personnel there, and proceeded to perform work in the high technology area.

26      10. Plaintiff performed all conditions under the lease contract and remained ready to

27  perform.

28

COMPLAINT
SUNNYSIDE VS OPSYS                                                                              2

RJN 8

1    11. On or about November 2002, defendant materially breached the lease by refusing to

2  pay rent. The last rent payment was received on or about October 2002. Defendant further

3  breached the lease agreement in or about October 2002    by failing to pay its debts to certain

4  contractors, who placed three mechanics liens on the property. Defendant further materially

5  breached the lease contract by conducting operations in an environmentally unsafe manner, in

6  violation of the laws, including hazardous and improper disposal of chemicals and other

7  hazardous substances.

8    12.    As a proximate result of the above acts of Defendant, plaintiff has suffered loss of

9  approximately over $ 5 million in rental income, and has incurred further costs to pay off the three

10  liens on the property, and has incurred further costs and fines and penalties to remediate and clean

11  up the toxic contamination caused by defendant, and has incurred attorney fees and litigation costs

12  to bring this suit. The amount of damages in total exceeds $ 10 million. The environmental

13  contamination made it impossible for plaintiff to use or rent the property until approximately

14  September 2004,   and plaintiff has not been able to find a tenant yet. Plaintiff has also been

15  damaged in losing the net increased value of the property which should have accrued if defendant

16  had performed as promised and had made the capital improvements it had promised.

17    13. As a further proximate result of defendant's material breach of lease contract, plaintiff

18  has incurred attorney fees and costs to bring this action as well as other attorney fees and costs, to

19  try to persuade defendant to meet its obligations, in an amount according to proof.

20

21    WHEREFORE, Counter claimant prays for judgment against defendants, and each of

22  them, as hereinafter set forth.

23    SECOND CAUSE OF ACTION

24    (FRAUD)

25    14. Plaintiff realleges and incorporates by reference, paragraphs 1 through 13 above, and

26  incorporates them herein by reference as if fully set forth herein.

27    15. On or about February 15, 2001, defendant by its officers and agents Gary Rhea (CFO

28

COMPLAINT
SUNNYSIDE VS OPSYS    3

1  Of Opsys) and Michael Holmes (CEO of Opsys) and other officials of defendant made materially

2  false representations to plaintiff in order to induce plaintiff to lease the property to them. These

3  misrepresentations included, *inter alia, a* promise that defendant would pay its rent every month

4  for the entire period of the lease, from May 1 2001 through April 30 2008. They also told plaintiff

5  that defendant would make additions and capital improvements to the property, during the lease

6  period, to improve the value of the property, and they promised not to violate any environmental

7  laws and they promised not to incur any mechanics liens on the property.

8  16. Plaintiff believed the representations of defendants described in the preceding

9  paragraph, and relied on them to its detriment, in that it entered into the lease agreement that is the

10  subject of this action.

11  17. As a proximate result of the above acts of Defendant, plaintiff has suffered loss of

12  approximately over $ 5 million in rental income, and has incurred further costs to pay off the three

13  liens on the property, and has incurred further costs and fines and penalties to remediate and clean

14  up the toxic contamination caused by defendant. The amount of damages in total exceeds $ 10

15  million. The environmental contamination made it impossible for plaintiff to use or rent the

16  property until approximately September 2004,  and plaintiff has not been able to find a tenant yet.

17  Plaintiff has also been damaged in losing the net increased value of the property which should

18  have accrued if defendant had performed as promised and had made the capital improvements it

19  had promised.

20  18. As a further proximate result of defendant's material breach of lease contract, plaintiff

21  has incurred attorney fees and costs to bring this action as well as other attorney fees and costs, to

22  try to persuade defendant to meet its obligations, in an amount according to proof.

23  19. The actions of defendant were malicious, outrageous, wanton and oppressive in

24  defrauding plaintiff, and plaintiff is entitled to an award of punitive damages of $ 25 million,

25  against defendant.

26

27  WHEREFORE, Counter claimant prays for judgment against defendants, and each of

28

COMPLAINT
SUNNYSIDE VS OPSYS                                                                                    4

RJN 10



1  them, as hereinafter set forth.

2

3

4

5

6

7

8

9                        **PRAYER FOR RELIEF**

10         WHEREFORE, plaintiff prays for judgment against the defendant as follows:

11              1.        For unpaid rent in an amount according to proof;

12              2.        For loss of value of the increased value of the property in an amount according to

13  proof ;

14              3.        For costs of plaintiff having to pay off the three mechanics liens in an amount

15  according to proof;

16              4.        For costs of plaintiff having to pay money to remediate the toxic and

17  environmental damage done by plaintiff, and fines and penalties in an amount according to proof;

18              5.        For punitive damages of $ 25 million to punish defendants for its wrongful conduct

19  and set an example for others;

20              6.        For interest on the sum of damages awarded, calculated from May 1 , 2001 to the

21  date of judgment;

22              7.        For reasonable attorney's fees and litigation costs pursuant to the lease agreement;

23              8.        For costs of suit herein incurred; and

24              9.        For such other and further relief as this Court deems fair, just and equitable.

25

26  Dated: December 9, 2004

27

28

COMPLAINT
SUNNYSIDE VS OPSYS                                                                                    5



1

2    Stanley G. Hilton

3    Attorney for Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
SUNNYSIDE VS OPSYS                                                    6

## ASSIGNMENT OF LEASE AND CONSENT OF LESSOR

THIS ASSIGNMENT OF LEASE AND CONSENT OF LESSOR ("Assignment") is made and entered into as of October __, 2002, by and among OPSYS LIMITED, a United Kingdom company ("Assignor"), OPSYS US CORPORATION, a Delaware corporation ("Assignee"), and SUNNYSIDE DEVELOPMENT COMPANY, LLC ("Lessor"), on the basis of the following facts and understandings.

WHEREAS, Lessor and Assignor as the lessee entered into a certain lease dated February 15, 2001, and amended by that certain Amendment No. 1 thereto dated September 1, 2002 (hereinafter collectively "Lease"), for that certain premises commonly known as 47375 Fremont Blvd., Fremont, California. A true and correct copy of the Lease is attached hereto as Exhibit A and made a part hereof. All capitalized terms not defined herein shall have the same meaning as used in the Lease.

WHEREAS, Assignor desires to assign the Lease to Assignee, and Assignee desires to acquire the Lease from Assignor, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the parties, the parties agree as follows:

1.  *Assignment of Lease.* Assignor hereby assigns and transfers to Assignee, and Assignee hereby accepts the assignment of, all right, title and interest of Assignor in and to the Lease, including without limitation any right to the cash portion of the Security Deposit remaining following consummation of this Assignment.

2.  *Effective Date.* The effective date of this assignment shall be the date on which all conditions precedent to Lessor's consent to this assignment as set forth in Paragraph 6 below have been satisfied ("Effective Date"). In the event not all of said conditions precedent have been satisfied by ninety (90) days after the date first written above, this assignment shall automatically be null and void and of no force or effect whatsoever.

3.  *Assumption of Assignor's Obligations Under Lease.* Assignee agrees to assume, perform and be bound by each and every obligation of the Assignor under the Lease, including not only those arising after the Effective Date but also those obligations currently existing, whether contingent, executory, liquidated, or otherwise. Assignee specifically acknowledges that those obligations include (a) the removal and surrender/restoration obligations in connection with the Alterations, Utility Installations and Trade Fixtures heretofore made by Assignor to the Premises as required by the Lease, and (b) the obligations under Paragraph 6.2 of the Lease with respect to Hazardous Substances in, on or around the Premises for which Assignor is responsible under the terms of the Lease. Assignee acknowledges that it has read and understands the Lease and the obligations created there under. Assignee represents and warrants that it has inspected the Premises and accepts the Premises in "as is, where is" condition.

4.  *Representations of Assignor.* Assignor represents and warrants to Assignee and Lessor, which representations and warranties shall be deemed remade as of the Effective Date, that:

-1-

120-1213

RJN 13

a. A true and correct copy of the Lease and any and all addenda, supplements, amendments and modifications thereof are attached hereto as Exhibit A;

b. The Lease is in full force and effect according to the terms thereof;

c. Assignor has not previously assigned or transferred any of its right, title or interest in, to or under the Lease and it holds such right, title and interest free and clear of any liens, claims or encumbrances;

d. As of the Effective Date, (i) Assignor is current in the payment of all rent and other amounts due under the Lease, including without limitation, amounts due in respect of taxes, utilities and insurance, and Assignor is not in default of any of its obligations there under, nor has any event or condition occurred which, with notice or lapse of time, would mature into a default under the Lease; and, (ii) to its knowledge there are no claims, rights or actions that have accrued or could be asserted by Assignor against Lessor for any default, breach or violation by Lessor under the Lease. Nothing contained herein shall be construed as a waiver by Lessor of any rights that it may have for any default, breach or violation of any term or provision of the Lease prior to the Effective Date by Assignor or by Assignee of any of Lessors' obligations or representations under the Lease.

5. *Indemnity.* Assignor agrees to indemnify Assignee and hold it harmless against any and all claims, demands, actions or causes of action arising out of or relating to any purported breach of the Lease by Assignor prior to the Effective Date, including without limitation reasonable attorneys' fees incurred by Assignee in defending there against.

6. *Lessor's Consent to Assignment.* Lessor hereby consents to this Assignment on the condition that not later than ninety (90) days after the date first written above:

a. Lessor and Assignee execute that certain proposed Amendment No. 2 to Lease, a copy of which is attached hereto as Exhibit B and made a part hereof;

b. Assignee deposits with Lessor the required letter of credit portion of the Security Deposit as described more fully in Paragraph 1(c) of said Amendment No. 2;

c. A pollution liability insurance policy described in Paragraph 3 of said Amendment No. 2 or a binder for such policy in form reasonably acceptable to Lessor is procured by Lessee and delivered to Lessor;

d. Lessor's attorney's fees incurred in connection with this Assignment in the amount of not greater than Ten Thousand Dollars ($10,000) are reimbursed by Assignee to Lessor as provided under Paragraph 36 of the Lease.

In the event all of the foregoing conditions are not fully satisfied by ninety (90) days after the date first written above, Lessor's foregoing consent shall automatically be null and void and of no force or effect whatsoever.

-2-

130-1213

RJN 14

7. *Release of Assignor.* In consideration of payment to Lessor of the sum of Fifty Thousand Dollars ($50,000) on the Effective Date, Lessor agrees to release Assignor irrevocably and unconditionally from any and all liability and obligation under the Lease and/or arising in connection with the Premises and from all claims and demands it may have against the Assignor arising pursuant to the Lease and/or in connection with the Premises, all conditioned on this Assignment becoming fully effective and unconditional. Said consideration shall be paid by Assignor to Lessor by Lessor retaining said sum from the cash portion of the Security Deposit, effective as of the Effective Date which shall reduce the cash portion of the Security Deposit by that amount to Two Hundred Fifty Thousand Dollars ($250,000).

8. *Miscellaneous.*

a. Notices. Any notice, consent, demand or other communication required or permitted hereunder must be in writing to be effective and shall be deemed delivered and received (i) if personally delivered including by a nationally recognized overnight delivery service such as FedEx, or (ii) if delivered by mail, when received, each addressed as follows:

If to Assignee:

Opsys US Corporation
47375 Fremont Blvd.
Fremont, CA 94539

If to Assignor:

Opsys Limited
8 SEEBROKE BUSINESS & SCIENCE PARK
SANDY LANE, YARNTON
OXFORD OX5 1PF
UK.

If to Lessor:

Sunnyside Development Company, LLC
c/o Law Office of James Bow
220 Montgomery Street, Suite 343
San Francisco, CA 94104

(or such other address as any party shall specify by written notice so given).

b. Time is of the essence of this Assignment. The parties acknowledge that they have mutually bargained for this provision, and would not have entered into this Assignment in the absence of this provision.

c. This Assignment shall be construed in accordance with the laws of the State of California.

-3-

120-1.213

RJN 15

d.  This Assignment, the Lease and such documents as are executed in connection therewith contain the entire agreement of the parties with respect to the subject matter hereof, and this Assignment shall not be varied, amended, or superseded except by written agreement between all of the parties to this Agreement. So long as this Assignment is effective, the Lease may be varied, amended, or superseded by the written agreement of Lessor and Assignee without the approval of Assignor.

e.  This Assignment may be executed in counterparts, each of which shall be an original and all of which when taken together shall be deemed to constitute one and the same instrument.

f.  In the event an action is initiated to interpret or enforce any of the terms of this Assignment or enforce any judgment, the prevailing party shall be entitled to receive from the other party reasonable attorneys' fees, costs, and expenses incurred in the action.

g.  The validity of this Assignment is conditioned upon due execution and delivery of the Assignment by all of the parties hereto, including the Lessor.

h.  In the event any one or more of the provisions contained in this Assignment are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Assignment shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein.

i.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the day and year above written.

ASSIGNOR                                    ASSIGNEE

OPSYS LIMITED,                              OPSYS US CORPORATION,
a United Kingdom company                    a Delaware corporation

By _____                      By _____

Its _Chief Financial Officer_               Its _Chief Operating Officer_

LESSOR

SUNNYSIDE DEVELOPMENT COMPANY, LLC

By _____

Its _Manager_

-4-

120-1713

RJN 16

## AMENDMENT NO. 1 TO LEASE
### 47375 Fremont Blvd., Fremont, CA

THIS AMENDMENT NO. 1 TO LEASE is made as of September 1, 2002, by and between SUNNYSIDE DEVELOPMENT COMPANY, LLC (hereinafter "Lessor"), and OPSYS LIMITED, a United Kingdom company (hereinafter "Lessee"), on the basis of the following facts and understandings.

WHEREAS, Lessor and Lessee entered into a certain lease dated February 15, 2001 (hereinafter "Lease"), for that certain premises commonly known as 47375 Fremont Blvd., Fremont, California (hereinafter "Premises"). The provisions of the Lease are incorporated herein and made a part hereof, including but not limited to the definitions of the capitalized terms as used herein.

WHEREAS, Lessor and Lessee are desirous of setting forth certain acknowledgements and of amending the Lease, all as set forth more fully below.

NOW, THEREFORE, the parties hereto agree to amend the Lease as follows:

1. *Business Park Expenses.* The parties hereto acknowledge that the Premises, which includes the parcel of land on which the demised building is situated, is part of the Bay Side Business Park complex ("Complex"), and that there are certain common area operating expenses in connection with the Complex assessed to the various owners (including Lessor) of the parcels of land situated in the Complex pursuant to the CC&Rs recorded for the Complex. The parties hereto further acknowledge and agree that, except as set forth herein to the contrary, Lessee is obligated to reimburse to Lessor on demand all such common area operating expenses incurred during the term of the Lease which are usual and customary as additional rent under the Lease, which expenses shall be subject to audit under Paragraph 64 of the Lease.

2. *Alterations, Utility Installations, and Trade Fixtures.* Lessee hereby acknowledges that Lessee has heretofore made certain Alterations, Utility Installations and Trade Fixtures to the Premises without requesting Lessor's written consent to same. The parties hereto acknowledge and agree that the provisions of Paragraph 7.4 of the Lease, and not those of Paragraph 55 of the Lease, shall govern the ownership, removal, and surrender/restoration rights and obligations in connection with such Alterations, Utility Installations and Trade Fixtures. Lessor agrees not to require the removal of any of such Alterations, Utility Installations or Trade Fixtures prior to the expiration or earlier termination of the Lease.

3. *Hazardous Substances.* Lessee hereby acknowledges that Lessee has heretofore engaged in activities in or on the Premises which constitute Reportable Uses of Hazardous Substances without obtaining the express prior written consent of Lessor for such Reportable Uses. Lessee agrees to promptly comply with all provisions of the Lease applicable to such prior Reportable Uses, and Lessor agrees to defer any breach claim so long as Lessee diligently completes its compliance obligations.

145-134.213

-1-

RJN 17

4  Security Deposit.

a.  In reference to Paragraph 50 of the Lease, the parties hereto agree that the Letter of Credit shall (i) be in the form of an irrevocable standby letter of credit, (ii) permit multiple draws, (iii) be for a term of not less than one year, (iv) provide for presentation at the issuing bank's office in either Oakland, San Francisco or Los Angeles, California, and (v) provide for automatic term extension of not less than one year unless the issuer gives written notice to Lessor not less than forty-five (45) days prior to the expiration date that the Letter of Credit will not be extended beyond that expiration date. In the event such notice is given by the issuer, Lessee shall deposit with Lessor not later than thirty (30) days prior to said expiration date a replacement letter of credit complying with the applicable requirements for a term commencing immediately following said expiration date and issued either by Bank of America or, subject to Lessor's prior written approval, another commercial bank of reasonably sufficient financial creditworthiness.    Notwithstanding any provision to the contrary in Paragraph 50 of the Lease and for purposes of determining Lessor's right to draw under the then existing letter of credit, the failure of Lessee to timely deposit with Lessor the required replacement letter of credit shall automatically constitute a default under the Lease with no applicable notice and cure period, and entitle Lessor, without the necessity of providing Lessee with any notice or cure period and in addition to all other remedies available to Lessor for such default, to draw the then remaining balance under the then existing remaining letter of credit and to hold such proceeds on account of the damages which Lessor has incurred or will incur in connection with Lessee's failure to provide a portion of the Security Deposit in the form of the required letter of credit .

b.  In the event Lessor should use, apply or retain all or any part of the Security Deposit (whether the cash portion or the Letter of Credit or both), Lessee shall within five (5) business days after written request therefor restore the Security Deposit to the full amounts and in the forms required by this Lease.

The foregoing amendments to the Lease shall be effective as of the date first written above. Except as so amended, all other provisions of the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment No. 1 to Lease as of the date first written above.

LESSOR                                    LESSEE

SUNNYSIDE DEVELOPMENT COMPANY, LLC       OPSYS LIMITED, a United Kingdom company

By _____              By _____

Its  Manager                             Its  CHIEF FINANCIAL OFFICER

115-114.213                              -2-

RJN 18

# EXHIBIT B

1  LAW OFFICES OF STANLEY G. HILTON
   Stanley G. Hilton, SBN #65990
2  580 California Street, Suite 500
   San Francisco, CA 94104
3  Telephone: (415) 378-6142
   Fax: (650) 558-1231
4
   Attorney for Plaintiff
5  SUNNYSIDE DEVELOPMENT COMPANY, LLC

6

7
                    UNITED STATES DISTRICT COURT
8
                  NORTHERN DISTRICT OF CALIFORNIA
9

10
   SUNNYSIDE DEVELOPMENT              )    Case No.: C-05-00553 MHP
11 COMPANY, LLC,                      )
                                      )    MEMORANDUM OF POINTS AND
12        Plaintiff,                  )    AUTHORITIES IN OPPOSITION TO
                                      )    MOTION TO DISMISS
13        v.                          )
                                      )    Date:   April 11, 2005
14 OPSYS LIMITED, a United Kingdom    )    Time:   2:00 p.m.
   Company, CDT LIMITED, a UK Company,)    Courtroom: 15, 18th Floor
15                                    )
          Defendants.                 )    Honorable Marilyn Hall Patel
16                                    )    United States District Judge
                  _____)
17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

At this juncture in the proceedings defendants seek dismissal or summary judgment without having answered the complaint. The defendants describe this as a frivolous action and an opportunistic attempt to extort monies from defendants. Such baseless hyperbole is a further evidence of the fraud that defendants have attempted to perpetrate upon plaintiff. That defendants should bring in declarations and unexecuted contracts to dismiss this claim without giving plaintiff a chance to perform the discovery that would substantiate its case is abusive in the extreme.

Defendants claim that plaintiff consented to the assignment of the lease contract in question to another company. It is true that the plaintiff considered the assignment of the lease agreement, but that assignment was never completed and by its own terms plaintiff never consented to it.

In fact, it is the attempt to manipulate such an assignment to plaintiff's detriment that is of the essence of the fraud that was perpetrated by defendants against plaintiff. Plaintiff was led to believe that the Assignment of Lease and Consent of Lessor ("Assignment") that had been negotiated would be completed and become effective. Such Assignment never became effective.

By arguing that the Assignment is a bar to recovery and moving for dismissal on that basis, defendants seem to be admitting that absent such an assignment, the original lease would be breached. But the Assignment was never effective. The defendants have breached the original lease agreement and defrauded plaintiff by contending that the conditions to assign the lease to a successor in interest would be met. Such conditions were never met and it is clear that the tender of such Assignment was merely a device and subterfuge to avoid the defendants' liabilities under the contract.

CDT Limited has purchased the assets of Opsys Limited. Plaintiff Sunnyside Development Company needs to do discovery to determine which of the defendants are liable or if they are jointly and severably liable.

Modern federal rules of pleading allow a complaint to stand if it can prevail on any theory assuming the facts pled are true. The plaintiff in this action has plainly met that burden and the motion for dismissal must be rejected. Equally the contention of a motion for summary judgment

1

1   is inapplicable and defendants should be required to answer the complaint.

2       If this Court finds any defects in the complaint, plaintiff requests leave to amend the

3   complaint to cure those defects.

4       If this Court converts this motion into a motion for summary judgment under Federal Rules

5   of Civil Procedure, Rule 56, plaintiff invokes Rule 56(f) and hereby requests at least six months to

6   conduct the necessary discovery to oppose a summary judgment motion consistent with the

7   discovery plan in the declaration of Stanley Hilton attached hereto.

8                        II. STATEMENT OF FACTS

9       This is a suit that involves the redress of a very direct breach of contract and fraud.

10       In 2001, the defendant Opsys Limited executed a lease agreement with plaintiff for the

11   premises known as 47375 Fremont Boulevard in Fremont California.

12       As the property manager for Sunnyside Development Company, Frank Chui was the

13   representative of the plaintiff during all of the events described in this lawsuit from on or about

14   March 2002, through the present. As such he was involved in all of the negotiations and

15   agreements that have passed between the parties in this action.

16       Defendants' motion to dismiss this action relies upon what they call a "novation

17   agreement" which settled all claims between Sunnyside Development Company and defendants

18   Opsys Limited, and CDT Limited. This "novation agreement" never became effective because

19   defendants never satisfied the three conditions stated in paragraph 6 of the novation agreement for

20   it to become effective. This "novation agreement" was the "Assignment of Lease and Consent of

21   Lessor" ("Assignment") attached as exhibit C to the Request for Judicial Notice of defendants.

22       By its own terms this Assignment never became effective. Paragraph 6 of said Assignment

23   placed four conditions upon the consent of Lessor, Sunnyside Development Company. Those

24   conditions were never met and as such plaintiff Sunnyside Development Company never

25   consented to the assignment.

26       The first condition that was never met was that a document entitled Amendment No. 2 to

27   Lease would be executed and incorporated into the Assignment. Amendment No. 2 to Lease was

28   never executed and was never signed by any representative of Opsys Limited or by Sunnyside.

Memorandum in Opposition to Motion to Dismiss

**RJN 21**

1   Indeed the copy in the defendants' Request for Judicial Notice is not signed.  Therefore,

2   defendants cannot claim that the document was executed by their own admission.

3         Furthermore, a signed copy of Amendment No. 2 to Lease was never received by plaintiff

4   Sunnyside Development Company or Sunnyside's attorney James Bow.  Also, Sunnyside

5   Development Company never signed it because defendants never signed it.  Although it was the

6   subject of extensive negotiation between the parties, it was never executed by either party.

7         The second condition was that a letter of credit that would have become a portion of the

8   security deposit be deposited by Assignee Opsys US with Lessor Sunnyside Development

9   Company.  This letter of credit by the terms of Amendment No. 2 to Lease would have increased

10  the letter of credit portion of the Security Deposit to $750,000 and the total security deposit to $1

11  million.  Such letter of credit was never received by Sunnyside Development Company.

12        The third condition was that a pollution liability insurance policy be procured by Lessee

13  (defendants) and delivered to Lessor (Sunnyside Development Company).  Such a pollution

14  liability insurance policy by the terms of Amendment No. 2 to Lease would have maintained at all

15  times $1 million of coverage with a deductible of no more than $10,000 covering injury, property

16  damage and cleanup costs associated with any hazardous substance pollution.  Such pollution

17  liability insurance policy was never obtained or delivered to plaintiff Sunnyside Development

18  Company.

19        Therefore, of the three conditions placed on Lessee (Opsys Limited) for Lessor Sunnyside

20  Development Company's consent, none of those conditions were met and Sunnyside never

21  consented to the Assignment by its own terms.

22        The Assignment (also called the novation agreement) was executed by the parties in

23  October, 2002, on a date that is illegible on the defendants' copy.  That Assignment by its terms

24  would have become effective on the date when all of the above conditions in paragraph 6 of the

25  Assignment were satisfied.  Also by its terms, if the above conditions were not satisfied within 90

26  days of the date it was executed the assignment would be "null and void and of no force and effect

27  whatsoever."  Therefore, the assignment was null and void and never became effect because the

28  conditions were never met.

Memorandum in Opposition to Motion to Dismiss

RJN 22

1     At least one mechanic's lien was filed against Opsys and the property because defendant

2     failed to pay its bills prior to the execution of the assignment and three mechanic's liens were filed

3     after it was executed on December 4, 2002, December 10, 2002 and December 16, 2002. Each of

4     these liens was a violation of the original lease and if plaintiff Sunnyside Development Company

5     had known of them would never have considered consenting to the Assignment. Sunnyside

6     Development Company did not know of these liens at the time it signed the Assignment.

7     Prior to and during the period when the Assignment was being negotiated and executed,

8     hazardous materials that contaminated the property were not being processed and disposed of

9     properly by defendant Opsys Limited. This was a violation of the original lease terms and if

10    plaintiff Sunnyside Development Company had known of this breach of the lease, as well as

11    federal, state, and local environmental laws, it would never have consented to the Assignment.

12    In addition, the rent for December 2002 was not paid by Opsys Limited to Sunnyside

13    Development Company and no rent has been paid since that time. Under the terms of the original

14    lease and the fact that plaintiff Sunnyside Development Company never consented to the

15    Assignment, defendant Opsys Limited is obligated to pay rent and has not done so. As such,

16    defendant Opsys Limited was in breach of the lease. Therefore, the Assignment is invalid for that

17    reason also.

18    On May 8, 2003, the City of Fremont posted a Notice of Violation & Order to Comply for

19    creating a condition dangerous to human health, property and the environment and failure to

20    submit a Hazardous Health Business Plan. (Exhibit A to the Declaration of Frank Chiu.)

21    Defendants Opsys Limited and CDT Limited have persistently ignored this Notice of

22    Violation and as a result plaintiff Sunnyside Development Company has incurred extensive

23    expenses and other damages associated with addressing the dangerous condition.

24    On May 5, 2003, the United States Bankruptcy Court issued a restraining order to prevent

25    the removal of equipment or the transferring of any intellectual property from the premises.

26    (Exhibit B to the Declaration of Frank Chiu.)

27    Defendants Opsys Limited and CDT Limited have ignored this Temporary Restraining

28    Order which has subjected plaintiff Sunnyside Development Company to further damages.

4

**RJN 23**

1    Defendant Opsys Limited continued to dismantle and remove the equipment on the

2    premises and in doing so destroyed a wall. This distruction led to further contamination in

3    violation of environmental regulations regarding Hazard Substances. It was later discovered that

4    personnel employed by Opsys Limited to remove said equipment were not trained in dealing with

5    hazardous material in further violation of the environmental regulations.

6    The actions of defendants were fraudulent because an agent for defendants, Gary Rhea,

7    provided false financial statements to Lessor Sunnyside Development Company on two separate

8    occasions. These false financial statements had the effect of misleading Sunnyside as to the

9    condition and intentions of defendants to avoid their responsibilities under the lease and further

10   damage Sunnyside by failing to perform their obligations under the lease. If plaintiff had known

11   the true financial condition of defendants, plaintiff would have had a warning to protect itself from

12   the damage that was caused by the failure to perform under the lease.

13   The actions of defendants were fraudulent because by seeking an Assignment under the

14   Lease they were misleading plaintiff as to the nature of their abandonment of the property. The

15   only purpose for the Assignment of the Lease was to mislead plaintiff as to the nature of the

16   defendants' departure from the property. Plaintiff Sunnyside Development Company relied on the

17   representations made in the Assignment of Lease and Consent of Lessor, and the Amendment

18   No. 2, to Lease to its detriment.

19   On November 1, 2002, counsel for plaintiff Sunnyside Development Company, James

20   Bow, wrote to Gary Rhea of Opsys US corporation, drawing his attention to the fact that the

21   pollution liability insurance policy was unsatisfactory and that the Amendment No. 2 to Lease had

22   not been signed. (Exhibit C to the Declaration of Frank Chiu.)

23   On December 16, 2002, and again on January 10, 2003, plaintiff's representative wrote to

24   Opsys Limited in care of the premises notifying defendant that it was in default of the lease for

25   nonpayment of rent. Both letters reminded defendant Opsys Limited that the Assignment of the

26   lease had not taken effect. (Exhibit D to the Declaration of Frank Chiu.)

27   On December 17, 2002, counsel for plaintiff Sunnyside Development Company, James

28   Bow, wrote to Opsys Limited at the premises informing it that plaintiff had been informed of the

5

1  existence of a lawsuit to enforce a mechanic's lien and that such mechanic's lien constituted a

2  violation of the lease and that defendant Opsys Limited would be deemed in breach of the lease.

3  (Exhibit E to the Declaration of Frank Chiu.)

4        On May 30, 2003, counsel for plaintiff Sunnyside Development Company, James Bow,

5  wrote to Frank Chiu attaching his communication with representatives of Opsys Limited

6  discussing revisions to the Amendment No. 2 to Lease and the requirements for the pollution

7  policy.  This letter and its attachments document the fact that the pollution insurance policy or the

8  execution of the Amendment No. 2 to Lease was never received by him.  (Exhibit F to the

9  Declaration of Frank Chiu.)

10        At the time defendant Opsys Limited persuaded plaintiff Sunnyside Development

11  Company to sign the Assignment, defendant Opsys defrauded plaintiff because it used Opsys US

12  as a strawman for the purpose of getting out of the lease and never paying plaintiff the rent that

13  was due and payable.  Opsys US was intended by Opsys Limited to go bankrupt and to default on

14  all of its obligations to plaintiff and other creditors and was never a viable entity by design.

15  Defendant Opsys concealed this fact from plaintiff during the assignment negotiations and falsely

16  told plaintiff that Opsys US was a viable company and would pay its bills and have a great

17  financial future.

18        When it became clear that Opsys Limited and CDT Limited has had defrauded plaintiff,

19  plaintiff brought the present lawsuit.

20                  III.  ARGUMENT

21      A.    Standard of Review

22        All of the principles of modern pleading support the idea that plaintiff must be allowed to

23  plead its case with the widest latitude, with the benefit of all doubts and all contentions or

24  ambiguities resolved in its favor

25        Courts view Federal Rules of Civil Procedure, Rule 12(b)(6) motions with disfavor

26  because of the role pleadings play in federal practice, the liberal policy toward amendment of the

27  pleadings and the right of a plaintiff to present his case on any theory that has a chance of success.

28  "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."

---

Memorandum in Opposition to Motion to Dismiss

RJN 25

1  Gilligan v. Jamco Development Corp. 108 F.3d 246, 249 (9th Cir., 1997).  See also, Colaprico v.

2  Sun Microsystems, Inc. 758 F.Supp. 1335, 1339, (N.D., 1991).

3      Similarly, this jurisdiction has held that a dismissal under Rule 12(b)(6) is proper only in

4  extraordinary circumstances.  United States v. Redwood City 640 F2d 963, 966 (9th Cir., 1981).

5      For our purposes here the case of Bennett v. Schmidt 153 F.3d 516 is even more

6  instructive.  The court in Bennett, at 518, said:

7          "Instead of lavishing attention on the complaint until the plaintiff
            gets it just right, a district court should keep the case moving – if the
8          claim is unclear, by requiring a more definite statement under Rule
            12(e), and if the claim is clear but implausible, by inviting a motion
9          for summary judgment."

10     In addition, it has long been held that the complaint must be construed in the light most

11  favorable to plaintiff.  Any doubt as to whether a claim is valid is resolved in favor of plaintiff.

12  (Parks School of Business, Inc. v. Symington 51 F.3d 1480, 1484 (9th Cir., 1995).)  On the same

13  point the United States Supreme Court, in Conley v. Gibson 355 U.S. 41, 45-46, 78 S.Ct. 99, 102

14  (1957), has said:

15         "A complaint should not be dismissed for failure to state a claim
            unless it appears beyond a doubt that the plaintiff can prove no set of
16         facts in support of his claim which would entitle him to relief."

17

18     The question of plaintiff's ability to prove his allegations is not at issue in a motion for

19  dismissal under Rule 12(b)(6).  For example, in citing a US Supreme Court case, the court in

20  Nami v. Fauver 82 F.3d 63, 65 (3rd Cir., 1996) said:

21         "We must determine whether, under any reasonable reading of the
            pleadings, the plaintiffs may be entitled to relief, and we must accept
22         as true the factual allegations in the complaint and all reasonable
            inferences that can be drawn therefrom. [citation omitted]  The
23         complaint will be deemed to have alleged sufficient facts if it
            adequately put the defendants on notice of the essential elements of
24         the plaintiffs' cause of action. Since this is a Section(s) 1983 action,
            the plaintiffs are entitled to relief if their complaint sufficiently
25         alleges deprivation of any right secured by the Constitution. Id. In
            considering a Rule 12(b)(6) motion, we do not inquire whether the
26         plaintiffs will ultimately prevail, only whether they are entitled to
            offer evidence to support their claims. Scheuer v. Rhodes, 416 U.S.
27         232, 236 (1974)."

28     With respect to the issue that the court must accept as true all material allegations in the

7

1  complaint, as well as reasonable inferences to be drawn from them, even if they are unlikely, see

2  also, <u>Pareto v. F.D.I.C.</u> 139 F.3d 696, 699 (9th Cir., 1998).

3         The point here is that the standard that defendant must reach to dismiss the claims for

4  failure to state a cause of action are very high.  Defendants have clearly failed to meet its burden as

5  we will demonstrate below.

6         B.      <u>Dismissal Must Be Based on Face of Complaint</u>

7         Ordinarily a Rule 12(b)96) motion cannot be used to raise an affirmative defense.

8  Complaints need not contain any information about defenses and may not be dismissed for that

9  omission.  <u>Xechem, Inc. V. Bristol-Myers Squibb Co.</u> (7th Cir. 2004) 372 F.3d 899, 901.

10         In this case defendant have reached out to amendments that it claims were added to the

11  lease agreement.  The plaintiff disputes those claims.  The Assignment of Lease and Consent of

12  Lessor was never consented to by its own terms.  The Assignment depended upon the completion

13  of a document called Amendment No. 2 to Lease that was never executed,

14         A defense to a complaint that would make the complaint subject to a motion to dismiss

15  must be absolute because any conditional defense calls into the question the truth of the allegations

16  and the allegations must be taken as true to the benefit of plaintiff for the purposes of a motion to

17  dismiss under a Rule 12(b)(6) motion.  Where the defense disclosed in the complaint is

18  conditional rather than absolute, a Rule 12(b)(6) motion to dismiss should be denied.

19  (<u>McCalden v. California Library Ass'n</u> (9th Cir. 1990) 955 F.2d 1214, 1219.)

20         It is not up to plaintiff to prove its case.  It is only necessary to show that if the allegations

21  were proven, it would have a case that was legally sufficient.  That is clearly present here.  The

22  facts and the allegations of fraudulent motive are clearly stated in the complaint.

23         Unless the court converts the Rule 12(b)(6) motion into a summary judgment motion or the

24  defense is apparent from matters of which the court may take judicial notice, the court cannot

25  consider material outside the complaint.  Consideration of declarations or extraneous documents

26  should not be considered as bearing on a motion to dismiss under Rule 12(b)(6) because the

27  allegations of plaintiff are only being tested for their legal sufficiency and all contentions of

28  plaintiff are taken as true.  (<u>Arpin v. Santa Clara Valley Transp. Agency</u> (9th Cir. 2001) 261 F.3d

8

1  912, 925.)

2      When a complaint's allegations are capable of more than one inference, the court must

3  adopt whichever inference supports a valid claim.  Columbia Natural Resources, Inc. v. Tatum (6th

4  Cir. 1995) 58 F.3d 1101, 1109.  In this case, defendants seek to establish an inference that an

5  assignment that was never consented to should be taken as having voided and superceded the

6  contract.  This is a highly disputed inference and cannot form the basis for a motion to dismiss.

7      In this case, the motion to dismiss depends not only on purported defects not on the face of

8  the complaint, but depends upon on documents that are not highly disputed and should be the

9  subject of extensive discovery.  The motion to dismiss is nothing but a blatant attempt invoke a

10  quasi-summary judgment before the defendants have even answered and the defenses are even

11  offered.

12      C.    Fraud Cause of Action Is Sufficient

13      The fraud cause of action should survive and plaintiff requests leave of court to amend the

14  complaint.

15      Regarding defendants' motion to dismiss the fraud cause of action as being void for

16  vagueness, the breach of contract together with the allegations of an attempt perpetrate an invalid

17  assignment of the lease are sufficient to constitute an allegation of fraud.  In addition, defendants'

18  agents and representative offered plaintiff false financial statements, misrepresented defendants'

19  financial solvency, not to mention concealing the motive and intentions with regard to the breach

20  of the lease. See Declaration of Frank Chiu, para. 15.

21      In addition to these issues, plaintiff ignored the temporary restraining order with respect to

22  the premises and ignored a Notice of Violation with respect to violation of environmental

23  regulations.  See Declaration of Frank Chiu, para. 10, 11 and 12.  In addition, defendants failed to

24  report to plaintiff mechanics liens against the property in violation of the lease.  See Declaration of

25  Frank Chiu, para. 7.

26      In the alternative, plaintiff requests leave of court to amend the complaint in order to

27  describe in detail the identities of defendants' agents, employees, and officers who made false

28  statements to plaintiff which constitute fraud, detailed verbatim renditions of the actual

9

**RJN 28**

1    misrepresentations uttered by defendants' agents and specific dates and locations where the

2    fraudulent statements were made.

3         Federal Rule of Civil Procedure, Rule 15 requires the court to adopt a very liberal policy

4    toward giving a plaintiff leave to amend the complaint at least once.

5         D.    Plaintiff Objects to Conversion to Summary Judgment and to Judicial Notice

6         There are severe limitations to the type of documents that may be attached to a motion to

7    dismiss under Rule 12(b)(6).  Documents that are quoted in part by the complaint or are referred to

8    in the complaint but not included may be used in a Rule 12(b)(6) motion if no party questions the

9    authenticity of the document. See Branch v. Tunnell (9th Cir. 1994) 14 F.3d 449, 454, and In re

10   Stac Electronics Securities Litig. (9th Cir. 1996) 89 F.3d 1399, 1405.).

11        On the other hand, where the complaint alleges a contract the court may not consider

12   documents that are not indisputably the basis for the alleged contract.  (BJC Health System v.

13   Columbia Cas. Co. (8th Cir. 2003) 348 F.3d 685, 687.)  Of course, the assignment of the lease,

14   which is highly disputed and never became effective on its face because it was not consented to by

15   plaintiff, cannot now be brought in as the basis for a motion to dismiss.  The assignment of the

16   lease goes to the nature of the fraud not the nature of the contract.  Seeking a dismissal based on

17   such disputed documents is clearly preposterous and well outside the scope of what can

18   legitimately become a part of a motion to dismiss under Rule 12(b)(6).

19        The abortive and invalid attempt to transfer the lease of the premises from Opsys Limited

20   and assign the lease to Opsys US is of the essence of the fraud.  Seeking a motion to dismiss on

21   that basis is tantamount to contending that the fraud should have worked and plaintiff should be

22   without recourse against defendants because of the failed and irresponsible attempt to assign the

23   lease.

24        At this stage in the proceedings any ambiguity in the documents must be resolved in

25   plaintiff's favor.  International Audiotext Network, Inc. v. AT&T Co. (2nd Cir. 1995) 62 F.3d 69,

26   72. The documents replied upon by defendants in this case are highly disputed as to their validity

27   and import.  That those documents should be considered by the court under the premise that they

28   are a part of the contract is both preposterous and unfounded.

Memorandum in Opposition to Motion to Dismiss

**RJN 29**

1     It is true that judicial notice may be taken of official records and reports. MGIC Indem.

2   Corp. v. Weisman (9th Cir. 1986) 803 F.2d 500, 504. However, contested assignments and

3   amendments to a lease that were never executed or consented to, and never became effective are

4   not "official records" in that sense.

5     It is clear that defendants' motion to dismiss attempts to carve out some special ground

6   half way between a motion to dismiss and a summary judgment where defendants get the

7   advantages of a motion to dismiss without the burden of proof in a summary judgment and without

8   plaintiff having a chance to propound the discovery that would be necessary and to which the

9   plaintiff is entitled.

10     E.     Standards for Summary Judgment Have Not Been Met

11     Plaintiff is entitled to heightened notice of a motion for summary judgment before an

12   answer.

13     Plaintiff is entitled to do discovery on its claims in order to respond to a motion for

14   summary judgment. When a motion to dismiss is converted to a motion for summary judgment by

15   reference to extrinsic evidence, summary judgment requirements apply and the opposing party

16   must be provided a reasonable opportunity to present material relevant to a Rule 56 motion.

17   (Cunningham v. Rothery (9th Cir. 1998) 143 F.3d 546, 549.)

18     Implicit in the opportunity to respond to summary judgment is the requirement that

19   sufficient time be afforded for discovery purposes to develop facts essential to justify a party's

20   opposition to the motion. (Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan (9th

21   Cir. 1981) 662 F.2d 641, 645.)

22     If plaintiff has clearly stated a valid claim and a motion to dismiss does not apply, as it

23   does not in this case, plaintiff must have a chance to pursue its discovery plan as outlined in the

24   Declaration of Stanley Hilton, attached hereto.

25     Plaintiff invokes Federal Rule of Civil Procedure, Rule 56(f) to request that the court

26   continue the summary judgment motion at least six months and permit summary judgment only

27   after defendants have filed an answer to the complaint, so that plaintiff can ascertain what

28   defendants' affirmative defenses are and so that plaintiff can have an adequate time to conduct

---

11

Memorandum in Opposition to Motion to Dismiss

**RJN 30**

1  discovery as stated in the discovery plan of plaintiff's attorney, Stanley G. Hilton, in his

2  declaration.

3      It is not necessary that plaintiff be specific as to the goals of discovery beyond what has

4  been alleged above.  In a case such as the present situation where no discovery has taken place at

5  all, the required showing for the expectations of discovery is very low.  The party making a

6  summary judgment motion under Rule 56(f) requesting continuance of the proceedings for

7  additional discovery cannot be expected to frame its motion with great specificity as to the kind of

8  discovery likely to turn up useful information as the ground for such specificity has not been laid.

9  (Burlington Northern Santa Fe R.R. Co. v. Assinibione & Sioux Tribes of Fort Peck Reservation

10  (9th Cir. 2003) 323 F.3d 767, 774.)  Therefore, the grounds for a continuance to allow plaintiff to

11  act on its discovery plan is very compelling.

12      F.    Plaintiff Alleges CDT Limited Alter Ego of Opsys Limited

13      Plaintiff is informed and believes that CDT Limited and Opsys Limited are the alter egos

14  of each other.  Opsys Limited may have acted as the agent of CDT Limited in shedding its

15  liabilities and debt as part of the plan to merge the assets of Opsys Limited into CDT Limited and

16  obtain the assets only.  Thus, CDT broke the lease contract with plaintiff and ended up with the

17  assets of Opsys while avoiding the obligations of Opsys Limited contract with plaintiff to the

18  detriment of plaintiff.

19      Plaintiff needs to do discovery to lift the corporate veil and find out where the assets of the

20  entity that broke its contract with plaintiff ended up.

21      G.    Bankruptcy of Opsys Us Was Sham Proceeding

22      Defendants quite correctly point out in their motion to dismiss that plaintiff took an active

23  role in the bankruptcy

24      That is the nature of the fraud perpetrated upon plaintiff that Opsys Limited and CDT

25  Limited split Opsys Limited and Opsys US into distinct entities and left all of the liabilities with a

26  bankrupt entity, while retaining all of the assets for itself.

27      That was a fraudulent attempt to deprive plaintiff of the benefits of the lease contract to

28  which Opsys Limited had been a party.  That is exactly why plaintiff is now suing Opsys Limited

Memorandum in Opposition to Motion to Dismiss

RJN 31

1  and CDT Limited.  Are the defendants contending that having once been taken in by the swindle

2  plaintiff should be without recourse.

3       Or perhaps the defendants are attempting to perpetrate upon the Court the same fraud that

4  was perpetrated upon plaintiff.  In any case, the point here is that plaintiff should be afforded the

5  opportunity to prove his case.  If, as plaintiff contends, defendants deliberately left an entity with

6  no assets and removed the assets to their own coffers, that is a fraud.  If plaintiff can prove it,

7  plaintiff will be entitled to damages.  That is all that is at issue at this point, and defendants should

8  be required to answer and offer whatever defenses they may have.

9                              IV.  CONCLUSION

10      Therefore, the overwhelming conclusion is that the plaintiff has stated facts sufficient to

11  meet the threshold of pleading for claims of breach of contract and fraud.  A motion to dismiss

12  under Rule 12(b)(6) cannot be based on documents outside the face of the complaint that are

13  highly disputed as to their validity, relevance and meaning.  A motion for summary judgment

14  would be highly inappropriate as defendants have not answered and plaintiff must be granted time,

15  at the very least to conduct discovery as to the facts.

16      The motion for dismissal should be rejected by this court and the defendants should be

17  required to answer the complaint.

18  DATED: March 21 , 2005            LAW OFFICES OF STANLEY G. HILTON

19

20                                By_____/s/_____
                                      Stanley G. Hilton, Attorney for Plaintiff
21                                    Sunnyside Development Company

22

23

24

25

26

27

28

Memorandum in Opposition to Motion to Dismiss

**RJN 32**

# EXHIBIT C

1

2

3

4

5

6

7                         UNITED STATES DISTRICT COURT

8                       NORTHERN DISTRICT OF CALIFORNIA

9

10    SUNNYSIDE DEVELOPMENT
      COMPANY, LLC,                              No. C 05-0553  MHP
11
                        Plaintiff,
12          v.

13    OPSYS LIMITED and CDT LIMITED,             **MEMORANDUM & ORDER**
                                                 **Motion to Dismiss**
14
                        Defendants.
15
      _____/
16

17          Plaintiff Sunnyside Development brought this breach of contract and fraud action against defendants

18    Opsys Limited and CDT Limited, both United Kingdom companies.  Now before the court is defendants'

19    motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Having read the parties' papers

20    and considered their arguments, the court hereby enters the following memorandum and order.

21

22    BACKGROUND[1]

23          On February 15, 2001, plaintiff and defendant Opsys Limited signed a single tenant lease for rental

24    of commercial space at 47375 Fremont Boulevard in Fremont, California.  The lease term ran from May 1,

25    2001 through April 30, 2008.  As conditions of the lease, Opsys Limited agreed to pay plaintiff a monthly

26    base rent, to make certain capital improvements, and to conduct its business in an environmentally safe

27    manner, complying with all applicable environmental laws.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**RJN 33**

1    Opsys Limited continued to make rental payments to plaintiff until October 2002. At the time,

2  defendant CDT Limited ("CDT") acquired control of Opsys' English business, Opsys UK Limited ("Opsys

3  UK"). As part of the corporate reorganization accompanying CDT's acquisition of Opsys UK, plaintiff,

4  Opsys Limited, and Opsys' United States subsidiary, Opsys US, signed a novation agreement that

5  purportedly assigned Opsys Limited's rights and obligations under the lease to Opsys US. Under the terms

6  of paragraph six of the novation agreement, the assignment was subject to a number of conditions

7  precedent, including a provision requiring that both parties execute a second amendment to the lease. In

8  addition, paragraph seven of the novation agreement provided that plaintiff would be paid $50,000, to be

9  deducted from Opsys Limited's original security deposit, in consideration for releasing Opsys Limited from

10  liability under the lease.

11    Plaintiff received no rental payments after October 2002, and Opsys US was forced into

12  involuntary bankruptcy by four of its creditors in May 2003. On December 14, 2004, plaintiff filed this

13  action in the Superior Court for Alameda County alleging breach of contract and fraud. On February 7,

14  2005, Opsys Limited and CDT (collectively "defendants") removed the state court action to this court

15  pursuant to 28 U.S.C. § 1441(a). On February 28, 2005, defendants moved to dismiss plaintiff's

16  complaint under Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment.

17  That motion is now before the court.

18

19  LEGAL STANDARD

20    Dismissal under Rule 12(b)(6) is appropriate where a plaintiff "can prove no set of facts which

21  would entitle him [or her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Dismissal can be

22  based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

23  legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). In reviewing a motion

24  to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable inferences

25  in favor of the non-moving party. Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). For

26  purposes of adjudicating a motion to dismiss, a court may not consider material beyond the pleadings. Hal

27  Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However,

28

UNITED STATES DISTRICT COURT
For the Northern District of California

2

1   documents not physically attached to a pleading but whose contents are alleged in the complaint may be

2   considered.  Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by Galbraith

3   v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002).

4

5   DISCUSSION

6   I.      Breach of Contract

7           The first cause of action in plaintiff's complaint alleges that defendants breached the original lease

8   agreement by failing to make rent payments and by failing to comply with various other lease provisions.

9   As an initial matter, the court notes that while both Opsys Limited and CDT are named as defendants to the

10  breach of contract claim, the original lease agreement lists Opsys Limited as the sole lessee, and plaintiff's

11  complaint contains no theory as to how CDT might be liable for breach of the original lease.  Plaintiff now

12  suggests that it will seek to hold CDT liable for breach of contract under an alter ego theory.  However,

13  because no such allegations appear on the face of the complaint, the court must dismiss plaintiff's breach of

14  contract claim against CDT.

15          As noted above, Opsys Limited is a party to the original lease that defendants allegedly breached

16  by failing to pay rent after October 2002.  This would appear to state a claim for breach of contract.

17  Nonetheless, Opsys Limited argues that under the terms of the novation, plaintiff consented to the

18  assignment of Opsys Limited's interest in the lease to Opsys US and thus released Opsys Limited from any

19  liability for breach of contract.  The court assumes without deciding that it is appropriate to consider the

20  contents of the novation agreement for the purpose of adjudicating the instant motion.  However, even

21  giving Opsys Limited the benefit of that assumption, there is nothing in the record to suggest that the

22  conditions precedent to the agreement were satisfied.  In particular, paragraph six of the novation required

23  that both parties execute "Amendment No. 2 " to the lease before the assignment could become effective.

24  Defendants' Request for Judicial Notice ("RJN"), Ex. C at 2.  Defendants suggested at the hearing that a

25  signed copy exists, although they have been unable to locate it thus far.  In its place, defendants have

26  submitted an unsigned copy of Amendment No. 2, see RJN, Ex. C.  However, absent submission of the

27  alleged document, the court must assume that Amendment No. 2 was never executed by the parties.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Accordingly, because Opsys Limited failed to comply with the provisions of paragraph six, it appears that

2    the parties never agreed to the assignment and that any subsequent breach of the lease should be governed

3    by the terms of the original agreement.

4        Opsys Limited also asserts that pursuant to the terms of paragraph seven of the novation, plaintiff

5    received consideration for releasing defendant from liability under the original lease. Specifically, the

6    novation called for payment of $50,000 to plaintiff on the effective date of the assignment, paid out of the

7    $250,000 security deposit already in plaintiff's possession. In support of their motion to dismiss,

8    defendants have submitted the declaration of former Opsys Limited CEO Michael Holmes, who asserts

9    that Opsys paid plaintiff the agreed upon amount. This at least gives rise to the possibility that plaintiff

10    waived any objection to the failure of one or more conditions precedent to the assignment of the lease.

11    However, because the Holmes declaration may not be considered in adjudicating a motion to dismiss, the

12    court need not decide whether such a waiver occurred for the purpose of determining whether plaintiff

13    states a claim for breach of contract. Furthermore, even if it is assumed that plaintiffs received the $50,000,

14    it is unclear if Opsys Limited's compliance with paragraph seven relieves it of its obligations under

15    paragraph six. Paragraph six specifically provides: "[i]n the event all of the foregoing conditions are not

16    fully satisfied by ninety (90) days after the date first written above, Lessor's foregoing consent shall

17    automatically be null and void and of no force or effect whatsoever." RJN, Ex. C at 2. This language

18    suggests that, notwithstanding payment of the $50,000, failure to meet the conditions of paragraph six voids

19    the novation in its entirety. At the very least, the operation of paragraph six vis-à-vis paragraph seven is a

20    matter of factual dispute. Thus, drawing all inferences in favor of plaintiff, the court cannot conclude as a

21    matter of law that Opsys Limited was relieved of further liability under the original lease by the October

22    2002 novation agreement.

23        In the alternative, defendants argue that plaintiff is judicially estopped from denying the validity of

24    the novation agreement because it has asserted claims against Opsys US's bankruptcy estate. The doctrine

25    of judicial estoppel is designed to "protect the integrity of the judicial process" and to prevent parties from

26    "playing fast and loose with the facts." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citations

27    omitted). Several factors inform the application of judicial estoppel, including whether a party's later

28

4

1   position is "clearly inconsistent" with its earlier position, whether the party has succeeded in persuading a

2   court to accept that party's earlier position, and whether the party seeking to assert an inconsistent position

3   would derive an unfair advantage if not estopped. Id. at 750-51.

4        Here, plaintiff filed a proof of claim with the United States Bankruptcy Court seeking

5   $1,906,657.10 from Opsys US for unpaid rent, loss of use of property, mechanic's liens, and restoration of

6   premises. However, Opsys US's bankruptcy trustee rejected that claim as a matter of law. RJN, Ex. K at

7   1. Given its inability to recover from Opsys US's bankruptcy estate, it is neither surprising nor unfair that

8   plaintiff has sought to hold Opsys Limited liable on the original lease agreement. Thus, plaintiff's failed

9   attempt to recover from Opsys US in its bankruptcy proceeding is insufficient to estop plaintiff from

10  pursuing its breach of contract claim against Opsys Limited in this court.

11       In summary, drawing all reasonable inferences in its favor, plaintiff states a claim that Opsys Limited

12  is liable for breaching the original lease agreement. Accordingly, defendants' motion to dismiss the breach

13  of contract claim must be denied with respect to Opsys Limited.

14  II.   Fraud

15       The second cause of action in plaintiff's complaint alleges that plaintiff was fraudulently induced to

16  lease the Fremont Boulevard property to Opsys in February 2001. Defendants contend that this claim is

17  not pled with particularity as required by Federal Rule of Civil Procedure 9(b) and, accordingly, should be

18  dismissed. A common law fraud claim requires a showing of five elements: misrepresentation, knowledge

19  of falsity (scienter), intent to induce reliance, justifiable reliance, and resulting damage. Bank of the West v.

20  Valley Nat'l Bank of Ariz., 41 F.3d 471, 477 (9th Cir. 1994) (citation omitted). Plaintiff's complaint

21  alleges that Opsys made materially false representations to plaintiff by promising to comply with the terms of

22  the lease. Plaintiff alleges that these representations were intended to and did induce actual reliance by

23  plaintiff, thereby causing it substantial financial harm. However, defendants correctly point out that plaintiff

24  makes no allegation of scienter in its complaint. Plaintiff also makes no mention of how CTD could have

25  made fraudulent misrepresentations during the initial lease negotiation, given that CTD had no business

26  relationship with Opsys in 2001. Thus, because plaintiff's complaint fails to plead all five of the elements of

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

5

1  fraud with Rule 9(b)'s requisite particularity, the fraud claim must be dismissed with respect to both

2  defendants.[2]

3

4  <u>CONCLUSION</u>

5       For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in

6  part.  Plaintiff is granted leave to amend its complaint for the purpose of alleging facts sufficient to establish

7  a fraud claim as to both defendants and establishing CDT's liability for breach of contract.  Plaintiff shall file

8  its amended complaint no later than twenty (20) days from the date of this order.

9       IT IS SO ORDERED.

10

11  Dated: April 21, 2005

12                                         /S/

13                                         MARILYN HALL PATEL
                                          District Judge
14                                         United States District Court
                                          Northern District of California
15

16

17

18

19

20

21

22

23

24

25

26

27

28

RJN 38

UNITED STATES DISTRICT COURT
For the Northern District of California

**ENDNOTES**

1.  All facts are taken from plaintiff's complaint, which is attached as Exhibit A to defendants' Notice of Removal, and from the documents incorporated by reference therein.

2.  Plaintiff argues for the first time in its opposition brief that both defendants acted fraudulently in seeking to assign the lease to Opsys US because they knew that Opsys US was insolvent at the time of the assignment. For purposes of the instant motion, the court need not address the merits of this allegation because it is absent from the complaint. However, plaintiff may include such allegations in an amended complaint if its able to do so in good faith.

RJN 39

Exhibits D-H to Request for Judicial Notice

# EXHIBIT D

1  STANLEY G. HILTON, BAR NO. 65990
2  LAW OFFICES OF STANLEY G. HILTON
   2570 NORTH FIRST ST., SUITE 200
3  SAN JOSE, CA 95131
   Tel: (415) 378 6142
4  Fax: (415) 474 2005
   Attorney for Plaintiff
5  SUNNYSIDE DEVELOPMENT CO., LLC

6
                    UNITED STATES DISTRICT COURT
7
                  NORTHERN DISTRICT OF CALIFORNIA
8

9                                        No. C 05-00553 MHP
10
   SUNNYSIDE DEVELOPMENT
11 COMPANY, LLC

12                              )    **FIRST AMENDED COMPLAINT FOR**
                                     **MONETARY DAMAGES**
13
           v.                   )    **JURY TRIAL DEMANDED**
14 Opsys Limited,  a United Kingdom Company,
   CDT LIMITED, A UK COMPANY,
15         Defendants.

16 _____
17 **FIRST CAUSE OF ACTION: BREACH OF CONTRACT (LEASE AGREEMENT)**

18     1 Plaintiff is a Limited Liability Company headquartered in Saratoga, CA and doing

19 business in California.

20     2. Defendant  Opsys Limited, a United Kingdom company,  is a British company

21 headquartered un England, which does business in California and has had offices in this district in

22 Fremont, CA. It is owned by defendant CDT, also a British company. Defendant signed a lease

23 agreement yielding to the personal jurisdiction of this court and thus agreed to be sued here.

24     3. **JURY TRIAL DEMANDED:** Plaintiff  DEMANDS A JURY TRIAL IN THIS

25 CASE.

26     6. **VENUE:** Venue is proper here because all actions occurred in Fremont, CA in this

27 court's jurisdiction.

28

_____

1       7. **JURISDICTION**: This court has diversity jurisdiction over this whole case as

2  defendants are domiciled in a different country than plaintiff, and plaintiff's damages demand

3  exceeds the jurisdictional minimum and is in fact over $ 10 million,

4  has supplemental jurisdiction of all the state torts herein, because they all arose out of the same

5  operative nucleus of facts as the federal claim. All defendants have "minimum contacts" in

6  California and in this county, as they do business here and have had offices and facilities in this

7  district, in Fremont, CA, during all times mentioned.

8       8. On or about February 15, 2001 plaintiff and defendant signed a single tenant lease

9  contract for seven years and three months (from May 1, 2001 through April 30, 2008, for rental of

10  space at 47375 Fremont Blvd., in Fremont, CA. Under the terms of this contract, defendant also

11  agreed to make certain capital improvements on the property, as consideration for the leased.

12  Defendant agreed to pay plaintiff a monthly base rent. The contract provides that defendant agreed

13  to be sued in this court and also provides that attorney fees and costs must be awarded to the

14  prevailing party in a lawsuit brought by plaintiff to enforce the lease, or for breach of contract

15  band fraud. As part of the terms and conditions of the lease, defendant agreed to pay all its bills to

16  all creditors and agreed not to allow a mechanics lien or other type of lien to be placed on the

17  property for its failure to pay money due creditors, and defendant also agreed that it would

18  conduct business in an environmentally safe manner complying with environmental laws of the

19  US and California and Alameda County. Defendant promised to maintain its premises in a clean

20  and environmentally-safe manner.    The agreement provided that if defendant defaulted or broke

21  the lease, and plaintiff sued and prevailed, plaintiff would be entitled to an award of attorney fees

22  and costs.

23       9. On or about May 1, 2001, the parties began performance on the lease. Defendant

24  moved into the premises and set up operations there, brought equipment and supplies and

25  personnel there, and proceeded to perform work in the high technology area.

26       10. Plaintiff performed all conditions under the lease contract and remained ready to

27  perform.

28

1    11. On or about November 2002, defendant materially breached the lease by refusing to

2   pay rent.  The last rent payment was received on or about October 2002.  Defendant further

3   breached the lease agreement in or about October 2002 by failing to pay its debts to certain

4   contractors, who placed five mechanics liens on the property for work they had done on the

5   property but been unpaid for by defendants. Defendant further materially breached the lease

6   contract by conducting operations in an environmentally unsafe manner, in violation of the laws,

7   including hazardous and improper dumping and disposal of chemicals and other hazardous

8   substances. Plaintiff avers that throughout the years  2001 and 2002, defendant CDT LIMITED, A

9   UK COMPANY ("CDT"), acted as  the alter ego of defendant Opsys Limited, a United Kingdom

10  Company ("Opsys Ltd"), vis-a-vis the lease contract that is the subject of this case,  in that CDT in

11  early 2001 entered unto *sub rosa* negotiations to purchase Opsys Ltd as a corporate acquisition,

12  and CDT was well aware of what Opsys Ltd intended to do vis-a-vis this lease with plaintiffs (i.e.,

13  walk away from the lease by fraudulent schemes and material breaches of contract) , and CDT

14  materially participated in, aided and abetted Opsys Ltd in its decision to materially breach the

15  lease contract with plaintiff. Indeed, plaintiff now possesses documents and has witnesses which

16  provide incontrovertible evidence that when CDT was involved  in negotiations to purchase

17  Opsys Ltd, in 2001 and 2002, one of the *SINE QUA NON* CONDITIONS which CDT created for

18  its  purchase of Opsys Ltd was that Opsys Ltd somehow get rid of its debt burdens owed to

19  plaintiff under this lease and that it somehow "terminate" said lease obligations.  Thus CDT not

20  only encouraged, but also DEMANDED, that Opsys Ltd materially breach its lease contract with

21  plaintiff, as a *sine qua non* for its acquiring Opsys Ltd.  Thus CDT acted as  not only an alter ego

22  of Opsys Ltd, but  also as an actual  co-conspirator who committed the tort of tortious interference

23  with contractual relations (viz., contractual relations between Opsys Ltd and plaintiff), and made

24  this material breach of contract by Opsys Ltd a *sine qua non* of its lucrative offer to purchase

25  Opsys Ltd.  The did occur, after Opsys Ltd breached its lkease contract with plaintiff.

26    12.    As a proximate result of the above acts of Defendants, plaintiff  has suffered loss

27  of approximately over $ 5 million in rental income, and has incurred further costs to pay off the

28

---

1 three liens on the property, and has incurred further costs and fines and penalties to remediate and

2 clean up the toxic contamination caused by defendant, and has incurred attorney fees and

3 litigation costs to bring this suit. The amount of damages in total exceeds $ 10 million. The

4 environmental contamination made it impossible for plaintiff to use or rent the property until

5 approximately September 2004,   and plaintiff has not been able to find a tenant yet. Plaintiff has

6 also been damaged in losing the net increased value of the property which should have accrued if

7 defendant had performed as promised and had made the capital improvements it had promised.

8     13. As a further proximate result of defendant's material breach of lease contract, plaintiff

9 has incurred attorney fees and costs to bring this action as well as other attorney fees and costs, to

10 try to persuade defendant to meet its obligations, in an amount according to proof.

11

12     WHEREFORE, plaintiff prays for judgment against defendants, and each of them, as

13 hereinafter set forth.

14                 **SECOND CAUSE OF ACTION**

15                     **(FRAUD)**

16     14. Plaintiff realleges and incorporates by reference, paragraphs 1 through 13 above, and

17 incorporates them herein by reference as if fully set forth herein.

18     15. On or about February 15, 2001, in Fremont, CA and also in Oxford, England,

19 defendants CDT and Opsys Ltd , by their officers and agents Gary Rhea (CFO Of Opsys) and

20 Michael Holmes (CEO of Opsys) and other officials of defendants,  made materially false

21 representations to plaintiff in order to induce plaintiff to lease the property to them. Defendants

22 OPSYS Ltd and CDT had SCIENTER, i.e. knowledge, of the falsify of their representations

23 which they made to plaintiff. CDT is liable for OPSYS Ltd's fraud also because such scienter

24 must be imputed to CDT under the "alter ego theory" as explained *supra. Ceteris parabus,* it must

25 be noted that CDT assumes all of the liabilities and assets of Opsys Ltd, including liability for

26 fraud as explained in this cause of action. These misrepresentations included, *inter alia, a* promise

27 that defendant would pay its rent every month for the entire period of the lease,  from May 1 2001

28

1　through April 30 2008. They also told plaintiff that defendant would make additions and capital

2　improvements to the property, during the lease period, to improve the value of the property, and

3　they promised not to violate any environment al laws and they promised not to incur any

4　mechanics liens on the property. *Defendants had scienter of the falsity of their representations*

5　*made to plaintiffs,* as is evinced, *inter alia,* by much evidence that defendants knew that at the

6　time they entered into the lease contract in or about February 2001, they had no intention of

7　making the improvements on the Fremont property promised, had no intention of cleaning up

8　hazardous chemicals and disposing of them properly, and had no intention of paying rent under its

9　lease obligations,   and intended all along to pawn off their debts under the lease on a straw man

10　subsidiary, "Opsys USA", which defendants intended to set up as a straw man *with no viability*

11　*whatsoever.* This fraudulent scheme was concocted both by CDT and Opsys Ltd solely for the

12　purpose of defrauding plaintiffs into signing the lease and allowing defendants to move into the

13　Fremont buildings, doing work there without paying rent, dumping hazardous and toxic chemicals

14　there, and then walking away from their lease obligations. In numerous meetings between

15　plaintiffs' official manager Frank Chiu and others,  and defendants' officials, including Gary Rhea

16　(CFO of defendants), in Fremont, CA, during the 6 months before the lease was entered into by

17　the parties, these fraudulent misrepresentations were made to plaintiffs by defendants and via their

18　official spokesman and agent, Rhea.  Also, other officials of defendants made such fraudulent

19　misrepresentations to plaintiffs.  In fact, defendants had a *sub rosa* scheme from the outset,

20　whereby they planned to use the Fremont building owned by plaintiff, dump many toxic chemicals

21　there without any intent to clean them up,  pawn off their lease rent obligations on a straw man

22　subsidiary, and walk away from the lease without paying rent (as part of this fraudulent scheme,

23　defendants intended to create a non-viable straw man "dummy shell" corporation ("Opsys USA"),

24　which they intended to sue as a mere ploy and conduit by which they intended to escape liability

25　under the lease (in addition to other ploys and gambits for escaping liability). The defendants thus

26　had scienter of the falsity of their representations to plaintiff, and the falsity of their

27　representations was unknown to plaintiff, who believed them to be true at the time plaintiff was

28

FIRST AMENDED COMPLAINT
SUNNYSIDE VS OPSYS, NO. C 05 553 MHP

5

**RJN 44**

1  induced to enter into the lease.

2      16. Plaintiff believed the representations of defendants described in the preceding

3  paragraph, and relied on them to its detriment, in that it entered into the lease agreement that is the

4  subject of this action. It suffered detriment.

5      17. As a proximate result of the above acts of Defendant, plaintiff has suffered loss of

6  approximately over $ 5 million in rental income, and has incurred further costs to pay off the five

7  mechanics liens on the property, and has incurred further costs and fines and penalties to

8  remediate and clean up the toxic contamination caused by defendant's dumping hazardous

9  chemicals on site.  The amount of damages in total exceeds $ 10 million. The environmental

10  contamination made it impossible for plaintiff to use or rent the property until approximately

11  September 2004,   and plaintiff has not been able to find a tenant yet. Plaintiff has also been

12  damaged in losing the net increased value of the property which should have accrued if defendant

13  had performed as promised and had made the capital improvements it had promised.

14      18. As a further proximate result of defendant's material breach of lease contract, plaintiff

15  has incurred attorney fees and costs to bring this action as well as other attorney fees and costs, to

16  try to persuade defendant to meet its obligations, in an amount according to proof.

17      19. The actions of defendant were malicious, outrageous, wanton and oppressive in

18  defrauding plaintiff, and plaintiff is entitled to an award of punitive damages of $ 25 million,

19  against defendant.

20

21      WHEREFORE, plaintiff prays for judgment against defendants, and each of them, as

22  hereinafter set forth.

23  **PRAYER FOR RELIEF**

24      WHEREFORE, plaintiff prays for judgment against the defendant as follows:

25      1.      For unpaid rent in an amount according to proof;

26      2.      For loss of value of the increased value of the property in an amount according to

27  proof ;

28

FIRST AMENDED COMPLAINT
SUNNYSIDE VS OPSYS, NO. C 05 553 MHP

1       3.     For costs of plaintiff having to pay off the three mechanics liens in an amount

2   according to proof;

3       4.     For costs of plaintiff having to pay money to remediate the toxic and

4   environmental damage done by plaintiff, and fines and penalties in an amount according to proof;

5       5.     For punitive damages of $ 25 million to punish defendants for its wrongful conduct

6   and set an example for others;

7       6.     For interest on the sum of damages awarded, calculated from May 1 , 2001 to the

8   date of judgment;

9       7.     For reasonable attorney's fees and litigation costs pursuant to the lease agreement;

10      8.     For costs of suit herein incurred; and

11      9.     For such other and further relief as this Court deems fair, just and equitable.

12

13  Dated: May 11, 2005

14

15                _____/S/_____

16                Stanley G. Hilton

17                Attorney for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E



1 | LAW OFFICES OF STANLEY G. HILTON
Stanley G. Hilton, SBN #65990
2 | 580 California Street, Suite 500
San Francisco, CA 94104
3 | Telephone:  (415) 378-6142
Fax: (650) 558-1231
4 |
Attorney for Plaintiff
5 | SUNNYSIDE DEVELOPMENT COMPANY, LLC

6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 |

11 | SUNNYSIDE DEVELOPMENT          )    Case No.: C-05-00553 MHP
COMPANY, LLC,                  )
12 |                                )    MEMORANDUM OF POINTS AND
          Plaintiff,             )    AUTHORITIES IN OPPOSITION TO
13 |                                )    MOTION TO DISMISS
          v.                     )
14 |                                )    Date:  July 18, 2005
OPSYS LIMITED, a United Kingdom )    Time:  2:00 p.m.
15 | Company, CDT LIMITED, a UK Company, )    Courtroom: 15, 18th Floor
                                   )
16 |       Defendants.             )    Honorable Marilyn Hall Patel
                                   )    United States District Judge
17 |                                )

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**RJN 48**

i

Memorandum in Opposition to Motion to Dismiss

## I. INTRODUCTION

In its second motion to dismiss the defendants make the rather bizarre contradictory claim in its first sentence of their points and authorities that "very little has changed from plaintiff's . . . initial complaint."

What the defendants fail to point out is that in the order of this court regarding the first motion to dismiss, the court denied the motion with respect to Opsys Limited, and granted the motion with respect to Cambridge Display Technology Limited ("CDT, Limited") in order

The court specifically stated that:

"Plaintiff now suggests that it will seek to hold CDT liable for breach of contract under an alter ego theory. However, because no such allegations appear on the face of the complaint, the court must dismiss plaintiff's breach of contract claim against CDT."

Is the defendant now suggesting that they don't know what we are talking about? It is simply the defendants seeking to run plaintiff around the block again with nothing new to complaint about and ignoring the fact that the First Amended Complaint has repaired the defects that the court identified in partially granting the prior motion to dismiss. The case must now go forward.

The prior order of this court was that an alter ego theory needed to be added to bring CDT Limited within the scope of the breach of contract cause of action and that scienter needed to be added to the fraud cause of action especially with respect to CDT.

The order also states in a footnote:

"Plaintiff argues for the first time in its opposition brief that both defendants acted fraudulently in seeking to assign the lease to Opsys US because they knew that Opsys US was insolvent at the time of the assignment. For purposes of the instant motion, the court need not address the merits of this allegation because it is absent from the complaint. However, plaintiff may include such allegations in an amended complaint if its able to do so in good faith."

That is exactly what plaintiff has done. The plaintiff has repaired all of the defects that the court identified in its order. The efforts of the defendant to claim that the complaint has not changed does not bear up under scrutiny.

In fact nothing in the motion to dismiss bears up under scrutiny, most especially the

**RJN 49**

Memorandum in Opposition to Motion to Dismiss

1    statement that the complaint must be dismissed again.  The prior order granted in part and denied

2    in part the prior motion.  The motion with respect to breach of contract against Opsys was denied

3    and therefore the breach of contract cause of action survives as to Opsys in any event.

4         But what must be acknowledged is that the breach of contract cause of action against

5    Opsys is the lynchpin on which all of the other causes of action hang.  There is a breach of contract

6    cause of action against CDT Limited because each was the alter ego of the other.  Of course, the

7    fraud cause of action was basically a conspiracy by both parties to defraud plaintiff because they

8    both had the crucial "scienter" the fore-knowledge that the scheme would breach the contract and

9    deprive (or defraud) plaintiff out of the monies owed.

10        As has been described before, defendants claim that plaintiff consented to the assignment

11   of the lease contract in question to another company.  The court has already found that the

12   assignment of the lease agreement was never completed and by its own terms plaintiff never

13   consented to it.

14        In fact, it is the attempt to manipulate such an assignment to plaintiff's detriment that is of

15   the essence of the fraud that was perpetrated by defendants against plaintiff.  Plaintiff was led to

16   believe that the Assignment of Lease and Consent of Lessor ("Assignment") that had been

17   negotiated would be completed and become effective.  Such Assignment never became effective.

18        The defendants have breached the original lease agreement and defrauded plaintiff by

19   contending that the conditions to assign the lease to a successor in interest would be met.  Such

20   conditions were never met and it is clear that the tender of such Assignment was merely a device

21   and subterfuge to avoid the defendants' liabilities under the contract.  That was the fraud.  And

22   since both parties knew of the dishonesty and misrepresentation and its likely effect to cheat

23   plaintiff, that is the scienter.  The fraud cause of action rests precisely on that point.

24        Plaintiff Sunnyside Development Company needs to do discovery to determine the extent

25   to which the defendants are jointly and severably liable.  It is only the ultimate facts that need to be

26   plead at this stage, and plaintiff has done it.

27        Modern federal rules of pleading allow a complaint to stand if it can prevail on any theory

28   assuming the facts pled are true.  The plaintiff in this action has plainly met that burden and the

**RJN 50**

Memorandum in Opposition to Motion to Dismiss

1   motion for dismissal must be rejected. Equally the contention of a motion for summary judgment

2   is inapplicable and defendants should be required to answer the complaint.

3      If this Court finds any defects in the complaint, plaintiff requests leave to amend the

4   complaint to cure those defects.

5      If this Court converts this motion into a motion for summary judgment under Federal Rules

6   of Civil Procedure, Rule 56, plaintiff invokes Rule 56(f) and hereby requests at least six months to

7   conduct the necessary discovery to oppose a summary judgment motion consistent with the

8   discovery plan in the declaration of Stanley Hilton attached hereto.

9                   II. STATEMENT OF FACTS

10      This is a suit that involves the redress of a very direct breach of contract and fraud.

11      In 2001, the defendant Opsys Limited executed a lease agreement with plaintiff for the

12   premises known as 47375 Fremont Boulevard in Fremont California.

13      As the property manager for Sunnyside Development Company, Frank Chui was the

14   representative of the plaintiff during all of the events described in this lawsuit from on or about

15   March 2002, through the present. As such he was involved in all of the negotiations and

16   agreements that have passed between the parties in this action.

17      Defendants' motion to dismiss this action relies upon what they call a "novation

18   agreement" which settled all claims between Sunnyside Development Company and defendants

19   Opsys Limited, and CDT Limited. This "novation agreement" never became effective because

20   defendants never satisfied the three conditions stated in paragraph 6 of the novation agreement for

21   it to become effective. This "novation agreement" was the "Assignment of Lease and Consent of

22   Lessor" ("Assignment") attached as exhibit C to the Request for Judicial Notice of defendants.

23      By its own terms this Assignment never became effective. Paragraph 6 of said Assignment

24   placed four conditions upon the consent of Lessor, Sunnyside Development Company. Those

25   conditions were never met and as such plaintiff Sunnyside Development Company never

26   consented to the assignment.

27      The first condition that was never met was that a document entitled Amendment No. 2 to

28   Lease would be executed and incorporated into the Assignment. Amendment No. 2 to Lease was

**RJN 51**

Memorandum in Opposition to Motion to Dismiss

1 never executed and was never signed by any representative of Opsys Limited or by Sunnyside.

2 Indeed the copy in the defendants' Request for Judicial Notice is not signed. Therefore,

3 defendants cannot claim that the document was executed by their own admission.

4     Furthermore, a signed copy of Amendment No. 2 to Lease was never received by plaintiff

5 Sunnyside Development Company or Sunnyside's attorney James Bow. Also, Sunnyside

6 Development Company never signed it because defendants never signed it. Although it was the

7 subject of extensive negotiation between the parties, it was never executed by either party.

8     The second condition was that a letter of credit that would have become a portion of the

9 security deposit be deposited by Assignee Opsys US with Lessor Sunnyside Development

10 Company. This letter of credit by the terms of Amendment No. 2 to Lease would have increased

11 the letter of credit portion of the Security Deposit to $750,000 and the total security deposit to $1

12 million. Such letter of credit was never received by Sunnyside Development Company.

13     The third condition was that a pollution liability insurance policy be procured by Lessee

14 (defendants) and delivered to Lessor (Sunnyside Development Company). Such a pollution

15 liability insurance policy by the terms of Amendment No. 2 to Lease would have maintained at all

16 times $1 million of coverage with a deductible of no more than $10,000 covering injury, property

17 damage and cleanup costs associated with any hazardous substance pollution. Such pollution

18 liability insurance policy was never obtained or delivered to plaintiff Sunnyside Development

19 Company.

20     Therefore, of the three conditions placed on Lessee (Opsys Limited) for Lessor Sunnyside

21 Development Company's consent, none of those conditions were met and Sunnyside never

22 consented to the Assignment by its own terms.

23     The Assignment (also called the novation agreement) was executed by the parties in

24 October, 2002, on a date that is illegible on the defendants' copy. That Assignment by its terms

25 would have become effective on the date when all of the above conditions in paragraph 6 of the

26 Assignment were satisfied. Also by its terms, if the above conditions were not satisfied within 90

27 days of the date it was executed the assignment would be "null and void and of no force and effect

28 whatsoever." Therefore, the assignment was null and void and never became effect because the

**RJN 52**

4

1  conditions were never met.

2      At least one mechanic's lien was filed against Opsys and the property because defendant

3  failed to pay its bills prior to the execution of the assignment and three mechanic's liens were filed

4  after it was executed on December 4, 2002, December 10, 2002 and December 16, 2002. Each of

5  these liens was a violation of the original lease and if plaintiff Sunnyside Development Company

6  had known of them would never have considered consenting to the Assignment. Sunnyside

7  Development Company did not know of these liens at the time it signed the Assignment.

8      Prior to and during the period when the Assignment was being negotiated and executed,

9  hazardous materials that contaminated the property were not being processed and disposed of

10  properly by defendant Opsys Limited. This was a violation of the original lease terms and if

11  plaintiff Sunnyside Development Company had known of this breach of the lease, as well as

12  federal, state, and local environmental laws, it would never have consented to the Assignment.

13      In addition, the rent for December 2002 was not paid by Opsys Limited to Sunnyside

14  Development Company and no rent has been paid since that time. Under the terms of the original

15  lease and the fact that plaintiff Sunnyside Development Company never consented to the

16  Assignment, defendant Opsys Limited is obligated to pay rent and has not done so. As such,

17  defendant Opsys Limited was in breach of the lease. Therefore, the Assignment is invalid for that

18  reason also.

19      On May 8, 2003, the City of Fremont posted a Notice of Violation & Order to Comply for

20  creating a condition dangerous to human health, property and the environment and failure to

21  submit a Hazardous Health Business Plan. (Exhibit A to the Declaration of Frank Chiu.)

22      Defendants Opsys Limited and CDT Limited have persistently ignored this Notice of

23  Violation and as a result plaintiff Sunnyside Development Company has incurred extensive

24  expenses and other damages associated with addressing the dangerous condition.

25      On May 5, 2003, the United States Bankruptcy Court issued a restraining order to prevent

26  the removal of equipment or the transferring of any intellectual property from the premises.

27  (Exhibit B to the Declaration of Frank Chiu.)

28      Defendants Opsys Limited and CDT Limited have ignored this Temporary Restraining

RJN 53

Memorandum in Opposition to Motion to Dismiss

1   Order which has subjected plaintiff Sunnyside Development Company to further damages.

2   Defendant Opsys Limited continued to dismantle and remove the equipment on the

3   premises and in doing so destroyed a wall. This destruction led to further contamination in

4   violation of environmental regulations regarding Hazard Substances. It was later discovered that

5   personnel employed by Opsys Limited to remove said equipment were not trained in dealing with

6   hazardous material in further violation of the environmental regulations.

7   The actions of defendants were fraudulent because an agent for defendants, Gary Rhea,

8   provided false financial statements to Lessor Sunnyside Development Company on two separate

9   occasions. These false financial statements had the effect of misleading Sunnyside as to the

10  condition and intentions of defendants to avoid their responsibilities under the lease and further

11  damage Sunnyside by failing to perform their obligations under the lease. If plaintiff had known

12  the true financial condition of defendants, plaintiff would have had a warning to protect itself from

13  the damage that was caused by the failure to perform under the lease.

14  The actions of defendants were fraudulent because by seeking an Assignment under the

15  Lease they were misleading plaintiff as to the nature of their abandonment of the property. The

16  only purpose for the Assignment of the Lease was to mislead plaintiff as to the nature of the

17  defendants' departure from the property. Plaintiff Sunnyside Development Company relied on the

18  representations made in the Assignment of Lease and Consent of Lessor, and the Amendment

19  No. 2, to Lease to its detriment.

20  On November 1, 2002, counsel for plaintiff Sunnyside Development Company, James

21  Bow, wrote to Gary Rhea of Opsys US corporation, drawing his attention to the fact that the

22  pollution liability insurance policy was unsatisfactory and that the Amendment No. 2 to Lease had

23  not been signed. (Exhibit C to the Declaration of Frank Chiu.)

24  On December 16, 2002, and again on January 10, 2003, plaintiff's representative wrote to

25  Opsys Limited in care of the premises notifying defendant that it was in default of the lease for

26  nonpayment of rent. Both letters reminded defendant Opsys Limited that the Assignment of the

27  lease had not taken effect. (Exhibit D to the Declaration of Frank Chiu.)

28  On December 17, 2002, counsel for plaintiff Sunnyside Development Company, James

**RJN 54**

6

1  Bow, wrote to Opsys Limited at the premises informing it that plaintiff had been informed of the

2  existence of a lawsuit to enforce a mechanic's lien and that such mechanic's lien constituted a

3  violation of the lease and that defendant Opsys Limited would be deemed in breach of the lease.

4  (Exhibit E to the Declaration of Frank Chiu.)

5      On May 30, 2003, counsel for plaintiff Sunnyside Development Company, James Bow,

6  wrote to Frank Chiu attaching his communication with representatives of Opsys Limited

7  discussing revisions to the Amendment No. 2 to Lease and the requirements for the pollution

8  policy.  This letter and its attachments document the fact that the pollution insurance policy or the

9  execution of the Amendment No. 2 to Lease was never received by him.  (Exhibit F to the

10  Declaration of Frank Chiu.)

11      At the time defendant Opsys Limited persuaded plaintiff Sunnyside Development

12  Company to sign the Assignment, defendant Opsys defrauded plaintiff because it used Opsys US

13  as a strawman for the purpose of getting out of the lease and never paying plaintiff the rent that

14  was due and payable.  Opsys US was intended by Opsys Limited to go bankrupt and to default on

15  all of its obligations to plaintiff and other creditors and was never a viable entity by design.

16  Defendant Opsys concealed this fact from plaintiff during the assignment negotiations and falsely

17  told plaintiff that Opsys US was a viable company and would pay its bills and have a great

18  financial future.

19      When it became clear that Opsys Limited and CDT Limited has had defrauded plaintiff,

20  plaintiff brought the present lawsuit.

21                      III.  ARGUMENT

22      A.      Standard of Review

23      All of the principles of modern pleading support the idea that plaintiff must be allowed to

24  plead its case with the widest latitude, with the benefit of all doubts and all contentions or

25  ambiguities resolved in its favor

26      Courts view Federal Rules of Civil Procedure, Rule 12(b)(6) motions with disfavor

27  because of the role pleadings play in federal practice, the liberal policy toward amendment of the

28  pleadings and the right of a plaintiff to present his case on any theory that has a chance of success.

**RJN 55**

1  "The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."

2  Gilligan v. Jamco Development Corp. 108 F.3d 246, 249 (9th Cir., 1997).  See also, Colaprico v.

3  Sun Microsystems, Inc. 758 F.Supp. 1335, 1339, (N.D., 1991).

4       Similarly, this jurisdiction has held that a dismissal under Rule 12(b)(6) is proper only in

5  extraordinary circumstances.  United States v. Redwood City 640 F2d 963, 966 (9th Cir., 1981).

6       For our purposes here the case of Bennett v. Schmidt 153 F.3d 516 is even more

7  instructive.  The court in Bennett, at 518, said:

8           "Instead of lavishing attention on the complaint until the plaintiff
            gets it just right, a district court should keep the case moving – if the
9           claim is unclear, by requiring a more definite statement under Rule
            12(e), and if the claim is clear but implausible, by inviting a motion
10          for summary judgment."

11      In addition, it has long been held that the complaint must be construed in the light most

12  favorable to plaintiff.  Any doubt as to whether a claim is valid is resolved in favor of plaintiff.

13  (Parks School of Business, Inc. v. Symington 51 F.3d 1480, 1484 (9th Cir., 1995).)  On the same

14  point the United States Supreme Court, in Conley v. Gibson 355 U.S. 41, 45-46, 78 S.Ct. 99, 102

15  (1957), has said:

16          "A complaint should not be dismissed for failure to state a claim
            unless it appears beyond a doubt that the plaintiff can prove no set of
17          facts in support of his claim which would entitle him to relief."

18

19      The question of plaintiff's ability to prove his allegations is not at issue in a motion for

20  dismissal under Rule 12(b)(6).  For example, in citing a US Supreme Court case, the court in

21  Nami v. Fauver 82 F.3d 63, 65 (3rd Cir., 1996) said:

22          "We must determine whether, under any reasonable reading of the
            pleadings, the plaintiffs may be entitled to relief, and we must accept
23          as true the factual allegations in the complaint and all reasonable
            inferences that can be drawn therefrom. [citation omitted]  The
24          complaint will be deemed to have alleged sufficient facts if it
            adequately put the defendants on notice of the essential elements of
25          the plaintiffs' cause of action. Since this is a Section(s) 1983 action,
            the plaintiffs are entitled to relief if their complaint sufficiently
26          alleges deprivation of any right secured by the Constitution. Id. In
            considering a Rule 12(b)(6) motion, we do not inquire whether the
27          plaintiffs will ultimately prevail, only whether they are entitled to
            offer evidence to support their claims. Scheuer v. Rhodes, 416 U.S.
28          232, 236 (1974)."

                                                                    RJN 56

                                          8

1    With respect to the issue that the court must accept as true all material allegations in the

2    complaint, as well as reasonable inferences to be drawn from them, even if they are unlikely, see

3    also, Pareto v. F.D.I.C. 139 F.3d 696, 699 (9th Cir., 1998).

4    The point here is that the standard that defendant must reach to dismiss the claims for

5    failure to state a cause of action are very high.  Defendants have clearly failed to meet its burden as

6    we will demonstrate below.

7    B.    Dismissal Must Be Based on Face of Complaint

8    Ordinarily a Rule 12(b)96) motion cannot be used to raise an affirmative defense.

9    Complaints need not contain any information about defenses and may not be dismissed for that

10    omission.  Xechem, Inc. V. Bristol-Myers Squibb Co. (7th Cir. 2004) 372 F.3d 899, 901.

11    In this case defendant have reached out to amendments that it claims were added to the

12    lease agreement.  The plaintiff disputes those claims.  The Assignment of Lease and Consent of

13    Lessor was never consented to by its own terms.  The Assignment depended upon the completion

14    of a document called Amendment No. 2 to Lease that was never executed.

15    A defense to a complaint that would make the complaint subject to a motion to dismiss

16    must be absolute because any conditional defense calls into the question the truth of the allegations

17    and the allegations must be taken as true to the benefit of plaintiff for the purposes of a motion to

18    dismiss under a Rule 12(b)(6) motion.  Where the defense disclosed in the complaint is

19    conditional rather than absolute, a Rule 12(b)(6) motion to dismiss should be denied.

20    (McCalden v. California Library Ass'n (9th Cir. 1990) 955 F.2d 1214, 1219.)

21    It is not up to plaintiff to prove its case.  It is only necessary to show that if the allegations

22    were proven, it would have a case that was legally sufficient.  That is clearly present here.  The

23    facts and the allegations of fraudulent motive are clearly stated in the complaint.

24    Unless the court converts the Rule 12(b)(6) motion into a summary judgment motion or the

25    defense is apparent from matters of which the court may take judicial notice, the court cannot

26    consider material outside the complaint.  Consideration of declarations or extraneous documents

27    should not be considered as bearing on a motion to dismiss under Rule 12(b)(6) because the

28    allegations of plaintiff are only being tested for their legal sufficiency and all contentions of

**RJN 57**

9

1  plaintiff are taken as true.  (Arpin v. Santa Clara Valley Transp. Agency (9th Cir. 2001) 261 F.3d

2  912, 925.)

3        When a complaint's allegations are capable of more than one inference, the court must

4  adopt whichever inference supports a valid claim.  Columbia Natural Resources, Inc. v. Tatum (6th

5  Cir. 1995) 58 F.3d 1101, 1109.  In this case, defendants seek to establish an inference that an

6  assignment that was never consented to should be taken as having voided and superceded the

7  contract.  This is a highly disputed inference and cannot form the basis for a motion to dismiss.

8        The attempts by defendants to seek a de facto summary judgment if the court finds crucial

9  documents extrinsic is completely inappropriate.  The plaintiff must be granted time to conduct

10  discovery as to the validity of certain documents as well as many other points.  The documents in

11  question are highly disputed and should be the subject of extensive discovery.

12        C.    Alter Ego Allegations Support Breach of Contract

13        Plaintiff is informed and believes that CDT Limited and Opsys Limited are the alter egos

14  of each other.  Opsys Limited may have acted as the agent of CDT Limited in shedding its

15  liabilities and debt as part of the plan to merge the assets of Opsys Limited into CDT Limited and

16  obtain the assets only.  Thus, CDT broke the lease contract with plaintiff and ended up with the

17  assets of Opsys while avoiding the obligations of Opsys Limited contract with plaintiff to the

18  detriment of plaintiff.

19        When a multiplicity of factors clearly support disregard of the corporate fiction on the

20  grounds of equity and fairness, courts have been willing to apply the "alter ego" or instrumentality

21  theory in order to cast aside the corporate shield and to fasten liability.  See, Holley v. Crank,

22  386 F.3d 1248 (9th Cir. 2004).  That is certainly the case here where the alter ego has been

23  propagated to assist in the breach of contract.

24        Similarly, it has been held that the very fact that the corporation was very thinly capitalized

25  is a relevant factor in applying an alter ego theory. See, Anderson v. Abbott, 321 U.S. 349, 362, 64

26  S.Ct. 531, 88 L.Ed. 793 (1944).

27        In the instant case it is certainly the case that CDT Limited was breaching the contract

28  along with Opsys, but as it was the one with the assets using the Opsys as its alter ego, CDT

**RJN 58**

10

1 Limited must be included in the cause of action in order to redress the injury suffered by plaintiff.

2 Another lien against a bankrupt entity will avail plaintiff nothing.

3        Plaintiff needs to do discovery to lift the corporate veil and find out where the assets of the

4 entity that broke its contract with plaintiff ended up.   It is also clear what Peter Howell's role was

5 in it, the contentions of counter-defendant notwithstanding.

6        D.        Allegations Support Fraud Cause of Action

7        Defendants' claims that the allegations of fraud lack specificity must be regarded at this

8 point. The prior insufficiency that the court identified was an absence of scienter. The plaintiff

9 has certainly pled scienter at this point. In the court's order the court specifically granted leave to

10 plead that both defendants acted fraudulently in seeking to assign the lease to Opsys US because

11 they knew that Opsys US was insolvent at the time of the assignment. That is of the essence.

12 Both defendants knew that Opsys US was bankrupt and that was the essence of the fraud.

13        The court then stated that plaintiff may include such allegations in an amended complaint

14 if it is able to do so in good faith. That is exactly what plaintiff has done.

15        As we have described, defendants' agents and representative offered plaintiff false

16 financial statements, misrepresented defendants' financial solvency, not to mention concealing the

17 motive and intentions with regard to the breach of the lease. Defendants ignored the temporary

18 restraining order with respect to the premises and ignored a Notice of Violation with respect to

19 violation of environmental regulations.  In addition, defendants failed to report to plaintiff

20 mechanics liens against the property in violation of the lease. Most importantly defendants's

21 fraudulent intention cannot be more clear when they concealed from plaintiff the transfer of

22 substantial assets from Opsys Limited to CDT in violation of lease

23        All of these actions taken together indicate that both defendants knew of and actively

24 participated in the fraud against plaintiff.

25        In the alternative, plaintiff requests leave of court to amend the complaint in order to

26 describe in detail the identities of defendants' agents, employees, and officers who made false

27 statements to plaintiff which constitute fraud, detailed verbatim renditions of the actual

28 misrepresentations uttered by defendants' agents and specific dates and locations where the

**RJN 59**

Memorandum in Opposition to Motion to Dismiss

1   fraudulent statements were made.

2       Federal Rule of Civil Procedure, Rule 15 requires the court to adopt a very liberal policy

3   toward giving a plaintiff leave to amend the complaint at least once.

4       E.    Plaintiff Objects to Review as Summary Judgment

5       Defendants again state that if the court considers some of the documents extrinsic, then

6   they would be review by the court under the standard for summary judgment.  This is preposterous

7   and a severe attack on plaintiff's right to do discovery and have its chance to prove its case.  There

8   are severe limitations to the type of documents that may be attached to a motion to dismiss under

9   Rule 12(b)(6).  Documents that are quoted in part by the complaint or are referred to in the

10  complaint but not included may be used in a Rule 12(b)(6) motion if no party questions the

11  authenticity of the document. See Branch v. Tunnell (9th Cir. 1994) 14 F.3d 449, 454, and In re

12  Stac Electronics Securities Litig. (9th Cir. 1996) 89 F.3d 1399, 1405.).

13      On the other hand, where the complaint alleges a contract the court may not consider

14  documents that are not indisputably the basis for the alleged contract.  (BJC Health System v.

15  Columbia Cas. Co. (8th Cir. 2003) 348 F.3d 685, 687.)  Of course, the assignment of the lease,

16  which is highly disputed and never became effective on its face because it was not consented to by

17  plaintiff, cannot now be brought in as the basis for a motion to dismiss.  The assignment of the

18  lease goes to the nature of the fraud not the nature of the contract.  Seeking a dismissal based on

19  such disputed documents is clearly preposterous and well outside the scope of what can

20  legitimately become a part of a motion to dismiss under Rule 12(b)(6).

21      At this stage in the proceedings any ambiguity in the documents must be resolved in

22  plaintiff's favor.  International Audiotext Network, Inc. v. AT&T Co. (2nd Cir. 1995) 62 F.3d 69,

23  72.  The documents replied upon by defendants in this case are highly disputed as to their validity

24  and import.  That those documents should be considered by the court under the premise that they

25  are a part of the contract is both preposterous and unfounded.

26      It is true that judicial notice may be taken of official records and reports.  MGIC Indem.

27  Corp. v. Weisman (9th Cir. 1986) 803 F.2d 500, 504.  However, contested assignments and

28  amendments to a lease that were never executed or consented to, and never became effective are

**RJN 60**

Memorandum in Opposition to Motion to Dismiss

1  not "official records" in that sense.

2  It is clear that defendants' motion to dismiss attempts to carve out some special ground

3  half way between a motion to dismiss and a summary judgment where defendants get the

4  advantages of a motion to dismiss without the burden of proof in a summary judgment and without

5  plaintiff having a chance to propound the discovery that would be necessary and to which the

6  plaintiff is entitled.  When a motion to dismiss is converted to a motion for summary judgment by

7  reference to extrinsic evidence, summary judgment requirements apply and the opposing party

8  must be provided a reasonable opportunity to present material relevant to a Rule 56 motion.

9  (Cunningham v. Rothery (9th Cir. 1998) 143 F.3d 546, 549.)

10  Implicit in the opportunity to respond to summary judgment is the requirement that

11  sufficient time be afforded for discovery purposes to develop facts essential to justify a party's

12  opposition to the motion.  (Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan (9th

13  Cir. 1981) 662 F.2d 641, 645.)

14  Again, it is of the essence that plaintiff needs to do discovery to lift the corporate veil and

15  find out where the assets of the entity that broke its contract with plaintiff ended up.  This is

16  inappropriate under the standards for motion to dismiss, and plaintiff must have a chance to do

17  discovery.

18  IV.  CONCLUSION

19  Therefore, the overwhelming conclusion is that the plaintiff has stated facts sufficient to

20  meet the threshold of pleading for claims of breach of contract and fraud.  A motion to dismiss

21  under Rule 12(b)(6) cannot be based on documents outside the face of the complaint that are

22  highly disputed as to their validity, relevance and meaning.  A motion for summary judgment

23  would be highly inappropriate as defendants have not answered and plaintiff must be granted time,

24  at the very least to conduct discovery as to the facts.

25  The motion for dismissal should be rejected by this court and the defendants should be

26  required to answer the complaint.

27  DATED: June 27 , 2005          LAW OFFICES OF STANLEY G. HILTON

28  By_____/s/_____
                    Stanley G. Hilton, Attorney for Plaintiff

**RJN 61**

Memorandum in Opposition to Motion to Dismiss

# EXHIBIT F

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUNNYSIDE DEVELOPMENT
COMPANY, LLC,

              Plaintiff,

     v.

OPSYS LIMITED and CDT LIMITED,

              Defendants.

_____/

No. C 05-0553 MHP

**MEMORANDUM & ORDER**
**Re: Defendants' Motion to Dismiss**

    On December 14, 2004, plaintiff Sunnyside Development Company, LLC filed this action for breach of contract and fraud in state court, naming Opsys Limited and CDT Limited as defendants. That action was subsequently removed to this court, and defendants now move for partial dismissal of plaintiff's first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND[1]

    Plaintiff Sunnyside Development Company is the lessor of a commercial property located at 47375 Fremont Boulevard in Fremont, California. On February 15, 2001, plaintiff agreed to lease commercial space at the Fremont Boulevard property to defendant Opsys Limited, with the lease term running from May 1, 2001 through April 30, 2008. Pursuant to the conditions of the lease

1   agreement, Opsys Limited agreed to pay plaintiff a monthly base rent, to make certain capital

2   improvements, and to conduct its business in an environmentally safe manner.

3         Opsys Limited continued to make rental payments to plaintiff until October 2002. At that

4   time, defendant CDT Limited ("CDT") acquired control of Opsys' British business, Opsys UK

5   Limited ("Opsys UK"). As part of the corporate reorganization accompanying that transaction,

6   plaintiff, Opsys Limited, and Opsys' United States subsidiary, Opsys US, signed a novation

7   agreement that purportedly assigned Opsys Limited's rights and obligations under the lease to Opsys

8   US. Under the terms of paragraph six of the novation agreement, the assignment was subject to a

9   number of conditions precedent, including a provision requiring that both parties execute a second

10  amendment to the lease.

11        Plaintiff received no rental payments after October 2002, and Opsys US was forced into

12  involuntary bankruptcy by four of its creditors in May 2003. On December 14, 2004, plaintiff filed

13  this action in the Superior Court for Alameda County, pleading causes of action for breach of

14  contract and fraud under California law. That action was subsequently removed to this court, and on

15  February 28, 2005, defendants moved to dismiss plaintiff's complaint pursuant to Federal Rule of

16  Civil Procedure 12(b)(6), arguing that plaintiff had failed to state a claim under either of the asserted

17  causes of action. With respect to plaintiff's breach of contract claims, defendants argued that CDT

18  was never a party to the Fremont Boulevard lease and that Opsys Limited had been released from its

19  obligations under the lease agreement by the October 2002 novation agreement. As for plaintiff's

20  fraud claim, defendants argued that plaintiff had failed to plead the elements of fraud with

21  particularity, as is required by Federal Rule of Civil Procedure 9(b).

22        On April 22, 2005, the court issued an order granting defendants' motion in part and denying

23  it in part. Specifically, the court agreed with defendants that plaintiff's complaint fails to allege that

24  CDT had ever been a party to the lease agreement, thus warranting dismissal of the breach of

25  contract claim against CDT. The court also dismissed the fraud claims against both defendants on

26  the ground that plaintiff had failed to satisfy the pleadings requirements of Rule 9(b). However, in

27  considering the breach of contract claim against Opsys Limited, the court rejected defendants'

28

2

1   argument that the terms of the novation agreement warranted granting their motion to dismiss.

2   Specifically, the court concluded that because defendants had failed to submit a signed copy of the

3   second amendment to the lease, it could not be determined from the face of the pleadings whether all

4   of the conditions precedent to releasing Opsys Limited from liability for failure to comply with the

5   conditions of the lease had been fulfilled.[2]  Thus, drawing all reasonable inferences in favor of the

6   nonmoving party, the court held that plaintiff had stated a claim for breach of contract against Opsys

7   Limited.

8          On May 11, 2005, plaintiff filed an amended complaint, having been granted leave to do so

9   for the purpose of curing the deficiencies in the December 2004 complaint that the court had

10  identified in its April 2005 order.  In the amended complaint, plaintiff again pleads causes of action

11  for breach of contract and fraud against both defendants.  However, in contrast to plaintiff's prior

12  pleadings, the amended complaint now alleges that Opsys Limited acted as the alter ego of CDT in

13  entering into and breaching the lease agreement, thereby entitling plaintiff to recover damages for

14  breach of contract from CDT as well as from Opsys.  As for plaintiff's fraud claims, the gravamen of

15  those claims continues to lay, as it did in the initial complaint, in plaintiff's theory that Opsys

16  Limited induced plaintiff to enter into the February 2001 lease agreement without ever having any

17  intention to perform its obligations as lessee of the Fremont Boulevard property, although plaintiff

18  now seeks to overcome the hurdle posed by Rule 9(b)'s particularity requirement by identifying

19  several of Opsys Limited's officers as the source of the actionable misrepresentations that defendants

20  allegedly made.

21         On May 31, 2005, defendants moved for partial dismissal of the amended complaint, arguing

22  that plaintiff had again failed to state a claim for breach of contract against CDT or to plead

23  adequately the required element fraud against either defendant.  The following memorandum and

24  order addresses those arguments.

25

26

27

28

3

1  LEGAL STANDARD

2      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

3  sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Unless it appears

4  beyond doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her

5  to relief, a motion to dismiss must be denied. Lewis v. Telephone Employees Credit Union, 87 F.3d

6  1537, 1545 (9th Cir. 1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

7  When assessing the legal sufficiency of a plaintiff's claims, the court must accept as true all material

8  allegations of the complaint, and all reasonable inferences must be drawn in favor of the non-moving

9  party. See Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996) (citations omitted).

10  Dismissal is proper under Rule 12(b)(6) "only where there is no cognizable legal theory or an

11  absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732

12  (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)).

13

14  DISCUSSION

15  I.    Breach of Contract (Against CDT)

16      Defendants first move to dismiss plaintiff's breach of contract claim against CDT. While

17  plaintiff concedes that CDT is not a party to the lease agreement that is the subject of its breach of

18  contract claims, it nevertheless asserts that Opsys Limited acted as CDT's alter ego in entering into

19  and subsequently breaching the lease. Thus, according to plaintiff, the court should pierce CDT's

20  corporate veil and hold it liable for Opsys Limited's failure to perform its contractual duties.

21      As an initial matter, the court notes that although neither party has addressed the issue of

22  choice of law, CDT is incorporated in the United Kingdom. As there is no relevant contractual

23  choice of law provision, the choice of law issue turns on whether the law of the forum state or the

24  law of CDT's place of incorporation should govern the alter-ego inquiry. In this diversity action, the

25  answer to that question must be determined based on California choice of law rules. See Klaxon Co.

26  Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).

27

28

4

**RJN 65**

1    In Schlumberger Logelco, Inc. v. Morgan Equipment Co., No. C 94-1776 MHP, 1996 WL

2    251951 (N.D. Cal. May 3, 1996) (Patel, J.), this court considered a similar issue arising from a

3    plaintiff's attempt to hold an Austrian corporation liable for breach of contract and various torts

4    under an alter-ego theory. See id. at *1, *3. Applying the "governmental interest" analysis that

5    California courts employ in adjudicating choice of law issues, see In re Yagman, 796 F.2d 1165,

6    1170 (9th Cir. 1986), amended on denial of reh'g, 803 F.2d 1085 (9th Cir. 1986), cert. denied, 484

7    U.S. 963 (1987), the court observed that Austria, as the state of incorporation, had "a substantial

8    interest in determining whether to pierce the corporate veil of one of its corporations."

9    Schlumberger, 1996 WL 251951, at *3. The court therefore concluded that Austrian law supplied

10   the rules of decision for determining whether to hold the defendant corporation liable under an alter-

11   ego theory. Id. at *4.

12        In the absence of any attempt by either party to brief the choice of law issue, the court sees no

13   reason to depart from the analysis set forth in the Schlumberger case. Thus, applying that analysis in

14   the case at bar, the court must look to British corporations law for the purpose of determining

15   whether plaintiff has alleged facts that support piercing CDT's corporate veil.[3] In essence, the theory

16   of alter-ego liability set forth in the amended complaint turns on allegations that defendants entered

17   into secret negotiations in early 2001, pursuant to which CDT sought to acquire Opsys Limited's

18   British operations and to divest itself of any liability associated with the target company's American

19   business, including Opsys' contractual liability to plaintiff. According to plaintiff, the allegations

20   concerning this collaboration, which it alternatively characterizes as a conspiracy to breach the lease

21   agreement,[4] are sufficient to permit a finding that Opsys Limited acted as CDT's alter-ego in its

22   dealings with plaintiff.

23        The court finds this argument unavailing. Certainly, the corporations law of the United

24   Kingdom recognizes circumstances where a corporate subsidiary can be considered the alter ego of

25   its parent corporation. See Palmers Company Law § 2.1519 ¶ 11 (2004) (observing that "there are

26   many cases in which the distinction between parent and subsidiary company has been ignored by the

27   court"). It nevertheless remains true that piercing the corporate veil under British law generally

28

5

1   requires that the parent exercise a significant degree of control over the subsidiary, going beyond

2   mere formal ownership and coordination of corporate strategies and extending to the direct

3   supervision of the subsidiary's day-to-day business activities. See, e.g., Adams v. Cape Indus., Plc.,

4   [1990] Ch. 433 (holding that facts establishing a disregard for corporate formalities among members

5   of an integrated mining group and the parent's strategic supervision of the subsidiary in question

6   were not sufficient to pierce the parent's corporate veil under an alter-ego theory). In any event,

7   plaintiff does not allege that the parent-subsidiary relationship in question even existed at the time

8   that it entered into the lease agreement with Opsys Limited, much less that the relationship was one

9   in which the parent controlled the affairs of the subsidiary to such an extent as would justify piercing

10   CDT's corporate veil. In fact, the court is unaware of any authority, in British law or otherwise, that

11   would permit it to pierce the veil of an acquiring corporation based on the facts alleged in the

12   amended complaint, and plaintiff has done nothing to assist the court in identifying any authority that

13   so holds. For that reason, the court must conclude that the allegations in plaintiff's amended

14   complaint do not support holding CDT liable for the breach of contract under an alter-ego theory.

15        This alone is sufficient to justify dismissal of plaintiff's breach of contract claim against

16   CDT. In addition, defendants correctly point out that plaintiff's alter-ego theory is premised upon

17   allegations of fraudulent conduct. As the Ninth Circuit observed in Vess v. Ciba-Geigy Corp. USA,

18   317 F.3d 1097 (9th Cir. 2003), such allegations are deemed to "sound in fraud" even if they are

19   pleaded in support of a cause of action in which fraud is not a required element. See id. at 1103-04.

20   Consequently, a plaintiff alleging a fraudulent course of conduct to support such a claim must satisfy

21   the heightened pleading standard of Federal Rule Civil Procedure 9(b), id., which requires that the

22   circumstances constituting fraud be pleaded with particularity. Fed. R. Civ. Pro. 9(b). Moreover,

23   where, as here, a plaintiff levels allegations of fraud against more than one defendant, Rule 9(b)

24   "requires that a plaintiff plead with sufficient particularity attribution of the alleged

25   misrepresentations or omissions to each defendant." In re Silicon Graphics, Inc. Sec. Litig., 970

26   F.Supp. 746, 752 (N.D. Cal. 1997) (Smith, J.). That requirement is clearly not satisfied by plaintiff's

27   allegations against CDT, as the only particularized allegations of fraud in the amended complaint

28

**RJN 67**

1   involve the conduct of Opsys Limited and its officers.  Thus, even if the facts that plaintiff has

2   alleged would permit a jury to hold CDT liable under an alter-ego theory (and they do not), those

3   allegations are not pleaded with adequate specificity to withstand a motion to dismiss under Rule

4   9(b).  Thus, for this reason, as well as for the reasons stated above, the court holds that plaintiff's

5   breach of contract claim against CDT must be dismissed.

6   II.     Fraud (Against Both Defendants)

7          The second issue raised by defendants' motion to dismiss requires the court to consider

8   whether plaintiff's amended complaint states a claim for fraud.  Under California law, the elements

9   of fraud are (1) a misrepresentation by the defendant; (2) knowledge of falsity (scienter); (3) intent to

10  induce reliance; (4) justifiable reliance; and (5) resulting damage.  Bank of the West v. Valley Nat'l

11  Bank of Ariz., 41 F.3d 471, 477 (9th Cir. 1994) (citation omitted) (applying California law).

12  Defendants argue that plaintiff's amended complaint fails to allege at least two of these elements, the

13  existence of an actionable misrepresentation and scienter, and thus urges the court to dismiss the

14  fraud claims that plaintiff has leveled against both Opsys Limited and CDT.

15          Before turning to the substance of those allegations, the court notes that while plaintiff

16  repeatedly alleges that "defendants" engaged in fraudulent conduct, nothing in the amended

17  complaint identifies any specific false or misleading statement that CDT or its employees or agents

18  might have made in connection with the Fremont Boulevard lease.  As the court has previously

19  noted, such generalized allegations of fraud are not sufficient to state a claim under Federal Rule of

20  Civil Procedure 9(b).  Moreover, the preceding discussion makes it equally clear that CDT cannot be

21  held liable for any fraudulent acts that Opsys Limited might have committed in the course of its

22  dealings with plaintiff.  Thus, for the same reasons that plaintiff is unable to state a claim for breach

23  of contract against CDT, the fraud claim against CDT must also be dismissed.

24          That leaves the court to consider whether plaintiff can state a claim for fraud against Opsys

25  Limited.  As noted above, Federal Rule of Civil Procedure 9(b) requires that "the circumstances

26  constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Under Ninth

27  Circuit law, those "circumstances" include the precise "time, place, and nature of the misleading

28

United States District Court
For the Northern District of California

7

**RJN 68**

1   statements, misrepresentations, [or] specific acts of fraud." <u>Kaplan v. Rose</u>, 49 F.3d 1363, 1370 (9th

2   Cir. 1994) (citations omitted), <u>cert. denied</u>, 516 U.S. 810 (1995).   In addition, the Ninth Circuit has

3   observed that plaintiffs seeking to satisfy Rule 9(b) must "set forth an explanation as to why the

4   statement or omission complained of was false and misleading." <u>In re Glenfed, Inc. Sec. Litig.</u>, 42

5   F.3d 1541, 1548 (9th Cir. 1994) (en banc).

6        What plaintiff has alleged in the amended complaint is in essence a claim for promissory

7   fraud.   Specifically, plaintiff asserts that at or about the time that the February 2001 lease agreement

8   was signed, Opsys Limited CEO Gary Rhea and other representatives of "defendants" made

9   promises to comply with the conditions of that agreement without ever having any intention of

10  keeping that promise. Pl.'s Am. Compl. ¶ 15.  There is little doubt that these alleged

11  misrepresentations are sufficiently specific so as to permit defendants to identify the circumstances

12  of the alleged fraud and to answer plaintiff's amended complaint, which would generally be enough

13  to satisfy the requirements of Rule 9(b). <u>See</u> <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1082 (9th Cir. 1995),

14  <u>cert. denied</u>, 517 U.S. 1136 (1996); <u>see also</u> <u>Vess</u>, 317 F.3d at 1106 (citation and original alteration

15  omitted) (noting that Rule 9(b) requires a plaintiff to allege facts that are "specific enough to give

16  defendants notice of the particular misconduct so that they can defend against the charge and not just

17  deny that they have done anything wrong").  The court thus finds that plaintiff has adequately

18  pleaded at least one actionable misrepresentation.

19       That being the case, a plaintiff seeking to state a claim for fraud must also plead knowledge

20  of falsity, or scienter. <u>See</u> <u>GlenFed</u>, 42 F.3d at 1546.  It is true that the requirement for pleading

21  scienter is less rigorous than that which applies to allegations regarding the "circumstances that

22  constitute fraud," as Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind

23  of a person may be averred generally." Fed. R. Civ. P. 9(b).  Nonetheless, nothing in the Federal

24  Rules of Civil Procedure relieves a plaintiff of the obligation to "set forth facts from which an

25  inference of scienter could be drawn." <u>Cooper v. Pickett</u>, 137 F.3d 616, 628 (9th Cir. 1997) (quoting

26  <u>Glenfed</u>, 42 F.3d at 1546).  In the complaint at issue here, the sum of the "facts" tending to show

27  scienter is a reference to the existence of "much evidence" that Opsys Limited never intended to

28

U NITED
For the Northern District of California

1   perform its obligations under the lease agreement. Pl.'s Am. Compl. ¶ 15. Even when viewed in the

2   light most favorable to plaintiff, such a conclusory statement falls well short of what would be

3   required to permit a reasonable finder of fact to infer that Opsys Limited was acting with fraudulent

4   intent when it entered into the lease agreement in February 2001.

5        Other than the above-cited allusion to "evidence" of defendants' intent to defraud, the sole

6   basis for inferring scienter from the allegations in the amended complaint is premised upon

7   plaintiff's assertion that Opsys Limited promised to comply with the terms of the lease agreement

8   but failed to do so. However, the mere fact that a party breaches a promise to perform a condition of

9   contract is as a matter of law insufficient to give rise to an inference that the breaching party acted

10  with fraudulent intent at the time that the promise was made. See Tenzer v. Superscope, Inc., 39

11  Cal. 3d 18, 30 (1985) (quoting People v. Ashley, 42 Cal. 2d 246, 263 (1954)) (noting that

12  "something more than nonperformance is required to prove the defendant's intent not to perform his

13  promise"). Thus, seeing that plaintiff has made no effort to allege facts beyond Opsys Limited's

14  failure to perform as promised in its attempt to plead the scienter element of common law fraud, the

15  court is compelled to conclude that plaintiff's fraud claims against both defendants fail as a matter of

16  law. The court therefore grants defendants' motion for partial dismissal in its entirety.

17  III.    Leave to Amend

18        The sole remaining issue is whether, in light of the foregoing discussion, plaintiff should be

19  given leave to file a second amended complaint. In determining whether it should grant leave to

20  amend a complaint, the court must consider (1) the plaintiff's bad faith; (2) undue delay; (3)

21  prejudice to the defendant; (4) futility of amendment; and (5) whether the plaintiff has previously

22  amended his or her pleadings. Nunes v. Ashcroft, 375 F.3d 805, 808 (9th Cir. 2004) (citing Bonin v.

23  Calderon, 59 F.3d 815, 845 (9th Cir. 1995)), reh'g and reh'g en banc denied, 375 F.3d 810 (9th Cir.

24  2004), cert. denied, __ U.S. __, 125 S. Ct. 1395 (2005). Here, plaintiff has already failed in two

25  attempts to plead facts that might lend support to its conclusory allegations regarding defendants'

26  purportedly fraudulent and conspiratorial conduct. Because there is no reason to believe that a third

27  attempt to do so would be any more successful than the first two, the court sees no reason to grant

28

9

1    plaintiff leave to amend its pleadings.  Accordingly, the court holds that plaintiff's breach of contract

2    claim against CDT and its fraud claims against both defendants should be dismissed with prejudice.

3

4    CONCLUSION

5         For the foregoing reasons, defendants' motion for partial dismissal is GRANTED.  Plaintiff's

6    claims for breach of contract against defendant CDT and its claims for fraud against both defendants

7    are hereby DISMISSED WITH PREJUDICE.

8         IT IS SO ORDERED.

9

10   Dated: August 8, 2005

11                                         _____
12                                         MARILYN HALL PATEL
                                           District Judge
13                                         United States District Court
                                           Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

**ENDNOTES**

1. All facts are drawn from plaintiff's first amended complaint and from the documents incorporated by reference therein.

2. The court also rejected defendants' argument that plaintiff was judicially estopped from denying the validity and enforceability of the novation agreement.

3. It should be noted that under California choice of law rules, the court need only reach the question of "governmental interest" if the substantive law of the foreign jurisdiction differs materially from California law. See Abogados v. AT&T, Inc., 223 F.3d 932, 934 (9th Cir. 2000) (applying California choice of law rules). It is at least debatable that the scope of the United Kingdom's veil-piercing doctrine is broader than its California equivalent. Compare Palmers Company Law § 2.1519 ¶ 11 (2004) (observing that "[i]t has sometimes been argued that there is emerging in English and Scottish law a general principle that all companies in a group of companies will be treated as a single entity"), with American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir. 1996) (citations and original alterations omitted) (noting that under California law, a parent corporation will be held liable for the debts of its subsidiary under an alter-ego theory only if the plaintiff proves "(1) that there is such unity of interest and ownership that the separate personalities of [the parent and subsidiary corporations] no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice"). In any event, as the court finds that British law does not permit CDT's corporate veil to be pierced in the instant action, its conclusion would not change if California law supplied the rules of decision with respect to the alter-ego issue.

4. Plaintiff's amended complaint also characterizes CDT's conduct as tortious interference with contractual relations. Pl.'s Am. Compl. ¶ 11. However, because plaintiff has failed to plead that cause of action, the court need not consider whether it has stated a claim under that theory.

11

RJN 72

# EXHIBIT G

1  Robert H. Bunzel, State Bar No. 99395
   Alyson L. Huber, State Bar No. 202713
2  BARTKO, ZANKEL, TARRANT & MILLER
   A Professional Corporation
3  900 Front Street, Suite 300
   San Francisco, California 94111
4  Telephone: (415) 956-1900
   Facsimile: (415) 956-1152
5  rbunzel@bztm.com
   ahuber@bztm.com
6
   Attorneys for Plaintiff
7  SUNNYSIDE DEVELOPMENT CO., LLC

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  SUNNYSIDE DEVELOPMENT COMPANY,      )  No. C 05-00553 MHP
    LLC,                                )
12                                      )  **NOTICE OF MOTION AND**
              Plaintiff,                )  **MOTION FOR LEAVE TO FILE A**
13                                      )  **SECOND AMENDED COMPLAINT**
          v.                            )  **AND/OR TO JOIN A RELATED**
14                                      )  **PARTY AS SUCCESSOR-IN-**
                                        )  **INTEREST; MEMORANDUM OF**
15  OPSYS LIMITED, a United Kingdom     )  **POINTS AND AUTHORITIES IN**
    Company,                            )  **SUPPORT THEREOF**
16                                      )
              Defendants.               )  **[F.R.C.P. Rules 15(a) and 25(c)]**
17                                      )
                                        )  Hearing Date:  December 12, 2005
18                                      )  Time:          2:00 p.m.
                                        )  Dept:          15
19  _____)

20  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21          PLEASE TAKE NOTICE that on December 12, 2005 at 2:00 p.m. or as soon

22  thereafter as the matter may be heard before the Honorable Marilyn H. Patel, United States District

23  Judge, in Courtroom 15 of the above entitled Court, plaintiff Sunnyside Development Co., LLC

24  ("Sunnyside") will move, and hereby does move the Court pursuant to F.R.C.P. Rule 15(a) for

25  leave to file a second amended complaint for breach of contract against Opsys Limited and add

26  Cambridge Display Technologies, Inc. ("Cambridge") as its successor-in-interest as a party,

27  pursuant to general principles of successor liability and pursuant to F.R.C.P. Rule 25(c).

28
                                    -1-                          **RJN 73**

2103.000/306463.1      NOTICE OF MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND/OR TO JOIN A
                       RELATED PARTY AS SUCCESSOR IN-INTEREST; MPA IN SUPPORT THEREOF; Case No. C 05-00553 MHP

*Left margin vertical text:* BARTKOZANKEL  Bartko Zankel Tarrant Miller  900 Front Street, Suite 300  San Francisco, CA 94111  Phone (415) 956-1900 • Fax (415) 956-1152

1    Plaintiff requests leave to file a Second Amended Complaint to conform to the

2    previous orders of this Court granting Opsys Limited's Rule 12(b)(6) motion to dismiss, and to add

3    the successor-in-interest to Opsys Limited as a party.   Cambridge completed its acquisition of

4    defendant Opsys Limited on December 29, 2004, after this action was filed.

5    This motion will be based on this Notice of Motion and Motion, the Memorandum

6    of Points and Authorities, the accompanying Declaration of Alyson L. Huber and Request for

7    Judicial Notice submitted herewith, including the proposed Second Amended Complaint at Exh. A

8    thereto, the complete files and records herein, and on the argument and other evidence to be

9    presented at the hearing of this matter.

10   DATED:  November 2, 2005

11                          BARTKO, ZANKEL, TARRANT & MILLER
                            A Professional Corporation
12

13

14                          By: _____
                                       Alyson L. Huber
15                                 Attorneys for Plaintiff
                            SUNNYSIDE DEVELOPMENT CO., LLC
16

17

18

19

20

21

22

23

24

25

26

27                                                              **RJN 74**

28
                                          -2-

BARTKO ZANKEL
Bartko·Zankel·Tarrant·Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................3

I.     INTRODUCTION ............................................................................................................3

II.    ISSUES TO BE DECIDED ............................................................................................4

III.   RELEVANT FACTS........................................................................................................4

       A.     Procedural History ..............................................................................................4

       B.     The Lease and the Successor Transactions.........................................................5

IV.    ARGUMENT....................................................................................................................6

       A.     The SAC Details the Contract Claim and Successor Liability ...........................6

              1.     The Bases for Breach of Contract and Ineffective
                     Assignment are Clearly Stated..................................................................6

              2.     The Basis for Successor Liability is Clearly Stated...................................9

       B.     Leave To Amend Should Be Liberally Granted .................................................10

       C.     Rule 25(c) and General Principles of Successor Liability
              Apply to Cambridge..........................................................................................11

V.     CONCLUSION...............................................................................................................14

BARTKO ZANKEL
Bartko · Zankel · Tarrant · Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

**RJN 75**

## TABLE OF AUTHORITIES

### CASES

*DCD Programs, Ltd. v. Leighton*
833 F.2d 183 (9th Cir. 1987) ..................................................................10

*Eminence Capital, LLC v. Aspeon, Inc.*
316 F.3d 1048 (9th Cir. 2003) ..............................................................10

*Foman v. Davis*
371 U.S. 178 (1962) .................................................................................10

*Howey v. United States*
481 F.2d 1187 (9th Cir. 1973) ..............................................................10

*Jackson v. Bank of Hawaii*
902 F.2d 1385 (9th Cir. 1990) ..............................................................10

*Lockman Found v. Evangelical Alliance Mission*
930 F.2d 764 (9th Cir. 1991) ................................................................10

*Marks v. Minnesota Mining and Manufacturing Co.*
187 Cal.App.3d 1429 (1987) .................................................................12

*Miller v. Rykoff-Sexton, Inc.*
845 F.2d 209 (9th Cir. 1988) ................................................................11

*Poling v. Morgan*
829 F.2d 882 (9th Cir. 1987) ................................................................10

*Shannon v. Samuel Langston Co.*
379 F. Supp. 797 (W.D. Mich. 1974) ..................................................12

*United States v. Webb*
655 F.2d 977 (9th Cir. 1981) ................................................................10

### STATUTES

Federal Rules of Civil Procedure

Rule 15(a) ....................................................................................10

Rule 25(c) ........................................................................1, 11, 12

*Phone (415) 956-1900 • Fax (415) 956-1152*
*San Francisco, CA 94111*
*900 Front Street, Suite 300*
**BARTKOZANKEL**

**RJN 76**

-ii-

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **INTRODUCTION**

Following this Court's Rule 12(b)(6) orders, this case presents a narrow claim for breach of a commercial lease. Since the filing of the initial complaint, the defendant lessee has been fully acquired by a public company, Cambridge Display Technologies, Inc. ("Cambridge"). Plaintiff seeks leave to file a Second Amended Complaint ("SAC") to allege the successor liability of Cambridge and to clarify the bases of liability that remain, including why the purported assignment of the lease to a bankrupt affiliate of the defendants was never effective. A clear amended complaint is in the interests of the Court, the parties, and the administration of justice.

Frankly, this motion should not have been required. At the direction of the Court, plaintiff provided the proposed SAC to defendants' counsel who declined to stipulate to its filing, necessitating this motion. Filing the SAC, of course, would have preserved to defendants all defenses, pleading and otherwise. While the case is not complex -- establishing the liability of a defunct commercial lessee and its successor, versus their defense that the lease was assigned to an undercapitalized shell company -- the proposed SAC surely lays out in sufficient detail under the federal rules the facts and theories of liability, which are sound as a matter of pleading and supported by substantial evidence. There has been no deposition discovery and no production of any meaningful documents from the defense. Yet defendants apparently oppose leave to file the SAC or naming the successor party by arguing the merits on a pleading record.

Simply, the Court should grant leave to file the SAC -- which only asserts a breach of contract claim -- and allow this case to proceed to any pleadings challenges, prompt discovery and hopefully resolution. As admitted in SEC filings, Cambridge succeeded to *all* assets of the lessee (the value of which could have paid rent to plaintiff), and is holding treasury stock of significant value payable to the shareholders of the original lessee as security for its potential liability in this case. A clearer case for naming a successor in a breach of contract case is hard to imagine.

**RJN 77**

2103:000/306463.1    NOTICE OF MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND/OR TO JOIN A RELATED PARTY AS SUCCESSOR IN-INTEREST; MPA IN SUPPORT THEREOF; Case No. C 05-00553 MHP

BARTKO ZANKEL
Bortko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

II.    **ISSUES TO BE DECIDED**

(1) Should plaintiff be allowed to amend its complaint, after substituting counsel, to clarify its claims and conform to this Court's Order granting defendant's 12(b)(6) motion?

(2) Should plaintiff be allowed to join the successor-in-interest to Opsys Limited?

III.    **RELEVANT FACTS**

A.    Procedural History

On December 14, 2004, plaintiff filed an action in Alameda County Superior Court. *See* Declaration of Alyson L. Huber and Request for Judicial Notice (hereafter "Huber Decl."), Exh. E. On February 7, 2005, defendants Opsys Limited and CDT Limited removed to this Court, and then moved to dismiss. On April 22, 2005, the Court granted in part and denied in part, defendants' motion with leave to amend.

On May 11, 2005, plaintiff filed a First Amended Complaint asserting breach of contract against Opsys Limited, alter ego liability as to CDT Limited and fraud claims against both companies. Defendants filed a motion dismiss all claims except the breach of contract claim against Opsys Limited. On August 8, 2005, the Court granted defendants' motion without leave to amend, effectively dismissing CDT Limited and leaving only a breach of contract claim remaining against Opsys Limited.

On August 26, 2005, plaintiff filed papers to substitute new counsel, and on September 9, 2005 that application was granted. Counsel appeared October 3, 2005 at a Case Management Conference and informed the Court that plaintiff was seeking a stipulation to add a publicly traded Delaware company, Cambridge, to this case as successor to Opsys Limited and suggested that a second amended complaint be filed to clarify plaintiff's allegations and add the successor-in-interest. The Court ordered the parties to meet and confer on a stipulation, and if one could not be attained plaintiff to file a motion for leave to file the amended complaint, on 35 days notice.

In compliance, plaintiff sought defendant Opsys Limited's stipulation to file a second amended complaint that added Cambridge as a defendant and re-pleaded with clarity the

BARTKO ZANKEL
Tarrant & Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-4-

RJN 78

1   breach of contract claim and the reasons assignment by the lessee was not effective. *See* Huber

2   Decl. at ¶ 2, Exh. B. Defendant refused to stipulate. *Id.* Plaintiff now requests that the Court

3   allow plaintiff to file the SAC attached to the Huber Declaration as Exhibit A.

4       B.    The Lease and the Successor Transactions

5           This case involves both breach of lease, and a series of international transactions

6   intertwined with the breach. On or about February 15, 2001, plaintiff and defendant Opsys

7   Limited entered into a written lease agreement ("Lease") for a term of seven years and three

8   months beginning May 1, 2001. *See* First Amended Complaint at ¶ 8.

9           In 2002, Opsys Limited apparently had two subsidiaries, Opsys UK and Opsys US.

10  *See* Declaration of Michael Holmes filed February 28, 2005 in Support of Defendants' Motion to

11  Dismiss at ¶¶ 3, 4. In October 2002, a Cambridge affiliate known as Cambridge Display

12  Technology Limited ("CDT Limited") acquired 16% of the stock and management control of

13  Opsys UK (which later changed its name to "CDT Oxford Limited"), with an option to purchase

14  Opsys Limited (the lessee here and the owner of the key IP Opsys assets) if certain conditions

15  were met. *See* Huber Decl., Exh. F, § 9.4. This option to purchase was exercised on

16  December 29, 2004, after the complaint was filed in this action. *See* Huber Decl., Exh. I, p. 2.[1]

17          Cambridge reports this lawsuit in its SEC filings, and advises publicly that it

18  maintains in escrow portions of the consideration payable to Opsys Limited shareholders in the

19  event plaintiff obtains a judgment against Cambridge for Opsys Limited's liability. *See* Huber

20  Decl., Exh. K at p. 8. The most recent 10-Q states:

21              In the event that the Company suffers a loss in relation to either of
                the claims against Opsys Limited, shares currently held in escrow
22              will be forfeited to the value of the loss, as measured at the
                December 2004 initial public offering price of $12.00 per share. The
23              value of the 422,610 shares held in escrow, based on the market
                price of $7.74 per share at June 30, 2005, is $3.3 million. The escrow

24  _____

25  [1]    On January 5, 2005, Cambridge filed form 8-K with the SEC, reporting that on December
    29, 2004, fifteen days after plaintiff filed its complaint, Cambridge issued its own stock to
26  purchase Opsys Limited pursuant to the option agreement between CDT Limited, Opsys UK a.k.a.
    CDT Oxford Limited, and Opsys Limited. Thus the series of transactions that began no later than
27  the fall of 2002 were completed by year-end 2004, and all of Opsys has been folded into
    Cambridge. The reasons for this strategic merger, i.e. acquiring the target's key technologies, are
28  described in the SAC at ¶¶24-26.

                                    -5-                                **RJN 79**

BARTKO ZANKEL
Bartko•Zankel•Tarrant•Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

shares are authorized and issued in the accompanying financial statements. Costs that the Company incurs in relation to the claims described above are charged to operating expense as incurred. *Id.* at p. 8.

Plaintiff thus has ample reason to believe Opsys Limited is inactive, and obviously Cambridge is now the interested party. The current pleading adequately provides notice to Opsys Limited and to Cambridge regarding successor liability and the underlying breaches of contract, and is fully consistent with the goals of the federal rules to resolve in one forum this dispute.[2]

## IV.    ARGUMENT

### A.    The SAC Details the Contract Claim and Successor Liability.

#### 1.    The Bases for Breach of Contract and Ineffective Assignment are Clearly Stated

The First Amended Complaint had asserted claims for fraud in the inducement, which might be confusing following this Court's August 8, 2005 Order granting defendants' Rule 12(b)(6) motion. The SAC eliminates this claim, and specifically calls out the sections of the Lease that plaintiff contends were breached and which actions constitute a breach of the covenant of good faith and fair dealing, as well as why the defense of assignment of the Lease will not lie. Paragraph 9 of the SAC sets forth the following material Lease obligations implicated in the breach of contract claim:

(a)    Opsys Limited **agreed to pay rent** as set forth in ¶ 52 of the Lease, approximately $73,148 per month for the first year, and subject to annual monthly rent increases thereafter of Y2: $76,806; Y3: $80,646; Y4: $84,678; Y5: $88,912; Y6: $93,358; and Y7: $98,026;

(b)    ¶ 7.3(c) of the Lease **prohibited** Opsys Limited from **incurring any liens or encumbrances** against the leased Premises during the term of the Lease, including mechanics liens;

(c)    ¶ 13.1 of the Lease required Opsys Limited to be in **compliance with all material terms** and conditions of the Lease at all times;

(d)    **Unconsented assignment increased base rent to 110%** pursuant to the Lease at ¶ 12.1(d), and assignment, whether obtained through consent or not,

---

[2]    If Cambridge is not made a party, then plaintiff would proceed here to judgment against a defunct shell and then have to enforce the judgment in a subsequent action. That is neither sensible nor the law.

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-6-                                    **RJN 80**

shall not "(ii) release Lessee of any obligations hereunder; or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee," pursuant to ¶ 12.2(a);

(e)    Pursuant to the Lease at ¶ 53, Opsys Limited agreed to **grant plaintiff warrants for 5,000 common shares of Opsys Limited** at the same price as the then latest round of equity investment;

(f)    Opsys Limited agreed to **pay all utilities and real property taxes** applicable to the Premises, pursuant to the Lease at ¶¶ 10, 11;

(g)    Opsys Limited agreed to **pay a late charge of 10%** on rent payments more than 5 days delinquent and an additional interest payment of prime plus 4% up to the maximum rate allowed by law running from the date when the rent was due pursuant to the Lease at ¶¶ 13.4, 13.5;

(h)    ¶ 6.2 of the Lease required Opsys Limited to **disclose to plaintiff the use of certain Hazardous Substances** on the Premises and to comply with all laws related thereto, and Opsys Limited agreed to **indemnify plaintiff** "against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses penalties, and attorney's and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party . . . ;"

(i)    Opsys Limited specifically agreed that the Hazardous Substances indemnity includes ". . . the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this lease." In bold typeface, ¶ 6.2 states: **"No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances,** unless specifically so agreed by Lessor in writing at the time of such agreement;"

(j)    Lessor's acceptance of **rent** or performance of the Lease **by a third party** "shall **[not] constitute a waiver** or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach" pursuant to the Lease at ¶12.2(b); and

(k)    The Lease at ¶ 31 also provides that any party that brings an action or proceeding to enforce the terms of the Lease "shall be entitled to **reasonable attorney's fees.**"

The SAC next sets out the history of the attempted assignment, how Opsys Limited breached the covenant of good faith and fair dealing, and why the assignment to its undercapitalized U.S. shell company was ineffective. Paragraph 13 of the SAC describes how Opsys Limited approached plaintiff with a proposal to cancel the Lease and make a new lease, due to what Opsys Limited called its "corporate reality" that the entity occupying the premises was

BARTKO ZANKEL
Bartko-Zankel-Tarrant-Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-7-

**RJN 81**

1   now a wholly-owned subsidiary known as Opsys US, and how plaintiff declined this cancellation

2   request.

3        The SAC then describes how a proposed assignment was negotiated by Opsys

4   Limited *without disclosing* that Opsys Limited and Cambridge had already been moving toward

5   combining their businesses. The SAC details the representations that were made to plaintiff and

6   the failure of the conditions precedent to the effectiveness of the assignment within 90 days,

7   including:

8        (a)    Sunnyside as Lessor and Opsys US, as assignee, were to execute an
         Amendment No. 2 to Lease, which added several terms including an increased
9        security deposit, additional rent, a specific insurance policy, and additional warrants
         for either $50,000 to plaintiff or a warrant to purchase common stock. Amendment
10       No. 2 only became effective if the assignment became effective;

11       (b)    Sunnyside was to receive a letter of credit for $750,000;

12       (c)    A pollution liability insurance policy subject to specific conditions
13       as set forth in the Lease was to be issued; and

14       (d)    Sunnyside's attorney's fees were to be reimbursed.

15   Some or all of these conditions were not satisfied in the 90-day period. SAC at ¶¶ 15-21.[3] Since

16   the conditions precedent were not satisfied within 90 days, the assignment was by its own terms at

17   ¶ 6 "automatically [] null and void and of no force or effect whatsoever."

18

19   [3]    Defendants apparently seek to argue the merits and contend (again) that all of the
     conditions precedent were established.    The facts are at best ambiguous and defendants'
20   documents have not been produced. For instance, there is no known Amendment No. 2 to the
     Lease signed by Opsys, whereas any amendment signed by plaintiff was either not delivered
21   during the 90-day period, or during that period became ineffective due to discovery of material
     breaches of the lease and the assignment. The parties disagree as to whether Sunnyside received
22   the required letter of credit as there was subsequent negotiation, during the 90-day period when
     breaches were discovered, as to how much cash the defendants should pay rather than pledge.
23   There is a disagreement as to whether the pollution liability policy that was to protect for business
     interruption contained appropriate covenants. SAC at ¶ 17. Moreover, any partial satisfaction of
24   these conditions precedent cannot excuse the material nondisclosures and undisclosed breaches of
     the lease, which fly in the face of the representations in the assignment itself that the Lease was in
25   full force and effect and that there were no breaches. SAC at ¶ 16. Obviously, the landlord would
     not have permitted an assignment with knowledge that the lessee was violating federal and state
26   laws regarding hazardous materials or incurring large mechanics' liens or with knowledge that
     support of the new tenant was highly risky given the British corporate transactions likely to make a
27   US research center expendable -- and immediately it was. It is against these facts -- alleged and
     now subject to proof and discovery -- on which the defendants apparently continue to ask this
28   Court to dismiss the case at the pleading stage.

                                          -8-                              RJN 82

BARTKOZANKEL
*Barko Zankel Tarrant Miller*
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    Equally as fatal to the assignment, within 90 days of signing and thus prior to its

2   effectiveness, plaintiff learned of material breaches of the Lease that both preceded and followed

3   the purported assignment. These breaches confer legal and equitable barriers to the purported

4   assignment.

5    First, neither Opsys Limited as lessee, nor the short-lived tenant Opsys US, paid

6   rent following the November 1, 2002 payment, mere weeks after the purported assignment was

7   signed. Within the 90-day period, Opsys US was indeed selling its assets and preparing to file for

8   bankruptcy. SAC at ¶¶ 19, 20.

9    Second, plaintiff learned that a substantial mechanics lien had been recorded against

10   the premises in March 2002 and two more were recorded in December 2002, all three material

11   breaches of the Lease and contrary to material representations made in the purported assignment

12   itself. SAC at ¶ 19. Plaintiff was forced to settle and remove the liens and incurred costs and

13   attorney's fees in doing so. The undisclosed mechanics' liens (Huber Decl., Exh. D) were a flat

14   breach of the lease (SAC at ¶ 9; Huber Decl. Exh. D) and therefore a material breach of the

15   assignment itself (SAC at ¶ 16).

16    Third, plaintiff discovered prior to effectiveness of the assignment, that Opsys

17   Limited had allowed undisclosed accumulation of hazardous substances that resulted in

18   contamination of the premises and prevented plaintiff from re-letting until the pollution was

19   removed and clean-up was complete. Again, such conduct was inconsistent with the provisions of

20   the purported assignment (Huber Decl., Exh. C; SAC ¶ 16) and negates its effect.

21    Thus, the SAC focuses the parties and the Court on the facts and legal issues

22   central to this case.

23    2.    The Basis for Successor Liability is Clearly Stated

24    The SAC alleges with specificity that Cambridge has completed its acquisition of

25   Opsys Limited and is properly a defendant by succession. According to its January 5, 2005 Form

26   8-K filed with the SEC, Cambridge acquired Opsys Limited on December 29, 2004, 15 days after

27   plaintiff originally filed this action. *See* Huber Decl., Exh. I, p. 2. As described above, there is

28

-9-

**RJN 83**

BARTKOZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    sufficient evidence that a transfer of interest has occurred.  *Id.*  Plaintiff should be allowed to

2    allege successor-in-interest status as to Cambridge and conduct discovery against and receive

3    discovery from Cambridge to prove this status.

4        B.    Leave To Amend Should Be Liberally Granted

5            It is the policy of the federal courts to liberally grant leave to amend.  *See* Fed. R.

6    Civ. Proc. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lockman Found v.*

7    *Evangelical Alliance Mission*, 930 F.2d 764, 772 (9th Cir. 1991); *Eminence Capital, LLC v.*

8    *Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  The Ninth Circuit has interpreted *Foman* as

9    identifying "four factors relevant to whether a motion for leave to amend pleadings should be

10   denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the

11   opposing party." *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981); *see also Poling v.*

12   *Morgan*, 829 F.2d 882, 886 (9th Cir. 1987). The enumerated factors are not of equal weight, and

13   delay alone is insufficient to deny leave to amend. *Id.* (citing *Howey v. United States*, 481 F.2d

14   1187 (9th Cir. 1973). "Prejudice to the opposing party is the most important factor." *Jackson v.*

15   *Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990).  The party opposing leave to amend bears

16   the burden of showing prejudice. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir.

17   1987).

18           Here, none of the factors weigh against granting leave to file the SAC.  First,

19   plaintiff has new counsel subsequent to the Court's August 8, 2005 Order.  Counsel promptly

20   informed defendant and this Court of its intention to file an amended complaint.  The litigation is

21   still in its early stages; the parties did not exchange initial disclosures until September 19, 2005.

22   Second, plaintiff's motive for filing the SAC cannot be described as dilatory or bad faith.  Plaintiff

23   seeks to amend in order to clarify the bases for liability and to add allegations of successor

24   liability.   This Court recognized the need for clarification of the pleadings during the Case

25   Management Conference on October 3, 2005.  Third, the amendment is not futile as it will inform

BARTKO ZANKEL
Bodine · Zankel · Tarrant · Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 · Fax (415) 956-1152

RJN 84

-10-

1    the parties and the Court of the specific breaches alleged and add a party that will be necessary for

2    any settlement or subsequent judgment obtained in this action.[4]

3        Finally, there is no prejudice to Opsys Limited or Cambridge in filing the SAC.

4    Opsys Limited did not file an Answer to the First Amended Complaint until September 12, 2005.

5    The underlying cause of action is the same and should not require a substantial change in the form

6    of Opsys Limited's Answer.  Cambridge will be required to file a responsive pleading to respond

7    to the allegations of successor liability, but this is hardly prejudicial since Cambridge did not

8    complete its acquisition of Opsys Limited until after the filing of the Complaint in this action and

9    now holds the original defendant's assets that could have paid the rent and has maintained some of

10   that value in escrow pending resolution of its liability here. *See generally* Huber Decl., Exhs. I and

11   J.

12        Given the liberal policy, and the lack of any mitigating factors weighing against

13   amendment, plaintiff's request to file a Second Amended Complaint should be granted.

14   C.    Rule 25(c) and General Principles of Successor Liability Apply to
         Cambridge

15

16        Rule 25(c) of the Federal Rules allows a party to be joined with the original party to

17   an action when there has been "any transfer of interest."  Here, Cambridge's SEC filings establish

18   that a transfer of interest occurred in part before and then completed after the filing of the initial

19   Complaint.

20       We acquired a *16% equity interest in CDT Oxford Limited in
         October 2002. CDT Oxford carries out research in high efficiency P-
21       OLED* materials and was *84% owned by Opsys Limited. In
         December 2004 we acquired the remaining 84% of CDT Oxford. We*
22       have had *full management control over CDT Oxford since October
         2002 and have been responsible for funding its operations* since that
23       time.

**RJN 85**

24   4      "Futility" under Rule 15(a) does not require establishing a *prima facie* case or
     preponderance at the pleading stage through declarations or otherwise.  An amendment is futile
25   only if "no set of facts can be proved under the amendment to the pleadings that would constitute a
     valid and sufficient claim or defense."  *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.
26   1988).  Nonetheless, the materials attached to the Huber Declaration and the specific allegations in
     the SAC certainly suffice to put the parties and the Court on notice that this is a substantially
27   meritorious action, which is now clearly laid out and directed at not only the hollowed out original
     lessee but its successor-in-interest capable and by law required to pay the debts left behind.

28

-11-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1
2
3

> Subsequent to the Company's original agreement with Opsys in October 2002, certain disputes arose with Opsys which were settled by a Settlement and Amendment Agreement, *pursuant to which the Company acquired 100% of the shares of Opsys Limited in December 2004* for the issue of 798 shares of its common stock.

4
5
Huber Decl., Exh. J at pp. 24 and F-16, (emphasis supplied). The 10-K also establishes that

6
Cambridge is paying for the defense of *this* action through its own operating funds, and has held

7
back a portion of the consideration paid to Opsys Limited to cover liability that Cambridge may

8
have as a result of a judgment against Opsys Limited. Huber Decl. Exh. K, p. 8.[5]

9
While a corporate purchaser of assets for cash generally does not assume the

10
seller's liabilities, the opposite is true where a de facto merger has occurred. *Marks v. Minnesota*

11
*Mining and Manufacturing Co.*, 187 Cal.App.3d 1429, 1435 and fn. 13 (1987). "[W]here the

12
consideration consists wholly of shares of the purchaser's stock which are promptly distributed to

13
the seller's shareholders in conjunction with the seller's liquidation," liability for the predecessor's

14
debts generally follows. *Id. quoting Shannon v. Samuel Langston Co.*, 379 F. Supp. 797, 807

15
(W.D. Mich. 1974). There are five relevant factors in establishing Cambridge's successor liability

16
for the debts of Opsys Limited: "(1) was the consideration paid for the assets solely stock of the

17
purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the

18
shareholders of the seller become the shareholders of the purchaser; (4) did the seller liquidate; and

19
(5) did the buyer assume the liabilities necessary to carry on the business of the seller." *See*

20
*Marks*, 187 Cal.App.3d at 1436 (citations omitted). Plaintiff has pled (SAC ¶ 26) and with public

21
documents can establish a basis for, all of these elements here.

22
First, Cambridge completed its acquisition of Opsys Limited by issuing 797,695

23
shares of Cambridge par value stock and an additional 19,736 of Cambridge common stock to two

24

25
26
27
28

---

[5]     Proceeding without the transferee also impairs discovery, since Cambridge presumably has custody of information relevant to the alleged breaches of good faith and fair dealing by Opsys Limited in seeking to avoid the lease liability to Sunnyside in October 2002, coincident with the first step of the corporate transactions by which Cambridge took control of Opsys. The policy of Rule 25(c) is furthered by having before the Court the entity that has succeeded to this relevant information.

BARTKOZANKEL
Ibchu-Zankel-Zamai-Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-12-

**RJN 86**

1    former Opsys Limited directors.   Huber Decl., Exh. I at p. 2.  This stock transfer satisfies the first

2    factor that the consideration paid was solely stock of the purchasing company.

3            The second factor, purchaser continuation of the business after sale is also evident

4    from the SEC filings.  Cambridge's asset base is largely in-process research and development in

5    the area of flourescent materials used in flat panel displays:

6            We are a recognized leader in OLED technology and believe we
             have the most comprehensive portfolio of OLED IP in the areas of
7            P-OLED devices incorporating fluorescent materials, high efficiency
             phosphorescent dendrimer and other materials, and solution
8            processing know-how.

9    Huber Decl. Exh. J at p. 4.  The Opsys assets have flowed into Cambridge directly to support its

10   core research and development business:

11           In 2002, as part of our IP expansion strategy, we acquired control of
             CDT Oxford Limited (formerly known as Opsys UK Limited),
12           which owns or controls a number of patents protecting the use of
             dendrimers to make solution processable phosphorescent materials.
13           This allows us to develop proprietary materials which we believe
             have the potential to form the basis of a future generation of high
14           efficiency green and red materials for solution-processed OLED
             displays.

15   Id. at p. 8. Moreover, these acquired assets are not separately administered, as Cambridge has "had

16   full management control over CDT Oxford since October 2002 and have been responsible for

17   funding its operations." Id. at p. 24.

18           The third factor, did the shareholders of the seller become the shareholders of the

19   purchaser, is satisfied by the Settlement Agreement which describes how the shares will be

20   distributed to Opsys Limited's shareholders. See generally Huber Decl., Exh. G.

21           The fourth factor, did the seller liquidate, is also established by the SEC filings

22   quoted above that all of the assets of Opsys have been folded into Cambridge.  The Final

23   Prospectus filed by Cambridge states that Opsys Limited has no operations other than its shares in

24   CDT Oxford Limited.  Huber Decl., Exh H at p. 62.

25           The fifth and final factor, whether the buyer assumed the liabilities necessary to

26   carry on the business of the seller, is also met here.  Cambridge expressly assumed the operational

27   liabilities of Opsys Limited.  Huber Decl., Exh. F at schedule A & B.       **RJN 87**

28                                         -13-

1    Cambridge has been selling its stock to the US public by openly saying that it took

2    over Opsys Limited and obtained its assets that complement Cambridge. It would be untrue and

3    inequitable to now hear that Cambridge interprets the corporate transactions as insulating itself

4    from liabilities of the acquired company. Justice requires this Court have jurisdiction over the

5    corporation that controls this litigation and is ultimately responsible for paying any judgment

6    obtained.

7    V.    **CONCLUSION**

8    For the forgoing reasons, plaintiff requests that the Court grant plaintiff's request

9    for leave to file the Second Amended Complaint attached as Exhibit A to the Huber Declaration.

10   DATED:  November 2, 2005

11                    BARTKO, ZANKEL, TARRANT & MILLER
                     A Professional Corporation
12

13

14                   By: _____
                          Alyson L. Huber
15                        Attorneys for Plaintiff
                     SUNNYSIDE DEVELOPMENT CO., LLC
16

17

18

19

20

21

22

23

24

25

26

27                                                              **RJN 88**

28                              -14-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

# EXHIBIT H

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUNNYSIDE DEVELOPMENT COMPANY, LLC,          No. C 05-00553 MHP

          Plaintiff,

   v.

OPSYS LIMITED, a United Kingdom Company,

          Defendant.

**MEMORANDUM & ORDER**
**Re: Motion for Leave to File**
**Second Amended Complaint**

Plaintiff Sunnyside Development Co. filed this lawsuit against defendant Opsys Limited, alleging that defendant breached a lease agreement for commercial property located in Fremont, California. Plaintiff's original complaint and First Amended Complaint also included a breach of contract claim against a related entity, Cambridge Display Technologies, Ltd. ("Cambridge Limited"), as well as fraud claims against both Opsys Limited and Cambridge Limited. This court dismissed the fraud claims against both parties and the contract claim against Cambridge Limited with prejudice. Now before the court is plaintiff's motion for leave to file a Second Amended Complaint ("SAC") which names another related entity, Cambridge Display Technology, Inc. ("Cambridge Inc.") as a defendant based on a theory of successor liability. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

<div align="center">1</div>

<div align="right">**RJN 89**</div>

<div style="writing-mode: vertical-lr">**United States District Court**<br>For the Northern District of California</div>

BACKGROUND[1]

Plaintiff is the lessor of a commercial property located at 47375 Fremont Boulevard in Fremont, California. On February 15, 2001 plaintiff agreed to lease commercial space at the Fremont Boulevard property to defendant Opsys Limited, with the lease term running from May 1, 2001 through April 30, 2008. Pursuant to the conditions of the lease agreement, Opsys Limited agreed to pay plaintiff a monthly base rent, to make certain capital improvements, and to conduct its business in an environmentally safe manner.

Opsys Limited continued to make rental payments to plaintiff until October 2002. At that time, Cambridge Limited acquired control of Opsys' British business, Opsys UK Limited ("Opsys UK"). As part of the corporate reorganization accompanying that transaction, plaintiff, Opsys Limited, and Opsys's United States subsidiary, Opsys US, signed a novation agreement that purportedly assigned Opsys Limited's rights and obligations under the lease to Opsys US. Under the terms of paragraph six of the novation agreement, the assignment was subject to a number of conditions precedent.

Plaintiff received no rental payments after October 2002, and Opsys US was forced into involuntary bankruptcy by four of its creditors in May 2003. On December 14, 2004, plaintiff filed this action in the Superior Court for Alameda County, alleging breach of contract and fraud under California law. That action was subsequently removed to this court, and on February 28, 2005 defendants moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff had failed to state a claim under either of its legal theories. With respect to plaintiff's breach of contract claims, defendants argued that Cambridge Limited was never a party to the Fremont Boulevard lease and that Opsys Limited had been released from its obligations under the lease agreement by the October 2002 novation agreement. As for plaintiff's fraud claim, defendants argued that plaintiff had failed to plead the elements of fraud with particularity, as is required by Federal Rule of Civil Procedure 9(b).

On April 22, 2005, the court issued an order granting defendants' motion in part and denying it in part. Specifically, the court agreed with defendants that plaintiff's complaint failed to allege that Cambridge Limited had ever been a party to the lease agreement, thus warranting dismissal of

2

1    the breach of contract claim against Cambridge Limited  The court also dismissed the fraud claims

2    against both defendants on the ground that plaintiff had failed to satisfy the pleadings requirements

3    of Rule 9(b).  However, in considering the breach of contract claim against Opsys Limited, the court

4    rejected defendants' argument that the terms of the novation agreement warranted granting their

5    motion to dismiss.  In particular, the court noted that defendants had failed to submit a signed copy

6    of the second amendment to the lease, and it could not be determined from the face of the pleadings

7    whether all of the conditions precedent to releasing Opsys Limited from liability for failure to

8    comply with the conditions of the lease had been fulfilled.  Thus, drawing all reasonable inferences

9    in favor of the nonmoving party, the court held that plaintiff had stated a claim for breach of contract

10   against Opsys Limited.

11          On May 11, 2005 plaintiff filed a First Amended Complaint, having been granted leave to

12   correct the deficiencies that the court identified in its April 2005 order.  In the First Amended

13   Complaint, plaintiff again alleged breach of contract and fraud against both defendants.  The First

14   Amended Complaint added the allegation that Opsys Limited acted as the alter ego of Cambridge

15   Limited in entering into and breaching the lease agreement, thereby entitling plaintiff to recover

16   damages for breach of contract from Cambridge Limited as well as from Opsys Limited.  Plaintiff

17   supplemented its fraud claims by identifying several of Opsys Limited's officers as the source of the

18   actionable misrepresentations that defendants allegedly made.

19          On May 31, 2005 defendants again moved for partial dismissal of the amended complaint,

20   arguing that plaintiff had again failed to state a claim for breach of contract against Cambridge

21   Limited or to plead adequately the required elements of fraud against either defendant.  The court

22   again granted defendants' motion to dismiss the fraud claims, this time with prejudice, as the added

23   allegations in the First Amended Complaint did nothing to address the previously identified

24   shortcomings.  In addition, the court dismissed the alter ego claim with prejudice based on a failure

25   to allege any of the requirements for alter ego liability.

26          Plaintiff has subsequently retained new counsel and now seeks leave to file a Second

27   Amended Complaint.  The Second Amended Complaint differs from the First Amended Complaint

28   in two respects.  First, plaintiff has supplemented the breach of contract allegations to enumerate the

3

1   specific ways in which defendant allegedly breached the lease and the reasons why the attempted

2   novation is deficient.  Second, plaintiff has attempted to join Cambridge Inc. as the successor in

3   interest to Opsys Limited's business.  Defendant objects to both proposed amendments, complaining

4   that plaintiff is attempting to circumvent the court's previous dismissal with prejudice of the fraud

5   claims and plaintiff's contract claim against Cambridge Limited.

6

7   LEGAL STANDARD

8       The Federal Rules of Civil Procedure provide that leave to amend be "freely given when

9   justice so requires."  Fed. R. Civ. Pro. 15(a).  The Ninth Circuit has construed Rule 15(a) broadly,

10  requiring that leave to amend be granted with "extraordinary liberality."  Morongo Band of Mission

11  Indians v. Rose, 893 F. 2d 1074, 1079 (9th Cir. 1990); see also DCD Programs, Ltd. v. Leighton,

12  833 F.2d 183, 186 (9th Cir. 1987) (Rule 15's policy of favoring amendments to pleadings should be

13  applied with "extreme liberality"); Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,

14  989 F. Supp. 1237, 1241 (N.D. Cal. 1997) (Jensen, J.) ("[T]he court must be very liberal in granting

15  leave to amend"); Poling v. Morgan, 829 F.2d 882, 886 (9th Cir. 1987) (describing a "strong policy

16  permitting amendment").

17      Despite this liberal policy of amendment, leave will not be given where the district court has

18  "a substantial reason to deny" the motion.  J. W. Moore et al., Moore's Federal Practice § 15.14[1]

19  (3d ed. 1998) ("district judge[s] should freely grant leave to amend when justice requires, absent a

20  substantial reason to deny").  The court may decline to grant leave where there is "any apparent or

21  declared reason" for doing so.  Foman v. Davis, 371 U.S. 178, 182 (1962); see also Lockman Found.

22  v. Evangelical Alliance Mission, 930 F.2d 764, 772 (9th Cir. 1991).

23      The Ninth Circuit has interpreted Foman as identifying "four factors relevant to whether a

24  motion for leave to amend pleadings should be denied: undue delay, bad faith or dilatory motive,

25  futility of amendment, and prejudice to the opposing party."  United States v. Webb, 655 F.2d 977,

26  980 (9th Cir. 1981); see also Poling, 829 F.2d at 886.  The enumerated factors are not of equal

27  weight, and delay alone is insufficient reason to deny leave to amend.  Webb, 655 F.2d at 980 (citing

28  Howey v. United States, 481 F.2d 1187 (9th Cir. 1973)).  By the same token, "[p]rejudice to the

United States District Court
For the Northern District of California

4

1   opposing party is the most important factor." <u>Jackson v. Bank of Hawaii</u>, 902 F.2d 1385, 1387 (9th

2   Cir. 1990). Futility alone can also justify the denial of a motion to amend. <u>Bonin v. Calderon</u>, 59

3   F.3d 815, 845 (9th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1051 (1996). The party opposing leave to

4   amend bears the burden of showing prejudice. <u>DCD Programs</u>, 833 F.2d at 187.

5

6   <u>DISCUSSION</u>

7   I.     <u>Additional Breach of Contract Allegations</u>

8          Defendant argues that plaintiff's proposed amendment is an attempt to reintroduce fraud

9   claims which this court has previously dismissed with prejudice. The parts of the proposed Second

10  Amended Complaint to which defendant objects most strenuously are paragraphs 15 and 16.

11  Paragraph 15 alleges that the novation was ineffective because "Opsys US was grossly

12  undercapitalized and the purported assignment without disclosure of material facts was in bad faith

13  under the Lease, and contrary to the covenant of good faith and fair dealing." SAC ¶ 15. Paragraph

14  16 also alleges that the purported novation, which included a clause stating that "Opsys Limited was

15  in full compliance with all terms of the Lease," was invalid due to "Opsys Limited's ongoing

16  undisclosed activities in breach of the covenant of good faith and fair dealing." <u>Id.</u> ¶ 16. Defendant

17  does not identify any particular prejudice flowing from the proposed amendment, other than its

18  supposed conflict with this court's prior dismissal of the fraud claims. Plaintiff responds that a

19  claim of breach of the covenant of good faith and fair dealing is distinct from a claim of fraud.

20  Plaintiff also argues that the alleged breaches serve to undermine defendant's defense based on

21  assignment of the contract.

22         The court finds that plaintiff's proposed amendments are acceptable and add welcome clarity

23  to the sloppy complaint drafted by plaintiff's former attorneys. The added allegations are distinct

24  from the previously dismissed fraud claim in a number of respects. First, plaintiff has not added a

25  separate claim for breach of the covenant of good faith and fair dealing, but rather has alleged that a

26  breach of the covenant rendered the purported assignment unenforceable. The fraud allegations, in

27  contrast, constituted an independent basis for recovery.

28

RJN 93

United States District Court

For the Northern District of California

Second, the damages recoverable under a fraud claim are broader than those recoverable under a claim for breach of contract or for breach of the covenant of good faith and fair dealing. See generally Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684 (1988) (holding that, outside of limited contexts such as insurance contracts, a party may not recover tort damages for breach of the covenant of good faith and fair dealing).

Third, in order to prove a breach of the covenant of good faith and fair dealing, plaintiff need not prove scienter. "Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." Carma Developers (Cal.), Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342, 373 (1992). This distinction is particularly relevant in light of the reason for the court's dismissal of the fraud claims: plaintiff's failure to state facts supporting a finding of scienter. See Sunnyside Dev. Co. v. Opsys Ltd., No. C 05-00553 MHP, slip op. at 8–9 (N.D. Cal. Aug. 8, 2005).

Defendant also alleges that plaintiff is using the proposed amendment to advance an entirely new breach of contract theory, in response to the production of a signed copy of the second amendment to the lease—the document which allegedly consummated the novation. Previously, the court found that the absence of a signed copy supported plaintiff's claim that the novation was invalid. See Sunnyside Dev. Co. v. Opsys Ltd., No. C 05-00553 MHP, slip op. at 3–4 (N.D. Cal. Apr. 22, 2005). While the court acknowledges that the production of a signed copy appears to weaken plaintiff's case, plaintiff has alleged additional violations of the terms of the assignment. In any event, even if plaintiff's current complaint articulates a theory that conflicts with plaintiff's earlier claims, there is no requirement of absolute consistency in pleadings, particularly in the early stages of a case. Fed. R. Civ. P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds"); see also Coleman v. Standard Life Ins. Co., 288 F. Supp. 2d 1116, 1119 (E.D. Cal. 2003).

For all of the foregoing reasons, and in furtherance of the rule providing for liberal amendment of complaints, the court grants plaintiff's motion to file the amended breach of contract

6

RJN 94

1    claims.

2

3    II.    <u>Successor Liability of Cambridge Inc.</u>

4          Defendant challenges plaintiff's attempt to add Cambridge Inc. on a number of grounds.

5    First, defendant claims that Cambridge Inc. is the same party that was dismissed from the action

6    with prejudice in connection with defendant's motion to dismiss plaintiff's First Amended

7    Complaint.  Second, defendant claims that Cambridge Inc. is not a successor in interest, but rather is

8    a stockholder of Opsys Limited.  Plaintiff responds that Cambridge Inc. is a different corporate

9    entity from Cambridge Limited, the party previously dismissed.  Plaintiff also argues that, regardless

10   of the form of ownership, Cambridge Inc. has entered into a *de facto* merger with Opsys Limited.

11         The court need not engage in the merits of either party's arguments at this time because

12   joinder of Cambridge Inc. is premature.  As an alleged successor in interest, Cambridge Inc. will

13   only be involved in this lawsuit to the extent that plaintiff is unable to collect a judgment from Opsys

14   Limited.  It would therefore be inefficient to join Cambridge Inc. at this time.  Plaintiff's motion for

15   leave to add Cambridge Inc. as a party is therefore denied without prejudice, subject to renewal if

16   and when the primary liability of Opsys Limited is established.

17   <u>CONCLUSION</u>

18         For the above reasons the court hereby GRANTS IN PART and DENIES IN PART

19   plaintiff's motion for leave to file its Second Amended Complaint.

20

21         IT IS SO ORDERED.

22

23

24   Date: January 3, 2006

25

26                                           MARILYN HALL PATEL
                                             United States District Judge
27                                           Northern District of California

28

                                   7

RJN 95

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

8

RJN 96

ENDNOTES

1. Unless otherwise noted, background facts are taken from plaintiff's proposed Second Amended Complaint.

RJN 97

United States District Court

For the Northern District of California

Exhibits I-N to Request for Judicial Notice

# EXHIBIT I



**ORRICK**

October 26, 2006

Justin M. Lichterman
(415) 773-5814
jLichterman@orrick.com

The Hon. Judge Marilyn Hall Patel
Courtroom 15, 18th Floor
United States District Court
450 Golden Gate Ave
San Francisco, CA 94102

Re:  _Sunnyside Development Co. LLC v. Opsys Limited,_ Case No. 05-00553

Dear Judge Patel:

Defendant Opsys Limited ("Opsys") submits this Discovery Statement pursuant to the
Court's Order of September 14, 2006.

1.  **Opsys's redaction of documents OPS 01712 and OPS 01408.** Plaintiff contests
redactions to Opsys Board Meeting minutes dated April 24, 2003, and an October 3, 2002 email.
Plaintiff argues that the communication in the Board minutes, reflecting legal advice of Craig Prim at
the Murray & Murray law firm, is not privileged because Opsys did not retain Murray & Murray.
However, the attorney-client privilege applies even if the attorney has not actually been retained.  _See_
Cal. Evid. Code § 951; _People v. Navarro,_ 138 Cal. App. 4th 146, 157 (2006). The context of the
document shows that Opsys asked a question about its legal obligations with respect to treatment of
certain creditors, and the redaction contains legal advice in response. Moreover, the advice is
protected by the common interest privilege because Opsys and Opsys US had an identical interest in
assessing their risk of liability based on the treatment of an Opsys US creditor. _Hewlett Packard Co. v.
Bausch & Lomb, Inc.,_ 115 F.R.D. 308, 309 (N.D. Cal. 1987).

In the email, Mr. Rhea tells Messrs. Holmes and Zervoglos about legal advice provided by
Wilson Sonsini. The parties do not dispute that (1) Wilson Sonsini represented Opsys US; (2) Mr.
Rhea was a consultant to Opsys US; and (3) Messrs. Holmes and Zervoglos were Opsys US
Directors. Accordingly, the redaction is proper. _See_ Cal. Evid. Code §§ 951, 952.

2.  **Attorney invoices.** Plaintiff claims damages in the form of attorneys fees for various legal
services, and has produced some redacted attorney invoices. Opsys therefore is entitled to review
the invoices without redaction because their substance is "in issue". _See Eisendrath v. Superior Court,_
109 Cal. App. 4th 351, 363 (2003).

3.  **The transaction between Opsys and Cambridge Display Technology ("CDT").**
Plaintiff claims it is entitled to all documents concerning a transaction between Opsys and CDT so
that Plaintiff knows what it was not told about the deal. But this is not a deal case; it is a breach of
contract action. Plaintiff's request goes far beyond issues pertaining to a breach of lease. Plaintiff

**RJN 98**



ORRICK

Judge Marilyn Hall Patel
October 26, 2006
Page 2

tries to justify its request on the theory that Opsys breached the implied covenant of good faith and fair dealing by not telling Plaintiff everything about the deal in advance. Opsys agreed to produce and has produced documents concerning the transaction that mention both CDT and Opsys and refer or relate to Plaintiff or the lease, between June 1, 2002 and December 31, 2002. Thus, Opsys produced documents with a nexus to this case under Plaintiff's theory of relevance.

4.      **Plaintiff's deficient expert reports.** The parties' Expert Disclosure deadline was September 22, 2006. On that date, Plaintiff disclosed two experts, Paul Ainslie and Kenneth Conner, but did not produce a report or disclose any opinions or their bases as required by Federal Rule of Civil Procedure 26(a)(2)(B). Mr. Conner previously testified in this case as a percipient witness. Accordingly, his opinions about subject matters not covered in his deposition should be prohibited. On October 23, 2006, Opsys received Plaintiff's supplemental and rebuttal expert disclosure, which provided a one-page statement of opinion and a damages spreadsheet from Mr. Ainslie, but no other detail. Plaintiff's noncompliant and untimely disclosures should result in the exclusion of any testimony from Mr. Ainslie.

Finally, Plaintiff yesterday raised an issue with Opsys's rebuttal expert disclosures, which were timely made on October 20, 2006 in an effort to comply with the Scheduling Order. At that time, Opsys did not know the opinions of Plaintiff's experts, and so could not provide complete disclosures. Opsys will supplement its rebuttal disclosure on a schedule set by the Court, if required.

Sincerely,

Justin M. Lichterman

cc:      Alyson Huber, Esq.

# EXHIBIT J

COPY

# BARTKOZANKEL
Bartko·Zankel·Tarrant·Miller | Lavitt & Hannan, Inc. *of Counsel*

Alyson L. Huber
ahuber@bztm.com

Our File: 2103.000

*A Professional Corporation*
900 Front Street, Suite 300
San Francisco, CA 94111
p: 415.956.1900
f: 415.956.1152
www.bztm.com

October 26, 2006

<u>Via Hand Delivery</u>

**RECEIVED**

OCT 2 6 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Hon. Marilyn H. Patel
United States District Court, Northern District of California
450 Golden Gate Ave, Courtroom 15, 18th Floor
San Francisco, CA 94102

> Re:  *Sunnyside Development Company LLC v. Opsys Limited, et al.;*
>      <u>Case No. C 05-00553 MHP (Cal.N.D.)-- Discovery Disputes</u>

Dear Judge Patel:

Plaintiff Sunnyside Development Company LLC ("Sunnyside") hereby submits this summary description of the discovery disputes between Sunnyside and Opsys Limited ("Opsys") before the telephonic hearing set for **11:00 a.m. on October 27, 2006**:

1.    <u>Cambridge Display Technologies' ("CDT") relevance</u>. Opsys has refused to provide all documents between CDT and Opsys between June 1, 2002 and December 31, 2002. *See* RFPD Nos. 7 and 13. Opsys only agreed to provide documents that refer to Sunnyside or the Lease, impacting Sunnyside's ability to defend against Opsys' affirmative defenses that Opsys had no value. The withheld documents likely refer to value and how other Opsys creditors were given better deals than Sunnyside. Opsys expert disclosure states that it will present evidence on "negotiations, structure and terms of the CDT-Opsys Limited transaction," but it refuses to provide discovery covering this same topic.

2.    <u>Community of Interest Privilege</u>. Opsys has asserted a privilege over all communications concerning the advice of attorneys between Opsys and Opsys US during the purported lease assignment although the two entities were supposedly in an arms length transaction shifting a $7 million liability and had separate counsel. The interests were adverse and the disclosure of the advice of attorneys was a waiver of the privilege and those documents should be produced.

3.    <u>Sunnyside August 2006 production</u>. Opsys is seeking to preclude the use of documents received in August 2006, prior to the discovery cut-off on the grounds that they were not produced earlier. There is no prejudice and this is the appropriate time to address preclusion rather than at trial in February. Mostly, the documents are checks and expense information and are not controversial.

**RJN 100**

Hon. Marilyn H. Patel
October 26, 2006
Page 2


     4.    <u>Ainslie report</u>.  Opsys is seeking to preclude the testimony of Paul Ainslie, Sunnyide's damages expert on the grounds that his full opinion was not received on the initial disclosure date.  Mr. Ainslie supplemented and provided a rebuttal report on October 20, 2006.  Mr. Ainsle's report required reviewing documents received after the discovery cut-off in September and October and was unable to commit to a final damages number until October 20, 2006.  His supplemental report reduced Sunnyside's earlier damages estimate by $3 million, and he is ready to be deposed, evidencing the lack of prejudice to Opsys from any delay.

                       Very truly yours,

                       Bartko·Zankel·Tarrant·Miller
                           *A Professional Corporation*

                       Alyson L. Huber

cc:    All Counsel

**RJN 101**

# EXHIBIT K

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT of CALIFORNIA

### CIVIL PRETRIAL MINUTES

**Date:** October 27, 2006

**Case No:** C 05-0553 MHP                **Judge:** MARILYN HALL PATEL

**Case Title:** SUNNYSIDE DEVELOPMENT COMPANY LLC. v. OPSYS LTD., ET AL.

**Appearances:**

For Plaintiff : Robert Bunzel, Alison Huber (all appearing by telephone)

For Defendant: James Burns, Justin Lichterman (all appearing by telephone)


**Deputy Clerks:** Edward Butler          **Court Reporter:** Catherine Edwards

**Time in Court:** 11:03 a.m. - 11:55 a.m.


### PROCEEDINGS

1.Telephonic Discovery Hearing, re: letter briefs submitted by Plaintiff and Defendants, 10/26/06, pursuant to court's Order of 9/14/06.


### SUMMARY

1. Defense must submit to the court for in-camera review the Opsys Board Meeting Minutes dated 4/24/03 and the 10/3/02 e-mail, within 10 days of today's date, i.e. Monday, 11/6/06.

2. With respect to ¶ 1of the Plaintiff's letter brief, re: CDT documents, Defendants shall provide the documents within 10 days of today's date, i.e. Monday, 11/6/06.

3. With respect to ¶¶ 3 and 4 of the Plaintiff's letter brief, any and all expert reports and supplemental reports shall be finished by 11/15/06.  Any depositions and further discovery regarding the reports shall be accomplished by 12/15/06.

4. Plaintiff is to provide all Redacted Attorney Invoices within 10 days of today's date, i.e. Monday, 11/6/06.

**RJN 102**

# EXHIBIT L



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SUNNYSIDE DEVELOPMENT COMPANY, LLC,

          Plaintiff,

    v.

OPSYS LIMITED, a United Kingdom Company,

          Defendant.

No. C 05-00553 MHP

**VERDICT FORM**

RJN 103

-1-

## VERDICT FORM

We answer the questions submitted to us as follows:

1.  Did Opsys Limited make material representations and warranties in the Assignment of Lease and Consent of Lessor ("Assignment") that were inaccurate?

    a.  At the time of entering into the Assignment?

        ___ Yes  X̲ No

    b.  At the time of the effective date of the Assignment?

        X̲ Yes ___ No

    Regardless of how you answer question 1, answer question 2.

2.  Did the Assignment effectively transfer the Lease from Opsys Limited to Opsys U.S. Corporation?

    ___ Yes  X̲ No

    If your answer to this question is Yes, stop here and have the presiding juror sign and date this form.  If your answer is No, then answer question 3.

3.  Did Opsys Limited breach the Lease with Sunnyside?

    X̲ Yes ___ No

    If your answer to this question is No, stop here and have the presiding juror sign and date this form.  If your answer is Yes, then answer question 4.

4.  Did Opsys Limited's breach cause Sunnyside to suffer damages?

    X̲ Yes ___ No

    If your answer to question 4 is No, stop here and have the presiding juror sign and date this form.  If your answer to question 4 is Yes, then answer question 5.

5.  What are Sunnyside's damages after reducing for any mitigation that you find?

                              TOTAL    $ 4,853,017

Signed: _Marco Rivera-Weiss_          Dated: _9 MARCH '07_
              Presiding Juror

After the verdict form has been signed, deliver this verdict form to the clerk.

**RJN 104**

# EXHIBIT M

1  Robert H. Bunzel, State Bar No. 99395
   Alyson L. Huber, State Bar No. 202713
2  BARTKO, ZANKEL, TARRANT & MILLER
   A Professional Corporation
3  900 Front Street, Suite 300
   San Francisco, California 94111
4  Telephone: (415) 956-1900
   Facsimile: (415) 956-1152
5  rbunzel@bztm.com
   ahuber@bztm.com
6
   Attorneys for Plaintiff
7  SUNNYSIDE DEVELOPMENT CO., LLC

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  SUNNYSIDE DEVELOPMENT COMPANY,    )   No. C 05-00553 MHP
    LLC,                             )
12                                    )   **PLAINTIFF'S NOTICE OF MOTION,**
                 Plaintiff,           )   **AND MOTION FOR ATTORNEY'S**
13                                    )   **FEES PURSUANT TO THE PARTIES**
          v.                          )   **CONTRACTS AND MOTION TO**
14                                    )   **ADD CAMBRIDGE DISPLAY**
                                      )   **TECHNOLOGY, INC. AS A PARTY**
15  OPSYS LIMITED, a United Kingdom   )   **TO ACTION AND JUDGMENT**
    Company,                          )
16                                    )
                 Defendants.          )
17                                    )   Hearing Date:  May 16, 2007
                                      )   Time:          1:00 p.m.
18                                    )   Dept:          15
                                      )   Judge:         Hon. Marilyn H. Patel
19  _____  )

20

21

22

23

24

25

26

27                                        **RJN 105**

28

2103.000/326341.1          NOTICE OF MOTION AND MOTION FOR ATTORNEY'S FEES & TO ADD CAMBRIDGE
                                                              Case No. C 05-00553 MHP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTIONS AND MOTIONS ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 2

I.     INTRODUCTION ............................................................................................................. 2

II.    PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS ............................... 2

    A.    Relevant History For the Award of Attorney's Fees. ........................................... 2

    B.    Sunnyside is Entitled to Its Full Attorney's Fees, Costs and Expenses Reasonably Incurred Under the Lease and the Assignment ........................................................................................................ 3

        1.    State Law Governing The Parties Contracts Controls And Supports An Award To Sunnyside Of Fees, Costs And Expenses. ............................................................................ 3

        2.    Sunnyside Is the Prevailing Party And Should Be Awarded Its Reasonable Attorney's Fees. ................................................. 5

        3.    Sunnyside's Attorney's Fees Were Reasonably Incurred. ...................................................................................................... 5

        4.    Plaintiff's Fees Should Not Be Reduced. ..................................... 7

            a.    No Apportioning for Defendant's Alleged Success on Mitigation. ........................................................ 7

            b.    No Apportioning of Attorney's Fees for Attempts to Add Cambridge as a Party or for ¶ 12.1 of the Lease. ............................................................ 8

III.   PLAINTIFF'S MOTION TO ADD CAMBRIDGE AS A PARTY TO ACTION AND JUDGMENT ......................................................................... 9

    A.    Factual Background. ............................................................................................. 9

    B.    Cambridge Should Be Added As A Defendant And Judgment Debtor ................................................................................................................ 12

        1.    Cambridge Controlled the Litigation. ......................................... 12

        2.    Application of Rules 25(c) and 69(a). ......................................... 13

        3.    State Law Procedures and Standards for Successor Liability. ...................................................................................... 16

        4.    Successor Liability Should Be Imposed on Cambridge. ................................................................................... 17

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 106

-i-

a.   Assumption of Liabilities. ...............................................17

b.   The Cambridge Transaction With Opsys
     Limited is a *De Facto* Consolidation or
     Merger. ..........................................................................18

c.   Cambridge Continued Opsys Limited's R&D
     Business, Providing Only Inadequate
     Consideration. ...............................................................19

d.   The Transfer of Opsys Limited's Assets to
     Cambridge Was for the Purpose of Avoiding
     Opsys Limited's Debts Including to
     Sunnyside. .....................................................................21

5.   Alternatively, An Evidentiary Hearing After
     Discovery May Be Appropriate, As Well As Claims
     Against Cambridge Or CDT Oxford Limited For
     Fraudulent Conveyance. ........................................................22

IV.   CONCLUSION .............................................................................23

BARTKOZANKEL
Bartko, Zankel, Bunzel & Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

**RJN 107**

-ii-

# TABLE OF AUTHORITIES

## CASES

*5th and 46th Co. v. Dusenberry, Ruriani & Kornhauser*
    394 N.Y.S.2d 684 (1977) ................................................................. 17

*Alyeska Pipeline Service Co. v. Wilderness Society*
    421 U.S. 240 (1975) ....................................................................... 4

*Arntz Contracting Co. v. St. Paul Fire & Marine Inc. Co.*
    47 Cal.App.4th 464 (1996) ............................................................. 5

*Beatrice Co. v. State Board of Equalization*
    6 Cal.4th 767 (1993) ....................................................................... 17

*Benaroya Capital Company, LLC v. EMF Partners, LLC*
    2005 WL 1580041 *5 (Wash.App.Div. 2005) ................................. 17

*Beneficial Standard Properties, Inc. v. Scharps*
    67 Cal.App.3d 227 (1977) .............................................................. 5

*Berg Chilling Systems, Inc. v Hull Corporation*
    435 F.3d 455 (3rd Cir. 2006) .......................................................... 15

*Bruckman v. Parliament Escrow Corp.*
    190 Cal.App.3d 1051 ...................................................................... 8

*Butler v. Adoption Media LLC*
    2005 WL2107784*3 (ND Cal. 2005) ............................................. 14

*Central States Southeast and Southwest Areas Pension Fund v. Express Freight Lines,*
*Inc.*
    971 F.2d 5 (7th Cir. 1992) .............................................................. 13

*Christianson v. Mechanical Contractors Bid Depository*
    404 F.2d 324 (10th Cir. 1968) ........................................................ 14

*Duris v. Erato Shipping, Inc.*
    684 F.2d, 352, 356 (6th Cir. 1982)
    *aff'd sub nom Pallas Shipping Agency, Ltd. v Duris*
    461 U.S. 529 (1983) ....................................................................... 14

*Expert Elec., Inc. v. Levine*
    554 F.2d 1227 (2nd Cir. 1977) *cert. denied* 434 U.S. 903 ............... 12

*Explosives Corp. of Am. v. Garlam Enters. Corp.*
    817 F.2d 894 (1st Cir. 1987) ..................................................... 12, 13

Federal Rules of Civil Procedure
    Rule 69(a) .......................................................... 1, 2, 13, 23

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

**RJN 108**

-iii-

*Fed-Mart Corp. v. Pell Enterprises, Inc.*
    111 Cal.App.3d 215 (4th Dist. 1980) ............................................................. 6

*Fisher v. Allis Chalmers Corp. Product Liability Trust*
    95 Cal. App. 4th 1182 (2002) ..................................................................... 22

*Franklin v. USC Corp.*
    87 Cal.App.4th 615 (2001) ................................................................... 18, 20

*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conference Ctr. Bd.*
    41 Cal.App.4th 1551 (1996) ...................................................................... 16

*Henkel Corporation v. Hartford Accident & Indemnity Co.*
    29 Cal.4th 934 (2003) ............................................................................... 17

*Hensley v. Eckerheart*
    461 U.S. 424 (1983) .................................................................................... 8

*Herrera v. Sing*
    118 F.Supp.2d 1120 (E.D. Wash. 2000) .................................................... 13

*Hsu v. Abbara*
    9 Cal.4th 863 (1995) ................................................................................... 4

*Hurtado v. Superior Court*
    11 Cal.3d 574 (1974) ................................................................................ 15

*Issa v. Alzammar*
    38 Cal.App.4th Supp. 1 (1995) ................................................................. 16

*Kasel v Remmington Arms Co.*
    24 Cal.App.3d 711 (1972) ........................................................................ 15

*Katzier's Floor and Home Design, Inc. v. M-MLS.com*
    394 F.3d 1143 (9th Cir. 2004) .................................................................. 20

*Klaxon Co. v Stentor Elec. Mfg. Co.*
    313 US 487 (1941) .................................................................................... 15

*Koehler v. The Bank of Bermuda Ltd.*
    2002 WL 1766444 (S.D.N.Y. 2002) .......................................................... 12

*Korech v. Hornwood*
    58 Cal.App.4th 1412 (2nd Dist. 1997) ........................................................ 7

*Libutti v. United States*
    178 F.3d 114 (2nd Cir. 1999) .............................................................. 12, 14

*Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*
    13 F.3d 69 (3rd Cir. 1993) ............................................................. 12, 14, 22

*Marks v. Minnesota Mining and Manufacturing Co.*
    187 Cal.App.3d 1429 (1987) ..................................................................... 18

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-iv-

**RJN 109**

*McClellan v. Northridge Park Townhome Owners*
        89 Cal.App.4th 746 (2001) ........................................................................ 16

*Monarch Bay II v. Prof'l Serv. Indus., Inc.*
        75 Cal.App.4th 1213 (1999) ...................................................................... 20

*Morrow v. Hood Communications, Inc.*
        59 Cal.App.4th 924 (1997) ........................................................................ 17

*Motores De Mexicali v. Superior Court*
        51 Cal.2d 172 (1958) ................................................................................ 13

*NEC Electronics, Inc. v. Hurt*
        208 Cal.App.3d 772 (1989) ....................................................................... 16

*Oyakawa v. Gillett*
        8 Cal.App.4th 628 (1992) .......................................................................... 13

*Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*
        566 F.2d 8 (7th Cir. 1977) ......................................................................... 23

*Peacock v. Thomas*
        516 U.S. 349 (1996) .................................................................................. 14

*Ray v. Alad Corp.*
        19 Cal.3d. 22 (1977) ........................................................................ 13, 17, 20

*Reynolds Metals Co. v. Alperson*
        25 Cal.3d 124 (1979) .............................................................................. 4, 7

*Schwartz v Pillsbury, Inc.*
        969 F.2d 840 (9th Cir. 1992) ..................................................................... 14

*Select Creations, Inc. v Paliafito America, Inc.*
        852 F.Supp. 740 (ED Wis. 1994) .............................................................. 14

*Shannon v. Samuel Langston Co.*
        379 F. Supp. 797 (W.D. Mich. 1974) ........................................................ 18

*Sierra-Bay Fed. Land Bank Assn. v Superior Court*
        227 Cal.App.3d 318 (1991) ....................................................................... 15

*Steinbach v. Hubbard*
        51 F.3d 843 (9th Cir. 1995) ....................................................................... 13

*Texas Commerce Bank v. Garamendi*
        28 Cal.App.4th 1234 (1994) ........................................................................ 5

*Thomas, Head & Greisen Employees Trust v. Buster*
        95 F.3d 1449 (9th Cir. 1996) ..................................................................... 14

*Triplett v. Farmers Ins. Exchange*
        24 Cal.App.4th 1415 (1994) ...................................................................... 16

BARTKO ZANKEL
Bartko · Zankel · Tarrant · Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 110

-v-

*Troy Company v. Products Research Company*
   339 F.2d 364 (9th Cir. 1964) .................................................................. 13

*TRW, Inc. v. Ellipse Corp.*
   495 F.2d 314 (7th Cir. 1974) .................................................................. 13

*USI Properties v. M.D. Construction Co.*
   186 F.R.D. 255 (D. Puerto Rico 1999) ..................................................... 13

**STATUTES**

28 United States Code

   section 1920 ......................................................................................... 3

Federal Rules of Civil Procedure

   Local Rule 54-1 ..................................................................................... 3

   Local Rule 54-6 ..................................................................................... 3

   Rule 18(b) ............................................................................................. 23

   Rule 25(c) ................................................................................ 1, 2, 13, 22, 23

   Rule 43(e) ............................................................................................. 22

   Rule 54(d)(1) .......................................................................................... 3

   Rule 54(d)(2) .......................................................................................... 3

   Rule 56(c) ............................................................................................. 22

   Rule 58 ................................................................................................. 13

California Civil Code

   section 1021 ........................................................................................... 4

   section 1717 ........................................................................................ 4, 5

   sections 3439, *et seq.* (Uniform Fraudulent Transfer Act) ..................... 22

California Code of Civil Procedure

   section  1032 ........................................................................................... 5

   section 187 ........................................................................................... 16

   section 1033.5 ........................................................................................ 5

California Corporations Code

   section 1107(a) ..................................................................................... 12

BARTKO ZANKEL
*Bartko Zankel Bunzel Miller*
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 111

Delaware General Corporation Law

section 259 ........................................................................................................................ 12


**OTHER AUTHORITIES**

9 Witkin, <u>Summary of Cal. Law,</u> "Corporations" ...................................................... 16

<u>Rest. 2d of Judgments</u> (1982) .......................................................................................... 13

Wright and Miller, <u>Federal Practice & Procedure</u> (2007) ............................................ 14

RJN 112

-vii-

**NOTICE OF MOTIONS AND MOTIONS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 16, 2007 at 1:00 p.m. or as soon thereafter as the matter may be heard before the Honorable Marilyn Hall Patel, United States District Judge, in Courtroom 15 of the above entitled Court, plaintiff Sunnyside Development Co., LLC ("Sunnyside" or "plaintiff") will and hereby does move for an award of its reasonable attorney's fees, costs and expenses in the amount of $936,534.83 pursuant to the parties' contracts.

Plaintiff will also and hereby does move to add Cambridge Display Technologies, Inc. ("Cambridge") as a party to the action and judgment as Opsys Limited's successor pursuant to general principles of successor liability, and pursuant to Federal Rules of Civil Procedure, Rules 25(c) and 69(a).

Alternatively, Sunnyside seeks leave to add a claim for fraudulent conveyance of the assets of Opsys Limited to Cambridge and to CDT Oxford Limited, pursuant to Rule 18(b).

These motions will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the accompanying Declarations of Alyson L. Huber, Robert H. Bunzel and Paul Ainslie and the complete files and records herein, and on the argument and other evidence to be presented at the hearing of this matter.

DATED: April 2, 2007

<div align="right">

BARTKO, ZANKEL, TARRANT & MILLER
A Professional Corporation


By: _____
            Robert H. Bunzel
            Attorneys for Plaintiff
    SUNNYSIDE DEVELOPMENT CO., LLC

</div>

**RJN 113**

-1-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Sunnyside seeks an award of $936,534.83 for its attorney's fees, costs and expenses reasonably incurred in litigating this breach of contract case to judgment. Although plaintiff attempted to keep costs down by limiting depositions and motion practice, the defense mounted an aggressive campaign to challenge every pleading, take the deposition of virtually every person ever associated with the plaintiff and made a Motion for Summary Judgment on virtually every legal and factual issue raised at trial. In this climate, it is not unreasonable for plaintiff to incur fees and costs that equal only 19% of the verdict received in prosecuting its claim and defending against Opsys Limited's affirmative defenses.

Sunnyside also requests that the Court add Cambridge as a party to the action and judgment against Opsys Limited. Alternatively, prompt discovery and an evidentiary hearing pursuant to Rules 69(a) and 25(c) should be ordered with leave to file a fraudulent conveyance claim if needed.

## II.   PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS

### A.   Relevant History For the Award of Attorney's Fees.

On February 15, 2001, Sunnyside and Opsys Limited entered into a Lease that provides for the recovery of attorney's fees. Paragraph 31 of the Lease states:

> If any Party of Broker brings an action or proceeding involving the Premises to enforce the terms hereof or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorney's fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who **substantially obtains** or defeats **the relief sought**, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorney's fees award shall not be computed in accordance with any court's fee schedule, but shall be such as to fully reimburse all attorney's fees reasonably incurred. In addition, Lessor shall be entitled to attorney's fees, costs and expenses incurred in the preparation and services of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach.

RJN 114

-2-

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    Declaration of Alyson L. Huber ("Huber Decl."), Exh. 1 (Exhibit 2 at trial) (emphasis in original

2    and supplied).  On or about October 2002, Sunnyside and Opsys Limited entered into another

3    contract, the Assignment of Lease and Consent of Lessor ("Assignment"), which also provides for

4    attorney's fees, costs and expenses.  Huber Decl. Exh. 2 (Exhibit 31 at trial).  Paragraph 8(f) of the

5    Assignment provides:

6              In the event an action is initiated to interpret or enforce any of the
               terms of this Assignment or enforce any judgment, the prevailing
7              party shall be entitled to receive from the other party reasonable
               attorney's fees, costs, and expenses incurred in the action.
8
9         On December 14, 2004, Sunnyside filed this breach of contract case.  Sunnyside

10   proceeded to trial on only a single claim for breach of the lease (although plaintiff sought damages

11   for multiple breaches).  The primary defense asserted by Opsys Limited was that the Assignment

12   effectively relieved it from any liability under the Lease, arguing that the Lease was transferred to

13   another entity.  The instructions read to the jury focused on plaintiff's breach of contract claim and

14   Opsys Limited's attempts to enforce the Assignment, which would have been a written novation.

15   All of the underlying disputed facts for both plaintiff's claims and each of defendant's affirmative

16   defenses were related.  Opsys Limited relied on the Assignment and Sunnyside the Lease.

17        On March 9, 2007, the jury returned a verdict in favor of plaintiff on its breach of

18   contract claim in the amount of $4,853,017.  Huber Decl. Exh. 3.  The jury found that the

19   Assignment did not effectively transfer the Lease.  *Id.*

     B.    Sunnyside is Entitled to Its Full Attorney's Fees, Costs and
20         Expenses Reasonably Incurred Under the Lease and the Assignment

21         1.    State Law Governing The Parties Contracts Controls
                 And Supports An Award To Sunnyside Of Fees,
22               Costs And Expenses.

23        Sunnyside files this motion for an award of attorney's fees pursuant to Federal

24   Rules of Civil Procedure, Rule 54(d)(2) and Local Rule 54-6.[1]  Sunnyside is entitled to be fully

25   reimbursed for its attorney's fees, costs and expenses reasonably incurred under two separate

26   ─────────────────
     [1]    Sunnyside has concurrently filed a separate Bill of Costs pursuant to 28 U.S.C. § 1920,
27   Federal Rules of Civil Procedure, Rule 54(d)(1) and Local Rule 54-1 for the costs taxable by the
     Clerk.  Sunnyside requests that any costs not taxed by the Clerk be added to the award issued
28   under this Motion for Attorney's Fees.

                                      -3-

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 115

1  contracts, the Lease and the Assignment. *See* Huber Decl. Exh. 1 at ¶ 31 and Exh. 2 at ¶ 8(f).

2  State law governs the construction of a contract for recovery of attorney's fees and the

3  reasonableness of fees. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259

4  fn.31 (1975). Here, California law provides that the measure and mode of compensation of

5  attorney's fees is left to the express or implied agreement of the parties. Cal. Civ. Code § 1021.

6  When a party is entitled to attorney's fees from an express contractual right, the Court does not

7  apply a lodestar analysis since the award is based on the parties' agreement and not on equitable

8  determinations of the Court. *Hsu v. Abbara*, 9 Cal.4th 863, 876-77 (1995).

9      Sunnyside is also entitled to its attorney's fees, costs and expenses in litigating

10  against the affirmative defense of the written Assignment. In California, when one party is

11  successful in defeating a contract claim (here the effectiveness of the Assignment) by proving that

12  the contract was not enforceable, that party is entitled to its attorney's fees pursuant to California

13  Civil Code § 1717. Civil Code § 1717 was enacted to make one-sided attorney's fees provisions

14  apply to all parties to the contract and to prevent the oppressive use of one-sided attorney's fees

15  provisions. *Reynolds Metals Co. v. Alperson*, 25 Cal.3d 124, 128 (1979). To achieve this purpose

16  the statute applies in favor of the prevailing party on a contract claim (here, the Assignment),

17  whenever that party would have been liable under the contract for attorney's fees had the other

18  party prevailed. *Hsu, supra*, 9 Cal.4th at 870. Had Opsys Limited successfully enforced the

19  Assignment, Opsys Limited would have claimed that Sunnyside is liable for attorney's fees

20  pursuant to ¶ 8(f) of the Assignment. Since Sunnyside prevailed, Sunnyside is entitled to the

21  benefit of ¶ 8(f), pursuant to § 1717.

22      The Assignment's fee provisions are as broad or broader than the Lease provision,

23  and extend to "attorney's fees, costs, and expenses" and efforts to "enforce any judgment." Huber

24  Decl. Exh. 2 at ¶ 8(f). Had Opsys Limited prevailed, it would have been entitled to fees to enforce

25  any judgment. Under Civil Code § 1717, and the California Supreme Court's interpretation of its

26  underlying policy, Sunnyside cannot receive less of a benefit than Opsys Limited would have

27  received had it prevailed on the Assignment. *Hsu, supra*, 9 Cal.4th at 870-71. Contracting parties

28

BARTKO ZANKEL
Bartko · Zankel · Tarrant · Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-4-

RJN 116

1   are free to agree to choose a broader standard authorizing recovery of reasonable litigation costs

2   and expenses, and the court must award these costs and expenses to the prevailing party. *Texas*

3   *Commerce Bank v. Garamendi*, 28 Cal.App.4th 1234 (1994); *Arntz Contracting Co. v. St. Paul*

4   *Fire & Marine Inc. Co.*, 47 Cal.App.4th 464, 491 (1996).

5              2.     Sunnyside Is the Prevailing Party And Should Be
                      Awarded Its Reasonable Attorney's Fees.

6              According to the Lease: "'**Prevailing Party**' shall include, without limitation, a

7   Party or Broker who substantially obtains or defeats the relief sought."[2] Huber Decl. Exh. 1 at

8   ¶ 31. Plaintiff is easily the prevailing party on the Lease and the Assignment contract. The

9   Defendant asserted an affirmative defense that the Assignment created a novation and released it

10  from liability under the Lease. Plaintiff defeated this claim in its entirety and is entitled to its

11  reasonable attorney's fees, costs and expenses incurred in defeating this and all other affirmative

12  defenses. Huber Decl. Exh. 1 at ¶ 31 and Exh. 2 at ¶ 8(f).

13             Plaintiff also substantially obtained the damages it sought on its breach of contract

14  claim. Plaintiff requested that the jury award approximately $6.6 million in damages. Defendant

15  argued that it owed zero under the Lease but that even if it were found liable under the Lease

16  reasonable damages, taking into account asserted mitigation, would fall between $1-1.5 million.

17  Huber Decl. ¶ 4. The jury awarded close to $4.9 million in damages to the plaintiff. Huber Decl.

18  Exh. 3. Plaintiff clearly is the prevailing party.

19             3.     Sunnyside's Attorney's Fees Were Reasonably
                      Incurred.

20

21             Sunnyside has elected to have its attorney's fees related to this litigation determined

22  by the Court as costs to be taxed to the judgment. *See Beneficial Standard Properties, Inc. v.*

23  *Scharps*, 67 Cal.App.3d 227, 231-232 (1977); Civ. Code § 1033.5 (a)(10)(A); also discussed at

24  Court Discovery Hearing on October 27, 2006. Sunnyside is not seeking by this post-trial motion

25  any attorney's fees, costs or expenses that were presented to the jury as damages. For example,

26  <hr>
    [2]    Prevailing Party is also defined in Cal. Code of Civ. Proc. § 1032(a)(4) as the party with a net

27  monetary recovery. Civ. Code § 1717(b)(1) states "the party prevailing on the contract shall be the
    party who recovered a greater relief in the action on the contract." Plaintiff meets both of these

28  definitions as well as the definition in the contract.

2103.000/326341.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES & TO
                     ADD CAMBRIDGE; Case No. C 05-00553 MHP

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    Sunnyside presented evidence at trial that it incurred attorney's fees for services performed by the

2    law firm of Wendel Rosen related to the clean-up of the property and the bankruptcy of Opsys US

3    Corporation. Sunnyside is not seeking those attorney's fees in this motion. Rather, Sunnyside is

4    only requesting an award of attorney's fees for those fees, costs and expenses directly related to

5    the prosecution of this action. Those fees include the services of Stanley Hilton, Esq., the Bartko

6    firm, and all experts and consultants used for this case.

7    　　　　The Lease provides that the award of attorney's fees to the prevailing party shall be

8    such as to "fully reimburse" it for all attorney's fees reasonably incurred. All fees and costs

9    prayed for here were incurred by Sunnyside. Bunzel Decl., ¶ 22. It is within the sound discretion

10   of the Court to determine whether the full fees were reasonably incurred. *Fed-Mart Corp. v. Pell*

11   *Enterprises, Inc.*, 111 Cal.App.3d 215, 228 (4th Dist. 1980). There are several factors that

12   contributed to the amount of fees incurred in this action. Plaintiff has summarized its time spent

13   on categories and tasks to shed light on why this breach of contract case was so heavily litigated.

14   Huber Decl. ¶¶ 8-9. To assist the Court in determining the reasonableness of the fees and costs,

15   plaintiff presents the following breakdown. *See* Huber Decl. ¶ 8.

| Category | Description | Hours | Fees |
|---|---|---|---|
| 1 | Initial Case Analysis | 264.65 | $71,137.50 |
| 2 | Efforts to Add CDT, Inc. | 55.8 | $20,060.50 |
| 3 | Document management | 106 | $16,527.00 |
| 4 | Fact Discovery | 529.4 | $146,777.50 |
| 5 | Communications w/ client | 19.9 | $8,821.25 |
| 6 | Expert Discovery | 152.15 | $44,925.00 |
| 7 | Defendant's MSJ | 321.2 | $90,966.00 |
| 8 | Sale of Property issues | 2.05 | $1,025.00 |
| 9 | Trial preparation | 766.35 | $214,299.00 |
| 10 | Trial | 465.05 | $136,227.50 |
| 11 | Post-Verdict | 13.85 | $5,205.00 |
| 12 | Fee Application | 35.65 | $8,787.50 |
| 13 | Mediation & Settlement | 46.95 | $18,541.25 |
|  | Bartko Fees Total | 2770 | $783,300.00 |
| 14 | Estimate 3/24-5/16 | 100 | $39,000.00 |
| 15 | Stanley Hilton, Esq. Fees |  | $6,200.00 |
| 16 | Non-taxable costs |  | $108,034.83 |
|  | **TOTAL Award Requested** |  | **$936,534.83** |

RJN 118

2103.000/326341.1      MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES & TO
ADD CAMBRIDGE; Case No. C 05-00553 MHP

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    4.    <u>Plaintiff's Fees Should Not Be Reduced.</u>

2    Since all of the claims that were taken to trial are claims for which there is a right to

3    attorney's fees (Lease and Assignment), there is no reason to apportion the attorney's fees among

4    claims. *Reynolds*, 25 Cal.3d at 129. Even if the Court concluded that other claims were not

5    technically contract claims, the rule in California is that attorney's fees need not be apportioned

6    when incurred for representation on an issue "common" to both a cause of action in which fees are

7    proper and one in which they are not allowed. *Korech v. Hornwood*, 58 Cal.App.4th 1412, 1416,

8    1422 (2nd Dist. 1997), *citing Reynolds*, 25 Cal.3d at 129-130. For example, the initial pleading of

9    fraud in the inducement of the Lease arises from the same nucleus of facts and relates to the Lease,

10   and should not be subject to apportionment. Even if the Court thought otherwise, plaintiff's

11   attorney's fees for Stanley Hilton, Esq. for $6,200 would only be slightly reduced. Huber Decl.

12   ¶ 8 (15). Plaintiff's present lawyers never argued a claim that fell outside the breach of contract

13   claim for relief.

14          a.    No Apportioning for Defendant's Alleged
                  <u>Success on Mitigation.</u>

15   Opsys Limited on March 14, 2007, argued at the post-trial case management

16   conference that it should be deemed the prevailing party on the "issue" of "mitigation," implying

17   that fees should be apportioned accordingly. The Court should reject this argument. First, neither

18   the Lease nor the Assignment provides for this reduction. The term "prevailing party" is expressly

19   defined by contract to mean the party that "substantially obtains" the relief sought. There is no

20   question that Sunnyside substantially obtained a significant breach of contract award.

21          Second, there is no California authority supporting the proposition that a Court

22   should apportion fees in the context of a contract-based attorney's fees award among sub-claims

23   within a breach of contract claim for relief. To do so would be contrary to the parties' binding

24   agreement.

25          Third, Opsys Limited's closing argument on mitigation establishes that Opsys

26   Limited was not successful. Huber Decl. ¶ 4. Mr. Burns asked the jury to only award between

27   $1 million–$1.5 million in damages after mitigation. Mr. Burns stated that Sunnyside only had

28   

-7-

BARTKO ZANKEL
*Bartko, Zankel, Tarrant & Miller*
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 119

1　$638,000 in lost rent through June 2004 and should only receive an additional nine months of rent,

2　or $954,000, for a total loss of $1,580,000. Mr. Burns claimed that anything additionally sought

3　by Sunnyside was "over reaching." Sunnyside requested an award of $6.6 million in its closing

4　argument and the jury returned a verdict for plaintiff in the amount of $4,853,017. These facts do

5　not imply that Opsys Limited was more successful than Sunnyside regarding the duty to mitigate,

6　and there were other damage-reducing theories advanced by the defense (such as penalty plus

7　interest being excessive), as well as an overall "reasonableness" instruction.

8　　　　　　　b.　　No Apportioning of Attorney's Fees for
　　　　　　　　　　Attempts to Add Cambridge as a Party or for
9　　　　　　　　　　¶ 12.1 of the Lease.

10　　　　　Plaintiff has sought to add Cambridge Display Technology, Inc. as a successor

11　party in aid of enforcement of the judgment, a clearly recoverable expense under the Assignment

12　at ¶ 8(f) and Lease at ¶ 31. In addition, plaintiff had earlier asserted breach of ¶ 12.1 of the Lease,

13　which provided additional breach of contract damages (unconsented assignment). Ainslie Decl.

14　¶ 2. Though plaintiff dropped this claim in order to avoid confusing the jury, it was integrally

15　related to the breach of contract claim. The prevailing party is entitled to be fully reimbursed for

16　its attorney's fees even if one of five asserted breaches on which related fees and cost were spent,

17　was not presented to the jury. As long as plaintiff "substantially obtained" the relief it sought, it is

18　the prevailing party under the contracts and is entitled to its reasonably incurred fees expenses. As

19　the U.S. Supreme Court noted in *Hensley v. Eckerheart*, 461 U.S. 424, 431 (1983), even in the

20　absence of a contractual basis for fee recovery, no reduction is warranted where "plaintiff's

21　counsel expended a certain limited amount of time pursuing certain issues of fact and law that

22　ultimately did not become litigated issues in the case or upon which plaintiffs ultimately did not

23　prevail," where "plaintiffs prevailed on the merits and achieved excellent results."

24　　　　　Finally, the fees incurred on this motion are recoverable. *Bruckman v. Parliament*

25　*Escrow Corp.*, 190 Cal.App.3d 1051, 1062 [recovery of fees for fee-related activity authorized in

26　contract action].

27

28

BARTKO ZANKEL
*Bartko, Zankel, Tarrant & Miller*
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 120

-8-

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

III.   **PLAINTIFF'S MOTION TO ADD CAMBRIDGE AS A PARTY TO ACTION AND JUDGMENT**

   A.   <u>Factual Background.</u>

   Sunnyside seeks post-verdict relief so that the company that has succeeded to the assets and business of the defendant, and which litigated this case on its behalf, shall pay this Court's judgment.[3]  This motion is supported by a large volume of publicly-filed documents and undisputed exhibits, and relates the following basic facts:

- In fall 2002, judgment debtor Opsys Limited had debts in excess of 17 million British pounds, and a potentially large lease liability to plaintiff, which has now been adjudicated against it.[4]

- A deal was made October 23, 2002 to sell Opsys Limited's intellectual property and operations in the UK to CDT Acquisition Corp. which subsequently changed its name to Cambridge Display Technology, Inc. ("Cambridge"), a Delaware company that has now gone public.[5]

- To effect this transaction, Opsys Limited pushed down all of its valuable intellectual property and patents, and its UK operations, into a subsidiary known as Opsys UK.[6]

- Cambridge acquired a 16% interest in Opsys UK for $5 million on October 23, 2002, obtaining a 98% interest in the profits of that company and full control over its technology and operations.[7]

- As part of that transaction, Cambridge purchased options to acquire the rest of Opsys UK, or all of Opsys Limited and its remaining 84% interest in Opsys UK, which held all of the transferred assets.[8]

---

[3]   At this writing, the form of Judgment presented March 20, 2007 has not been entered, but this motion assumes that a Judgment on the verdict issued March 9, 2007 will be entered at or before the hearing on this motion.  Most of the facts supporting this motion are set forth as attachments to the Declarations of Robert H. Bunzel ("Bunzel Decl.") and Paul R. Ainslie ("Ainslie Decl."), referenced in the following footnotes.

[4]   Bunzel Decl. ¶ 18 and Exh. M, pp. 17-18; Ainslie Decl. ¶ 6.           **RJN 121**

[5]   Bunzel Decl. ¶¶ 3-4 and Exhs. A-B.

[6]   Bunzel Decl. ¶ 3 and Exh. A, p. 5 of 16 WHERAS clause (F); Ainslie Decl ¶ 5.

[7]   Ainslie Decl. ¶ 5; Bunzel Decl. ¶ 3 and Exh. A, pp. 22 of 116, § 7.1; 24 of 116, §§ 8.3, 8.4.

-9-

1   • In 2002, the name of Opsys Limited's subsidiary, Opsys UK, was changed to CDT Oxford
2     Limited.[9]

3   • After October 2002, the Oxford-based research and development business of Opsys
4     Limited was continued by Cambridge, until July 2003, when the operations of CDT Oxford
5     Limited (formerly Opsys UK) were fully "consolidated" into Cambridge and/or
6     Cambridge's other affiliates "under one roof" in the city of Cambridge.[10]

7   • In 2004, Cambridge filed its prospectus with the Securities Exchange Commission to issue
8     public shares. In that prospectus and in its annual reports thereafter, Cambridge touted its
      acquisition of Opsys Limited as a cornerstone of its research and development value in the
9     flat panel display niche, and noted that IPO funds would be used to pay Opsys Limited
10    liabilities.[11]

11  • Just prior to its initial public offering, Cambridge elected to complete the acquisition of
12    Opsys Limited and CDT Oxford Limited (formerly Opsys UK) by acquiring 100% of the
13    stock of Opsys Limited (which owned 84% of Opsys UK) in exchange for 817,000 shares
14    of Cambridge stock.[12]

15  • Cambridge for accounting purposes valued the acquisition of CDT Oxford Limited
16    (holding all of the IP UK assets of Opsys Limited) at between $19.7 million and
17    $26.9 million.[13]

18  • Cambridge and the shareholders of Opsys Limited agreed to a settlement and escrow
19    mechanism whereby some of the Cambridge stock, but not all of it, that Opsys Limited's
20    shareholders were to receive from exchanging their Opsys Limited stock, would indemnify
      Cambridge for undisclosed or contingent liabilities.[14]
21

22
23  [8]   Ainslie Decl. ¶ 4 and Exh B.
24  [9]   Bunzel Decl. Exh. C, p. 68 of 149.
      [10]  Bunzel Decl. ¶ 8 and Exh. F.
25  [11]  Bunzel Decl. ¶ 5 and Exh. C at pp. 29 of 149, 40 of 149, 58 of 152, 68 of 149; ¶ 7 and Exh. E
      at pp. 22 of 99, 25 of 99, 30 of 99, and 36 of 99.
26  [12]  Ainslie Decl. Exh B, p. F-16.                                    **RJN 122**
27  [13]  Ainslie Decl. ¶ 7 and Exh. B.
28  [14]  Bunzel Decl. ¶ 6 and Exh. D, Escrow Agreement § 4(e) at p. 43 of 58.

-10-

*Left margin:*
BARTKO ZANKEL
Becker, Tarbox, Bunzel, Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

- In the same month of the Cambridge public offering and the purchase of Opsys Limited shares by Cambridge, plaintiff filed this action against Opsys Limited.[15]

- Opsys Limited and CDT Oxford Limited (formerly Opsys UK and once owned by Opsys Limited) have applied for or obtained, in the name of CDT Oxford Limited, substantial patents related to Cambridge's research and development business.[16]

- In 2005, *during the pendency of this case*, CDT Oxford Limited (formerly Opsys UK) was transferred from the direct ownership (84%) of now judgment debtor Opsys Limited to become a direct subsidiary of Cambridge.[17]

- After protracted and expensive litigation, the jury returned a verdict in this action on March 9, 2007 for approximately $4.85 million against Opsys Limited.[18]

- Cambridge then announced in a press release that Opsys Limited does "not have any assets nor does it have any intellectual property rights...."[19]

- Cambridge directed this litigation and advanced the funds to defend it and its representatives presided over the trial.[20]

- The market capitalization value today of Cambridge, which includes the valuable IP and operations from Opsys Limited that supported its public offering, is $121 million (as of March 30, 2007) http://finance.yahoo.com/q?s=oled&x=0&y=0.

Thus, defendant's assets, valued by Cambridge at $19.7 million to $26.9 million, were transferred to Cambridge despite considerable debt and the potential liability to Sunnyside, while Cambridge infused minimum cash into Opsys Limited in fall of 2002, with only Cambridge shares delivered directly to the shareholders of Opsys Limited in 2004 to close the deal. Thereafter, the only remaining asset of Opsys Limited -- its majority shareholding in CDT Oxford Limited (IP and patents) -- was transferred to Cambridge in 2005 *while this action was pending*.

[15]  Docket entry No. 1, Notice of Removal, attaching Complaint filed December 14, 2004.

[16]  Bunzel Decl. ¶ 20 and Exh. O.

[17]  Ainslie Decl. ¶¶ 9-10 and Exh. C.

[18]  Docket entry No. 166, March 9, 2007.

[19]  Bunzel Decl. ¶ 14 and Exh. J.

[20]  Bunzel Decl. ¶ 19 and Exh. N; ¶¶ 12-13 and Exhs. H, I.

RJN 123

-11-

BARTKOZANKEL
Bartko · Zankel · Tarrant · Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  Opsys Limited was thus 'hollowed out,' its assets stripped and transferred to Cambridge in

2  exchange for Cambridge stock to Opsys Limited shareholders, bypassing Opsys Limited and its

3  creditor Sunnyside.  The disclosures in the Cambridge 2004 10-K, describing the acquisition of

4  Opsys Limited, contain "unusual" awareness of prejudice to creditors. Ainslie Decl. ¶ 8, Exh. B.

5  Although Cambridge vigorously defended this case, it now seeks to hide behind the stripped shell.

6      The Federal Rules do not condone such conduct, and equity and due process dictate

7  that Cambridge be added as a party and judgment debtor.  The remaining escrow shares, payable to

8  Cambridge following the verdict, should be delivered to plaintiff, along with whatever additional

9  funds from Cambridge are needed to satisfy the judgment, plus attorney's fees and costs.

10      B.    Cambridge Should Be Added As A Defendant And Judgment
              Debtor

11      1.    Cambridge Controlled the Litigation.

12      A corporation that merges with another corporation is the latter's successor for

13  purposes of litigation.  *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3rd Cir.

14  1993); Del. Gen. Corp. Law § 259 [merger or consolidation requires surviving corporation to pay

15  "all debts" of any of the "constituent corporations"]; Cal. Corp. Code § 1107(a). Cambridge and

16  Opsys Limited did not consolidate by statutory merger, but rather via an asset and stock purchase:

17

18          On the other hand, a corporation that acquires all of another
            corporation's assets without undergoing a legal merger ordinarily is
            not liable for a judgment as a successor [citation] **unless it**

19          **controlled the litigation that resulted in the judgment,** see
            *Explosives Corp. of Am. v. Garlam Enters. Corp.*, 817 F.2d 894,

20          904-07 (1st Cir. 1987) or if there is fraud, see *Libutti*, 178 F.3d at
            124. (Emphasis supplied.)

21
   *Koehler v. The Bank of Bermuda Ltd.*, 2002 WL 1766444 (S.D.N.Y. 2002).

22
            Generally speaking, one whose **interests were adequately**
23          **represented** by another vested with the authority of representation **is**
            **bound by the judgment,** although not formally a party to the

24          litigation. (Emphasis supplied.)

25  *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1223 (2nd Cir. 1977), *cert. denied* 434 U.S. 903.

26  While Cambridge and Opsys Limited sought to avoid a statutory merger, all the earmarks of

27  successor liability exist. A transferee may be "liable for a judgment" when (1) the transferee is a

28

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-12-

RJN 124

1    bona fide successor, (2) the transferee had notice of the potential liability, and (3) the predecessor

2    is unable to directly provide adequate relief. *Herrera v. Sing*, 118 F.Supp.2d 1120, 1123 (E.D.

3    Wash. 2000), *citing Steinbach v. Hubbard*, 51 F.3d 843, 845-46 (9th Cir. 1995).[21] There are strong

4    equitable reasons for imposing liability against Cambridge, which directed the litigation with full

5    opportunity to defend. Bunzel Decl. ¶ 19, Exh. N.[22]

6                2.    Application of Rules 25(c) and 69(a).

7                As stated at p. 4 of plaintiff's Post-Trial Summary of the Record filed March 20,

8    2007, post-verdict proceedings against Cambridge or its affiliates are driven by Fed. R. Civ. P.

9    Rules 25(c) and 69(a).[23]  Rule 25(c) applies to transfers occurring at any time "after an action is

10   brought, including after judgment is entered." *Herrera v. Sing, supra*, 118 F.Supp.2d at 1123,

11   *citing USI Properties v. M.D. Construction Co.*, 186 F.R.D. 255, 260 (D. Puerto Rico 1999);

12   *Explosives Corp. of Am. v. Garlam Enters. Corp.*, 817 F.2d 894, 907 (1st Cir. 1987); 6 Moore's

13   Federal Practice (3d Ed.) § 25.35[1] and fn.4. Imposing successor liability involves broad

14   equitable considerations. *Ray v. Alad Corp.*, 19 Cal.3d. 22, 34 (1977).[24]

15               Rule 69(a) provides:

16               The ***procedure on execution***, in proceedings supplementary to and
                 in aid of a judgment, and in proceedings on and in aid of execution
17               ***shall be in accordance with the practice and procedure of the state***

---

18   [21]   The requirement that the party to be added to the judgment had to have controlled the
19   litigation is to protect that party's due process rights. *Motores De Mexicali v. Superior Court*,
     51 Cal.2d 172 (1958). See *also* Rest. 2d of Judgments, § 59 (1982).

20   [22]   *Oyakawa v. Gillet*, 8 Cal.App.4th 628, 631 (1992) [judgment amended; new defendant
     represented by original defendant's representation at trial]. Factors important to a finding of
21   control include selection and payment of counsel, payment of litigation expenses, a written
     indemnification agreement, participation in settlement negotiations, and control over the decision
22   to appeal. *TRW, Inc. v. Ellipse Corp.*, 495 F.2d 314, 318 (7th Cir. 1974); *Troy Company v.
     Products Research Company*, 339 F.2d 364, 367 (9th Cir. 1964). All are present here.
23
     [23]   As one court has noted, "the judgment entered pursuant to Fed. R. Civ. P. 58 ends the
24   proceeding to determine liability and relief, but it begins the collection proceeding if the defendant
     refuses to pay." *Central States Southeast and Southwest Areas Pension Fund v. Express Freight
25   Lines, Inc.*, 971 F.2d 5, 6 (7th Cir. 1992).

26   [24]   Plaintiff is not asking the Court to reconsider the prior dismissal with prejudice as to earlier
     claims made against CDT Limited, a UK company.  Rather, this motion concerns Cambridge
27   Display Technology, Inc., a Delaware Company, and potentially CDT Oxford Limited, and does
     not assert *alter ego* claims for participating directly in the breach of lease or for fraud, which were
28   earlier dismissed.

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-13-                                RJN 125

1          **in which the district court is held**, existing at the time the remedy is
sought, except that any statute of the United States governs to the
2          extent that it is applicable. (Emphasis supplied.)

3 Under Rule 69(a) "the relevant law is that of the state in which the district court is held." Wright

4 and Miller, Federal Practice & Procedure (2007) at § 3012. "[I]n determining the liability of the

5 corporation's successor for the judgment debt of the corporation, Utah [forum] corporate law was

6 controlling when applicable." *Id.* at fn.26, *citing Christianson v. Mechanical Contractors Bid*

7 *Depository*, 404 F.2d 324, 325 (10th Cir. 1968).

8        In *Thomas, Head & Greisen Employees Trust v. Buster*, 95 F.3d 1449, 1456-60 (9th

9 Cir. 1996), a judgment creditor used supplementary proceedings against non-parties to recover

10 amounts transferred to them to satisfy his judgment, and the Ninth Circuit approved application of

11 forum state (Alaska) law in enforcing judgment rights against non-parties.[25]    Rule 69(a)'s

12 requirement to apply forum state law should resolve the issue of choice of law in determining

13 successor liability here, given the verdict and incipient judgment.

14        Rule 25(c), itself, "does not ordinarily alter the substantive rights of parties but is

15 merely a procedural device designed to facilitate the conduct of a case." *Luxliner, supra*, 13 F.3d

16 at 71-2. If the Court on this motion concludes additional discovery and a later evidentiary hearing

17 are required before Cambridge is added to the judgment (*see* section II D, *infra*), then adding

18 Cambridge as a party may not require resolution of substantive law at this time. *See Butler v.*

19 *Adoption Media LLC*, 2005 WL2107784*3 (ND Cal. 2005).[26]    Ultimately, successor liability is

20 determined by state substantive law. *Libutti v. United States*, 178 F.3d 114, 124 (2nd Cir. 1999).

21        The Ninth Circuit in *Schwartz v Pillsbury, Inc.*, 969 F.2d 840, 844-5 (9th Cir. 1992)

22 applied California law to determine successor liability without reference to the parties' contract,

23

24 [25]   *See Peacock v. Thomas*, 516 U.S. 349, 356 (1996) [approving "broad range of supplementary
proceedings involving third parties to assist in the protection of federal judgments, including
25 attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent transfers."]

26 [26]   Nor is there a jurisdictional issue, since "if a court has personal jurisdiction over the
predecessor in interest, once successor liability is established, personal jurisdiction over the
27 successor in interest necessarily exits."   *Select Creations, Inc. v Paliafito America, Inc.*,
852 F.Supp. 740, 765 (ED Wis. 1994), *citing Duris v. Erato Shipping, Inc.*, 684 F.2d, 352, 356
28 (6th Cir. 1982), *aff'd sub nom Pallas Shipping Agency, Ltd. v Duris*, 461 U.S. 529 (1983).

-14-

BARTKO ZANKEL
Berker, Zankel, Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 126

1  where imposition of successor liability "does not involve the interpretation or enforcement" of

2  such agreement. Here, the only liability against Cambridge to be enforced is derivative of Opsys

3  Limited's breach of lease, Exhibit 2 at trial and Exhibit 1 to the accompanying Declaration of

4  Alyson Huber. It provides at § 29 p. 10: "the laws of the State in which the Premises are located

5  [California]" governs. While the Transaction Agreement between Cambridge and Opsys Limited

6  specifies English law at § 36 (Bunzel. Decl. Exh. A), Sunnyside is *not* a party to that agreement.

7  In a lengthy analysis of choice of law in the successor liability context, the Third

8  Circuit in *Berg Chilling Systems, Inc. v Hull Corporation,* 435 F.3d 455 (3rd Cir. 2006) held the

9  choice of law rules of the forum state are the starting point, "because in an action based on

10  diversity of citizenship jurisdiction we must apply the substantive law of the state in which the

11  district court sat, including its choice of law rules." *Id.* at 462, *citing Klaxon Co. v Stentor Elec.*

12  *Mfg. Co.,* 313 US 487, 496 (1941).

13  Judge Alito in *Berg* did *not* apply the contractual choice of law term in the

14  predecessor and successor corporation's asset purchase contract, as those parties had "bargained

15  for New Jersey law to apply to interpretation of the provisions of the contract, not to their real

16  world effect," and because the plaintiff "did not bargain" at all for such law while defendants had

17  acted "to construct the asset purchase agreement specifically to avoid liability to third parties such

18  as Berg." *Id.* at 466 at fn.3. *Berg* ultimately turned on forum state choice of law principles.

19  Here, California's "governmental interest approach" dictates the result. *Hurtado v.*

20  *Superior Court,* 11 Cal.3d 574, 579-580 (1974). California law "would be displaced only if there

21  is a compelling reason for doing so," *Kasel v Remmington Arms Co.,* 24 Cal.App.3d 711, 731

22  (1972), and "only if our state's interest in having its law applied was insignificant or if the other

23  state's law did not conflict with our state's interests." *Sierra-Bay Fed. Land Bank Assn. v Superior*

24  *Court,* 227 Cal.App.3d 318, 331 (1991).[27]  California, in protection of its resident plaintiff

25

26  [27]  Delaware (Cambridge's state of incorporation) also recognizes successor liability of third
parties and the doctrine of *de facto* merger. *Fehl v. S.W.C. Corp.,* 433 F.Supp. 939, 945 (D.C. Del.

27  1977); *Drug, Inc. v. Hunt,* 35 Del. 339, 361 (1933); *Re Xperex v. Viasystems Technologies Corp.,*
2004 WL 3053649 *2 (Del. Ch. 2004). An analysis of successor liability under English law is

28  beyond the scope of this page-limited brief, and should be unnecessary since if the foreign law is

-15-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 127

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    Sunnyside and satisfaction of a judgment entered in this state, has a significant interest in applying

2    California law in construing successor liability.[28]    It would defeat the interests of justice in this

3    state and this Court should a foreign party cause millions in legal fees and weeks of court time be

4    spent defending its subsidiary on a local dispute, only to seek the shelter of a private contract under

5    foreign law.[29]    These compelling interests, coupled with the direct requirements of Rule 69(a),

6    means California post-verdict procedures and California substantive law should apply.

7            3.    State Law Procedures and Standards for Successor
                   Liability.
8

9    In *McClellan v. Northridge Park Townhome Owners*, 89 Cal.App.4th 746, 752-3

10   (2001), the court stated that under Cal. Code Civ. Proc. § 187: "a trial court has jurisdiction to

11   modify a judgment to add additional judgment debtors," citing *NEC Electronics, Inc. v. Hurt*,

12   208 Cal.App.3d 772, 778 (1989), and that § 187 is applicable to "successor corporation"

13   circumstances, citing 9 Witkin, Summary of Cal. Law, "Corporations" § 19, p. 532; *see also*

14   *Issa v. Alzammar*, 38 Cal.App.4th Supp. 1, 4 (1995) [under § 187 a court "has the authority to

15   amend a judgment to add additional judgment debtors"]; *Hall, Goodhue, Haisley & Barker, Inc. v.*

16   *Marconi Conference Ctr. Bd.*, 41 Cal.App.4th 1551, 1554-55 (1996).

17           To amend a judgment under § 187, two requirements must usually be met: "(1) that

18   the new party be the alter ego of the old party and (2) that the new party had controlled the

19   litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns."

20   *Triplett v. Farmers Ins. Exchange*, 24 Cal.App.4th 1415, 1421 (1994).    Here, Cambridge

21

22   contrary to California's, then California choice of law rules should require this state's law be
     applied under the current circumstances.

23   [28]  "California's general policies of affording relief to its citizens who have suffered a breach of
     contract or a tort (*see* Civ. Code §§ 3300, 3333) and of punishing and deterring wrongful conduct
24   (*see* Civ. Code § 3294, subd. (a)) give it a strong interest in application of its law."  *Wong v.*
     *Tenneco, Inc.* 39 Cal.3d 126, 143 (1985), Mosk, J. dissenting.

25   [29]  In this Court's August 8, 2005 Order regarding plaintiff's First Amended Complaint, the Court
     applied British law in determining that *alter ego* allegations were insufficient to pierce the
26   corporate veil of CDT Limited, a U.K. company.  Plaintiff is not alleging here that Cambridge is
     the *alter ego* of Opsys Limited with respect to entering into or breaching the lease (as was alleged
27   by former counsel), but rather that Cambridge has succeeded to the adjudicated liability of Opsys
     Limited.  We are thus in a substantially different posture than the prior Order.
28

-16-

RJN 128

1  controlled the Opsys Limited defense, and it is its alter ego for successor liability under state law

2  as to this judgment, as discussed next.

3      In *Ray, supra,* 19 Cal.3d at 28, the California Supreme Court enumerated four

4  long-established "exceptions" to the general rule that a corporation purchasing the assets of

5  another corporation is insulated from the debts and liabilities of its predecessor:

> 6   (1) [t]here is an express or implied agreement of assumptions, (2) the
> 7   transaction amounts to a consolidation or merger of the two
>     corporations, (3) the purchasing corporation is a mere continuation
>     of the seller, or (4) the transfer of assets to the purchaser is for the
> 8   fraudulent purpose of escaping liability for the seller's debts.
>     [citations][30]

9   The *Ray* exceptions were stated again in *Beatrice Co. v. State Board of Equalization,* 6 Cal.4th 767

10  (1993), 778, and *Henkel Corporation v. Hartford Accident & Indemnity Co.,* 29 Cal.4th 934, 941

11  (2003), and are clearly in the disjunctive, such that any *one* of them may establish successor

12  liability. Here, *all* of the exceptions apply, and read together and given Cambridge's control of the

13  litigation, establish Cambridge's successor liability to plaintiff.[31]

14      4.    Successor Liability Should Be Imposed on
15          Cambridge.

16      a.    Assumption of Liabilities.

17      The first basis on which successor liability may be imposed is Cambridge's express

18  or implied assumption of Opsys Limited's liabilities. While the Transaction Agreement shows an

19  intent not to assume any of the US obligations (Bunzel Decl. Exh. A, p. 5 of 116), WHEREAS

20  clause(E), the Fremont lease has now been determined by the jury to be *a UK company liability.*

21  Further, Cambridge understood there was risk of undisclosed "contingent liabilities" of Opsys

22

23  ───────────────

    [30]  The "fifth" exception created in *Ray* was for "product line" cases involving products liability,
24  not applicable here.

    [31]  Courts have employed successor liability in the context of defaulted leases. *Morrow v. Hood
25  Communications, Inc.,* 59 Cal.App.4th 924, 925 (1997) [trial court decision to that effect not
    reviewed on the merits due to settlement and petition to vacate granted]; *Benaroya Capital
26  Company, LLC v. EMF Partners, LLC,* 2005 WL 1580041 *5 (Wash.App.Div. 2005) [on summary
    judgment, trial court concluded transaction at issue "was a defacto merger. The effect of this
27  ruling was to make [successor] liable for [lessee's] obligations on the *Benaroya* lease."]; *5th and
    46th Co. v. Dusenberry, Ruriani & Kornhauser,* 394 N.Y.S.2d 684 (1977).

28

                                    -17-                              RJN 129

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  Limited (Bunzel Decl. Exh. D, p. 43 of 58, *e.g.*), and Cambridge and its affiliates assumed future

2  liabilities of the Opsys Limited subsidiary they acquired. Bunzel Decl. Exh. A, p. 23 of 116, § 7.5.

3      Cambridge obtained contingent rights to the shares of its stock left in escrow for the

4  Opsys Limited shareholders (Bunzel Decl. Exh. D, p. 43 of 58; Exh. E, p. 25 of 99), and

5  Cambridge has apparently invaded those assets to finance this litigation. Bunzel Decl. ¶ 11;

6  Exh. G, pp. 17-18 of 59. Since the liability to Sunnyside is now clearly a UK liability, Cambridge

7  has impliedly assumed it, and has rights to remaining stock in the escrow as a consequence.

8          b.      The Cambridge Transaction With Opsys
                   Limited is a *De Facto* Consolidation or
9                  Merger.

10      *Marks v. Minnesota Mining and Manufacturing Co.*, 187 Cal.App.3d 1429, 1435

11  and fn.13 (1987) held that: "[w]here the consideration consists wholly of shares of the purchaser's

12  stock which are promptly distributed to the seller's shareholders in conjunction with the seller's

13  liquidation," liability for the predecessor's debts generally follows, *quoting Shannon v. Samuel*

14  *Langston Co.*, 379 F. Supp. 797, 807 (W.D. Mich. 1974). Five relevant factors apply:

15          (1) was the consideration paid for the assets solely stock of the
            purchaser or its parent; (2) did the purchaser continue the same
16          enterprise after the sale; (3) did the shareholders of the seller become
            the shareholders of the purchaser; (4) did the seller liquidate; and (5)
17          did the buyer assume the liabilities necessary to carry on the
            business of the seller.

18  *Marks, supra*, at 1436; *Franklin v. USC Corp.*, 87 Cal.App.4th 615, 626 (2001). All apply here.

19

20      First, Cambridge acquired Opsys Limited by issuing 797,695 shares of Cambridge

21  stock and an additional 19,736 of Cambridge stock to two former Opsys Limited directors. Ainslie

22  Decl. Exh. B. This stock transfer satisfies the first factor.[32]

23      The second factor, continuation of the business after sale, is also evident from the

24  SEC filings, showing that Opsys assets have flowed into Cambridge directly to support its core

25  research and development business:

26          In 2002, as part of our IP expansion strategy, *we acquired control of*
            *CDT Oxford Limited (formerly known as Opsys UK Limited)*,

27  ─────────────────────────────────────────────
    [32]  The 2002 $5 million cash contribution was for a controlling interest in the affiliate, not
28  directly for acquisition of Opsys Limited, which later in 2004 was a 100% stock deal.

-18-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 130

1        which owns or controls a number of patents protecting the use of
         dendrimers to make solution processable phosphorescent materials.
2        This *allows us to develop proprietary materials which we believe
         have the potential to form the basis of a future generation...*
3        (Emphasis supplied.)

4   Bunzel Decl Exh. C, Prospectus at p. 58 of 149.  Cambridge has "had full management control

5   over CDT Oxford since October 2002 and have been responsible for funding its operations." *Id.* at

6   p. 40 of 149.  All Opsys R&D was absorbed by Cambridge  "under one roof" as of July 2003.

7   Bunzel Decl. Exh. F.

8        The third factor, did the shareholders of the seller become the shareholders of the

9   purchaser, is established by the Settlement Agreement and Amendment which describes how the

10  shares will be distributed to Opsys Limited's shareholders (Bunzel Decl. Exh. D), and the 2004

11  10-K description of the ultimate acquisition through a 100% stock deal. Ainslie Decl. Exh. B.

12       The fourth factor, did the seller liquidate, is also established by the public filings

13  and press releases showing that all assets and operations of Opsys Limited have been transferred to

14  Cambridge, and that Opsys Limited has no assets following the transfer of it majority stockholding

15  position in CDT Oxford Limited to Cambridge.  Ainslie Decl. ¶ 9, Exh. C; Bunzel Decl. Exhs. F

16  and J.

17       The fifth and final factor, whether the buyer assumed the liabilities necessary to

18  carry on the business of the seller, is also met here.  Cambridge expressly assumed the operational

19  liabilities of Opsys UK (holding the assets of Opsys Limited), which was formed to carry on the

20  judgment debtor's R&D business.  Bunzel Decl. Exh. A, p. 23 of 116, § 7.5.

21               c.     Cambridge Continued Opsys Limited's R&D
                        Business, Providing Only Inadequate
22                      Consideration.

23       The public filings of Cambridge are replete with statements that Cambridge has

24  continued the research and development business and operations of Opsys Limited, and that it has

25  succeeded to the assets of Opsys Limited.  The 2002 Transaction Agreement permitted Cambridge

26  to "control" the "operations" of the Opsys Limited subsidiary (Opsys UK) created to hold all

27  Opsys UK operations and all of its IP and assets. Bunzel Decl. ¶ 3 and Exh. A pp. 22 of 116, § 7.1;

28

-19-                                                        **RJN 131**

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   24 of 116, §§ 8.3, 8.4. Thereafter, those operations and assets were folded into Cambridge,

2   forming a cornerstone for Cambridge's IPO.[33]

3              The California Supreme Court in *Ray* stated that "a corporation acquiring the assets

4   of another corporation is the latter's mere continuation and therefore liable for its debts" upon "a

5   showing of one or both of the following factual elements":

6                   (1) no adequate consideration was given for the predecessor
                    corporation's assets and made available for meeting the claims of its
7                   unsecured creditors; (2) one or more persons were officers or
                    directors or stockholders of both corporations.

8   *Ray, supra,* 19 Cal.3d at p. 29; *Franklin v. USX Corp., supra*, 87 Cal.App.4th at p. 626. The Ninth

9   Circuit in *Katzir's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir.

10  2004), in applying California law, noted that:

11                  The requirement of inadequate consideration in a successor liability
12                  case is premised on the notion that when a successor corporation
                    acquires the predecessor's assets without paying adequate
13                  consideration, the successor deprives the predecessor's creditors of
                    their remedy.[34]

14  Here, the research and development business activities of Opsys Limited/Opsys UK continued

15  after the Cambridge acquisition, ultimately under "one roof." Bunzel Decl. Exh. F. Nor can there

16  be any legitimate dispute that any cash provided by Cambridge in 2002 was "inadequate" to satisfy

17  Opsys Limited's debts or that this money was "made available" for that purpose to Sunnyside.

18  Ainslie Decl. ¶ 6, Exh. B, p. F-15; Bunzel Decl. Exh. M, pp. 17-18. Just the opposite is true.

19  Further, following the consolidation of Opsys and Cambridge, Opsys Limited's financial controller

20  became a director of the surviving subsidiary Opsys UK, which became CDT Oxford Limited, and

21  Mr. Holmes (who testified at trial) became an observer on the Cambridge board. Bunzel Decl.

22

23

24  [33]  Bunzel Decl. ¶ 5 and Exh. C at pp. 29 of 149, 40 of 149, 58 of 152, 68 of 149; ¶ 7 and Exh. E
25  at pp. 22 of 99, 25 of 99, 30 of 99, and 36 of 99; Exh. F [press release re consolidating operations
    under one roof]; Exh. M [patents].

26  [34]  In *Monarch Bay II v. Prof'l Serv. Indus., Inc.*, 75 Cal.App.4th 1213 (1999), the court indicated
    there must be a causal relationship between a successor's acquisition of assets and the
27  predecessor's creditors inability to get paid. That causal relationship is clearly established here,
    since significant Cambridge stock consideration (valued at between $12 million and 19 million in
28  2002 or 2004) has not been paid to satisfy Opsys Limited's creditors, including Sunnyside.

-20-

BARTKOZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 132

1  Exh. P. There is no question that Opsys Limited shareholders became Cambridge shareholders.

2  Bunzel Decl. Exh. D.

3          d.    The Transfer of Opsys Limited's Assets to
                 Cambridge Was for the Purpose of Avoiding
4                   Opsys Limited's Debts Including to
                 Sunnyside.

5

6         The fourth exception for imposing successor liability on Cambridge, that the

7  transfer of assets was for the fraudulent purpose of escaping liability for the seller's debts, is

8  equally applicable here. How else can one interpret the following statement in the Cambridge

9  2004 10-K summarizing the Opsys transaction?

10       The terms of the Transaction Agreement were entered into by the
      Company **so that it could gain control of an economic interest in**
11       **the UK assets and operations of Opsys** (which had been
      transferred to Opsys UK immediately prior to the transaction) **in**
12       **such a manner to avoid acquiring any interest in any other assets**
      **or liabilities of Opsys.** (Emphasis supplied.)

13 Ainslie Decl. ¶ 8 and Exh. B, p. F-15. If that were not brazen enough, in 2005 defendants during

14 the pendency of this action transferred the patent-rich CDT Oxford Limited subsidiary, owned

15 84% by Opsys Limited when the case began, to Cambridge directly, leaving Opsys Limited,

16 according to Cambridge, with "no assets." Ainslie Decl. ¶¶ 9-10 and Exh. C; Bunzel Decl. ¶ J.

17        Opsys Limited, directed by Cambridge, argued at trial that in 2002 it was

18 essentially insolvent such that the Cambridge transaction was the only solution. Attached as

19 Exh. L, p. 102, to the Bunzel Decl. is testimony from Opsys Limited's expert Terry Lloyd,

20 summarizing Opsys Limited's September 30, 2002 financial statements to that effect. Plaintiff's

21 consultant, Mr. Ainslie, in his current declaration, concludes that any cash provided by Cambridge

22 in 2002 was inadequate to pay Opsys Limited's then-stated debts in excess of £17 million British

23 pounds (not including the liability now determined by the jury here). Ainslie Decl. ¶ 6; Bunzel

24 Decl. Exh. M, pp. 17-18.

25        The Cambridge and Opsys Limited consolidation, extracting value for the assets of

26 Opsys Limited by creating subsidiaries and then going 'around' the company and its liabilities

27 such as the Sunnyside lease, were the mechanisms of ambitious young businessmen whom the

28

-21-

RJN 133

1    Court saw at trial.  California has adopted the Uniform Fraudulent Transfer Act, Cal.Civ. Code

2    §§ 3439, *et seq.*, and §§ 3439.07-08 of that Act provides for voiding such transfers "to the extent

3    necessary to satisfy the creditor's claim."[35]  Cambridge is the transferee and a proper defendant.

4                    5.    Alternatively, An Evidentiary Hearing After
                          Discovery May Be Appropriate, As Well As Claims
5                          Against Cambridge Or CDT Oxford Limited For
                          Fraudulent Conveyance.
6
            In *Luxliner, supra*, 13 F.3d at 72, the Third Circuit evaluated due process concerns
7
     of third parties under Rule 25(c), concluding: "at a minimum, notice and an opportunity to be
8
     heard are required."  Here, Cambridge has been on actual and participating notice since at least
9
     November 2005 of its potential liability, and it threw the kitchen sink at defense of this case.  In
10
     determining how to proceed under Rule 25(c), the Third Circuit in *Luxliner* wrote:
11
                    [A]t least in a context such as this in which a decision on a
12                  Rule 25(c) motion effectively imposes liability, the court must first
                    determine whether the affidavits "show that there is no genuine issue
13                  as to any material fact and that the moving party is entitled to joinder
                    or substitution as a matter of law." *C.f* Fed. R. Civ. P. 56(c). If they
14                  do, the court should grant the motion; if they do not, however, the
                    court should conduct an evidentiary hearing to decide whether the
15                  motion should be granted. *See* Fed. R. Civ. P. 43(e).

16    In *Luxliner*, because facts were disputed and the credibility of explanations for some of them were

17    at issue, "the district court should have held an evidentiary hearing."  *Id.* at pp. 75-6.

18            While Sunnyside believes the public record facts and Cambridge's participation to

19    date mandate that Cambridge should be added to the judgment, we anticipate Cambridge will

20    respond to this motion with a panoply of corporate details, argument and data not previously seen

21    or discovered by plaintiff.  No reply brief is envisioned per this Court's scheduling order following

22    the post-trial CMC.  Application of successor liability can be "extremely fact sensitive." *Fisher v.*

23    *Allis Chalmers Corp. Product Liability Trust*, 95 Cal. App. 4th 1182, 188 (2002).  If an evidentiary

24    hearing is required, plaintiff seeks leave under Rule 69(a) to conduct discovery related to the

25

26    [35]  Plaintiff's motion here is timely, and was initially brought and has been pending in this Court
      since no later than November 2, 2005.  *See* pp. 2-3 of plaintiff's Post-Trial Summary of the Record
27    filed March 20, 2007.  Indeed, the final and perhaps most alarming transfer that occurred during
      the pendency of this case occurred only in 2005.  Ainslie Decl. ¶ 10.
28                                                                    RJN 134

                                          -22-

BARTKO ZANKEL
Bardo, Zankel, Tarrant & Miller
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  transfer of Opsys Limited assets to Cambridge and CDT Oxford Limited (formerly Opsys UK and

2  once owned by Opsys Limited).

3       Plaintiff will be prepared May 16 to identify the discovery required against

4  Cambridge and its affiliates, which would likely involve document requests and several

5  depositions.

6       Plaintiff may also seek leave to file a supplemental claim for relief for fraudulent

7  conveyance against Cambridge and CDT Oxford Limited, pursuant to Fed.R.Civ.P. Rule 18(b), so

8  as to restore to Opsys Limited for the benefit of Sunnyside all or a part of the IP assets and patents

9  from which the judgment might be satisfied. *See Panther Pumps & Equipment Co. v. Hydrocraft,*

10  *Inc.* 566 F.2d 8, 25-7 (7th Cir. 1977).

## IV.   CONCLUSION

12       Sunnyside requests that the Court award the attorney's fees, costs and expenses

13  incurred in prosecuting this breach of lease case, defending against the Assignment, and its

14  post-trial and estimated fees and expenses.

15       <u>Sunnyside asks the Court to apply appropriate state law and hold Cambridge</u>

16  <u>responsible for the judgment. Alternatively, prompt discovery and an evidentiary hearing pursuant</u>

17  <u>to Rules 69(a) and 25(c) should be ordered with leave to file a fraudulent conveyance claim if</u>

18  <u>needed.</u>

19  DATED: April 2, 2007

20                   BARTKO, ZANKEL, TARRANT & MILLER
                     A Professional Corporation

22                   By: _____

23                        Robert H. Bunzel
                      Attorneys for Plaintiff
                 SUNNYSIDE DEVELOPMENT CO., LLC

**RJN 135**

-23-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

# EXHIBIT N

1  Robert H. Bunzel, State Bar No. 99395
   Alyson L. Huber, State Bar No. 202713
2  BARTKO, ZANKEL, TARRANT & MILLER
   A Professional Corporation
3  900 Front Street, Suite 300
   San Francisco, California 94111
4  Telephone: (415) 956-1900
   Facsimile: (415) 956-1152
5
   Attorneys for Plaintiff
6  SUNNYSIDE DEVELOPMENT CO., LLC

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  SUNNYSIDE DEVELOPMENT COMPANY,  )   No. C 05-00553 MHP
    LLC,                            )
12                                  )   **DECLARATION OF PAUL R.**
              Plaintiff,            )   **AINSLIE RE MOTION TO ADD**
13                                  )   **CAMBRIDGE DISPLAY**
         v.                         )   **TECHNOLOGY, INC. AS A PARTY**
14                                  )   **TO ACTION AND JUDGMENT**
    OPSYS LIMITED, a United Kingdom )
15  Company; and CDT LIMITED, a United )  Hearing Date:  May 16, 2007
    Kingdom Company,                )   Time:          1:00 p.m.
16                                  )   Courtroom:     15
              Defendants.           )
17  _____)

18

19

20

21

22

23

24

25

26

27                                              **RJN 136**

28

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    I, PAUL R. AINSLIE, declare as follows:

2    1.    I am a Certified Public Accountant and a partner in the accounting firm of

3    Odenberg, Ullakko, Muranishi & Co. LLP. I have personal knowledge of the matters stated herein

4    except as to statements based on information and belief (and as to those matters, I believe them to

5    be true) and, if called upon as a witness, I could and would competently testify thereto.  My CV is

6    attached hereto as Exhibit A, and I testified at deposition and at trial in this cause.

7    2.    I was retained by plaintiffs in this case in part to evaluate the damages

8    suffered by plaintiff Sunnyside Development LLC ("Sunnyside"), including how the acquisition of

9    Opsys Limited by Cambridge Display Technology, Inc. ("Cambridge") or its affiliates may have

10    violated the subject lease as an unconsented assignment.  My earlier damages schedules included a

11    column showing approximately $596,000 (10% of the unpaid base rent) in increased damages due

12    to the transfer to Cambridge.  I understand that this additional damage column was not submitted

13    in the final version of the damages schedule (Exhibit 60 at trial) that went to the jury.

14    3.    In conducting the analysis regarding the Cambridge transaction, I reviewed

15    in detail the Cambridge annual 2004 Form 10-K submitted in March of 2005 to the SEC.  In my

16    profession it is customary to rely on such SEC submissions because a public company's and its

17    auditors are required to fairly and accurately reflect information related to the financial condition

18    of the company.

19    4.    Attached hereto as Exhibit B are pages F-14 through F-16 of the Cambridge

20    2004 10-K, which are the audited financial statement notes regarding the acquisition of CDT

21    Oxford Limited (formerly Opsys UK).  In general, the notes describe a 2-step transaction by which

22    Cambridge in October 2002 acquired a 16% equity interest in Opsys Limited's subsidiary Opsys

23    UK (now known as CDT Oxford Limited), plus control, and then at December 2004 concluded the

24    transaction by acquiring the other 84% interest through exchanging Cambridge stock for 100% of

25    the stock of Opsys Limited, which at that time owned 84% of CDT Oxford Limited.

26    5.    The notes describe that the cash paid by Cambridge in 2002 was $2 million

27    for an Opsys Limited technology license, $500,000 for an option to buy the balance of CDT

28    -1-    **RJN 137**

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   Oxford Limited, and $2.5 million for the 16% stock interest in Opsys UK (CDT Oxford Limited).

2   I understood from the 10-K and the Transaction Agreement attached thereto, that all of the UK

3   assets and related IP of Opsys Limited had been pushed down to Opsys UK as a necessary

4   predicate to the Cambridge transaction.

5          6.     In reading the audited financial statements of Opsys Limited for the period

6   ending September 30, 2002, and audited by Deloitte, I note that total liabilities of Opsys Limited at

7   that time were in excess of £17 million British pounds, not inclusive of the lease liability to

8   Sunnyside, such that any or all of the $5 million in cash paid by Cambridge in 2002 was

9   inadequate to satisfy Opsys Limited's creditors.

10         7.     Cambridge in the 2004 10-K reflected the fair value of the acquisition of

11  Opsys UK (CDT Oxford Limited), which held all of the assets of Opsys Limited regarding the UK

12  operations, at $26.894 million in October 2002, adjusted at December 2004 to $19.679 million due

13  to changes in the value of Cambridge stock going to the Opsys Limited shareholders.  In my

14  experience, shareholders and third parties reviewing the 10-K would reasonably conclude, as I do,

15  that these numbers reflect Cambridge's best determination of the value of the transaction to

16  Cambridge.

17         8.     Page F-15 of the 2004 10-K (Exhibit B hereto) is instructive regarding the

18  intent of the parties:

19              The terms of the Transaction Agreement were entered into by the
                Company so that it could gain control of and economic interest in the
20              UK assets and operations of Opsys (which had been transferred to
                Opsys UK immediately prior to the transaction) in such manner to
21              avoid acquiring any interest in any other assets or liabilities of
                Opsys.
22

23  In my experience as a public accountant for over 30 years, this is unusual language, and I do not

24  recall seeing it before.  I believe it was likely inserted by the auditors to disclose that the purpose

25  of the transaction may be inconsistent with the interests of creditors of Opsys Limited.  In my

26  experience the complex 2-step transaction here was indeed contrary to the interests of creditors of

27  Opsys Limited, since significant value in the form of Cambridge stock was to be delivered outside

28                                        -2-                              **RJN 138**

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller · A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 · Fax (415) 956-1152

of Opsys Limited to its shareholders, even though Cambridge through its affiliate CDT Oxford Limited would end up with ownership and control of valuable IP that had belonged to Opsys Limited.

9.      Subsequent to the trial, I have been asked to examine various public filings of Cambridge regarding changes to the ownership of CDT Oxford Limited (formerly Opsys UK), especially the "List of Subsidiary" information for Cambridge filed with the SEC between 2004 and 2006.  I have attached hereto as Exhibit C the SEC filing indices and "List of Subsidiary" information for Cambridge, including its:

> S-1 for Public Offering, filed July 30, 2004
>
> 10-K annual report for period ending Dec. 30, 2004, filed March 31, 2005
>
> 10-K annual report for period ending Dec. 30, 2005, filed March 14, 2006
>
> 10-K annual report for period ending Dec. 30, 2006, filed March 1, 2007

As an accountant familiar with these listings, it is apparent that at July 30, 2004, the company CDT Oxford Limited was listed as being owned 16% by Cambridge and subject to Cambridge's control; at December 31, 2004, CDT Oxford Limited was listed as a subsidiary of Opsys Limited, which in turn was listed as a subsidiary of Cambridge following completion of the transaction whereby Cambridge acquired 100% of Opsys Limited's stock in December 2004; and by December 31, 2005, CDT Oxford Limited was no longer listed as a subsidiary of Opsys Limited but was instead a direct subsidiary of Cambridge, and this pertained as well at December 31, 2006.

10.      What this shows is that sometime in 2005, during the pendency of this case, the company CDT Oxford Limited was transferred from the ownership of Opsys Limited, the defendant in this action, to Cambridge as a direct subsidiary.  CDT Oxford Limited was the entity whose acquisition had been valued at $26.9 million by Cambridge, and which held the UK IP assets that once belonged to Opsys Limited.

11.      I have not yet reviewed (since I understand Sunnyside does not have access) the actual contracts and records of Cambridge not attached to the SEC filings, and would expect to

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-3-

RJN 139

1  review them to complete an opinion as to whether Opsys Limited on behalf of its creditors

2  received fair value for the transfers of (i) Opsys Limited assets to the control of Cambridge and (ii)

3  CDT Oxford Limited and its assets to Cambridge. At this stage in the proceedings, my initial

4  opinion is that the series of transactions were either designed to or had the effect of impairing the

5  interests of Opsys Limited creditors including Sunnyside.

6          I declare under penalty of perjury under the laws of the state of California that the

7  foregoing is true and correct and that this Declaration was executed March 30, 2007 at San

8  Francisco, California.



PAUL R. AINSLIE

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 140

-4-

DECLARATION OF PAUL AINSLIE RE MOTION TO ADD CAMBRIDGE DISPLAY TECHNOLOGY, INC. AS
A PARTY TO ACTION AND JUDGMENT
Case No. C 05-00553 MHP

Exhibits O-T to Request for Judicial Notice

# EXHIBIT O

1   Robert H. Bunzel, State Bar No. 99395
    Alyson L. Huber, State Bar No. 202713
2   BARTKO, ZANKEL, TARRANT & MILLER
    A Professional Corporation
3   900 Front Street, Suite 300
    San Francisco, California 94111
4   Telephone: (415) 956-1900
    Facsimile: (415) 956-1152
5
    Attorneys for Plaintiff
6   SUNNYSIDE DEVELOPMENT CO., LLC

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  SUNNYSIDE DEVELOPMENT COMPANY,    )   No. C 05-00553 MHP
    LLC,                              )
12                                    )   **DECLARATION OF ROBERT H.**
                    Plaintiff,        )   **BUNZEL RE MOTION TO ADD**
13                                    )   **CAMBRIDGE DISPLAY**
          v.                          )   **TECHNOLOGY, INC. AS A PARTY**
14                                    )   **TO ACTION AND JUDGMENT**
    OPSYS LIMITED, a United Kingdom    )
15  Company,                          )   Hearing Date:   May 16, 2007
                                      )   Time:           1:00 p.m.
16                  Defendant.        )   Courtroom:      15
                                      )
17  _____   )

18

19

20

21

22

23

24

25

26

27                                            **RJN 141**

28

BARTKO ZANKEL
Bartko Zankel Tarrant Miller Tarrant & Thomson Inc. A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1       I, ROBERT H. BUNZEL, declare as follows:

2          1.    I am counsel for plaintiff Sunnyside Development, LLC in this action. As

3 such I have personal knowledge of the within facts, except those alleged on belief, which I believe

4 to be true, and I am competent to testify thereto if called upon to do so.

5          2.    This Declaration supports plaintiff's motion to add Cambridge Display

6 Technology, Inc. ("Cambridge"), a Delaware corporation, as a party to the action and judgment,

7 and for related relief, by attaching and highlighting selected Cambridge publicly-filed Securities

8 Exchange Commission ("SEC") records, Cambridge public press releases, publicly available list of

9 patents associated with Opsys Limited and now Cambridge, and certain relevant exhibits and

10 transcripts produced in this action.

11          3.    Attached hereto as **Exhibit A** is a true copy of the Transaction Agreement

12 dated October 23, 2002 between Cambridge (formerly known as CDT Acquisition Corp.) and

13 Opsys Limited and several of their affiliates, which was first filed with the SEC July 30, 2004 with

14 Cambridge's Form S-1 as Exh. 10.3 At p. 5 of 16, in "Whereas" clause (F), the parties stated:

15          CDT [Cambridge] and Opsys [Opsys Limited] have agreed that <u>all
16          of the assets used by Opsys</u> in the course of or required <u>to operate its
             business in the United Kingdom</u> including <u>all intellectual
17          <u>property</u> [1] . . . <u>shall be transferred to Opsys UK</u> on and subject to the
          terms of a hive down agreement to be entered into between Opsys
18          and Opsys UK. (Emphasis supplied.)

19 At "Whereas" clause "E," the Transaction Agreement provides: "it is the intention" that "Opsys

20 will be restructured so that its subsidiaries . . . and any other operations located in the United States

21 of America and all liabilities or obligations of any kind relating to such operations including

22 liabilities relating to all employees retained by such business are divested into a

23                                      **RJN 142**

---

[1]    In the Opsys Limited/Opsys UK Agreement, attached to the S-1 as Exh. 10.4, Opsys Limited's "Intellectual Property" transferred to its then subsidiary Opsys UK , is defined at § 1.1 (Definitions) as: "means patents, trade marks, service marks rights in designs, trade or business names, trade secrets, know-how, copyrights, topography rights and rights in databases (whether or not any of these is registered and including applications for registration of any such thing) and all rights or forms of protection of a similar nature or having equivalent or similar effect to any of these which may subsist anywhere in the world." http://www.sec.gov/Archives/edgar/data/1297968/000119312504128258/dex104.htm.

-1-

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  newly-incorporated company."   However, the jury has now determined that the Fremont lease

2  liability remained with Opsys Limited, the UK company.

3  At p. 22 of 116, § 7.1, of the Transaction Agreement, the parties agreed:

4           Effective from the date of this agreement, CDT UK [Cambridge
             Display Technology Ltd., wholly owned by Cambridge] shall on an
5           exclusive and irrevocable basis manage the assets and business of
             Opsys UK generally and in particular . . . . (Emphasis supplied.)
6

7  At p. 23 of 116, § 7.5 of the Transaction Agreement, the parties agreed:

8           CDT and CDT UK shall be responsible for all liabilities arising from
             its management of Opsys UK and shall indemnify Opsys and the
9           directors of both Opsys UK and Opsys against all claims arising
             from such liabilities.

10  Page 24 of 116, § 8.3 of the Transaction Agreement recites certain corporate acts that Opsys UK

11  [holding all of the UK assets of Opsys Limited] could not take "without the prior written approval

12  of CDT." Again, at p. 38 of 116, § 18, the parties agreed, "Between the date of this agreement and

13  Completion [defined as Cambridge's subscription for shares in Opsys UK] that Opsys would not

14  take "any action" that "could reasonably be expected to be material to the business of [Opsys] UK

15  after Completion without having in each case the consent in writing of CDT [Cambridge], such

16  consent not to be unreasonably withheld." See also p. 96 of 116, at Schedule 5 of the Transaction

17  Agreement, listing a series of business activities for Opsys UK that are prohibited.

18           4.     Attached hereto as **Exhibit B** is the October 28, 2002 Cambridge press

19  release announcing the Opsys transaction and describing "Opsys" at p. 2 as "Opsys Limited," the

20  defendant here.  At p. 1, Michael Holmes, "CEO of Opsys," who testified March 2, 2007 in this

21  action, is quoted by Cambridge:

22           We believe that this transaction will combine the strengths of two
             dynamic teams, which are working together with the UK's two
23           leading universities, to further advance display technology.

24           5.     Attached hereto as **Exhibit C** is a true copy of the December 15, 2004

25  Prospectus for Cambridge in connection with its 2004 public offering of stock, and filed with the

26  SEC.  At p. 40 of 149, Cambridge represented to the investing public:        **RJN 143**

27           We acquired a 16% equity interest in CDT Oxford Ltd. [formerly
             Opsys UK, holding all of the UK and IP assets of Opsys Limited] in
28

-2-

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

October 2002.  CDT Oxford carries out research in high-efficiency P-OLED materials and is <u>84% owned by Opsys Limited</u>. However, <u>we have full management control</u> over this company and are responsible for funding its operations. (Emphasis supplied.)

At p. 48 of 149, the Prospectus states:

[N]et cash used in investing activities <u>for the year ended December 31, 2002</u> was $9.4 million, of which <u>$5.0 million was used to acquire control of CDT Oxford</u> . . . . (Emphasis supplied.)

At p. 68 of 149, the Prospectus states:

The <u>only material asset of Opsys Limited is its shareholding in CDT Oxford</u> [formerly Opsys UK, holding all of the UK assets and IP of Opsys Limited].  Because of these conditions, and because <u>Opsys Limited has no operations, we do not believe that it will make a material difference as to whether we acquire the remaining stock in CDT Oxford or whether we acquire the entire share capital of Opsys Limited</u>. . . . <u>CDT Oxford also has a large body of know-how</u> concerning the development of solution processable phosphorescent materials.  This allows us to develop and <u>to patent materials</u> that we believe have the potential to form the basis of a future generation of high-efficiency materials thus <u>enhancing our IP portfolio</u> with respect to the future market for OLED displays . . . .  (Emphasis supplied.)

Later filings, including Exhibit E hereto, establish that Cambridge completed the acquisition of Opsys through a stock-for-stock transaction in December 2004, exchanging Cambridge stock for 100% of the stock of Opsys Limited, the judgment debtor here.

      6.     Attached hereto as **Exhibit D** is the Settlement and Amendment Agreement between Cambridge and Opsys Limited and certain of its affiliates and shareholders related to the acquisition of Opsys Limited by Cambridge, and filed with the SEC in March 2005 as Exhibit 10.45 to Exhibit E to this Declaration.  Such agreement attaches and incorporates a form of Escrow Agreement at pp. 39 of 58 through 53 of 58, by which certain shares of Cambridge are held in escrow pending satisfaction of contingent liabilities.  Subparagraph 4(e) at p. 43 of 58 provides:

In the event <u>Buyer [Cambridge] determines that any liability, contingent liability, claim</u>, obligation or damage (collectively "Claim") exists or has been asserted against Opsys (other than the Identified Liabilities . . . ) prior to the termination of the Escrow Account hereunder, <u>Buyer shall have the right</u> (but not the obligation) to deliver to the Escrow Agent, with a copy to New Co, a written notice . . . and . . . payment instructions <u>specifying the</u>

RJN 144

-3-

BARTKO ZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

BARTKO ZANKEL
*Gerald, Zankel, Tarrant, Miller, Tanke, Zlotnick, Inc. of Counsel*
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   number of CDT [Cambridge] Shares to be transferred to Buyer in
2   respect thereof . . . that shall most nearly equal the amount of the
    Claimed Amount." (Emphasis supplied.)

3       7.      Attached hereto as **Exhibit E** is a true copy of the Cambridge Form 10-K

4   for the year ended December 31, 2004 and filed with the SEC in March 2005.  At p. 12 of 19

5   thereof, Cambridge stated:

6           In 2002, as part of our IP expansion strategy, we acquired control of
            CDT Oxford Limited (formerly known as Opsys UK Limited),
7           which owns and controls a number of patents protecting the use of
            dendrimers to make solution processable phosphorescent materials.
8           (Emphasis supplied.)

9   At p. 22 of 99, the 2004 10-K provides:

10          In October 2002, control of CDT Oxford [Opsys UK, holding all of
            the UK assets of Opsys Limited] was acquired and its loss has been
11          accounted for from October 2002 until December 2003 under the
            equity method.  From January 2004, CDT Oxford has been fully
12          consolidated into our results. (Emphasis supplied.)

13  At p. 25 of 99, the 2004 10-K explains that Cambridge Display Technology, Inc. was "formerly

14  known as CDT Acquisition Corp., a Delaware corporation."  At p. 29 of 99, the 2004 10-K

15  provides:

16          We acquired a 16% equity interest in CDT Oxford Limited in
            October 2002.  CDT Oxford carries out research in high-efficiency
17          P-OLED materials and was 84% owned by Opsys Limited.  In
            December 2004, we acquired the remaining 84% of CDT Oxford.
18          We have had full management control over CDT Oxford since
            October 2002 and have been responsible for funding its operations
19          since that time. Until December 2003, we accounted for 100% of
            the results of this company in a manner similar to the equity method.
20          Commencing January 1, 2004, we consolidated CDT Oxford as a
            subsidiary pursuant to the terms of FIN no. 46 R.    (Emphasis
21          supplied.)

22  Further on that page, the 2004 10-K provides:

23          The Amended and Restated Settlement and Amendment Agreement
            [Exhibit D to this Declaration] provides for an escrow of
24          approximately 53% of the shares issuable to the Opsys shareholders
            against certain contingent liabilities and the possibility that other
25          liabilities will emerge. (Emphasis supplied.)

                                                                    **RJN 145**
26  At p. 30 of 99, the 2004 10-K provides:

27          Good will is included in the balance sheet as a result of our
            acquisition of the UK members of the CDT group in 1999 and the
28
                                        -4-

1    consolidation of CDT Oxford in 2004.  We perform an annual
     impairment test on the value of goodwill and, to date, have
2    concluded that no impairment is required.  For purposes of this
     impairment test, we have concluded that the <u>CDT group is one</u>
3    <u>reporting unit</u>. (Emphasis supplied.)

4    At p. 36 of 99 in describing total research and development expenses, the 2004 10-K provides:

5        The remainder of the decrease (and expenses) was due to a
         <u>reorganization of research facilities and staff</u> in <u>the second half of</u>
6        <u>2003</u>, including the <u>relocation of the former CDT Oxford offices in</u>
         <u>Oxford, England, to Cambridge, England, and the consolidation of</u>
7        <u>all of our clean room facilities</u> within our Technology Development
         Center. (Emphasis supplied.)

8

9        8.    Attached hereto as **Exhibit F** is a true copy of Cambridge's July 3, 2003

10   press release, advising of a "reorganization" and "consolidation of resources under one roof":

11       In <u>September 2002, CDT</u> [Cambridge] <u>acquired the rights to</u> develop
         the <u>technology of Opsys Ltd.</u>, an Oxford-based developer of
12       high-efficiency, next-generation LED materials - light emitting
         dendrimers.  Since then CDT has carried on similar work in both
13       Oxford and Cambridge.  In the first major move for enhanced
         efficiency, <u>CDT will close the Oxford facility and move key</u>
14       <u>scientists to Cambridge</u> as part of a new "high Efficiency Materials"
         research group, focused on next-generation materials research.

15       9.    The accounting treatment for the acquisition of CDT Oxford (formerly

16   Opsys UK, holding all of the assets of Opsys Limited) is described in detail in the notes to the

17   2004 Cambridge financial statements at pp. 80 of 99 - 82 of 99 (F-14-F-16) of Exhibit E.   In

18   particular, for accounting purposes, Cambridge reported that:

19       [s]ince the equity in CDT Oxford is not sufficient to permit it to
         finance its activities without outside support, this has resulted in the
20       Company consolidating CDT Oxford.

21       10.   The financial statement notes in the 2004 Cambridge 10-K at Exhibit E,

22   show an accounting for "the original acquisition of CDT Oxford" as a purchase, at $26.894 million

23   (p. 80 of 99, Exh. E), which had included the exchange of "all of the outstanding stock of Opsys

24   [Opsys Limited] in exchange for the 679,000 of the company's Class A common stock" at a

25   "deemed price" of $27.60 per share.  (*Id.*, at p. 81 of 99.)  Following the Cambridge IPO and in

26   connection with "the initial public offering price of $12 per share," the "value of that [Cambridge

27   stock exchanged for Opsys Limited stock] was $9.8 million which reduced the "total purchase

28
                                        -5-                          **RJN 146**

Phone (415) 956-1900 • Fax (415) 956-1152
900 Front Street, Suite 300
San Francisco, CA 94111
BARTKO ZANKEL

1 consideration" by $7.215 million (*id.*, p. 82 of 99). Thus, for accounting purposes, the acquisition

2 of CDT Oxford Ltd. (formerly Opsys UK), which held the Opsys Limited assets, was valued at

3 between $19 million and $27 million to Cambridge.

4        11.     Attached hereto as **Exhibit G** is a true copy of Cambridge's Form 10-Q for

5 the period ending June 30, 2005. At pp. 17 of 59-18 of 59, in describing the current action, this

6 10-Q provides:

> When the Company acquired Opsys Limited for stock in December
> 2004, a proportion of the stock consideration was issued to the
> former owners of Opsys Limited but was held in escrow. In the
> event that the Company suffers a loss in relation to either of the
> claims against Opsys Limited [the claim by Dr. Reddy and the claim
> by Sunnyside], shares currently held in escrow shall be forfeited to
> the value of the loss, as measured at the December 2004 initial
> public offering price of $12 per share. The value of the 422,610
> shares held in escrow, based on the market price of $7.74 per share
> at June 30, 2005 is $3.3 million. The escrow shares are authorized
> and issued in the accompanying financial statements. Costs that the
> Company incurs in relation to the claims described above are
> charged to the operating expense as incurred. (Emphasis supplied.)

14       12.     Attached hereto as **Exhibit H** is Cambridge's Form 10-K for the fiscal year

15 ending December 31, 2005. At p. 30 of 99, in describing this action, the 2005 10-K provides:

> The claim against Opsys Limited for breach of contract will proceed
> to trial. We continue to believe (and have been so advised by
> external counsel) that the claim will fail .... The actual cost of
> resolving any claims may be substantially different from the
> amounts of liability recorded. We have not recorded any liability
> with respect to the claim from Sunnyside described above.
> (Emphasis supplied.)

20 Further, the 2005 10-K states and clarifies at p. 80 of 99:

> The Company owns 100% of CDT Oxford, formerly Opsys UK, and
> 100% of Opsys Limited and consolidates both of these into its
> consolidated results of operations, financial position and cash flows.
> (Emphasis supplied.)

23

24       13.     Attached hereto as **Exhibit I** is Cambridge's Form 10-K for the period

ending December 31, 2006. The 2006 10-K at p. 25 of 92 provides:

> ***We are subject to developments in and expenses associated with
> resolving matters currently in litigation.***
>
> We have been and may continue to be the subject of complaints or
> litigation in connection with disputes unrelated to patent or other IP

BARTKO ZANKEL
Barbo Zankel Tarrant Miller & Hanson Inc. of Counsel
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 966-1900 • Fax (415) 956-1152

RJN 147

-6-

rights described above. We are currently the subject of litigation with Sunnyside Development as described under "Legal Proceedings" in Item 3 of Part I above. There is considerable risk associated with any litigation, particularly litigation such as this action which may be decided by a jury and the outcome of which will be affected by a number of factors beyond our control. As is also the case with other complaints or litigation to which we may become subject, we may incur significant legal costs in defending or settling the action with Sunnyside Development and, if a court finds against us, we could be liable for substantial financial damages or suffer other losses that are the subject of dispute. (Emphasis supplied.)

Also, at p. 77 of 92 of the 2006 10-K, the current status of the escrow account is described (p. F-15).

14.    Attached hereto as **Exhibit J** is Cambridge's March 12, 2007 press release announcing the verdict in this action:

CDT [Cambridge] does not intend to assist Opsys Limited with any funding for settlement of the award of damages. Opsys Limited does not have any assets, nor does it have any intellectual property rights which are relevant to CDT's business.

15.    Attached hereto as **Exhibit K** is a true copy of what was marked as Exhibit 51 to the deposition of Damoder Reddy, and entitled Fair Market Value of Opsys US Corporation, dated August 2002. At p. OPS 01950 of Exhibit K, the Grant Thornton consultants state:

Based on the foregoing and applying the above-noted weightings, it is our opinion that the fair market value of a 100% ownership interest in the shareholders' equity of Opsys US, as of June 30, 2002, is $108,000, rounded.

While the stated context of this report was in part for tax purposes, other contemporaneous documents such as November 11, 2002 board minutes of Opsys Limited, the subject of testimony by Mr. Zervoglos at deposition (also attached as part of Exhibit K), confirmed that the Opsys US entity had "negligible" value. Exhibit K and the board minutes were produced by defendant Opsys Limited in this action.

16.    I was present for the testimony of Mr. Zervoglos on March 2, 2007 in this action. The Court will recall, I believe, that he testified that "Opsys US" had since 2001 been separated from Opsys Limited. Because the jury determined that the lease liability here was a

-7-

BARTKO ZANKEL
Tobin Lacrois & Misbin & Emerson & A Law Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

RJN 148

1    liability of Opsys Limited, not Opsys US, Mr. Zervoglos' testimony and the admissions that the US

2    operation had negligible value are relevant, I believe, to rebutting any assertion by defendants now

3    that Cambridge did not acquire all of the contracting party's (Opsys Limited) stock or asset value.

4           17.     Attached hereto as **Exhibit L** are true copies of excerpts of the deposition

5    testimony of plaintiff's consultant Paul Ainslie, and Opsys Limited's consultant Terry Lloyd,

6    which describe the accounting treatment values for the acquisition of Opsys Limited and CDT

7    Oxford Limited by Cambridge. I have highlighted certain relevant testimony.

8           18.     Attached hereto as **Exhibit M** is a true copy of the audited Opsys Limited

9    financial statements for the period ending September 30, 2002, the month prior to the Cambridge

10   Transaction Agreement (Exh. A hereto). The debts of Opsys Limited existing at that time are

11   identified at pp. 17-18 (OPS 07508-9) of Exh. J, and total £5.286 million (convertible debt) and

12   £12.024 million (short-term debt), not including the $4.85 million the jury has awarded plaintiff in

13   this action. Opsys Limited's expert Mr. Lloyd interpreted Exhibit M at his deposition (attached as

14   part of Exhibit L, Lloyd depo., pp. 101-102), and Exhibit M was produced to plaintiff by Opsys

15   Limited.

16           19.     I have been lead counsel for plaintiff since we substituted into this case in

17   fall 2005. Throughout that entire time, I have been informed that Cambridge has directed the

18   litigation for the defense. In particular, Cambridge participants have attended mediation, my client

19   has met with Cambridge officers for such purposes in England, and the client representative for the

20   defense at trial, Mr. Andrew Fields, who was present for the entire trial, is a lawyer with

21   Cambridge. **Exhibit N**, from Cambridge's website, confirms Mr. Fields's position for Cambridge.

22   I have frequently been advised that direction for defense of this action comes from Cambridge, and

23   I have not heard that Opsys Limited or its former shareholders have directed the defense. We also

24   have been advised that Opsys Limited records are on a server in the custody of Cambridge,

25   although apparently some of the Opsys Limited documents used in the case have come from

26   individual former employees. This has been hard-fought, expensive litigation, in which Cambridge

27

28

**RJN 149**

-8-

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller, A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    on behalf of Opsys Limited made every effort and engaged in every due procedure to defend and

2    contest plaintiff's breach of contract claim.

3        20.    My office, at my direction, has searched publicly-available patent records,

4    and attached hereto as **Exhibit O** is a listing of patents applied for or in the name of "CDT Oxford

5    Limited," the company which was 84% owned by the judgment debtor at the time of initiation of

6    this action in December 2004, and which was, I believe, transferred to Cambridge's direct

7    ownership sometime in 2005 during the pendency of this case, as explained in the accompanying

8    Declaration of Paul Ainslie.

9        21.    Attached hereto as **Exhibit P** are true copies of pages of the deposition

10   testimony of Messrs. Holmes and Zervoglos, confirming that the financial controller of Opsys

11   Limited became a director of Opsys UK, later CDT Oxford Limited, and that Mr. Holmes became

12   an observer director on the Cambridge board.

13       22.    Finally, as to the attorney's fees motion, as the managing shareholder of the

14   BartkoZankel firm, I attest that the statements made in Ms. Huber's declaration regarding the

15   normative rates of our firm in the San Francisco legal market are accurate.  I cause surveys

16   annually to be conducted so that our hourly rates are at the level of our peers and generally lower

17   than the rates of larger San Francisco firms against whom we frequently litigate.  I know, as the

18   lawyer in charge who sends and collects the bills for this hourly engagement, that Sunnyside has

19   incurred the fees and costs prayed for by this motion, which I have always endeavored to keep as

20   low as possible for the client, and I know that we prepared and tried this case as efficiently as

21   possible given the dogged opposition.

22       I declare under penalty of perjury under the laws of the state of California that the

23   foregoing is true and correct and that this Declaration was executed April 2, 2007 at San Francisco,

24   California.

25   

26                   ROBERT H. BUNZEL

27   

28                           **RJN 150**

-9-

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

Company Registration No 3426174

# OPSYS LIMITED

**Report and Financial Statements**

30 September 2002

LD3
COMPANIES HOUSE    0270
21/05/04

Deloitte & Touche LLP
London

RJN 151

OPS 07490

OPSYS LIMITED

REPORT AND FINANCIAL STATEMENTS 2002

CONTENTS

| | Page |
|---|---|
| Officers and professional advisers | 1 |
| Directors' report | 2 |
| Statement of directors' responsibilities | 5 |
| Independent auditors' report | 6 |
| Profit and loss account | 8 |
| Balance sheet | 9 |
| Notes to the accounts | 10 |

RJN 152

OPS 07491

OPSYS LIMITED

REPORT AND FINANCIAL STATEMENTS 2002

OFFICERS AND PROFESSIONAL ADVISERS

**DIRECTORS**

| | |
|---|---|
| Sir John Fairclough | Chairman (resigned 26 April 2003) |
| John Baits | Vice Chairman (resigned 28 April 2003) |
| Michael Holmes | Chief Executive Officer |
| Alexis Zervoglos | Chief Financial Officer |
| Andrew Holmes | Non-Executive Director |
| Peter Johnson | Non-Executive Director |
| David Martin | Non-Executive Director (resigned 25 April 2003) |
| Andreas Zombanakis | Non-Executive Director (resigned 31 January 2002) |
| Paul Brunet | Non-Executive Director (resigned 1 May 2003) |

**SECRETARY**

Ovalsec Limited
30 Queen Charlotte Street
Bristol
BS1 4HJ

**REGISTERED OFFICE**

Oxford Centre for Innovation
Mill Street
Oxford OX2 0JX

**BANKERS**

Barclays Bank plc
Oxford City Centre Branch
The Oxford Group
PO Box 333
Oxford
OX1 3HS

**SOLICITORS**

Ashurst Morris Crisp
Broadwalk House
5 Appold Street
London EC2A 2HA

**AUDITORS**

Deloitte & Touche LLP
Chartered Accountants
London

RJN 153

OPSYS LIMITED

## DIRECTORS' REPORT

The directors present their annual report and the audited financial statements for the year ended 30 September 2002.

### PRINCIPAL ACTIVITIES AND REVIEW OF THE BUSINESS

October 2002 saw the transfer of management control of Opsys' principal centre of activities in Oxford, UK to CDT, a competitor, in a transaction by which Opsys received $5 million in cash and an option for its shareholders to sell its shares to CDT when CDT is sold or lists, providing Opsys can demonstrate that it is free of other substantial liabilities.

In early 2002, after an extremely taxing year of fundraising in difficult markets, Opsys had secured adequate deals with large corporates to assure, at the very least, the medium-term prospects of the company, and the continued development of its exciting light-emitting dendrimer technology. As well as the transaction with Toppan announced in the accounts for 2001, management had fully drafted cash-generative transactions with two major US chemicals companies.

However, while pleased at the enthusiasm that all these large companies had shown for Opsys' technology and vision, management was concerned that the deals compromised the Company's intellectual property in a way which would make it difficult to achieve an attractive exit for shareholders in the long-term. While bringing in much needed cash and furthering the development of the technology, each deal would essentially have also made the Company a less tractable object for a potential buyer to swallow. Management therefore decided that selling to CDT and the consequent consolidation of intellectual property constituted a better approach to long-term value creation than striking further dilutive deals with corporates. CDT has an excellent portfolio of intellectual property relating to light-emitting polymers, an important class of OLED materials which share many of the same processing characteristics as Opsys' light-emitting dendrimers, and are likely to be licenseable to the same set of licensees. It is backed by strong financial institutions based in New York, and has signed license arrangements with Osram, Philips, DuPont and Seiko Epson, among others.

Opsys enjoys the right to appoint an observer to the Board of CDT, and has appointed Michael Holmes to represent it in this capacity until further notice.

As part of the transaction, the Opsys shareholders are also to establish a joint venture with CDT to exploit non-display applications of dendrimer technology. Opsys shareholders will own 60% of this venture, which will be called Arborescent. Although plans are embryonic, Opsys management believes that this is an exciting opportunity, which could return further value to Opsys shareholders in the long term. The Company has already won a Scottish Executive SMART award to pursue opportunities in the area of printable electronics.

Management was always aware that the sale of Opsys' UK operation to CDT would make funding the Company's US operation a great challenge, and so it proved. After very nearly raising capital to fund the operation as an independent spin-out company, management was forced to put the company into liquidation in May 2003. The liquidation process has proceeded largely smoothly, with all assets and Opsys US intellectual property transferred to Global Tech Appliances, Inc., as anticipated by various financing transactions completed before the liquidation.

Opsys Limited's role, therefore, is now restricted to representing the interests of its shareholders with regard to CDT, and managing out the various liabilities with which the Company is now left, the biggest of which is a $2m liability to Kodak. Although the Company retains no staff and is making no payments for work conducted, the remaining directors continue to work on behalf of the shareholders on these tasks.

### RESULTS AND DIVIDENDS

The results for the year are set out on page 8. The directors are not proposing a dividend (2001: £ nil).

RJN 154

2

OPS 07493

OPSYS LIMITED

## DIRECTORS' REPORT

### DIRECTORS' SHARE INTERESTS

| | 2002 | | | | 2001 | | | |
|---|---|---|---|---|---|---|---|---|
| | Ordinary number | A number | B number | C number | Ordinary number | A number | B number | C number |
| J Fairclough | 400 | - | - | | 400 | - | - | - |
| J Baits | - | | 10,000 | | - | - | - | - |
| M Holmes | 1,005 | 2,651 | 600,000 | 72,187 | - | - | 10,000 | - |
| A Zervoglos | 1,060 | 34900 | 1,000,000 | 156,113 | 1,000 | - | 600,000 | 66,660 |
| P Johnson | 405 | 3,092 | 168,640 | 6,449 | 1,000 | - | 1,000,000 | 83,330 |
| A Zombanakis | 540 | 99,870 | 160,280 | | 540 | 99,870 | 138,890 | - |
| P Brunet | 61 | 35,342 | 214,450 | 73,703 | | | 160,280 | - |
| | | | | | | | 44,450 | - |

Aggregate emoluments disclosed do not include amounts for the value of options to acquire Ordinary 'B' shares in the Company granted to or held by directors.  Information regarding directors' emoluments can be seen at note 3.

### DIRECTORS' SHARE OPTIONS

| Name of director | Options held at 1 October 2001 | Granted during the year | Exercised during the year | Cost of option £ | Exercise price £ | Options held at 30 September 2002 | Date from which exercisable | Expiry date |
|---|---|---|---|---|---|---|---|---|
| M Holmes | 15,560 | | | | 0.45 | 15,560 | 3 December 1998 | 3 December 2008 |
| M Holmes | 20,000 | | | | 1.00 | 20,000 | 10 January 2000 | 10 January 2010 |
| M Holmes | | 1,165,661 | | | 0.92 | 1,165,661 | 5 June 2002 | 5 June 2012 |
| P Johnson | 25,000 | | | | 0.45 | 25,000 | 3 December 1998 | 3 December 2008 |
| P Johnson | 25,000 | | | | 0.18 | 25,000 | 20 May 1998 | 20 May 2008 |
| P Johnson | 83,330 | | | 0.12 | 0.18 | 83,330 | 1 January 1999 | 1 January 2009 |
| P Johnson | 40,000 | | | | 1.00 | 40,000 | 10 January 2000 | 10 January 2010 |
| P Johnson | | 152,250 | | | 0.92 | 152,250 | 5 June 2002 | 5 June 2012 |
| A Zervoglos | 25,000 | | | | 0.45 | 25,000 | 3 December 1998 | 3 December 2008 |
| A Zervoglos | 40,000 | | | | 1.00 | 40,000 | 10 January 2000 | 10 January 2010 |
| A Zervoglos | | 792,649 | | | 0.92 | 792,649 | 5 June 2002 | 5 June 2012 |
| A Zombanakis | 20,000 | | | | 0.45 | 20,000 | 3 December 1998 | 3 December 2008 |
| A Zombanakis | 25,000 | | | | 0.18 | 25,000 | 20 May 1998 | 20 May 2008 |
| A Zombanakis | 83,330 | | | 0.12 | 0.18 | 83,330 | 1 January 1999 | 1 January 2009 |
| A Zombanakis | 40,000 | | | | 1.00 | 40,000 | 10 January 2000 | 10 January 2010 |
| A Zombanakis | | 100,000 | | | 0.92 | 100,000 | 5 June 2002 | 5 June 2012 |
| J Fairclough | 400,000 | | | | 0.45 | 400,000 | 3 December 1998 | 3 December 2008 |
| Total | 953,690 | 2,443,692 | | | | 3,397,382 | | |

**RJN 155**

3

OPS 07494

OPSYS LIMITED

## DIRECTORS' REPORT

### AUDITORS

On 1 August 2003, Deloitte & Touche, the Company's auditors transferred their business to Deloitte & Touche LLP, a limited liability partnership incorporated under the Limited Liability Partnerships Act 2000. The Company's consent has been given to treating the appointment of Deloitte & Touche as extending to Deloitte & Touche LLP with effect from 1 August 2003 under the provisions of section 26(5) of the Companies Act 1989. A resolution to re-appoint Deloitte & Touche LLP as the Company's auditor will be proposed at the forthcoming Annual General Meeting.

Approved by the Board of Directors
and signed on behalf of the Board

Alexis Zervoglos
Director

21 May 2004

**RJN 156**

4

OPS 07495

OPSYS LIMITED

## STATEMENT OF DIRECTORS' RESPONSIBILITIES

United Kingdom company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company as at the end of the financial year and of the profit or loss of the company for that period. In preparing those financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates that are reasonable and prudent;
- state whether applicable accounting standards have been followed; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985. They are also responsible for the system of internal control, safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

**RJN 157**

5

## INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF OPSYS LIMITED

We have audited the financial statements of Opsys Limited for the year ended 30 September 2002 which comprise the profit and loss account, balance sheet, and the related notes 1 to 19. These financial statements have been prepared under the accounting policies set out therein.

This report is made solely to the company's members, as a body, in accordance with section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

### Respective responsibilities of directors and auditors

As described in the statement of directors' responsibilities, the company's directors are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards. Our responsibility is to audit the financial statements in accordance with relevant United Kingdom legal and regulatory requirements and auditing standards.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985. We also report if, in our opinion, the directors' report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and transactions with the company is not disclosed.

We read the directors' report for the above year and consider the implications for our report if we become aware of any apparent misstatements.

### Basis of opinion

We conducted our audit in accordance with United Kingdom auditing standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion, we also evaluated the overall adequacy of the presentation of information in the financial statements.

### Going concern

In forming our opinion, we have considered the adequacy of the disclosure made in Note 1 to the financial statements concerning the uncertainties as to the Company obtaining further funding and the continued agreement of the Company's principal creditors to extend the due date of the Company's liabilities. In view of the significance of these uncertainties we consider that it should be drawn to your attention but our opinion is not qualified in this respect.

**RJN 158**

6

OPS 07497

## INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF OPSYS LIMITED

**Opinion**

In our opinion the financial statements give a true and fair view of the state of the company's affairs as at 30 September 2002 and of its loss for the year then ended and have been properly prepared in accordance with the Companies Act 1985.

*Deloitte & Touche LLP*

**Deloitte & Touche LLP**
Chartered Accountants and Registered Auditors
London

21 May 2004

**RJN 159**

7

OPS 07498

OPSYS LIMITED

**PROFIT AND LOSS ACCOUNT**
**Year ended 30 September 2002**

| | Note | 2002 £ | 2001 £ |
|---|---|---|---|
| TURNOVER | | 131,581 | 250 |
| **ADMINISTRATIVE EXPENSES** | | | |
| Research expenses | | (2,241,440) | (1,730,472) |
| Other administrative expenses | | (2,240,891) | (2,454,896) |
| Amounts written off investments | 9 | (4,955,169) | (2,135,946) |
| Amounts written off licences | 7 | (2,861,434) | - |
| Loss on impairment of fixed assets | 8 | (779,659) | (4,088,964) |
| | | (13,078,593) | (10,410,278) |
| **OPERATING LOSS** | 2 | (12,947,012) | (10,410,028) |
| Interest receivable | | 17,618 | 56,745 |
| Interest payable and similar charges | 6 | (7,230,932) | (160,650) |
| **RETAINED LOSS ON ORDINARY ACTIVITIES BEFORE TAXATION** | | (20,160,326) | (10,513,933) |
| Tax credit on loss on ordinary activities | 4 | 434,463 | 377,401 |
| **LOSS FOR THE FINANCIAL YEAR** | | (19,725,863) | (10,136,532) |
| Retained loss brought forward | 15 | (13,416,748) | (3,280,216) |
| Retained loss carried forward | 15 | (33,142,611) | (13,416,748) |

See note 19 to the accounts for details of significant post balance sheet events including the sale of the Company's operations.

There are no recognised gains or losses other than the loss for the year.

RJN 160

8

OPS 07499

OPSYS LIMITED

**BALANCE SHEET**
**30 September 2002**

| | Note | 2002 £ | 2001 £ |
|---|---|---|---|
| **FIXED ASSETS** | | | |
| Development costs, patents and trademarks | 7 | - | 2,861,434 |
| Tangible assets | 8 | 766,071 | 933,812 |
| Investments | 9 | 2 | 2 |
| | | 766,073 | 3,795,248 |
| **CURRENT ASSETS** | | | |
| Debtors | | | |
| Due within one year | 10 | 610,544 | 839,769 |
| Due after one year | 10 | 13,200 | 220,239 |
| Cash at bank and in hand | | 454,663 | 1,466,491 |
| | | 1,078,407 | 2,526,499 |
| **CREDITORS: amounts falling due** | | | |
| **within one year** | | | |
| Convertible debt | 11 | (5,286,538) | (1,361,819) |
| Other creditors | 11 | (12,024,324) | (2,971,016) |
| | | (17,310,862) | (4,332,835) |
| **NET CURRENT LIABILITIES** | | (16,232,455) | (1,806,336) |
| **TOTAL ASSETS LESS CURRENT** | | | |
| **LIABILITIES** | | (15,466,382) | 1,988,912 |
| **CREDITORS: amounts falling due** | | | |
| **after more than one year** | 12 | (198,185) | (418,269) |
| **NET ASSETS** | | (15,664,567) | 1,570,643 |
| **CAPITAL AND RESERVES** | | | |
| Called up share capital | 14 | 25,271 | 18,070 |
| Share premium account | 15 | 17,432,779 | 14,949,327 |
| Share options reserve | 15 | 19,994 | 19,994 |
| Profit and loss account | 15 | (33,142,611) | (13,416,748) |
| **EQUITY SHAREHOLDERS' FUNDS** | 17 | (15,664,567) | 1,570,643 |

These financial statements were approved by the Board of Directors on 21 May 2004.

Signed on behalf of the Board of Directors

Alexis Zervoglos
Chief Financial Officer

RJN 161

9

OPS 07500

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

1.    ACCOUNTING POLICIES

The financial statements are prepared in accordance with applicable accounting standards. The particular accounting policies adopted by the directors are described below. The requirements of FRS 19 (Deferred Taxation) were adopted during the current year and prior year comparative figures have not been restated as there was no material effect. With the exception of FRS 19, all other accounting policies were applied consistently.

Basis of accounting

The financial statements are prepared under the historical cost convention and in accordance with applicable accounting standards. The Company has taken advantage of the exemption in s248 of the Companies Act 1985 not to prepare group accounts on the basis that it qualifies as a medium sized group under the Act. Therefore the financial information contained in these financial statements relates to the individual Company and not its group.

Going concern

As stated in the Directors' report and in note 19, the company has relinquished control of its UK operation to CDT and liquidated its US operation. With respect to the closure of the US operation, there has been no impact on the company other than a potential employment dispute with the erstwhile manager of that operation. Although the Directors do not believe there to be any merit whatsoever in any claim brought by this former employee, in any case they estimate that the maximum liability for this claim to be $250,000.

The company essentially remains now as a holding company managing its stake in CDT. To that end, its operating expenses are greatly reduced and consist of the costs associated with its observer status on the CDT Board and of fulfilling other responsibilities such as audit requirements.

This low level of funding is currently being met by the company's shareholders and it is the intention of the directors to secure sufficient funding for at least a period of twelve months from the date of these accounts, as they have already done in the preceding months since the liquidation of the US operation.

With regard to the Company's existing creditors, the Company intends to repay them at such time as its stake in CDT (as described in Note 19) becomes liquid. It secured agreement from over 99% (by value) of its creditors to this position and is in discussions with the balance. Notable among its creditors is Eastman Kodak Company ("Kodak") which accounts for over 90% of the outstanding creditor balance. The Company has made arrangements with Kodak that the due date for this liability be formally extended for six months and Kodak has indicated to the Directors that it intends to extend this on a semi-annual basis until such time as the company's assets are liquid (although it is not legally bound to do so). The Kodak liability is secured against the company's assets.

The Directors believe that there is a reasonable certainty that they will be able to obtain appropriate funding and therefore have prepared the financial statements on a going concern basis. The going concern basis assumes that such funding will be available, the financial statements do not include any adjustments that may be necessary should the Company fail to obtain the necessary funding.

Investments

Fixed asset investments are shown at cost less provision for impairment.

Tangible fixed assets

Tangible fixed assets are stated at cost, net of depreciation and provision for impairment. Depreciation is provided on all tangible fixed assets at rates calculated to write off the cost or valuation, less estimated residual value, of each asset on a straight line basis over its expected useful life as follows:

| | | |
|---|---|---|
| Development costs, patents and trade marks | - | 10 years |
| Computer equipment and software | - | 3 years |
| Fixtures and fittings | - | 5 years |
| Laboratory equipment | - | 5 years |
| Motor vehicles | - | 4 years |

RJN 162

10

OPS 07501

. OPSYS LIMITED

## NOTES TO THE ACCOUNTS
Year ended 30 September 2002

1. **ACCOUNTING POLICIES (CONTINUED)**

**Turnover**

Turnover represents the amount receivable in the normal course of business and is stated net of VAT.

**Pension costs**

The amount charged to the profit and loss account in respect of pension costs for defined contribution schemes is the contributions payable in the year. Any difference between contributions payable in the year and contributions actually paid are shown as either accruals or prepayments in the balance sheet.

**Foreign currency**

Transactions in foreign currencies ·are recorded at the rate of exchange at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies at the balance sheet date are reported at the rates of exchange prevailing at that date or, if appropriate, at the forward contract rate. All exchange differences are included in the profit and loss account.

**Research expenses**

Research expenditure is written off as it is incurred.

**Cash flow**

The Company has taken advantage of the exemption allowed under FRS 1 (revised) and has not produced a cashflow statement on the basis that it qualifies as a medium sized group.

**Leases**

Assets held under hire purchase transactions, which confer rights and obligations similar to those attached to owned assets, are capitalised as tangible fixed assets and are depreciated over their useful lives. The capital elements of future hire purchase obligations are recorded as liabilities, while the interest elements are charged to the profit and loss account over the period of the leases to produce a constant rate of charge on the balance of capital repayments outstanding.

Rentals under operating leases are charged on a straight-line basis over the lease term, even if the payments are not made on such a basis. Benefits received and receivable as an incentive to sign an operating lease are similarly spread on a straight-line basis over the lease term, except where the period to the review date on which the rent is first expected to be adjusted to the prevailing market rate is shorter than the full lease term, in which case the shorter period is used.

**Debt**

Debt is initially stated at the amount of the net proceeds after deduction of issue costs. The carrying amount is increased by the finance cost in respect of the accounting period and reduced by payments made in the period. Convertible debt is reported as a liability until conversion actually occurs. No gain or loss is recognised on conversion.

**Taxation**

Current tax, including UK corporation tax, is provided at amounts expected to be paid or recovered using the tax rates and laws that had been enacted or substantially enacted by the balance sheet date.

**Patents and trade marks**

Patents, licences and trademarks are included at cost and depreciated in equal annual instalments over a period of 10 years, which is their estimated useful economic life. Provision is made for any impairment.

**RJN 163**

11

OPS 07502

OPSYS LIMITED

## NOTES TO THE ACCOUNTS
Year ended 30 September 2002

2.   **OPERATING LOSS**

Operating loss is stated after charging:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Depreciation: |  |  |
| Of owned assets | 127,343 | 50,217 |
| Assets held under hire purchase contracts | 178,841 | 178,831 |
| Operating lease rentals – property | 52,800 | 52,800 |
| Auditors remuneration for audit services | 44,000 | 45,000 |
| And after crediting: |  |  |
| Foreign exchange gain | 194,285 | 60,044 |

3.   **DIRECTORS' REMUNERATION**

The remuneration of the directors was as follows:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Directors' fees | 240,734 | 222,807 |
| Fees paid to third parties in respect of directors' services | 5,099 | 12,398 |

Two (2001 - two) directors are members of money purchase pension schemes. Aggregate contributions paid by the Company in respect of such directors were £7,750 (2001 - £6,760). Details of director's shareholdings and options are shown in the Directors' Report.

The highest paid director received a salary of £80,000 (2001 - 75,000). The company paid contributions to money pension schemes, in respect of the highest paid director of £4,000 (2002 - £3,750).

4.   **TAXATION**

No corporation tax liability has been accrued due to the Company's losses both in the current and previous year.

The Company has claimed R&D tax credit repayments of £434,463 for the year ending 30 September 2002 (2001: £377,401).

The Company has not recognised a deferred tax asset in respect of losses of approximately £9 million due to a lack of certainty regarding future profitability.

RJN 164

12

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

4.     TAXATION (CONTINUED)

The standard rate of current tax for the year, based on the UK standard rate of corporation tax is 30% (2001 – 30%). The current tax credit for the year is 2.1% (2001 – 3.6%) for the reasons set out in the following reconciliation:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Loss on ordinary activities before tax | (20,160,326) | (10,513,933) |
| Tax at 30% | (6,048,098) | (3,154,180) |
| Expenses not deductible for tax purposes | 5,441,054 | 2,342,238 |
| Capital allowances | (44,912) | (69,953) |
| Losses not utilised | 651,956 | 881,896 |
| Research & development tax credit | (434,463) | (377,401) |
|  | (434,463) | (377,401) |

5.     EMPLOYEES

Employment costs

|  | 2002 £ | 2001 £ |
|---|---|---|
| Employee costs (including executive directors) amounted to: |  |  |
| Wages and salaries | 1,408,507 | 939,781 |
| Social security costs | 137,397 | 90,604 |
| Pension costs | 41,165 | 27,934 |
|  | 1,587,069 | 1,058,319 |

Number of employees

The average monthly number of employees (including executive directors) was 35 (2000: 30). All were employed in administrative (including research) capacities.

6.     INTEREST PAYABLE AND SIMILAR CHARGES

|  | 2002 £ | 2001 £ |
|---|---|---|
| Premium Conversion | 6,822,489 | - |
| Bank loans and overdrafts | 298,586 | 62,220 |
| Finance charges | 109,167 | 97,740 |
| Other interest | 690 | 690 |
|  | 7,230,932 | 160,650 |

RJN 165

13

OPSYS LIMITED

**NOTES TO THE ACCOUNTS**
Year ended 30 September 2002

7.     DEVELOPMENT COSTS, PATENTS AND TRADE MARKS

|  | Patents and trade marks £ | Total £ |
|---|---|---|
| **Cost** | | |
| 1 October 2001 | | |
| Additions | 3,012,036 | 3,012,036 |
| 30 September 2002 | 3,012,036 | 3,012,036 |
| **Depreciation** | | |
| 1 October 2001 | | |
| Written off | 150,602 | 150,602 |
| | 2,861,434 | 2,861,434 |
| 30 September 2002 | 3,012,036 | 3,012,036 |
| **Net book value** | | |
| 30 September 2002 | | |
| 30 September 2001 | 2,861,434 | 2,861,434 |

**RJN 166**

14

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

8.    TANGIBLE FIXED ASSETS

| | Motor vehicle £ | Computer Equipment £ | Laboratory equipment £ | Fixtures and fittings £ | Assets in the course of construction £ | Total £ |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| 1 October 2001 | 13,950 | 161,271 | 1,073,370 | 53,184 | 4,088,964 | 5,390,739 |
| Additions | - | 9,182 | 149,747 | 2,210 | 779,659 | 940,798 |
| Disposals | - | (34,249) | - | - | (4,047,764) | (4,082,013) |
| 30 September 2002 | 13,950 | 136,204 | 1,223,117 | 55,394 | 820,859 | 2,249,524 |
| **Depreciation** | | | | | | |
| 1 October 2001 | 6,631 | 48,338 | 297,560 | 15,434 | 4,088,964 | 4,456,927 |
| Charge for year | 3,488 | 50,967 | 240,163 | 11,566 | - | 306,184 |
| Disposal | - | (11,553) | - | - | (4,047,764) | (4,059,317) |
| Impairment loss | - | - | - | - | 779,659 | 779,659 |
| 30 September 2002 | 10,119 | 87,752 | 537,723 | 27,000 | 820,859 | 1,483,453 |
| **Net book value** | | | | | | |
| 30 September 2002 | 3,831 | 48,452 | 685,394 | 28,394 | - | 766,071 |
| 30 September 2001 | 7,319 | 112,933 | 775,810 | 37,750 | - | 933,812 |

The motor vehicle, a proportion of the computer equipment, laboratory equipment and fixture and fittings are held under a hire purchase contract.

A provision has been made for the impairment of 'Assets in the course of construction' under FRS 11 (Impairment of Fixed Assets and Goodwill) reflecting the current inability of Opsys Limited to realise value from these assets.

*Leased assets included above:*

| | Motor vehicle £ | Computer equipment £ | Laboratory equipment £ | Fixtures and fittings £ | Assets in the course of construction £ | Total £ |
|---|---|---|---|---|---|---|
| **Net book value** | | | | | | |
| 30 September 2002 | 3,831 | 14,237 | 384,809 | - | - | 402,877 |
| 30 September 2001 | 7,319 | 30,140 | 543,779 | - | - | 581,238 |

See note 19 for details of significant post balance sheet events including the sale of the Company's operations and assets.

RJN 167

15

OPS 07506

. OPSYS LIMITED

## NOTES TO THE ACCOUNTS
### Year ended 30 September 2002

9.    INVESTMENT

|  | Opsys 2 Corp | | Opsys US Corp | | |
|---|---|---|---|---|---|
|  | Equity £ | Loans £ | Equity £ | Loans £ | Total £ |
| **Cost** | | | | | |
| At 1 October 2001 | 1,187,986 | 129,603 | 68 | 818,291 | 2,135,948 |
| Additions | - | - | - | 4,955,169 | 4,955,169 |
| At 30 September 2002 | 1,187,986 | 129,603 | 68 | 5,773,460 | 7,091,117 |
| **Amounts written off** | | | | | |
| At 1 October 2001 | 1,187,985 | 129,603 | 67 | 818,291 | 2,135,946 |
| Impairment losses | - | - | - | 4,955,169 | 4,955,169 |
| At 30 September 2002 | 1,187,985 | 129,603 | 67 | 5,773,460 | 7,091,115 |
| **Net Book Value** | | | | | |
| At 30 September 2002 | 1 | - | 1 | - | 2 |
| At 30 September 2001 | 1 | - | 1 | - | 2 |

The directors continue to believe that the investment and amounts owed by its subsidiaries are impaired and thus have been written off in accordance with FRS 11.

RJN 168

16

OPS 07507

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

10.    DEBTORS

Amounts falling due within one year:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Amounts owed by subisidary undertakings | | |
| Corporation tax | 435,163 | 377,401 |
| VAT | 33,967 | 115,841 |
| Other debtors | 35,718 | 166,649 |
| Prepayments and accrued income | 105,696 | 67,882 |
| Shares to be issued | - | 111,996 |
|  | 610,544 | 839,769 |

Amounts falling due after one year:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Other debtors | 13,200 | 220,239 |
|  | 13,200 | 220,239 |

11.    CREDITORS: AMOUNTS FALLING WITHIN ONE YEAR

|  | 2002 £ | 2001 £ |
|---|---|---|
| Convertible debt | 5,286,538 | 1,361,819 |
|  | 5,286,538 | 1,361,819 |

In September 2001, Opsys Limited raised from its institutional investors £1,400,000 in the form of a convertible loan. This debt is shown above after deduction of issue costs. The loan, a 20% premium and a monthly interest rate of 1.5% was repayable prior to 31 May 2002.

During November 2001, Opsys Limited raised further funds through a two financial instruments – a share issue combined with a zero interest loan and a convertible loan. Through the former instrument Opsys Limited issued 3,062,125 shares at £0.10 per share combined with a loan of £414,288. The convertible loan raised £1,584,000 and has a conversion premium of 200%.

During April 2002, Opsys Limited again raised funds through two financial instruments – a share issue combined with a zero interest loan and a convertible loan. Through the former instrument Opsys Limited issued 1,317,500 shares at £0.10 per share combined with a loan of £178,250. The convertible loan raised £1,710,000 and has a conversion premium of 200%.

In the event of an investment in new ordinary shares, the repayable sum may, in part or total, be converted through a share subscription at the same price per share as the investors subscribe in new ordinary shares.

RJN 169

17

OPS 07508

.OPSYS LIMITED .

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

11.   CREDITORS: AMOUNTS FALLING DUE WITHIN ONE YEAR (CONTINUED)

Other creditors:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Loans and accrued interest | 8,577,851 | - |
| Obligations under hire purchase contracts | 220,085 | 181,263 |
| Trade creditors | 1,664,602 | 886,845 |
| Amounts owed to subsidiary undertakings | - | 12,124 |
| Other taxation & social security | 52,735 | 35,960 |
| Other creditors | 1,282,274 | 1,404,693 |
| Accruals | 226,777 | 450,131 |
|  | 12,024,324 | 2,971,016 |

The Company has granted a fixed and floating charge on its assets to secure its loans.

12.   CREDITORS: AMOUNTS FALLING DUE AFTER MORE THAN ONE YEAR

|  | 2002 £ | 2001 £ |
|---|---|---|
| Obligations under hire purchase contracts | 198,185 | 418,269 |
|  | 198,185 | 418,269 |

13.   HIRE PURCHASE CONTRACTS

Liabilities under hire purchase contracts are repayable as follows:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Within one year | 220,085 | 181,263 |
| Between two and five years | 198,185 | 418,269 |
|  | 418,270 | 599,532 |

RJN 170

18

OPS 07509

OPSYS LIMITED

## NOTES TO THE ACCOUNTS
### Year ended 30 September 2002

14. SHARE CAPITAL

|  | 2002 £ | 2001 £ |
|---|---|---|
| **Authorised:** |  |  |
| 16,620 Ordinary shares of 0.1p each (2001: 38,950 | 17 | 39 |
| 4,887,274 Ordinary 'A' shares of 0.1p each (2001: 4,981,820 | 4,887 | 4,982 |
| 17,649,514 Ordinary 'B' shares of 0.1p each (2001: 13,956,230) | 17,649 | 13,956 |
| 7,968,854 Ordinary 'C' shares of 0.1p each (2001: 20,100,000) | 7,969 | 20,100 |
| 15,214,776 Ordinary 'D' shares of 0.1p each (2001: Nil) | 15,215 | - |
| 4,702,712 Ordinary 'D-UK' shares of 0.1p each (2001: Nil) | 4,703 | - |
|  | 50,440 | 39,077 |
| **Called up, allotted and fully paid** |  |  |
| 16,620 Ordinary shares of 0.1p each (2001: 16,620) | 17 | 17 |
| 4,459,420 Ordinary 'A' shares of 0.1p each (2001: 4,459,420) | 4,459 | 4,459 |
| 11,373,425 Ordinary 'B' shares of 0.1p each (2001: 6,993,800) | 11,373 | 6,994 |
| 6,599,990 Ordinary 'C' shares of 0.1p each (2001: 6,599,990) | 6,600 | 6,600 |
| 2,821,622 Ordinary 'D-UK' shares of 0.1p each (2001: Nil) | 2,822 | - |
|  | 25,271 | 18,070 |

In April 2001, Opsys Limited issued 704,751 shares for £12.00 per share. In July 2001, there was a 10:1 share split for all classes of shares.

The rights attached to Ordinary 'A', Ordinary 'B', Ordinary 'C' and Ordinary shares are as follows:

o   all shares have the right to attend, speak and vote at any General meeting of the Company;

o   any dividend declared by the Company shall be paid on all Shares in issue pari passu as if they were all Shares of the same class;

o   in the event of a sale or winding up, the proceeds shall be distributed as follows – firstly, Ordinary 'C' shares shall receive £1.80 per share, secondly, Ordinary 'A' shares shall receive £1.00 per share, thirdly, Ordinary and Ordinary 'B' shares shall receive £1.00 per share in proportion to the shares held, fourthly Ordinary 'A', Ordinary 'B' and Ordinary shares shall receive £0.80 per share in proportion to the shares held and the balance shall be distributed amongst all shares in proportion to the shares held;

o   if immediately prior to a listing, the value per share is less than £1.80 then a capital reorganisation shall take place to ensure that in the following priority - firstly, Ordinary 'C' shareholders shall receive the equivalent of £1.80 per share, secondly, Ordinary 'A' shareholders shall receive the equivalent of £1.00 per share, thirdly, Ordinary and Ordinary 'B' shareholders shall receive the equivalent of £1.00 per share in proportion to the shares held, and finally Ordinary 'A', Ordinary 'B' and Ordinary shareholders shall receive the remainder of the shares in proportion to the shares held.

RJN 171

19

OPS 07510

OPSYS LIMITED

## NOTES TO THE ACCOUNTS
### Year ended 30 September 2002

14    SHARE CAPITAL (CONTINUED)

*Shares issued for cash*

| Class of share allotted | 2002 Number | £ | 2001 Number | £ |
|---|---|---|---|---|
| Ordinary shares | - | - | 3,130 | 3,756 |
| Ordinary 'A' shares | - | - | - | - |
| Ordinary 'B' shares | 4,379,625 | 437,962 | 423,560 | 508,272 |
| Ordinary 'C' shares | - | - | 6,599,990 | 7,919,988 |
| Ordinary 'D-UK' shares | 2,821,622 | 2,088,000 | - | - |
| | 7,201,247 | 2,525,962 | 7,026,680 | 8,432,016 |

During the financial year, Opsys Limited issued shares in conjunction with loans outlined in Note 11.

Furthermore, in July 2002, Toppan Printing Company Ltd ("Toppan") paid £2,088,000 for 2,821,622 Ordinary "D-UK" shares. These shares will form a new class ranking pari passu with other Ordinary shares with respect to voting rights but where the return (whether in the form of income or capital) on the investment made in the Company shall be derived solely from the Non-US Business.

Options have been granted under the unapproved share option scheme to subscribe for shares of the Company as follows:

**Ordinary 'B' shares**

| Number of shares under option | Subscription price per share | Exercise period |
|---|---|---|
| 276,660 | £0.18 | Maximum of 10 years from date of granting |
| 632,980 | £0.45 | Maximum of 10 years from date of granting |
| 200,000 | £1.00 | Up to 1 December 2001 |
| 609,430 | £1.00 | Maximum of 10 years from date of granting |
| 5,046,519 | £0.92 | Maximum of 10 years from date of granting |

**Ordinary shares**

| Number of shares under option | Subscription price per share | Exercise period |
|---|---|---|
| 500 | £1.00 | Up to 1 December 2001 |

RJN 172

20

OPS 07511

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

15  CAPITAL AND RESERVES

|  | Share capital £ | Share premium account £ | Share options reserve £ | Profit & loss account £ | Total £ |
|---|---|---|---|---|---|
| At 1 October 2001 | 18,070 | 14,949,327 | 19,994 | (13,416,748) | 1,570,643 |
| Share issues | 7,201 | 2,518,761 | - | - | 2,525,962 |
| Share issue costs | - | (35,309) | - | - | (35,309) |
| Retained loss for the year | - | - | - | (19,725,863) | (19,725,863) |
| At 30 September 2002 | 25,271 | 17,432,779 | 19,994 | (33,142,611) | (15,664,567) |

16  RELATED PARTY TRANSACTIONS

At the year-end Quester Capital Management held 4,714 Ordinary shares, 1,243,310 Ordinary 'A' shares, 255,220 Ordinary 'B' shares and 2,887,872 Ordinary 'C' shares in Opsys Limited. Andrew Holmes was appointed director of Opsys Limited on 12 January 2000. He also has a controlling interest in, and is the Managing Director of Quester Capital Management. During the year £536 (2001: £12,398) was paid to Quester Capital Management in respect of director's fees for Andrew Holmes' services during the year.

Peter Johnson, a director, charged fees for consultancy services of £ 4,563 (2001: £nil) during the financial year.

17  RECONCILIATION OF MOVEMENTS IN EQUITY SHAREHOLDERS' FUNDS

|  | 2002 £ | 2001 £ |
|---|---|---|
| Loss for the financial year | (19,725,863) | (10,136,532) |
| New shares issued | 2,525,962 | 8,432,016 |
| Share issue costs | (35,309) | (216,692) |
| Net addition to shareholders' funds | (17,235,210) | (1,921,208) |
| Opening shareholders' funds | 1,570,643 | 3,491,851 |
| Closing shareholders' funds | (15,664,567) | 1,570,643 |

RJN 173

21

OPSYS LIMITED

NOTES TO THE ACCOUNTS
Year ended 30 September 2002

18    FINANCIAL COMMITMENTS

Annual commitments under non-cancellable operating leases, in respect of land and buildings are as follows:

|  | 2002 £ | 2001 £ |
|---|---|---|
| Expiry date |  |  |
| - between two and five years |  |  |
| - after five years | 55,440 | 52,800 |
|  | 76,805 | 73,148 |

In 2001, Opsys Limited entered into a lease contract, in respect of land and buildings, for and on behalf of its subsidiary Opsys US Corp. This expense is borne in the books of Opsys US Corp. The annual commitment increases by 5% on an annual basis for the duration of the lease. The lease expires on 30 April 2008.

In addition, Opsys Limited also entered into contracts, for and on behalf of Opsys US Corp, with respect to the acquisition of capital equipment for the pilot line in Fremont, California. The outstanding financial commitments with respect the capital equipment, as at the year-end, is £12,114,015. These commitments have been either fulfilled or contractually novated to Opsys US Corp after the year-end.

19    POST BALANCE SHEET EVENTS

As described in the Directors' Report, the company has relinquished control of all its operations since the balance sheet date and remains purely as a holding company for its resulting stake in CDT Acquisition Corp, the acquiror.

The series of transactions that led to this are as follows:

   i.   On 24 October 2002, the entirety of the company's UK R&D operations, including associated contracts and staff, was hived down into a newly incorporated entity, Opsys UK Limited.

   ii.  On 25 October 2002, Opsys Limited entered into a management agreement with CDT Limited under which CDT Limited undertook to manage and fund Opsys UK Limited going forward in return for a significant proportion of profits from that company. As part of this arrangement, it was agreed that Opsys UK Limited would be renamed CDT Oxford Limited.

   iii. Also on 25 October 2002, CDT Acquisition Corp and Opsys Limited entered into a series of complementary options under which CDT has the right to buy Opsys UK Limited and Opsys Limited has the right to sell either Opsys UK Limited or Opsys Limited. All three of these options are subject to a number of conditions.

The net upfront fee for entering into these transactions was a cash payment by CDT of $5,000,000 and on eventual sale through the exercise of the options described in (iii) above, Opsys Limited or its shareholders will receive a significant number of shares in CDT Acquisition Corp, the holding company for the CDT group of companies.

In addition, on 22 November 2002, Opsys Limited sold Opsys US Corporation (until then a wholly owned subsidiary) to Opsys Holding Co 2 Limited, a newly incorporated independent company. The consideration for the sale was $1 although Opsys Limited remained a $2,000,000 creditor of Opsys US Corporation. The sale was carried out after an independent valuation by Grant Thornton in the US. Subsequently, after failing to secure funding, the US company was liquidated in May 2003 and the debt was written off in the company's accounts.

RJN 174

22

OPS 07513

# EXHIBIT P

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   BRUCE A. ERICSON #76342
2  SHARON L. O'GRADY #102356
   ALICE KWONG MA HAYASHI #178522
3  50 Fremont Street
   Post Office Box 7880
4  San Francisco, CA 94120-7880
   Telephone: (415) 983-1000
5  Facsimile: (415) 983-1200
   bruce.ericson@pillsburylaw.com
6  sharon.ogrady@pillsburylaw.com
   alice.hayashi@pillsburylaw.com
7
   Attorneys for Non-Party/Respondent
8  CAMBRIDGE DISPLAY TECHNOLOGY, INC.

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14  SUNNYSIDE DEVELOPMENT                    No. C-05-00553 MHP
    COMPANY, LLC,
15                                           **DECLARATION OF MICHAEL**
                          Plaintiff,         **BLACK IN OPPOSITION TO**
16                                           **PLAINTIFF'S MOTION TO ADD**
           vs.                               **CAMBRIDGE DISPLAY**
17                                           **TECHNOLOGY, INC. AS A PARTY**
    OPSYS LIMITED, a United Kingdom          **TO ACTION AND JUDGMENT**
18  Company,
                                             Date:      May 16, 2007
19                        Defendant.         Time:      1:00 p.m.
                                             Courtroom: 15, 18th Floor
20                                           Judge:     Hon. Marilyn Hall Patel

21

22

23

24

25

26

27                                                         **RJN 175**

28

1      1.      I, **MICHAEL BLACK**, declare as follows:

2      2.      I am the Chief Financial Officer for Cambridge Display Technology, Inc.

3  ("CDT Inc."). I have held this position since March 2007. From September 2004 to March

4  2007, I was the Vice President, Finance, for CDT Inc. I have also been Assistant Company

5  Secretary for CDT Inc. since March 2004. I have been Principal Financial Officer and

6  Principal Accounting Officer for CDT Inc. from July 2004 to September 2005 and from

7  July 2006 to the present. I have never been a director of CDT Inc.

8      3.      From June 2002 to September 2004, I was the Financial Planning and

9  Analysis Manager for Cambridge Display Technology Limited ("CDT Ltd."). I also have

10  held other positions with CDT Ltd. and have served as a director of CDT Ltd.

11      4.      I am a member of the Board of Directors of Opsys Limited ("Opsys"). I

12  have been a director of Opsys since December 2004. I have not held any other positions

13  with Opsys. I did not hold any position with Opsys at the time of the "2002 Transaction"

14  discussed below.

15      5.      I have personal knowledge of the matters stated in this declaration and, if

16  called as a witness, could testify competently thereto.

17      6.      I received a BA (Hons) in Management Studies from Selwyn College,

18  University of Cambridge. I am trained in accounting and am an associate of the Chartered

19  Institute of Management Accountants (1991 – present). As such, I have a broad knowledge

20  of tax law in the United Kingdom.

21                          **The 2002 Transaction**

22      7.      I am familiar with the structure of the "2002 Transaction" whereby CDT

23  Ltd. acquired control of the assets of Opsys UK Limited ("Opsys UK"). I also am familiar

24  with certain significant potential UK liabilities which were avoided by the structure of the

25  2002 Transaction.

26      8.      CDT Inc. deemed tax considerations to be of importance in determining the

27  structure of the 2002 Transaction. For example, tax considerations were a major reason that

28  the 2002 Transaction was not structured as a sale of Opsys' UK assets for CDT Inc. stock.

BLACK DECLARATION IN OPPOSITION TO
PLAINTIFF'S MOTION TO ADD CDT INC.
Case No. C 05-00553 MHP

RJN 176

1    If CDT Inc. had acquired all of Opsys' UK assets for CDT Inc. stock in 2002, then Opsys

2    would have been taxed on the value of such stock less the value of any tangible assets sold.

3    The patents developed by Opsys' UK operations had a very low "basis" for UK tax

4    purposes, even though very significant sums had been spent developing the underlying

5    technology and prosecuting the patents. If CDT Inc. had acquired these patents, therefore,

6    Opsys would have been taxed on substantially the entire value of the stock received from

7    CDT Inc. Because Opsys did not have cash on hand or other means to pay such tax, and

8    because CDT Inc.'s stock was then illiquid, such a tax would have been a significant barrier

9    to completing the transaction. It is my understanding, as CDT Inc.'s Chief Financial

10   Officer, that the transaction whereby CDT Ltd. acquired control of Opsys' UK assets was

11   structured to avoid such a result.

12        9.     For the reasons described in the David Fyfe's declaration, CDT Inc. had no

13   interest in acquiring Opsys' US assets or liabilities. To the best of my knowledge and

14   belief, Opsys did not transfer any assets or liabilities of Opsys US Corporation ("Opsys

15   US") to Opsys UK. Specifically, Opsys did not transfer any intellectual property of Opsys

16   US to Opsys UK. This is entirely consistent with what CDT Inc. said in its final prospectus

17   of December 15, 2004 at page F-15, where it stated: "The terms of the Transaction

18   Agreement [meaning the 2002 Transaction] were entered into by the Company [meaning

19   CDT Inc. and its subsidiaries] so that it could gain control of and economic interest in the

20   UK assets and operations of Opsys (which had been transferred to Opsys UK immediately

21   prior to the transaction) in such a manner to avoid acquiring any interest in any other assets

22   or liabilities of Opsys." Bunzel Decl. (Dkt. 182) Ex. C at 119.

23        10.    Mr. Ainslie, in his declaration dated March 30, 2007 and filed April 2, 2007

24   (Dkt. 180) ("Ainslie Decl."), suggests that the language quoted immediately above was

25   "unusual," and he speculates that "the purpose of the transaction may be inconsistent with

26   the interests of creditors of Opsys Limited." Ainslie Decl. ¶ 8. His speculation is entirely

27   wrong and reflects a fundamental misunderstanding of the situation. As explained above,

28   the structure of the 2002 Transaction reflected two principal purposes:  a proper business

RJN 177

1    purpose of obtaining certain assets (Opsys' UK assets) but not other assets (Opsys' US

2    assets); and sound tax planning.  There was no purpose to place Opsys' creditors at any

3    disadvantage.  To the contrary, and as further explained in paragraphs 26 through 29 below,

4    steps were taken so that most of the consideration paid to Opsys and its shareholders would

5    be escrowed or placed in trust for the protection of Opsys' creditors, rather than simply be

6    transferred outright to Opsys' shareholders.

7        11.    Sunnyside Development Company, LLC ("Plaintiff"), in its motion (Dkt.

8    179, at 11:17-12:9), and to a lesser extent Mr. Ainslie in his declaration (Dkt. 180, ¶ 7),

9    insinuate either (a) that CDT Inc. underpaid Opsys for its UK assets or (b) that CDT Inc.

10    moved the UK assets out of Opsys for the purpose of hindering Opsys' creditors.  Neither

11    suggestion is correct.

12        (a)    The insinuation that CDT Inc. underpaid Opsys for its UK assets is not only

13            wrong, it is circular.  The value assigned to the transaction is the then (pre-IPO)

14            value ascribed to the consideration given by CDT Inc. in the transaction (mainly

15            stock but also $5 million in cash).  Mr. Ainslie concedes as much by noting that the

16            value was adjusted downward at December 2004 "due to changes in the value of

17            Cambridge [CDT Inc.] stock going to the Opsys Limited shareholders."  Ainslie

18            Decl. ¶ 7.  Besides, as reflected in CDT's Final Prospectus (Bunzel Decl. (Dkt. 182),

19            Ex. C, at 143), the price paid was not only **not** too low, it was vastly in excess of the

20            book value of the assets at the date of the transaction:  the book value of the assets

21            was then $602,000; the value of research and development then in process was

22            $12,200,000; and fully $14,092,000 of the price was deemed "goodwill," meaning

23            that the price paid was more than double the book value of that which was acquired.

24        (b)    The insinuation that CDT Inc. moved assets out of Opsys for the purpose of

25            hindering Opsys' creditors is equally wrong, for the reasons stated in paragraph 10

26            above and for the reasons stated in Mr. Fyfe's declaration.

27        12.    Attached hereto as **Exhibit A** is a true and correct copy of Opsys' Disclosure

28    Letter, dated October 23, 2002, and addressed to CDT Acquisition Corp. (the name, at that

RJN 178

BLACK DECLARATION IN OPPOSITION TO
PLAINTIFF'S MOTION TO ADD CDT INC.
Case No. C 05-00553 MHP

1    time, of CDT Inc.). (From this document we have redacted part 2, section 25; part 3,

2    section 18; and item 29 of the Disclosure Bundle (because they contain trade secrets and

3    other commercially sensitive information) and part 2, section 30 (because they contain

4    individuals' salaries).) Opsys provided this Disclosure Letter to CDT Inc. pursuant to the

5    Transaction Agreement executed October 23, 2002, by CDT Inc., CDT Ltd., Opsys, Opsys

6    UK, Opsys US, Opsys 2 Corporation and the directors of Opsys (Alexis Zervoglos and

7    Michael Holmes) ("Transaction Agreement"), a true and correct copy of which is attached

8    as Exhibit A to the Bunzel Decl. filed April 2, 2007 (Dkt. 182).

9        13.    In addition to the $5 million cash that Opsys received under the Transaction

10    Agreement in 2002, CDT Inc. effectively forgave a $900,000 loan that CDT Inc. had made

11    to Opsys earlier that year.

12    **Opsys UK (Later Renamed CDT Oxford) and Opsys Remain Separate Entities**

13        14.    Opsys UK was renamed CDT Oxford Limited ("CDT Oxford") late in 2002.

14    Henceforth in this declaration I shall refer to this entity as CDT Oxford.

15        15.    At all times after CDT Ltd. acquired control of CDT Oxford's operations,

16    CDT Oxford maintained employees, books of accounts, and bank accounts separate from

17    those of CDT Inc. and CDT Ltd. CDT Ltd., Opsys and CDT Oxford all have their own

18    audited accounts, as required by UK law. Each maintains its own share register. Each has

19    its own General Ledger. Each has its own board of directors.

20        16.    Through December 2004, Opsys' Chief Executive Officer and Chief

21    Financial Officer were Michael Holmes and Alexis Zervoglos. Damoder Reddy was

22    employed as Chief Operating Officer by either Opsys or Opsys US. Which of these two

23    companies employed Mr. Reddy was the subject of a legal action that settled out of court.

24    None of these individuals has ever been an employee of CDT Inc. or CDT Ltd. None of

25    them has ever been a member of CDT Inc.'s Board of Directors.

26        17.    None of the members of CDT Inc.'s Board of Directors has ever been a

27    member of the Board of Directors of Opsys, Opsys UK, or CDT Oxford.

28

**RJN 179**

BLACK DECLARATION IN OPPOSITION TO
PLAINTIFF'S MOTION TO ADD CDT INC.
Case No. C 05-00553 MHP

1   18.  Beginning in October 2002, CDT Inc. reported 100% of the net profit or loss

2 of CDT Oxford in accounts using a method similar to the equity method.  This means that

3 CDT Oxford's net profit or loss was reported as an item of other income or expense.

4 Effective January 1, 2004, CDT Inc. was required as a matter of accounting to fully

5 consolidate CDT Oxford's results as part of CDT Inc.'s consolidated financial statements.

6 This was described in the Final Prospectus of CDT Inc. at F-33 and F-34 (Bunzel Decl.

7 (Dkt. 182) Ex. C at 142-43).  Nevertheless, CDT Oxford continued to be a company that is

8 separate and distinct from both CDT Inc. and CDT Ltd.  As noted above, CDT Oxford

9 observes the normal corporate formalities.

10      **The 2004 Transactions and the IPO of CDT Inc.**

11   19.  After the 2002 Transaction, a dispute arose between Opsys and CDT Inc.

12 over whether the anti-dilution provisions of the Transaction Agreement had been triggered

13 by a financing entered into by CDT Inc. that resulted in the issuance of additional preferred

14 stock.  Were the anti-dilution provisions of the Transaction Agreement triggered by this

15 financing, Opsys' shareholders would be entitled to more shares of CDT Inc.'s common

16 stock if certain put or call options provided for in the Transaction Agreement were

17 exercised.  As stated in the Transaction Agreement, a number of events could cause such an

18 options exercise.  Among the listed events that could lead to an options exercise was an

19 initial public offering ("IPO") by CDT Inc.

20   20.  CDT Inc. did hope to go public.  On July 30, 2004 CDT Inc. filed a

21 registration statement with the Securities and Exchange Commission.

22   21.  To settle this anti-dilution dispute, and in anticipation of CDT Inc.'s IPO, the

23 parties to the Transaction Agreement entered into a Settlement and Amendment Agreement

24 on August 3, 2004, which amended the Transaction Agreement.

25   22.  On December 14, 2004, the same parties, as well as a newly created party,

26 Opsys Management Limited ("Opsys Management"), entered into an Amended and

27 Restated Settlement and Amendment Agreement (the "Amended Settlement Agreement"), a

28 true and correct copy of which is attached as Exhibit D to the Bunzel Decl. filed April 2,

**RJN 180**

1    2007 (Dkt. 182). I was involved in the negotiations leading to the execution of these two

2    settlement agreements.

3         23.    CDT Inc. priced its IPO December 15, 2004. Market trading on Nasdaq

4    commenced on December 16, 2004. The IPO formally closed on December 21, 2004. The

5    IPO price of CDT Inc.'s common stock was $12 per share.

6         24.    On December 29, 2004, and pursuant to the Transaction Agreement and the

7    Amended Settlement Agreement, Opsys' shareholders exercised their option requiring CDT

8    Inc. to acquire all the stock of Opsys in exchange for 931,633 shares of CDT Inc.'s

9    common stock (the "Opsys Limited Option").

10        25.    The exercise of the Opsys Limited Option rather than either one of the other

11   two options provided for in the Transaction Agreement resulted in tax benefits for Opsys.

12   Had Opsys exercised its put option requiring CDT Inc. to acquire the remaining 84%

13   interest in CDT Oxford, Opsys would have become liable for a tax charge of approximately

14   30% of the consideration received from CDT Inc. Exercise of the call option permitting

15   CDT Inc. to acquire the remaining 84% interest in CDT Oxford also would have resulted in

16   a taxable gain by Opsys.

17        26.    The 2004 transactions as structured protected Opsys' creditors in at least

18   three ways, as described in paragraphs 27, 28 and 29 below.

19        27.    First, shares of CDT Inc. stock were held back to cover known and identified

20   liabilities. As required under the Amended Settlement Agreement, CDT Inc. withheld from

21   the option exercise price 133,938 shares of CDT Inc. stock to ensure satisfaction of Opsys'

22   identified liabilities, as set forth in Schedule A to the Amended Settlement Agreement.

23        28.    Second, 422,610 shares of CDT Inc. stock went into an escrow to cover the

24   Reddy claim referred to in paragraph 16 above and unidentified liabilities, including

25   unidentified contingent liabilities.

26        29.    Third, the remaining CDT Inc. shares paid for Opsys were issued to Opsys

27   Management pursuant to a "Deferred Consideration Agreement" entered into to protect

28   Kodak and certain other known creditors. Attached hereto as **Exhibit B** is a true and

RJN 181

BLACK DECLARATION IN OPPOSITION TO
PLAINTIFF'S MOTION TO ADD CDT INC.
Case No. C 05-00553 MHP

1    correct copy of the Deferred Consideration Agreement, dated December 29, 2004, between

2    Opsys Management and Opsys' shareholders at the time.  (From this document we have

3    redacted, on privacy grounds, the addresses but not the names of the shareholders.)  The

4    Amended Settlement Agreement (clause 5.1) required the delivery of a complete and

5    correct copy of the Deferred Consideration Agreement to CDT Inc.  None of the CDT Inc.

6    shares held by Opsys Management has been paid out to the former shareholders.  The

7    shares are to be paid first to a former trade creditor of Opsys (Kodak), then to former debt

8    holders that had provided venture capital to Opsys, and only then to the former

9    shareholders.

10        30.    As of December 29, 2004, when CDT Inc. acquired all of Opsys' stock, I

11    had no idea that Plaintiff was suing Opsys and CDT Ltd.

12        31.    Neither I, nor, to my knowledge, anyone at CDT Inc. or CDT Ltd., knew at

13    the time of CDT Inc.'s IPO that Plaintiff was planning legal action against CDT Inc. or

14    against CDT Ltd.

15        32.    Had CDT Inc. known at the time of its IPO that Plaintiff was planning legal

16    action against it or against CDT Ltd., or would claim that CDT Inc. or CDT Ltd. might

17    have some liability on Plaintiff's lease of real property to Opsys, CDT Inc. would not have

18    permitted the exercise of the option whereby it acquired Opsys' stock.

19                              **The 2005 Transaction**

20        33.    In May 2005, to simplify its corporate structure pursuant to a plan developed

21    in November 2004 that could not be implemented until after the completion of CDT Inc.'s

22    acquisition of Opsys, CDT Inc. transferred both its 16% interest in CDT Oxford and its

23    100% interest in Opsys to CDT Ltd.  In addition, Opsys transferred its 84% interest in CDT

24    Oxford to CDT Ltd.

25        34.    As a result, both CDT Oxford and Opsys are now direct, wholly owned

26    subsidiaries of CDT Ltd. and indirect subsidiaries of CDT Inc.  CDT Ltd. is a second-tier

27    subsidiary of CDT Inc., so CDT Oxford and Opsys are third-tier subsidiaries.  Mr. Ainslie's

28    statements to the contrary in his declaration (Ainslie Decl. (Dkt. 180) ¶¶ 9-10) are wrong.

**RJN 182**

BLACK DECLARATION IN OPPOSITION TO
PLAINTIFF'S MOTION TO ADD CDT INC.
Case No. C 05-00553 MHP

1    35.    Opsys has not liquidated.

2    36.    The transfer in the ownership of Opsys made no difference to the creditors

3    of Opsys. The transfer of 84% of the shares in CDT Oxford from Opsys to CDT Ltd. also

4    made no practical difference, because CDT Ltd. had, since October 2002, the right to 98%

5    of the profits of CDT Oxford (in exchange for managing and funding CDT Oxford),

6    rendering negligible the value of a shareholding in CDT Oxford (equivalent to 2% of future

7    profits).

8    37.    As of May 2005, at the time of this transfer, Plaintiff's complaint in this

9    action named as a defendant CDT Ltd. but not CDT Inc. Thus, the 2005 transaction

10    transferred equity to—not away from—an entity that Plaintiff was then suing.

11    38.    Attached hereto as **Exhibits C, D** and **E** are true and correct copies of the

12    cover page and Exhibit 21.1 (Exhibit 21.1 entitled "List of Subsidiaries of the Registrant")

13    to each of the last three annual reports on Form 10-K filed by CDT Inc. Exhibit C is from

14    2004; Exhibit D is from 2005; and Exhibit E is from 2006. As they clearly show, Opsys

15    was a subsidiary of CDT Inc., and CDT Oxford was a subsidiary of Opsys (hence a second-

16    tier subsidiary of CDT Inc.), as of December 31, 2004, but both became subsidiaries of

17    CDT Ltd. in 2005 and have remained so ever since.

18    **Control of the Litigation**

19    39.    Plaintiff's suggestion that CDT Inc. controlled Opsys' defense of this action

20    is contrary to the facts.

21    40.    In 2006, Opsys had three directors: Stephen Chandler; Dr. Jeremy

22    Burroughes; and me.

23    41.    Stephen Chandler, in his capacity as a director of Opsys, supervised this

24    litigation for Opsys until December 2006, when he ceased his full-time employment with

25    CDT Ltd. He resigned as a director of Opsys in April 2007. I have supervised the litigation

26    for Opsys, in my capacity as a director of Opsys, since January 2007.

27    //                                                          RJN 183

28    //

1    42.    As a director of Opsys, Mr. Chandler participated in a mediation in this

2    action on behalf of Opsys.

3    43.    As a director of Opsys, I participated in a settlement meeting with Plaintiff's

4    property manager, Frank Chiu, on February 17, 2007. David Fyfe, Chairman and Chief

5    Executive Officer of CDT Inc., was also present during this settlement meeting to represent

6    the interests of CDT Inc. (See Mr. Fyfe's declaration for his statement as to why he

7    attended this meeting.)

8    44.    I participated in another settlement meeting on February 26, 2007. Andrew

9    Fields, in-house counsel for CDT Inc., attended this meeting to represent CDT Inc.

10    45.    CDT Inc. took an interest in this litigation principally because Plaintiff had

11    named CDT Ltd. as a defendant in its original complaint and its first amended complaint,

12    and because Plaintiff had moved to add CDT Inc. as a defendant in November 2005.

13    46.    Because of Plaintiff's attempts to sue CDT Inc. and CDT Ltd., Mr. Fields

14    attended the trial of Plaintiff's complaint.

15    47.    I was excluded from the first six days of trial and could not attend on Opsys'

16    behalf because I was a potential witness.

17    48.    Although Mr. Chandler remained a director of Opsys at that time and a part-

18    time employee of CDT Ltd., he was not obliged to travel outside the UK under the terms of

19    his contractual arrangements. He therefore could not be required to attend the trial.

20    49.    The only other director of Opsys at the time, Dr. Jeremy Burroughes, did not

21    attend the trial because he is a scientist by training and would not have been able to

22    represent Opsys' interests effectively.

23    I declare under penalty of perjury under the laws of the United States of America

24    that the foregoing is true and correct.

25    Executed this 8th day of May, 2007 at Royston, England, UK.

**RJN 184**

26

27    _____

28    Michael Black

# EXHIBIT Q

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON #76342
2   SHARON L. O'GRADY #102356
    ALICE KWONG MA HAYASHI #178522
3   50 Fremont Street
    Post Office Box 7880
4   San Francisco, CA  94120-7880
    Telephone:  (415) 983-1000
5   Facsimile:  (415) 983-1200
    bruce.ericson@pillsburylaw.com
6   sharon.ogrady@pillsburylaw.com
    alice.hayashi@pillsburylaw.com
7
    Attorneys for Non-Party/Respondent
8   CAMBRIDGE DISPLAY TECHNOLOGY, INC.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13
    SUNNYSIDE DEVELOPMENT
14  COMPANY, LLC,                         No. C-05-00553 MHP

15                      Plaintiff,        **DECLARATION OF DAVID FYFE
                                          IN OPPOSITION TO PLAINTIFF'S
16          vs.                           MOTION TO ADD CAMBRIDGE
                                          DISPLAY TECHNOLOGY, INC. AS
17  OPSYS LIMITED, a United Kingdom       A PARTY TO ACTION AND
    Company,                              JUDGMENT**
18
                        Defendant.        Date:       May 16, 2007
19                                        Time:       1:00 p.m.
                                          Courtroom:  15, 18th Floor
20                                        Judge:      Hon. Marilyn Hall Patel

21

22

23

24

25

26

27                                                            **RJN 185**

28

700685383_1vHCAmend                       FYFE DECLARATION IN OPPOSITION TO
                                           PLAINTIFF'S MOTION TO ADD CDT INC.
                                           Case No. C 05-00553 MHP

1       I, **DAVID FYFE**, declare as follows:

2       1.     I am the Chairman of the Board of Directors and Chief Executive Officer of

3    Cambridge Display Technology, Inc. ("CDT Inc."). I have held these positions since 2000.

4    I have never been an officer or director of Opsys Limited ("Opsys"), Opsys UK Limited

5    ("Opsys UK"), or CDT Oxford Limited ("CDT Oxford"). I have personal knowledge of the

6    matters stated in this declaration and, if called as a witness, could testify competently

7    thereto.

8       2.     CDT Inc. is a holding company. It owns all the stock of CDT Holdings

9    Limited, which, in turn, owns all the stock of Cambridge Display Technology Limited

10   ("CDT Ltd."). CDT Ltd. currently owns all the stock of Opsys. In addition, CDT Ltd.

11   currently owns all the stock of CDT Oxford, a corporation formerly owned by Opsys and

12   formerly named Opsys UK Limited.

13      3.     CDT Inc. is a leading developer of polymer organic light-emitting diode ("P-

14   OLED") technology, which makes possible energy-efficient, ultra-thin, lightweight displays

15   in a variety of electronic devices.

16      4.     In mid-2002, CDT Inc. (then called CDT Acquisition Corporation) began

17   negotiating to acquire control of certain U.K.-based assets of Opsys, which owned or

18   controlled a number of patents that had the potential to be useful in developing the next

19   generation of high efficiency P-OLED materials. I was involved in these negotiations.

20      5.     The Opsys research facilities developing the intellectual property based on

21   the patents that could be useful to CDT Inc. were all located in the U.K. near Oxford.

22      6.     Opsys also had operations in the United States involving the pilot

23   manufacturing of displays based on small molecule emitters. The U.S. operations did not

24   involve printable P-OLEDS, as the U.K. operations did. Instead, they employed a

25   competing technology based on a license that Opsys had obtained from the Eastman Kodak

26   Company ("Kodak").

27      7.     CDT Inc. was not interested in acquiring Opsys's U.S. operations for a

28   number of business reasons. The Kodak manufacturing process differed fundamentally

RJN 186

1    from the process used by CDT Inc., which had invested in its own pilot manufacturing

2    facility and had no need of another such facility, particularly one using non-compatible

3    production equipment. Because Kodak is a competitor of CDT Inc. in the licensing of

4    OLED technology, CDT Inc. did not wish to take any action that would endorse (tacitly or

5    otherwise) Kodak's technology. In addition, CDT Inc. had a business model specifically

6    eschewing the manufacturing business that Opsys's U.S. operations were seeking to enter—

7    the highly competitive, low-profit, capital-intensive business of display manufacturing.

8    Instead, the business model of CDT Inc. focuses on licensing its technology and

9    transferring that technology to display makers and others in the display supply chain.

10    Although CDT Inc. had invested in a process development line to develop manufacturing

11    process know-how, it never intended to be a volume manufacturer of displays. In contrast,

12    Opsys's U.S. operations intended to manufacture and sell display products.

13        8.    The senior management of CDT Inc. made it absolutely clear to Opsys's

14    management from the outset that CDT Inc. had no interest whatsoever in the U.S. assets

15    and business of Opsys and that any deal would require a clean separation of the U.S.

16    business from the U.K. assets in which CDT Inc. was interested. Therefore, the 2002

17    transaction proceeded on this basis. Opsys had already placed its U.S. assets and business

18    into Opsys US Corporation. It placed its U.K. assets and business into another entity

19    (Opsys U.K.). A principal point of this structure was to effect this clean separation.

20        9.    By means of the 2002 transaction, which closed in October 2002, CDT Ltd.

21    acquired control of Opsys UK. Thereafter, three out of twenty-three Opsys UK employees

22    became employees of CDT Ltd. Later in 2002, Opsys UK was renamed CDT Oxford

23    Limited.

24        10.    Beginning in July 2003, the CDT Oxford facility in Oxford was gradually

25    shut down. Most of CDT Oxford's employees were laid off in July 2003; a few remained

26    on until October 2003 to oversee the shutdown. Three such employees subsequently

27    accepted offers to work for CDT Oxford in Cambridge. They and certain CDT Ltd.

28    employees, who were transferred to CDT Oxford, formed a new high efficiency materials

RJN 187

1    research group located in Cambridge and funded by one of CDT Inc.'s shareholders. This

2    group conducted research that built upon and expanded both the research previously

3    conducted by CDT Oxford and research conducted by CDT Ltd., thereby capturing the

4    synergies from CDT Ltd.'s acquisition of control over CDT Oxford's intellectual property.

5    CDT Oxford's employees used different laboratories than CDT Ltd.'s employees in

6    Cambridge.

7         11.    Opsys had no operations of its own after the transfer of its U.K. operations to

8    Opsys UK/CDT Oxford in 2002. Opsys, however, has not been liquidated.

9         12.    From time to time, the CDT Inc. Board of Directors has considered the

10   action brought by Sunnyside Development Company, LLC ("Plaintiff"), against Opsys, not

11   only because Opsys is a subsidiary of CDT Ltd. (and hence an indirect fourth-tier

12   subsidiary of CDT Inc.) but also because Plaintiff named CDT Ltd. in its original complaint

13   and in its first amended complaint, and because Plaintiff moved to add CDT Inc. as a party

14   in November 2005. Because of Plaintiff's attempts to sue CDT Ltd. and CDT Inc., I have

15   paid some attention to this litigation. CDT Inc. (and CDT Ltd.) did not direct the day-to-

16   day defense of Plaintiff's claim.

17        13.    I participated in a settlement discussion with Plaintiff's property manager,

18   Frank Chiu, because Mr. Chiu asked that a representative of CDT Inc. attend. Mr. Chiu and

19   I did not speak again after this meeting. Michael Black, a director of Opsys, was present at

20   all times during that meeting.

21        14.    CDT Inc. would not have acquired Opsys's stock in 2004 (CDT Inc. later

22   transferred that stock to CDT Ltd.) if CDT Inc. or CDT Ltd. had known that Plaintiff

23   claimed that the assignment of the lease agreement between Plaintiff and Opsys to Opsys

24   US Corporation was ineffective or that CDT Inc. or CDT Ltd. might be deemed to have any

25   liability under that lease.

26   //

27   //                                                        **RJN 188**

28   //

FYFE DECLARATION IN OPPOSITION TO
                                                  PLAINTIFF'S MOTION TO ADD CDT INC.
                                                  Case No. C 05-00553 MHP

1      I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct.  Executed this 7th day of May, 2007 at San Francisco,

3   California.

4

5

6

7

8

9                                              David Fyfe

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                          RJN 189

28

# EXHIBIT R

1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   BRUCE A. ERICSON #76342
2  SHARON L. O'GRADY #102356
   ALICE KWONG MA HAYASHI #178522
3  50 Fremont Street
   Post Office Box 7880
4  San Francisco, CA 94120-7880
   Telephone: (415) 983-1000
5  Facsimile: (415) 983-1200
   bruce.ericson@pillsburylaw.com
6  sharon.ogrady@pillsburylaw.com
   alice.hayashi@pillsburylaw.com
7
   Attorneys for Non-Party/Respondent
8  CAMBRIDGE DISPLAY TECHNOLOGY, INC.

9
                 UNITED STATES DISTRICT COURT
10
              NORTHERN DISTRICT OF CALIFORNIA
11
                   SAN FRANCISCO DIVISION
12

13
   SUNNYSIDE DEVELOPMENT              No. C-05-00553 MHP
14 COMPANY, LLC,
                                      **DECLARATION OF ALICE K. M.**
15                    Plaintiff,      **HAYASHI IN OPPOSITION TO**
                                      **PLAINTIFF'S MOTION TO ADD**
16      vs.                           **CAMBRIDGE DISPLAY**
                                      **TECHNOLOGY, INC. AS A PARTY**
17 OPSYS LIMITED, a United Kingdom    **TO ACTION AND JUDGMENT**
   Company,
18                                    Date:      May 16, 2007
                      Defendant.      Time:      1:00 p.m.
19                                    Courtroom: 15, 18th Floor
                                      Judge:     Hon. Marilyn Hall Patel
20

21

22

23

24

25

26                                              **RJN 190**
27

28

700686488v1                          HAYASHI DECLARATION IN OPPOSITION TO
                                      PLAINTIFF'S MOTION TO ADD CDT INC.
                                      Case No. C 05-00553 MHP

1      I, **ALICE KWONG MA HAYASHI**, declare as follows:

2      1.      I am an attorney licensed to practice in the State of California and before this

3    Court.  I am a counsel at the law firm of Pillsbury Winthrop Shaw Pittman LLP, attorneys

4    for non-party/respondent Cambridge Display Technology, Inc. ("CDT Inc.").  I have

5    personal knowledge of the facts stated herein and, if called as a witness, could testify

6    competently thereto.

7      2.      The deposition of Frank Chiu was taken in this matter on July 28, 2006.

8    Attached hereto as Exhibit A are true and correct copies of the excerpts from Mr. Chiu's

9    deposition transcript cited in CDT Inc.'s Opposition to Plaintiff's Motion to Add

10   Cambridge Display Technology, Inc. as a Party to Action and Judgment.

11     3.      The deposition of Damoder Reddy was taken in this matter on May 4, 2006.

12   Attached hereto as Exhibit B are true and correct copies of the excerpts from Mr. Reddy's

13   deposition transcript cited in CDT Inc.'s Opposition to Plaintiff's Motion to Add

14   Cambridge Display Technology, Inc. as a Party to Action and Judgment.

15      I declare under penalty of perjury under the laws of the United States of America

16   that the foregoing is true and correct.  Executed this 7th day of May, 2007 at San Francisco,

17   California.

18

19                        /s/ Alice Kwong Ma Hayashi

20                        Alice Kwong Ma Hayashi

21

22

23

24

25

26

27                                            **RJN 191**

28

700686488v1            - 1 -        HAYASHI DECLARATION IN OPPOSITION TO
                                     PLAINTIFF'S MOTION TO ADD CDT INC.
                                     Case No. C 05-00553 MHP

Exhibit A to Declaration of Alice K. M. Hayashi

RJN 192

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

**CERTIFIED COPY**

SUNNYSIDE DEVELOPMENT COMPANY,
LLC,

       Plaintiff,

vs.                    Case No. C 05-00553 MHP

OPSYS LIMITED, a United
Kingdom Company,

       Defendant.

_____//


DEPOSITION OF FRANK CHIU

July 28, 2006


REPORTED BY:

INGRID GOVERS, CSR NO. 11669

**RJN 193**

**U.S. LEGAL**
*Support*

*Certified Shorthand Reporters*

180 Montgomery Street, Suite 2180
San Francisco, CA 94104

888-575-3376 • Fax 888-963-3376
www.uslegalsupport.com

1   Pentalpha and whatever, $132,000, does that refresh your

2   recollection -- is that the amount that was charged by

3   the contractor to clean the premises up?

4       A.   No.

5       Q.   Do you know what that amount consists of,

6   132,000?

7       A.   That's the amount above and beyond what SCA

8   has been paid.  That was subtracted from the total

9   amount.  120,000 wasn't included in the 132,000.

10      Q.   And so that would, combined, be $252,000?

11      A.   Yes.

12      Q.   And so what does 252 constitute?  Is that the

13  amount paid to the contractor?

14      A.   Paid to all the contractors that's involved in

15  the cleanup and the security and the -- and the cost

16  that was incurred during the time for the cleanup.  That

17  may include the PG&E bill, the water, and so on and so

18  forth.

19      Q.   The actual amount paid to the contractor is,

20  like, $150,000 or so; is that right?

21      A.   I haven't add up all the numbers.

22      Q.   So you don't know?

23      A.   I do not know.

24          MR. BURNS:  Okay.  Let me show you one other

25  document.  This has been marked before, but I don't have

                                                        293

RJN 194

1    the number.

2              MS. HUBER:   46.

3              MR. BURNS:   Q.   I'm going to have you look at

4    Exhibit 46, which is an e-mail from Damoder Reddy to, I

5    believe, Stanley Hilton, an attorney, where he

6    introduces you to Mr. Hilton.

7              Did you have conversations with Mr. Reddy

8    before he wrote this e-mail to Mr. Hilton?

9         A.   Yes.

10        Q.   And can you -- on how many occasions did you

11   talk to him about the situation with Opsys Limited in

12   the days leading up to this December -- excuse me --

13   November 12th, '04 e-mail?

14        A.   One or two times.

15        Q.   And can you relate those conversations you had

16   with Mr. Reddy?

17        A.   He said Sunnyside should file a lawsuit

18   against the lessee.

19        Q.   Did he say anything else?

20        A.   There may be something else, but I don't

21   recall in details.

22        Q.   Did he say why you should sign -- or file a

23   lawsuit against the lessee?

24             MS. HUBER:   His question is not limited to the

25   document in front of you, so you might want to listen to

                                                          294

U.S. Legal Support

1    the question.

2           THE WITNESS:  No, he did not say that.

3           MR. BURNS:  Q.  Did he give you any

4    information which you thought would support a lawsuit?

5        A.   He faxed me some IPO document.

6        Q.   And what IPO document was this?

7        A.   I think it's a Cambridge Display Technology

8    IPO.

9        Q.   And you read that?

10       A.   I read those couple pages.

11       Q.   Did he give you any other information besides

12   that?

13       A.   No.

14       Q.   How did he come to, as far as you know,

15   introduce you to his -- or to this attorney, Mr. Hilton?

16       A.   I asked him -- I asked him, since we do not

17   have any information about Opsys Limited nor any of the

18   transaction, we just -- we just do not know what is

19   going on.  We do not know the whereabout of these

20   people.  We just don't know anything about Opsys Limited

21   and no other parties, so I ask him whether we can use

22   his attorney for the information that he know about

23   these matters, so I ask him, "Can I use your attorney?"

24       Q.   And what did he say?

25       A.   He said yes.

295

RJN 196

1    State of California            )

2    County of Alameda              )

3

4         I, INGRID GOVERS, hereby certify that the

5    witness in the foregoing deposition was by me duly sworn

6    to testify to the truth, the whole truth and nothing but

7    the truth in the within entitled cause; that said

8    deposition was taken at the time and place herein named;

9    that the deposition is a true record of the witness'

10   testimony as reported to the best of my ability by me, a

11   duly Certified Shorthand Reporter and disinterested

12   person, and was thereafter transcribed under my

13   direction into typewriting by computer; that the witness

14   was given an opportunity to read, correct and sign the

15   deposition.

16        I further certify that I am not interested in

17   the outcome of said action nor connected with nor

18   related to any of the parties in said action nor to

19   their respective counsel.

20        IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand on this 9th day of August, 2006.

22

23

24   _____

25        INGRID GOVERS, CSR NO. 11669

Page 1 of 1

Subj:     **Introduction of Stanley Hilton to Frank Chui**
Date:     11/12/2004 4:03:48 PM Pacific Standard Time
From:     Damoder
To:       STAVROS3589
CC:       Atgatg22

Stanley:

Frank Chui is need of some legal help.  Frank represents landlord of the building in Fremont which was leased by Opsys Limited.  The lease was defaulted by Opsys Limited causing serious financila damage to Frank. Frank is interested in talking to you to see whether you can represent him in this case.  I copied Frank on this e-mail so that you can contact each other.

Frank, you can reach Stanley Hilton on his Cell Phone Numbe: 415-378-6142.

Damoder Reddy
408-858-4808



EXHIBIT
46
Reddy 5|4|06

Monday, November 15, 2004 America Online: Atgatg22          SUN 001544

RJN 198

Exhibit B to Declaration of Alice K. M. Hayashi

RJN 199

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

SUNNYSIDE DEVELOPMENT )
COMPANY, LLC, )
)
Plaintiff, )
)
vs. )    No. C 05-00553 MHP
)
)
OPSYS LIMITED, ET AL, )
)
Defendant. )
)

DEPOSITION OF

DAMODER REDDY

Thursday, May 4, 2006

Pages (1 - 149)

CERTIFIED COPY

REPORTED BY:  MICHELLE L. GIACHINO, CSR 11028   01-379565



LEGALINK
A WORDWAVE COMPANY

LegaLink San Francisco
575 Market Street, 11th Floor
San Francisco, CA 94105

tel (415) 357-4300     www.legalink.com
tel (800) 869-9132
fax (415) 357-4301

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

DAMODER REDDY May 4, 2006

```
 1          At any time in your dealings with Gary Rhea,
 2   did you form an opinion as to Gary Rhea's reputation for
 3   truthfulness?
 4          MR. BURNS:  Okay.  I will enter the same
 5   objection.  Impermissible opinion.  I will move to
 6   strike.
 7          THE WITNESS:  Again, no specific opinion about
 8   truthfulness aspects.
 9          MS. HUBER:  Let's mark as Plaintiff's
10   Exhibit 46, a document with the Bates No. SUN 001544.
11          Can you take a moment to review that document,
12   please.
13          (Plaintiff's Exhibit 46 was marked for
14           identification.)
15          MS. HUBER:  Q.  Is this an e-mail you sent to
16   Stanley Hilton?
17      A.   Yes, I did.
18      Q.   Do you recall sending this e-mail?
19      A.   Yes, I do.
20      Q.   Can you explain the circumstances that led you
21   to send this e-mail?
22      A.   Frank Chiu asked me whether I know of any
23   legal counsel who could -- who could assist him, and so
24   he knew that I had -- I was using one legal counsel, and
25   he asked me whether I could introduce him, and then I
```

19

RJN 201

DAMODER REDDY May 4, 2006

1    made the introduction.

2        Q.  In the e-mail, you state, "The lease was

3    defaulted by Opsys Limited causing serious financial

4    damage to Frank."

5        Why did you say that?

6        A.  Based on what Frank Chiu basically informed

7    me.

8        Q.  Did you agree with that statement?

9        A.  It's a legal matter, so I didn't really know

10   the details, so I couldn't really say.  That's why I was

11   referring him to a lawyer.

12       Q.  In November of 2004 when you sent this e-mail,

13   did you have any recollection of Frank taking the

14   position that Opsys Limited had breached the lease?

15       A.  I think Frank and I talked a few times, and I

16   think that was his impression.  He told me that the

17   lease was breached.

18       Q.  Do you recall whether you ever had that

19   impression?

20       A.  I really did not because the lease was

21   assigned.

22       Q.  As you sit here today, do you believe Opsys

23   Limited breached the lease with Sunnyside?

24       MR. BURNS:  I will object.  Calls for a legal

25   conclusion.  Move to strike.  You can go ahead and

20

RJN 202

DAMODER REDDY May 4, 2006

1   between September '03 --

2      A.  Late '03, correct.

3      Q.  From late '03 -- you don't recall any serious

4   discussions from late '03 until November '04?

5      A.  I may have had discussions, but nothing that I

6   can remember specifically, yeah.

7      Q.  Do you remember providing to Frank Chiu the

8   CDT IPO documents?

9      A.  Yeah, I think I sent him saying that CDT is

10  filing for IPO and some published information which was

11  available on the open documents.

12     Q.  And why did you provide Frank with the CDT IPO

13  documents?

14     A.  Because CDT acquired Opsys and so that's why I

15  was informing him that this is happening.

16     Q.  And why did you want to inform him that this

17  was happening?

18     A.  I think it was just -- there was a -- there

19  was an event which I think I thought may be important

20  for him to know.

21     Q.  Was it important for him to know because you

22  didn't think he knew before you gave him the IPO

23  documents?

24     A.  Actually, I didn't know we knew that or not.

25  Again, we had a long-standing relationship, Frank and I,

RJN 203

DAMODER REDDY  May 4, 2006

1    so that was something that I thought I would let him

2    know, yeah.

3        Q.   Because you weren't sure that he knew about

4    the CDT transaction?

5        A.   Right.  It's possible he knew, but it became

6    public knowledge at the time.

7        Q.   Okay.  Do you recall Frank Chiu's reaction to

8    learning about the CDT transaction?

9            MR. BURNS:  What CDT transaction are you

10   talking about?  Vague and ambiguous.  Are you talking

11   about the IPO?

12           MS. HUBER:  Sorry, let me restate the

13   question.  I'll withdraw the question.

14       Q.   Do you recall Frank Chiu's reaction to

15   receiving the CDT IPO documents you sent him?

16       A.   I don't recall whether he simply replied in an

17   e-mail or he called me.  I'm not sure.

18       Q.   Other than the mode of communication, do you

19   remember anything about the substance of his response?

20       A.   I'm just trying to remember what it is, and

21   nothing that sticks to my mind specifically.

22       Q.   You don't recall if he was surprised or angry

23   or ...

24       A.   No.

25       Q.   Nothing?

137

RJN 204

```
1                    CERTIFICATE OF REPORTER

2              I, MICHELLE L. GIACHINO, a Certified Shorthand

3      Reporter, hereby certify that the witness in the

4      foregoing deposition was by me duly sworn to tell the

5      truth, the whole truth, and nothing but the truth in the

6      within-entitled cause;

7              That said deposition was taken down in

8      shorthand by me, a disinterested person, at the time and

9      place therein stated, and that the testimony of the said

10     witness was thereafter reduced to typewriting, by

11     computer, under my direction and supervision;

12             That before completion of the deposition,

13     review of the transcript [X] was [ ] was not requested.

14     If requested, any changes made by the deponent (and

15     provided to the reporter) during the period allowed are

16     appended hereto.

17             I further certify that I am not of counsel or

18     attorney for either or any of the parties to the said

19     deposition, nor in any way interested in the event of

20     this cause, and that I am not related to any of the

21     parties thereto.

22             DATED:    5/12/06

23

24             _____

25             MICHELLE L. GIACHINO, CSR No. 11028
```

RJN 205

# EXHIBIT S

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON #76342
2   SHARON L. O'GRADY #102356
    ALICE KWONG MA HAYASHI #178522
3   50 Fremont Street
    Post Office Box 7880
4   San Francisco, CA  94120-7880
    Telephone:  (415) 983-1000
5   Facsimile:  (415) 983-1200
    bruce.ericson@pillsburylaw.com
6   sharon.ogrady@pillsburylaw.com
    alice.hayashi@pillsburylaw.com
7
    Attorneys for Non-Party/Respondent
8   CAMBRIDGE DISPLAY TECHNOLOGY, INC.

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13   SUNNYSIDE DEVELOPMENT                    No. C 05-00553 MHP
     COMPANY, LLC,
14                                            **OPPOSITION OF CAMBRIDGE
                                              DISPLAY TECHNOLOGY, INC. TO
15                       Plaintiff,           PLAINTIFF'S MOTION TO ADD
                                              CAMBRIDGE DISPLAY
16           vs.                              TECHNOLOGY, INC. AS A PARTY
                                              TO ACTION AND JUDGMENT**
17   OPSYS LIMITED, a United Kingdom
     Company,                                 Date:        May 16, 2007
18                                            Time:        1:00 p.m.
                         Defendant.           Courtroom:   15, 18th Floor
19                                            Judge:       Hon. Marilyn Hall Patel

20                                            Declarations filed herewith:

21                                            1.   Michael Black (Dkt. 204)
                                              2.   David Fyfe (Dkt. 205)
22                                            3.   Alice K. M. Hayashi (Dkt. 206)

23

24

25

26

27                                                            **RJN 206**

28

500132528v3                     CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD
                                CDT INC. AS A PARTY TO ACTION & JUDGMENT
                                Case No. C 05-00553 MHP

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION. ............................................................................................... 1

II.   STATEMENT OF FACTS. .................................................................................. 2

    A.    CDT Inc., its affiliates and their corporate structure. ...................................... 2

    B.    The transactions with Opsys in 2002. ............................................................. 3

    C.    The changes in the business of Opsys UK/CDT Oxford after October
        2002. ................................................................................................................ 5

    D.    The IPO and the exercise of the Opsys Limited Option in December
        2004. ................................................................................................................ 5

    E.    The transfer of Opsys and CDT Oxford to CDT Ltd. in May 2005. ............... 7

III.  ARGUMENT. ..................................................................................................... 7

    A.    The Court should either deny Plaintiff's motion outright or order an
        evidentiary hearing. ........................................................................................ 8

    B.    CDT Inc. is not liable as a successor. ............................................................ 10

        1.    The successor liability doctrine has no application to stock
            purchases. ................................................................................................ 10

        2.    Even if CDT Inc. had purchased Opsys' assets, the successor
            liability doctrine would not apply ........................................................... 11

            a.    CDT Inc. did not agree to assume Opsys' liabilities. ........... 12

            b.    CDT Inc.'s purchase of Opsys' stock did not amount
               to a de facto merger. ............................................................. 13

            c.    CDT Inc. is not a mere continuation of Opsys. .................... 16

            d.    CDT Inc. has not fraudulently sought to escape
               liability for Opsys' debts. ..................................................... 18

    C.    Plaintiff's motion under Rule 69(a) should be denied. ................................... 19

    D.    Plaintiff's claim against CDT Inc. is barred by laches. ................................. 22

    E.    Leave to add a fraudulent conveyance claim should be denied. ................... 23

IV.   CONCLUSION. .................................................................................................. 24

**RJN 207**

# TABLE OF AUTHORITIES

Page

### Cases

Chaknova v. Wilbur-Ellis Co.,
  69 Cal. App. 4th 962 (1999) .................................................................. 12

Danjaq LLC v. Sony Corp.,
  263 F.3d 942 (9th Cir. 2001) ........................................................... 22, 23

EEOC v. Pan American World Airways, Inc.,
  No. C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182 (N.D. Cal. Dec.
  1, 1987) ........................................................................................................ 9

Expert Electric, Inc., v. Levine,
  554 F.2d 1227 (2d Cir. 1977) ................................................................ 21

Franklin v. USX Corp.,
  87 Cal. App. 4th 615 (2001) ...................................................... 11, 12, 16

Herrera v. Singh,
  118 F. Supp. 2d 1120 (E.D. Wash. 2000) ............................................. 13

Hot Wax, Inc. v. Turtle Wax, Inc.,
  191 F.3d 813 (7th Cir. 1999) ................................................................. 22

Katzir's Floor & Home Design, Inc., v. M-MLS.com,
  394 F.3d 1143 (9th Cir. 2004) ............................................. 17, 18, 19, 22

Koehler v. Bank of Bermuda Ltd.,
  No. M18-302, 2002 WL 1766444 (S.D.N.Y. July 31, 2002) ................... 21

Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.,
  13 F.3d 69 (3d Cir. 1993) ..................................................................... 8, 9

Maloney v. American Pharm. Co.,
  207 Cal. App. 3d 282 (1988) ............................................................ 16, 18

Marks v. Minnesota Mining & Mfg. Co.,
  187 Cal. App. 3d 1429 (1986) ...................................................... 10, 13, 15

McClellan v. Northridge Park Townhome Owners Ass'n, Inc.,
  89 Cal. App. 4th 746 (2001) ................................................................... 20

Orthotec, LLC, v. REO Spineline, LLC,
  438 F. Supp. 2d 1122 (C.D. Cal. 2006) ............................................ 14, 16

Oyakawa v. Gillett,
  8 Cal. App. 4th 628 (1992) .................................................................... 21

Phillips v. Cooper Labs., Inc.,
  215 Cal. App. 3d 1648 (1989) ............................................................... 10

RJN 208

1    Potlatch Corp. v. Superior Court,
           154 Cal. App. 3d 1144 (1984) ............................................................. 10
2
     Ray v. Alad Corp.,
3          19 Cal. 3d 22 (1977) ............................................... 11, 14, 16, 19
4    Troy Co. v. Products Research Co.,
           339 F.2d 364 (9th Cir. 1964) ..................................................... 21, 22
5
     TRW, Inc., v. Ellipse Corp.,
6          495 F.2d 314 (7th Cir. 1974) ........................................................... 21
7    Weber v. John Crane, Inc.,
           143 Cal. App. 4th 1433 (2006) ......................................................... 12
8
                              **Statutes and Codes**
9
     California Code of Civil Procedure
10         Section 187 ............................................................................... 18
11   California Code of Civil Procedure
           Section 3439.04(a)(2) ..................................................... 17
12         Section 3439.04(b)(8) ..................................................... 17
13   California Uniform Fraudulent Transfer Act ........................................ 17
14                          **Rules and Regulations**
15   Federal Rules of Civil Procedure
           Rule 9(b) ......................................................................... 23
16         Rule 18(b) ................................................................. 22, 23
           Rule 25(c) ................................................................... passim
17         Rule 56(c) ......................................................................... 7
18

19

20

21

22

23

24

25

26

27
                                                            **RJN 209**
28

1    I.     **INTRODUCTION.**

2          By this motion, Plaintiff seeks to join non-party **CAMBRIDGE DISPLAY**

3    **TECHNOLOGY, INC.** ("CDT Inc.") to a judgment Plaintiff seeks to have entered on its

4    jury verdict against defendant Opsys Limited ("Opsys"). Plaintiff seeks to do so

5    summarily, by motion, without bothering to file a complaint against CDT Inc., or obtain its

6    answer, or participate in discovery or proceed to evidentiary hearing or trial—in short

7    without everything that goes by the name of "due process."

8          That won't wash. While parties may summarily be substituted where the facts are

9    simple and uncontroverted—a party dies, one public officer succeeds another—where, as

10   here, the facts are complex and disputed, due process and clear case law demand a fair

11   opportunity to develop the case and an evidentiary hearing. What Plaintiff seeks cannot be

12   done by motion.

13         There is, however, one thing that could be done summarily, and that is deny

14   Plaintiff's motion. As a matter of law, the three theories advanced by Plaintiff will not

15   work: That much can be determined without resolving disputed issues of fact.

16         *The successor liability doctrine:* Normally if one corporation buys assets from the

17   other, the purchaser takes only the assets and not the liabilities. The successor liability

18   doctrine creates four exceptions to this rule, but none fits here.

19         First and foremost, the doctrine does not apply because the transactions here were

20   not asset sales, they were stock sales. The doctrine does not apply to stock sales. But even

21   if we had asset sales here, none of the exceptions would apply. One exception applies when

22   the buyer agrees to assume the seller's liabilities; there was no such agreement here. The

23   second exception applies where the transaction is so close to a statutory merger that the law

24   deems it a de facto merger; these transactions have none of the earmarks of a merger and

25   none of the entities has disappeared. The third exception applies when the buyer pays

26   inadequate consideration for the assets yet continues to operate exactly the same business as

27   before; here, in contrast, CDT Inc. paid a price well in excess of the audited asset value of

28   the company it bought and then dismantled most of that company. The fourth exception

RJN 210

1    applies to attempts to defraud creditors; here, in contrast, the proceeds of the transactions

2    were held in escrow and trust for the benefit of creditors, known and unknown.

3        *The alter ego doctrine:*  Alternatively, Plaintiff seeks to pierce the corporate veil—

4    not once, not twice but three times, all the way from Opsys, a third-tier subsidiary, up to

5    CDT Inc., its ultimate parent.  Plaintiff does so despite making no showing whatsoever that

6    any of the entities it must pierce to reach CDT Inc. are shells, or don't observe corporate

7    formalities.  And it does so despite the fact that it previously sued one of these entities—

8    Cambridge Display Technology Limited ("CDT Ltd.")—in this action and suffered

9    dismissal of those claims with prejudice.  Dkt. 39.

10       *Fraudulent conveyance:*  Finally, Plaintiff asserts that CDT Inc. committed fraud by

11   transferring its stock in Opsys to CDT Ltd. in May 2005, while CDT Ltd. was a defendant

12   in this action.  A fraudulent conveyance normally involves the surreptitious transfer of

13   assets from the defendant to a third party out of reach.   Here, the third party (CDT Inc.)

14   openly transferred its equity in Opsys to the then-defendant (CDT Ltd.).  Some fraud.

15       *Laches:*  For all these reasons, Plaintiff has no claim against CDT Inc., but there is

16   another reason as well.  For two years Plaintiff sat on its rights until CDT Inc. went public

17   and bought stock in Opsys.  Only then, after the public offering, and after a transaction that

18   never would have happened had Plaintiff spoken up earlier, did Plaintiff attack CDT Inc.'s

19   interest in Opsys.  This is textbook laches: unreasonable delay coupled with prejudice.

20   II.      **STATEMENT OF FACTS.**

21   A.      **CDT Inc., its affiliates and their corporate structure.**

22        CDT Inc. is headquartered in Cambridge, England.  A public company since

23   December 2004, its stock is traded on the NASDAQ Global Exchange.

24        At all times relevant to this case, CDT Inc. has had a first-tier subsidiary called CDT

25   Holdings Limited and a second-tier subsidiary, CDT Ltd., which, as noted above, once was

26   a defendant herein but was dismissed with prejudice in August 2005.  Dkt. 39.

27        Since May 2005, CDT Ltd. has had several subsidiaries (which therefore are third-

28   tier subsidiaries of CDT Inc.).  One is Opsys.  Another is CDT Oxford Limited ("CDT

RJN 211

1    Oxford"), which until late 2002 was called Opsys UK Limited ("Opsys UK"). Before May

2    2004, the corporate structure was somewhat different, as shall be explained below.

3    B.    **The transactions with Opsys in 2002.**

4          CDT Inc. is a leading developer of polymer organic light-emitting diode ("P-

5    OLED") technology, which makes possible energy-efficient, ultra-thin, lightweight displays

6    in a variety of electronic devices. Declaration of David Fyfe, Dkt. 205 ("Fyfe Decl."), ¶ 3.

7    In 2002, CDT Inc. began negotiating to acquire control of certain UK-based assets of

8    Opsys: some patents thought to be useful in developing the next generation of high

9    efficiency P-OLED materials. *Id.* ¶ 4. Opsys had research facilities in the UK near Oxford,

10   where it developed intellectual property based on these patents. *Id.* ¶ 5. Opsys also had US

11   operations in Fremont for the pilot manufacturing of displays based on small molecule

12   emitters. The US operations did not involve printable P-OLEDs, as the UK operations did.

13   Instead, they employed a competing technology based on a license that Opsys had obtained

14   from the Eastman Kodak Company ("Kodak"). *Id.* ¶ 6.

15         CDT Inc. wanted Opsys' UK assets but did not want Opsys' US assets for a number

16   of business reasons. The Kodak process differed fundamentally from the CDT Inc. process;

17   CDT Inc. had invested in its own facility and had no need of another such facility,

18   particularly one using incompatible production equipment. *Id.* ¶ 7. Kodak competes with

19   CDT Inc. in the licensing of OLED technology. Therefore, CDT Inc. did not wish to do

20   anything that would endorse Kodak's technology. *Id.* CDT Inc. also wanted nothing to do

21   with the manufacturing business that Opsys' US operations sought to enter—the highly

22   competitive, low-profit, capital-intensive business of display manufacturing. It has never

23   intended to be a volume manufacturer of displays; instead it seeks to license and transfer

24   technology to the companies that do manufacture displays. *Id.*

25         CDT Inc. made it clear to Opsys that CDT Inc. had no interest in the US assets and

26   business of Opsys, and that any deal would require a clean separation of the US operations

27   from the UK operations. *Id.* ¶ 8. Opsys agreed, so the transaction proceeded on the basis of

28   a clean separation: the UK assets were put into one subsidiary and the US assets into

RJN 212

1  another subsidiary.  Opsys transferred its UK operations to Opsys UK.  *Id.*; *see* Bunzel

2  Decl. (Dkts. 182-85) ¶ 3, Ex. A at 5 (recital F) & 32 (clause 11.1).  Opsys transferred its US

3  operations to Opsys US Corporation ("Opsys US").  Fyfe Decl. ¶ 8.  Despite Plaintiff's

4  suggestion otherwise (Mot. 9:14-15), Opsys did not transfer any assets, including IP, of

5  Opsys US to Opsys UK.  Declaration of Michael Black, Dkt. 204 ("Black Decl."), ¶ 9.

6      On October 23, 2002, CDT Inc., Opsys and others entered into a Transaction

7  Agreement (the "Transaction Agreement").  Bunzel Decl. ¶ 3. Ex. A.  The terms are

8  complex, but the essential points can be sketched briefly.  CDT Inc. purchased a 16%

9  interest in Opsys UK for $2.5 million in cash.  *Id.* at 16 (clause 2.1).  CDT **Ltd.**—*not* CDT

10  **Inc.**—got management control of Opsys UK and 98% of Opsys UK's profits, if any.  *Id.* at

11  22 (clause 7).  CDT **Ltd.**—*not* CDT **Inc.**—paid Opsys $2 million in cash for a sublicense to

12  Opsys' IP.  *Id.* at 21, 32 (clauses 5.1(iii), 14.2).  Plaintiff claims that CDT **Inc.** got control

13  of Opsys UK (Mot. 9:16-19) but that is wrong:  CDT **Ltd.** got control.

14      The Transaction Agreement created two "put" options and one "call" option.

15  Bunzel Decl. ¶ 3, Ex. A, at 16-20 & 25-30 (clauses 3 & 9).  Only one actually was

16  exercised—one of the "put" options (the "Opsys Limited Option").  It gave Opsys'

17  shareholders the right to force CDT Inc. to buy Opsys on these conditions (among others):

18  Opsys' shareholders could exercise this option only if the aggregate liabilities, including

19  contingent liabilities, of Opsys and its subsidiaries (excluding Opsys UK) were less than

20  $1.25 million (*id.* at 26 (clause 9.4(C)); the option exercise price would be reduced by the

21  value of the aggregate current liabilities; and CDT Inc. would withhold from the exercise

22  price the amount of all contingent liabilities until the liabilities materialized or until the

23  statute of limitations expired (*id.* at 27-28 (clauses 9.11(A) & 9.12)).

24      Opsys expressly warranted that it was not a party to any contract that could not

25  readily be performed by it on time; that it was not a party to, nor did it have any liability

26  under, any lease; that it was not a party to any contract "of a value of more than £10,000" or

27  "of one year or greater duration"; and that it was not under any obligation in respect of

28  unaccrued or undisclosed liabilities in connection with operations in the US.  Bunzel Decl.

**RJN 213**

1   ¶ 3, Ex. A, at 59-60 (sched. 3, part 2, clauses 9.1-9.2, 9.7(a)-(b), & 9.9). In its Disclosure

2   Letter dated October 23, 2002, Opsys explicitly represents that the Fremont lease was

3   assigned to Opsys US, and it attaches the Assignment of Lease and Consent of Lessor.

4   Black Decl. ¶ 10, Ex. A (Disclosure Letter at 9).

5        The structure was complex but its purposes were simple and straightforward: CDT

6   Inc. wanted Opsys' UK assets and not its US assets; and the parties wanted to avoid the

7   punitive taxes that would be levied on a sale of assets. Paragraphs 7 through 13 of the

8   Black Declaration explain the tax planning; we shall not burden the Court by repeating that

9   explanation here. The salient point is that there were sound business and tax reasons for the

10   structure, having nothing to do with disadvantaging Plaintiff or any other creditor. *Id.*

11   C.   **The changes in the business of Opsys UK/CDT Oxford after October 2002.**

12        Late in 2002, Opsys UK was renamed CDT Oxford Limited. Fyfe Decl. ¶ 9.

13   Beginning in July 2003, the CDT Oxford facility in Oxford was gradually shut down. Most

14   of CDT Oxford's employees were laid off. *Id.* ¶ 10. Three employees eventually accepted

15   offers to continue working for CDT Oxford in Cambridge, where they and certain CDT Ltd.

16   employees, who were transferred to CDT Oxford, formed a new high efficiency materials

17   research group located in Cambridge. *Id.*

18        Two points here are salient: First, CDT Inc. did not merely continue the business of

19   Opsys UK but fundamentally transformed it. Fyfe Decl. ¶¶ 9-10. Second, Opsys and

20   Opsys UK remained and remain separate legal entities that observe the proper corporate

21   formalities and thus are entitled to have their separate existence recognized. Black Decl.

22   ¶¶ 14-18. As shall be shown below, the first point undermines Plaintiff's "successor

23   liability" argument, and the second point undermines Plaintiff's "alter ego" argument.

24   D.   **The IPO and the exercise of the Opsys Limited Option in December 2004.**

25        Two things set the stage for the CDT/Opsys transaction of late 2004. The first was

26   the IPO of CDT Inc. The second was a dispute between CDT Inc. and Opsys over whether

27   an earlier round of private financing had triggered an anti-dilution provision in the

28   Transaction Agreement; if it had, Opsys' shareholders stood to get more shares of CDT Inc.

RJN 214

500132528v3             - 5 -     CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD
                                      CDT INC. AS A PARTY TO ACTION & JUDGMENT
                                      Case No. C 05-00553 MHP

1    stock if CDT Inc. went public than they would get otherwise. Black Decl. ¶¶ 19-22.

2        The dispute was settled and CDT Inc. went public on December 15, 2004.

3    Plaintiff's manager, Frank Chiu, knew all about the public offering and had consulted an

4    attorney about suing, but he breathed not a word of this to anyone at CDT Inc. until after

5    the IPO had closed. *See* part III.D below.

6        After the IPO, Opsys' shareholders exercised the Opsys Limited Option, thus

7    requiring CDT Inc. to acquire the equity of Opsys in exchange for 931,633 shares of CDT

8    Inc.'s newly public common stock. Black Decl. ¶ 25. The number of shares of CDT Inc.

9    stock to be paid was calculated pursuant to a formula agreed as part of the settlement of the

10    anti-dilution dispute. Black Decl. ¶¶ 21-22; the Amended Settlement Agreement is Bunzel

11    Decl. ¶ 6, Ex. D, at 4-5 (clause 1.1(c)).

12        By exercising the Opsys Limited Option rather than the other options, Opsys and its

13    shareholders obtained significant tax benefits, which are detailed in Black Decl. ¶ 25. Once

14    again, the salient point is that sound tax planning—and not creditor avoidance—accounts

15    for the structure of the deal.

16        Far from harming creditors, the Transaction Agreement, as modified by the

17    Amended Settlement Agreement, protected creditors in at least three ways:

18        First, 133,938 shares of CDT Inc. stock (at the IPO price of $12 a share, Black Decl.

19    ¶ 23, this amounted to $1,607,256) were held back to cover known and identified liabilities,

20    as set forth in Schedule A to the Amended Settlement Agreement. Bunzel Decl. ¶ 6, Ex. D,

21    at 6 (clause 1.1(g)); Black Decl. ¶ 27. The list in Schedule A did not include the Fremont

22    lease. Bunzel Decl. ¶ 6, Ex. D, at 20-21. Opsys Management (an entity created to hold the

23    CDT Inc. shares) and the directors of Opsys (Michael Holmes and Alexis Zervoglos)

24    warranted that there were no facts known to them, after reasonable inquiry, that would

25    cause a reasonable person to conclude that "there are any liabilities of Opsys, whether

26    absolute, accrued, contingent, or otherwise, other than those identified in Schedule A or

27    Schedule B. . . ." *Id.* at 9 (clause 1.1(h)), 11 (clause 2.1). (Schedule B listed a claim by

28    Damoder Reddy, who had served as COO either of Opsys or of Opsys US.)

RJN 215

1    Second, 422,610 shares of CDT Inc. stock (at $12 a share, $5,071,320) went into

2    escrow as security for contingent and unidentified liabilities of Opsys (including the Reddy

3    claim in Schedule B). *Id.* at 9-10 (clause 1.1(h)).

4    Third, the remaining CDT Inc. shares paid for Opsys were issued to Opsys

5    Management (Bunzel Decl. ¶ 6, Ex. D, at 10 (clause 1.1(h)), to be distributed pursuant to a

6    "Deferred Consideration Agreement" between Opsys Management and Opsys'

7    shareholders. Black Decl. ¶ 29, Ex. B. None of the CDT Inc. shares held by Opsys

8    Management has been paid out to the former shareholders. The shares are to be paid first to

9    a former trade creditor of Opsys (Kodak), then to former debt holders that had provided

10   venture capital to Opsys, and only then to the former shareholders. Black Decl. ¶ 29.

11   Opsys' shareholders could exercise the Opsys Limited Option only if Opsys'

12   liabilities were below a specified level. CDT Inc. would not have allowed the exercise and

13   CDT Inc. would not have purchased Opsys' stock if CDT Inc. had know that the Fremont

14   lease assignment was ineffective or that Plaintiff was planning legal action against CDT

15   Inc. or CDT Ltd. on the Fremont lease. Fyfe Decl. ¶ 14; Black Decl. ¶¶ 30-32.

16   E.    **The transfer of Opsys and CDT Oxford to CDT Ltd. in May 2005.**

17   CDT Inc. held the stock of Opsys for only a short time. In May 2005, to simplify its

18   corporate structure, CDT Inc. transferred both its 16% interest in CDT Oxford and its 100%

19   interest in Opsys to CDT Ltd. In addition, Opsys transferred its 84% interest in CDT

20   Oxford to CDT Ltd. As a result, both CDT Oxford and Opsys are now direct, wholly

21   owned subsidiaries of CDT Ltd. and indirect third-tier subsidiaries of CDT Inc. Black

22   Decl. ¶¶ 33-38. These transfers were planned in late 2004, before Plaintiff filed its claim.

23   Black Decl. ¶¶ 24-25. These transfers occurred in May 2005, when CDT **Ltd.**, not CDT

24   **Inc.**, was a defendant in this action. *Id.*

     RJN 216

25   III.   **ARGUMENT.**

26   Plaintiff moves under Rule 25(c) and Rule 69(a) (all references to "Rule" herein are

27   to the Federal Rules of Civil Procedure) to add CDT Inc. to any judgment against Opsys.

28   As discussed below, Rule 69(a) requires the same substantive showing of successor liability

1   as Rule 25(c), or a showing that CDT Inc. is Opsys' alter ego, *plus* a showing that CDT Inc.

2   controlled Opsys' defense of Plaintiff's action.  Plaintiff's motion should be denied under

3   both Rule 25(c) and Rule 69(a).

4   A.     **The Court should either deny Plaintiff's motion outright or order an**

5          **evidentiary hearing.**

6          Rule 25(c) provides a procedure for substituting one party for another in cases of

7   death, incompetency or transfer of interest or public office.  Where the facts underlying the

8   grounds for substitution are incontrovertible (e.g., death, appointment of a new Attorney

9   General), the substitution can be made summarily, without an evidentiary hearing or trial.

10  But where the facts are disputed, due process requires at least an evidentiary hearing

11  (following appropriate discovery) and sometimes a trial before the decision whether to

12  substitute one party for another can be made.  *Luxliner P.L. Export Co. v. RDI/Luxliner,*

13  *Inc.,* 13 F.3d 69 (3d Cir. 1993).

14         The plaintiffs in *Luxliner* moved under Rule 25(c), as Plaintiff does here, to join or

15  substitute a corporation, Sturgis Lux-Liner Homologation, Inc. ("Sturgis"), on a judgment

16  previously entered against another corporation, RDI/Luxliner, Inc. ("RDI").  Sturgis had

17  purchased RDI's assets before entry of judgment against RDI, making RDI judgment-proof.

18  *Id.* at 71.  The district court granted the motion, finding that Sturgis' purchase of RDI's

19  assets had resulted in a de facto merger and that Sturgis was a mere continuation of RDI.

20  But the Third Circuit reversed, holding that because there were conflicting affidavits

21  concerning whether Sturgis was RDI's successor in interest, the district court should have

22  held an evidentiary hearing.  *Id.* at 70.

23         *Luxliner* emphasized that "[b]efore a party may be deprived of a property interest,

24  due process requires, at a minimum, notice and an opportunity to be heard."  *Id.* at 72

25  (citations omitted).  The court said that Sturgis' due process interest were "particularly

26  compelling" because Sturgis was joined "not merely in ongoing litigation but on a

27  judgment already entered against RDI."  *Id.*   In such a context, the court held, a district

28  court must determine "whether the affidavits 'show that there is no genuine issue as to any

RJN 217

1   material fact and that the moving party is entitled to [joinder or substitution] as a matter of

2   law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). If there are genuine issues of material fact, the

3   court must conduct an evidentiary hearing. *Id.* at 72-73. *Accord, EEOC v. Pan American*

4   *World Airways, Inc.,* No. C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182, at *8 (N.D. Cal.

5   Dec. 1, 1987) (denying plaintiff's pre-trial Rule 25(c) motion to join a new defendant where

6   the motion raised numerous factual disputes, and observing that "granting such a motion

7   requires extensive factual development, and such development is sorely lacking here").

8        It is obvious, even from a cursory reading of the declarations submitted on this

9   motion, that here the facts are hotly disputed on every level. Our witnesses will say that

10  Plaintiff does not understand the corporate transactions it purports to describe and its

11  attempts to ascribe nefarious motives to CDT Inc. are wholly without merit. Plaintiff has

12  not adduced enough evidence even to create a genuine issue of material fact. Its motion

13  should therefore be summarily denied. If the Court finds, however, that there might be

14  genuine issues of material fact, then it must at least hold an evidentiary hearing before

15  deciding whether to add CDT Inc. as a judgment debtor. *See Luxliner,* 13 F.3d at 72.

16       Plaintiff has acknowledged that an evidentiary hearing would be appropriate here.

17  It originally sought to proceed against CDT Inc. via complaint. On November 28, 2005,

18  when seeking leave to file a second amended complaint, it stated, "If [Rule 25(c)'s]

19  application affects substantive due process, such as substituting a party *after* a judgment,

20  then the Court should conduct an evidentiary hearing to decide whether the motion should

21  be granted." Dkt. 55, at 6:17-19 (emphasis in original) (citing *Luxliner,* 13 F.3d at 72).

22  More recently, in Plaintiff's Post-Trial Case Management Statement, it sought to renew its

23  motion to add CDT Inc. as a defendant, stating that if the Court granted this motion, it

24  would "file and serve a new pleading that adds Cambridge as an additional party to the

25  existing Second Amended Complaint." Dkt. 171, at 1:20-25. Plaintiff also asked the Court

26  to "set a schedule for adjudicating the successor liability of Cambridge," estimating that

27  discovery would take 90 to 120 days. *Id.* at 1:25-28. Only when it filed its current motion

28  (Dkt. 179) did Plaintiff switch ground and argue that successor liability can be determined

RJN 218

1  without pleadings, discovery and an evidentiary hearing. If the Court does not deny

2  Plaintiff's motion out of hand, it should schedule an evidentiary hearing.

3  B.      **CDT Inc. is not liable as a successor.**

4  　　　Plaintiff argues this issue under California law. Mot. 14-15. But the Transaction

5  Agreement provides that English law should apply. Bunzel Decl. ¶ 3, Ex. A at 51 (clause

6  36). As the 2002 transaction in particular involves the UK assets of several UK companies,

7  it is not at all clear that California law should be applied. But until we can obtain expert

8  advice on the UK law of successor liability (if any), we shall assume *arguendo* that

9  California law applies without conceding the point.

10  1.      **The successor liability doctrine has no application to stock purchases.**

11  　　　Plaintiff's principal argument that that CDT Inc. is a successor to Opsys under the

12  "successor liability" doctrine. That doctrine—a limited exception to the principle that a

13  corporation can normally sell assets, even all its assets, without also transferring its

14  liabilities to the vendee—applies only to asset purchases, not stock purchases. *Potlatch*

15  *Corp. v. Superior Court,* 154 Cal. App. 3d 1144, 1150 (1984). The transactions here were

16  fundamentally stock-for-stock deals. CDT Inc. did not buy assets; it and CDT Ltd. bought

17  equity interests in Opsys and Opsys UK. Accordingly, the successor liability doctrine has

18  no application here.

19  　　　*Potlatch* held that a corporation (Potlatch) was not liable for damages caused by a

20  defective product manufactured by another company before Potlatch purchased all the

21  outstanding stock of that company. The court observed, "The difference between an

22  acquisition of capital stock and an acquisition of physical assets is no mere matter of form."

23  *Id.* at 1150. "It implicates fundamental concepts and principles of California and United

24  States law:  corporate identity and shareholder immunity." *Id.; see also Marks v.*

25  *Minnesota Mining & Mfg. Co.,* 187 Cal. App. 3d 1429, 1436 (1986) (listing factors that

26  indicate "whether a transaction cast in the form of *an asset sale* actually achieves the same

27  practical result as a merger") (emphasis added); *Phillips v. Cooper Labs., Inc.,* 215 Cal.

28  App. 3d 1648, 1660 (1989) (holding that *Marks* did not apply to stock sale).

RJN 219

1       Here, CDT Inc. purchased the stock of Opsys in 2004; it never purchased the assets

2  of Opsys. Accordingly, the successor liability doctrine simply does not apply.

3       Plaintiff's characterization of the earlier 2002 transaction as an asset purchase also

4  is wrong. In 2002, CDT **Ltd.** agreed to manage and fund the operations of Opsys UK. This

5  was a management agreement, not an asset purchase. The parties were CDT **Ltd.** and

6  Opsys UK (later renamed CDT Oxford)—not CDT **Inc.** and Opsys, the two companies now

7  before the Court. Opsys UK is not the same as Opsys, and CDT Inc. is not the same as

8  CDT Ltd. Plaintiff admits that CDT Inc. and CDT Ltd. are different companies. *E.g.,* Mot.

9  13 n.24. Plaintiff admits that the 2002 transaction involved Opsys UK, that it was not until

10  2004 that CDT Inc. acquired Opsys and that the 2004 transaction was "a 100% stock deal."

11  Mot. 18 n.32. These admissions defeat Plaintiff's successor liability claim.

12  2.     **Even if CDT Inc. had purchased Opsys' assets, the successor liability doctrine**

13        **would not apply.**

14       A corporation that purchases the assets of another corporation ordinarily does not

15  assume the debts of the selling corporation.[1] Only if one of four recognized exceptions

16  applies is the vendee liable for the vendor's debts. As stated by the California Supreme

17  Court in *Ray v. Alad Corp.,* 19 Cal. 3d 22 (1977), the four recognized exceptions are:

18  "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to

19  a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere

20  continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent

21  purpose of escaping liability for the seller's debts." *Id.* at 28.[2] Plaintiff previously argued

22  that only *one* of these four exceptions applied—the de facto merger exception. Dkt. 48, at

23  12:8-13:28. Although it now seeks to invoke all four, its earlier decision not to claim the

24  [1]     In contrast, when there has been a statutory merger, the surviving corporation

25  assumes the disappearing corporation's liabilities. Plaintiff concedes that there has been
     no statutory merger of CDT Inc. and Opsys. Mot. 12:15-17.

26  [2]     *Ray* created a fifth exception to the general rule of non-liability, but that fifth
     exception has since been limited to cases of strict tort liability for product defects. *See*

27  *Franklin v. USX Corp.,* 87 Cal. App. 4th 615, 627-29 (2001); *see also* Mot. 17 n.30
     (agreeing that this fifth exception does not apply here).

28

500132528v3          - 11 -   CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD
                                 CDT INC. AS A PARTY TO ACTION & JUDGMENT
                                 Case No. C 05-00553 MHP

RJN 220

1    other three exceptions underscores the weakness of its position.

2    a.    **CDT Inc. did not agree to assume Opsys' liabilities.**

3        CDT Inc. never agreed to assume Opsys' liabilities, whether expressly or by

4    implication. Instead, before the exercise of the Opsys Limited Option and its purchase of

5    Opsys' stock, CDT Inc. took steps to ensure that it would *not* assume Opsys' liabilities and

6    that Opsys would pay those liabilities itself. The 2002 Transaction Agreement provided

7    that the Opsys Limited Option could not be exercised unless Opsys' aggregate liabilities,

8    including its contingent liabilities, were less than $1.25 million. The 2004 Amended

9    Settlement Agreement provided that all of Opsys' identified liabilities would be satisfied

10    out of the consideration payable for the Opsys shares. CDT Inc. also deposited part of this

11    consideration into an escrow account as security for any unidentified liabilities of Opsys,

12    including contingent liabilities.

13        Plaintiff argues that CDT Inc. understood there was a risk of undisclosed contingent

14    liabilities and that plaintiffs might even assert claims for such liabilities against CDT Inc.

15    Mot. 17:21-18:1. But that does not mean that CDT Inc. agreed to assume such liabilities.

16    To the contrary, CDT Inc. insisted on an escrow and a trust and set-asides, as outlined in

17    part II.D above, to ensure that the former Opsys shareholders would continue to bear

18    responsibility for such claims. *See* Black Decl. ¶¶ 19-32. These provisions are compelling

19    evidence that CDT Inc. did *not* agree to assume Opsys' unidentified contingent liabilities.

20    *See Franklin,* 87 Cal. App. 4th at 621-22 (buyer held not liable as successor-in-interest

21    where, among other factors, asset purchase agreement showed unambiguously that buyer

22    did not assume seller's contingent tort liabilities); *Chaknova v. Wilbur-Ellis Co.,* 69 Cal.

23    App. 4th 962, 967-69 (1999) (buyer held not liable as successor-in-interest in part because

24    it had assumed only certain specific financial liabilities in asset purchase agreement, which

25    did not include contingent tort liabilities), *abrogated on other grounds, Weber v. John*

26    *Crane, Inc.,* 143 Cal. App. 4th 1433 (2006).

27        Plaintiff cites a provision in the Transaction Agreement stating that CDT Inc. and

28    CDT Ltd. "shall be responsible for all liabilities arising from its management of Opsys

RJN 221

1   UK." Mot. 18:1-2 (citing Bunzel Decl. ¶ 3, Ex. A at 23 (clause 7.5)). But this provision

2   plainly does not state that CDT Inc. shall be responsible for all liabilities of **Opsys**. The

3   "liabilities arising from [CDT Ltd.'s] management of Opsys UK" do not include liabilities

4   of Opsys—a different corporation than Opsys UK—which are wholly unrelated to CDT

5   Ltd.'s management of Opsys UK.

6       Plaintiff concedes that CDT Inc. intended not to assume any obligations arising

7   from Opsys US operations (Mot. 17:18-19), but argues that the Fremont lease is different

8   because it is an obligation of Opsys itself. This argument is irrelevant. The Transaction

9   Agreement and Amended Settlement Agreement make clear that CDT Inc. did not assume

10  any of Opsys' liabilities, including liability for the Fremont lease— whether or not it is

11  characterized as a "US obligation."

12  b.    **CDT Inc.'s purchase of Opsys' stock did not amount to a de facto merger.**

13      In evaluating claims of de facto merger, courts consider the following factors:

14      (1)    Was the consideration paid for the assets solely stock of the buyer or
               its parents?

15

16      (2)    Did the buyer continue the same enterprise after the sale?

        (3)    Did the shareholders of the seller become shareholders of the buyer?
17

        (4)    Did the seller liquidate?
18

        (5)    Did the buyer assume the liabilities necessary to carry on the
19             business of the seller?

20  *Marks,* 187 Cal. App. 3d at 1436.[3] Here, four of the questions must be answered "no."

21  Only one question—the first—even allows of any ambiguity.

22      (1)    *Was the consideration paid for the assets solely stock of the buyer or its*

23  *parents?* The consideration paid in 2004 by CDT Inc. for Opsys' stock was CDT Inc.

24  _____

25  [3]    Citing *Herrera v. Singh,* 118 F. Supp. 2d 1120 (E.D. Wash. 2000), Plaintiff offers
        what appears to be an alternative test for successor liability. Mot. 12:27-13:3 (arguing
26      that a transferee may be liable for a judgment when it is a "bona fide successor," the
        transferee has notice of the potential liability, and the predecessor is unable to directly
27      provide adequate relief). In fact, *Herrera* describes the "successorship doctrine" under
        federal common law. 118 F. Supp. 2d at 1123 (observing that this doctrine is frequently
28      invoked in employment situations). *Herrera* is therefore irrelevant here.

RJN 222

1    stock.  But Plaintiff urges the Court to look at the 2002 transaction as well.  If one does so,

2    one sees this:  In 2002, CDT Inc. paid not stock but $2.5 million cash for stock not in Opsys

3    but in Opsys UK.

4            (2)    *Did the buyer continue the same enterprise after the sale?*  No.  Opsys had

5    no operations of its own after the transfer of its UK operations to Opsys UK in 2002.  Fyfe

6    Decl. ¶ 11.  Hence, Opsys had no operations either before or after its acquisition by CDT

7    Inc. in 2004.  CDT Inc. did not either continue or discontinue Opsys' business after the

8    acquisition.  Plaintiff argues, in effect, that CDT **Inc.** continued the same enterprise after its

9    purchase of Opsys in 2004 because CDT **Ltd.** continued the business of Opsys UK after

10   CDT **Ltd.** acquired control of Opsys UK in 2002.  *See* Mot. 18:22-19:7.  But CDT Inc. and

11   CDT Ltd. are different companies, just as Opsys and Opsys UK are different companies.

12   Moreover, CDT Ltd. did *not* continue the business of Opsys UK as before.  The facts here

13   are not even remotely like the facts in *Ray v. Alad,* where the successor continued the old

14   business in every respect.  19 Cal. 3d at 26-28.  Here, in contrast, virtually all the

15   employees were let go, the Oxford facility was closed and the few employees left joined a

16   new lab in Cambridge.  Fyfe Decl. ¶¶ 9-11.[4]  Such facts do not create successor liability.

17   *See Orthotec, LLC, v. REO Spineline, LLC,* 438 F. Supp. 2d 1122, 1131 (C.D. Cal. 2006)

18   (holding that an alleged successor did not continue the same enterprise where it hired some

19   of predecessor's employees, developed relationships with some of predecessor's sales

20   agents and operated out of the same office space, but marketed its own products and

21   retained its own trade name).

22           (3)    *Did the shareholders of the seller become shareholders of the buyer?*  For

23   the most part, no.  Except in settlement of two personal claims, the former Opsys

24   shareholders have not yet received any CDT Inc. stock, and none will be distributed to them

25   unless Kodak and certain debt holders are paid.  Black Decl. ¶ 29.  The de facto merger

26   _____

27   [4]    Plaintiff says the operations of CDT Oxford were "fully 'consolidated' into
     Cambridge or Cambridge's other affiliates."  Mot. 10:5-6 (citing Bunzel Decl. ¶ 8,
28   Ex. F).  But the press release Plaintiff cites describes only a "consolidation of resources."

RJN 223

1    exception applies "where the consideration consists wholly of shares of the purchaser's

2    stock which are *promptly distributed* to the seller's shareholders in conjunction with the

3    seller's liquidation." *Marks*, 187 Cal. App. 3d at 1435 (citations and internal quotations

4    omitted) (emphasis added). Even if some former Opsys shareholders eventually receive

5    some CDT Inc. stock, they will not have been paid "promptly."

6           (4)    *Did the seller liquidate?* No. Opsys has not liquidated. Black Decl. ¶ 35;

7    Fyfe Decl. ¶ 11. During the five months that CDT Inc. held Opsys' stock directly, CDT

8    Inc. did not dispose of Opsys' only material asset, its 84% interest in CDT Oxford. Opsys

9    did not transfer its interest in CDT Oxford to CDT Ltd. until after CDT Inc. transferred

10    Opsys to CDT Ltd. As Plaintiff itself has repeatedly emphasized, it seeks to add CDT **Inc.**

11    to a judgment here, not CDT **Ltd.** *See, e.g.,* Mot. 13 n.24.

12           (5)    *Did the buyer assume the liabilities necessary to carry on the business of the*

13    *seller?* No. CDT Inc. did not assume Opsys' liabilities. *See* part II.D above.

14         The differences between the facts here and those in *Marks* illustrate why a different

15    result is required. In *Marks,* the court held that there had been a de facto merger where,

16    among other factors, the predecessor corporation was required to change its name (so that

17    the successor corporation could use it), distribute the successor's stock to its shareholders,

18    and dissolve as soon as practicable; all of the predecessor's employees, including the seven

19    shareholders, were asked to sign employment agreements with the successor; all five

20    founders of the predecessor continued to work for the successor in substantially the same

21    capacity; the successor assumed essentially all normal operating liabilities of the

22    predecessor; and the successor manufactured and marketed the same products as the

23    successor. 187 Cal. App. 3d at 1432, 1435-36. In contrast, Opsys did not change its name

24    and has not dissolved. Opsys Management has not distributed the CDT Inc. stock to the

25    former Opsys shareholders. Only a handful of Opsys UK employees became employees of

26    CDT Ltd.; most were laid off within a matter of months. Opsys' CEO, CFO, and COO

27    were never employees of CDT Inc. or CDT Ltd. None of them has ever been a member of

28    CDT Inc.'s Board of Directors. Black Decl. ¶¶ 16-17.

RJN 224

500132528v3           - 15 -      CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD
                                      CDT INC. AS A PARTY TO ACTION & JUDGMENT
                                      Case No. C 05-00553 MHP

1    c.    **CDT Inc. is not a mere continuation of Opsys.**

2    "California decisions holding that a corporation acquiring the assets of another

3    corporation is the latter's mere continuation and therefore liable for its debts have imposed

4    such liability only upon a showing of one or both of the following factual elements:  (1) no

5    adequate consideration was given for the predecessor corporation's assets and made

6    available for meeting the claims of its unsecured creditors; (2) one or more persons were

7    officers, directors, or stockholders of both corporations." *Ray,* 19 Cal. 3d at 29.

8    Subsequent decisions have clarified that the first of these elements is determinative.  The

9    "crucial factor" in determining whether a corporate acquisition constitutes a mere

10    continuation is "whether adequate cash consideration was paid for the predecessor

11    corporation's assets." *Franklin,* 87 Cal. App. 4th at 625.  The *Franklin* court said that all

12    the cases cited by *Ray* "involved the payment of inadequate cash consideration, and some

13    also involved near complete identity of ownership, management or directorship after the

14    transfer." *Id.* at 627.  *Franklin* therefore held that a buyer was not a mere continuation of a

15    seller even though the same individual was president and a board member of both

16    corporations. *Id.* at 626-27.  To the same effect are *Orthotec, LLC,* 438 F. Supp. 2d at 1128

17    n.6, 1133; and *Maloney v. American Pharm. Co.,* 207 Cal. App. 3d 282, 287 (1988)

18    (refusing to find one corporation liable as a successor absent the "essential ingredient" of

19    inadequate consideration, although the corporation held itself out as a continuation of the

20    first corporation and the two corporations shared a common officer).  *Mahoney* also hold

21    that the party asserting successor liability bears the burden of proving inadequate

22    consideration. *Maloney,* 207 Cal. App. 3d at 288 & n.3.

23    *Adequacy of consideration:*  CDT Inc. paid 931,633 shares of its common stock for

24    Opsys' stock in 2004.  At the IPO price of $12 per share, this amounts to $11,179,596.

25    Furthermore, Opsys had received $5 million in cash in 2002—CDT Inc. had paid $2.5

26    million for its 16% interest in Opsys UK; CDT Ltd. had paid $2 million for a patent license;

27    and CDT Inc. had paid $500,000 for a call option to acquire 84% of Opsys UK (Bunzel

28    Decl. ¶ 3, Ex. A, at 16 (clause 3.1)).  Thus, the 2002 and 2004 transactions together resulted

RJN 225

1    in payments totaling $16,179,596. This far exceeds the book value of Opsys' assets, which

2    was £1.8 million ($2.9 million) as of September 30, 2002, just before execution of the

3    Transaction Agreement. Bunzel Decl. ¶ 18, Ex. M at OPS 07500. (Amounts in British

4    pounds have been converted to US dollars at the September 30, 2002 rate of £1 to $1.56

5    (http://www.oanda.com/convert/fxhistory).)

6         The same balance sheet shows that Opsys' *liabilities* exceeded £17 million. *Id.*

7    Plaintiff argues that adequacy of consideration should be measured against the seller's

8    liabilities rather than the assets purchased—a novel position for which Plaintiff cites no

9    authority. A rule requiring a purchaser of a corporation's assets to pay enough to settle all

10    of the corporation's liabilities—regardless of the value of the assets themselves—would

11    place such a corporation's creditors in a better position than if there had been no acquisition

12    at all. *Cf. Katzir's Floor & Home Design, Inc., v. M-MLS.com,* 394 F.3d 1143, 1151 (9th

13    Cir. 2004). It would mean that a corporation in distress could never liquidate its assets—

14    truly a senseless result.

15         Plaintiff argues that CDT Inc. initially reported a $26.894 million purchase price for

16    CDT Oxford, based on the cash and stock paid or to be paid to Opsys and its shareholders.

17    Bunzel Decl. ¶ 7, Ex. E, at 80 (CDT Inc.'s Form 10-K). This figure was reduced in

18    December 2004 to $19.679 million to reflect a decrease in the value of CDT Inc.'s common

19    stock. *Id.* at 82. Plaintiff claims that these figures reflect how much CDT Oxford or Opsys

20    was worth. Mot. 10:15-17. But as noted, Opsys' own audited financial statements dated

21    September 30, 2002, just before to the execution of the Transaction Agreement, show assets

22    of only £1.8 million ($2.9 million). Bunzel Decl. ¶ 18, Ex. M at OPS 07500. Opsys had a

23    negative net worth of £15.5 million ($24.1 million). *Id.* It had lost £19.7 million ($30.8

24    million) for the year ending September 30, 2002. *Id.* at OPS 07499; *see also* Dkt. 200-1

25    ¶ 2, Ex. A at 4-6 (expert witness report).

26         The claim that Opsys' assets were worth $26.894 million or $19.679 million (*see*

27    Mot. 10:15-17) depends on the declaration of Plaintiff's expert Paul Ainslie, who candidly

28    admits that he has "not yet reviewed" contracts and records that he "would expect to

RJN 226

1    review…to complete an opinion" about whether Opsys received fair value for assets

2    transferred to CDT Inc.  Ainslie Decl. ¶ 11.  Moreover, the $26.9 million and $19.7 million

3    numbers represent the price paid by CDT Inc., *not* the value of Opsys' assets.  Plaintiff

4    would have the Court determine the adequacy of the consideration by reference to the

5    amount of the consideration.  This is circular:  If the value of the assets is the same as the

6    consideration paid, then the consideration paid is necessarily adequate.  Black Decl. ¶ 11;

7    *see also* Dkt. 200-1 ¶ 2, Ex. A at 4-6 (expert witness report re: valuation of Opsys' assets).

8         *Interlocking directors and officers:*  Plaintiff asserts that Opsys' financial controller

9    became a director of Opsys UK, that Michael Holmes became an observer on the CDT Inc.

10   Board of Directors and that Opsys shareholders became CDT Inc. shareholders.  Mot.

11   20:19-21:2.  These assertions do not come close to making CDT Inc. the successor to

12   Opsys.  Whether or not Michael Holmes was an observer on the CDT Inc. board is

13   irrelevant; he was not a director, and there is no such creature as an "observer director"

14   (Bunzel Decl. ¶ 21).  Although CDT Inc. or CDT Ltd. employees have served as directors

15   of Opsys, no director of CDT Inc. has ever been a director of Opsys or Opsys UK and the

16   principal shareholders and officers of Opsys have never worked for CDT Inc. or CDT Ltd.

17   Black Decl. ¶¶ 16-17.  Whether they ever even get much CDT Inc. stock remains to be

18   seen.  *Id.* ¶¶ 26-29.[5]

19   d.    **CDT Inc. has not fraudulently sought to escape liability for Opsys' debts.**

20        **CDT Ltd.** acquired control of Opsys UK in 2002 to gain access to IP potentially

21   useful to CDT Ltd.'s business.  CDT **Inc.** purchased the stock of Opsys in 2004 to obtain

22   Opsys' 84% interest in Opsys UK.  There was nothing fraudulent about these transactions.

23   _____

24   [5]    CDT Inc. is not a mere continuation of Opsys for the additional reason that Opsys'
     assets were transferred to Opsys UK and then, arguably, to CDT **Ltd.**—not CDT **Inc.**

25   *See Maloney,* 207 Cal. App. 3d 282, 288 (1988) ("a mere continuation contemplates a
     *direct* sale of assets from the predecessor corporation to the successor corporation")

26   (emphasis added); *Katzir's,* 349 F.3d at 1151 (holding that corporation was not mere
     continuation of judgment debtor where it had obtained the assets of the judgment debtor

27   from an intervening corporation, although this intervening corporation was wholly
     owned by the wife of the sole shareholder of both the alleged successor corporation and

28   the judgment debtor).

RJN 227

1    Opsys received ample consideration for its UK assets.[6]  Black Decl. ¶ 11.

2         The structure of these transactions reflected legitimate business reasons and sound

3    tax planning, not a plan to defraud creditors.  A simpler structure, such as an asset purchase,

4    would have created tax liability that Opsys probably could not have paid—a significant

5    barrier to completing the transaction.  Black Decl. ¶ 8.  Creating new unpaid tax obligations

6    would have done nothing for Opsys' creditors.

7         The Transaction Agreement and Amended Settlement Agreement explicitly

8    provided for the satisfaction of all of Opsys' identified liabilities, as well as providing for

9    contingent liabilities and unidentified liabilities.  *See* part II.D above; Black Decl. ¶¶ 26-29.

10   CDT Inc. did not purchase Opsys' stock to escape liability for Plaintiff's claim because

11   CDT Inc. did not even know about Plaintiff's claim.  Plaintiff cites no authority for its

12   argument that CDT Inc. should not have been permitted to acquire the UK assets of Opsys

13   without assuming liability for Opsys' US operations.  *See* Mot. 21:7-13.  The rule is to the

14   contrary.  It is well settled that, absent one of the four exceptions enunciated in *Ray*, a

15   corporation that purchases the assets of another corporation does *not* assume the selling

16   corporation's liabilities.  *Ray*, 19 Cal. 3d at 28.  Here, none of the four exceptions applies.

17   C.   **Plaintiff's motion under Rule 69(a) should be denied.**

18        Plaintiff argues that Rule 69(a) allows it to rely on California Code of Civil

19   Procedure section 187, which courts have interpreted to permit the amendment of a

20   judgment to add judgment debtors under certain circumstances.  Doing this requires

21   "(1) that the new party be the alter ego of the old party *and* (2) that the new party had

22   controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy

23   due process concerns."  *Katzir's*, 394 F.3d at 1148 (citations and internal quotations

24   omitted); *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th

25   _____

26   [6]    Plaintiff cites California's Uniform Fraudulent Transfer Act (Mot. 22:103), which
     explicitly considers whether a debtor received "reasonably equivalent value" for the asset
27   transferred.  *See* Cal. Civ. Code §§ 3439.04(a)(2) & (b)(8); *see also id.* § 3439.08 (a
     transfer is not voidable against a person who took in good faith and for a reasonably
28   equivalent value or against any subsequent transferee).

RJN 228

1    746, 752 (2001). Section 187 has also been applied to permit the addition of successors in

2    interest, as well as alter egos, to a judgment. *Id.* at 753-55.

3         Here, none of these requirements is satisfied. As shown above, CDT Inc. is not a

4    successor in interest to Opsys. It also is not the alter ego of Opsys, its third-tier subsidiary.

5    Plaintiff has not even begun to make the showing necessary to pierce the corporate veil

6    between Opsys and Opsys UK, much less the one separating those two corporations from

7    CDT Ltd., CDT Ltd. from CDT Holdings Limited, and CDT Holdings Limited from CDT

8    Inc. Nor has there been any failure to observe corporate formalities. Opsys UK has

9    employees, books of accounts and bank accounts separate from those of CDT Inc. and CDT

10   Ltd. Black Decl. ¶ 15. Its employees use different laboratories than CDT Ltd.'s

11   employees. Fyfe Decl. ¶ 10. CDT Ltd., Opsys and Opsys UK all have their own audited

12   accounts. Each maintains its own share register. Each has its own General Ledger. Each

13   has its own board of directors. No member of CDT Inc.'s board has ever sat on the boards

14   of Opsys or Opsys UK, nor have the principals in Opsys sat on the boards of CDT Inc.

15   Black Decl. ¶¶ 15-17. Plaintiff concededly is *not* alleging that CDT Inc. is an alter ego of

16   Opsys with respect to breach of the Fremont lease. *See* Mot. 13 n.24 & 16 n.29. In no way

17   has Plaintiff made an alter ego showing, much less one that would pierce through the three

18   layers from a third-tier subsidiary to the ultimate parent.

19        Contrary to Plaintiff's bare assertion, no entity other than Opsys has directed Opsys'

20   defense of this litigation. The suggestion that CDT Inc. has directed Opsys' defense is

21   demonstrably wrong. Black Decl. ¶¶ 39-49. Plaintiff mentions Dr. Fyfe's attendance at a

22   settlement conference but neglects to mention that Plaintiff asked that a representative of

23   CDT Inc. attend the meeting. Fyfe Decl. ¶ 13. Dr. Fyfe and Mr. Chiu did not speak again

24   following that meeting. *Id.*

25        CDT Inc. has taken an interest in the litigation not only because Opsys is a

26   subsidiary of CDT Ltd. (and hence an indirect third-tier subsidiary of CDT Inc.) but also

27   because Plaintiff named CDT Ltd. in its original complaint and in its first amended

28   complaint, and because Plaintiff moved to add CDT Inc. as a party in November 2005.

RJN 229

1    CDT Inc. (and CDT Ltd.) did not direct the day-to-day defense of Plaintiff's claim. Fyfe

2    Decl. ¶ 12; Black Decl. ¶ 32. Mr. Fields (an in-house lawyer for CDT Inc.) attended the

3    trial because of Plaintiff's attempts to sue CDT Inc. and CDT Ltd. and because Opsys'

4    representative Mr. Black was excluded from the first six days of trial as a potential witness.

5    Black Decl. ¶¶ 46-49.

6         Plaintiff cites cases that supposedly impose liability on a corporation solely on the

7    ground that it controlled the litigation for the defendant. *See* Mot. 12:17-25 & 13:3-5 &

8    n.22. But none supports Plaintiff's position here. In *Koehler v. Bank of Bermuda Ltd.,*

9    No. M18-302, 2002 WL 1766444 (S.D.N.Y. July 31, 2002), the court denied a Rule 25(c)

10   motion to join or substitute as an additional judgment debtor a bank that had transferred

11   some of the original judgment debtor's assets to its own account, allegedly in satisfaction of

12   outstanding debts. There was no claim that the bank had controlled the litigation. *Koehler*

13   mentions in passing that a corporation that acquires all of another corporation's assets

14   without merging ordinarily is not liable for a judgment as a successor unless it controlled

15   the litigation that resulted in the judgment. *Id.* at *3. This observation is dicta.

16        Both *Expert Electric, Inc., v. Levine,* 554 F.2d 1227 (2d Cir. 1977), and *TRW, Inc.,*

17   *v. Ellipse Corp.,* 495 F.2d 314 (7th Cir. 1974), applied res judicata to determine whether

18   appellants were bound by the results in prior proceedings. They did not hold that a

19   corporation could be added to the judgment in an action to which it was not a party.

20        In *Oyakawa v. Gillett,* 8 Cal. App. 4th 628 (1992), the court of appeal reversed an

21   order granting a motion under section 187 to add a judgment debtor's wife as an additional

22   judgment debtor, reasoning that the wife was not the husband's alter ego and had not

23   controlled the litigation.[7]

24        In *Troy Co. v. Products Research Co.,* 339 F.2d 364 (9th Cir. 1964), the district

25   court found that the defendant, Troy, was only a nominal defendant, and that another entity,

26   _____

7    Plaintiff's assertion that *Oyakawa* approved of the order amending the judgment and
27   that the "new defendant [had been] represented by the original defendant's representation
     at trial" (Mot. 13 n.22) is wrong.
28

RJN 230

1   Danville, was principally responsible for the litigation. *Id.* at 366. Danville, however, was

2   significantly more involved in the litigation than CDT Inc. here. *Troy* was a patent

3   infringement suit; Danville manufactured the allegedly infringing device, prepared exhibits,

4   designated all prior art references, indemnified Troy and conducted settlement negotiations

5   without Troy's knowledge. *Id.* at 367. There was no issue of adding or substituting

6   Danville as a judgment debtor. *Id.* at 368.

7        In sum, neither *Troy* nor any of the other cases cited by Plaintiff supports its

8   argument that controlling the litigation of an action alone is sufficient to justify the

9   imposition of liability in that litigation.

10   D.    **Plaintiff's claim against CDT Inc. is barred by laches.**

11        Even if Plaintiff's claim against CDT Inc. had any merit—which, as demonstrated

12   above, it does not—Plaintiff's motion should nevertheless be denied because its claim is

13   barred by laches. Laches "addresses delay in the pursuit of a right when a party must assert

14   that right in order to benefit from it." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820

15   (7th Cir. 1999). To demonstrate laches, a defendant must prove "unreasonable delay by the

16   plaintiff and prejudice to itself." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir.

17   2001) (citation omitted). Because laches is an equitable defense (*id.* at 950), it may

18   properly be asserted against an equitable doctrine such as successor liability. *See Katzir's*,

19   394 F.3d at 1149 (holding that proceedings under Civ. Proc. Code § 187 are equitable).

20   Both of the requirements for laches are satisfied here.

21        *Unreasonable delay:* Although Plaintiff received no rent payments after November

22   1, 2002 (Pl.'s 2d Am. Compl. ¶ 17, Dkt. 58), it waited two years until December 14, 2004

23   to file its complaint—the day before CDT Inc.'s IPO. CDT Inc. filed its registration

24   statement on July 30, 2004. Plaintiff knew about the planned IPO by November 2004,

25   when Damoder Reddy faxed him information about the IPO and suggested that he file suit.

26   Mr. Chiu asked Mr. Reddy to refer him to an attorney; Mr. Reddy introduced Mr. Chiu to

27   Stanley Hilton, Plaintiff's first counsel in this case. Hayashi Decl. ¶ 2, Ex. A (Chiu Dep.

28   293:24-295:5, Ex. 46) & ¶ 3, Ex. B (Reddy Dep. 19:9-20:17, 136:7-137:6). Plaintiff sat

RJN 231

1    silent while CDT Inc. priced its IPO and went to market. Black Decl. ¶ 23. Plaintiff sat

2    silent while CDT Inc. acquired all of Opsys' stock, allowing Opsys to exercise the Opsys

3    Limited Option. *Id.* ¶ 24. All this time, Plaintiff sat on its rights. It did not serve its

4    complaint until January 10, 2005, well after the IPO and the completion of the 2004

5    transaction. *See* Notice of Removal, Ex. A (summons and complaint) (Dkt.1). If Plaintiff

6    had promptly asserted its claim, then CDT Inc. would have known that Opsys' liabilities

7    exceeded the $1.25 million cap set in the Transaction Agreement, CDT Inc. would not have

8    purchased Opsys' stock and Plaintiff would not have had a theory for suing CDT Inc.—

9    which is undoubtedly why Plaintiff did not act sooner.

10       Hence, the first requirement for laches—unreasonable delay—is satisfied. "In

11    determining reasonableness, courts look to the cause of the delay." *Danjaq,* 263 F.3d at

12    954. Here, Plaintiff waited to act until it had what it hoped would be a deep pocket.

13       *Prejudice:* The second requirement for laches—prejudice—also is met. A

14    defendant may demonstrate prejudice by showing that it "took actions or suffered

15    consequences that it would not have, had the plaintiff brought suit promptly." *Id.* at 955. If

16    Plaintiff had acted promptly here, CDT Inc. would not have bought Opsys' stock and would

17    not now be facing a motion to add it to a $5 million judgment against Opsys. This is

18    prejudice by any definition. Plaintiff's counsel himself commented in court that CDT Inc.

19    might have an equitable defense based on Plaintiff's inaction. *See* Dkt. 198, at 7:6-8.

20    E.      **Leave to add a fraudulent conveyance claim should be denied.**

21       Plaintiff notice of motion seeks leave to add a claim under Rule 18(b) for fraudulent

22    conveyance of Opsys' assets to CDT Inc. and to CDT Oxford. Mot. 1:12-13. Elsewhere,

23    however, Plaintiff seeks leave to file this claim only "if needed" (*id.* 2:13-14), stating that it

24    "*may* also seek leave to file a supplemental claim for relief for fraudulent conveyance

25    against Cambridge and CDT Oxford Limited" (*id.* 23:6-7) (emphasis added).

26       Plaintiff apparently claims that CDT **Inc.**'s transfer of Opsys' 84% interest in Opsys

27    UK to CDT **Ltd.** in May 2005 was fraudulent. *In May 2005, however, CDT Ltd. was a*

28    *defendant in this litigation.* The order dismissing CDT Ltd. with prejudice was not entered

RJN 232

1    until August 8, 2005. *See* Dkt. 39. One does not avoid liability by transferring assets from

2    one party defendant (Opsys) to another (CDT Ltd.). There is no ground to assert that this

3    transaction defrauded anybody, or was intended to do so. Black Decl. ¶¶ 33-38. The

4    transfer of assets from Opsys to CDT Ltd. was planned well before the filing of Plaintiff's

5    complaint—before CDT Inc. knew of Plaintiff's claim—to simplify CDT Inc.'s corporate

6    structure. *Id.* Contrary to Plaintiff's claims (Mot. 21:13-16), the 84% interest in CDT

7    Oxford that Opsys transferred to CDT Ltd. had little value because CDT Ltd. had been

8    entitled to 98% of CDT Oxford's profits since 2002. Black Decl. ¶ 36.

9        Possibly Plaintiff will dispute that CDT **Ltd.** was the defendant named in its original

10   complaint and its first amended complaint and claim it meant all along to sue CDT **Inc.**

11   After all, Plaintiff described the CDT entity named in its original complaint as a British

12   company that was the owner of Opsys. Dkt. 1, ¶ 2. On the date Plaintiff filed its complaint,

13   CDT Inc. owned 16% of Opsys UK; CDT Ltd. did not own any stock in Opsys or Opsys

14   UK. Thus, the only CDT entity that owned any part of Opsys was CDT Inc., not CDT Ltd.

15       If this is Plaintiff's theory, then its Rule 18 motion must be denied because that

16   defendant—CDT Inc.—was dismissed with prejudice in August 2005. Dkt. 39.

17       Plaintiff's request to add a fraudulent conveyance claims also fails on procedural

18   grounds. Rule 18(b) provides that "a plaintiff may state a claim for money and a claim to

19   have set aside a conveyance fraudulent as to that plaintiff, without first having obtained a

20   judgment establishing the claim for money." But Plaintiff has filed no claim for money

21   against either CDT Inc. or Opsys UK. Plaintiff has cited no authority permitting it to

22   piggyback a fraudulent conveyance claim on top of a successor liability claim under

23   Rule 25(c) or Rule 69(a). Because Plaintiff has declined to file a complaint against CDT

24   Inc., there is no pleading to which a fraudulent conveyance claim may be added, much less

25   a pleading that would satisfy the heightened pleading standards of Rule 9(b). Having not

26   even lodged a proposed complaint, Plaintiff has not begun to comply with these rules.

27   IV.    **CONCLUSION.**

28       The Court should deny outright Plaintiff's motion to add CDT Inc. as a party to this

RJN 233

1    action and to the judgment to be entered against Opsys. If, however, the Court believes that

2    Plaintiff has alleged enough to go forward, the Court should hold an evidentiary hearing on

3    the matter. If the Court grants Plaintiff's request for discovery on successor liability issues,

4    CDT Inc. requests that the Court permit the parties to file motions for summary judgment

5    on Plaintiff's successor liability claim following the close of discovery.

6         Dated: May 7, 2007.

7                                        PILLSBURY WINTHROP SHAW PITTMAN LLP
                                         BRUCE A. ERICSON
8                                        SHARON L. O'GRADY
                                         ALICE KWONG MA HAYASHI
9                                        50 Fremont Street
                                         Post Office Box 7880
10                                       San Francisco, CA 94120-7880

11

                                         By _____/s/ Bruce A. Ericson_____
12                                              Bruce A. Ericson
                                         Attorneys for Non-Party/Respondent
13                                       CAMBRIDGE DISPLAY TECHNOLOGY, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26
                                                          RJN 234
27

28

# EXHIBIT T

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E-Filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUNNYSIDE DEVEOPMENT COMPANY, LLC.,

    Plaintiff,

    v.

OPSYS LIMITED, a United Kingdom Company,

    Defendant.

No. C 05-00553 MHP

**JUDGMENT**
**(Fed.R.Civ.P. 58)**

    This action came on for trial before the court, the Honorable Marilyn Hall Patel, United States District Judge, presiding, and the issues having been duly tried before a jury and the jury having duly rendered its verdict,

    IT IS HEREBY ORDERED AND ADJUDGED that plaintiff, SUNNYSIDE DEVELOPMENT COMPANY, LLC., recover of the defendant OPSYS LIMITED, the sum of $4,853,017.00, with interest thereon at the rate of 4.95 percent as provided by law, and its costs of action.

Date: May 29, 2007

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

RJN 235

Exhibits U-W to Request for Judicial Notice

# EXHIBIT U

COPY 1

PAGES 1 - 73

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL, JUDGE

SUNNYSIDE DEVELOPMENT          )
COMPANY,                       )
                               )
            PLAINTIFF,          )
                               )
   VS.                         )          NO. C 05-553 MHP
                               )
OPSYS, LTD.                    )
                               )
            DEFENDANT.          )
_____)

                               SAN FRANCISCO, CALIFORNIA
                               WEDNESDAY, MAY 16, 2007

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          BARTKO ZANKEL TARRANT & MILLER
                        900 FRONT STREET
                        SUITE 300
                        SAN FRANCISCO, CA  94111
                  BY:   **ROBERT H. BUNZEL**
                        **ALYSON L. HUBER**
                        **BRIAN VILLAREAL**
                        ATTORNEYS AT LAW


FOR DEFENDANT:          ORRICK HERRINGTON & SUTCLIFFE
                        THE ORRICK BUILDING
                        405 HOWARD STREET
                        SAN FRANCISCO, CA  94105
                  BY:   **JAMES E. BURNS, JR.**
                        **JUSTIN MYER LICHTERMAN**
                        ATTORNEYS AT LAW
              (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:            JAMES YEOMANS, CSR #4039, RPR
                        OFFICIAL REPORTER
              COMPUTERIZED TRANSCRIPTION BY ECLIPSE          **RJN 236**

```
 1   APPEARANCES:   (CONTINUED)

 2   FOR DEFENDANT:          PILLSBURY WINTHROP
                             2550 HANOVER STREET
 3                           PALO ALTO, CA  94304-1115
                        BY:  BRUCE ERICSON
 4                           SHARON O'GRADY
                             ALICE KWONG MA HAYASHI
 5                           ATTORNEYS AT LAW

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                          RJN 237

25
```

1    WEDNESDAY, MAY 16, 2007                    11:00 A.M.

2              (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

3         THE COURT:  NOW, YOU CALL THE OTHER CASE.  I'M SORRY,

4    I DIDN'T REALLY -- JUST CALLED ONE OF THEM.

5         THE CLERK:  CIVIL 05-0553, SUNNYSIDE DEVELOPMENT

6    COMPANY VERSUS OPSYS LIMITED.

7         MR. BUNZEL:  ROBERT BUNZEL, ALYSON HUBER ON BEHALF OF

8    THE PLAINTIFF.

9         THE COURT:  GOOD AFTERNOON.

10        MR. BURNS:  GOOD AFTERNOON AGAIN.

11        JAMES BURNS AND JUSTIN LICHTERMAN FOR DEFENDANT OPSYS

12   LIMITED.

13        THE COURT:  GOOD AFTERNOON.

14        MR. ERICSON:  GOOD AFTERNOON.

15        BRUCE ERICSON, SHARON O'GRADY AND ALICE HAYASHI FOR

16   NON-PARTY CAMBRIDGE DISPLAY TECHNOLOGY, INC.

17        THE COURT:  AND HOPING TO KEEP IT THAT WAY.

18        MR. ERICSON:  YES.

19        THE COURT:  OKAY.  LET ME ASK YOU ABOUT SOME THINGS

20   BEFORE WE GET TO THAT.

21        I THINK, THE BEST ORDER IN WHICH TO TAKE THESE, IS

22   PROBABLY ON THE MOTION FOR NEW TRIAL AND SO FORTH, SO WHOSE

23   GOING TO ADDRESS THAT?

24        MR. BURNS:  I WILL, YOUR HONOR.        RJN 238

25        THE COURT:  YOU ARE.  AND?

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1          MR. BUNZEL: ·I AM.

2          THE COURT:, AND PLAINTIFFS YOU ARE.  WHY DON'T YOU

3    BOTH GET UP HERE, SO NEITHER ONE OF YOU GETS TOO COMFORTABLE.

4          IN ANY EVENT, THE INCONSISTENT VERDICT ISSUE, ISN'T

5    THAT PROPERLY RAISED ON UNDER 59(A)?

6          MR. BURNS:  IT IS PROBABLY A 59(A), RULE 59 MOTION.

7          THE COURT:  AND YOU AGREE WITH THAT, RIGHT?

8          MR. BUNZEL:  YES, YOUR HONOR.  I DON'T BELIEVE IT FITS

9    UNDER RULE 50.

10          THE COURT:  THERE WAS NO 50(A) MOTION YOU COULD MAKE

11   GIVEN --

12          MR. BURNS:  WE PRESERVED ALL OF OUR MOTIONS, IF YOU

13   RECALL.

14          THE COURT:  YOU PRESERVED EVERYTHING, EVEN THINGS

15   YOU'RE NOT ENTITLED TO YOU PRESERVED.

16          MR. BURNS: ·THAT'S RIGHT, EXACTLY.  I THINK, THIS IS A

17   CLASSIC NEW TRIAL MOTION.

18          THE COURT:  THIS IS A 59, RULE 59 MOTION, BUT THEN

19   TAKING IT FROM THERE, THERE'S CERTAINLY -- THERE WERE QUESTIONS

20   REGARDING THE QUESTIONS THAT WERE PROPOUNDED TO THE JURY IN THE

21   SPECIAL INTERROGATORIES.                    RJN 239

22          BUT, AND I HAVE TO SAY, LOOKING AT THE TRANSCRIPT,

23   THAT MY ANSWERS TO THEM WERE SOMEWHAT GARBLED, BUT I THINK THAT

24   NONETHELESS THEY QUOTE THE PICTURE AND IT WAS MADE CLEAR THAT

25   WHATEVER THEY BELIEVED HAPPENED WITH REGARD TO THE ASSIGNMENT

1   AND WHETHER OR NOT THE ASSIGNMENT WAS SIGNED AND WHETHER IT

2   EVER BECAME EFFECTIVE, THAT ITS EFFECTIVE DATE WAS PREMISED

3   UPON THE SATISFACTION OF CERTAIN CONDITIONS, CORRECT?

4        AND THAT WAS EXPLAINED TO THEM, I THINK, IN THE --

5   WITH MY SOMEWHAT INARTICULATE EXPLANATIONS, BUT THEY UNDERSTOOD

6   THAT AND UNDERSTOOD THAT, IN FACT, WHILE THE DOCUMENT MAY HAVE

7   BEEN DRAFTED AND IN THE POSSESSION OF THE PARTIES, IT WOULD NOT

8   TAKE EFFECT UNTIL THOSE CONDITIONS HAD BEEN MET.

9        AND THEY DETERMINED IT HAD NOT BECOME EFFECTIVE, BUT I

10  ALSO EXPLAINED TO THEM THAT DURING THAT PERIOD OF TIME IT MAY

11  OR MAY NOT HAVE BECOME EFFECTIVE.  IT COULD HAVE BECOME

12  EFFECTIVE ANYTIME WITHIN THAT 90 DAYS.

13       BUT QUESTION WAS WHETHER OR NOT DURING THAT PERIOD OF

14  TIME ANY KIND OF REPRESENTATIONS OR MISREPRESENTATIONS WERE

15  MADE, ET CETERA.  AM I CORRECT?

16       **MR. BUNZEL:**  FROM THE PLAINTIFF'S PERSPECTIVE VERY

17  MUCH SO.  ON PAGE 9 OF THE TRANSCRIPT FROM MARCH 9TH, I THINK,

18  CONFIRMS THAT ANALYSIS.

19       **MR. BURNS:**  WELL, THE RUB, OF COURSE, IS THAT THE

20  QUESTION NUMBER ONE AS THE PLAINTIFF NOW CONCEDES WAS PUT IN

21  THERE AT -- IN AID OF THE COURT'S JURISDICTION ON RESCISSION.

22       I'M QUOTING FROM THEIR BRIEF AND OTHER THINGS THAT

23  THEY SAID, WHATEVER THAT HAPPENS TO MEAN.  AND QUESTION NUMBER

24  TWO GOES TO THE QUESTION OF WHETHER THE ASSIGNMENT EVER BECAME

25  EFFECTIVE.  I.E., WHETHER THE LIABILITY WAS PASSED.

RJN 240

1        SO WHAT WE'RE DEALING WITH HERE IS THE BASIC

2   INCONSISTENCY OF THOSE TWO POSITIONS.  BECAUSE IF THERE'S

3   RESCISSION YOU HAVE AN EFFECTIVE CONTRACT WHICH YOU ARE

4   AVOIDING.

5        THE COURT:  BUT THE TERM RESCISSION WAS NEVER

6   MENTIONED TO THE JURY OR ANYTHING.

7        MR. BURNS:  NO, THAT'S TRUE.  YOU'RE ABSOLUTELY

8   CORRECT, BUT THAT'S THE BASIS FOR THAT QUESTION, WE KNOW

9   BECAUSE THAT'S WHAT THE PLAINTIFFS HAVE SAID AND WHAT THE COURT

10  SAID WHICH -- AND I THINK THE COURT INSTRUCTED THE JURY

11  CORRECTLY ON THEIR QUESTION ON THE LAST DAY OF TRIAL.

12       ON PAGE 10 AND 11 THE COURT SAID:

13       "I DON'T KNOW HOW IT COULD BE DONE ANY DIFFERENT," I'M

14  PARAPHRASING HERE TO TRY TO MAKE IT CORRECT ENGLISH, WOULD HAVE

15  TO BE SOME TIME WITHIN THAT PERIOD OF TIME, ALTHOUGH THE

16  LANGUAGE SAYS, "AT THE TIME OF THE EFFECTIVE DATE OF THE

17  ASSIGNMENT".

18       "THE PROBLEM WITH THAT IS, HOWEVER, THAT IT COULD

19  BECOME EFFECTIVE SOME TIME EARLIER THAN 90 DAYS.

20       MR. BURNS:  "EXACTLY".

21       "YOU DON'T HAVE ANY DISPUTE WITH THAT?"

22       MR. BURNS:  "EXACTLY."

RJN 241

23       THEN IT GOES ONTO SAY, THE COURT COULD HAVE BEEN, AND

24  AGAIN WE'RE STILL TALKING TO THE JURY, COULD HAVE BEEN

25  EFFECTIVE EARLIER, IT COULD HAVE BEEN AFFECTED AT THE TIME --

1   -- EXCUSE ME -- IT COULD HAVE BEEN AT THE TIME IT BECAME

2   EFFECTIVE OR THE DATE WHICH IT WAS TO BECOME EFFECTIVE.

3          AND BUT AFTER 90 DAYS, YOU'RE GOING TO READ THE REST

4   OF THIS SECTION TO KNOW THAT, IN THE EVENT NOT ALL THE

5   CONDITIONS PRECEDENT HAVE BEEN SATISFIED AND 90 DAYS HAVE

6   PASSED, THEN THE ASSIGNMENT IS NULL AND VOID.

7          SO THAT I'M GIVING JUST PART OF THE INSTRUCTIONS THAT

8   THE COURT GAVE IN ANSWER TO THE QUESTION, BUT THEN THE JURY

9   CAME BACK AND SAID, WERE THERE MATERIAL MISREPRESENTATIONS?

10         AGAIN, MATERIAL WAS NEVER DEFINED, BUT WERE THERE

11  MATERIAL MISREPRESENTATIONS AT THE TIME IT WAS ENTERED INTO?

12  NO.  AND THEN B IS AT THE EFFECTIVE DATE OF THE ASSIGNMENT.

13         SO THE COURT READ THE ASSIGNMENT, READ PARAGRAPH TWO,

14  AS I RECALL, YES, PARAGRAPH TWO OF THE ASSIGNMENT, WHICH TALKS

15  ABOUT THE EFFECTIVE DATE AND THE EFFECTIVE DATE IS WHEN ALL THE

16  CONDITIONS PRECEDENT HAVE BEEN DONE, WHEN THE RELEASE IS

17  EFFECTIVE, WHEN EVERYTHING ELSE IN THE ASSIGNMENT IS EFFECTIVE.

18         AND THEY SAID, YES, YOU CANNOT ANSWER THAT QUESTION

19  WITHOUT FIRST DETERMINING THAT THERE WAS AN EFFECTIVE DATE

20  BECAUSE, AS THE COURT SAID, IF IT GOES BEYOND THE 90 DAYS IT'S

21  NULL AND VOID.  AND SO IN PARAGRAPH TWO, IN ESSENCE, THEY SAY

22  OR QUESTION NUMBER TWO, IN ESSENCE, THEY SAY IT'S NOT

23  EFFECTIVE.                                    **RJN 242**

24         SO, I MEAN, THIS AS FAR AS WE'RE CONCERNED WAS INVITED

25  BY THE PLAINTIFF OVER OUR OBJECTION, BUT YOU HAVE DIAMETRICALLY

1    OPPOSED DETERMINATIONS, A, IT WAS EFFECTIVE AND, B, IT WASN'T

2    EFFECTIVE.

3          AND, I THINK, THEREIN IS THE RUB AND IT'S SORT OF IN

4    BLACK AND WHITE, NOT A WHOLE LOT WE CAN DO ABOUT IT.

5        THE COURT:  ONLY IF YOU IGNORE ALL THE INSTRUCTIONS

6    THEY WERE GIVEN WHEN THEY ASKED THE QUESTION, AND THE QUESTION

7    WAS ANSWERED AND I THINK THAT, YOU KNOW, IT'S NOT A SITUATION

8    WHERE THEY WALKED OUT OF HERE AND YOU END UP WITH A VERDICT

9    FORM WITH TWO INCONSISTENT ANSWERS.

10          IT'S A SITUATION WHERE THEY WERE GIVEN FURTHER

11   INSTRUCTIONS AND THEY ANSWERED THAT QUESTION IN ACCORDANCE WITH

12   THOSE INSTRUCTIONS.  AT LEAST, WE HAVE TO ASSUME THEY DID AND

13   THAT RESOLVES ANY CONFLICT, I THINK, FOR INCONSISTENCY.

14        MR. BURNS:  THE INSTRUCTIONS GIVEN BY THE COURT, AS I

15   SAY, WE BELIEVE WERE CORRECT, IS THAT THE EFFECTIVE DATE IS THE

16   EFFECTIVE DATE IN THE ASSIGNMENT, AND SO TO ANSWER THAT

17   QUESTION, WHICH THE JURY DID --

18        THE COURT:  TO BE DETERMINED, YOU KNOW, HAD TO HAPPEN

19   WITHIN A CERTAIN DATE, BUT IT DIDN'T, DOESN'T MEAN IT

20   NECESSARILY OCCURRED.

21        MR. BURNS:  WELL, BUT THE COURT ACTUALLY ADDRESSED

22   THAT ISSUE.  SAID IT COULD HAVE BEEN ANYTIME WITHIN THE 90

23   DAYS.                                    RJN 243

24        THE COURT:  THAT'S RIGHT.

25        MR. BURNS:  THAT'S THE EFFECTIVE DATE.  SO, I GUESS,

1   I'M JUST SAYING --

2        THE COURT:  IT COULD HAVE BEEN THE EFFECTIVE DATE IF

3   IT HAD BEEN AFFECTED.

4        MR. BURNS:  I'M NOT SURE ABOUT THAT.  BUT YOU CAN'T

5   FIND, I WOULD SIMPLY SUBMIT TO THE COURT, YOU CAN'T FIND THAT

6   THERE WAS AN EFFECTIVE DATE OF THE ASSIGNMENT AND THE

7   ASSIGNMENT WAS NOT EFFECTIVE.

8        THE COURT:  I THINK, THAT'S SUFFICIENTLY EXPLAINED BY

9   THE INSTRUCTIONS, THEY ACTED IN ACCORDANCE, I TRUST, IF YOU

10  TAKE THIS UP ON APPEAL, THAT YOU WILL, IN FACT, GIVE THE COURT

11  THE BENEFIT OF THE INSTRUCTIONS THAT WERE GIVEN TO THE JURY.

12       MR. BURNS:  ABSOLUTELY.

13       THE COURT:  AND --

14       MR. BUNZEL:  DO YOU NEED ANYTHING FURTHER FROM THE

15  PLAINTIFF ON THAT ISSUE?

16       THE COURT:  I DON'T THINK SO, NOR ON THE REST OF

17  THESE.

18       WE DEALT WITH WAIVER.  HOW MANY TIMES HAVE WE DEALT

19  WITH WAIVER ON THIS CASE?  SEVERAL TIMES, ON THE MOTION FOR

20  SUMMARY JUDGMENT, AND THEN, YOU KNOW, THE EQUITABLE ESTOPPEL

21  ONLY THING SORT OF LEFT UNTIL THE END.

22       AND THEN THERE'S SOME ARGUMENT MADE ABOUT THIS LETTER

23  FROM MR. CHIU TO WHOMEVER IT WAS, SO FORTH, BUT THAT WAS NOT

24  ADMITTED TO CHANGE THE TERMS NOR INTEND TO CHANGE THE TERMS OF

25  THE ASSIGNMENT, IT WAS ADMITTED TO SHOW EITHER THERE WAS A LACK

RJN 244

1    OF, YOU KNOW, IGNORANCE OR -- LACK OF IGNORANCE OR INTENT OR

2    LACK OF INTENT, RIGHT?

3            RELIANCE, LACK OF RELIANCE AND THAT SEPARATE AND APART

4    FROM THE TERMS OF THE ASSIGNMENT.

5            AND THEN UNCLEAN HANDS, YOU KNOW, YOU SAID THERE'S

6    AMPLE EVIDENCE, BUT YOU DIDN'T CITE TO ANY SPECIFIC AND I DON'T

7    KNOW WHAT THAT MEANS.

8            I GUESS, MEANS YOU THINK IT'S SO OBVIOUS I SHOULD

9    RECOGNIZE IMMEDIATELY, BUT I DON'T BECAUSE I DON'T SEE THAT

10   THERE IS REALLY EVIDENCE OR IF THERE IS ANY, IT'S VERY SCANT.

11           CERTAINLY NOT SUFFICIENT TO GIVE IT TO THE JURY, THAT

12   THE PLAINTIFF INTENDED TO OBTAIN OR KEEP ANY BENEFIT FROM THE

13   ASSIGNMENT, BUT THEN NEVER INTENDED TO HONOR IT, IN FACT.

14           OF COURSE, IN FACT, THE JURY FOUND IT NEVER BECAME

15   EFFECTIVE ANYWAY, SO.

16           MR. BURNS:  THEY FOUND A LOT OF UNEFFECTIVENESS.  I

17   WOULD SAY, YOUR HONOR, ON THIS, THAT I WOULD POINT OUT THAT

18   PLAINTIFF DEVOTES ONE PAGE OF ARGUMENT IN ITS BRIEF TO THE

19   INCONSISTENT VERDICT AND THEN JUMPS RIGHT INTO RESCISSION, BUT

20   IF THE COURT SHOULD THEN WE WANT TO RESCIND.

21           THE COURT:  RESCISSION NO LONGER AN ISSUE, IS IT?

22   RIGHT?

23           MR. BURNS:  I GUESS NOT, YOUR HONOR.  ALTHOUGH, THAT

24   SEEMS TO BE THE FALLBACK AND THESE ARE, OBVIOUSLY, ALL

25   EQUITABLE DEFENSES, BUT I THINK THE COURT IS CORRECT, THAT WE

RJN 245

1    HAVE HASHED THESE OVER.  WE MAY HAVE OUR DISAGREEMENTS, BUT I

2    THINK IT'S BEEN FULLY EXPLORED.

3            THE COURT:  THAT'S WHAT THOSE THREE WISE HEADS ARE

4    FOR.

5            MR. BUNZEL:  YOU'RE CORRECT ABOUT RESCISSION, YOUR

6    HONOR, AND I DON'T THINK WE SPENT A LOT OF TIME ON THAT IN OUR

7    BRIEF.

8            THE LAST PARAGRAPH OF THE BRIEF SAYS THAT RESCISSION

9    IS NO LONGER SOMETHING THAT'S REQUIRED TO BE DECIDED AT THIS

10   TIME BY THIS COURT.

11           THE COURT:  DOES THAT MEAN IT'S NOT BEING SOUGHT?

12           MR. BUNZEL:  AS I SAID AT THE END OF THAT SENTENCE,

13   YOUR HONOR, IN THE UNLIKELY EVENT THAT YOU THOUGHT THE VERDICT

14   WAS INCONSISTENT AND THAT QUESTION TWO WAS IMPAIRED, THEN YOU

15   WOULD PROBABLY -- WE WOULD ASK YOU TO DECIDE RESCISSION.

16           SINCE THAT'S NOT THE CASE WE'RE NOT ASKING YOU TO

17   DECIDE RESCISSION.

18           THE COURT:  OKAY.  NOW, YOU WANT TO DEAL WITH THE

19   ATTORNEYS' FEES ISSUES OR WITH THE CDT ISSUES?

20           MR. BURNS:  YOUR HONOR, MR. LICHTERMAN WILL HANDLE THE

21   ATTORNEYS' FEES MOTION, IF THAT'S NEXT UP.

22           THE COURT:  MAYBE THAT'S THE WAY WE SHOULD DO AND THEN

23   GO TO THE NEW ISSUE OF A QUOTE "NEW PARTY" OR ATTEMPT TO THEN.

24   MAYBE SOMEBODY BROUGHT DIAGRAMS OF EVERYTHING THAT HAPPENED ON

25   THE OTHER SIDE OF THE POND, AS THEY SAY.

RJN 246

1    ATTORNEYS' FEES, FIRST OF ALL, GET THE RIGHT

2  PARAGRAPH.  DO I UNDERSTAND THAT YOU'RE RELYING -- DEFENDANTS

3  ARE RELYING UPON -- WELL, LET ME PUT IT THIS WAY:

4    DEFENDANTS ARE RELYING UPON, I GUESS, THE LAST

5  SENTENCE OR SO OF THE PARAGRAPH ABOUT ATTORNEY'S FEES AND

6  PREVAILING PARTY?

7    MR. LICHTERMAN:  I'M SORRY, YOUR HONOR.

8    THE COURT:  THE LAST PARAGRAPH B?

9    MR. LICHTERMAN:  IN ADDITION?

10    THE COURT:  IN ADDITION, RIGHT.

11    MR. LICHTERMAN:  NO, YOUR HONOR.  I THINK, WE'RE

12  READING THE WHOLE PARAGRAPH AS A WHOLE, APPLYING JUST BASIC

13  CONTRACT INTERPRETATION PRINCIPLES, WHICH IS THE APPROPRIATE

14  WAY UNDER SETTLED CALIFORNIA CASE LAW TO ANALYZE AN ATTORNEY'S

15  FEES PROVISION.

16    I THINK, WHERE THIS STARTS, I THINK, EVERYBODY AGREES,

17  UNDER CALIFORNIA LAW THERE'S NO RIGHT TO ATTORNEYS' FEES.  IT

18  ALL TURNS ON WHAT IS THE PROVISION IN THE CONTRACT.

19    THE COURT:  RIGHT.

20    MR. LICHTERMAN:  WHAT DOES IT SAY.

21    THE COURT:  THAT'S WHERE WE ARE, THAT'S WHY I JUST

22  JUMPED RIGHT TO THE CONTRACT.

23    MR. LICHTERMAN:  I THINK, AT THAT POINT YOU GOT TO

24  READ THE WHOLE PROVISION AS A WHOLE APPLYING BASIC CONTRACT

25  INTERPRETATION PRINCIPLES.                    RJN 247

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1      THE COURT:  THEY'RE THE PREVAILING PARTY, RIGHT?

2      MR. LICHTERMAN:  ON SOME ISSUES.

3      THE COURT:  SO FAR.

4      MR. LICHTERMAN:  ON SOME ISSUES.

5      THE COURT:  ON A GOODLY NUMBER OF THEM.  ON ENOUGH OF

6   THEM TO GET THEM A WHOOPING 400 SOME MILLION DOLLARS, WHATEVER

7   IT WAS.

8      MR. LICHTERMAN:  I WILL CONCEDE THEY RECEIVED A

9   VERDICT FOR $4.8 MILLION.

10      THE COURT:  SO PREVAILING PARTY, SIGNIFICANTLY THE

11   PREVAILING PARTY, RIGHT?

12      MR. LICHTERMAN:  BUT PREVAILING ON WHAT, YOUR HONOR?

13      I MEAN, THE CONTRACT -- THE LEASE IS VERY CLEAR AS TO

14   WHAT YOU HAVE TO PREVAIL ON AND WHAT SORT OF CLAIMS APPLY.  AND

15   IT'S AN INTEGRATED AGREEMENT, WE CAN ONLY LOOK TO THE TERMS OF

16   THE AGREEMENT, NOT WHAT ANYONE THOUGHT, OR SAID, OR MAY THINK.

17      TO THE EXTENT THERE'S AMBIGUITY, WE KNOW FROM TRIAL

18   TESTIMONY MR. ROHAS HE'S THE GUY WHO HANDED OVER THIS STANDARD

19   FORM CONTRACT AND, I THINK, WHEN YOU START TO ANALYZE THE

20   LANGUAGE RATHER THAN JUST ASK WHO PREVAILED IN THE LAWSUIT --

21      THE COURT:  WELL, WHO PREVAILED IN ENFORCING THE TERMS

22   OF THE CONTRACT?

23      MR. LICHTERMAN:  NO ONE, YOUR HONOR.  ABSOLUTELY NO

24   ONE ENFORCED THE TERMS OF THE CONTRACT.          RJN 248

25      YOUR HONOR WILL RECALL WE HAD A HEATED DISPUTE OVER

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1    THIS AT THE END OF THE TRIAL WITH RESPECT TO CALIFORNIA AND

2    CIVIL CODE 1951, AND IT WAS DEFENDANT'S POSITION THAT IF YOU'RE

3    ENFORCING THE CONTRACT YOU'RE NOT ENTITLED TO FUTURE RENT, YOU

4    HAVE TO WAIT FOR EACH CONSECUTIVE BREACH.

5           THAT'S THE CIVIL CODE AND IT WAS PLAINTIFF'S POSITION

6    THAT, NO, NO, NO, THIS IS TERMINATED, THERE'S NO CONTRACT TO

7    ENFORCE.  NO ONE COMING BACK.  WE JUST WANT OUR DAMAGES.

8           AND THE CIVIL CODE OUTLINES THAT IS NOT ENFORCEMENT

9    THAT IS TERMINATION.  THAT IS SOMETHING VERY, VERY DIFFERENT

10   AND, I THINK, THAT'S A SIGNIFICANT DIFFERENCE.  I THINK, IT'S

11   SIGNIFICANT THAT THE PARTIES ARGUED QUITE VOCIFEROUSLY ABOUT IT

12   IN FRONT OF THE COURT.

13          WE HAD OUR CIVIL CODES WE WERE HANDING THEM UP TO THE

14   COURT, THE COURT WILL RECALL AND THAT IS A DIFFERENCE AT LAW,

15   IT'S SUBSTANTIVE.

16          **THE COURT:**  AS A MATTER OF FACT, I THINK, I STILL HAVE

17   SOMEBODY'S CIVIL CODE HERE.

18          **MR. BUNZEL:**  THAT'S FINE, I WAS LOOKING FOR IT THE

19   OTHER DAY.

20          **MR. LICHTERMAN:**  I THINK, THE IMPORTANT THING IT'S A

21   SUBSTANTIVE DIFFERENCE, LEGISLATURE MADE POINT OF SEPARATING

22   OUT TWO DIFFERENT METHODS OF DEALING WITH A BREACH.  OKAY.

23          AND I DON'T THINK WE CAN, YOU KNOW, BECAUSE WE WANT TO

24   COLLECT ATTORNEYS' FEES, JUST CHANGE OUR MIND AND SAY NO, NO,

25   NOW WE'RE ENFORCING IT, THAT'S ALL.          RJN 249

1    AND THE ARGUMENT AT THE TIME, I REMEMBER QUITE

2  CLEARLY, WAS OPSYS LIMITED NOT COMING BACK, WE'RE TERMINATED,

3  IT'S TERMINATED, IT'S OVER, THERE'S NOTHING TO ENFORCE.  IT'S

4  JUST A COLLECTION OF WHERE TO -- WE GET DAMAGES, EITHER

5  CONSEQUENTIAL, OR COMPENSATORY, OR SOMETHING ELSE, LIQUIDATED

6  OR WHATEVER IT WAS.

7    **THE COURT:**  IS IT THAT OR IS IT A THEORY OF DAMAGES TO

8  WHICH YOU MAY BE ENTITLED AS A RESULT OF THE BREACH?

9    **MR. LICHTERMAN:**  NO, YOUR HONOR.  I THINK, THE CIVIL

10  CODE IS QUITE CLEAR ON THIS, THERE ARE TWO SEPARATE WAYS OF

11  DEALING WITH BREACHES OF A LEASE AGREEMENT.

12    ONE, IS ENFORCEMENT WHERE YOU GOT TO WAIT EACH MONTH

13  FOR YOUR RENT, THEN A SUBSEQUENT BREACH.

14    THE OTHER IS TERMINATION.

15    I DON'T THINK THERE'S EVEN ANY ROOM FOR DISCUSSION,

16  IT'S IN BLACK AND WHITE IN THE CIVIL CODE.  WE ARGUED ABOUT IT

17  AND THE PLAINTIFFS TOOK THE POSITION THIS IS TERMINATION AND

18  THEY WERE ADAMANT, AND WE SAID, NO, IT'S NOT.

19    **MR. BUNZEL:**  YOUR HONOR, ON THAT POINT, 1951.2 AND THE

20  ISSUE OF TERMINATION OF THE LEASE WAS USED AS THE APPROPRIATE

21  DAMAGE MODEL IN THE CASE, BECAUSE THE DEFENDANTS HAD ABANDONED

22  THE LEASE AND TERMINATED IT PURSUANT TO THE LANGUAGE OF 1951.2.

23  IT SAYS, THAT ABANDONMENT EQUALS TERMINATION.    **RJN 250**

24    THERE WAS NEVER AN ARGUMENT MADE BY THIS PLAINTIFF

25  THAT THE TERMINATION OF THE LEASE WAS NOT AN ENFORCEMENT OF THE

1    LEASE AS TO DAMAGES, RATHER IF YOU LOOK AT THE CLEAR LANGUAGE

2    OF THE DAMAGE PROVISION IN THE LEASE AND ATTORNEYS' FEES GOES

3    TO ENFORCING THE TERMS OF THE LEASE.

4         IF YOU LOOK AT SECTION 13.2(A) AFTER DISCUSSION --

5    DISCUSSING TERMINATING LESSEES RIGHT TO POSSESSION, THE LEASE

6    PROVIDES THAT UNDER -- AFTER THAT THE LESSOR MAY RECOVER UNPAID

7    RENT THROUGH THE TERM OF THE LEASE THAT WAS TERMINATED.

8         THAT'S WHAT THE LEASE SAYS, THAT'S ALSO WHAT 1951.2

9    SAYS.  WITH ALL RESPECT TO COUNSEL AND THE SEMANTICS HERE, IT'S

10   DIFFICULT TO FATHOM THAT IN THE COMMERCIAL STANDARD LEASE

11   CONTRACT THAT'S IN PLACE FOR TENS, IF NOT HUNDREDS OF THOUSANDS

12   OF BUILDINGS IN THIS JURISDICTION, THAT UPON A TERMINATED LEASE

13   UNDER THE CIVIL CODE THE PLAINTIFF CAN'T SEEK DAMAGES FOR

14   COLLECTING DEFAULTED RENT.

15        IT COMES CLOSE TO A RULE 11 QUESTION IN MY MIND, TO

16   MAKE THE ARGUMENT.

17        **MR. LICHTERMAN:**  SINCE I'M BEING ACCUSED OF A RULE 11

18   VIOLATION I WOULD LIKE TO RESPOND.

19        **THE COURT:**  ARE YOU GOING FOR BROKE THEN?

20        **MR. LICHTERMAN:**  I JUST DON'T CONSIDER THE STATUTES,

21   THE CIVIL CODE TO BE SEMANTICS.  I CONSIDER IT TO BE LAW.  AND

22   THE LEGISLATURE HAS TWO SEPARATE PROVISIONS DEALING WITH TWO

23   SEPARATE WAYS OF DEALING WITH DAMAGES.          RJN 251

24        ONE BASED ON ENFORCEMENT, ONE BASED ON TERMINATION.

25   THAT IS INTENTIONAL, THAT IS DELIBERATE, THAT IS SUBSTANTIVE

1    AND MEANINGFUL.

2         AND THEN WE GO LOOK AT A STANDARD COMMERCIAL LEASE,

3    AND I DON'T CARE HOW MANY OTHER LEASES THERE ARE THAT HAVE THIS

4    TERM, WE HAVE A DUTY AS OFFICER OF THE COURT AND AS A LEGAL

5    ISSUE TO ANALYZE THE TERMS OF THE CONTRACT, NOT WHAT 10,000

6    OTHER LEASES MIGHT MEAN AS STANDARD LEASES.  AND THESE TERMS

7    TALK ABOUT ENFORCEMENT, DOESN'T TALK ABOUT DAMAGES UNDER A

8    TERMINATION THEORY.

9         NOW, I CONCEDE THERE ARE DIFFERENCES, OKAY, AND

10   PLAINTIFF MAY NOT HAVE THOUGHT OF THIS OR REALIZED IT, MAYBE NO

11   ONE ANALYZED IT.  MAY BE IT'S NEVER BEEN LITIGATED, I DON'T

12   KNOW, BUT THE LAW IS WHAT THE LAW IS.

13        I'M NOT HERE MAKING SOME FLIMFLAM THEORY, I'M TALKING

14   ABOUT WHAT THE LEGISLATURE DECIDED.  THEY DECIDED TO SEPARATE

15   THEM OUT, THEY DECIDED TO TREAT THEM DIFFERENTLY AND WORDS AND

16   INTEGRATED CONTRACT HAVE MEANING RIGHT HERE ON THIS PAPER, THEY

17   DON'T HAVE MEANING BASED ON 10,000 OTHER LEASES.

18        NOW, I'M NOT SAYING YOU'RE NOT ENTITLED TO DAMAGES,

19   SURE YOU ARE, SURE YOU'RE ENTITLED TO DAMAGES, THAT'S WHAT THE

20   LEASE SAYS.

21        I'M SAYING, WHAT IS THE MEANING OF THE ATTORNEYS' FEES

22   PROVISION IN LIGHT OF THE STATUTORY AUTHORITY THAT WE IN THIS

23   COURTROOM FOUGHT ABOUT?                    **RJN 252**

24        THE COURT:  ARE YOU SAYING THAT THE STATUTORY

25   AUTHORITY AGGREGATES ANY PROVISION IN THE LEASE REGARDING

1    ATTORNEYS' FEES?

2            MR. LICHTERMAN:  NO.  I'M SAYING THE STATUTES PROVIDE

3    HOW YOU COLLECT DAMAGES AND WHAT NEEDS TO BE IN YOUR LEASE TO

4    COLLECT DAMAGES.

5            AND YOU GOT TO PICK HERE, IT'S 1951.2 OR 1951.4.  ARE

6    YOU ENFORCING THIS CONTRACT WHICH HAS CONSEQUENCES FOR HOW YOU

7    COLLECT DAMAGES OR ARE YOU TERMINATING IT, WHICH HAS

8    CONSEQUENCES FOR HOW YOU COLLECT DAMAGES?

9            I THINK, THAT IS A MUCH TOO RESTRICTIVE VIEW OF

10   ENFORCING AS OPPOSED TO TERMINATING.  THE REST OF THIS, JUST

11   LOOKING AT THIS, THE REST OF THE LANGUAGE IN THIS PARTICULAR

12   SECTION OF THE LEASE SAYS THE TERM PREVAILING PARTY SHALL

13   INCLUDE, WITHOUT LIMITATION, A PARTY OR BROKER WHO

14   SUBSTANTIALLY OBTAINS OR DEFEATS THE RELIEF SOUGHT AS THE CASE

15   MAY BE, WHETHER BY COMPROMISE, SETTLEMENT, JUDGEMENT OR THE

16   ABANDONMENT BY THE OTHER PARTY OR BROKER OF ITS CLAIM OR

17   DEFENSE.

18           AND BUT THE WHOLE NOTION THAT SOMEHOW YOU'RE NOT, WHEN

19   YOU'RE LOOKING IN 1951.2 YOU'RE NOT ENFORCING THE LEASE JUST

20   BECAUSE OF THE NICETY OF THE LANGUAGE THE LEASE TERMINATING,

21   WHEN THAT WHOLE SECTION TALKS ABOUT IF THERE IS A BREACH OF THE

22   LEASE THEN YOU ARE ATTEMPTING TO -- YOU ARE ATTEMPTING TO

23   ENFORCE OR DECLARE RIGHTS THEREUNDER AND YOUR ATTEMPTING TO

24   RECOVER UNDER THAT, YOU KNOW, UNDER THAT LEASE AS WELL AS THE

25   STATUTE.                                      **RJN 253**

1        I MEAN, THE STATUTE IS TALKING ABOUT WHEN THERE IS A

2   LEASE, BUT THIS IS WHAT MAY HAPPEN IF, IN FACT, IT'S BECAUSE OF

3   THE BREACH OF THE LEASE, A BREACH OF THE LEASE.

4        **MR. LICHTERMAN:**  SURE.

5        **THE COURT:**  THE LEASE TERMINATES.

6        **MR. LICHTERMAN:**  I DON'T THINK WE CAN SEPARATE,

7   ISOLATE ONE ASPECT OF THE STATUTE.  THERE ARE TWO ASPECTS OF

8   THE STATUTE AND VERY DIFFERENT METHODOLOGY FOR CALCULATING

9   DAMAGES UNDER EACH.

10        THE ONE SAYS YOU GOT TO WAIT FOR EACH SUBSEQUENT

11  BREACH AND THAT'S AN ENFORCEMENT.  YOU'RE SAYING I'M HOLDING

12  YOU TO IT, IF YOU PAY YOU'RE NOT IN BREACH.

13        THE OTHER SAYS I'M NOT ENFORCING THIS LEASE, I'M

14  TERMINATING IT, I'M TERMINATING IT, I'M COLLECTING EVERYTHING

15  YOU WOULD HAVE OWED FOREVER.  THAT'S A SUBSTANTIVE DIFFERENCE

16  IN THE STATUTE IN TWO SEPARATE PARTS AND I DON'T THINK WE CAN

17  CONFLICT THE TWO.

18        I THINK, THAT'S PROBLEMATIC.  I THINK, THERE'S

19  ACTUALLY EVEN MORE FUNDAMENTAL PROBLEM.

20        IF YOU CHOOSE TO TERMINATE A LEASE, HOW ARE YOU STILL

21  ENTITLED TO ENFORCE THE ATTORNEYS' FEES PROVISION OF THAT

22  LEASE?                                        **RJN 254**

23        BUT I WON'T EVEN GET TO THAT.  I THINK, THE

24  LEGISLATURE MADE IT CLEAR, THERE ARE TWO SEPARATE WAYS OF

25  DEALING WITH THIS.  AND WE STOOD UP HERE AND ARGUED VIGOROUSLY

1  THAT, WE SAID THE ENFORCEMENT PROVISION APPLIES.

2       THE COURT: COULD YOU, IN FACT, BRING AN ACTION

3  SEEKING DAMAGES ALA 1951.2 IF THERE WAS NO LEASE AT ALL?

4       MR. LICHTERMAN: I DON'T THINK THAT'S THE ISSUE.

5       THE COURT: ANSWER MY QUESTION.

6       MR. LICHTERMAN: SEEKING LEASE DAMAGES?

7       THE COURT: COULD YOU BRING AN ACTION FOR DAMAGES

8  USING METHOD UNDER 1951.2 WITHOUT THERE BEING A LEASE?

9       MR. LICHTERMAN: WITHOUT THERE BEING A LEASE?

10      THE COURT: IF THERE WERE NO LEASE AT ALL.

11      MR. LICHTERMAN: I THINK, YOU COULD NOT BRING AN

12  ACTION FOR DAMAGES UNDER ANY PROVISION OF 1951, WHETHER IT BE

13  .2 OR .4 WITHOUT A LEASE.

14      THE ISSUE IS, WHAT ARE YOU CLAIMING IS THE DAMAGE

15  YOU'RE ENTITLED TO?

16      IS IT ENFORCEMENT OR IS IT TERMINATION?

17      ONCE YOU PICK ONE OF THOSE YOU THEN CAN LOOK TO THE

18  CONTRACT AND SEE WHAT IT SAYS ABOUT ENFORCEMENT OR TERMINATION.

19      NOW, THIS ATTORNEYS' FEES PROVISION SAYS A LOT OF

20  THINGS, DOESN'T SAY TERMINATION. JUST COULDN'T SAY IT. WE

21  HAVE AN ARGUMENT HERE ABOUT ENFORCEMENT VERSUS TERMINATION.

22  THAT WASN'T AN ACCIDENT.                    RJN 255

23      THE COURT: THAT HAD DO WITH THE MEASURE OF DAMAGES.

24      MR. LICHTERMAN: HAD A LOT MORE TO DO WITH THAT. HAD

25  TO DO WITH WHAT THE CONTRACT SAYS ABOUT THE CONSEQUENCES THAT

1  FLOWED FROM A CHOICE A PLAINTIFF MAKES.

2         THE LEGAL CONSEQUENCES WHEN YOU READ JUST THIS

3  PROVISION ON ITS FACE, PLANE LANGUAGE AND YOU READ THE WAY THE

4  LEGISLATIVE DELIBERATELY DEVISED A DAMAGES STATUTE.  I DON'T

5  THINK YOU CAN IGNORE THAT.

6         I DON'T THINK YOU CAN SAY, WE'LL LOOK AT 1951.2 AND

7  NOT READ IT NARROWLY.  IF WE DON'T READ IT NARROWLY WHY DO WE

8  HAVE 1951.4?

9         SHOULD WE PUT AN X THROUGH IT?

10        I DON'T THINK SO.  I THINK, THE LEGISLATURE, I DON'T

11  EVEN HAVE TO THINK IT'S RIGHT THERE, THE LEGISLATURE MADE A

12  CONSCIOUS DECISION THAT THE TWO DIFFERENT THINGS A PLAINTIFF IN

13  A LEASE SITUATION CAN DO.

14        AND WE FORCED AN ELECTION ON PLAINTIFF.  WE SAID, TELL

15  US WHICH ONE IT IS BECAUSE WE THINK IT'S THIS ONE.  THEY SAID

16  NO WAY, NO WAY, IT'S NOT THAT ONE.  AND NOW THEY WANT TO SAY,

17  WELL, BUT IT DOESN'T MATTER THAT WE MADE THAT CHOICE, THERE'S

18  NO LEGAL CONSEQUENCE TO THAT CHOICE.

19        THERE IS A LEGAL CONSEQUENCE, THERE'S A LEGAL

20  CONSEQUENCE FOR DAMAGE.  THERE'S A LEGAL CONSEQUENCE FOR

21  CONTRACT INTERPRETATION.                          RJN 256

22        I DON'T THINK A DEFENDANT WHO HAD, YOU KNOW, DIDN'T

23  DRAFT THIS CONTRACT, HAD GIVEN TO HIM BY A BROKER REPRESENTING

24  PLAINTIFF, SHOULD BEAR THE PRICE OF PLAINTIFF'S ELECTION, AND

25  PARTICULARLY WHEN THE ISSUE WAS RAISED AND LITIGATED.

1    THE COURT:  MR. BUNZEL, IS THERE ANYTHING YOU WANT TO

2  SAY ON THIS ONE?

3    MR. BUNZEL:  THE ANSWER TO THE QUESTION YOU RAISED

4  WAS, NO, THE BREACH OF CONTRACT CLAIM FOR BREACH OF THE LEASE

5  COULD NOT HAVE BEEN BROUGHT IN THE ABSENCE OF A LEASE.

6    AND THIS WHOLE DISCUSSION IS ANSWERED AGAIN BY SECTION

7  13.2(A) OF THE CONTRACT, WHICH INCORPORATES SECTION 1951.2 AND

8  SAYS, THAT AFTER TERMINATION THE PLAINTIFF CAN OBTAIN THESE

9  DAMAGES.

10    THERE'S NOTHING INCONSISTENT WITH TERMINATING THE

11  LEASE AND SEEKING TO ENFORCE THE DAMAGE PROVISIONS OF THE

12  LEASE.  IT'S CONTEMPLATED BY THE LEASE AND IT'S HORNBOOK LAW

13  THAT A PLAINTIFF CAN TERMINATE THE LEASE AND SEEK DAMAGES FOR

14  BREACH OF LEASE.

15    MR. LICHTERMAN:  I DON'T DISAGREE WITH THAT.  I'M

16  SAYING THE LEGISLATURE HAS CALCULATED TWO DIFFERENT CHOICES FOR

17  DAMAGES, ONCE YOU MAKE ONE THERE'S A CONSEQUENCE TO THAT

18  CHOICE.

19    MR. BUNZEL:  NOTHING IN THE SUIT ABOUT ATTORNEY'S

20  FEES.                                    RJN 257

21    THE COURT:  I DON'T KNOW HOW YOU EXPLAIN THEN

22  SUBPARAGRAPH C, THE LESSOR MAY RECOVER DAMAGES UNDER PARAGRAPH

23  3 OF THE SUBDIVISION OR OF SUBDIVISION A WHICH, OF COURSE, IS

24  NONE OF THE SECTIONS THAT WERE BEING USED FOR DAMAGES, IT --

25  ONLY IF THE LEASE PROVIDES -- I MEAN, REFERENCES BACK TO THE

1    LEASE CONSTANTLY.

2          MR. LICHTERMAN:  BUT SO DOES 1951.4.  THERE IS A CLEAR

3    DIFFERENCE BETWEEN THOSE STATUTES.

4          THE COURT:  THERE MAYBE A DIFFERENCE, BUT I DON'T

5    THINK THE DIFFERENCE ESSENTIALLY VISCERATES AN ATTORNEY CLAUSE

6    PROVISION.

7          MR. LICHTERMAN:  I'M NOT SAYING THAT, YOUR HONOR.  I'M

8    SAYING, THE CONSEQUENCE OF ELECTING ONE REMEDY OVER ANOTHER --

9          THE COURT:  I HEARD WHAT YOU SAID.

10          MR. LICHTERMAN:  RIGHT.  I DEFINITELY WANT TO MAKE IT

11    CLEAR, I'M NOT CLAIMING VISCERATES THE ATTORNEY FEES PROVISION.

12          THE COURT:  YOUR THEORY IS IF IT MAKES THE ELECTION

13    THEN IT DOES, BUT I DON'T THINK THAT'S PERSUASIVE.

14          NOW, WITH RESPECT -- ON THE OTHER HAND, AS I

15    UNDERSTAND, PLAINTIFFS ARE TRYING TO GET SOME BENEFIT FROM THE

16    ASSIGNMENT AGREEMENT WITH RESPECT TO COST AND EXPENSE, RIGHT?

17          MR. BUNZEL:  YES, YOUR HONOR.

18          THE COURT:  BUT NEVER BECAME EFFECTIVE.  SO IT'S

19    NONEXISTENT.

20          MR. BUNZEL:  IT WAS LITIGATED, YOUR HONOR, AS TO ITS

21    --

22          THE COURT:  IT WAS LITIGATED?

RJN 258

23          MR. BUNZEL:  RIGHT.

24          THE COURT:  BUT THE ASSIGNMENT NEVER BECAME EFFECTIVE.

25          MR. BUNZEL:  YOUR HONOR, IT WAS A CONTRACT BETWEEN THE

1   PARTIES WHICH HAD RIGHTS AND OBLIGATIONS AND --

2       THE COURT:  IT NEVER BECAME A QUOTE "CONTRACT".

3       MR. BUNZEL:  NEVER BECAME EFFECTIVE PURSUANT TO THE

4   TERMS OF THE CONTRACT, BUT IT WAS EXECUTED BY THE PARTIES AND

5   THE PARTIES SUED TO INTERPRET THE ASSIGNMENT.

6       IT WAS THE CORNERSTONE OF THE AFFIRMATIVE DEFENSE OF

7   THE DEFENDANTS IN THE CASE AND IT WAS --

8       THE COURT:  IT -- AND IT WAS AN AFFIRMATIVE DEFENSE.

9   WE GOT THIS ASSIGNMENT, ET CETERA, THEY LOST ON THAT.

10      BUT THEY DID NOT BRING AN ACTION ON THE ASSIGNMENT AND

11  IF THEY HAD BROUGHT AN ACTION ON THE ASSIGNMENT AND THEN YOU

12  RESPONDED TO THAT, YOU REBUTTED IT AND THEN YOU WON, THEN MAYBE

13  YOU HAVE SOME GROUNDS FOR SAYING WE'RE ENTITLED TO ATTORNEYS'

14  FEES.

15      BECAUSE THE ASSIGNMENT PROVIDES FOR ATTORNEYS' FEES

16  AND THEY BROUGHT AN ACTION ON IT, THEY LOST, YOU MIGHT BE ABLE

17  TO SAY YOUR ENTITLED TO ATTORNEYS' FEES.  BUT THEY ASSERTED AS

18  AN AFFIRMATIVE DEFENSE AND I THINK THAT'S REALLY -- REALLY

19  FOLLOWS CALIFORNIA LAW.

20      MR. BUNZEL:  PRIOR TO OR --

21      THE COURT:  ISN'T THAT GIL MANSANO?

                                        **RJN 259**

22      MR. LICHTERMAN:  ABSOLUTELY.

23      MR. BUNZEL:  IN THE GIL CASE THE PRIMARY CLAIM WHICH

24  LEAD TO THE DECISION THE ATTORNEYS FEES NOT BE AWARDED WAS A

25  TORT CLAIM, NOT A BREACH OF CONTRACT CLAIM.  THIS WAS A

1   CONTRACT CASE AND --

2        THE COURT:  BUT IT EXPLICITLY SAID THAT ASSERTING A

3   DEFENSE DOES NOT CONSTITUTE BRINGING OF AN ACTION.

4        MR. LICHTERMAN:  ACTUALLY, YOUR HONOR, DEFENSE BASED

5   ON A CONTRACT, WHICH IS EXACTLY WHAT WE HAVE HERE, A DEFENSE OF

6   RELEASE BASED ON A CONTRACT WHICH IS ON ALL FOURS HERE.  IT'S

7   WHAT AN OVATION IS.

8        MR. BUNZEL:  TWO POINTS.  FIRST, THE SECOND AMENDED

9   COMPLAINT AT PARAGRAPH 17 THROUGH 20 AND PARAGRAPH 22 OUR

10  PLEADING INITIATED LITIGATION OVER THE EFFECTIVENESS OF THE

11  ASSIGNMENT.  SO THAT THE PLAINTIFF INTRODUCED THE LITIGATION OF

12  THE ASSIGNMENT.

13       IT'S PART OF OUR CASE EVEN THOUGH IT WAS THEIR

14  AFFIRMATIVE DEFENSE.  WE INITIATED LITIGATION WITH RESPECT TO

15  THE EFFECTIVENESS OF THAT ASSIGNMENT.  IT'S THEN SET FORTH AS

16  AN AFFIRMATIVE DEFENSE AND WAS LITIGATED.

17       THE COURT:  WAS YOUR THEORY THE ASSIGNMENT WAS NOT IN

18  EFFECT, RIGHT?

19       MR. BUNZEL:  CORRECT.  WE HAD TO LITIGATE THAT AND IF

20  IT HAD BEEN EFFECTIVE, THEN ACCORDING TO CALIFORNIA LAW UNDER

21  THAT PROVISION FOR ATTORNEYS' FEES THE DEFENSE WOULD HAVE

22  RECEIVED ATTORNEYS' FEES FOR DEFEATING OUR CONTRACT AND COULD

23  RELY UPON THE ASSIGNMENT.                    RJN 260

24       AND CALIFORNIA LAW AS WE BRIEFED IT THE SHU CASE,

25  S-H-U, AT 9 CAL 4TH PAGE 873 THROUGH 871, MAKES THAT RIGHT TO

1    ATTORNEYS' FEES UNILATERAL.

2         IT'S ONLY FAIR IF THEY'RE GOING TO BRING IN A CONTRACT

3    IN THE CASE IN DEFENSE OF OUR CONTRACT CASE, WE'RE ENTITLED TO

4    IF WE PREVAIL UNDER THAT CONTRACT OF OBTAINING ATTORNEYS' FEES

5    THEY OTHERWISE WOULD GET IF THEY HAD PREVAILED, OTHERWISE IT

6    WOULD BE A ONE-DAY ATTORNEY FEES PROVISION IN VIOLATION OF

7    1717.

8         THE COURT:  YOU DON'T THINK IT MAKES ANY DIFFERENCE

9    AFFIRMATIVE DEFENSE THEY'RE NOT SUING ON?

10        MR. BUNZEL:  I THINK, IF YOU LOOK AT THE LANGUAGE OF

11   THE CONTRACT, THAT IS THE ASSIGNMENT ITSELF, IT PROVIDES THAT

12   IF ANY PARTY SUES TO INTERPRET THE ASSIGNMENT, DOESN'T SAY TO

13   ENFORCE, OR ENFORCE, INTERPRET OR ENFORCE THE ASSIGNMENT, THAT

14   ATTORNEYS' FEES ARE AWARDABLE TO THE PREVAILING PARTY.

15        THIS CASE INTERPRETED THAT ASSIGNMENT.  THAT

16   ASSIGNMENT WAS EXECUTED BY BOTH PARTIES.  IT DID NOT BECOME

17   EFFECTIVE BECAUSE THE CONDITIONS SUBSEQUENT OR PRECEDENT TO ITS

18   EFFECTIVENESS DID NOT MATURE.

19        BUT IT CLEARLY PROVIDED FOR ATTORNEYS' FEES FOR ITS

20   INTERPRETATION AND WE HAD TO GET OUT OF THE EFFECTIVENESS OF

21   THAT ASSIGNMENT PROTRACTED LITIGATION AND ENTITLED TO THE COST

22   PROVISIONS THEREUNDER.                           RJN 261

23        MR. LICHTERMAN:  I WOULD INVITE THE COURT TO LOOK AT

24   THE SECOND AMENDED COMPLAINT.  THERE IS ONE CAUSE OF ACTION ON

25   ONE CONTRACT, CLAIMING BREACH OF ONE CONTRACT DEALING WITH THE

1   TERMS OF ONE CONTRACT, THERE'S NOT EVEN A MENTION OF TERMS OF

2   THE OTHER CONTRACT EXCEPT TO SAY THAT IT NEVER BECAME

3   EFFECTIVE.  THAT'S IT.

4           MR. BUNZEL:  AGAIN, THAT'S NOT TRUE.

5           MR. LICHTERMAN:  NO ATTEMPT TO ENFORCE THAT

6   ASSIGNMENT, CERTAINLY NO ATTEMPT TO INTERPRET.  THEY DIDN'T SAY

7   WE DISAGREE WITH WHAT THIS MEANS, THEY JUST SAID IT NEVER

8   BECAME EFFECTIVE.

9           MORE THAN THAT, FORGET WHAT THE COMPLAINT SAID, YOU

10  WERE HERE WHEN THE WITNESSES SAT UP THERE AND SAID, NO, NO, NO,

11  WE DON'T DISAGREE WITH THIS, WE DON'T THINK IT'S WRONG,

12  MISUNDERSTAND ITS MEANING, WHAT WE'RE SAYING IS THEY NEVER

13  SIGNED AMENDMENT NUMBER TWO, THAT'S WHAT THEY'RE SAYING.

14          NOW, GIL VERSUS MANSANO ADDRESSED THIS CASE ALMOST ON

15  ALL FOURS.  THE ONLY DIFFERENCE IS THAT THE INITIATING ACTION

16  WAS TAUGHT AND THE INITIATING ACTION BEING TAUGHT MEANS NOTHING

17  EXCEPT THAT THE INITIATING PLAINTIFF HAD THEY PREVAILED WOULD

18  NOT BE ENTITLED TO UNILATERAL ATTORNEYS' FEES.  OKAY.

19          THERE THE ISSUE WAS WHEN YOU ASSERT AN AFFIRMATIVE

20  DEFENSE RATHER THAN INITIATE AN ACTION, THEN YOU ARE NOT

21  ENTITLED UNDER NARROW INITIATING ACTION LANGUAGE TO CLAIM THAT

22  YOU INITIATED THE ACTION.  OKAY.                **RJN 262**

23          NOW, I DON'T KNOW WHAT MR. BUNZEL IS CLAIMING NOW WAS

24  INITIATED WITH RESPECT TO THE ASSIGNMENT, BUT THERE'S ONLY ONE

25  CAUSE OF ACTION IN THAT SECOND AMENDED COMPLAINT AND THERE'S

1    ONLY ONE CONTRACT EVER INITIATED ANY LAWSUIT ON.

2         MAYBE THAT IMPLICATED ANOTHER CONTRACT, AND YOU WILL

3    RECALL THAT THE SECOND AMENDED COMPLAINT CAME ABOUT TO DEAL

4    WITH THE SUCCESS THAT OPSYS LITIGATED IN DEFENDING PRIOR

5    COMPLAINT ON THE BASIS OF ITS AFFIRMATIVE DEFENSES.

6         AND WHAT HAPPENED THEN, AND WE MADE STRONG OBJECTIONS

7    TO THIS AT THE TIME, WAS WE SAID THE PLAINTIFF SHOULD NOT BE

8    ALLOWED TO AMEND TO PLED FACTS AROUND AN AFFIRMATIVE DEFENSE.

9         PLAINTIFF AT THAT TIME DIDN'T SAY, NO, NO, WE'RE

10   INITIATING AN ACTION ON THAT, THEY SAID, YES, WE SHOULD, WE'RE

11   JUST BRINGING CLARITY TO WHY WE PREVAIL ON OUR CONTRACT CLAIM.

12        THAT'S WHAT THIS IS ABOUT, CLARITY, THERE'S NO

13   INITIATION OF AN ACTION THERE.  WHEN AN ACTION IS INITIATED THE

14   MERE FACT IT IMPLICATES OTHER CONTRACT, IT'S DOESN'T MEAN YOU

15   INITIATED AN ACTION ON THOSE OTHER CONTRACTS.

16        **THE COURT:**  OKAY.

17        **MR. BUNZEL:**  THAT MONOLOGUE STARTED WITH A STATEMENT,

18   THE SECOND AMENDED COMPLAINT WHICH I DRAFTED WHICH DID NOT

19   ADDRESS THE ASSIGNMENT OTHER THAN PASSING.  PARAGRAPH 17 TO 22

20   DEAL WITH THE ASSIGNMENT.  THEY DEAL WITH THE TERMS OF THE

21   ASSIGNMENT, WHY IT WAS NOT EFFECTIVE AND WHY AT TRIAL WAS

22   NECESSARY FOR BREACH OF CONTRACT.                **RJN 263**

23        PARAGRAPH 22 OF THE SECOND AMENDED COMPLAINT

24   DESCRIBING THE BREACH OF CONTRACT ALLEGATIONS EXPRESSLY STATES

25   THAT THE ASSIGNMENT WAS NOT EFFECTIVE FOR THE REASONS SET FORTH

1    IN PARAGRAPH 17 THROUGH 22.

2              IT WAS CLEARLY THE PRIMARY ISSUE THAT WAS LITIGATED IN

3    THIS CASE, WAS INITIATED, THAT'S THE LANGUAGE OF THE ASSIGNMENT

4    DOCUMENT, TO CONSTRUE OR INTERPRET THE ASSIGNMENT, EITHER BY

5    THE PLAINTIFF, OR THE DEFENDANT, OR BOTH.

6              AND IT WOULD, I THINK, IT WOULD BREAK THE RULE OF

7    MUTUALITY OF ATTORNEYS' FEES HAVING -- PREVAILING UNDER THAT

8    CONTRACT NOT TO OBTAIN THE ATTORNEYS' FEES THAT THE DEFENSE

9    WOULD HAVE OBTAINED.  FAIRLY SIMPLE.

10             MR. LICHTERMAN:  GO AHEAD.  I THINK THE RULE --

11             THE COURT:  MIGHT HAVE BEEN ENTITLED THE ATTORNEYS'

12   FEES HAD THEY PREVAILED ON, YOU KNOW, AS AGAINST YOU WITH

13   RESPECT TO THE CONTRACT CLAIM.

14             MR. LICHTERMAN:  THE RULE --

15             THE COURT:  THAT WAS AN AFFIRMATIVE DEFENSE THAT WOULD

16   HAVE EATEN INTO AND, PERHAPS, ULTIMATELY DEFEATED THE CONTRACT

17   CLAIM.

18             MR. LICHTERMAN:  NO, YOUR HONOR.

19             THE COURT:  THEY COULD HAVE POSSIBLY -- THEN POSSIBLY

20   COULD HAVE PREVAILED, BUT IT WOULD HAVE BEEN BY VIRTUE OF

21   DEFEATING YOUR CONTRACT CLAIM, NOT BY VIRTUE OF AN AFFIRMATIVE

22   DEFENSE ON THE ASSIGNMENT.                      **RJN 264**

23             MR. BURNS:  CORRECT.  THE RULE OF MUTUALITY DOES NOT

24   AGGREGATE THE CONTRACT LANGUAGE.  JUST SAYS IF ONE PARTY

25   ENTITLED UNDER THE CONTRACT SO IS THE OTHER.  UNDER THIS

1   LANGUAGE INITIATED -- THIS IS GIL V. MANSANO WE DIDN'T INITIATE

2   WE'RE NOT ENTITLED, THERE'S NO MUTUALITY ISSUE.

3       THE COURT:  THINK THAT'S ENOUGH.

4       MR. BUNZEL:  THIS RELATES TO THE COST ISSUE --

5       THE COURT:  I KNOW.

6       MR. BUNZEL:  -- PLEADING.

7       THE COURT:  MUCH ADO ABOUT COST?

8       YOU'RE READING THE ATTORNEYS' FEES PROVISION IN THE

9   LEASE AS NOT COVERING COSTS; IS THAT CORRECT?

10      THE COURT:  THAT'S CORRECT.  THAT SAYS ATTORNEYS' FEES

11  ONLY IN THAT LATTER PART.  IT WHERE IT SAYS IN ADDITION LESSOR

12  SHALL BE ENTITLED TO ATTORNEY FEES, THAT'S VERY EXPLICIT WHAT

13  THAT INVOLVES --

14      MR. LICHTERMAN:  I THINK, IT GOES BEYOND COST, IT GOES

15  TO ENFORCEMENT.  THAT'S RIGHT OUT OF PLAINTIFF'S OWN PLEADINGS.

16  THEY ADMIT THE ASSIGNMENT IF THAT PROVISION APPLIED AND IT

17  DOESN'T -- WOULD ALLOW COSTS TO ENFORCE A JUDGMENT.

18      THE COURT:  I'M NOT SURE HOW YOU CAN ENFORCE AN

19  AGREEMENT.  ESSENTIALLY WAS WHAT THE ASSIGNMENT WAS SUPPOSE TO

20  BE WAS AN AGREEMENT THAT NEVER WENT INTO EFFECT ALSO.  I THINK,

21  THAT'S A STRETCH.

22      MR. BUNZEL:  YOU CAN HAVE TO DECLARATORY RELIEF OR

23  RELATED LITIGATION.  HERE WE LITIGATED WHETHER THE ASSIGNMENT

24  WAS EFFECTIVE.                                    RJN 265

25      FOR A LONG TIME IT WAS INTEGRAL PART OF THE CONTRACT

1    CLAIM AND PARTIES CAN LITIGATE THAT WITH AN ATTORNEY'S FEES

2    CLAUSE AND BE LIABLE FOR ATTORNEYS' FEES, EVEN THOUGH THE

3    CONCLUSION OF THE TRIER OF FACT IS THAT THE CONTRACT WAS NOT

4    EFFECTIVE.

5            IF THAT'S WHERE THE COURT IS RESTING ITS THINKING, I

6    DON'T BELIEVE THAT'S AN ACCURATE READING OF CALIFORNIA LAW.

7    FOR THE REASONS THIS RELATED CASE SAY --

8            **THE COURT:**  THAT'S ALL STUFF WE CAN TAKE UP.

9            **MR. LICHTERMAN:**  THAT'S KIND OF MY POINT, THERE IS NO

10   DECK RELIEF CLAIM, THERE NEVER WAS.  AT THE RISK OF HUMORING

11   THE COURT AND MR. BURNS, THAT'S AN EQUITABLE CLAIM AND WOULD

12   HAVE RESTORED OUR EQUITABLE DEFENSES.

13           **THE COURT:**  YOU KEEP TRYING.  LET'S TALK

14   APPORTIONMENT.

15           **MR. LICHTERMAN:**  IF AT FIRST YOU DON'T SUCCEED.

16           **THE COURT:**  LET'S TALK APPORTIONMENT.

17           FIRST OF ALL, LET ME GET RIGHT OFF THE TOP, NOT SPEND

18   A LOT OF TIME ON THIS.

19           YOU KNOW, I FEEL SORRY FOR MR. CHIU IN THAT HE HAD AN

20   ATTORNEY WHO DRAFTED A SHODDY COMPLAIN AND TOOK AWHILE TO GET

21   THROUGH THE VARIOUS AND SUNDRY MOTIONS, BUT NONETHELESS

22   DEFENDANTS EVEN THOUGH THEY DO NOT PREVAIL AND MR. CHIU DID OR

23   PLAINTIFF PREVAILED SHOULD NOT HAVE TO PAY FOR THE FIRST

24   ATTORNEY AND HIS SLOPPY WORK.                    **RJN 266**

25           SO THEN MY QUESTION WAS WITH REGARD TO WHAT WAS IT?

1    BUT CERTAINLY WITH NEW COUNSEL COMING IN HAVING TO DRAFT AN

2    AMENDED COMPLAINT AND I WOULD TREAT THAT AS IF THERE WAS NO

3    PRIOR COMPLAINT.

4        ESSENTIALLY DRAFTED UP A NEW COMPLAINT, WHATEVER

5    EXPENSES OR RATHER ATTORNEYS' FEES WERE ENCOUNTERED IN DOING

6    THAT OR INCURRED IN DOING THAT YOU'RE ENTITLED TO, AND THE

7    QUESTION IS HOW MUCH CAN YOU PARSE OUT OF THIS?

8        I GUESS, APPROXIMATELY $71,000.

9        HOW MUCH OF THAT WOULD BE ATTRIBUTED TO CLEANING UP

10   THE WORK THAT HAD BEEN DONE BEFORE AS OPPOSED TO DELVING INTO

11   THE CASE?

12       IT'S A NEW CASE AND LEARNING WHAT YOU HAD TO LEARN

13   ABOUT IT AS YOU WOULD DO IN ANY CASE AND THEN DRAFTED THE --

14   DRAFTING THE AMENDED COMPLAINT, CAN YOU DO THAT?

15       MR. BUNZEL:  YES.  I CAN ANSWER THAT EASILY.  THE WORK

16   OF PRIOR COUNSEL SERVED NO PURPOSE, BENEFIT OR TOUCHSTONE IN

17   OUR HOUSE SINCE WE STARTED OVER AGAIN.

18       THE COURT:  DID ANY OF THAT, IS ANY OF THAT $71,000,

19   DOES ANY OF THAT $171,000 REPRESENT UNDO THAT WHICH HAD BEEN

20   DONE?

21       MR. BUNZEL:  NO, IT WAS WRITING A SECOND AMENDED

22   COMPLAINT FOR BREACH OF CONTRACT AND NOT PURSUING A FRAUD

23   CLAIM.                                        RJN 267

24       THE COURT:  DO YOU HAVE ANY REASON TO QUESTION THAT?

25       MR. LICHTERMAN:  WELL, YES, YOUR HONOR, PROBABLY NOT

1    TO A LARGE EXTENT.  THE ONLY ISSUE IS -- AND THIS IS MY

2    RECOLLECTION, I'M SORRY, THIS WAS NOT PUT IN THE RECORD BEFORE

3    YOU WHEN PLAINTIFF'S COUNSEL REQUESTED LEAVE TO FILE THE SECOND

4    AMENDED COMPLAINT, THERE WERE REFERENCES MADE TO TRYING TO BE

5    CONSISTENT WITH THE COURT'S PRIOR 12(B) ORDERS AND EFFORTS TO

6    BRING A COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM THAT

7    SOUNDED VERY STRONGLY IN FRAUD.

8         I'M NOT SURE, I HAVE NO INSIGHT INTO HOW THAT WORKED

9    ON THE PLAINTIFF'S SIDE, I JUST RAISE IT FOR SOMETHING FOR THE

10   COURT TO CONSIDER.

11        **THE COURT:**  WASN'T THERE BREACH OF COVENANT AND GOOD

12   FAITH AND FAIR DEALING CLAIM OR PURPORTED ONE ANYWAY,

13   ESSENTIALLY RIDING ALONG WITH THIS?

14        I THINK, AT SOME POINT EITHER BEFORE OR AT TRIAL I

15   SUGGESTED DUMPING THIS SINCE YOUR DAMAGE MEASURE WASN'T GOING

16   TO BE ANY DIFFERENT.

17        **MR. BUNZEL:**  WE ALLEGED IN THE FIRST CAUSE OF ACTION

18   IN THE SECOND AMENDED COMPLAINT THAT ONE FORM OF BREACH OF

19   CONTRACT HERE WAS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR

20   DEALING, NOT CREATING A SEPARATE CAUSE OF ACTION, BUT ALLEGING

21   THAT WAS AN ADDITIONAL TYPE OF BREACH OF THE SAME CONTRACT, AND

22   YOUR HONOR RULED BEFORE INSTRUCTING THE JURY THAT THE JURY

23   WOULD NOT BE INSTRUCTED ON BREACH OF COVENANT OF GOOD FAITH AND

24   FAIR DEALING.                              **RJN 268**

25        **THE COURT:**  I WOULD THINK THAT, UNLESS YOU CAN

1   DEMONSTRATE OTHERWISE, I CONCLUDE THAT THAT KIND OF A CLAIM IS

2   PRETTY MUCH BOUND UP IN A CONTRACT CLAIM.

3         THE KIND OF WORK YOU WOULD PUT INTO NOT GOING TO BE

4   MUCH DIFFERENT FROM NOR IS IT GOING TO ADD TO THE WORK JUST

5   BRINGING REGULAR BREACH OF CONTRACT CLAIM.

6         MR. LICHTERMAN:  ORDINARILY I MIGHT AGREE WITH YOU.

7   IN THIS CASE, I THINK, THERE ARE SOME INTERESTING FACTS THAT

8   FORM THIS DECISION.  THE HISTORY HERE WE HAD THESE FRAUD CLAIMS

9   DISMISSED WITH PREJUDICE AND --

10        THE COURT:  THAT WAS BEFORE.

11        MR. LICHTERMAN:  CORRECT.

12        THE COURT:  THEY COME INTO THE CASE.

13        MR. LICHTERMAN:  THAT WAS BEFORE THE BARTKO FIRM CAME

14  INTO THE CASE, WHEN NEW COUNSEL CAME IN THEY PUT IN ONE OF

15  THEIR PLEADINGS, I CAN'T RECALL WHICH ONE, THEY WANT TO AMEND

16  THEIR COMPLAINT BUT CONSISTENTLY WITH THE 12(B)(6) ORDER BY THE

17  COURT.

18        IT'S PRETTY CLEAR, IN FACT, I THINK IT LEAPS OFF THE

19  PAGE WHAT THEY WERE REALLY TRYING TO DO WAS GET BACK AT A FRAUD

20  THEORY, GET DISCOVERY ON IT.  IN FACT, THEY FLAT OUT SAID IT IN

21  THE SECOND AMENDED COMPLAINT THEY WANTED SOME DISCOVERY ON IT,

22  DO SOME WORK ON THAT ISSUE.                **RJN 269**

23        YOU'RE TRYING TO AVOID THE CONTRACT, IT WAS YOU DID

24  THESE SHADY THINGS TO DEFRAUD THE LANDLORD, TO PREVENT HIM FROM

25  GETTING, YOU KNOW, TO -- MR. BUNZEL MADE A VERY IMPASSIONED

1    CLOSING ARGUMENT ON THIS, ABOUT HIGHLY MOTIVATED BUSINESSMEN

2    WHO WERE TRYING TO DUP THE LANDLORD OUT OF SOME MONIES OWED

3    HIM.

4         I THINK, WHAT WAS REALLY GOING ON HERE, I THINK

5    EVERYBODY KNEW IT, THIS WAS AN ATTEMPT TO BACKDOOR FRAUD INTO

6    THE CASE.

7         **THE COURT:**  WELL, YOU DO -- YOU THINK -- IS THERE

8    EVIDENCE THEY ACTUALLY SPENT TIME ON THAT AS TO WORKING UP HIS

9    PASSION DURING CLOSING ARGUMENT?

10        **MR. LICHTERMAN:**  THAT'S EXACTLY MY ISSUE.  A LOT OF

11   EVIDENCE THAT, THERE'S A TON OF IT, NONE OF IT IS BEING

12   PRESENTED TO THE COURT.

13        WHAT HAPPENED IS THE VERY FIRST THING FILED BY BARTKO

14   SAID WE'VE BEEN ANALYZING WHAT YOUR HONOR DID AND WE KNOW WHAT

15   YOU DID WITH THE FRAUD.

16        SO I KNOW THAT WE'RE THINKING ABOUT IT AND THEY COME

17   UP WITH A VERY CLEVER WAY TO TRY TO GET AROUND IT.  WE

18   LITIGATED THAT THROUGH THE COURSE OF DISCOVERY.  IN FACT, IN

19   MOST OF PLAINTIFF'S DISCOVERY WAS DIRECTED TO CDT AND THIS

20   WHOLE WILD FRAUD THEORY.                        RJN 270

21        THE LEASE ITSELF WAS PRETTY SIMPLE CASE BY PLAINTIFFS

22   OWN ADMISSION, AT LEAST, FOUR CONDITIONS MET, DID YOU PAY THE

23   RENT, THAT WAS IT, THAT WAS MS. HUBER'S OPENING ARGUMENT, SHE

24   STOOD UP THERE AND SAID THAT'S ALL HAVE YOU TO DECIDE.

25        THE COURT SAID THERE'S A LEASE HERE, NO DISPUTE

1  THERE'S A LEASE HERE. WE HAVE MOTIONS IN LIMINE ON IT.  RIGHT

2  UP UNTIL THE EAVE OF TRIAL WE HAD EXPECTED CDT WITNESSES TO

3  HAVE TO COME INTO COURT AND EXPLAIN THIS TRANSACTION.

4      WE HAVE TWO DAYS OF MOTIONS IN LIMINE ON THAT AND, I

5  THINK, THAT WAS ALL CLEARLY DIRECTED AT FRAUD.  AND PLAINTIFF'S

6  IN MOTIONS IN LIMINE SAID, WELL, WE CAN KIND OF FIT IT IN UNDER

7  THIS 12.1(A) THEORY.

8      AND THE COURT SAID, WELL, WAIT A MINUTE, THAT SAYS YOU

9  GOT TO HAVE 25 PERCENT STOCK TRANSFERRED, WE KNOW HE HAD OR

10  ONLY 16 PERCENT, AND EVENTUALLY, LITERALLY THE NIGHT BEFORE

11  TRIAL PLAINTIFF ABANDONED THIS WHOLE CDT THEORY CLINGING STILL

12  ONTO ITS COVENANT OF GOOD FAITH ARGUMENT, WHICH HAD BEEN MADE

13  EVEN AFTER THE COURT'S RULING.

14      SO, I THINK, WE ALL KNOW WHAT WAS REALLY GOING ON

15  THERE AND, I THINK, THIS CUTS TO THE HEART OF THE APPORTIONMENT

16  BECAUSE MOST OF THAT DISCOVERY WAS NOT DIRECT TO THE LEASE, WAS

17  NOT DIRECTED AT -- OPSYS LITIGATED IT, WHAT DIRECTED FINDING

18  OUT ABOUT CDT AND WE SEE THAT IN THE RULE 25 MOTION.

19      WE SEE THAT IN THE EXPERT WITNESS WHO WAS HIRED TO

20  DEAL WITH CDT, EVEN THOUGH CDT WASN'T A PARTY.  TRANSACTIONS

21  ABOUT FRAUD AND THE EXPERT WITNESS AND HOW IT SAYS IN A

22  DECLARATION IT'S A FRAUD.                    **RJN 271**

23      SO WE KNOW WHAT WAS GOING ON.  I DON'T THINK WE SHOULD

24  OVERLOOK THAT.  THAT'S THE REASON COSTS WERE SO HIGH IN THIS

25  CASE.

1          **MR. BUNZEL:** YOUR HONOR, THIS IS EXPLAINED IN

2     MR. AINSLIE'S DECLARATION, AND THE COURT MIGHT RECALL THAT WE

3     DID SPEND TIME IN DISCOVERY IN THIS CASE AND PRETRIAL WITH

4     RESPECT TO WHETHER THE PLAINTIFF WOULD SEEK AN ADDITIONAL 10

5     PERCENT UNDER THE CONTRACT FOR UNCONSENTED ASSIGNMENT, THAT IS

6     THE TRANSFER OF CONTROL OF **OPSYS** LIMITED TO CDT.

7          IT'S A COMPLICATED QUESTION, THE CONTRACT DOES NOT

8     LIMIT THE CIRCUMSTANCES WHICH THAT COULD OCCUR TO 25 PERCENT.

9     WE HAD A CONTRACT, THAT TRANSACTION AGREEMENT FOR WHICH WE'LL

10    TALK ABOUT WITH MR. ERICSON IN A LITTLE BIT, IN WHICH ALL

11    CONTROL WAS CEDED TO CDT.

12          I MADE A DECISION AS A TRIAL LAWYER LISTENING TO YOUR

13    HONOR'S REACTION TO THE COMPLEXITY OF THIS CLAIM, THAT IT WAS

14    NOT IN A SINGLE CAUSE OF ACTION, BREACH OF CONTRACT CASE

15    NECESSARY FOR THE PLAINTIFF TO PURSUE THE CDT CONTRACT BREACH

16    ISSUE 12.1 OF THE LEASE TO THE JURY.

17          BUT THE LAW IS THAT WE'RE ENTITLED TO PARE THAT DOWN.

18    THERE'S NO AUTHORITY THAT'S BEEN CITED BY THE DEFENDANT THAT IN

19    A SINGLE CAUSE OF ACTION BREACH OF CONTRACT CLAIM, THAT IF AN

20    ELEMENT ONE TYPE OF BREACH IS NOT PURSUED TO THE JURY THAT

21    SOMEHOW THAT SHOULD BE APPORTIONED OUT.

22          THAT WOULD PENALIZE THE PLAINTIFF AND, INDEED, CAUSE

23    ALL PLAINTIFFS TO GIVE EVERYTHING TO THE JURY, OTHERWISE THEY

24    MIGHT LOSE THEIR ATTORNEYS' FEES.          **RJN 272**

25          WE MADE A DECISION WITHIN A SINGLE CAUSE OF ACTION

1    COMPLAINT TO PARE OUT 10 PERCENT OF THE POTENTIAL DAMAGES FOR

2    EFFICIENCY REASONS, AS I THINK A LOT OF TRIAL LAWYERS WOULD DO

3    AND THAT'S WHY WE DID IT.

4         THERE'S ABSOLUTELY NO AUTHORITY THAT WOULD ALLOW THE

5    COURT TO APPORTION ATTORNEYS' FEES AND SAY, YOU KNOW, YOU

6    RECOVER DAMAGE UNDER SECTION 13.2 BUT NOT UNDER 12.1 AND,

7    THEREFORE, YOU ARE SINGLE CAUSE OF ACTION.

8         BREACH OF CONTRACT CLAIM NEEDS TO BE APPORTIONED, I

9    THINK, THE LAW IS VERY MUCH TO THE CONTRARY.  WE HAVE IN THE

10   MATERIALS THAT WE PRESENTED TO YOU APPORTIONED OUT ALL OF THE

11   TIMES SPENT, AND I DID THIS MYSELF PERSONALLY GOING THROUGH OUR

12   TIME RECORDS, SOME EFFORT, ALL OF THE TIME SPENT WITH RESPECT

13   TO WHETHER CDT WOULD BE ADDED AS A PARTY TO THE CASE UNDER

14   SUCCESSOR OR UNDER THEORY.

15        THAT WAS SEPARATED OUT, THAT WAS APPROXIMATELY $20,000

16   AT THE TIME WE FILED OUR MOTION, AND IT'S OBVIOUSLY MORE THAN

17   THAT SINCE WE'RE ADDRESSING THEIR BRIEFS NOW, BUT THAT HAS BEEN

18   SEGREGATED OUT.

19        IT'S NOT POSSIBLE TO SEGREGATE OUT NOR IS IT NECESSARY

20   WHAT MR.  BURNS WOULD LIKE US TO DO, NO CASE LAW SUGGEST --

21        **MR. LICHTERMAN:**  I THINK, IT SHOULD BE CLEAR WHAT IT

22   IS THAT I'M SAYING, WHICH IS BLACK LETTER CALIFORNIA LAW.  YOU

23   DO NOT GET FEES FOR CLAIMS THAT ARE NOT CONTRACT CLAIMS.

24        IF YOU WANT TO PUT ASIDE, LOOK AT THE SECOND AMENDED

25   COMPLAINT, IT CLEARLY SAYS IN ONE OF THE LATTER PARAGRAPHS, I

RJN 273

1    THINK, IT'S 22, THAT THEY ARE ADDING ALLEGATIONS TO PURSUE

2    DISCOVERY ABOUT SUCCESSOR LIABILITY, THAT'S NOT TODAY, RIGHT AT

3    THE BEGINNING.

4         SO FORGET WHAT'S THE SELF-INTEREST ARGUMENT OF BOTH

5    SIDES TODAY, LOOK AT PLAINTIFFS OWN PLEADINGS AND THAT'S WHAT

6    THEY DID.  THEY SPEND A LOT OF TIME --

7         **THE COURT:**  IF I DETERMINE THAT NEEDS TO BE SOME

8    APPORTIONING I'M GOING TO COME BACK TO YOU AND ASK YOU EACH

9    GIVE ME YOUR FIGURES THEN.  OKAY.

10        AND, I THINK, LET'S THEN MOVE ONTO WHAT REQUIRES

11   PHOTOGRAPHS AND CHARTS, I THINK, TO EXPLAIN.  WHO'S GOING TO BE

12   HEARD ON THIS?

13        MR. ERICSON.

14        **MR. ERICSON:**  I AM.

15        **MR. BUNZEL:**  I'M STILL HERE.  I'M BATTING IN ALL

16   THINGS TODAY.

17        **THE COURT:**  LET ME ASK YOU THIS, MR. ERICSON.  WHAT,

18   AFTER THIS 2002 TRANSACTION, WHAT WAS LEFT OF OPSYS LIMITED?

19        WHAT WAS IT DOING?

20        WHAT ASSETS DID IT HAVE?

21        OBVIOUSLY, GOT SOME MONEY FROM CDT, RIGHT?

22        **MR. ERICSON:**  YES.                    **RJN 274**

23        **THE COURT:**  BUT WHAT WAS THERE, TRANSFERRED, WHATEVER

24   IT HAD IN THE U.S., I GUESS, ASSETS AND LIABILITIES IN THE U.S.

25   TO OPSYS U.S.

1          MR. ERICSON:  YES.

2          THE COURT:  WHATEVER IT HAD IN THE UK, DID IT TRANSFER

3     LIABILITIES AS WELL AS ASSETS IN THE UK TO OPSYS UK?

4          MR. ERICSON:  YES, I BELIEVE SO, YOUR HONOR.  I

5     BELIEVE THAT'S RIGHT.  IT HAD VERY LITTLE LEFT IN OPSYS ITSELF,

6     THAT WAS ESSENTIALLY A HOLDING COMPANY WITH RESPECT TO OPSYS

7     UK.  IT HAD NO OPERATIONS AS SUCH AFTER '02.

8          THE COURT:  IT HAD --

9          MR. ERICSON:  I WOULD SAY, I'M VERY SORRY I DID NOT

10    BRING ANY PHOTOGRAPHS AND CHARTS.  IF I HAD ONLY KNOWN I WOULD

11    HAVE DRAWN THEM MYSELF.

12         THE COURT:  I GAVE UP, I DREW A COUPLE THEN I HAD TO

13    TOSS THEM BECAUSE THE LINES WERE GETTING CONFUSING AND I DIDN'T

14    UNDERSTAND MY OWN GRAPH.

15         AT SOME POINT 2 MILLION, AM I CORRECT, 2 MILLION WENT

16    FROM CDT LIMITED TO OPSYS LIMITED FOR LICENSING OF TECHNOLOGY;

17    IS THAT CORRECT?

18         MR. ERICSON:  THERE WAS 2 MILLION AND I, FRANKLY,

19    FORGET WHICH ENTITY CAME FROM.  THERE WAS 2 MILLION FOR A

20    LICENSE AGREEMENT, IT WAS SORT OF A BACKSTOP LICENSE.

21         THERE WERE CERTAIN THIRD-PARTY CONSENTS THAT WERE

22    NEEDED TO BE ABLE TO USE THE IP AND THIS CASE THEY COULDN'T GET

23    THOSE THIRD-PARTY CONSENTS.  THEN THIS LICENSE OR SUBLICENSE AS

24    YOU RECALL WOULD HAVE STEPPED IN.              **RJN 275**

25         AS IT TURN OUT THE CONSENTS WERE OBTAINED, SO THE

1   LICENSE WAS LATER WRITTEN OFF AND ACTUALLY TURNED OUT TO BE OF

2   NO VALUE.  YOUR RIGHT, 2 MILLION WAS PAID FOR THAT LICENSE

3   PURELY AS A BACKSTOP.

4           THE COURT:  THAT 2 MILLION WENT TO OPSYS LIMITED; IS

5   THAT CORRECT?

6           MR. ERICSON:  I BELIEVE IT WAS PAID TO OPSYS,ASH YOU

7   MAY CORRECT ME IF I'M WRONG.

8           MS. HAYASHI:  IT DID GO TO OPSYS LIMITED.

9           THE COURT:  OPSYS LIMITED FOR LICENSING OF THEIR

10  TECHNOLOGY, AND THE LICENSING RIGHTS WENT THEN TO CDT LIMITED;

11  IS THAT CORRECT?

12          MR. ERICSON:  IT WAS CDT LIMITED.  IT IS IMPORTANT TO

13  KEEP THE LIMITEDS AND THE INC. SEPARATE, THEY ARE VERY SEPARATE

14  ENTITIES.

15          THE CDT LIMITED WHICH, AGAIN, MANAGEMENT CONTROL OVER

16  OPSYS UK IN '02 AND CDT, INC. OWNED ALL, ALL IT OWNED WAS

17  16 PERCENT OF OPSYS UK AT THIS TIME.

18          THE COURT:  CDT, INC. THE MANAGEMENT CONTROLLED

19  98 PERCENT OF THE PROFITS, WE'RE GOING TO GO TO --

20          MR. ERICSON:  THIS DID.

21          THE COURT:  LIMITED?

22          MR. ERICSON:  YES.

23          THE COURT:  THOSE WERE THE MANAGEMENT CONTROL OF OPSYS

24  UK?

25          MR. ERICSON:  RIGHT.                    **RJN 276**

1          THE COURT:  WHICH THEN BECAME CDC OXFORD LIMITED?

2          MR. ERICSON:  RIGHT.

3          THE COURT:  CDT OXFORD LIMITED STILL IN EXISTENCE?

4          MR. ERICSON:  ALL THESE ENTITIES STILL IN EXISTENCE.

5   NOTHING BEEN LIQUIDATED THEY'RE ALL STILL IN EXISTENCE, THEY

6   MAY NOT HAVE OPERATIONS, THEY MAY NOT HAVE ASSETS, BUT THEY ALL

7   STILL EXIST AS CORPORATE ENTITIES.

8          THE COURT:  AND, CDT LIMITED IS A WHOLLY OWNED

9   SUBSIDIARY OF CDT, INC.

10         MR. ERICSON:  SECOND TIER WHOLLY OWNED SUBSIDIARY.  AT

11  THE TOP IS CDC, INC., THIS IS A SELF-GRAPHIC, SORRY.

12         MR. BUNZEL:  WE SHOULD HAVE A CAMERA.

13         MR. ERICSON:  PROBABLY NOT.  THE TOP WE HAVE CDT,

14  INC., THEN WE HAVE WHAT'S CALLED CDT HOLDINGS, THEN BELOW THAT

15  WE HAVE CDT LIMITED BUT WHOLLY OWNED.  SO IT'S TWO TIERS DOWN

16  BUT WHOLLY OWNED, BUT INDIRECT WHOLLY OWNED.

17         THE COURT:  WHERE IS CDT OXFORD LIMITED IN THIS?

18         MR. ERICSON:  NOW, CDT OXFORD AND OPSYS ARE BOTH

19  WHOLLY OWNED SUBSIDIARY OF CDT LIMITED.  SO YOU HAVE INC.,

20  HOLDINGS, LIMITED AND THEN THE TWO OPSYS ENTITIES.

21         THE COURT:  THAT'S FOURTH TIER?          **RJN 277**

22         MR. ERICSON:  YES.  THAT'S THE WAY IT IS TODAY AND IN

23  THE WAY IT'S BEEN SINCE ABOUT MAY OF 2005.  IF YOU LIKE I CAN

24  GO THROUGH THE STEPS BEFORE THAT AND EXPLAIN THE STRUCTURE.

25         THE COURT:  THAT WOULD REALLY HELP ME OUT OF THE

1    CONFUSION.

2           MR. ERICSON:  LE ME SEE IF I CAN DO IT IN A WAY THAT

3    TRIES.  THEY'RE COMPLICATED TRANSACTIONS, NO DOUBT ABOUT IT,

4    BUT LET ME SEE IF I CAN KEEP IT AS SIMPLE AS POSSIBLE.

5           WE HAVE THE '02 TRANSACTIONS, WE HAVE '04 AND '05,

6    AFTER THE '02 TRANSACTIONS CDT, INC., WHICH IS THE COMPANY I'M

7    REPRESENTING TODAY, OWNED 16 PERCENT OF OPSYS UK.  THAT WAS THE

8    OWNERSHIP INTEREST.

9           IT DIDN'T OWN ANY OF OPSYS, IT DIDN'T HAVE ANY

10   MANAGEMENT RIGHTS OR ANYTHING LIKE THAT, IT OWNED 16 PERCENT OF

11   OPSYS UK.

12          CDT LIMITED THE SECOND TIER SUBJECT OF CDT HAD THESE

13   MANAGEMENT RIGHTS THAT YOUR HONOR REFERRED TO.  THE RIGHT TO

14   MANAGE, TO 98 PERCENT OF THE PROFITS, WERE THERE EVER TO BE ANY

15   PROFITS AND SO ON, AND THAT WAS THE STRUCTURE FROM '02 TO '04.

16          THEN IN '04 SHORT COUPLE WEEKS AFTER THE IPO OF INC.

17   THAT POINT CDT, INC. OWNS 100 PERCENT OF OPSYS LIMITED.  IT

18   STILL OWNS THE 16 PERCENT OF OPSYS UK AND CDT LIMITED STILL HAS

19   THE MANAGEMENT RIGHTS WITH RESPECT TO OPSYS UK.  THAT'S THE

20   SITUATION FOR THE FIVE MONTHS OR SO UNTIL MAY OF 2005.

21          IN MAY OF 2005, BEAR IN MIND IT'S CDT LIMITED THAT'S A

22   DEFENDANT HERE IN THIS COURTROOM, HADN'T BEEN DISMISSED OUT YET

23   BY YOUR HONOR, SO AT THIS POINT THE INTERESTS WERE CHANGED, SO

24   THAT CDT, INC., I'M SORRY, CDT LIMITED OWNED 100 PERCENT OF

25   OPSYS LIMITED AND OWNED 100 PERCENT OF OPSYS UK AT THAT POINT,

RJN 278

1    AND FROM THAT POINT ON CDT, INC. DIDN'T OWN ANY PART OF EITHER

2    ENTITY AND DIDN'T HAVE ANYMORE, NEVER HAD MANAGEMENT RIGHTS OR

3    ANYTHING LIKE THAT.

4            SO FROM MAY '05 ON CDT, INC., THE ENTITY HERE TODAY,

5    HAS NO OWNERSHIP INTEREST, OR MANAGEMENT RIGHTS, OR ANYTHING

6    WITH RESPECT TO EITHER OF THE OPSYS ENTITIES.

7            THE COURT:  BUT EARLIER YOU SAID AS A RESULT OF

8    TRANSACTION IN 2002, CDT, INC. OWNED 100 PERCENT OF OPSYS

9    LIMITED; IS THAT CORRECT?

10           MR. ERICSON:  NO.

11           THE COURT:  I MISUNDERSTAND YOU.

12           MR. ERICSON:  CDT, INC. OWNED 16 PERCENT OF OPSYS UK,

13   IT OWNED NOTHING OF OPSYS LIMITED.  THE POINT AT WHICH CDT,

14   INC. OWNED 100 PERCENT OF OPSYS LIMITED WAS FROM DECEMBER, I

15   THINK, IT'S THE 29TH OF '04 THROUGH MAY OF '05.

16           THE COURT:  I SEE.  OKAY.  THEN WHAT HAPPENED?

17           FIRST OF ALL, HOW DID THAT HAPPEN?  BY REASON OF

18   OPTIONS THAT IT HAD HELD OR HOW DID THAT HAPPEN?

19           MR. ERICSON:  HOW DID IT HAPPEN INC. OWNED --

20           THE COURT:  100 PERCENT AS OF END OF '04.

21           MR. ERICSON:  BY VIRTUE OF THE OPTIONS THAT WERE IN

22   THE '02 AGREEMENTS AS MODIFIED BY THE '04 SETTLEMENT AGREEMENT,

23   THE SHAREHOLDERS OF OPSYS LIMITED HAD THE RIGHT TO CAUSE CDT,

24   INC. TO BUY OPSYS LIMITED ON CERTAIN CONDITIONS.    **RJN 279**

25           ONE OF THE MOST SALIENT ONES OF WHICH THE LIABILITIES

1   OF LIMITED BE BELOW CERTAIN LEVEL A MILLION 250 AND IF THOSE

2   CONDITIONS WERE MET AND PARTIES THOUGHT THEY WERE, THEY COULD

3   REQUIRE CDT, INC. TO BUY THE EQUITY IN OPSYS LIMITED AND THAT'S

4   WHAT OCCURRED, PURSUANT TO THOSE CONTRACTS.

5          BUT THEN THE STRUCTURE WAS SIMPLIFIED, AS I SAID, IN

6   MAY OF '05, SO THE CURRENT STRUCTURE WHERE WE HAVE BOTH OPSYS

7   ENTITIES BELOW CDT LIMITED, THEN TWO TIERS BELOW CDT, INC.

8          THE COURT:  THAT'S THE STRUCTURE THAT STILL OBTAINS

9   TODAY?

10          MR. ERICSON:  YES, STILL OBTAINS TODAY.

11          THE COURT:  NOW, IN THE TRANSFERS TO OPSYS U.S. WERE

12   ALL U.S. ASSETS AND LIABILITIES TRANSFERRED?

13          MR. ERICSON:  YES.  THAT'S MY UNDERSTANDING, YES.

14   NOTHING WHATSOEVER IN THE U.S. EVER CAME TO ANY CDT ENTITY, FOR

15   THE REASONS WE EXPLAINED IN THE BLACK DECLARATION.

16          CDT HAD NO INTEREST IN ANY OF THE U.S. BUSINESS OF

17   OPSYS, IT WAS DIFFERENT TECHNOLOGY.  IT WAS TECHNOLOGY THAT WAS

18   INVOLVED WITH KODAK, WHO IS THE SORT OF ARCHRIVAL OF CDT IN

19   THIS BUSINESS.

20          CDT WANTED NOTHING TO DO WITH THE AMERICAN BUSINESS.

21   WASN'T A CASE OF NOT WANTING LIABILITY OR BEING FOCUSED ON

22   LEASEHOLDS, IT WAS THE CASE THEY DIDN'T HAVE ANY INTEREST IN

23   THE BUSINESS IN THE UNITED STATES.                **RJN 280**

24          IT WAS A DIFFERENT BUSINESS WITH DIFFERENT TECHNOLOGY,

25   TECHNOLOGY THAT DEPENDED ON A LICENSE FROM KODAK.  TECHNOLOGY

1    THAT WAS GOING TO BE USED FOR MANUFACTURING BUSINESS.

2            CDT TOOK ONE LOOK AT THAT AND SAID WE HAVE NO INTEREST

3    IN THIS, WE DON'T THINK THIS IS A GOOD BUSINESS.  IT WOULD PUT

4    US IN BED WITH KODAK.  THEY'RE OUR ARCHRIVAL, WE HAVE COMPETING

5    TECHNOLOGY.

6            THEY NEVER EVER HAD ANY INTEREST IN THE U.S. ASSETS OF

7    OPSYS, THEREFORE, DIDN'T ACQUIRE ANY ASSETS, DIDN'T ACQUIRE ANY

8    LIABILITIES.

9            THE COURT:  SO THE MANUFACTURING THAT WAS GOING ON IN

10   FREMONT WAS NOT MANUFACTURING OF TECHNOLOGY THAT HAD BEEN

11   RESEARCHED AND INVENTED BY OPSYS CDT WHOM, I GUESS, OPSYS AT

12   THAT POINT, OPSYS LIMITED, OPSYS UK.

13           MR. ERICSON:  WHAT WENT ON IN FREMONT WAS

14   MANUFACTURING OR SORT OF PILOT MANUFACTURING THAT WAS BASED

15   ON -- I'M NOT SAYING OPSYS DIDN'T DO ANY WORK, BUT IT WAS

16   TECHNOLOGY BASED ON A LICENSE FROM KODAK IN DIFFERENT

17   TECHNOLOGY THEN THE CDT TECHNOLOGY.  THAT'S WHY CDT DIDN'T WANT

18   TO HAVE ANYTHING TO DO WITH IT.

19           THE COURT:  I THOUGHT MAY BE JUST A --

20           MR. BUNZEL:  OXFORD AND CAMBRIDGE PEOPLE JUST WANTED

21   TO DO PURE RESEARCH AND NOT TOUCH THEIR FINGERS AND GET THEM

22   DIRTY ON THE MANUFACTURING.  THAT'S NOT A GOOD THEORY, IS THAT

23   IT?                                        **RJN 281**

24           MR. ERICSON:  I'M NOT GOING TO STAND UP HERE AN ARGUE

25   IT WAS.  THEY WERE SO IVORY TOWER THEY DIDN'T HAVE AN INTEREST

1    IN TRYING TO MAKE MONEY OR SOMETHING LIKE THAT.

2         THEY DIDN'T FEEL THE WAY TO DO IT WAS TO BECOME

3    INVOLVED IN KODAK.  THEY CLEARLY WANTED TO MAKE MONEY, THEY

4    WANTED TO MAKE MONEY USING THEIR OWN BUSINESS MODEL, USING

5    THEY'RE OWN TECHNOLOGY, NOT HAVE ANYTHING TO DO WITH WHAT WAS

6    GOING ON IN THE UNITED STATES.

7         THE COURT:  WELL, IS IT YOUR POSITION THAT SOMEHOW ALL

8    OF THESE TRANSACTIONS WERE ENGAGED IN SO AS TO AVOID LIABILITY

9    ON THE LEASE?

10        MR. BUNZEL:  I THINK THERE'S, YES, IN A SENSE IN 2002

11   IT WAS UNDERSTOOD THAT OPSYS LIMITED HAD THIS LIABILITY AND

12   THAT IT WAS A REQUIREMENT OF THE CDT SIDE THAT LIABILITY NOT BE

13   ASSUMED.

14        THAT WAS PART OF THE GOAL THAT THE ASSIGNMENT WAS

15   GEARED TO AVOID SUCH A LIABILITY BEING IN THE BASKET OF ASSETS

16   AND LIABILITIES THAT A SUCCESSOR SUCH AS CDT MIGHT ACQUIRE.

17        AND THAT ULTIMATELY THEY WERE WRONG ABOUT THAT AND

18   THAT THIS LIABILITY IS A UK LIABILITY, THAT IT'S AN OPSYS

19   LIMITED LIABILITY.  AND, INDEED, THAT'S THE EVIDENCE.

20        THE COURT:  HOW DOES THAT HAPPEN?          RJN 282

21        YOU HAVE TO JUMP THROUGH, YOU KNOW, YOU HAVE TO JUMP

22   THROUGH ALL THOSE HOOPS WITH RESPECT TO SUCCESSOR LIABILITY.

23        FIRST OF ALL, THE -- AS I UNDERSTAND IT, THE ONLY

24   TRANSFER OF ASSETS THAT WENT ON HERE OTHER THAN WHAT MAY HAVE

25   BEEN TRANSFERRED TO OPSYS U.S. WAS THE TRANSFER FROM OPSYS

1    LIMITED TO OPSYS UK, RIGHT?

2         WERE THERE ANY OTHER TRANSFERS OF ASSETS?

3         **MR. BUNZEL:** YES, YOUR HONOR. THAT'S THE 2002

4    TRANSFER RIGHT AT THE TIME OF THE ASSIGNMENT NEGOTIATIONS. THE

5    ENGLISH COMPANY THAT'S THE DEBTOR HERE TOOK ALL OF ITS ASSETS

6    AND TRANSFERRED THEM TO AN ENTITY THAT COULD THEN BE CONTROLLED

7    AND ACQUIRED BY THE CAMBRIDGE SIDE, ONE ENTITY OR ANOTHER OF

8    CAMBRIDGE. THAT'S THE FIRST TRANSFER OF ASSETS.

9         THE SECOND TRANSFER OF ASSETS THAT'S IMPORTANT TO US

10   HERE OCCURS IN 2004 WHEN THEY CLOSED THE TRANSACTION AND ITS

11   STOCK GETS TRANSFERRED, ESSENTIALLY THE OWNERSHIP OF OPSYS

12   LIMITED BECOMES OWNED BY CDT, INC. HUNDRED PERCENT, SO THEY

13   TRANSFER ALL THEIR STOCK.

14        **THE COURT:** THAT'S NOT TRANSFER OF ASSETS, RIGHT?

15        **MR. BUNZEL:** IT'S A TRANSFER OF STOCK IN 2002. EXCUSE

16   ME, 2004.

17        **THE COURT:** I GUESS, YOU KNOW, JUST TO CUT TO THE

18   CHASE ON THIS. HOW DO YOU MEET ALL THOSE REQUIREMENTS OF RAY,

19   THE RAY CASE, BEATRICE THAT SPELL OUT HOW YOU, YOU KNOW, YOU

20   HAVE TO ESTABLISH SUCCESSOR LIABILITY?

21        FIRST OF ALL, THE PURCHASER OF THE ASSETS -- LET ME

22   ASK YOU THIS:

23        WHO IS THE PURCHASER OF THE ASSETS?

                                      **RJN 283**

24        CDT PAYS THE MONEY, RIGHT?

25        BUT THE ASSETS ACTUALLY GET TRANSFERRED FROM, FIRST

1   FROM OPSYS TO OPSYS UK AND THEN TO CDT OXFORD, RIGHT?

2           MR. ERICSON: WELL, CDT OXFORD IS OPSYS, THEY JUST

3   CHANGED THE NAME.

4           THE COURT: EXCUSE ME?

5           MR. ERICSON: I THINK YOUR HONOR HAD EXACTLY RIGHT,

6   THE ASSETS MOVED FROM CDT LIMITED TO, I'M SORRY, FROM OPSYS

7   LIMITED TO OPSYS.

8           THE COURT: IT'S CONFUSING.

9           MR. ERICSON: IT IS AND THOSE NAME CHANGES DON'T HELP.

10  THEY REALLY DON'T, BUT THEN WHO ASKED US.

11          FROM OPSYS LIMITED TO OPSYS UK AND THERE THEY STAYED,

12  AND THE SUBSEQUENT TRANSACTIONS ARE NOT ASSET TRANSFERS,

13  THEY'RE BUYING AND SELLING STOCK, WHICH IS WHY THIS -- YOU'RE

14  RIGHT, THE DOCTRINE IS ELUCIDATED IN RAY AND OTHER CASES

15  DOESN'T APPLY HERE BECAUSE WERE NOT TRANSFERRING ASSETS AND

16  THEN DISSOLVING CORPORATIONS OR DOING QUASI MERGERS OR ANYTHING

17  LIKE THAT, THE ASSETS ARE SPUN OFF INTO OPSYS UK AND THERE THEY

18  STAY AND THERE THEY ARE.

19          THE COURT: BACKING UP, THOUGH, WHO IS, IN FACT, THE

20  PURCHASER WHEN THE PARTY THAT PAYS THE MONEY IS NOT THE

21  RECIPIENT OF THE TRANSFERS?

22          THE ASSETS ACTUALLY GO TO SOME OTHER PARTY, WHOSE THE

23  PURCHASER OF THAT?

24          PERSON THAT PARTY THAT PARTS WITH THE MONEY OR THE

25  PARTY RECIPIENT OF THE ASSETS?                    **RJN 284**

1      MR. ERICSON:  THE PARTY RECIPIENT OF THE ASSETS, I

2  THINK.

3      MR. BUNZEL:  MY REACTION TO READING --

4      THE COURT:  WAS THAT JUST GRATUITOUS PURCHASE?

5      MR. ERICSON:  WELL, AS WE EXPLAIN, THE STRUCTURE

6  COMPLICATED LARGELY FOR TAX REASONS AND LARGELY FOR THE

7  BUSINESS REASONS.

8      I INDICATED EARLIER NO PART OF IT IS DESIRE TO DO HARM

9  TO CREDITORS OR ANYTHING LIKE THAT, BUT THEY HAD TAX

10  CONSIDERATIONS AND THEY, IN ESSENCE, THEY WANTED TO BUY AND

11  THEY HAD ASSETS THEY DIDN'T WANT TO BUY, THAT'S WHY IT'S

12  STRUCTURED THE WAY IT IS.

13      IT DOES NOT FIT THE SUCCESSOR LIABILITY MODEL BECAUSE

14  WE'RE NOT MOVING ASSETS INTO A SUCCESSOR AND WE'RE NOT

15  DISSOLVING THE ENTITY FROM WHICH IT CAME.  NEITHER HAPPENS HERE

16  AND THERE'S ALSO NO ISSUE OF INADEQUATE CONSIDERATION FOR ANY

17  OF THIS.

18      THE FACTS OF RAY ARE SO STARK AND SO STARKLY DIFFERENT

19  THAN ANYTHING WE HAVE HERE.  AND KIND OF IN RAY WE HAVE A LOT

20  ONE AND LOT TWO, OTHER THAN THEY'RE DIFFERENT CORPORATIONS IN

21  THE SECRETARY STATE SENSE EVERYTHING IS THE SAME.

22      THEY BUILD THE SAME LADDERS USING THE SAME FACTORIES

23  WITH THE SAME PEOPLE, WITH THE SAME SALES FORCE AND THE SAME

24  CUSTOMERS, AND THIS SAME LADDERS AND ALL WE HAVE IS THIS PAPER

25  CHANGE OF ENTITY WITH NOTHING ELSE CHANGES AND THERE'S AN

RJN 285

1    ATTEMPT TO ESCAPE LIABILITY ON THAT BASIS.

2         NOT IN ANY RESPECT WHAT HAPPENED HERE WITH RESPECT TO

3    THESE TRANSACTIONS.  THE SUCCESSOR LIABILITY MODEL SIMPLY

4    DOESN'T FIT.

5         AS FOR THE OTHER MODEL ALTER EGO, THEY WOULD HAVE TO

6    SUCCEED ON ALTER EGO THEORY, THEY WOULD HAVE TO GO FROM OPSYS

7    TO CDT LIMITED TO CDT HOLDINGS TO GET TO CDT INC., YOU KNOW,

8    MULTIPLE PIERCING OF MULTIPLE VEILS, AS IT WERE.

9         BUT THE TROUBLE IS THE FIRST VEIL THEY HIT IS CDT

10   LIMITED AND THEY ALREADY MADE THEIR CLAIM AND THEY ALREADY LOST

11   IN THAT CLAIM AND YOUR HONOR DISMISSED IT WITH PREJUDICE.  SO

12   THEY GET TO THE FIRST VEIL AND IT STOPS, SO ALL THREE NEITHER

13   THEORY SUCCEEDS FOR THE PLAINTIFF.

14        **MR. BUNZEL:**  YOUR HONOR, IN TERMS OF THE PLEADINGS

15   THAT HAVE BEEN FILED BY THE DEFENDANT, WHICH WE HAVEN'T HAD A

16   CHANCE TO RESPOND TO, FACTUALLY OR LEGALLY, MY REACTION IN

17   READING IT WAS REMINDED ME OF THE THREE-CARD MONTE GAME, WHERE

18   ARE THE ASSETS, UNDER WHICH SHELL OF A CDT ENTITY DO THEY

19   RESIDE?

20        AND IT STRUCK ME THAT IN ORDER TO REALLY UNDERSTAND

21   EVERYTHING HERE WE NEED TO HAVE SOME DISCOVERY AGAINST ALL OF

22   THOSE CDT ENTITIES AND GET THE DOCUMENTS RELATED TO WHERE ARE

23   THE ASSETS AND HOW THEY ARE BEING EXPLOITED.          RJN 286

24        AND IN RESPONSE TO YOUR QUESTION A MOMENT AGO ABOUT

25   WHAT TRANSFERS THERE WERE, THE THIRD TRANSFER WHICH I DIDN'T

1    GET IN AT THIS TIME IS THE 2005 TRANSFER.  THIS IS IN 2005

2    DURING THE PENDENCY OF THIS CASE.

3            THE ONLY ASSET, AND IT'S AN ASSET, OKAY, HAS TO BE AN

4    OWNERSHIP INTEREST IN SUBSIDIARY, BUT IT'S THE ONLY ASSET OF

5    THE JUDGMENT DEBTOR HERE, WHICH WAS 84 PERCENT OWNERSHIP OF THE

6    IP FROM OPSYS.  ALL OF THE IP NOT JUST UK, U.S. IP.  ALL OF THE

7    IP, THAT'S PATENTS AND EVERYTHING ELSE THAT THE JUDGMENT DEBTOR

8    OWNED WENT DOWN AT OPSYS UK.

9            AND OPSYS LIMITED OWNED 84 PERCENT OF IT DURING THIS

10   CASE UNTIL MAY OF '05 WHEN FOR BUSINESS REASONS THAT AREN'T

11   EXPLAINED IN THE DECLARATIONS OTHER THAN TO FACILITATE

12   CORPORATE STRUCTURE AND FOR UNKNOWN CONSIDERATIONS, UNKNOWN

13   VALUE OF THE ASSETS, THOSE ASSETS NO LONGER BELONGED TO THE

14   JUDGMENT DEBTOR, SO THAT MY CLIENT CANNOT GO AND ENFORCE ITS

15   JUDGMENT AGAINST THOSE ASSETS.  THAT'S A CLASSIC CASE.

16           **THE COURT:**  YOU'RE REFERRING TO OPSYS LIMITED?

17           **MR. BUNZEL:**  YES, OPSYS LIMITED OWNED 84 PERCENT OF

18   THE PATENTS.  THEY HAD TRANSFERRED 98 PERCENT OF THE PROFITS

19   FROM THOSE PATENTS TO AN ENTITY OWNED BY CDT, INC.

20           BUT THE ASSETS THEMSELVES, THE VALUE OF THOSE ASSETS

21   BELONGED WITH THE JUDGMENT DEBTOR.  84 PERCENT SUBJECT TO

22   FORECLOSURE OF THIS JUDGMENT OR ENFORCEMENT OF THIS JUDGMENT IN

23   ENGLAND OR OTHERWISE UNTIL DURING THIS CASE THEY GOT

24   TRANSFERRED OUT.                              **RJN 287**

25           AND, I THINK, THAT UNDER THOSE CIRCUMSTANCES WE HAVE

1    EITHER A SUCCESSOR LIABILITY SITUATION OR BECAUSE ONE OF THE

2    ELEMENTS OF RAY IS A TRANSFER TO AVOID OBLIGATIONS TO CREDITORS

3    WHICH DOESN'T REQUIRE FRAUD.

4        IT'S JUST A TERM OF ART IN THE CIVIL CODE OR WE HAVE A

5    SECTION 18(B) FRAUDULENT CONVEYANCE CLAIM.  AND, YOUR HONOR,

6    WHETHER THESE ARE STOCK TRANSACTIONS OR ASSET TRANSACTIONS, I

7    THINK, IT'S IMPORTANT BECAUSE MR. ERICSON IS RIGHT, MR. BARNES

8    IS RIGHT IN HIS PIECE OF PAPER, THE RAY FACTORS ARE GENERALLY

9    APPLIED TO ASSET TRANSACTIONS, NOT TO STOCK TRANSACTIONS.

10        AND THE REASON FOR THAT IN CALIFORNIA LAW IS VERY

11    SIMPLE.  IF YOU OWN A HUNDRED PERCENT OF A COMPANY THAT

12    OPERATES AND YOU TRANSFER A HUNDRED PERCENT OF THAT STOCK TO

13    ME, THAT COMPANY THAT OPERATES CAN STILL PAY ITS CREDITORS AND

14    ITS TRADE CREDITORS, ITS JUDGMENT DEBTORS AND THE LIKE, AND THE

15    FACT THAT YOU AND I EXCHANGE OWNERSHIP INTEREST AT A TOP LEVEL

16    DOESN'T AFFECT THAT AT ALL.

17        UNDER THAT TYPE OF A STOCK TRANSACTION YOU DON'T HAVE

18    TO GET INTO WHETHER THERE'S BEEN AN ASSUMPTION OF LIABILITIES

19    BY THE SHAREHOLDERS WHO TRANSFERRED THE STOCK.

20        BUT HERE OPSYS LIMITED WENT OUT OF BUSINESS, IT

21    DOESN'T EXIST ANYMORE, ITS DOCUMENTS, ITS ASSETS, ITS

22    EMPLOYEES, ALONG WITH THIS CORPORATE HIERARCHY THROUGH A VERY

23    COMPLICATED SERIES OF STRUCTURES.          RJN 288

24        AND IF YOU LOOK AT THE DESCRIPTION OF THESE

25    TRANSACTIONS IN THE 10K FILED WITH THE SEC IT STATES, AND THIS

1    IS AT THE AINSLIE DECLARATION EXHIBIT B, QUOTE "THE TERMS OF

2    THE TRANSACTION AGREEMENT RENDERED INTO BY THE COMPANIES, SO

3    THAT IT COULD GAIN CONTROL OF AN ECONOMIC INTEREST IN THE UK,

4    ASSETS AND OPERATION OF OPSYS" UNQUOTE AND AVOID CERTAIN

5    LIABILITIES.

6         THEY STRUCTURED AN ASSET PURCHASE ESSENTIALLY AS A

7    STOCK DEAL.  AND IF ONE APPLIES THE RAY SET OF STANDARD FOR

8    SUCCESSOR LIABILITY IS EQUITABLE DOCTRINE.  AND WE HAVE ALL THE

9    APPROPRIATE FACTS OR WITNESSES BEFORE THIS COURT FOR AN

10   EQUITABLE HEARING.  I THINK, I CAN PROVE THAT IN APPLYING THE

11   RAY STANDARDS THAT THIS SITUATION IS TAILOR MADE FOR SUCCESSOR

12   LIABILITY.

13        OTHERWISE VERY CLEVER BUSINESSMEN COULD PUT TOGETHER A

14   DEAL TO OBTAIN THE ASSETS OF A COMPANY AND AVOID THE

15   LIABILITIES OF A COMPANY AND CALL IT A PURE STOCK DEAL.  AND

16   THAT'S WHAT THEY'VE TRIED TO DO.

17        IT'S NOT APPROPRIATE AND THEY HAVE LEFT OUT THE MAJOR

18   CREDITOR OF THE ACQUIRED COMPANY OUT IN THE COLD ON PURPOSE NOW

19   AND CLAIMED THAT THE JUDGMENT DEBTOR THAT WE SPENT A MILLION

20   DOLLARS ESTABLISHING THE OBLIGATION, THEY SPENT A LOT MORE, NO

21   LONGER HAS ANY ASSETS BECAUSE THEY'VE BEEN ABSORBED BY

22   MR. ERICSON'S CLIENTS.                    **RJN 289**

23        IT'S NOT FAIR AND A SUCCESSOR LIABILITY DOCTRINE IS

24   EQUITABLE DOCTRINE.  I HAVE TO GIVE IT TO THE DEFENDANTS, THEY

25   CREATED TRIABLE ISSUES OF FACT AND I THINK THAT IT'S PROBABLY

1    --

2              THE COURT: DON'T MENTION THAT.

3         MR. BUNZEL: AS MUCH AS I HATE TO SAY IT.

4         THE COURT: WE JUST WENT THROUGH THAT.

5         MR. BUNZEL: WE HAVE TO HAVE FURTHER PROCEEDINGS,

6    THEY'RE ALL EQUITABLE THEY DON'T REQUIRE A JURY, BUT THEY WILL

7    REQUIRE SOME EXPLANATION.

8         THE COURT: THAT'S EVEN WORSE.

9         MR. ERICSON: I'D LIKE TO RESPOND BRIEFLY TO A COUPLE

10   OF POINTS, I THINK, ARE MISAPPREHENSIONS REALLY.

11        FIRST OF ALL, TWO CHARACTERIZATION OF THE MAY 2005

12   TRANSACTIONS, THERE WAS, AT LEAST, AN INSINUATION AND MAYBE

13   MORE THIS WAS NEFARIOUS, IF NOT FRAUDULENT.

14        MR. BUNZEL: NOT WHAT I INTENDED.

15        MR. ERICSON: WELL, TALK ABOUT FRAUDULENT CONVEYANCE,

16   I HEARD THE WORD FRAUDULENT, BUT SOME INSINUATION THERE WAS

17   SOMETHING IMPROPER ABOUT THIS.

18        BUT LOOK AT WHAT HAPPENED. WE HAVE STOCK MOVING FROM

19   A NON-DEFENDANT TO A DEFENDANT, IS THAT THE WAY SOMEBODY MAKES

20   FRAUDULENT CONVEYANCE BY CONVEYING STOCK FROM A NON-PARTY TO A

21   DEFENDANT?                              **RJN 290**

22        NO, OF COURSE NOT. IF SOMEBODY WISHES TO PUT

23   SOMETHING OUT OF CREDITORS' REACH THEY DON'T CONVEY IT TO

24   SOMEONE WHO'S A DEFENDANT IN THE CASE. THEY DO EXACTLY THE

25   OPPOSITE, THEY CONVEY IT TO SOMEBODY IN THE SUNNY PLACE FOR

1    SHADY PEOPLE OR SOMETHING LIKE THAT, BUT THEY DON'T CONVEY

2    THINGS TO A DEFENDANT, YET THAT'S WHAT HAPPENED HERE.

3              AS I EXPLAINED EARLIER, THE EQUITY IN AN OPSYS LIMITED

4    WENT TO CDT LIMITED, AT THE TIME IT WAS A DEFENDANT IN THIS

5    CASE.  SO I MEAN, THE NOTION THAT THIS WAS SOMEHOW CREDITOR

6    AVOIDANCE OR DESIGNED TO PREJUDICE SUNNYSIDE OR ANY OTHER

7    CREDITOR JUST FLOUNDERS ON THE FACTS, THE CONVEYANCES EITHER

8    BETWEEN PARTIES IN THIS CASE OR FROM NON-PARTIES TO PARTIES IN

9    THIS CASE AND THERE JUST NO WAY THAT CAN BE TO THE PREJUDICE OF

10   ANY CREDITOR.

11             SECOND POINT I WANT TO MAKE, WITH RESPECT TO THE

12   NOTION, THE ANALOGY THREE-CARD MONTE WAS USED.  THREE-CARD

13   MONTE IS, AS I UNDERSTAND IT, SOME SORT OF GAME, THINGS GET

14   HIDDEN AND SO ON, THERE'S NOTHING HIDDEN HERE.

15             THE MONEY THAT WAS USED OR THE CONSIDERATION FOR THE

16   TRANSACTIONS IN 2004, THE CDT, INC. STOCK THAT WAS GIVEN FOR

17   THE 2004 TRANSACTION, SOMETHING ON THE ORDER OF 800, 900 SHARES

18   OF CDT, INC. STOCK, WHICH IS WORTH OF A LOT OF MONEY THEN AND

19   UNFORTUNATELY QUITE A BIT LESS MONEY TODAY, MOST OF THAT IS

20   STILL IN THE ESCROW OR IN WHAT'S CALLED OPSYS MANAGEMENT, IS

21   SORT OF ESCROW.                           **RJN 291**

22             IT'S NOT GONE TO THE FORMER SHAREHOLDERS OF OPSYS

23   LIMITED EXCEPT IN VERY SMALL AMOUNTS AND IN SATISFACTION OF

24   INDIVIDUAL CLAIMS THEY HAD.  MOST OF IT IS STILL SITTING THERE

25   IN EITHER IN A FORMAL ESCROW OR IN SOMETHING THAT IS THE

1    EQUIVALENT OF AN ESCROW, THAT IS OPSYS MANAGEMENT STRUCTURE AND

2    IS AVAILABLE.

3         **THE COURT:**  THAT CAN BE USED TO SATISFY ANY JUDGMENT

4    IN THIS CASE?

5         **MR. ERICSON:**  I'M RELUCTANT TO SPEAK FOR ENTITIES I

6    DON'T REPRESENT THAT ARE, OBVIOUSLY, OF INTEREST SOMEWHAT

7    DIFFERENT THAN MY CLIENTS OWN INTEREST, SO I REALLY CANNOT

8    SPEAK DEFINITIVELY TO THAT.

9         BUT THE MONEY IS THERE, IT'S BASICALLY THERE FOR THE

10   SAKE OF CREDITORS.  AND WHILE I CAN'T SAY WHETHER IT'S EASY OR

11   HARD OR SOMETHING, I DON'T KNOW THAT THERE'S ANYTHING THAT

12   PREVENTS MR. BUNZEL AND HIS CLIENT FROM LOOKING THROUGH OPSYS

13   MANAGEMENT.

14        AND THERE'S STILL SOMETHING ON THE ORDER OF, BETWEEN

15   THE ESCROW AND THE OPSYS MANAGEMENT, SOMETHING IN THE ORDER OF

16   700,000 SHARES OF CDT, INC. STOCK.  UNFORTUNATELY NOT WORTH

17   WHAT IT ONCE WAS.

18        IT'S SITTING IN SORT OF ESCROW, SORT OF QUASI ESCROWS,

19   BASICALLY SITTING THERE BECAUSE OF CREDITOR CLAIMS AND THE

20   LIKE, NOT BEEN DISTRIBUTED TO THE FORMER SHAREHOLDERS OF OPSYS

21   LIMITED.  I THINK, THAT'S REALLY WHERE THE PLAINTIFF OUGHT TO

22   BE LOOKING AND THAT WHAT THEY'RE ATTEMPTING TO DO HERE.

23        WHAT PLAINTIFF IS ATTEMPTING TO DO HERE IS SOMETHING

24   THAT JUST CANNOT BE FIT WITHIN ANY OF THESE DOCTRINES THEY

25   MENTIONED.                                          **RJN 292**

1       THE ALTER EGO WHICH ANALYTICALLY, AT LEAST, MAKES

2    SENSE, YOU CAN CONCEIVE HOW THERE CAN BE AN ALTER EGO CLAIM,

3    AND YOU CAN SORT OF TRY TO GO FROM ONE ENTITY TO THE NEXT.

4    ANALYTICALLY IT MAKES SENSE, FACTUALLY IT HITS A BRICK WALL.

5    THEY CAN'T GET PASSED OPSYS LIMITED, THEY TRIED, THEY LOST, THE

6    CLAIM WAS DISMISSED WITH PREJUDICE.

7       SO SAY ANALYTICALLY FACTUALLY I'M AFRAID DOESN'T WORK

8    FOR THEM, BUT SUCCESSOR LIABILITY SIMPLY IS NOT, AS A MATTER OF

9    LAW.  I WOULD AGREE WITH MR. BUNZEL IN A SENSE THERE ARE PLENTY

10   OF FACTS THAT ONE COULD GET INTO IN DISCOVERY, PLENTY OF

11   FURTHER PROCEEDINGS AND SO ON, THAT ONE WOULD HAVE TO GO

12   THROUGH BEFORE ONE COULD EVER REACH A DECISION ADVERSE TO MY

13   CLIENT.

14       BUT YOU DON'T HAVE TO GO THERE AS A MATTER OF LAW, THE

15   DOCTRINE SIMPLY DOESN'T WORK.  THE DOCTRINE APPLIES TO

16   TRANSFERS OF ASSETS SUCH AS THE POTLATCH CASE SAYS.  THERE

17   AREN'T TRANSFER OF ASSETS HERE, NOT TO MY CLIENT.  AS I SAID

18   EARLIER, THE ASSETS ARE STILL WITH OPSYS UK.

19       THE DOCTRINE APPLIES WHERE THE TRANSFEROR HAS BEEN

20   DISSOLVED, IT'S NOT HAPPENED HERE, THESE ENTITIES HAVE NOT BEEN

21   DISSOLVED.  THE DOCTRINE APPLIES ONLY WHERE THE CONSIDERATION

22   IS INADEQUATE OR THE TRANSACTION ESSENTIALLY SHAM BECAUSE

23   THEY'RE NOT ARMS-LENGTH IN CONSIDERATION, WASN'T FAIR AND

24   ADEQUATE.                                        **RJN 293**

25       THE COURT:  I'LL PICK UP ON THAT IN JUST A MOMENT,

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1    BUT -- AND ASK MR. BUNZEL ABOUT THAT, BUT WHAT ABOUT THIS

2    ARGUMENT THAT WHILE, -- WELL, THIS IS A SUCCESSOR LIABILITY, IS

3    REALLY AN EQUITABLE DOCTRINE AND IT DOESN'T HAVE TO BE CONFINED

4    TO A TRANSFER OF ASSETS, COULD BE INVOLVED TRANSFER OF STOCK OR

5    ESSENTIALLY IF, FOR EXAMPLE, IF IT'S A HOLDING COMPANY, THAT

6    MAYBE ALL THAT A HOLDING COMPANY HAS.

7         MR. ERICSON:  YES, IT IS EQUITABLE, I AGREE WITH THAT

8    PART.  I DO NOT AGREE THAT IT APPLIES TO A TRANSFER OF STOCK.

9    THAT WAS THE HOLDING OF THE POTLATCH CASE WE CITE, 154 CAL APP.

10   AT 1150 DOES NOT APPLY TO STOCK DEALS, IT ONLY APPLIES TO ASSET

11   TRANSFERS.

12        SO EQUITABLE DOESN'T MEAN ELASTICITY, MEANS EQUITABLE.

13   CLEAR CALIFORNIA LAW SAYS THAT DOESN'T APPLY TO STOCK

14   TRANSFERS.

15        MR. BUNZEL:  IN PHILLIPS AND POTLATCH THE UNDERLYING

16   COMPANY DEBTOR WHO'S STOCK WAS TRANSFERRED REMAINED IN

17   EXISTENCE, THAT WAS THE TOUCHSTONE OF THOSE HOLDINGS.

18        THAT'S WHY GENERALLY THE RAY FACTORS AREN'T APPLIED

19   UNDER THOSE CIRCUMSTANCES.  YOU HAVE AN EXISTING COMPANY TO

20   PURSUE, WE FOUND OUT, AND I TAKE MR. ERICSON --

21        THE COURT:  WOULDN'T YOU HAVE TO, IN FACT, ESTABLISH

22   AND, IN FACT, YOU DON'T HAVE A COMPANY TO PURSUE BEFORE YOU

23   COULD, THEN IF YOU TAKE YOUR THEORY THEN YOU HAVE TO TRY TO

24   RECOVER JUDGMENT FROM OPSYS LIMITED AND THEN AND ONLY THEN

25   SUCCESSFUL IN THE RECOVERY FROM THEM PURSUE ANY SUCCESSOR

RJN 294

1    LIABILITY.

2         MR. BUNZEL:  YOUR HONOR, THE CEO OF THE PUBLIC COMPANY

3    CDT, INC. STATED TO ITS SHAREHOLDERS AND TO THE INVESTING

4    PUBLIC WITHIN DAYS AFTER THE VERDICT IN THIS CASE THAT OPSYS

5    LIMITED QUOTE "HAS NO ASSETS" UNQUOTE.

6         IT WENT ONTO SAY THEY WEREN'T GOING TO HELP FUND THE

7    SETTLEMENT, THAT'S NEITHER HERE NOR THERE.  IT WAS NEWS TO ME

8    HAVING BEEN WITH THIS CASE FOR A YEAR AND A HALF THAT THIS 84

9    PERCENT INTEREST IN THE INTELLECTUAL PROPERTY NO LONGER RESIDES

10   WITH THE JUDGMENT DEBTOR, IT HAPPENED DURING THE PENDENCY OF

11   THIS CASE.

12        I UNDERSTAND MR. ERICSON'S ARGUMENT THAT TRANSFER WAS

13   TO CDT LIMITED, IT WAS BEFORE THE COURT, BUT IT WAS A WAY FROM

14   THE CONTRACT DEFENDANT, THE OBVIOUS PRIMARY DEFENDANT IN THIS

15   CASE DURING THIS CASE.  SO THEIR SIDE IS STATING PUBLICLY THAT

16   THE JUDGMENT DEBTOR HAS NO ASSETS, I TAKE THEM AT THEIR WORD

17   FOR THAT.

18        THE COURT:  THAT'S SOMETHING YOU READ IN THE

19   NEWSPAPER, RIGHT?

20        MR. BUNZEL:  I READ IT IN A PRESS RELEASE FILED WITH

21   THE SECURITY AND EXCHANGE COMMISSION.  I BELIEVE IT WAS FILED

22   WITH THE SECURITIES EXCHANGE COMMISSION, YOUR HONOR.

23        THE COURT:  I'M NOT SURE IT'S A GOOD IDEA TO RELY ON

24   PRESS RELEASE.                                RJN 295

25        MR. BUNZEL:  WHILE I'M NOT ACCUSING ANY PARTIES OF

1    HIDING THINGS HERE AND --

2              THE COURT:  I THOUGHT YOU WERE.

3              MR. BUNZEL:  NO, I'M NOT.  FRAUDULENT CONVEYANCE.

4              THE COURT:  THREE-CARD MONTE AND ALL THAT, I THOUGHT

5    THAT'S ALL ABOUT SHUFFLE THINGS AROUND.

6              MR. BUNZEL:  A LOT OF COMPLEXITY DESIGNED TO AVOID

7    ASSUMPTION OF LIABILITIES.  INDEED, MR. BLACK'S DECLARATION

8    STATES AT THE -- THAT THE ONLY REASON THIS WASN'T AN ASSET DEAL

9    WAS TO -- BECAUSE OF TAX CONSEQUENCES AND THE BASIS OF THE IP

10   ASSETS THAT THEY STRUCTURED IT AS A STOCK TRANSACTION FOR TAX

11   REASONS.

12             SO THERE'S A LOT OF COMPLEXITY THERE.  THERE WAS A

13   STATEMENT MADE IN DECEMBER OF 2005 THAT OPSYS LIMITED ASSETS

14   REMAIN AVAILABLE TO SATISFY LIABILITIES AT THAT POINT DECEMBER

15   OF 2005, JUST AS THEY WERE BEFORE THE TRANSACTION.  THAT WAS

16   FROM OPSYS LIMITED.

17             THAT'S, I ASSUME, THAT THAT STATEMENT WAS NOT

18   INTENTIONALLY MISLEADING, BUT IT IS INACCURATE.  WE NOW KNOW IN

19   MAY OF 2005 EVERYTHING THAT OPSYS LIMITED OWNED WENT OUT THE

20   WINDOW AND WE CONTINUE TO LITIGATE THIS CASE AT ENORMOUS

21   EXPENSE.

22             NOBODY TOLD US THAT AND I BELIEVE THAT THOSE ASSETS

23   ARE BEING UTILIZED BY THE DEFENDANTS WITH SYNERGIST AND THE

24   LIKE, AS THEY SAY IN THEIR PUBLIC FILE, TO SUPPORT PROFITS AND

25   SHARE PRICE AND VALUE AND EVERYTHING ELSE.        **RJN 296**

1    WITH RESPECT TO THE ESCROW, YOUR HONOR, THE REASON CDT

2  NEEDS TO BE A PARTY IS THAT CDT AND/OR ONE OF THE ITS CELL

3  ENTITIES ARE THE PARTIES TO THAT AGREEMENT WITH THE FORMER

4  OPSYS SHAREHOLDERS, WE AREN'T.  THEY HAVE RIGHTS WITH RESPECT

5  TO THOSE SHARES, TO FORCE THOSE SHARES TO BE SOLD TO SATISFY

6  OPSYS LIMITED LIABILITIES.

7    SO WE NEED CDT IN THIS CASE TO CAUSE THAT TO HAPPEN.

8  I HAD THE FOLLOWING THOUGHT ABOUT WHERE TO GO WITH THIS AND I

9  KNOW THAT BOTH OF THE DEFENDANTS SUGGESTED THAT SOME FURTHER

10  PLEADING MIGHT BE NEEDED.

11    I DON'T KNOW IF THE COURT BELIEVES THAT WOULD BE

12  HELPFUL, BUT WE COULD PREPARE A SHORT SUPPLEMENTAL COMPLAINT TO

13  THE CURRENT COMPLAINT, NOT ADDING MORE THAN TWO OR THREE PAGES

14  WOULD BE MY GOAL, AND THEN SET IT FOR FURTHER STATUS

15  CONFERENCE, IF YOU THINK THAT WOULD BE HELPFUL.

16    **THE COURT:**  I WANT TO GO BACK TO SOMETHING THAT

17  MR. ERICSON ALSO TALKED ABOUT AND THAT WAS ADEQUACY OF

18  CONSIDERATION.                              **RJN 297**

19    **MR. BUNZEL:**  YES.

20    **THE COURT:**  WHAT IS THE EVIDENCE THAT THE

21  CONSIDERATION THAT INVOLVED THIS TRANSFER WAS INADEQUATE?

22    **MR. BUNZEL:**  WE'VE PUT THAT IN MR. AINSLIE'S

23  DECLARATION, HE'S SUMMARIZING PUBLICLY FILED DOCUMENTS IN 2002.

24  THE LIABILITIES OF OPSYS LIMITED WERE APPROXIMATELY $17 MILLION

25  BRITISH POUNDS, WHICH DID NOT INCLUDE RECOGNITION OF THE

1    LIABILITY TO MY CLIENT, SO MAKE IT $22 MILLION-POUND OR SOME

2    SUCH NUMBER IF YOU ADD THIS ONE.

3            AND THE ONLY CASH THAT WENT TO OPSYS LIMITED ITSELF

4    WAS $5 MILLION, WHICH WAS $2 MILLION FOR A TECHNOLOGY LICENSE,

5    $500,000 FOR THE OPTION RIGHTS AND $2 MILLION TO SATISFY

6    CERTAIN LIABILITIES.

7            SO THEY PUT $2 MILLION TO LIABILITY SATISFACTION AS I

8    SEE IT AND OBTAINED ASSETS THAT THEY VALUED AT BETWEEN 19 AND

9    $26 MILLION AND I DON'T THINK THAT'S ADEQUATE CONSIDERATION.

10           THE GOAL OF THIS IF YOU LOOK AT IT GLOBALLY, WAS THAT

11   VALUE FROM THESE ASSETS, WHATEVER THEY WERE WORTH WOULD GET TO

12   THE OPSYS SHAREHOLDERS, AND IT'S BEEN SOMEWHAT HELD UP BECAUSE

13   OF THIS LAWSUIT AND THE ESCROW AND THE LIKE, AND DR. READY'S

14   LAWSUIT.

15           BUT VALUE WOULD GET TO THE SHAREHOLDERS AND WOULD

16   BYPASS, AT LEAST, MY CLIENT AS A CONTINGENT CREDITOR.  THEY

17   SECURED THAT POSSIBILITY WITH SOME ESCROW SHARES, THEY DIDN'T

18   SECURE IT ENOUGH TO COVER THIS LIABILITY, AND AS A CONSEQUENCE

19   I THINK HAVING RETAINED THE ASSETS AND ONLY PUT IN $2 MILLION

20   OR SO TOWARDS SATISFACTION OF LIABILITIES YOU HAVE A CLASSIC

21   CASE WHERE THERE ARE EXCESS LIABILITIES OVER THE CONTRIBUTION

22   FROM THE ACQUIRING COMPANY.

23           THE COURT:  WELL, DOESN'T HAVE TO BE SOME KIND OF

24   CAUSAL RELATIONSHIP, HOWEVER, BETWEEN YOU TWO, THE ACQUISITION

25   OCCURRED AND THE ACQUISITION OF ASSETS AND THE PREDECESSORS

RJN 298

1   INABILITY TO PAY THOSE DEBTS?

2          MR. BUNZEL:  I DON'T KNOW, YOUR HONOR.

3          THE COURT:  DOESN'T THAT HAVE TO BE RELATIONSHIP, NOT

4   JUST THEY CAN'T PAY THEIR DEBTS, HAVE TO BE A RELATIONSHIP

5   BETWEEN THE ACQUISITION AND THE INABILITY TO PAY?

6          MR. BUNZEL:  AND, I THINK, IF THAT IS THE PART OF THE

7   TEST HERE THERE IS A CAUSAL RELATIONSHIP.  IF YOU READ ALL OF

8   THESE TRANSACTIONS TOGETHER, THE INTELLECTUAL PROPERTY AND THE

9   PATENTS WHICH WERE WORTH SOME SUM OF MONEY TO THE CAMBRIDGE

10  PEOPLE IN TERMS OF THE STOCK HAVE A -- THEY VALUED IT IS LONGER

11  THERE, SO THAT THE INABILITY --

12         THE COURT:  WHERE IS THAT?  WHO OWNS --

13         MR. ERICSON:  THE IP'S WHERE IT'S BEEN SINCE 1992 IN

14  THE HAND OF OPSYS UK.  HASN'T GONE ANYWHERE.

15         THE COURT:  THERE 1992.

16         MR. ERICSON:  2002 YOU GET PAST A CERTAIN AGE ALL THE

17  DECADES RUN TOGETHER, I MEANT 2002.

18         MR. BUNZEL:  THAT'S THE SUBSIDIARY THAT ALL THE IP WAS

19  PUSHED DOWN INTO WHICH IS NO LONGER OWNED.

20         THE COURT:  WHICH IS NOW CDT OXFORD?

21         MR. ERICSON:  RIGHT.

22         MR. BUNZEL:  NO LONGER OWNED BY MY CLIENT, ACTUALLY,

23  BY THE JUDGMENT DEBTOR TO MY CLIENT.

24         THE COURT:  YOU'RE SUING YOURSELF.  OKAY.  ANYTHING

25  ELSE ON THIS ISSUE?                          **RJN 299**

1    MR. ERICSON: VERY QUICKLY ON THAT. I DON'T THINK

2    THERE'S ANY THEORY THAT CDT UNDERPAID. IT PAID AN AMOUNT, THAT

3    BOOK SHOW TO BE VASTLY IN EXCESS OF BOOK VALUE OF THAT WHICH IT

4    GOT WAS TREMENDOUS AMOUNT OF GOOD WILL THAT WAS PUT ON THE

5    BOOKS BECAUSE THE PRICE PAID FOR THESE ENTITIES WAS AT LEAST

6    DOUBLE THEIR BOOK VALUE.

7        AND THE RULE HE SUGGESTING IS, I THINK, FOR THE

8    REASONS YOUR HONOR MENTIONED, JUST COMPLETELY WRONG. THE IDEA

9    THAT YOU CAN'T BUY SOMETHING FROM, YOU CAN'T BUY A CORPORATION

10   OR YOU CAN'T BUY SOMETHING FROM A CORPORATION UNLESS YOU PAY AN

11   AMOUNT SUFFICIENT TO COVER ALL THEIR LIABILITIES, THERE'S NO

12   BASIS IN LAW FOR THAT SORT OF ARGUMENT.

13       YOU CAN'T UNDERPAY FOR THE ASSETS, THERE'S NO RULE OF

14   LAW YOU HAVE TO BE DADDY WARBUCKS AND PAYOFF ALL THEIR OTHER

15   CREDITORS TO APPLY SOMETHING FROM LIMITED.

16       YOUR HONOR PUT YOUR FINGER ON IT, THE ONLY REAL ISSUE

17   YOU MAKE YOUR CREDITORS WORSE OFF. THERE'S NO WAY CDT MADE

18   OPSYS CREDITORS WORSE OFF BY PUTTING MONEY INTO OPSYS, BY

19   PUTTING A LOT OF CDT STOCK WHICH IS VALUE IN THERE. AND AS I

20   SAID, ALMOST ALL THE CDT STOCK IS STILL SITTING THERE IN ESCROW

21   OR IN OPSYS MANAGEMENT, IT'S NOT GONE WITH THE WIND OR

22   DISAPPEARED OR ANYTHING.

23       THE COURT: IS THERE ENOUGH TO COVER THE JUDGMENT IN

24   THE CASE?                                    **RJN 300**

25       MR. ERICSON: IF THE CURRENT STOCK PRICE, I DON'T

1    THINK THERE IS.  I THINK, REASON SIGNIFICANT PART OF IT, I

2    THINK THE CURRENT PRICE OF CDT STOCK, I DON'T THINK SO.   I

3    THINK WHAT I SAID EARLIER ON THE ORDER OF 700,000 SHARES, I

4    HAVEN'T CHECKED THE STOCK PRICE IN THE LAST FEW DAYS, BUT I

5    THINK IT WAS FIVE OR SOMETHING LIKE THAT LAST TIME I LOOKED.

6    SO THAT WOULD BE 3 1/2 NOT 4.8, BUT THERE ARE OBVIOUSLY OTHER

7    CLAIMANTS INCLUDING EASTMAN KODAK AS IDENTIFIED IN OUR PAPERS.

8            THE POINT THIS IS NOT SOME SORT OF STRUCTURE WHERE

9    SOME PEOPLE STUCK THE MONEY IN THEIR POCKET AND SNUCK OFF IN

10   THE DARK OF NIGHT, IT'S A CONSIDERATION PAID IN FOR THESE

11   ENTITIES IS STILL SITTING THERE IN THESE ESCROWS.

12           BUT, AGAIN, I JUST THINK THERE IS NO CREDIBLE THEORY

13   ADVANCED THAT CONSIDERATION OF WHAT WERE VERY MUCH ARMS-LENGTH

14   TRANSACTIONS, HEAVILY DOCUMENTED, HEAVILY NEGOTIATED, GOOD LAW

15   FIRMS ON BOTH SIDES AND SO ON, ON ALL RESPECTS ARMS-LENGTH, NO

16   CREDIBLE THEORY OR CREDIBLE EVIDENCE THE CONSIDERATION PAID FOR

17   ANYTHING WAS INADEQUATE BY ANY TEST.

18           THE COURT:  NOW, WERE IT NOT FOR THE EARLIER DISMISSAL

19   WITH RESPECT TO CDT LIMITED, WOULD THERE BE BASIS FOR PURSUING

20   CDT LIMITED?

21           MR. BUNZEL:  YOUR HONOR, MY READING OF DISMISSAL WITH

22   PREJUDICE.

23           THE COURT:  WERE IT NOT FOR THAT.  IS THERE SOME

24   THEORY?                                    **RJN 301**

25           MR. BUNZEL:  I THINK, GIVEN THE PRESENTATION, AS I

1    SAID EARLIER, BY MR. ERICSON'S CLIENTS ABOUT THE INVOLVEMENT OF

2    ALL OF THESE ENTITIES, THAT IS CDT LIMITED, CDT OXFORD LIMITED

3    WHICH IS FORMERLY OPSYS UK, CDT, INC. AND I DON'T KNOW WHAT

4    ABOUT THE PASSIVE HOLDING COMPANY IT'S IN THE MIDDLE.

5            THE COURT:  JUST SWEEP THEM ALL IN THERE, IS THAT YOUR

6    THEORY?

7            MR. BUNZEL:  WE MAY NEED DISCOVERY WITH RESPECT TO ALL

8    OF THEM.  IF THEIR POSITION IS THAT EACH ONE OF THESE IS AN

9    INSULATING LAYER AND HAS NO ASSETS, THEN THAT'S A PROBLEM AND I

10   THINK WE NEED TO ADDRESS HAVING ALL OF THEM BEFORE THE COURT OR

11   AT LEAST FOR PURPOSES OF DISCOVERY.

12           I DON'T BELIEVE THE CDT LIMITED WERE DISMISSED FOR

13   WHATEVER THE CLAIM WAS INTERFERING WITH CONTRACT OR FRAUD, THAT

14   IT WOULD BE INAPPROPRIATE TO HAVE THEM ON A POST VERDICT BASIS

15   BE A PARTY TO AID THE ENFORCEMENT OF A JUDGMENT UNDER RULE 25

16   OR 69.

17           I THINK THAT WOULD -- IT'S NOT BARRED, YOUR HONOR, I'M

18   NOT TRYING TO COMPLICATE THE MATTER, BUT IT'S A COMPLICATED

19   SERIES OF TRANSACTIONS THEY'RE DESCRIBING.  YOU ASKED IF THERE

20   WAS ANYTHING FURTHER ON THIS AND --                **RJN 302**

21           THE COURT:  THAT MAY HAVE BEEN A MISTAKE.

22           MR. BUNZEL:  WELL, I'M SORRY.  YOU'RE PROBABLY RIGHT,

23   BUT WE DID BRING UP IN OUR MOTION PAPERS BECAUSE THE DEFENDANTS

24   ARE CORRECT, THAT OBVIOUSLY DUE PROCESS IS IMPLICATED IN A

25   POST-JUDGEMENT OR POST-VERDICT MOTION SUCH AS THIS AND WE

1    BROUGHT UP THE FACTS SUCH AS WE KNOW THEM ABOUT CONTROL OF THE

2    LITIGATION, AND THERE WAS A STATEMENT FOR THE FIRST TIME, AS

3    FAR AS I KNOW, MY CLIENT KNOWS THAT OPSYS LIMITED HAS SOMEHOW

4    DIRECTED THIS LITIGATION THROUGH A DIRECTOR OF OPSYS LIMITED

5    MR. BLACK.

6         MR. BLACK IS ALSO AN OFFICER OF CAMBRIDGE AND THE

7    OPERATING COMPANY, I BELIEVE THE PUBLIC COMPANY AS WELL, AND IN

8    THE MEETINGS HE DESCRIBES -- IN WHICH HE SAYS HE WAS WEARING

9    HIS OPSYS LIMITED HAT, THE BUSINESS CARD THAT HE PASSED OUT TO

10   MY CLIENT WAS WITH HIS CAMBRIDGE HAT, IF THAT'S AT ALL RELEVANT

11   TO THE COURT I HAVE THOSE MATERIALS.  BUT.

12        **THE COURT:**  NOW WE'RE GOING TO DECIDE THINGS ON THE

13   BASIS OF SOMEBODY'S BUSINESS CARD?

14        **MR. BUNZEL:**  I -- NO, BUT AS TO A FACTOR WITH RESPECT

15   TO DUE PROCESS THERE'S REALLY NO QUESTION CAMBRIDGE ON NOTICE

16   OF THIS LITIGATION, THAT THEY CERTAINLY HAVE DIRECTED, AT

17   LEAST, SETTLEMENT, I BELIEVE, THEY PROBABLY DIRECTED MORE THAN

18   THIS WITH RESPECT TO THIS LITIGATION AND TO COME IN AND THEN

19   SAY THIS COMPANY THAT HAS NO ASSETS.

20        **MR. LICHTERMAN:**  I'M GOING TO OBJECT TO THIS ON THE

21   GROUND ITS ATTEMPT TO USE SETTLEMENT DISCUSSION TO ESTABLISH

22   LIABILITY, FEDERAL RULE OF EVIDENCE 408.          **RJN 303**

23        **MR. BUNZEL:**  WE'RE CERTAINLY NOT DOING THAT.  THE CASE

24   LAW INDICATES THAT WITH RESPECT TO SUCCESSOR LIABILITY CONTROL

25   OR PARTICIPATION IN SETTLEMENT DISCUSSIONS IS ONE OF THE

1  FACTORS AND BOTH MR. ERICSON'S CLIENTS --

2          THE COURT: WE'RE NOT TALKING ABOUT THE SUBSTANCE OF.

3          MR. LICHTERMAN: I DON'T THINK IT'S EVER BEEN

4  ADDRESSED.

5          MR. BUNZEL: BOTH MR. ERICSON'S CLIENTS AND MY PIECE

6  OF PAPER REFERENCE THESE MEETINGS AND THEY DON'T TALK ABOUT THE

7  SUBSTANCE OUT OF RESPECT TO THE FEDERAL RULES.

8          BUT THE PARTICIPANTS, THERE WERE PARTICIPANTS FROM

9  CAMBRIDGE THEY HAVE BEEN ON NOTICE OF THIS CLAIM FOR SOME TIME

10  AND HAVE PARTICIPATED WITH RESPECT TO ITS DIRECTION AND I THINK

11  THAT'S RELEVANT TO THE DUE PROCESS CONSIDERATIONS THAT ARE

12  IMPLICATED HERE.

13          I'M NOT SURE WOULD SATISFY TO THE POINT OF GRANTING

14  OUR MOTION, YOUR HONOR, WITHOUT AN EVIDENTIARY HEARING UNDER

15  THE LUX LINER CASE, HOWEVER.

16          THE COURT: OKAY.

17          MR. ERICSON: ONE POINT.

18          THE COURT: VERY BRIEFLY.

19          MR. ERICSON: MR. BUNZEL SUGGESTED THAT THE DISMISSAL

20  IN AUGUST '05 OF CDT LIMITED WAS ON SOME GROUND THAT'S NO

21  LONGER OPERATIVE, BUT I THINK IF YOU CHECKED, YOUR HONOR, THAT

22  THE RECORD WILL REFLECT THAT WHAT WAS ASSERTED WAS ALTER EGO

23  CLAIM AND THAT WAS DISMISSED WITH PREJUDICE, WHICH IS EXACTLY

24  THE POINT I MADE EARLIER.                    **RJN 304**

25          THEY CANNOT NOW SEEK TO PURSUE ALTER EGO THROUGH

1    LIMITED TO GET AT OTHER ENTITIES SUCH AS CDT, INC. BECAUSE THEY

2    ALREADY TRIED AND LOST THAT.  IT WAS DISMISSED WITH PREJUDICE

3    EXACTLY THE SAME THING ALTER EGO.

4         **THE COURT:**  WHAT EFFECT WOULD THAT HAVE ON A SUCCESSOR

5    LIABILITY CLAIM?  WHERE THE THEORY IS DIFFERENT FROM --

6         **MR. ERICSON:**  IT'S A DIFFERENT THEORY.

7         **THE COURT:**  THEN ALTER EGO, CERTAINLY NOT UNRELATED,

8    CERTAINLY NOT THE SAME.

9         **MR. ERICSON:**  IT'S A DIFFERENT THEORY, IT WASN'T

10   RAISED, SO WE CONCEDE THOSE POINTS.  I THINK, ONE WOULD HAVE TO

11   THINK MORE THAN I THOUGHT ABOUT WHAT RES JUDICATA MEANS IN THIS

12   CONTEXT AND WHETHER THE BAR GOES BEYOND THE EXACT LEGAL THEORY

13   ADVANCED TO RELATED THEORIES THAT COULD HAVE BEEN.

14        **THE COURT:**  WHY NOT WE HAD EVERY OTHER THEORY IN THE

15   BOOK IN THE CASE, THAT WAS SUPPOSEDLY A BREACH OF CONTRACT

16   CASE, WHY NOT ADD ONE MORE?  RES JUDICATA, TAKE A LITTLE

17   COLLATERAL ESTOPPEL, A LITTLE WHATEVER.

18        **MR. BURNS:**  YOUR HONOR, AT THE RISK OF CONFUSING THIS

19   A BIT MORE OPSYS LIMITED MY CLIENT --

                                              **RJN 305**

20        **THE COURT:**  THAT'S YOU, YES.

21        **MR. BURNS:**  ALSO FILED AN OPPOSITION TO THIS RULE 25

22   AND WE WOULD RESPECTFULLY REQUEST AND SUGGEST TO THE COURT THAT

23   THE PROPER PROCEDURE AT THIS POINT IS A NEW COMPLAINT, NOT

24   COMPLAINT IN THE CASE THAT WE'VE JUST TRIED, BUT RATHER A BRAND

25   NEW COMPLAINT COMPLETELY BECAUSE RULE 25 RESPECTFULLY DOES NOT

1   APPLY AND WE WOULD PUT THAT BEFORE THE COURT AND SUGGEST THAT

2   IF THEY WISH TO PROCEED PLAINTIFFS WE CAN'T STOP THEM, BUT THAT

3   SHOULD BE IN A NEW CASE.

4        THE COURT:   THEN IT'S NOT RELATED.   GIVE SOMEBODY ELSE

5   A HEADACHE.

6        MR. BUNZEL:   I THINK THAT'S FORM OVER SUBSTANCE.

7        THE COURT:   OKAY.  WELL, MATTERS SUBMITTED UNTIL

8   ANOTHER DAY.   OKAY.   AND WE'LL FIGURE OUT WHAT WE'RE GOING TO

9   DO WITH IT, IT IS A BIT OF A MESS.

10       MR. ERICSON:   THANK YOU.

11       MR. BUNZEL:   YOUR HONOR, IF WE ARE NOT ON HERE FOR A

12  STATUS CONFERENCE, ONE OF THE THINGS THAT PLAINTIFF WOULD LIKE

13  TO DO AND I KNOW THAT WE'RE COMPLICATING THE MATTER, PERHAPS,

14  BY THE POST-TRIAL MOTIONS EXCUSE ME, IT'S GETTING --

15       THE COURT:   GOING ON.

16       MR. BUNZEL:   -- IT'S GETTING TIRESOME, IS THE ENTRY OF

17  A JUDGMENT.   AND I JUST WANTED TO REMIND YOUR HONOR THAT IN

18  MIDDLE OF MARCH WE SUBMITTED AS AN EXHIBIT TO A POST STATUS

19  PACKAGE, A PROPOSED FORM OF JUDGMENT, AND I'M SURE THAT AT THE

20  TIME THE COURT BELIEVES IT'S APPROPRIATE TO ENTER A FORM OF

21  JUDGMENT WITH OR WITHOUT RULE 54 YOU WILL DO SO.

22       I WANTED TO BRING THAT UP AGAIN, BECAUSE IT IS IN THE

23  ABSENCE OF THAT JUDGMENT I BELIEVE WERE NOT ACCRUING INTEREST

24  SOME NUMBER IN EXCESS OF $30,000 A DAY, SO IT'S IMPORTANT TO

25  MR. CHIU, SUNNYSIDE PEOPLE THAT HAPPEN AND JUST WANTED TO

RJN 306

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1    REMIND THE COURT OF THAT.

2         THE LAST THING I THOUGHT MIGHT SUGGEST THE PARTIES GO

3    BACK TO JAMS AND SEE JUDGE SMITH AT SOME POINT.  MAYBE IT'S

4    AFTER WE'VE FILED, IF THE COURT BELIEVES WE NEED TO FILE A

5    SUPPLEMENTAL PLEADING AFTER WE HAD A STATUS CONFERENCE, BUT

6    DOING THAT I THINK WOULD BE --

7         THE COURT:  YOU'RE CERTAINLY FREE TO DO THAT ANYWAY,

8    YOU DON'T HAVE TO WAIT FOR THE AFOREMENTIONED.  IT WOULD SEEM

9    TO ME TO BE A GOOD IDEA.

10        MR. BUNZEL:  OKAY.

11        THE COURT:  OKAY.

12        MR. BUNZEL:  THANK YOU.

13        THE COURT:  THANK YOU.

14        MR. BURNS:  THANK YOU.

15

16              (PROCEEDINGS ADJOURNED.)

17

18

19

20

21

22

23

24

25                                          **RJN 307**

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 30TH DAY OF MAY, 2007.

JAMES YEOMANS, CSR, RPR

**RJN 308**

# EXHIBIT V

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8
  SUNNYSIDE DEVELOPMENT COMPANY, LLC,
9
                              Plaintiff,
10        v.                                        No. C 05 0553 MHP

11  OPSYS LIMITED,
                                                    **MEMORANDUM & ORDER**
12                  Defendants,                     **Re: Plaintiff's Motion to Add
                                                    Cambridge Display Technology, Inc.
13  _____/               as a Party to Action and Judgment**

14

15        Plaintiff Sunnyside Development Company, LLC ("plaintiff" or "Sunnyside") filed this

16  breach of contract action against defendant Opsys Limited ("defendant" or "Opsys Ltd.") in the

17  California Superior Court for the County of Alameda on December 14, 2004. Defendant removed

18  the action to this court on February 7, 2005. The matter proceeded to jury trial on February 21,

19  2007. On March 9, 2007 the jury returned a verdict in favor of plaintiff. Plaintiff now moves

20  pursuant to Federal Rules of Civil Procedure 25(c) and 69(a) to add Cambridge Display Technology,

21  Inc. ("CDT, Inc.") as a party to the action and judgment. Having considered the parties' arguments

22  and submissions, and for the reasons stated below, the court enters the following memorandum and

23  order.

24

25  BACKGROUND

26        The factual background of this action is set forth in this court's order on defendant's motion

27  for summary judgment. Sunnyside Dev. Co. v. Opsys Ltd., No. C 05 0553 MHP, 2007 WL 419865

28

UNITED STATES DISTRICT COURT
For the Northern District of California

RJN 309

1   (N.D. Cal. Feb. 6, 2007) (Patel, J.). The court addresses the relevant procural and factual

2   background below.

3

4   I.    CDT, Inc.'s History in this Action[1]

5        Plaintiff filed this action on December 14, 2004, in Alameda Superior Court, naming as

6   defendants Opsys Limited and CDT Limited, a subsidiary of CDT, Inc. Both defendants in that

7   action jointly removed the suit to this court on February 5, 2007. The complaint alleged breach of

8   contract and fraud in the inducement against both defendants. Defendants subsequently moved to

9   dismiss the complaint. By order dated April 22, 2005, this court granted the motion in part and

10  denied the motion in part, granting plaintiff "leave to and its complaint for the purpose of alleging

11  facts sufficient to establish a fraud claim as to both defendants and establishing CDT's liability for

12  breach of contract." Docket Entry 20. at 6.

13       Plaintiff filed its First Amended Complaint on May 11, 2005, again naming Opsys Limited

14  and CDT Limited as defendants and asserting claims for fraud and breach of contract. Docket Entry

15  21. Defendants subsequently moved for partial dismissal. By order dated August 8, 2005 this court

16  granted the motion, holding that plaintiff's claims for breach of contract against defendant CDT and

17  its claims for fraud against both defendants were dismissed with prejudice. Docket Entry 39 at 10.

18       On November 2, 2005 plaintiff filed a Motion for Leave to File a Second Amended

19  Complaint and/or to Join a Related Party as Successor-in-Interest. Docket Entry 48. The motion

20  sought to add CDT, Inc. as a successor-in-interest to Opsys Limited pursuant to Federal Rule of

21  Civil Procedure 25(c). Id. at 1. In ruling on plaintiff's motion the court declined to engage in the

22  merits of plaintiff's Rule 25(c) motion on the grounds that joinder of CDT, Inc. at that time was

23  premature. Docket Entry 57 at 7. Accordingly, the court denied plaintiff's motion for leave to add

24  CDT, Inc. as party without prejudice, "subject to renewal if and when the primary liability of Opsys

25  Limited is established." Id. The court granted plaintiff's motion for leave to file a second amended

26  complaint. Id.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

2

1    Plaintiff now renews its Rule 25(c) motion, and additionally seeks to add CDT, Inc. as a

2    party pursuant to Rule 69(a). Opsys Limited and CDT, Inc. have each filed separate oppositions to

3    plaintiff's motion.

4

5    II.    Factual Background[2]

6    Plaintiff asserts that CDT, Inc. has succeeded to the assets and business of defendant, and

7    that CDT, Inc. litigated this case on defendant's behalf. Plaintiff's contention is based on an

8    elaborate series of transactions in 2002 in 2004 involving CDT, Inc., Opsys Limited, and

9    subsidiaries of both companies. While the parties dispute the legal significance of these

10    transactions, the basic facts are largely undisputed.

11    Opsys Limited had two business lines in 2002: research into dendrimer materials, based in

12    the UK, and pilot manufacturing of displays based on small molecule emitters based in Fremont,

13    California. The lease and property at issue in this litigation involved Opsys Limited's pilot

14    manufacturing operations only. Opsys Limited was in serious financial trouble in 2002, having £17

15    million in liabilities. Bunzel Dec., Exh. M at 17–18. Opsys searched for financing and discovered

16    that potential investors were interested only in one business line or the other. No investor would

17    invest in both operations. Accordingly, Opsys Limited decided to split its operations and fund each

18    one separately. As part of the process of "spinning off" Opsys Limited's California operations,

19    defendant entered into the Assignment at issue in this case.

20    By late 2002, CDT, Inc. had been identified as a potential financing partner. According to

21    defendant and CDT, Inc., however, CDT, Inc. was not interested in Opsys Limited's California

22    operations, and would not engage in any transaction involving that business, its associated liabilities,

23    or its obligations under the lease. Fyfe Dec. ¶ 7. As a general matter, CDT, Inc. is a research and

24    design company and had no interest in manufacturing operations. Id. CDT, Inc. made it clear to

25    Opsys that it had no interest in the California assets and business, and that any deal would require a

26    clean separation of the US operations from the UK operations. Id. ¶ 8. Opsys agreed to this

27    arrangement.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On October 23, 2002 Opsys Limited struck a deal to sell interests in its intellectual property

2    related to dendrimer OLED technology and its UK operations to CDT, Inc., which at that time was

3    called CDT Acquisition Corp. Bunzel Dec., Exhs. A & B. As part of this transaction, Opsys

4    Limited transferred all of its UK assets and operations into a subsidiary known as Opsys UK.

5    Bunzel Dec., Exh. A at 5 of 116, clause (F). CDT, Inc. paid Opsys Limited $2.5 million in exchange

6    for 16% of the shares of Opsys UK. Ainslie Dec., Exh. B at 80 of 99. As part of this deal, CDT

7    Limited, a subsidiary of CDT, Inc., was granted management control of Opsys UK and 98% of

8    Opsys UK's profits, if any. Bunzel Dec. Exh. A at 22 of 116 clause 7. Opsys Limited received an

9    additional $2 million from CDT Limited for a license of its technology. Id. at 21 of 116 clause

10   5.1(iii) & 32 of 116 clause 14.2.

11    The 2002 transaction additionally included put and call options. Id. at 16–20 of 116 clause 3

12   & 25–30 of 116 clause 9. The transaction gave CDT, Inc. a call option to purchase the remaining

13   84% of shares in Opsys UK, which were at that time owned by Opsys Limited. The agreement also

14   contained two put option provisions which gave Opsys Limited's shareholders the right to require

15   CDT, Inc. to purchase all shares of Opsys Limited if certain conditions were met. Among the

16   conditions were that Opsys Limited's liabilities could not exceed $1.25 million, that Opsys

17   Limited's share ownership in Opsys UK was its only material asset, that the option exercise price

18   would be reduced by the value of the aggregate current liabilities, and that CDT, Inc. would

19   withhold from the exercise price the amount of all contingent liabilities until the liabilities

20   materialized or until the statute of limitations expired. Id. at 26 of 116 clause 9.4, 27 of 116 clause

21   9.11(a), 28 of 116 clause 9.12; Bunzel Dec., Exh. E at 81 of 99. Opsys Limited received an

22   additional $500,000 for the call option. Id. at 16 of 116 § 3.1. Opsys Limited therefore received a

23   total of $5 million in cash through the October 2002 transaction, and the value of the options

24   exceeded the vale of the assets transferred to Opsys UK as set forth in Opsys Limited's September

25   2002 Report and Financial Statements. Bunzel Dec., Exh. M.

26    Finally, the 2002 transactions involved a number of warranties by Opsys. Namely, that

27   Opsys was not a party to any contract that could not readily be performed by it on time; that it was

28

4

1   not a party to, nor did it have any liability under, any lease; that it was not a party to any contract

2   valued at more than £10,000 or of one year or greater duration; and that it was not under any

3   obligation in respect of unaccrued or undisclosed liabilities in connection with its US operations.

4   Bunzel Dec. ¶ 3, Exh. A at 59–60. A disclosure letter dated October 23, 2002 by Opsys Limited

5   explicitly states that the lease had been assigned to Opsys US. Black Dec., Exh. A. CDT, Inc.

6   asserts that this elaborate transaction structure was designed to minimize tax liability rather than

7   disadvantage plaintiff. Black Dec. ¶¶ 7–13.

8        The 2002 transaction did not involve any assets, including intellectual property, related to

9   Opsys Limited's US operations. Rather, Opsys Limited transferred all of its US assets to a separate

10   subsidiary, Opsys US, and sought financing for that company as well. Opsys Limited was

11   apparently unable to secure financing for Opsys US. As part of this transaction, Opsys Limited

12   attempted to assign the Lease at issue in this litigation to Opsys US, an assignment which the jury in

13   this action subsequently found to have been ineffective.

14        In late 2002, Opsys UK was renamed CDT Oxford Limited. Bunzel Dec., Exh. C at 68 of

15   149; Fyfe Dec. ¶ 9. CDT Oxford Limited remained in operation, being managed by CDT Limited,

16   until mid-2003. Beginning in July 2003, the CDT Oxford Limited facility in Oxford was gradually

17   shut down, and most of its employees were laid off. Id. ¶ 10. Via press release, CDT, Inc.

18   announced that it would close the CDT Oxford Limited facility and "move key scientists to

19   Cambridge as part of a new 'High Efficiency Materials' research group," consolidating the Oxford

20   and Cambridge resources "under one roof." Bunzel Dec., Exh. F. CDT, Inc. asserts that this new

21   materials research group was a fundamental transformation of the pre-existing operations. Fyfe Dec.

22   ¶¶ 9–10. Additionally, CDT, Inc. maintains that Opsys Limited and Opsys UK were separate legal

23   entities that at all times observed the proper corporate formalities. Black Dec. ¶¶ 14–18.

24        Subsequent to the October 2002 transaction, disputes arose between Opsys and CDT, Inc.

25   regarding the transaction and, at one point, Opsys Limited considered legal action against CDT, Inc..

26   Black Dec. ¶¶ 19–22. The companies resolved their dispute via a settlement agreement entered into

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

5

RJN 313

1    on August 3, 2004, which was amended via a second agreement dated December 14, 2004

2    (coincidentally, the date this action was filed in Alameda Superior Court).

3        In the meantime, CDT, Inc. filed a prospectus with the SEC to issue public shares. The

4    prospectus identified CDT, Inc.'s acquisition of the 16% interest in CDT Oxford Limited and the

5    right to control its operations as a key element of its research and development value, and stated that

6    up to $1.2 million of the IPO funds would be used to pay Opsys Limited's liabilities. Bunzel Dec.

7    Exh. C at 29 of 149, 40 of 149, 58 of 149, 68 of 149. As part of the settlement agreement between

8    CDT, Inc. and Opsys Limited, CDT, Inc. exercised its options and acquired 100% of the stock of

9    Opsys Limited in exchange for shares of newly public CDT, Inc. stock valued at $9.8 million.

10   Ainslie Dec., Exh. B at 82 of 99. CDT, Inc. valued the acquisition of CDT Oxford Limited at $26.9

11   million. Id. at 80 of 99; Black Dec. ¶ 25. Black Dec. ¶¶ 21–22, Bunzel Dec. ¶ 6; Exh. D at 4–5. As

12   part of this transaction, it was agreed that a portion of the CDT, Inc. stock offered in exchange for

13   the Opsys Limited stock would indemnify CDT, Inc. for undisclosed or contingent liabilities.

14   Bunzel Dec., Exh. D at 43 of 58 § 4(e). CDT, Inc. asserts that exercising this option was, again, a

15   matter of tax benefits. Black Dec. ¶ 25.

16       As part of the 2004 transaction, 133,938 shares of CDT, Inc. stock valued at a total of

17   $1,607,256 were held back to cover known and identified liabilities. Bunzel Dec., Exh. D at 6

18   (clause 1.1(g)); Black Dec. ¶ 27. The list of identified liabilities did not include the lease. Bunzel

19   Dec., Exh. D at 20–21. Additionally, 422,610 shares of CDT, Inc. stock, valued at $5,071,320 went

20   into escrow as security for contingent and unidentified liabilities. Black Dec. ¶ 28, Exh. D at 9–10

21   clause 1.1(h). The remaining CDT, Inc. shares constituting the payment for the put option were

22   distributed to Opsys management to be distributed between management and shareholders. Black

23   Dec. ¶ 29, Exh. B. CDT, Inc. claims that no shares have yet been distributed to shareholders, and

24   will not be until other creditors are paid off.

25       During the same month as CDT, Inc.'s IPO, plaintiff filed this action. Since that time, Opsys

26   Limited and CDT Oxford Limited have applied for, and obtained, substantial patents related to CDT,

27   Inc.'s research and development business. Bunzel Dec. ¶ 20; Exh. O. These patents are assigned to

28

6

UNITED STATES DISTRICT COURT
For the Northern District of California

1    CDT Oxford Limited or CDT Oxford Limited and CDT, Inc.  Id.  Plaintiff asserts that CDT, Inc.

2    directed this litigation and advanced the funds to defend itself, and that its representatives "presided

3    over the trial," citing evidence that attorneys and other representatives from CDT, Inc. were present

4    at certain proceedings in the instant action.  Bunzel Dec. ¶ 19, Exh. N, ¶¶ 12–13, Exhs. H & I.

5         In May 2005, while this action was pending, CDT, Inc. transferred its 16% interest in CDT

6    Oxford Limited and its 100% interest in Opsys Limited to CDT Limited.  Additionally, Opsys

7    Limited transferred its 84% interest in CDT Oxford Limited to CDT Limited.  Accordingly, CDT

8    Oxford Limited and Opsys are now wholly owned subsidiaries of CDT Limited and indirect

9    subsidiaries of CDT, Inc.  Black Dec. ¶¶ 33–38.  CDT, Inc. claims that these transfers were planned

10   in late 2004, prior to the initiation of this lawsuit.  Black Dec. ¶¶ 24–25.  At the time of these

11   transfers, CDT Limited, rather than CDT, Inc., was a defendant in this action.

12       Subsequent to the return of the jury verdict in this action in favor of plaintiff, CDT, Inc.

13   issued a press release stating that Opsys Limited does "not have any assets, nor does it have any

14   intellectual property rights which are relevant to CDT's business," and that CDT, Inc. did not intend

15   to assist Opsys Limited in funding the litigation.  Bunzel Dec., Exh. J.  The present market

16   capitalization value of CDT, Inc. is over $100 million.

17

18   LEGAL STANDARD

19       Federal Rule of Civil Procedure 25(c) provides, in relevant part: "In case of any transfer of

20   interest, the action may be continued by or against the original party, unless the court upon motion

21   directs the person to whom the interest is transferred to be substituted in the action or joined with the

22   original party."  Rule 25(c) is purely procedural and does not confer any substantive rights.

23   Hilbrands v. Far East Trading Co., Inc., 509 F.2d 1321, 1323 (9th Cir. 1975).  Accordingly, the issue

24   of successor liability in the context of corporate mergers and acquisitions is a matter of state law.

25   LiButti v. United States, 178 F.3d 114, 124 (2d Cir. 1999).

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

7

RJN 315

UNITED STATES DISTRICT COURT
For the Northern District of California

1  DISCUSSION

2  I.    Applicability of Rule 25(c)

3        As a preliminary matter, defendant asserts that Rule 25(c) does not apply at all in these

4  circumstances, as cases have held that Rule 25(c) applies only after a transfer of interest with respect

5  to the subject matter of the suit.  Ignoring the rule that the substantive law of successor liability

6  pursuant to Rule 25(c) is the law of the forum state, defendants cite a number of federal authorities

7  from other circuits in support of this position.  Oddly enough, the authorities cited by defendant

8  generally stand for the proposition that successor liability is appropriate where the subject matter of

9  the action has been transferred *or* the purported successor has acquired all of the defendant's assets

10  and liabilities.  Because plaintiff posits the latter theory, these authorities do not support a

11  categorical bar on successor liability due to the fact that the lease interest was not specifically

12  transferred from Opsys Limited to CDT, Inc..  As discussed below, California state law provides for

13  several circumstances in which successor liability may attach following a general asset transfer.

14        Additionally, plaintiffs rely on an unpublished decision from this district in support of their

15  claim that Rule 25(c) does not apply to stock transfers between shareholders and parent

16  corporations.  Equal Employment Opportunity Comm'n v. Pan Am. World Airways, Inc., No.

17  C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182 (N.D. Cal. Dec. 1, 1987) (Peckham, C.J.).  That case

18  held only that successor liability was not available under those particular facts.  Plaintiffs cite no

19  further support for their proposed categorical bar on successor liability under Rule 25(c) for parent

20  company acquisitions.  As discussed below, however, acquisitions which involve only stock

21  purchases rather than asset purchasers cannot give rise to successor liability, regardless of whether

22  the purchaser is a parent of the seller.

23

24  II.    Successor Liability

25        Plaintiff cites Rule 25(c) and Rule 69(a) as bases for the imposition of successor liability.

26  Because plaintiff appears to consolidate these two rules into a single inquiry, the court will do the

27  same.[3]

28

8

1    The parties appear to be in agreement that California substantive law governs the issue of

2  successor liability for the purposes of this motion.[4]  California law generally provides that, with a

3  few exceptions, successor liability does not attach in the context of an asset purchase:

4    "As typically formulated the rule states that the purchaser [of
     corporate assets] does not assume the seller's liabilities unless (1)

5    there is an express or implied agreement of assumption, (2) the
     transaction amounts to a consolidation or merger of the two

6    corporations, (3) the purchasing corporation is a mere continuation of
     the seller, or (4) the transfer of assets to the purchaser is for the

7    fraudulent purpose of escaping liability for the seller's debts."

8  Beatrice Co. v. State Bd. of Equalization, 6 Cal. 4th 767, 778 (1993) (quoting Ray v. Alad Corp., 19

9  Cal. 3d 22, 28 (1977)).  "Eliminating the exceptions requires disproving at least one element of each

10  exception or showing that at least one such element cannot be established."  Fisher v. Allis-

11  Chalmers Corp. Prod. Liab. Trust, 95 Cal. App. 4th 1182, 1188 (2002).  This is obviously a highly

12  factual inquiry that does not lend itself well to determination without a trial or, at the very least, an

13  evidentiary hearing.  Id. (stating that the successor liability exceptions are "extremely fact

14  sensitive") (internal quotations omitted); Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc., 13 F.3d 69,

15  72–73 (3d Cir. 1993) (holding that where a Rule 25(c) decision "effectively imposes liability," the

16  court should conduct an evidentiary hearing unless the standards for summary judgment have been

17  met).

18    Before turning to the exceptions, however, it is worth noting that successor liability under

19  California law requires the purchase of assets, not merely the purchase of stock.  Potlatch Corp. v.

20  Superior Court, 154 Cal. App. 3d 1144, 1150–51 (1984).  In establishing this rule, the California

21  Court of Appeal made it clear that this is not simply a matter of form over substance.  As the court

22  explained:

23    [T]he fact that Potlatch did not acquire the physical assets of
     Speedspace and its Summer Bell division and continue the business of

24    Summer Bell as a part of its own business but, instead, acquired the
     capital stock of Speedspace is no mere matter of form.  It implicates

25    fundamental concepts and principles of California and United States
     law: corporate identity and shareholder immunity.

26

27

28

9

1    Id. at 1150.  The court further explained that when a corporation acquires only capital stock rather

2    than assets, it becomes a "sole shareholder" of the acquired company, and that "[i]t is fundamental

3    that a shareholder owns no part of the specific property of the corporation."  Id.

4        Here, the record discloses a single relevant transfer of business assets: the transfer of Opsys

5    Limited's UK assets and operations to Opsys UK, which later became CDT Oxford Limited.  CDT,

6    Inc. never acquired these assets, but rather purchased management rights, licenses, and an interest in

7    the profits.  Even if this latter transaction may be considered an asset transfer, which is highly

8    dubious, the "assets" were transferred to CDT Limited, not CDT, Inc.  Transfer to an "intervening

9    corporation" is not sufficient for successor liability to attach under California law.  Katzir's Floor &

10   Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1151 (9th Cir. 2004).  Furthermore, "[t]he mere

11   fact of sole ownership and control does not eviscerate the separate corporate identity that is the

12   foundation of corporate law."  Id. at 1149.  Plaintiff makes no attempt to pierce the corporate veil

13   between CDT Limited and CDT, Inc.  Accordingly, plaintiff's attempt to impose successor liability

14   upon CDT, Inc. fails.

15       Assuming, however, that the transactions may be characterized as an asset transfer from

16   Opsys Limited to CDT, Inc., the court will consider whether any of the above exceptions applies.

17

18   A.    Express or Implied Assumption

19       Plaintiff claims that, notwithstanding the express disclaimers of liability in the transactions

20   between Opsys and CDT, Inc., CDT, Inc. assumed the lease liabilities for a number of reasons.

21   CDT, Inc. understood that there was a risk of undisclosed contingent liabilities of Opsys Limited.

22   Because the lease was ultimately determined to be a liability of Opsys Limited (not having been

23   effectively assigned to Opsys US), plaintiff claims that the lease was a contingent liability assumed

24   by CDT, Inc..

25       In support of this claim, plaintiff asserts that CDT, Inc. has "invaded" the shares in escrow to

26   finance this litigation.  Bunzel Dec. ¶ 11; Exh. G at 17–18 of 59.  However, the passage of the SEC

27   filing that plaintiff cites in support of this position states only that the shares in escrow would be

28

UNITED STATES DISTRICT COURT
For the Northern District of California

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1   forfeited to cover any loss or other costs that may incur to CDT, Inc. as a result of the claim. There

2   is nothing to suggest that CDT, Inc. "invaded" the escrow to "finance" this litigation. Rather, the

3   escrow shares were being used to cover a contingency as originally envisioned. The fact that CDT,

4   Inc. may have incurred some costs or losses as a result of a lawsuit involving one of its subsidiaries

5   does not amount to an assumption of the subsidiary's liability. In any case, the contingent liabilities

6   were ultimately the responsibility of Opsys Limited, not CDT, Inc., as indicated by the fact that

7   CDT, Inc. withheld consideration owed to Opsys Limited in order to satisfy the contingencies.

8   Plaintiffs have therefore failed to show that CDT, Inc. expressly or impliedly assumed the liabilities

9   associated with this litigation.

10

11         B.    Consolidation or Merger

12         Plaintiff contends that the transaction between Opsys Limited and CDT, Inc. was a de facto

13   consolidation or merger. California courts consider the following five factors in determining

14   whether a transaction styled as an asset purchase is a de facto merger:

15               (1) was the consideration paid for the assets solely stock of the
            purchaser or its parent; (2) did the purchaser continue the same
16               enterprise after the sale; (3) did the shareholders of the seller become
            shareholders of the purchaser; (4) did the seller liquidate; and (5) did
17               the buyer assume the liabilities necessary to carry on the business of
            the seller?

18   Marks v. Minn. Mining & Mfg. Co., 187 Cal. App. 3d 1429, 1436 (1986). Plaintiff claims that all

19   five factors favor a finding of de facto merger.

20         First, Cambridge acquired Opsys Limited by issuing 797,965 shares of stock and an

21   additional 19,736 shares to two former Opsys Limited directors. Ainslie Dec., Exh. B. Plaintiff

22   claims that the $5 million in cash paid in 2002 was for a controlling interest in an affiliate, as

23   distinguished from the 100% stock deal in 2004. Second, plaintiff claims that CDT, Inc.'s

24   acquisition of CDT Oxford Limited, along with full management control over CDT Oxford Limited

25   beginning in October 2002, amounts to a continuation of Opsys Limited's enterprise. Third,

26   plaintiff claims that the Settlement Agreement and Amended Agreement each establish that the

27

28

<div align="center">11</div>

UNITED STATES DISTRICT COURT
For the Northern District of California

1    shares of CDT, Inc. will be distributed among Opsys Limited's shareholders, Bunzel Dec., Exh. D,

2    and that the 2004 10-K describes the ultimate acquisition through a 100% stock deal. Ainslie Dec.,

3    Exh. B. Fourth, plaintiff asserts that Opsys Limited has no remaining assets and that the company

4    has therefore liquidated. Ainslie Dec. ¶ 9, Exh. C; Bunzel Dec., Exhs. F & J. Finally, plaintiff

5    argues that CDT, Inc. expressly assumed the operational liabilities of Opsys UK, which held the

6    assets of Opsys Limited. Bunzel Dec., Exh. A at 23 of 116, § 7.5. Regarding this last point,

7    defendant offers an overly ambitious reading of the documentary evidence. The clause in question

8    states that CDT, Inc. would be responsible for liabilities arising from *its management* of Opsys UK,

9    not any pre-existing liabilities.

10        Defendant, in response, focuses on the 2002 transaction, stating that Opsys Limited's assets

11    in the UK were transferred to Opsys UK rather than CDT, Inc., and that Opsys Limited received

12    cash consideration (the $5 million) rather than stock only. Defendant additionally argues that the

13    2004 transaction was not a de facto merger because it did not involve a sale or transfer of assets.

14    Rather, CDT, Inc. acquired only capital stock of Opsys Limited, rendering Opsys Limited a wholly

15    owned subsidiary of CDT, Inc.. The parent-subsidiary structure, according to defendant, insulates

16    CDT, Inc. from Opsys Limited's liabilities.

17        CDT, Inc. further adds that the former Opsys shareholders have not yet received any CDT,

18    Inc. stock, with the exception of the settlement of two personal claims. Black Dec. ¶ 29. CDT, Inc.

19    additionally states that no shares will be distributed until certain superior creditors are paid. Id.

20    This undercuts plaintiff's assertion that the operations of Opsys Limited merely switched hands, as

21    in such circumstances courts expect the shares of the purchaser's stock to be "promptly distributed

22    to the seller's shareholders in conjunction with the seller's liquidation." Marks, 187 Cal. App. 3d at

23    1435. Additionally, CDT, Inc. states that Opsys Limited has not liquidated, Black Dec. ¶ 35, and

24    denies that CDT, Inc. assumed liabilities as discussed above.

25        Analyzing plaintiff's theory, it is clear that plaintiff is selectively characterizing the 2002 and

26    2004 transactions as a single transaction in certain respects and as separate transactions in other

27    respects. For example, in an effort to escape the $5 million in cash consideration paid in 2002,

28

12

RJN 320

1    plaintiff characterizes those funds as going to a controlling interest in an affiliate.  However, plaintiff

2    conflates CDT, Inc.'s acquisition of Opsys Limited's UK subsidiary with the ultimate acquisition of

3    Opsys Limited itself, notwithstanding the fact that Opsys Limited remained an independent company

4    for two years after CDT, Inc. acquired Opsys UK.  Because the Opsys UK deal involved cash

5    consideration, that cash consideration must be considered in evaluating the acquisition of Opsys

6    Limited.  Additionally, CDT, Inc. has submitted evidence that it transformed Opsys UK's operations

7    subsequent to the acquisition.  Fyfe Dec. ¶¶ 9–11.  This is therefore simply not a situation in which a

8    pre-existing business continued following its acquisition by a separate entity.

9         Furthermore, a de facto merger requires a showing that the purchaser paid inadequate

10    consideration for the seller's assets.  Franklin v. USX Corp., 87 Cal. App. 4th 615, 625 (2001) ("The

11    crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a

12    mere continuation is the same: whether adequate cash consideration was paid for the predecessor

13    corporation's assets.").  California courts justify this rigid rule by citing the need for predictability in

14    the field of corporate asset transfers.  Id.  As discussed more fully below, plaintiff has failed to make

15    any showing that CDT, Inc. paid inadequate consideration for Opsys Limited's assets.

16         Accordingly, plaintiff has failed to establish that CDT, Inc.'s acquisition of Opsys Limited

17    was a de facto merger for the purposes of successor liability.

18

19        C.    Continuation

20         Under California law, a corporation acquiring the assets of another corporation is the latter's

21    mere continuation only upon a showing that "(1) no adequate consideration was given for the

22    predecessor corporation's assets and made available for meeting the claims of its unsecured

23    creditors," or "(2) one or more persons were officers, directors, or stockholders of both

24    corporations."  Ray, 19 Cal. 3d at 29.  Plaintiff claims that the research and development business

25    activities of Opsys Limited/Opsys UK continued under one roof after the Cambridge acquisition.

26    Bunzel Dec., Exh. F.  Additionally, plaintiff claims that the consideration was inadequate because

27    Opsys Limited has been left with no assets and therefore unable to pay its debt to plaintiff.  See

28

<div align="center">UNITED STATES DISTRICT COURT<br>For the Northern District of California</div>

<div align="center">13</div>

<div align="right">**RJN 321**</div>

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Katzir's Floor & Home Design, 394 F.3d at 1151.  Regarding continuity of personnel, Opsys

2   Limited's financial controller became a director of the surviving subsidiary Opsys UK, which

3   became CDT Oxford Limited, and Opsys Limited CEO Michael Holmes became an observer on the

4   CDT, Inc. board.  Bunzel Dec., Exh. P.  Finally, plaintiff claims that Opsys Limited shareholders

5   became CDT, Inc. shareholders under the terms of the settlement agreement.  Bunzel Dec., Exh. D.

6        Apart from the two specific requirements delineated in Ray, California courts generally hold

7   that successor liability based on continuation is not established "where the selling and purchasing

8   corporations were completely separate and distinct entities both before and after sale."  Tidewater

9   Oil Co. v. Workers' Comp. Appeals Bd., 67 Cal. App. 3d 950, 955–56.  Here, it is undisputed that

10   CDT, Inc. and Opsys Limited remain separate legal entities.

11        Turning to the "crucial factor" of adequate consideration, Franklin, 87 Cal. App. 4th at 625,

12   plaintiff must show more than Opsys Limited's current inability to pay its debts.  Rather, "there must

13   be a causal relationship between a successor's acquisition of assets (i.e., inadequate consideration),

14   and the predecessor's creditors' inability to get paid."  Katzir's Floor & Home Design, 394 F.3d at

15   1151 (citing Monarch Bay II v. Prof'l Serv. Indus., Inc., 75 Cal. App. 4th 1213 (1999)).  Where it is

16   a "lack of sufficient assets that deprive[s] the predecessor's creditors of their remedy, not the

17   acquisition of the predecessor's assets by another entity," successor liability cannot attach based on a

18   theory of mere continuation.  Id.  See also Franklin, 87 Cal. App. 4th at 627 (holding that inadequate

19   consideration requires a showing that there were insufficient assets available at the time of the

20   acquisition).  In other words, the inability to pay is not itself the basis for finding successor liability.

21   Over and above Opsys Limited's inability to pay, plaintiff must specifically point to inadequate

22   consideration at the time of the purported asset transfer.  Although plaintiff asserts that the $5

23   million cash consideration was less than the value of Opsys Limited's liabilities, plaintiff makes no

24   argument that the payment in exchange for Opsys Limited's approximately £2 million worth of

25   assets was objectively inadequate.  In addition to this cash consideration, CDT, Inc. paid over $11

26   million worth of stock when it finally acquired Opsys Limited as a result of the settlement

27   agreement.  Plaintiff cites no authority for the proposition that in order for consideration to be

28

14

1  sufficient the purchaser must pay off the seller's debts, rather than simply compensate the seller for

2  its assets. Because CDT, Inc. paid consideration which was adequate in light of the assets it

3  received, plaintiff has failed to demonstrate inadequate consideration.

4      Failure to prove inadequate consideration is fatal to plaintiff's claim of mere continuation.

5  However, defendants further attack the sufficiency of plaintiff's evidence regarding the personnel

6  issue. Although the court in Ray required "one or more" persons switching from one company to

7  the other, subsequent decisions have required a more substantial continuity of personnel. In

8  Franklin, 87 Cal. App. 4th at 627, the court noted that some of the cases underlying the holding in

9  Ray "involved near complete identity of ownership, management or directorship after the transfer."

10  None of these cases involved a situation where "only a single person with minimal ownership

11  interest in either entity remained as an officer and director." Id.; see also Maloney v. American

12  Pharm. Co., 207 Cal. App. 3d 282, 288 (1988) ("a mere continuation typically involves continuity of

13  employees beyond [a] single officer"). Here, plaintiffs identify only two individuals allegedly

14  involved in both companies. One became a board member of CDT Oxford Limited, not CDT, Inc.

15  itself, while another became an observer on the CDT, Inc. board. This is hardly the level of

16  personnel continuity that courts look for when finding that an asset transfer amounts to a mere

17  continuation.

18      In sum, plaintiffs have not shown that the transfer of assets from Opsys Limited to CDT, Inc.

19  was a mere continuation of Opsys Limited's operations.

20

21      D.    Fraudulent Purpose

22      In support of its contention that the CDT transaction was entered into for the purpose of

23  avoiding Opsys Limited's debts, including its lease liabilities, plaintiff cites the following passage

24  from CDT, Inc.'s 2004 10-K:

25          The terms of the Transaction Agreement were entered into by the
            Company so that it could gain control of an economic interest in the
26          UK assets and operations of Opsys (which had been transferred to
            Opsys UK immediately prior to the transaction) in such a manner to
27          avoid acquiring any interest in any other assets or liabilities of Opsys.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

15

1   Ainslie Dec. ¶ 8, Exh. B at 81 of 99. This statement is unremarkable. It is undisputed that CDT,

2   Inc. at no time had any interest in Opsys Limited's US operations. Accordingly, the transaction was

3   structured to avoid both the assets and liabilities of the Opsys Limited's US business—in other

4   words, the entire operation. There is no indication that Opsys Limited's attempts to maintain its UK

5   operations by seeking financing from CDT, Inc. was specifically designed to dodge the liabilities of

6   the US operations. Rather, Opsys Limited unsuccessfully sought a financing partner for Opsys US

7   at the same time it was working out its arrangement with CDT, Inc. regarding Opsys UK.

8       Furthermore, it is significant that this alleged fraudulent scheme involved two separate

9   transactions separated by two years. The 2002 transaction, which ultimately resulted in CDT

10  Limited acquiring control over Opsys UK, was supported by its own set of legitimate business

11  reasons. Only two years later did CDT, Inc. acquire Opsys UK by purchasing Opsys Limited

12  through a settlement agreement. Each transaction was supported by adequate consideration, and

13  treating them as a consolidated fraudulent scheme is unwarranted.

14      Plaintiffs additionally point to the fact that defendants transferred CDT Oxford Limited from

15  Opsys Limited to CDT Limited in 2005, while this action was pending, leaving Opsys Limited with

16  no assets. Bunzel Dec. ¶ J. CDT, Inc. claims that these transfers were planned in late 2004, prior to

17  the initiation of this lawsuit. Black Dec. ¶¶ 24–25. At the time of these transfers, CDT Limited,

18  rather than CDT, Inc., was a defendant in this action. Id. An asset transfer between defendants is

19  hardly an attempt to thwart a plaintiff's ability to collect. These facts do not support a finding of

20  fraudulent transfer.

21      Finally, plaintiff argues that the consideration provided in 2002 was insufficient to pay off

22  Opsys Limited's £17 million debts. As discussed above, however, it is undisputed that Opsys

23  Limited received adequate consideration for the assets acquired, if any, by CDT, Inc. Accordingly,

24  this outstanding debt is not a basis for fraudulent transfer.

25      The parties cite California's Uniform Fraudulent Transfer Act, California Civil Code sections

26  3439 et seq., as the controlling authority regarding whether successor liability applies based on the

27  fraudulent transfer exception. A prerequisite for the various forms of fraudulent transfer is that the

28

16

RJN 324

1  acquiring party pays inadequate consideration. Because plaintiff has failed to demonstrate this with

2  respect to any of the transactions at issue, the fraudulent transfer exception does not apply.

3        In sum, plaintiff has clearly not established that CDT, Inc. should be added as a defendant

4  pursuant to Rule 25(c). At the very least, adding CDT, Inc. at this point would require discovery and

5  additional evidentiary proceedings. In light of the weakness of plaintiff's arguments, however, and

6  the undisputed facts in the record, the court holds as a matter of law that CDT, Inc. is not a proper

7  defendant in this action.[5]

8

9  CONCLUSION

10       For the reasons stated above, the court DENIES plaintiff's motion to add Cambridge Display

11 Technology, Inc. as a party.

12

13       IT IS SO ORDERED.

14

15

16 Dated: August 29, 2007

17                                       MARILYN HALL PATEL
                                         United States District Court Judge
18                                       Northern District of California

19

20

21

22

23

24

25

26

27

28

17

RJN 325

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1

### ENDNOTES

2

1. The background facts related to the Cambridge Display Technology companies are taken from
this court's previous orders and other docket entries.

3

4

2. The background facts are taken from the parties' declarations and submissions. Because
defendant has moved to strike plaintiff's declarations, every effort has been made to cite to
documentary evidence rather than the declarations themselves. To the extent that citation to
declarations is necessary to fully set forth the salient facts, the court will rule on defendant's
objections as needed.

5

6

7

3. The specific basis for plaintiff's motion is somewhat unclear. In citing Rule 69(a), plaintiff
seems to raise, but never fully develops, a separate theory of alter ego liability in addition to
successor liability under Rule 25(c). In light of this court's previous orders dismissing plaintiff's
alter ego theories with prejudice, the court is skeptical as to whether such an argument would be
viable, if it were properly raised. Furthermore, plaintiff acknowledges the need to show that CDT,
Inc. controlled the litigation in order to establish alter ego liability pursuant to Rule 69(a), and has
not done so. At best, plaintiff has shown some degree of involvement and interest on the part of
CDT, Inc., which is not surprising in light of the fact that its subsidiary was being sued. In any case,
because plaintiff's successor liability theory appears to be a species of alter ego liability, the court
will focus on the specifically developed successor liability arguments.

8

9

10

11

12

13

14

4. Remarkably, a footnote in defendant's opposition brief claims that plaintiff failed to address the
choice of law issue regarding successor liability. Plaintiff's memorandum of points and authorities,
in fact, devotes almost two pages to this very issue, raising substantial arguments in favor of
California law. Defendant deigns to discuss the California law on which plaintiff relies but "does
not concede that California law, rather than Delaware law, UK law, or some other law, should
apply." In light of defendant's failure to address the choice of law arguments in plaintiff's brief, the
court will consider any choice of law arguments to be waived by defendant, and will assume that
California law controls the issue of successor liability. In its separate brief, CDT, Inc. also attempts
to preserve its challenge to the application of California law but assumes *arguendo* that California
law applies.

15

16

17

18

19

20

21

5. CDT, Inc. additionally argues that plaintiff's instant motion is barred by the doctrine of laches.
Because plaintiff's delay in bringing this motion is due in part to this court's previous order
deferring the issue until after trial, the court finds that the doctrine of laches is inapplicable.

22

23

24

25

26

27

28

**RJN 326**

# EXHIBIT W

(Rule 4.7)    Winding-Up Petition    **Form 4.2**





No. 357 of 2008.

**IN THE** HIGH COURT OF JUSTICE
COMPANIES COURT

**IN THE MATTER OF**
OPSYS LIMITED

(Registered No.    03426174  )

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

(a) Insert title of court    To (a)
THE HIGH COURT OF JUSTICE, COMPANIES COURT

(b) Insert full name(s) and    The petition of (b)
address(es) of petitioner(s)    SUNNYSIDE DEVELOPMENT LLC (Company Registration No. 199932510035,
U.S.A) C/O BEACHCROFT LLP, 100 FETTER LANE, LONDON EC4A 1BN

(c) Insert full name and    1. (c)
registered no. of company    OPSYS LIMITED
subject to petition
(hereinafter called "the company") was incorporated on

(d) Insert date of    (d) 28/08/1997
incorporation

under the Companies Act 1985

2. The registered office of the company is at (e)

(e) Insert address of    BUILDING 2020, CAMBOURNE BUSINESS PARK, CAMBRIDGESHIRE CB23 6DW
registered office

(f) Insert amount of nominal    3. The nominal capital of the company is (f) £ 65,820 & $2000
capital and how it is divided    divided into ATTACHED    shares of £0.1P    each. The amount of the capital paid up

(g) Insert amount of capital    or credited as paid up is (g) £ 42,312 & $2000
paid up or credited as paid up

4. The principal objects for which the company was established are as follows:
TO CARRY ON BUSINESS AS A GENERAL COMMERCIAL COMPANY

and other objects stated in the memorandum of association of the company

RJN 327

Form 4.2 contd.

<div style="margin-left:2em">

(j) Delete as applicable

6. The company <sup>(j)</sup> ~~is~~/is not an insurance undertaking; a credit institution; an investment undertaking providing services involving the holding of funds or securities for third parties; or a collective investment undertaking as referred to in article 1.2 of the EC Regulation.

(k) Insert name of person swearing affidavit

(l) Insert whether main, secondary or territorial proceedings

7. For the reasons stated in the affidavit of <sup>(k)</sup>NICHOLAS BRAINSBY    filed in support here of it is considered that the EC Regulation on insolvency proceedings <sup>(j)</sup> will/~~XXXXXX~~ apply <sup>(j)</sup> and that these proceedings will be <sup>(l)</sup>MAIN proceedings as defined in Article 3 of the EC Regulation

8. In the circumstances it is just and equitable that the company should be wound up

The petition(s) therefore pray(s) as follows:-

(1) that <sup>(c)</sup>
OPSYS LIMITED

may be wound up by the court under the provisions of the Insolvency Act 1986

or

(2) that such other order may be made as the court thinks fit

(m) If the company is the petitioner, delete "the company". Add the full name and address of any other person on whom it is intended to serve this petition

**Note:** It is intended to serve this petition on <sup>(m)</sup>
[the company] [~~XXX~~]

</div>



RJN 328

5. (h)

(h) Set out the grounds on which a winding-up order is sought

THE COMPANY IS INDEBTED TO THE PETITIONER IN THE SUM OF U.S. $4,853,017.00 WITH INTEREST THEREON AT A RATE OF 4.95 PER CENT PURSUANT TO A JUDGEMENT OBTAINED IN THE UNITED STATES DISTRICT COURT, NORTHERN DISCTRICT OF CALIFORNIA IN THE CASE OF SUNNYSIDE DEVELOPMENT COMPANY LLC (PLAINTIFF) V OPSYS LIMITED (A UNITED KINGDOM COMPANY) (DEFENDANT) NO. C 05-00553 MHP. THE JUDGEMENT IS SET OUT BELOW:

"THIS ACTION CAME ON FOR TRIAL BEFORE THE COURT, THE HONOURABLE MARILYN HALL PATEL, UNITED STATES DISTRICT JUDGE, PRESIDING, AND THE ISSUES HAVING BEEN DULY TRIED BEFORE A JURY AND THE JURY HAVING DULY RENDERED ITS VERDICT,

IT IS HEREBY ORDERED AND ADJUDGED THAT THE PLAINTIFF, SUNNYSIDE DEVELOPMENT COMPANY LLC, RECOVER OF THE DEFENDANT OPSYS LIMITED, THE SUM OF $4,853,017.00, WITH INTEREST THEREON AT THE RATE OF 4.95 PER CENT AS PROVIDED BY LAW, AND ITS COSTS OF ACTION."

THE PETITIONER HAS MADE APPLICATION TO THE COMPANY FOR PAYMENT OF THE DEBT IN ACCORDANCE WITH THE COURT JUDGEMENT AS SET OUT ABOVE. ON WEDNESDAY 5 DECEMBER 2007 AT 10.05 A.M. A STATUTORY DEMAND (FORM 4.1) WAS SERVED ON THE COMPANY VIA ITS SOLICITORS OSBORNE CLARKE AT APEX PLAZA, FORBURY ROAD, READING RG1 1AX WHO WERE AUTHORISED TO ACCEPT SERVICE ON THE COMPANY'S BEHALF. NEITHER THE COMPANY NOR ITS SOLICITORS HAVE RESPONDED TO THE STATUTORY DEMAND FOR PAYMENT AND THE COMPANY HAS FAILED AND NEGLECTED TO PAY OR SATISFY THE SAME OR ANY PART THEREOF.

THEREFORE THE PETITIONER CONCLUDES THAT THE COMPANY IS INSOLVENT AND UNABLE TO PAY ITS DEBTS AND IN THE CIRCUMSTANCES IT IS JUST AND EQUITABLE THAT THE COMPANY SHOULD BE WOUND UP.

RJN 329

**Endorsement**

This petition having been presented to the court

on _____15/1/08_____ will be heard at [i] [Royal Courts of Justice,

Strand, London, WC2A 2LL] [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX ]

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

on:

Date _____30ᵗʰ April 2008_____

Time _____10.30_____                    hours

  (or as soon thereafter as the petition can be heard)

The solicitor to the petitioner is:-

Name  MIKE STUBBS

Address  BEACHCROFT LLP, 100 FETTER LANE, LONDON EC4A 1BN

Telephone no  020 7242 1011

Reference  NTB/ARMM SUN119-0507298

[i] XXXXXXXXXXXXXXXXXXXXXXXX

Name _____

Address _____

_____

Telephone no _____

Reference _____ ]

(n) Insert name and
address of Court

(o) Insert name and
address of District
Registry

**RJN 330**

Laserform International 5/02

Classes of Shares: OPSYS LIMITED

Ordinary 0.1p Shares

A Preference 0.1 cent Shares

B Preference 0.1p Shares

C Preference 0.1p Shares

D Preference 0.1p Shares

E Preference 0.1p Shares

A Ordinary 0.1p Shares

B 0.1p Shares

C Ordinary 0.1p Shares

Deferred 0.1p Shares

RJN 331