EX-99.1 2 rrd79908_5940.htm PRESS RELEASE DATED MAY 24, 2005

JOINT VENTURE ANNOUNCED IN POLYMER OLED MATERIAL SUPPLY

CAMBRIDGE, United Kingdom, 24th May 2005 - Cambridge Display Technology (CDT) [Nasdaq: OLED] and Sumitomo Chemical have announced the signing of a memorandum of understanding which will lead to the formation of a new joint venture company to develop and supply advanced polymer OLED (P-OLED) materials and formulated inks for use in commercial P-OLED display and lighting applications.

The new company, to be based in Tokyo, Japan, will be owned equally by the two parent companies, and will have the largest concentration of P-OLED material development expertise and intellectual property (IP) in the OLED industry.

The parent companies will channel their existing P-OLED materials research and development activities into the new JV company, which will have access to the P-OLED material IP of the parent companies. Sumitomo has recently completed the acquisition of the Lumation™ business from The Dow Chemical Company, and will make available, on an exclusive basis, the polyfluorenes technology and IP of the Lumation business to the joint venture.

To ensure a smooth transfer of technology and to avoid disruption to customers, Sumitomo and Dow have agreed to cooperate in transitional period activities.

P-OLED materials manufacture will ultimately be based in Japan.

The joint venture will have access to the strongest materials set in the polymer OLED sector, including the current best-performing full colour P-OLED materials based on polyfluorene chemistry which CDT and Dow have separately developed over the last ten years. It will also have exclusive access to 'next generation' high efficiency materials based on dendrimer chemistry which CDT gained through the acquisition of Opsys in 2002.

Sumitomo and CDT have been working together since 2003 on the dendrimer class of materials and have made great progress.

The existing range of Sumitomo P-OLED materials will now be manufactured and supplied by the joint venture, while for CDT, this is the first time that the company has been directly involved in the materials supply business.

This new joint venture company, once established, will combine the high quality chemicals manufacturing experience of Sumitomo with the leading edge P-OLED development know-how of CDT and Sumitomo, and ensure that display and lighting producers have access to the very best performing materials. The synergies which flow from combining the experiences of the companies should increase the pace of development of P-OLED materials, and in turn this is expected to accelerate the adoption of the technology in the next generation of consumer products such as mobile phones, portable DVD players and ultimately televisions.

The parties will work on a Definitive Agreement over the coming weeks in order to implement the non-binding memorandum of understanding.

For Sumitomo Chemical, Mr. Satoshi Kawachi, Executive Vice President said: "Sumitomo Chemical has been committed to the development of P-OLED materials since 1989 and has accumulated a substantial technology base which includes technology relating to design and product manufacture. CDT has been a leader of the industry and owns advanced technology regarding P-OLED devices and materials. Combining the strengths of the two companies, along with former Dow technology, the joint venture will accelerate significantly the development of innovative materials and be able to respond to our customers' requirements."

For CDT, Dr David Fyfe, CEO said: "Sumitomo is one of the world's leading chemical companies. Sumitomo became a licensee and a CDT investor in 2001. Since that time, CDT has been developing a deepening relationship with Sumitomo Chemical, and this joint venture is the latest important product of our relationship. Sumitomo has shown great vision and boldness of action, first in acquiring the Lumation business and now in joining with us in the joint venture. We believe that this combination will have substantial synergies, and should be seen as very positive for CDT investors and the display industry alike."

About CDT

Cambridge Display Technology is a pioneer in the development of light emitting polymers (P-OLEDs) and their use in a wide range of electronic display products used for information management, communications and entertainment. P-OLEDs are part of the family of organic light emitting diodes, or OLEDs, which are thin, lightweight and power efficient devices that emit light when an electric current flows. P-OLEDs offer an enhanced visual experience and superior performance characteristics compared with other flat panel display technologies such as liquid crystal displays, and have the key advantage that they can be applied in solution using printing processes. Founded in 1992, the company is headquartered in Cambridge, UK and listed on the US Nasdaq stock exchange under the symbol 'OLED'.

More information on CDT can be found at: www.cdtltd.co.uk

About Sumitomo Chemical

Sumitomo Chemical Company, Limited is one of Japan's leading chemical manufacturers, offering a diverse range of products, including basic chemicals, petrochemicals, fine chemicals, IT-related chemicals, agricultural chemicals, and pharmaceuticals. Established in 1913, its products are now sold in more than 100 countries. Sumitomo Chemical's strong basic and applied research programs have yielded numerous products that have gained top market shares in global markets. More information is available about Sumitomo Chemical at: www.sumitomo-chem.co.jp/english/.

Statements contained in this press release that are not historical facts are "forward-looking statements" and their presence may be indicated by words such as "believe," "expect," "anticipate," "intend," "plan," "estimate," "seek," "will," "may," the negative thereof and similar expressions. There can be no assurance that future developments affecting Cambridge Display Technology, Inc. and its subsidiaries will be those anticipated by management. Among the factors, risks and uncertainties that could cause actual results to differ, possibly materially, from expectations or estimates reflected in such forward-looking statements are the following: the outcomes of our ongoing and future research and development activities; our ability to form and continue strategic relationships with manufacturers of P-OLED materials and displays; future demand for products using our P-OLED technology; and our future capital requirements and our ability to obtain additional financing when needed. Readers should also consider the additional factors described under the caption "Business-Risk Factors" in our 10-K and 10-Q Reports filed with the Securities and Exchange Commission. Investors should not place undue reliance on such forward-looking statements and we undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

Editorial Contacts

CDT -

Terry Nicklin

Marketing Director

email: tnicklin@cdtltd.co.uk

tel: +44 1954 713600

EX-99.1 2 rrd79908_5940.htm PRESS RELEASE DATED MAY 24, 2005

JOINT VENTURE ANNOUNCED IN POLYMER OLED MATERIAL SUPPLY

CAMBRIDGE, United Kingdom, 24th May 2005 - Cambridge Display Technology (CDT) [Nasdaq: OLED] and Sumitomo Chemical have announced the signing of a memorandum of understanding which will lead to the formation of a new joint venture company to develop and supply advanced polymer OLED (P-OLED) materials and formulated inks for use in commercial P-OLED display and lighting applications.

The new company, to be based in Tokyo, Japan, will be owned equally by the two parent companies, and will have the largest concentration of P-OLED material development expertise and intellectual property (IP) in the OLED industry.

The parent companies will channel their existing P-OLED materials research and development activities into the new JV company, which will have access to the P-OLED material IP of the parent companies. Sumitomo has recently completed the acquisition of the Lumation™ business from The Dow Chemical Company, and will make available, on an exclusive basis, the polyfluorenes technology and IP of the Lumation business to the joint venture.

To ensure a smooth transfer of technology and to avoid disruption to customers, Sumitomo and Dow have agreed to cooperate in transitional period activities.

P-OLED materials manufacture will ultimately be based in Japan.

The joint venture will have access to the strongest materials set in the polymer OLED sector, including the current best-performing full colour P-OLED materials based on polyfluorene chemistry which CDT and Dow have separately developed over the last ten years. It will also have exclusive access to 'next generation' high efficiency materials based on dendrimer chemistry which CDT gained through the acquisition of Opsys in 2002.

Sumitomo and CDT have been working together since 2003 on the dendrimer class of materials and have made great progress.

The existing range of Sumitomo P-OLED materials will now be manufactured and supplied by the joint venture, while for CDT, this is the first time that the company has been directly involved in the materials supply business.

This new joint venture company, once established, will combine the high quality chemicals manufacturing experience of Sumitomo with the leading edge P-OLED development know-how of CDT and Sumitomo, and ensure that display and lighting producers have access to the very best performing materials. The synergies which flow from combining the experiences of the companies should increase the pace of development of P-OLED materials, and in turn this is expected to accelerate the adoption of the technology in the next generation of consumer products such as mobile phones, portable DVD players and ultimately televisions.

The parties will work on a Definitive Agreement over the coming weeks in order to implement the non-binding memorandum of understanding.

For Sumitomo Chemical, Mr. Satoshi Kawachi, Executive Vice President said: "Sumitomo Chemical has been committed to the development of P-OLED materials since 1989 and has accumulated a substantial technology base which includes technology relating to design and product manufacture. CDT has been a leader of the industry and owns advanced technology regarding P-OLED devices and materials. Combining the strengths of the two companies, along with former Dow technology, the joint venture will accelerate significantly the development of innovative materials and be able to respond to our customers' requirements."

For CDT, Dr David Fyfe, CEO said: "Sumitomo is one of the world's leading chemical companies. Sumitomo became a licensee and a CDT investor in 2001. Since that time, CDT has been developing a deepening relationship with Sumitomo Chemical, and this joint venture is the latest important product of our relationship. Sumitomo has shown great vision and boldness of action, first in acquiring the Lumation business and now in joining with us in the joint venture. We believe that this combination will have substantial synergies, and should be seen as very positive for CDT investors and the display industry alike."

About CDT

Cambridge Display Technology is a pioneer in the development of light emitting polymers (P-OLEDs) and their use in a wide range of electronic display products used for information management, communications and entertainment. P-OLEDs are part of the family of organic light emitting diodes, or OLEDs, which are thin, lightweight and power efficient devices that emit light when an electric current flows. P-OLEDs offer an enhanced visual experience and superior performance characteristics compared with other flat panel display technologies such as liquid crystal displays, and have the key advantage that they can be applied in solution using printing processes. Founded in 1992, the company is headquartered in Cambridge, UK and listed on the US Nasdaq stock exchange under the symbol 'OLED'.

More information on CDT can be found at: www.cdtltd.co.uk

About Sumitomo Chemical

Sumitomo Chemical Company, Limited is one of Japan's leading chemical manufacturers, offering a diverse range of products, including basic chemicals, petrochemicals, fine chemicals, IT-related chemicals, agricultural chemicals, and pharmaceuticals. Established in 1913, its products are now sold in more than 100 countries. Sumitomo Chemical's strong basic and applied research programs have yielded numerous products that have gained top market shares in global markets. More information is available about Sumitomo Chemical at: www.sumitomo-chem.co.jp/english/.

Statements contained in this press release that are not historical facts are "forward-looking statements" and their presence may be indicated by words such as "believe," "expect," "anticipate," "intend," "plan," "estimate," "seek," "will," "may," the negative thereof and similar expressions. There can be no assurance that future developments affecting Cambridge Display Technology, Inc. and its subsidiaries will be those anticipated by management. Among the factors, risks and uncertainties that could cause actual results to differ, possibly materially, from expectations or estimates reflected in such forward-looking statements are the following: the outcomes of our ongoing and future research and development activities; our ability to form and continue strategic relationships with manufacturers of P-OLED materials and displays; future demand for products using our P-OLED technology; and our future capital requirements and our ability to obtain additional financing when needed. Readers should also consider the additional factors described under the caption "Business-Risk Factors" in our 10-K and 10-Q Reports filed with the Securities and Exchange Commission. Investors should not place undue reliance on such forward-looking statements and we undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

Editorial Contacts

CDT -

Terry Nicklin

Marketing Director

email: tnicklin@cdtltd.co.uk

tel: +44 1954 713600

8-K 1 rrd97289.htm FORMATION OF JOINT VENTURE WITH SUMITOMO

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 8-K

**Current Report**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported):  11/16/2005**

# Cambridge Display Technology, Inc.

(Exact name of registrant as specified in its charter)

**Commission File Number:  000-51079**

| | |
|---|---|
| **Delaware** | **13-4085264** |
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

c/o Cambridge Display Technology Limited
**2020 Cambourne Business Park**
**Cambourne**
**CB3 6DW**
(Address of principal executive offices, including zip code)

**011 44 1954 713600**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ]   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ]   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ]   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.    Entry into a Material Definitive Agreement**

On November 9th, 2005, Cambridge Display Technology Limited ("CDT"), a subsidiary of Cambridge Display Technology, Inc. ("the Company"), entered into a joint venture agreement ("JVA") with Sumitomo Chemical Company Limited ("Sumitomo"). The JVA provides for the organisation and capitalisation of Sumation Company Limited ("Sumation"), a limited liability company incorporated under the laws of Japan. The purpose of the JVA is to develop and supply advanced polymer organic light emitting diode ("P-OLED") materials and formulated inks for use in commercial P-OLED displays and lighting applications.

Each party has contributed initial working capital to the Sumation in exchange for a 50% voting and ownership interest. The parties have agreed and are committed to an initial two year budget and additional funds will be requested on an 'as-needed' basis, with equal funding coming from each party.

CDT and Sumitomo have equal representation on the board of Sumation.

The JVA is of indefinite term, but does include provisions for the sale of part or all of CDT's equity stake to Sumitomo at fair market value after a minimum of five years.

In conjunction with the execution of the JVA and effective November 14, 2005, CDT Oxford Limited, a subsidiary of the Company, is licensing materials intellectual property, owned by (or licensed to) CDT Oxford Limited, to Sumation and the Company is executing amendments to existing licenses to Dow (now assigned to Sumitomo) and to Sumitomo to enable Sumitomo (on behalf of itself and as successor to the license to Dow) to sub-license this intellectual property to Sumation. Sumitomo recently acquired Dow Chemical's P-OLED materials business and the acquired intellectual property rights will also be licensed to Sumation.

Throughout the term of the initial two year budget, both Sumitomo and CDT Oxford Limited will provide research and development services for Sumation. After the initial two year period of providing such services, good faith discussions will take place regarding the third and subsequent years.

For an initial period of three years, Sumation will sub-contract its manufacturing requirements to Sumitomo with Sumitomo having the right to sub-contract this manufacturing to its affiliates.

The JVA may be terminated by either party by mutual written agreement, or by one of the parties in the case of a material breach of the other party. In addition, the JVA may be terminated in the event of the bankruptcy or insolvency of either party, or if a 40% interest is acquired in one party by a direct and substantial competitor of the other joint venture party. The JVA will also terminate if Sumitomo acquires 100% of the shares in the joint venture.

The foregoing summary of the material terms of the agreements referred to above is qualified in its entirety by reference to the text of these agreements, which will be filed as exhibits to the Company's annual report on Form 10-K for the year ended December 31, 2005.

Sumitomo is a shareholder in the Company, owning less than 5% of the Company's common stock.

---

**Signature(s)**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Cambridge Display Technology, Inc.

Date: November 16, 2005

By:     /s/    Daniel Abrams

Daniel Abrams
Chief Financial Officer



Search for

TECHNOLOGY    TECHNOLOGY DEVELOPMENT    RESOURCES    ABOUT US    PRESS    CAREERS    FAQS    EVENTS

HOME | SITEMAP | CONTACT US                                                16 August 2008



Home > Press > Archive Press Release Index > 2007 > Sumitomo Chemical Company Completes Acquisition of

## Press

Current Press Release Index

**Archive Press Release Index**
- 1999 and before
- 2000
- 2001
- 2002
- 2003
- 2004
- 2005
- 2006
- 2007

Image Library

Media Kit

- - - - - - - - - - - - - - - - - - -

Cambridge
20:47

San
Francisco
12:47

Tokyo
05:47



- - - - - - - - - - - - - - - - - - -

# Current Press Releases

19th September 2007

### Sumitomo Chemical Company Completes Acquisition of Cambridge Display Technology for $12 per Share

**TOKYO and CAMBRIDGE, England, Sept. 19, 2007 (PRIME NEWSWIRE) --** Sumitomo Chemical Company (Sumitomo Chemical) and Cambridge Display Technology Inc. (Nasdaq:OLED) (CDT), a developer of technologies based on polymer organic light emitting diodes (P-OLEDs), today jointly announced that Sumitomo Chemical has completed its $285 million acquisition of CDT, by means of a merger between CDT and a wholly owned subsidiary of Sumitomo Chemical. The merger consideration represents a 107 percent premium over CDT's 90-day average closing share price and a 95 percent premium over CDT's closing share price of $6.15 on July 30, the last trading day prior to first public announcement of the acquisition.

Holders of over 73% of CDT's outstanding common shares approved the merger earlier today, and all customary closing conditions have now been satisfied. As a result of the merger, CDT's common stock will no longer be publicly traded after today and will be converted into the right to receive $12 per share in cash.

CDT has appointed Mellon Investor Services LLC to act as paying agent for this transaction. Mellon Investor Services LLC will contact CDT shareholders shortly to arrange for payment.

Nikko Citigroup Limited, Citigroup Global Markets Inc. and Pillsbury Winthrop Shaw Pittman LLP advised Sumitomo Chemical in the transaction. Cowen and Company, LLC and Cadwalader, Wickersham & Taft LLP advised CDT.

---

Safe Harbor

CDT DISCLOSURE NOTICE: This news release contains forward-looking statements that predict or describe future events or trends. The matters described in these forward-looking statements are subject to known and unknown risks, uncertainties and other unpredictable factors, many of which are beyond CDT's control. CDT faces many risks that could cause its actual performance to differ materially from the results predicted by its forward-looking statements. CDT's performance may be impacted by many factors, including (i) the outcomes of its ongoing and future research and development activities, and those of its licensees, related to its polymer organic light emitting diode, or P-OLED, Total Matrix Addressing, or TMA, and related technologies; (ii) the potential commercial applications of its P-OLED, TMA and related technologies, and of OLED products in general; (iii) its ability to form and continue joint ventures and other strategic relationships with manufacturers of P-OLED materials, displays and other devices which incorporate its technologies; (iv) successful commercialization of products including its P-OLED, TMA or related technologies by CDT or by its licensees; (v) the willingness of these manufacturers and licensees to continue to develop, manufacture and sell commercial products integrating CDT's technology; (vi) future demand for products using its P-OLED, TMA or related technologies; (vii) the comparative advantages and disadvantages of its technologies versus competing technologies currently on the market; (viii) the nature and potential advantages of any competing technologies that may be developed in the future; (ix) CDT's ability to compete against third parties with greater resources; (x) its ability to maintain and improve its competitive position following the expiration of its fundamental patents; (xi) the adequacy of protection afforded to it by the patents that it owns or license and the cost to it of enforcing that protection; (xii) its ability to obtain, expand and maintain patent protection in the future and to protect its unpatentable intellectual property; (xiii) developments in and expenses associated with resolving matters currently in litigation; (xiv) the payments that it expects to receive in the future under its existing contracts and the terms that it is able to enter into with new licensees of its technology; (xv) exposure of its international operations and those of its licensees to significant risks; (xvi) its future capital requirements and its ability to obtain additional financing when needed; and (xvii) its future P-OLED technology licensing and other revenues and results of operations. The reports that CDT files with the U.S. Securities and Exchange Commission ("SEC") contain a fuller description of these and many other risks to which CDT is subject. Because of those risks, CDT's actual results, performance or achievements may differ materially from the results, performance or achievements contemplated by its forward-looking statements. The information set forth in this news release represents management's current expectations and intentions. CDT assumes no responsibility to issue updates to the forward-looking matters discussed in this news release.

## Media Contact

**CDT**
Michael Black                         email: investors@cdtltd.co.uk
CFO of CDT                            tel: +44 (0) 1954 713600

## Investor Relations Contact

**The Paciente Group**
Brandi Piacente                       tel: +1-212-481-2050

## Investor Relations Contact

**Sumitomo Chemical Co., Ltd**
Corporate Communications Dept.        email: hirayamat1@sc.sumitomo-chem.co.jp
                                      tel: +81 3 5543 5102

● back to top



# England and Wales Court of Appeal (Civil Division) Decisions

[New search] [Printable RTF version] [Help]

Neutral Citation Number: [2006] EWCA Civ 542

Case No: A3/2005/1183

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM
HHJ Weeks QC sitting as a deputy Judge
of the High Court of Justice Chancery Division dated 16 May 2005

Royal Courts of Justice
Strand, London, WC2A 2LL

12th May 2006

B e f o r e :

**LORD JUSTICE WALLER**
**LADY JUSTICE ARDEN**
and
**SIR MARTIN NOURSE**

------------------------

Between:

**HILL (As Trustee in Bankruptcy of Nurkowski)**

Appl Applicant/Respondent to
Appeal

**- and -**

**SPREAD TRUSTEE COMPANY LTD & Anor**

Respondents/Appellants

------------------------

(Transcript of the Handed Down Judgment of
Smith Bernal WordWave Limited
190 Fleet Street, London EC4A 2AG
Tel No: 020 7421 4040 Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

------------------------

Catherine Newman QC and Timothy Evans (instructed by Osborne Clarke) for the Appellants
Stephen Davies QC and Stefan Ramel (instructed by Clarke Willmott) for the Respondents

------------------------

**HTML VERSION OF JUDGMENT**

------------------------

Crown Copyright ©

**Lady Justice Arden:**

1. The judgment under appeal in this case occupies nearly eighty pages of the law reports ([2005] BPIR 842). It concerns claims

made by the trustee in bankruptcy of a Mr Nurkowski to obtain relief under section 423 of the Insolvency Act 1986 ("the 1986 Act") in respect of a settlement made by Mr Nurkowski in favour of his daughter, and in respect of certain charges given by him to the trustees of that settlement. The appellant trustees challenge a number of the judge's crucial findings of fact. But this appeal also raises a number of important issues of law about claims made under section 423 with which we must also deal. The relevant statutory provisions are set out in the appendix to this judgment. The essence of section 423 of the 1986 Act is that it empowers the court to avoid transactions entered into at any time if made by a person at an undervalue and with the purpose of prejudicing his creditors. As we shall see, section 423 is cast in very wide terms in order to cover the vast range of transactions which might meet the basic criteria which I have just mentioned. As I said in *IRC v Hashmi* [2002] 2 BCLC 489, 504:

> "Section 423 plays an important role in insolvency law. It can moreover apply even though the debtor is not in a formal insolvency … Section [423] is a carefully calibrated section forming part of a carefully calibrated group of sections."

2.  I have dealt with all the issues that were argued, save as stated in paras 118 and 138 below.

3.  This then is an appeal by Spread Trustee Company Limited and Mr David John Warr, the trustees of the Henry Stanley Nurkowski Maintenance and Settlement Trust ("the trustees"), against the order of HHJ Weeks QC sitting as a deputy Judge of the High Court of Justice, Chancery Division. By his order it was declared, on the application of Mr Richard Hill, Mr Nurkowski's trustee in bankruptcy, that the settlement dated 10 March 1989 ("the settlement"), of which the trustees are trustees, two legal charges dated 17 April 1996 and 12 August 1996 (respectively "the second legal charge" and "the third legal charge" and collectively "the later charges") and an assignment dated 21 November 1997 in their favour of a loan account owed to Mr Nurkowski by his company HS and KM Nurkowski Ltd ("the company") constituted transactions within section 423(3) of the 1986 Act. By way of relief in respect of these transactions, the order provided (1) that the trustees should indemnify the estate of Mr Nurkowski in bankruptcy against any claim by HM Revenue & Customs ("the Revenue") to set aside a compromise of tax liabilities made with Mr Nurkowski on 30 March 1993 ("the compromise"); (2) that the first legal charge and the second legal charge should be set aside; and (3) that the trustees should repay the sum of £162,051 plus interest to Mr Nurkowski paid to them under the assignment dated 21 November 1997, such sum to be recredited to the amounts owed by him to the trustees.

*The background*

4.  The judge set out the background in detail in his judgment, and my summary, which follows, is based largely on his judgment. The paragraphs of the judgment of the judge are not numbered and accordingly I will use page references from the report in BPIR. My summary should be read with the report of the judge's judgment. The numbers in brackets are references to the pages of that report.

5.  The events in issue occurred between 1988 and 2001. I will start with an overview of the facts. Mr Nurkowski, an ice-cream manufacturer and vendor with commercial interests also in building and property development, owned two fields, called respectively OS149 (3½ acres) ("the bottom field") and OS160 (4½ acres) (the bottom field), at Hilperton, near Trowbridge, Wiltshire. These fields abutted an area of some 200 acres ("the Paxcroft Mead development") for which Gallagher Limited ("Gallagher") made an application for planning permission. (Unless otherwise stated, when I refer to OS 149, I include a small parcel of land forming part of the top field which was known as OS 149A). The application for planning permission was made to West Wiltshire District Council and Mr Nurkowski was a member of the planning committee of that Council, though he did not vote on the grant of permission to Gallagher on 4 April 1989. About a month before that resolution, Mr Nurkowski had made a gift into settlement of OS160. The settlement was a newly formed accumulation and maintenance settlement for Mr Nurkowski's 2 ½ year old daughter, Anna. Those representing Mr Nurkowski advised subsequently the Revenue that OS 160 was worth only £35,000 on its settlement in March 1989. In fact, the judge found that Mr Nurkowski had already received an offer for this field of £700,000 from Gallagher and that Mr Nurkowski knew that £700,000 was the minimum value of OS160. OS149 and OS160 were sold some five months after the settlement for £2m, even though neither field was within the planning permission which had been given.

6.  The Revenue did not accept the valuation of £35,000 for OS 160 put forward by Mr Nurkowski's advisers. In due course, the Revenue agreed to compromise its claim against Mr Nurkowski in the sum of £160,000. The trustee in bankruptcy takes the view that that compromise was colourable and that the Revenue could now raise a new assessment under section 29 or section 36 of the Taxes Management Act 1970.

7.  Following the receipt of the sale consideration, the trustees made a number of loans to Mr Nurkowski. Between 1994 and 1997 Mr Nurkowski executed charges conferring additional security on the trustees for its loans to him. He also made an assignment to the trustees of the sums owed to him by the company on loan account. The first of these charges is not material for the purposes of this appeal.

8.  We have been provided with a helpful chronology prepared by counsel. In reading the summary below, the following critical dates should be borne in mind:

14 March 1986 Mr Nurkowski acquires OS 149 and OS 160 for £21,000

10 March 1989 gift of OS 160 into settlement

4 April 1989 Gallagher's planning application granted for land abutting OS 149 and OS 160

1/2 August 1989 OS160 sold to Gallagher (£218,000 paid immediately and £518,000 deferred until 2 February 1991)

10 October 1989 Submission to the Revenue of a valuation of £35,000 for OS160

16 February 1993 No 1 Loan (£250,000) secured over the share certificates representing shares in the company

28 March 1993 No 2 Loan (£198,500) secured over the Lion & Fiddle public house

30 March 1993 compromise between Mr Nurkowski, the trustees and the Revenue

30 March 1993 No 3 Loan (£160,000) secured over land at Cockhill, Trowbridge

19 May 1993 No 4 Loan (£30,000) (no additional security)

29 June 1993 No 5 Loan (£70,000) secured over The Three Lions, Holt, Wiltshire

17 April 1996 the second legal charge. This was an all monies charge which gave the trustees security over Mr Nurkowski's home, a property called Enniswood

12 August 1996 a field adjoining Enniswood was charged to the trustees – the third legal charge

27 September 1996 all monies charge executed in favour of the trustees ranking behind a charge over the property already given to Lloyds Bank plc (Lloyds)

21 November 1997 assignment by way of charge by Mr Nurkowski in favour of the trustees of his loan account with the company

7 January 1998 the Revenue assess capital gains tax on Mr Nurkowski in respect of the sale of OS 149 in the sum of £436,790.32

28 January 1999 a bankruptcy order was made against Mr Nurkowski on the Revenue's petition

4 December 2002 Notice of this application was issued by the trustee in bankruptcy

9. I will now amplify this summary of events. The judge deals with the planning history (846), and I do not consider that I need set it out. The process was a long and drawn out one, but the judge found that it was generally agreed between Gallagher and the planning officers that OS 160 should eventually be part of the comprehensive development of the area, and that OS 149 might either be developed as an independent site or as a means of access to adjacent land.

10. Mr Nurkowski's own accountant was a Mr Holdway. In late 1987 he approached the Revenue on behalf of Mr Nurkowski for their view of the income tax implications of a sale of the land. The Revenue replied that they could not give a tax clearance without more information. So the tax implications of a disposal were under consideration at this early stage.

11. Gallagher were in touch with Mr Nurkowski before permission was given. In May 1988 they made an offer to buy an option over OS 149 and 160 for £40,000. If the option was exercised, Gallagher would pay 80% of the market value following grant of planning permission. On 12 December 1988, Mr Cox of Gallagher and Miss Foster, representing the agents for Gallagher, met Mr Nurkowski. It was agreed that the negotiations should be put on hold so Mr Nurkowski "could put his own house in order". He said that he would revert to Gallagher in due course. There is an important issue as to whether in the course of these negotiations Gallagher offered Mr Nurkowski £700,000 for OS 160. Mr Nurkowski's evidence was that no such offer was made but the judge rejected his evidence on this point.

12. In January 1989, Mr Nurkowski went to take tax advice from Spicer & Oppenheim. On 9 January 1989, Mr Nurkowski met Miss Horrocks of that firm. The judge set out the material parts of the attendance note prepared by Ms Horrocks at 846G to 847G of the judge's judgment. In that attendance note, Mr Nurkowski is recorded as saying that he had received an offer of £700,000 for OS 160. The attendance note also stated that it was Mr Nurkowski's opinion that this sum represented neither the current value of the land nor the value of the land with planning permission. Miss Horrocks' attendance note states that the main concern of Mr Nurkowski was how to alleviate capital gains tax of about £1m. The issue on which he sought advice is recorded in the following terms:

> "He wondered if his offshore company could be used by transferring the land to that company which he realised would trigger off a capital gain by his sale into the company but he hoped [that this] would protect the final greater gain when planning permission was granted [and] the land was sold to the development company. [H]e considers this very urgent and would like action very very quickly…"

Miss Newsham, another representative of Spicer & Oppenheim, spoke to Mr Nurkowski the following day and ascertained his view as to the current market value which he said was in the region of £25,000 to £40,000. He

said that he was expecting OS 149 and OS 160 to be worth at least £300,000 and more "if he obtained planning permission in his own right". He also told Miss Newsham that he expected the district council to grant planning permission in April 1989.

13. Mr Nurkowski is recorded as saying that the market value of his land was as agricultural land with possibly some hope value thrown in and that it was worth about £5,000 per acre when valued as agricultural land but that it would be worth considerably more in view of the development. On the basis of the offer that he had received the bottom field would be worth £1.5m. He thought that the final offer from the developer would be worth some £2.4m once planning permission was obtained.

14. Spicer & Oppenheim consulted Reads, a firm of accountants in Guernsey. On 13 January 1989, Mr Donaldson, a partner in Reads, sent his advice by fax. The material parts of that advice are set out at 848G to 849H. The essence of the advice was that the best course would be to set up an accumulation and maintenance settlement for a child with UK trustees, gift into it one of the fields and then immediately appoint foreign trustees in their place (or "export" the settlement to Guernsey). This would enable Mr Nurkowski to argue that any sale of the land by the trustees was not subject to income tax. Mr Nurkowski could make an election to hold over the gain on making the gift into settlement, which could accumulate income and capital gains. There would, however, be a charge to capital gains tax when the settlement was exported, based on the then value of the land. The significant points about this advice for the purposes of this appeal are as follows. Firstly, it proceeded on the basis that there was a sporting chance that Mr Nurkowski would be able to defer capital gains tax or even avoid it altogether if he formed a settlement. But success was not guaranteed. Mr Nurkowski might find that he had incurred the expenses of setting up a settlement for no purpose. Secondly, the advice supports the inference that when Mr Nurkowski proceeded to make the gift into settlement of OS160 he was simply following the advice he had received from Spicer & Oppenheim. Thirdly, Mr Donaldson must have thought that the land even at that stage was worth more than its agricultural value since he talks of transferring "(say) £100,000 worth of the land" into a discretionary settlement (849C).

15. There was a further meeting on 16 January 1989 at the offices of Spicer & Oppenheim in Bristol. A note was taken by Miss Goillau. She recorded that Mr Nurkowski thought that the market value of the land, meaning the then current market value, was £700,000, the amount of Gallagher's offer for OS 160 plus a further £100,000/150,000 for OS 149 (850C). The meeting note also records that Mr Nurkowski had a meeting with his developers planned for the following Wednesday as "he has put a proposal to them for a joint venture whereby he provides" OS 160. There is therefore in this file note a further reference to the £700,000 offer and to active negotiations for the sale of the land.

16. The deed setting up an accumulation and maintenance trust of Mr Nurkowski's daughter Anna then aged 2½ years was executed on 10 March 1989. The original trustees were UK residents. The deed contained a clause (clause 17) excluding the settlor and his spouse from any benefit from the capital or income of the settlement. In due course the trustees made substantial loans to Mr Nurkowski. It was suggested in argument that the loans did not involve a breach of clause 17. We expressed our surprise at that suggestion but we do not have to decide if it is right or not but note that the Revenue might reasonably have taken the view that as a result of this clause Mr Nurkowski could not as a result arrange a loan from the settlement. After execution of the deed, OS 160 (the bottom field) was simultaneously gifted into the settlement. On 13 March 1989, the appellants replaced the original trustees and the settlement was thereby "exported" to Guernsey (852A).

17. The planning committee of the West Wiltshire District Council approved Gallagher's planning application on 4 April 1989. Mr Nurkowski was not present when this business was taken. Within a few weeks Mr Nurkowski had re-opened negotiations with Gallaghers' agent, Mrs Foster, and received offers from other developers. There is a curious letter from Mrs Foster to Gallagher of 24 April 1989, set out at 852B to G, in which Mrs Foster states that Mr Nurkowski had been under the incorrect impression that his land had planning permission and that he was looking for an option arrangement with Gallagher, and she also ends the letter by stating that Mr Nurkowski had been "a good ally" and encouraging Gallagher to do a deal with him. The judge makes no findings as to what she meant by these last matters and indeed Mrs Foster was unable to enlighten the court what she meant when she was cross-examined. It seems unlikely that Mr Nurkowski, a member of the planning committee, would have been unaware of the fact that his fields were outside the permission that was granted. In April 1989 Mr Nurkowski also opened negotiations with other developers, such as Beazer Homes.

18. However that may be, Gallagher did not leave the matter in Mrs Foster's hands. Mr Cox took over the negotiations and agreed with Mr Nurkowski that he would sell OS 149 and OS 160 for a total aggregate price of £2m. The purchase of the bottom field was not conditional on planning permission but the consideration was to be paid in part as a deposit and part was to be deferred for a maximum of two years. The purchase of the top field was however conditional on planning permission.

19. The original deal provided that the price for OS160 would be paid outright without any deferral (853C). In the course of negotiating the contract, Mr Boyd, Mr Nurkowski's solicitor, took tax advice on behalf of Mr Nurkowski and the settlement. At one stage, Mr Nurkowski considered an exchange of land between the settlement and himself as the bottom field was worth more and Gallaghers only wanted to enter into a conditional contract for the top field (856E). Further negotiations took place between Mr Nurkowski, Mr Boyd and Gallagher and a contract for the sale of the bottom field was prepared and signed by the trustees for £1.25m. in early June 1989. At that time OS 149 was agreed to be sold for £875,000. But the agreement was then renegotiated without the active participation of the trustees. The parties then executed contracts whereunder consideration (£2m) was apportioned as to £740,000 for the bottom field (the settlement's property) and £1,260,000 for Mr Nurkowski's property. The consideration for the sale of OS 160 was payable in two instalments, a deposit of £220,000 and the balance being due in February 1991. In the case of OS 149 the deal was structured as to one acre as an outright sale for £378,000 payable on completion and as to the balance as a put option exercisable by Mr Nurkowski at a price of £882,000 by 8 January

1993. In due course Mr Nurkowski exercised his option against Gallagher. Accordingly the contracts for the top field were not in the event conditional on planning permission. Completion took place on 2 August 1989. The price paid was wholly remarkable given the lack of development prospects for the land but that would of course not prevent the incurring of tax.

20. There was no explanation for why the price was reapportioned in the way described, other than that Mr Nurkowski decided that after all he want a larger slice of the profits than before. It is doubtful whether the trustees took separate advice before accepting the renegotiated contract. If, as seems likely, they did not do so, that is evidence of their willingness to do Mr Nurkowski's bidding, rather than act as independent trustees. The renegotiation of the contract also shows Mr Nurkowski's intense interest in money matters. The judge's assessment of him was that he was an astute business man (914H).

21. Shortly before the renegotiated contracts were exchanged, Mr Boyd arranged for OS 160 to be valued by Mr Nicolson of Carter Jonas on the basis of sale of the freehold with vacant possession as at 16 March 1989. Mr Boyd did not disclose the negotiations with Gallagher: the judge held that neither Mr Boyd nor Mr Nicolson knew about the offer of £700,000 in December 1988. Mr Nicolson made enquiries as to whether there was any planning potential in OS 160 and the planning officer told him that this field had no planning hope at all. On 14 July 1989 Mr Nicolson provided a written valuation of OS 160 in the sum of £35,000 which was submitted to the Revenue. The transaction with Gallagher was in due course completed.

22. In November 1990 the district valuer asked for further information about the land.

23. At Mr Nurkowski's suggestion, the settlement bought Mr Nurkowski's land at Cockhill, Trowbridge in April 1990 for £130,000. In February 1991 the settlement agreed to lend £510,000 to Mr Nurkowski to help him settle his capital gains tax bill arising on the sale of that part of OS 149/149A which was sold outright. Interest was agreed at 1% over base rate, with six monthly rests. This was in due course secured by a loan agreement secured by an assignment by Mr Nurkowski of his rights against Gallaghers under his put option in respect of Field 149.

24. In December 1991 Mr Nurkowski was assessed for £30,000 tax in respect of the sale of the Cockhill land. Mr Nurkowski's accountant said that he was not in a position to pay.

25. In April 1992 the Revenue sought information about the sale of OS 160 from Gallagher.

26. On 26 May 1992, Mr Nurkowski made an offer to buy a public house called the Lion & Fiddle for £150,000. This did not in the event proceed at this stage but the settlement lent £10,000 in cash to Mr Nurkowski on 8 July 1992.

27. In June 1992, the district valuer told the Revenue that he could not see why the value of OS160 in March 1989 should be less than the amount paid by Gallagher in August 1989.

28. According to a document prepared by Mr Gardner of the trustees, on 14 July 1992 Mr Nurkowski and Mr Gardner had a meeting at which Mr Nurkowski said that he was in dispute with the Revenue over valuation and that he therefore wanted to dispose of as many of his assets as he could to the settlement. He would not be able to repay the loan due to the settlement before January 1993 and he would then either transfer assets or repay in cash which could be used to buy assets from him.

29. On 12 November 1992, a new district valuer advised his colleagues in the Revenue that OS 160 was worth £650,000 as at 16 March 1989.

30. In December 1992, Mr Nurkowski (having exercised his put option) became liable to pay a further £352,000 tax in respect of the sale of the balance of OS 149 payable in December 1993. He also owed £665,000 to the settlement. He and Mr Boyd agreed to offer to repay one half of the monies owed to the settlement. The trustees accepted this proposal and that the repayment should be made out of the proceeds of the consideration outstanding from the sale of OS149.

31. Shortly after this, Lloyds Bank plc, with which the company had a loan account, sought a reduction in the company's overdraft.

32. On 29 January 1993, Mr Boyd had a meeting with the Revenue in order to negotiate the value of the land sold to Gallagher. He told the Revenue that the sale to Gallagher had only been secured at the last minute (879H). Mr Boyd told the Revenue that no deal had been concluded before the settlement had taken place.

33. In a telephone conversation on 3 February 1993, as recorded by Mr Fuller of the Revenue, Mr Boyd told Mr Fuller that Mr Nurkowski was "very heavily in debt. He owed substantial amounts to two banks, particularly in respect of his company's account. The £880,000 realised last month had wholly gone to settle the money owed to the bank." (881E). He said Mr Nurkowski "simply did not have the wherewithal to meet even the £143,000 and was relying on being able to raise this amount from the bank by way of loan". Mr Fuller asked for a statement of Mr Nurkowski's financial position. Mr Boyd said that he had drafted a balance sheet and it showed that Mr Nurkowski was "in the red by some £350,000". In answer to a question from Mr Fuller Mr Boyd said that "he understood that the funds to buy the investments held by the settlement had been financed by bank loans" (881-2).

34. In February 1993, Mr Nurkowski agreed to buy two public houses, the Three Lions and the Nettleton Arms for £52,000 plus VAT and £150,000 respectively. Mr Boyd told the trustees that Mr Nurkowski would be drawing down on his loan arrangements with them to make a number of acquisitions. The terms as agreed meant that Mr Nurkowski would not have to pay any interest to the trustees for five years.

35. In February 1993, Mr Nurkowski made a further offer to purchase the Lion & Fiddle public house.

36. On 15 February 1993, Mr Fuller telephoned Mr Boyd. Mr Fuller referred to the substantial assets of the settlement and raised the question whether the trustees would lend money to Mr Nurkowski to pay his tax. Mr Boyd said that he thought that the trustees would not make any loan to Mr Nurkowski except on commercial terms. Mr Boyd said that he would need instructions from Mr Nurkowski. Mr Nurkowski instructed him to continue to negotiate.

37. On 16 February 1993, the trustees lent £250,000 to Mr Nurkowski so that the company's overdraft with Lloyds Bank could be paid off. This loan carried interest at 1.5% above Lloyds Bank base rate, payable at six-monthly intervals, and was secured over the shares in the company. In fact the last audited accounts of the company, drawn up as at 31 March 1991, showed that the company was then insolvent but the trustees did not ask to see these accounts. The terms of the loan were set out in a loan agreement, which the judge called "Loan 1". Clauses 5 and 6 of Loan 1 provided for the making of further advances and the grant of further security as follows:

    "5. It is intended that further sums may from time to time be advanced to the borrower. The parties acknowledge that all such further advances should be on the same terms and conditions as the principal loan and as are contained in this agreement.

    6….The Borrower will deposit such further security from time to time in connection with further advances as the trustees shall reasonably require …"

38. Meanwhile, Mr Boyd continued his negotiations with the Revenue and made an offer of compromise of £160,000. He reported the offer to Mr Nurkowski, who was proceeding to acquire three public houses.

39. On 24 February 1993, the Revenue accepted the offer of £160,000 made by Mr Boyd. On 26 February 1993, contracts were exchanged for the purchase for the Lion & Fiddle for £165,000 plus VAT.

40. On 1 March 1993, Mr Nurkowski instructed Mr Boyd to apply to the settlement for a further loan of £198,500 to complete the purchase of the Lion & Fiddle and also a loan of £160,000 to pay his tax. The trustees agreed to make both loans. The loan of £198,500 was recorded in an agreement which the judge called "Loan 2". It was dated 25 March 1993. The terms as to interest and other terms in Loan 1 applied. This loan was secured by a charge over the Lion & Fiddle public house.

41. The loan of £160,000 was recorded in a loan agreement dated 30 March 1993 which the judge called "Loan 3". This was not supplemental to Loan 1 and was interest free for up to twenty years as the terms of this loan provided that it was not repayable for 20 years or if earlier 28 days after the death of Mr Nurkowski. Mr Nurkowski was given a right to pre-pay the loan. The trustees asked for security against Enniswood House. Mr Nurkowski refused to offer Enniswood House as security but gave security over the balance of the land at Cockhill not previously sold to the trustees. He gave an indemnity to the trustees against liabilities arising by reason of the trustees making the loan free of interest. Clause 5 of Loan 3 contained the following provision for further security:

    "The Borrower will deposit such further security from time to time in connection with the Number 3 loan as the trustees shall reasonably require…"

42. On 30 March 1993, Mr Nurkowski signed an agreement of compromise with the Revenue. The Revenue agreed to accept the sum of £160,000 in full and final settlement of all tax liabilities of whatever description arising on the making of the settlement, on the sale of the land in August 1989 and on the disposal of the Cockhill land. That sum of £160,000 was duly paid.

43. In May 1993, Mr Nurkowski asked the trustees for yet more loans. On 19 May the trustees agreed to lend a further £30,000. This was recorded in a loan agreement which the judge called "Loan 4", which was supplemental to loan 1. There was no additional security for this loan (890G).

44. In June 1993, Mr Boyd asked the trustees for a loan of a further £90,000 to make a further property acquisition. The trustees indicated that they would be willing to lend their remaining cash (£40,000) and to liquidate their remaining investments. Mr Nurkowski through Mr Boyd asked the trustees to do this. Accordingly the trustees made a further loan of £70,000 to Mr Nurkowski, which was recorded in a loan agreement dated 29 June 1993 which the judge called "Loan 5". The security was the Three Lions public house which Mr Nurkowski had bought for £52,000 plus VAT. The terms were those applying to Loan 1.

45. On 23 November 1993, the trustees had to ask Mr Nurkowski to lend some small sums so that they could pay the tax due from them as trustees. Later they asked for small sums to pay their own fees but none of these sums were paid.

46. Meanwhile Mr Nurkowski had received a further assessment for £372,457 in respect of the gain on OS 149. Mr Boyd told Mr Nurkowski's accountant that he had no sums to pay the tax. The balance sheet of the settlement as at 5 April 1994 showed that the debts then owed by Mr Nurkowski to the settlement amounted to £762,729.

47. On 16 June 1994, the trustees asked for the security for the loans made to Mr Nurkowski to be increased. On 4 November 1994, Mr Boyd made a number of proposals to the trustees, including a proposal for a second charge over Enniswood House. On 24 November 1994, Pritchard Englefield & Tobin, solicitors, wrote to Mr Boyd on behalf of the trustees asking for a reduction in the borrowings or an increase in the security offered. Their letter stated:

"It would seem there is a serious shortfall and our clients have instructed us to press for either a reduction in the borrowings or a major increase in the security offered. It is important that a formal offer with valuations is made to the trustees at an early date."

48. Mr Boyd replied on 30 December 1994, stating that Mr Nurkowski was unlikely to be able to reduce the borrowings but was willing to offer further security. Mr Boyd stated that he intended to continue to negotiate with the trustees direct. Nothing further was heard from Pritchard Englefield & Tobin.

49. On 30 December 1994, Mr Nurkowski executed a legal charge over the Lion & Fiddle in favour of the trustees.

50. In May 1995, having taken advice from counsel, Mr Boyd told the trustees that he could no longer act for them. On 7 October 1995, Mr Nurkowski told the trustees that he was unable to pay their fees. The Revenue continued to press both the trustees and Mr Nurkowski in respect of tax due.

51. In February 1996 the trustees asked Mr Nurkowski if the land at Cockhill could be sold "to provide some liquidity for the trust", although this was a trust asset. On 27 March 1996, Mr Nurkowski sold the Three Lions public house to the company and the trustees released the charge without requiring any repayment of the debts due from Mr Nurkowski. On 17 April 1996, Mr Nurkowski executed a second charge over Enniswood in favour of the trustees. In August 1996 and February 1997, Mr Nurkowski provided the trustees with further security over property he owned.

52. On 23 October 1997, the trustees wrote to Mr Nurkowski stating that they were only willing to allow the loans to Mr Nurkowski to remain outstanding if they were satisfied that the security was adequate. On 4 December 1997 the trustees wrote to Mr Boyd saying that the trustees would like to have the maximum security available and that they would be pleased if Mr Boyd would pursue that matter with Mr Nurkowski.

53. On 21 November 1997, Mr Nurkowski assigned to the trustees all the indebtedness of the company to himself. This was absolute in its terms but it was common ground that it was given by way of security only.

54. On 30 June 1998, the Revenue made an assessment on Mr Nurkowski in the sum of £437,147 tax plus interest on the gain on OS 149.

55. In August 1998, Mr Nurkowski was served with a statutory demand in respect of the unpaid tax. On 12 January 1999, Mr Nurkowski was served with a bankruptcy petition and on 28 January 1999 a bankruptcy order was made against him.

56. On 21 January 1999, the trustees made a demand for repayment of £548,500 being the amount outstanding of the monies lent by them, plus interest due thereon of £311,458, even though some of these monies could not be rendered due on demand.

57. Mr Hill was appointed trustee in bankruptcy. Mr Boyd told Mr Hill that he acted for the settlement and had not acted for Mr Nurkowski for some time.

*The judge's findings*

58. In his general observations about the witnesses, the judge said:

"Mr Nurkowski was a dreadful witness. At times he did not even attempt to make plausible replies to questions and his evidence was at odds with the contemporary documents and the likely chain of events. I find that he was completely dishonest and I can place no reliance on anything he said."

59. The judge was also critical of Mr Boyd. He said that Mr Boyd was not prepared to tell a direct lie but was a master of what Kipling called the "truthful answer that tells the blacker lie" (906C). By way of example he held that he had wrongly misrepresented to the trustees that the reapportionment of the consideration for the sale of OS 149 and OS 160 was Gallagher's idea.

60. The judge then made his findings in respect of the argument that the settlement was a sham. There is no appeal against that part of his judgment so I need say no more about it. At 914B, the judge turned to the claim under section 423 of the 1986 Act. He held that Mr Nurkowski had three purposes in making the settlement, namely an understandable and proper intention to provide for his daughter, a proper intention to defer tax on the property and a purpose to evade tax by pretending that there was little difference between the current value of the land and the cost to him on acquisition in 1986. The judge held that this was so even if Mr Nurkowski had intended to elect to hold over the tax payable on the gift into settlement as there would have been at least a partial clawback when the settlement was exported. The judge continued:

"Mr Nurkowski thought, until he was later corrected by Miss Foster, that OS 160 was going to get planning permission in April. *He therefore decided to conceal the current value of the land and to endeavour to persuade the Inland Revenue that it had little or no hope value in March 1989.* He was aware that he should have taken action some time ago, but he hoped that by misrepresenting the current value he would be able to achieve the benefit he would have had if he had settled the land in 1987. *I find that, as Miss Newsham recorded, he had an offer in 1988 of £700,000 for OS160 and he was aware that that was probably its minimum value at the time.* I do not find Miss Foster's evidence to the contrary convincing she was not a party to Gallagher's negotiations." (914F) (Italics added)

61. The judge went on to hold that although Mr Nurkowski instructed Mr Boyd to give him tax advice he did not give him anything like the same information that he had given Spicer & Oppenheim in January. He held that Mr Nurkowski had deliberately concealed the offer he had received for the land from his advisers in the summer of 1989. He found that neither Mr Boyd nor Mr Nicolson knew of it: it is indeed the trustees' case that Mr Boyd did not know of the £700,000 offer (appellants' skeleton argument page 23, para. 64(iii)). He held that he could infer that it was Mr Nurkowski's intention in March 1989 not to reveal that offer or the extent of the interest shown by Gallagher in 1988 to the Revenue, and that one of his purposes in making the settlement was to prejudice the interests of the Revenue by inducing them to make a wrong assessment of capital gains tax. The judge held that he could not do this without the settlement because if he retained the land the capital gain would be the difference between the cost adjusted for indexation, and the sale price. The judge held that although this was not his sole or dominant purpose this was positively intended and a factor which substantially motivated him. The judge rejected the submission that it was the deception not the settlement which caused any prejudice.

> "The settlement was an essential part of the purpose. If I buy petrol, I can say that I do so for the purpose of making a fire, although I cannot make the fire without buying matches." (915B)

62. The judge rejected a defence that the claim was statute barred. He held that the claim under section 423 was a specialty and that section 8(1) of the Limitation Act 1980 applied. He held that the action could not have arisen before the bankruptcy order was made. Since that order had been made on 28 January 1999 the application was not statute- barred.

63. The judge also rejected the argument that the Revenue was not a victim for the purpose of section 423(5) because it had entered into a compromise with Mr Nurkowski. He held that the question whether section 423(3) was satisfied had to be determined at the time the transaction was entered into. If his interests had not actually been prejudiced that might be a matter to be taken into account when the court gave relief.

64. The judge considered a number of the transactions under which Mr Nurkowski had given security over his assets in favour of the trustees. In particular he held that section 423 did not apply to the security given for the loans made in 1991 and 1993. The aggregate amount which Mr Nurkowski borrowed from the settlement was £1,228,500. The 1991 transaction had been repaid and the 1993 loans were not within section 423. He held that the charge over the Lion & Fiddle on 30 December 1994 was outside section 423 because it was made pursuant to a contractual obligation to perfect security on demand from the trustees. However he held that the charges over Enniswood and the land at the rear of that property, in April and August 1996 respectfully, and the assignment of the loan account in November 1997 were transactions within section 423. These transactions involved the grant of security for loans already made and although it might appear that the trustees had given consideration in the form of forbearance from enforcing their loans, in fact the trustees' pressure was "synthetic" and no consideration was given. The purpose was to put assets beyond the reach of the Revenue.

65. In the light of his findings the judge heard further argument as to the appropriate form of order and gave the relief described in para. 3 of this judgment and made orders for the payment of costs.

*The issues on this appeal*

66. The following are the issues which arise on the judge's findings of fact:

   a. *The £700,000 offer issue:* Was the judge entitled to find that Gallagher had made an oral but unconditional offer of £700,000 to purchase OS 160 from Mr Nurkowski in 1988, and as at the date of the settlement dated 10 March 1989 Mr Nurkowski knew that such offer represented the minimum value of OS160?

   b. *The purpose issue (fact)*: Was the judge entitled to find that one of Mr Nurkowski's purposes in making the settlement was, by concealing the £700,000 offer, to cause the Revenue to value the land at less than its true value as at the date of the settlement?

   c. *The later charges and assignment issue*: was the judge entitled to conclude that the later charges and the assignment were given for no consideration for the purposes of section 423 of the 1986 Act?

67. The following are the issues of law which arise on this appeal:

   d. *The limitation issue:* is the trustee in bankruptcy's application statute- barred?

   e. *The purpose issue (law)*: was Mr Nurkowski's intention as found by the judge sufficient to constitute a purpose capable in law of being a purpose for the purposes of section 423(3)(b)? i.e. was it prejudicial? was it sufficiently realistic? did it cause prejudice?

   f. *The victim issue:* was the Revenue a victim for the purposes of section 423(5)? i.e. did the applicant have to prove that the Revenue was a victim at the date of the trial?

   g. *The charges and assignment issue*: if the later charges were outside section 423(1)(a), should the judge have held that they were within section 423(1)(c) as they involved the disposition of the property of Mr Nurkowski at an undervalue?

68. In the course of the hearing of this appeal an application was made to amend the grounds of appeal to include new points of law as to the form of relief that the judge should have granted and in addition a point which was not investigated at trial as to whether the second and third charges were granted pursuant to clause 5 (the covenant to provide such further security as the trustees might reasonably require) in Loan 3. We granted the application to raise new points of law as to relief, which were not opposed. We refused permission to amend the grounds of appeal in respect of the remaining issue. It raised the issue of the reasonableness of any requirement by the trustees, and this was not investigated at the trial as it was not raised by the appellants until after all the witnesses other than Mr Boyd had by then given their evidence. Indeed we have not been shown any evidence that the trustees were seeking to invoke this clause in any event.

69. A number of issues arise on this appeal but have been stood over for hearing following the handing down of this judgment. Those further issues are therefore not dealt with in this judgment. They include issues as to costs and:

> h. *The relief issue (the settlement)*: did the judge err in the exercise of his discretion as to the form of relief in respect of the settlement?

> i. *The penalties issue*: should relief have extended to penalties and also to tax which Mr Nurkowski owed apart from the gift into settlement?

> j. *The relief issue (charges)*: should the judge have brought into account the release by the trustees of their charge over the shares in the company?

*Issues of fact*

70. The judge could not have concluded that the settlement was a transaction to which section 423 applied unless he had found that one of Mr Nurkowski's purposes in entering into it on 10 March 1989 was to prejudice the interests of the Revenue. If therefore Mr Nurkowski only formed that intention at a later date, for example when he saw Mr Nicolson's valuation of OS 160, or if he had never formed anything that might be described in law as a "purpose", the settlement could not be avoided under section 423.

71. An unusual feature of this case is that the settlement alone could not prejudice the Revenue. It was the failure to reveal the offer of £700,000 made in December 1988 (if made) for the purposes of valuing the land vested in the settlement that was capable of prejudicing the Revenue. It would indeed succeed in prejudicing the Revenue if it led to an incorrect valuation of the land and that valuation caused the Revenue to agree a lower value for it than it would otherwise have done. On the other hand if there had been no settlement there would have been no charge to tax and no valuation. Mr Nicolson's valuation was incomplete for the Revenue's purposes since at it took no account of any prior offer for OS 160. However, the position is further complicated by the fact that the Revenue did not rely on Mr Nicolson's valuation but on internal advice as to the value of OS 160. The position is yet further complicated by the fact that the Revenue proceeded to enter into a compromise with Mr Nurkowski and to relinquish its claim to assess tax arising out of the gift into settlement. However, the Revenue certainly was a form of future creditor by reason of the settlement. Moreover, its position is that in the events which have happened there are still claims to tax and interest of about £270,000 arising out of the gift into settlement, and that the compromise does not prevent these claims from being advanced. The Revenue also claims tax pursuant to section 739 of the Income and Corporation Taxes Act 1988 as a result of loans made by the trustees to Mr Nurkowski.

72. The judge did not decide whether the Revenue was correct about being able to reopen the compromise. Indeed he could not do so in a way that would bind the Revenue because the Revenue was not a party to the application. He did not, however, dismiss the application on the basis that it had not been shown that the Revenue was a victim who still had a claim at the date of the trial. He fashioned the relief in a way which he considered was appropriate to deal with the situation that the Revenue might or might be shown later to be a victim in relation to the tax due as a result of the gift into settlement. Whether he gave appropriate relief is not in issue at this stage. The point to be made at this stage is that this is a most unusual case; in the usual situation the bankrupt has entered into a transaction which removes assets from the reach of a creditor or creditors and has a direct effect on their ability to recover their debts, and that creditor or those creditors remain unpaid at the date of the trial. Here, as I have said the settlement did not as such prejudice the Revenue and indeed the Revenue received a sum which at the time it accepted in full discharge of the tax due in respect of the gift into settlement.

73. The appeal must be considered at two levels. First, the court must examine whether the judge's findings of fact can be successfully challenged. Then, the court must consider the questions of law. It should be borne in mind, however, that, while questions of fact have been separated out for ease of analysis, there are in some cases closely connected issues of law which are considered separately.

*The £700,000 offer issue*

74. This is an appeal against the judge's finding of fact. Accordingly, the only issue here is whether the judge was entitled to make a finding that Gallagher made an offer of £700,000 in December 1988. Mr Nurkowski's evidence was that no such offer was made. Mr Cox of Gallagher was not called to give evidence, but Miss Foster, who represented Gallagher's agents, was called and she denied that an offer of £700,000 had been made. Miss Newman submits that the existence of such an offer conflicted with Mr Cox's file note made in April 1992 in preparation for the inspection of his file by the Revenue. She also submits that it is more probable that Gallagher offered to buy merely an option over OS 160 and that Mr Nurkowski merely exaggerated the position when he had meetings with Spicer & Oppenheim in January 1989.

75. Miss Newman further submits that the question whether such an offer was made was irrelevant because the question at issue as between Mr Boyd and the Revenue was whether the £740,000 agreed to be paid by Gallagher in August 1989 was significantly more than market value. I do not accept this submission. If an offer of £700,000 was made in December 1988 it was clearly material to determining the market value at March 1989.

76. The three contemporaneous attendance notes prepared by Spicer & Oppenheim record statements by Mr Nurkowski that Gallagher had made an offer of £700,000 in December 1988. Mr Nurkowski's denials in evidence that such an offer had been made were partly based on the lack of a written offer.

77. Mr Nurkowski had clearly been interested in disposing of his land for some time, as the enquiry which Mr Holdway made of the Revenue in late 1987 demonstrates. Moreover, this is confirmed by the negotiations with other developers after the grant of planning permission in respect of the main development. In normal circumstances it would not be expected that developers would be keen to acquire sites on the periphery of the main development which did not have planning permission but that was not the case in respect of these two sites.

78. The judge took the view that there were negotiations between Gallagher and Mr Nurkowski to which Miss Foster was not a party. Her suggestion that Mr Nurkowski thought that his land had planning permission is difficult to accept having regard to Mr Nurkowski's involvement in the planning matter. It was therefore open to the judge to reject her evidence that no negotiations had taken place in December 1988. His conclusion was supported by contemporaneous documents.

79. In my judgment, particularly in the light of the Spicer & Oppenheim attendance notes, the judge was entitled to make the finding that Gallagher had made an offer to Mr Nurkowski to acquire OS 160 in December 1988. On no less than three occasions Mr Nurkowski is recorded as saying that such an offer had been made. Moreover, Mr Nurkowski said he wanted to proceed as quickly as he could and one of the reasons why he might have wished to do that was to make sure the December offer from Gallagher was not lost.

*The purpose issue (fact)*

80. Again this is an appeal against the judge's findings of fact. The judge inferred that one of the purposes in setting up the settlement was to evade tax by pretending that there was little difference between the cost of OS 160 to him and its value as at March 1989. To do this, Mr Nurkowski had concealed the offer of £700,000 from his adviser, Mr Boyd, and from Mr Nicolson.

81. Miss Newman focuses on the judge's general assessment of Mr Nurkowski as a witness. She submits that the judge was not entitled to find that Mr Nurkowski was "completely dishonest" and that the judge should have given specific examples and reasons for finding that he was dishonest. The judge failed to make allowance for the fact that the cross-examination was conducted (by Mr Stephen Davies QC) in what she submitted was a bullying way. She submits that the judge should have made express allowance for this conduct. In addition, insufficient allowance was made for the fact that Mr Nurkowski was severely dyslexic: at the trial Miss Newman made an application that when he was to be cross-examined on a document it should first be read to him. The judge said he would make every allowance for Mr Nurkowski's disability. In my judgment he was right not to prescribe how Mr Davies should cross-examine from the outset. The judge intervened from time to time in the cross-examination so that Mr Nurkowski was given a proper opportunity to answer a question. Miss Newman submits that he did not do so sufficiently.

82. By way of further example, Miss Newman submits that the cross-examiner's approach to Mr Boyd was so aggressive that he was paralysed and unable to answer questions in a way which put his evidence in its best light: she described him as "a rabbit stuck in the headlights". She added that her objections to this approach were overruled by the judge or waved aside without reasons.

83. Miss Newman informed us that of the evidence of Miss Foster was interrupted because she broke into tears. She declined the judge's offer of a break. I do not see from the transcript that any improper pressure was brought to bear on this witness in the cross-examination which led up to that interruption.

84. In relation to Mr Nurkowski and Mr Boyd, Miss Newman's submission clearly raises serious issues. However, there is nothing in the grounds of appeal to support the way the submission is put. There is a general ground of appeal that the judge's findings on such matters as purpose were against the weight of the evidence, but that does not of itself cover a submission that the judge gave too much weight to the evidence of particular witnesses because he failed to take into account that they had unfairly been pressurised into giving their answers. It does not give the respondent proper notice of the points to be made. Furthermore, the submission is not substantiated by the necessary evidence. This court only has the transcript of the evidence. Some aspects of the alleged bullying would not be recorded in the transcripts, such as tone of voice, rapid fire of questioning and so forth. I can see from the transcript that for instance there were comments by the cross-examiner in the course of the cross-examination which offended the rule that advocates should not express any personal opinion on the matters in issue. That should not have occurred. There were also instances in the extracts shown to the court where a number of comments made by the cross-examiner in the course of cross-examination were highly critical of the witness. These comments too should not have been made. The duty of the advocate is at all times to be courteous to witnesses and, if this does not occur, the judge should intervene. However, the responsibility does not rest only on the judge. If the judge does not intervene, counsel for the other side should consider whether to object. We do not see that that occurred very often in this case, and if counsel's the objections are brushed aside counsel needs to make a general statement which is recorded in the transcript to explain why counsel will not be intervening on every occasion and reserving all the parties' rights. Needless to say, cross-examination of a witness that is

excessive may also lead to any answers that are favourable to the cross-examiner being rejected in any event, and so even apart from being discourteous the technique may be self-defeating.

85. Miss Newman has prepared a file of extracts from transcripts with her comments interposed. I have used this file as the basis of making my criticisms of the cross-examination in the last paragraph. But some of the comments which she makes in those comments in my judgment are not fair criticisms of the cross-examiner. His role was to elicit answers from which the judge could draw some very serious inferences against Mr Nurkowski and Mr Boyd. In all the circumstances I would reject Miss Newman's submission that the judge's findings of fact against the appellants can be set aside because of the conduct of the cross-examination of these witnesses. This was a very experienced judge and in making findings of fact he would be well practised at making all the allowances which need to be made for witnesses, particularly in the situation where their reputation is at stake. There is no evidence to suggest that the approach had a material adverse effect on the witnesses. It would not be fair to the respondents for this court to proceed on the basis that they were so affected unless there was evidence to that effect to which the respondents had had an opportunity to reply.

86. I now turn to the question whether the crucial finding of purpose was a finding which the judge was not entitled to make. The judge gave few clues as to how he reached his finding. The test whether Mr Nurkowski had the necessary intention is a subjective test: the judge had to be satisfied that he actually had the purpose, not that a reasonable person in his position would have it. On the other hand, the judge could infer that such a purpose existed even if Mr Nurkowski himself denied it.

87. It is incontrovertible that Mr Nurkowski had tax planning advice which suggested a gift into settlement. At first sight therefore this looks like a case where the lay client merely followed his advisers' advice, and left it to them to provide the necessary information to the Revenue. Section 423 does not prevent a person from acting on legitimate tax avoidance advice in this way. After all Mr Nurkowski's case is that he did not try to hide anything from Mr Boyd, to whom he gave Spicer & Oppenheim's contact details. Mr Boyd could if he had followed up those leads have found out what Mr Nurkowski had told Spicer & Oppenheim. The judge did not refer to this evidence. It was always possible that Mr Nurkowski had no intention of deceiving the Revenue. He simply found later that Mr Nicolson was prepared to give a valuation which just happened to give him a benefit in tax terms which he was not expecting. Mr Nicolson was not on the scene at 10 March 1989. There is a risk that the judge saw that the sale of OS 160 and OS 149 occurred within a short period after March 1989 and therefore assumed that Mr Nurkowski must have intended throughout to set up the settlement with a view to getting an incorrect valuation which would lead the Revenue to assess him with far less tax than he would otherwise have to pay. Did the judge work backwards from what happened in July and August 1989 and conclude that the purpose must have been to conceal the gain in March 1989? It can be said that the fact that the sale occurred so soon after the grant of planning permission goes against the idea that Mr Nurkowski intended to conceal the existence of an earlier offer from Gallagher. It is said that he would have put more distance between the offer and the eventual deal if he really intended this.

88. The difficulty with these arguments is that, taking the judge's findings step by step, the judge's conclusion was that Mr Nurkowski had had an offer from Gallagher in December 1988, and that Mr Nurkowski's evidence to the contrary was untrue. His subsequent actions have to be viewed in the light of those findings. Moreover, it is common ground that Mr Boyd did not know of the offer and Mr Nurkowski did not expressly inform him of it. It was clearly a relevant matter to be mentioned to his solicitor and therefore the fact that it was not expressly disclosed was a factor for which there was no real explanation: it is hardly an answer to say that Mr Boyd could have found the information out for himself if he had contacted Spicer & Oppenheim. In addition, Mr Nurkowski wanted money in a hurry. He clearly regarded the settlement as a vehicle of his own and that is why he felt able to renegotiate the contract without the participation of the trustees in a way that disadvantaged the settlement. It must have been obvious to him the law did not actually allow him to do that. He was very familiar with the tax issues and with the importance of land values. These points are apparent from the Spicer & Oppenheim attendance notes. There is nothing in Mr Boyd's attendance notes which we have seen that suggests that Mr Nurkowski needed detailed advice on these issues. Mr Nurkowski was experienced in doing property deals. Moreover the chronology of events shows that Mr Nurkowski was unwilling to pay tax and regularly delayed paying it, all of which demonstrates a constant awareness in what he did of tax implications. The memo of 16 July 1992 referred to above is subsequent evidence of his desire to ensure that the Revenue recovered as little as possible.

89. As to the lie in relation to the £700,000, the judge could, as Charles J had done in *Carman v Yates* [2005] BPIR 476, have reminded himself of the direction, known as the *Lucas* direction, used by judges when summing up to juries that a person may have several different reasons to lie and the fact that he lies on one occasion or about certain matters does not necessarily mean that he did so on other occasions or on other matters as well (see *R v Lucas* [1981] 1 QB 720 and *R v Middleton* [2000] TLR 293). A tribunal must consider whether there were special circumstances which would help explain why he lied on past occasions. The need to do this, however, is well known to judges and there is no need for them to give themselves an express direction.

90. In my judgment, in the light of all the circumstances, the judge was entitled to take the view that, when Mr Nurkowski was in discussion with Mr Boyd, that it was unlikely that he just forgot about the offer in December 1988 and that he could be satisfied that the non-disclosure to Mr Boyd was deliberate. It is not enough for Miss Newman to say that the allegation was not pleaded. It was pleaded that there was concealment of the offer from the Revenue and it must have followed from that that concealment from Mr Boyd would also be alleged.

91. Having reached that point the judge was faced with the question why should Mr Nurkowski have dissembled on both these matters? The judge heard all the evidence and there were many different strands in the evidence. In my judgment it was open

to him to conclude that Mr Nurkowski had the plan for making the gift into settlement and hiding information from the Revenue. I accept Miss Newman's submission that it would be unsatisfactory if the judge had merely relied on his impression of Mr Nurkowski as a witness but in my judgment there was plenty of other evidence from which he could draw the inference that he did, particularly the contemporaneous Spicer & Oppenheim attendance notes.

*The later charges and assignment issue*

92. The judge found that the later charges and the assignment were given for the purpose of putting assets beyond the reach of the Revenue. He took the view that there was no consideration for these transactions for the purposes of section 423(1)(a). It has not been suggested that for a transaction to be "on terms that provide for… no consideration" within that paragraph the terms of the transaction must expressly provide for there to be no consideration. The claim as originally pleaded was under section 423(1)(c), i.e. that the charges were transactions at an undervalue, but in the end the respondent succeeded on section 423(1)(a).

93. Miss Newman submits that a transaction which grants security cannot be for no consideration because a charge does not deplete the debtor's assets. In my judgment this argument must be rejected. Miss Newman's argument relies on the holding of Millett J as he then was in *Re M C Bacon Ltd* [1990] BCLC 324 at 340c to 341d that the grant of security cannot constitute a transaction at an undervalue. It does not follow from this that a transaction involving the grant of security can never amount to a transaction for no consideration. In my judgment, it is no different from any other transaction in that respect. This in my judgment was also the view of Millett J who was careful to point out that the security in the case before him was not given without consideration because it was given in exchange for forbearance by the creditor (340f).

94. Clause 6 of Loan 1 provided for the grant of further security in connection with further advances. Since neither of the later charges nor the assignment was given for further advances, it cannot be said that the judge was in error in holding that this clause did not apply. Miss Newman submits that the judge should have interpreted the covenant for further security in clause 6 of Loan 1 as arising not simply when the trustees were making further advances to Mr Nurkowski but also by implication when he was in default of his covenants, for example to make repayment. The judge's interpretation meant that the trustees were unprotected. In my judgment, although Miss Newman's interpretation would have produced a more commercial result, it is not possible to reach that interpretation except by an impermissible rewriting of the terms of Loan 1.

95. The trustees also argued before the judge that they were entitled to take possession of the profits of the Three Lions and the Lion & Fiddle and that they took the later charges and assignment in lieu of enforcing such rights. However the question is then whether that argument is substantiated by the evidence and in particular whether the trustees in fact applied genuine pressure so that the later charges and the assignment can be said to have been given as consideration for their forbearance from enforcing such rights as they had. The forbearance which the trustees gave was to enable Mr Nurkowski to develop the Three Lions and the Lion & Fiddle and continued after 16 February 1998. Accordingly, on Miss Newman's submission, forbearance was given.

96. Miss Newman accepts that the question whether the later charges and the assignment were for no consideration can be determined on the documentary evidence, consisting mainly of correspondence. In my judgment the facts appearing from the documents summarised above show that the trustees were asking for repayment and for further security without applying pressure. They naturally wanted their fees paid and to be put in funds to pay tax due from them. However, subject to those matters, they were in reality otherwise content to let matters roll forward. The letter from Pritchard Englefield and Tobin was a contrived and artificial attempt to demonstrate the imposition of pressure. That firm's quick departure from the scene lends support to the argument that the trustees did not wish to apply any pressure at all. The fact that the trustees thought that the debts due to them were repayable before 16 February 1998, or that Mr Nurkowski also thought that they were in a position to enforce repayment of the sums due to them, does not mean that consideration in that form was in fact given. The test is objective and consideration was plainly not given in that circumstance. The grant of the security over Enniswood or the land at the rear was not to obtain the trustees' consent to the release of their charge over the Three Lions so that it could be developed; this was not the reason why those charges were granted. Those charges were granted so that the trustees could have as much security as possible even though they were in no position to demand repayment or exert any pressure or give forbearance. The fact that the development of the Three Lions continued after 16 February 1998 does not mean that there was consideration for the grant of security before that date, as Miss Newman submits. It is no answer that the trustees felt that they had to apply pressure gently as Mr Nurkowski was providing a home for the beneficiary of the settlement. The truth is that the trustees were prepared to act in accordance with Mr Nurkowski's wishes and that attitude did not significantly change when the trustees became short of money themselves. It was not the trustees who were pressing for payment of the amounts due to them. It was the Revenue.

97. Miss Newman submits that there was consideration for the assignment of the loan account because Lloyds Bank were seeking to increase the amount for which they had priority over Enniswood from £75,000 to £120,000. There is a reference to that proposal before the assignment is signed. However the deed of postponement was not signed until 1998 and it is not suggested in the correspondence that the trustees were only prepared to execute the deed of postponement if they were given the further security in the form of the assignment of the loan account.

98. In my judgment the judge was entitled to conclude that the trustees were not pressing for repayment of the sums due to them and did not give any consideration in the form of forbearance for the grant of the later charges and the assignment. Loans 1, 2, 4 and 5 were not repayable until 16 February 1998. Loan 3 was not repayable until 30 March 2013 (unless Mr Nurkowski died in the meantime). Accordingly the trustees were in no position to demand repayment at the date of the later charges or the date

of the assignment. The loans were one-sided in Mr Nurkowski's favour. The trustees were in law prospective creditors of Mr Nurkowski. However, they did not threaten to start proceedings to obtain a judgment or to bring bankruptcy proceedings against Mr Nurkowski. Moreover, the trustees were advised by Mr Boyd at most times, which makes it even more unlikely that they would apply any real pressure on Mr Nurkowski.

99.  Accordingly in my judgment, the appeal against the judge's findings in respect of the later charges must be dismissed.

*Issues of law*

100.  Most of the issues of law which arise concern section 423 and therefore I start with some general observations about that section and sections 424 and 425, which are connected with it. Sections 423 to 425 are drafted in wide terms. The sections apply to transactions defrauding creditors (using the terminology in the marginal note) whether or not the person effecting the transaction has become insolvent.

101.  The scheme of section 423 is unusual. Subs (1) defines the circumstances in which section 423 applies: there must be a transaction at an undervalue as defined. Both gifts and transactions with a gratuitous element are covered. Subs (2) defines the objects for which the court can grant relief and refers to "victims". Subs (2) does not set out the circumstances in which the court may grant that relief. Those circumstances appear from subs (3). Subs (3) stipulates the purpose with which the transaction must have been entered into before relief can be granted. Subs (4) identifies the court which can hear a claim under section 423. Subs (5) defines a "victim" of a transaction defrauding creditors, and it is to be noted that the definition is not restricted to creditors with present or actual debts: whether a person is a victim turns on actual or potential prejudice suffered. The definition of "victim" is employed in relation to the criteria for relief in subs (2). It is not used in subs (3), which defines the necessary purpose. The person or persons who fulfil the conditions in section 423(3) may thus be a narrower class of persons than those who at the date of the transaction are victims for the purpose of section 423(5). For a person to be a "victim" there is no need to show that the person who effected the transaction intended to put assets beyond his reach or prejudice his interests. Put another way, a person may be a victim, and thus a person whose interests the court thinks fit to protect by making an order under section 423, but he may not have been the person within the purpose of the person entering into the transaction. That person may indeed have been unaware of the victim's existence. That answers the question: what connection must there be between the purpose and the prejudice? Section 423(2) in conjunction with the definition of victim in 423(5) makes prejudice or potential prejudice a condition for obtaining relief. That prejudice does not have to be achieved by the purpose with which the transaction was entered into. Nor in my judgment does the purpose have to be one which by itself is capable of achieving prejudice. What subs (3) requires is that the purpose should be one which is to prejudice "the interests" of a claimant or prospective claimant. The "interests" of a person are wider than his rights. The expression the "interests" of a member in section 459 of the Companies Acts 1985 (right of members of a company to apply for relief against unfair prejudice) have been similarly construed: see for example *Re Sam Weller & Sons Ltd* [1990] Ch.682, 685. Likewise in *Peter Buchanon Ltd v McVey* [1955] AC 516n at 521, Kingsmill Moore J of the Supreme Court of Ireland spoke of having to consider the *interests* of creditors (which included in that case the tax authority in respect of a tax liability triggered by a sale of whiskey stocks), when a dividend is paid by a solvent company, even though those creditors have no right in law to stop a dividend being paid. I do not therefore consider that it is any answer to the application of section 423 in the present case that the settlement did not by itself prejudice the right of the Revenue to make an assessment of tax on the disposal of OS 160 to the settlement when it was exported to Guernsey. In my judgment, therefore, where as in this case the applicant relies on section 423(3)(b), the crucial step is to identify the interests of the person which are said to be prejudiced.

102.  The next question is whether a person can be said to have the necessary purpose if he is completely mistaken as to whether entry into the transaction can have the effect of prejudicing a person's interests. This question assumes a rather exceptional state of affairs where a person has the necessary purpose of putting assets beyond the reach of his creditors and wrongly thinks that if he enters into a transaction at an undervalue (e.g. gifts property to his wife) his creditor, B, will be prejudiced. If unbeknown to him his wife has agreed to pay the monies transferred to her to B, the purpose that he had in mind will not be achieved. If the creditor takes the benefit of the transaction solely for himself and refuses to share it out with other creditors, they will be persons who (arguably at least) are prejudiced by the transaction and can constitute victims within section 425(5). Another situation that might occur is where the debtor enters into a transaction knowing that his entry into that transaction, together with the happening of some other event, will prejudice a creditor. I consider that the court does not have to consider the relative causal effect of the two matters. If the transaction is entered into with the requisite purpose, the fact that some other event needs to occur does not mean that the transaction cannot itself be within section 423(3). I consider that this is what the judge meant by his test of whether the transaction was an essential part of the purpose (in which connection he applied his analogy with petrol and matches for a fire). I therefore do not accept Miss Newman's submission that it is necessary to approach section 423 as if a test of causation were to be applied. The right approach in my judgment is to apply the statutory wording. It is enough if the transaction sought to be impugned was entered into with the requisite purpose. It is entry into the transaction, not the transaction itself, which has to have the necessary purpose.

103.  Miss Newman seeks to test her propositions by supposing that Mr Nurkowski had entered into the transaction with the requisite purpose but had then thought the better of it with the result that there was no concealment of the £700,000 offer from the Revenue. I infer that the Revenue would in this case have gone on to make a proper assessment of the tax. It is not necessary to express a final view on the application of section 423 to this example but if that example had happened and there was no reason why Mr Nurkowski should not make the gift to the settlement, it is doubtful whether there would have been any victims for the purpose of section 423. However, the point does not arise in this case and I express no view on it.

104. Section 424 sets out who may apply for an order under section 423. A victim may bring proceedings under section 424 as well as (say) a trustee in bankruptcy, but any application, by whomsoever brought must be brought on behalf of all the victims of the transaction.

105. Section 425 sets out a non-exhaustive list of the orders that may be made under section 423. The 1986 Act does not specify any period of limitation in relation to a claim under section 423. Although section 423 has been in statute in one form or another since 1571, there is no reported case that we have seen which decides whether any period of limitation applies to claims under the section and if so what that period is. I shall have to deal with that question and a number of detailed points that arise on the interpretation of sections 423 to 425 below.

*The limitation issue*

106. The argument on limitation has been conducted on the following basis. The questions that have been argued are:

   a. Is there a statutory period of limitation for claims under section 423?

   b. If the answer to a is yes, when did the period of limitation begin to run?

107. These proceedings were begun on 4 December 2002, that is over twelve years after the settlement was executed. Therefore this action must fail unless there is no period of limitation, or the period is six or twelve years and began within the period of six or twelve years (as the case may be) ending on 4 December 2002. That would be the case if the period begins on the date of the bankruptcy order, which was 28 January 1999.

108. If there is a statutory period of limitation, it is either twelve years or six years. The relevant statutory provisions of the 1980 Act are as follows:

   "8. (1) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.

   (2) Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.

   9. (1) An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued …"

109. Before the judge Mr Davies submitted that the commencement of the period of limitation could be postponed under section 32 of the 1980 Act set out in para 120 below. Under that section, the commencement of a statutory limitation period can be postponed if there has been fraud, concealment or mistake. The judge did not find it necessary to reach a decision on section 32 but he observed that it raised a number of difficulties. The fraud or concealment must be the act of the defendant (as defined in section 32(1)). Here any fraud or concealment was on the face of it that of Mr Nurkowski, not the appellant trustees. Mr Davies did not develop his submissions on section 32(1) at the hearing of this appeal.

110. We were shown no authority which decides the limitation point. In the recent case of *Law Society v Southall* [2002] BPIR 336, this court proceeded on the basis that there was no applicable limitation period. (That case concerned gifts made by the debtor and it may be that the parties took the view that if there was any statutory period, its commencement would be postponed under section 32 of the 1980 Act). In the present case, the judge held that there was an applicable limitation period and considered that the claim was a specialty (915E to F). However he held that the limitation period (twelve years) ran from the date of the bankruptcy order so that the claim was brought in time.

111. Before I go to the authorities, attention should be drawn to the features of claims under section 423 which mean that, if such claims are subject to a statutory limitation period, there may be practical difficulties in bringing such claims. As noted above, there is no requirement that the transaction should have occurred in a specified "twilight" period before the bankruptcy. It is quite possible that it will have lain undiscovered for some time. It is one of the characteristics of transactions to which section 423 applies that they are entered into by a person when he is solvent just in case he becomes unable to pay his debts as they fall due later (as where a person is about to embark on a new and risky business venture). In that situation he might well have entered into the transaction with the necessary purpose of prejudicing his creditors in those circumstances. Moreover, if the statutory limitation period runs, as Miss Newman submitted, from the date of the transaction, that period might well have expired before the appointment of the office holder who is entitled to bring a claim under section 424(1) (a) or (b) unless, of course, section 32 applies.

112. Under section 424(1)(c) a victim can bring an application under section 423 at any time. If he does so, he is deemed to bring the claim on behalf of every victim of the transaction (section 424(2)). If the judge is right, then there must be separate limitation periods for different applicants even though there can only be a single cause of action. On the face of it, that is anomalous. A victim who brings an application under section 423 is not enforcing a remedy for prejudice to himself alone because he, like the trustee to bankruptcy, is deemed to bring the proceedings on behalf of all the victims (section 424(2)). Moreover, once the court has made an order on an application under section 423, that must be the end of any claim by any other person under section 423 in respect of that transaction. If there is a statutory limitation period commencing on the date of the transaction, there may well be victims who only come into existence after its expiry, but it may be said that it is the inevitable consequence of any limitation period that it will give the defendant a good defence to claims brought after the expiry of the period. I would

add that there is a question on which we have not heard argument as to who benefits from an order under section 423. It may not be the general body of creditors in the bankruptcy (see for example Fidelis Oditah, *Legal Aspects of Receivables Financing*, 1991, para 7.6).

113. Notwithstanding the above, it is the policy of the statute of limitations that there should be an end to litigation and that this is in the public interest. On this basis, there is no reason why claims under this section should not be subject to some time limit. A trustee in bankruptcy is always liable to find himself in a position where claims that he might have made have become statute-barred before he can take steps to enforce them. The hardship is arguably not great here because the cause of action could always have been enforced by a victim of the transaction, even before the trustee was appointed. In any event, the trustee may be able to rely on section 32(1) of the 1980 Act. Section 424(1)(a) reflects the practice under earlier legislation: see for example *Re Lane-Fox* [1900] QB 508. In *Re Eichholz* [1959] Ch 708, Harman J left open the question whether, if the proceedings were brought by a trustee in bankruptcy, a representative creditor had to be joined. It may be that the purpose of providing in section 424(1)(a) that a trustee in bankruptcy could make the application was simply to resolve this question. It would be odd if by inserting section 424(1)(a) Parliament had made a radical change to the question when time starts to run for limitation purposes. If it runs from the appointment of a trustee in bankruptcy or the appointment of a supervisor of a voluntary arrangement within section 424(1), time may start to run again many years after the transaction sought to be set aside, and indeed there may be successive bankruptcies or voluntary arrangements. It is, moreover, not clear whether a victim who makes an application with the permission of the court pursuant to section to 424(1)(a) or (b) would then be entitled to the benefit of the same limitation period.

114. With that introduction I turn to the first of the two questions set out in para 106 above.

*Is there a statutory period of limitation?*

115. In his notice of application, the trustee seeks declarations that the settlement, the later charges and the assignment were transactions defrauding creditors under the meaning of section 423 of the 1986 Act which should be set aside accordingly. The trustee also seeks an order vesting the assets of the settlements in him, but that is of little use now as nearly all the assets of the settlement have been applied in making loans to Mr Nurkowski. He also asks for further or other relief. By his respondent's notice, the trustee in bankruptcy seeks a "compendious money judgment" (as his skeleton argument puts it) to put the Revenue into the position that it would have been in if Mr Nurkowski had himself sold both OS 149 and OS 160 to Gallagher for the sum of £2m., and an order setting aside the later charges and the assignment. The judge's order does not set aside the settlement, and the trustee does not in his respondent's notice contend that the order should have done so. (It may be that the range of orders mentioned in section 425 was not available under earlier legislation). While the relief sought in respect of the later charges and the assignment is clearly not to recover a sum of money (though it may lead to a consequential order for the payment of money), the order sought in respect of the gift into settlement may be such an order. In those circumstances, section 9(1) may apply: see section 9(1) and section 8(2), above. However that may be, I do not see how it can be said that, in that case, the 1980 Act provides no limitation period. Of course, the court has jurisdiction to make some form of order other than the payment of money, but it is established by earlier decisions of this court that where statute enables the court to give relief in monetary or non-monetary form the court should look to see what is actually claimed: see *West Riding of Yorkshire CC v Huddersfield Corp* [1957] 1 QB 540, and *Re Farmizer (Products) Ltd* [1997] 1 BCLC 589.

116. Insofar as the relief sought is not for "the recovery of a sum recoverable by virtue of" an enactment, within section 9 of the 1980 Act, I agree with the judge that this is an action for a specialty. The essence of a specialty is a covenant under seal or an obligation imposed by statute: see *Collin v Duke of Westminster* [1985] 1 QB 581, at 601D to 603H per Oliver LJ with whom May LJ and Sir Roger Ormrod agreed, citing in particular Lord Hanworth MR in *Aylott v West Ham Corporation* [1927] 1 Ch 30, 50 and Lord Atkin in *Pratt v Cook, Son & Co (St Paul's) Ltd* [1940] AC 437,446. In both the cases cited the claim was to recover a sum of money under a statute. The *Collin* case itself concerned a claim for a declaration as to entitlement to acquire the freehold of a property under the Leasehold Reform Act 1967. This court did not determine whether such a claim was a specialty but we have not been shown any authority which establishes that an obligation imposed by statute other than to pay money is not a specialty. On the contrary, section 8 seems to assume that it is as otherwise there would be little purpose in section 8 in relation to statutory obligations having regard to section 8(2) (see also Preston & Newsom, Limitation of Actions, 1989, para 8.9, page 59).

117. I note that the view is expressed in the Cork Report (Report of the Review Committee on Insolvency Law and Practice, 1982, Cmnd 8558) that there is no time limit in which proceedings must be brought to have a transaction set aside under section 172 of the Law of Property Act 1925 (paras 1203 and 1213), but no authority is cited for this opinion. It may be that the Cork Committee had in mind *Re Maddever* (1884) 27 Ch D 523 (not cited to us in argument) in which this court held that a specialty creditor who applied to set aside a conveyance as fraudulent under the statute 13 Eliz. c.5, the predecessor of section 172 of the Law of Property Act 1925, was not barred by laches and could be brought at any time before his own claim as a creditor became statute-barred. However, at this time there was no statutory limitation period for claims made pursuant to statute, other than debts (see section 3 of the Civil Procedure Act 1833). A statutory limitation period for non-monetary claims made pursuant to statute was introduced for the first time by section 2 of the Limitation Act 1939, pursuant to the recommendation of the Law Review Committee chaired by Lord Wright MR in its Fifth Interim Report (Statutes of Limitation) (Cmnd 5334,1936) (see in particular page 8 of the Report). Once there was a statutory limitation period for non-monetary claims based on a statute, that period must in my judgment apply. However it must follow from *Re Maddever* that a claim which is statute-barred as against the debtor cannot be the basis of a claim to set aside a fraudulent conveyance. This principle is consistent with the principle that a statute-barred debt cannot be proved in bankruptcy (see, for example, *Cotterill v Price* [1960] 1 WLR 1907),

and accordingly I would hold that the same principle applies to claims which may result in the distribution of the benefits of a judgment under section 423.

118. My conclusion as to the application of a statutory limitation period is consistent with the decision of this court in the *Farmizer* case that a claim for a contribution to the assets of a company under section 214 of the 1986 Act in consequence of wrongful trading was subject to the limitation period in section 9(1). It is also consistent with the decision of John Randall QC sitting as a deputy judge of the High Court of Justice, Chancery Division, in *Re Priory Garage (Walthamstow) Limited* [2001] BPIR 144 in relation to applications to set aside transactions as at an undervalue or as voidable preferences under section 238 to 241 of the 1986 Act. As we have not heard argument on the form of relief in respect of the settlement, I would leave open the question whether section 9(1) could apply to that part of the trustee's application in that respect.

*When did the period of limitation begin to run?*

119. I now turn to the question when the period begins. The argument that it begins on the appointment of the trustee where an application is made by a trustee in bankruptcy under section 424(1)(a) is that that section prevents any application being made under section 423 except by the persons mentioned in section 424(1). Thus the requirements for making an application cannot be satisfied in the case of a trustee in bankruptcy until he has been appointed. The judge accepted this argument, citing para. 182 of the judgment of Charles J in *Carman v Yates*. The holding of Charles J was based on an opinion expressed in Muir Hunter on *Personal Insolvency* and a passage in *Re Priory Garage*, though I agree with the judge that the passage cited is not directed to this point.

120. I do not consider that the judge was correct on this point. The question is one of statutory interpretation. A period of limitation runs from the date on which the ingredients of the cause of action are complete: *Coburn v Colledge* [1897] 1 QB 702, 706 (see also *Letang v Cooper* [1967] 1 QB 232 at 242 to 243). A cause of action is complete when all the facts which it would be necessary to prove, if traversed, in support of the right to a judgment of the court, can be pleaded.

121. It must be uncontroversial that the matters contained in section 423(1) and (3) are ingredients of the cause of action under section 423. The difficult question is whether section 424 also sets out ingredients of the cause of action. As the marginal note states, section 424 deals with the question of who can bring the application. Is this – in whole or part - purely a procedural question, or does section 424(1) set out ingredients of the cause of action?

122. In favour of the former view, it can be said that the appointment of the trustee is not a matter which has to be pleaded before any claim under section 423 can be pleaded. It is likely that there will be a victim prior to his appointment (if there are any victims at all). I have already observed that if the judge is right, the limitation period can begin many years after the transaction. It also means that there are separate limitation periods applying to different applicants. These considerations would tend to make it less likely that time began to run in this case for the purpose of the 1980 Act only when the trustee was appointed. Likewise, it would be very odd if a statutory limitation period began on the appointment of a trustee in bankruptcy if there were in fact no victims at that date.

123. It can also be said that, if the claim is brought outside a statutory period starting on the date of the conveyance, the application may be saved by section 32(1). This provides:

"(1) Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act, either--

(a) the action is based upon the fraud of the defendant; or

(b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

(c) the action is for relief from the consequences of a mistake;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

References in this subsection to the defendant include reference to the defendant's agent and to any person through whom the defendant claims and his agent."

124. This section could clearly be invoked where the defendant was party to the fraud or to any deliberate concealment. Here, however, there is no basis for saying that the appellants were party to any fraud or that they have deliberately concealed any relevant facts. It is possible that the fraud of Mr Nurkowski can be treated as that of the trustees as a result of the extended meaning given in section 32(1) to references to the defendant. However we have not heard any submissions on this point and it is thus inappropriate to express a view on the application of section 32 to this case as that matter has not been fully argued.

125. On the other hand, if it is correct that for the purposes of limitation time begins to run from the date of the transaction, there may be no person at all at the start of the period. It would be odd if Parliament enacted a provision for victims where time started to run before the person who wanted to enforce his rights as a victim had become a victim. In the present case, for instance, the Revenue did not become a victim before Mr Nurkowski made the gift into settlement and submitted the valuation of the land for £35,000. Likewise, a person who enters into (say) a voluntary settlement of all his assets in contemplation of

entering into a risky trade may remain solvent for many years. In such a case, I doubt whether a person is "capable of being prejudiced" by the settlement for the purposes of section 423(5) until the debtor becomes insolvent. Until that point in time, there may therefore be no person capable of applying for an order.

126. In these circumstances, in my judgment, the statutory limitation period cannot start to run until there is a victim within the statutory definition. It must be part of the cause of action that it can be shown that he is a victim. The limitation period must in my judgment then continue unless and until whichever first occurs of (a) the disposal of the possibility of any claim under section 423 by a binding judgment or settlement, or (b) the expiry of the period of limitation applicable to the section 423 claim.

127. The next issue is whether the period also begins when a trustee in bankruptcy is appointed. I do not consider that that is the effect of section 424 because the trustee's application is also made on behalf of the victims. This is an indication that he is to be in no better position than the victims themselves, and thus not able to bring a claim if their claims under section 423 or against the debtor are statute-barred. On the other hand he must be in a position to make an application so long as there is any victim whose claim is not statute barred. I note that in *Re Maddever*, the co-applicant was the nominee under letters of administration of the insolvent estate of the deceased but the judgment of this court does not suggest that his presence had any effect on the limitation question. I accept, of course, that that case was decided before section 424 was enacted. I have put forward in para. 113 above a possible explanation for including the trustee as a person who may make an application under section 423.

128. The next issue is whether the limitation period begins each time a victim comes into existence. I would put my answer to this issue in this way. Section 424 establishes the collective nature of the remedy under section 423: any victim can make the application but if he does so he represents all victims. Likewise, a trustee in bankruptcy can make an application. However, if the trustee makes an application under section 423, his application is also on behalf of all victims. Section 423 is thus a collective remedy. It follows that the ingredients of the cause of action can be established by pointing to the existence of any one of the victims. It must follow logically from this that the limitation period applicable to the section 423 claim made on any particular application cannot start before the victim for the purposes of that application (ie the applicant, or, if the applicant if not himself a victim, the person(s) on whose behalf the applicant makes the application) became a victim. The period then runs from this date or, if the commencement of that period is postponed under section 32 of the 1980 Act, from that postponed date. The length of the period is governed by section 8(1) of the 1980 Act, unless section 9 of that Act applies.

129. In this case, the claim which the Revenue now seeks to advance in respect of the capital gains tax liability apparently settled by the compromise did not come into existence until the compromise was made in 1993. This court has not heard argument on the form of relief and therefore this court must as I see it proceed on the basis that section 8 applies. Accordingly the trustee's claim cannot be struck out as statute barred at this stage.

*The purpose issue (law)*

130. There can be no doubt but that section 423(3) requires the person entering into the transaction to have a particular purpose. It is not enough that the transaction has a particular result. The question which Miss Newman raises is: what must be shown in order for the court to be able to find that a purpose has been formed?

131. This is different from the question considered by this court in the recent case of *IRC v Hashmi* [2002] 2 BCLC 489. In that case the question was whether when there was more than one purpose the proscribed purpose had to be dominant or not. This court held that it is not necessary for the proscribed purpose to be the dominant purpose; it was sufficient if it was a real substantial purpose.

132. Here it is said that Mr Nurkowski could not be confident that he would get any tax advantage. It was just a hope that he would save tax, rather than an intention. I would accept that there is a line to be drawn between mere hopes and settled aims. As Asquith LJ said in *Cunliffe v Goodman* [1950] 2 KB 237, 253, a person cannot be said to have an intention merely because he contemplates something as a possibility or if his wishes are merely a minor factor in the achievement of a particular result.

133. The judge did not draw a distinction between hopes and purposes. However, in my judgment the strength of his finding makes the distinction irrelevant since he found that inducing the Revenue to make a wrong assessment of the capital gains was something that Mr Nurkowski positively intended and was a factor which "substantially motivated" him (915A). This in my judgment was enough to show that Mr Nurkowski acted with what was in law a purpose.

134. I have already dealt with the question whether the purpose was prejudicial or had to be causative of the prejudice to the Revenue.

*The victim issue*

135. If I may be forgiven for saying so, this issue is a bit like the chicken and the egg. The appellants criticise the judge for not making a finding about the compromise. They say that he heard all the evidence that there was likely to be on that issue. The position as it existed before the settlement could not be restored and so court has no jurisdiction to make an order unless there was a victim as defined in section 423(5).

136. In my judgment there is nothing in section 423 which mandates this result. I have already observed that it is a feature of sections 423 to 425 that they are drafted in wide terms, and this is another example of their inbuilt elasticity. It is correct that normally the court would consider that it was not proportionate to hear an application unless it could be shown at that date that

there was a person who could benefit by a positive finding under section 423. But there are bound to be cases where that cannot be shown, perhaps because the person who seems to have been prejudiced has to establish his claim in foreign proceedings, or because there are creditors whose claims have not yet matured into present debts. Here the Revenue has grounds for saying that they were deceived as to Mr Nurkowski's means and as to his ability to raise loans from the settlement. There is as it seems to me a deliberate avoidance of the term "victim" in section 423(1) and (3), which set out the conditions which have to be satisfied before the court can make an order under section 425. On the contrary, all that has to be shown is that the person is making or may at some time make a claim (see section 423(3)(a) and (b)).

137. There is another perspective on the victim issue. The Revenue in the unusual circumstances of this case appeared to move out of the class of victims when it agreed to the compromise but to move back into the class when it resuscitated the claims thereby settled. The position is more apparent than real because it contends that it has had the right to set the compromise aside since the date of entry into the compromise. On that basis it did not move out of the class of victims when it agreed to the compromise. However I see no reason why a person cannot cease to be the person within section 423(3) but become a victim for the purposes of section 423(5) (perhaps by reason of some other indebtedness which the debtor owes to it) before the court makes its order so as to be a person whose interests may be protected by such order. Section 423 is sufficiently flexible to allow this.

*The charges and assignment issue*

138. The respondent initially relied on section 423(1) (c) as the basis for invoking section 423 in relation to the later charges and the assignment. The question of the application of section 423(1) ( c) to these transactions does not arise in the light of my rejection of the appeal against the judge's finding that the trustees gave Mr Nurkowski no consideration for these transactions. It would be difficult on the judge's findings to consider the appeal on the alternative basis of section 423(1) (c) applies because that paragraph requires a comparison to be made between the consideration provided by the parties, for which there is no factual basis which could be reviewed on appeal. Miss Newman, however, sought to argue that as a matter of law the grant of security involved no diminution in the value of Mr Nurkowski's assets. Therefore the fact that the consideration provided by the trustees was negligible did not bring the transactions within this paragraph. As to that, I would observe that section 423(1)(c) did not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this approach is supported by section 425 which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the trustees. Obviously there is no change in the physical assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of account. In the circumstances, I would respectfully doubt whether the holding in *MC Bacon* on which Miss Newman relied could apply to the later charges, which were in fact charges by way of legal mortgage, especially in the light of what was said by Lord Hoffmann and Lord Millett in *Buchler v Talbot* [2004] 2 AC 298 at [29] and [51] respectively. I would have the same doubts in relation to the assignment, under which (even though section 136 of the Law of Property Act 1925 was not satisfied) title to the debt was transferred to the trustees. The holding in *MC Bacon* was applied by this court in *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, where a further assignment was made of a debt that had already been assigned by way of charge, and if this point had to be decided we would have to consider whether that case was distinguishable or was now binding on this point in the light of the *Buchler* case. However it is not necessary for me to express a final view on these points on this appeal.

*Disposition of this appeal*

139. For the reasons given above I would dismiss this appeal as respects the issues so far argued, and stand over the remaining issues in the appeal and on respondent's notice to a further hearing.

**Sir Martin Nourse :**

140. I have had the opportunity of reading in draft the judgment of Lady Justice Arden. I agree with her conclusions on all the questions we have to decide except the limitation issue (paras 106 to 129).

141. On that issue the first question is whether there is a period of limitation at all. It is not clear why in *Law Society v Southall* [2002] BPIR 336 the parties, and thus this court, proceeded on the basis that there was no period of limitation applicable to the claim under section 423 of the 1986 Act. What is clear is that the point was not argued, so that the decision is of no assistance in the present case.

142. Those who may apply for an order under section 423 are specified in section 424(1). They include, in para (a):

> "in a case where the debtor has been adjudged bankrupt ……. the trustee of the bankrupt's estate ……. or (with the leave of the court) …. a victim of the transaction. "

> In the present case the action is brought by a trustee in bankruptcy and there is at least one victim of the transaction in the shape of the Inland Revenue.

143. There is no general rule that an action brought by a trustee in bankruptcy is not subject to the provisions of the Limitation Act 1980, and I can see no justification for there to be an exception in the case of a claim brought under s.423. That is confirmed by

such authority as may be said to bear on the point; see in particular *Re Priory Garage (Walthamstow) Ltd* [2001] BPIR 144, a case relating to the somewhat comparable provisions of section 238 to 241 of the 1986 Act.

144. The second question is whether the claims of the trustee in bankruptcy fall within section 8(1) or section 9(1) of the Limitation Act 1980. My own view, like that of Judge Weeks QC (pp 915-916), is that, since the main claim was in origin and substance a claim to set aside the settlement, the action as a whole was "an action upon a specialty" within section 8(1). But because the action was commenced on 4 December 2002, more than twelve years after the settlement was made on 10 March 1989 and less than six years after the bankruptcy order was made on 28 January 1999, the question whether the applicable period of limitation was twelve years under section 8(1) or six years under section 9(1) is academic.

145. So the third and decisive question is whether the period started on the date of the settlement, in which case the action is barred, or on 28 January 1999, in which case it was brought in due time. Following the view expressed by Charles J in para 182 of his judgment in *Re Yates (A Bankrupt)* [2004] All ER (D) 373, Judge Weeks held that the cause of action could not have accrued before the bankruptcy order was made. Charles J said:

> "If there is a limitation period, the passages in *Muir Hunter* suggest that in the case of a claim by a trustee in bankruptcy begins to run from the date of the bankruptcy order. Counsel for the trustee made the same submission on the basis that that is the date when the cause of action accrued to the trustee. I agree......"

146. The principal objection to that view is that, because section 424(2) provides that an application made under any of the paragraphs of sub-section (1) is to be treated as made on behalf of every victim of the transaction there can only be a single cause of action, while if the view expressed by Charles J and Judge Weeks is right, there must be separate limitation periods for different applicants under section 423.

147. In my respectful view the premise of this objection is incorrect. It may be difficult to know exactly what Parliament did or did not have in mind in enacting section 424(2), but it seems that its main purpose must have been to ensure that a victim who had not applied under section 423 should gain the same advantage as one who had.

148. In any event, I do not think it is right to say that the effect of section 424(2) is that there can only be a single cause of action in respect of one transaction. In *Letang v Cooper* [1965] 1 QB 232, 242, Diplock LJ said:

> "A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person."

> That shows that the identity of the claimant or applicant is an ingredient of the cause of action and because two different persons may have the same or a similar cause of action it does not follow that there is only a single cause of action.

149. Further, I see no inherent objection to the notion that there may be separate limitation periods for different applicants under section 423. While it has always been the policy of the Limitation Acts to put an end to stale claims, it has not been part of their policy to provide that time shall run against a claimant or applicant before he has been able to commence his action; see in particular section 28 of the 1980 Act (disability).

150. Three further points must be made. First, it is not an objection to the judge's view that the limitation period may begin many years after the transaction. That state of affairs is perfectly capable of arising under other sections of the 1980 Act, e.g. sections 28 and 32. Secondly, I do not agree that the appointment of the trustee in bankruptcy is not an ingredient of the cause of action vested in *the* trustee. It is not until a bankruptcy order is made that the trustee is identified as the person entitled to sue. Thirdly, it is in my view immaterial that when the bankruptcy order is made there may be other victims of the transaction whose individual claims may already be statute-barred but who may nevertheless be able to claim as creditors in the bankruptcy.

151. For these reasons, differing from Lady Justice Arden, I have come to the conclusion that the judge's view of the limitation issue was correct. Like him, I would decide it in favour of the trustee in bankruptcy and dismiss the appeal accordingly.

**Lord Justice Waller:**

152. I too agree with conclusions reached by Lady Justice Arden on all questions we have to decide except the limitation issue. On that issue I agree with the judgment of Sir Martin Nourse, and am fully persuaded by his reasoning that the judge's conclusion on this issue was correct.

153. It follows that the appeal on the issues which were before us will be dismissed and (for the avoidance of doubt) further argument on relief will not include argument on the limitation issue.

THE APPENDIX

*Sections 423 to 435 of the 1986 Act*

Sections 423 to 435 of the 1986 Act (as amended and now in force) provide as follows:

"**423 Transactions defrauding creditors**

(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if –

(a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b) he enters into a transaction with the other in consideration of marriage; or

(c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for –

(a) restoring the position to what it would have been if the transaction had not been entered into, and

(b) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose –

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or –

(a) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

**424 Those who may apply for an order under s 423**

(1) An application for an order under section 423 shall not be made in relation to a transaction except –

(a) in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or is in administration, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(b) in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the voluntary arrangement or by any person who (whether or not so bound) is such a victim; or

(c) in any other case, by a victim of the transaction.

(2) An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.

**425 Provision which may be made by order under s 423**

(1) Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)-

(a) require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b) require any property to be so vested if it represents, in any person's hands, the application

either of the proceeds of sale of property so transferred or of money so transferred;

(c) release or discharge (in whole or in part) any security given by the debtor;

(d) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order –

(a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security."

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2006/542.html*

# APPENDIX

# LIMITATION ACT 1980[1]

## (1980 Chapter 58)

*An Act to consolidate the Limitation Acts 1939 to 1980*

[13 November 1980]

PART I
ORDINARY TIME LIMITS FOR DIFFERENT CLASSES OF ACTION

*Time limits under Part I subject to extension or exclusion under Part II*

**1    Time limits under Part 1 subject to extension or exclusion under Part II**

(1)    This Part of this Act gives the ordinary time limits for bringing actions of the various classes mentioned in the following provisions of this Part.

(2)    The ordinary time limits given in this Part of this Act are subject to extension or exclusion in accordance with the provisions of Part II of this Act.

*Actions founded on tort*

**2    Time limit for actions founded on tort**

An action founded on tort shall not be brought after the expiration of six years from the date on which the cause of action accrued.

**3    Time limit in case of successive conversions and extinction of title of owner of converted goods**

(1)    Where any cause of action in respect of the conversion of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion takes place, no action shall be brought in respect of the further conversion after the expiration of six years from the accrual of the cause of action in respect of the original conversion.

(2)    Where any such cause of action has accrued to any person and the period prescribed for bringing that action has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

---

[1] As amended by the Supreme Court Act 1981, the Mental Health Act 1983, the Patronage (Benefices) Measure 1986, the Latent Damage Act 1986, the Consumer Protection Act 1987, the Arbitration Act 1996, the Defamation Act 1996, the Trusts of Land and Appointment of Trustees Act 1996, the Protection from Harassment Act 1997, the Land Registration Act 1997. Only schedules 1 and 2 to the Act have been included.

**4    Special time limit in case of theft**

(1)    The right of any person from whom a chattel is stolen to bring an action in respect of the theft shall not be subject to the time limits under sections 2 and 3(1) of this Act, but if his title to the chattel is extinguished under section 3(2) of this Act he may not bring an action in respect of a theft preceding the loss of his title, unless the theft in question preceded the conversion from which time began to run for the purposes of section 3(2).

(2)    Subsection (1) above shall apply to any conversion related to the theft of a chattel as it applies to the theft of a chattel; and, except as provided below, every conversion following the theft of a chattel before the person from whom it is stolen recovers possession of it shall be regarded for the purposes of this section as related to the theft.

If anyone purchases the stolen chattel in good faith neither the purchase nor any conversion following it shall be regarded as related to the theft.

(3)    Any cause of action accruing in respect of the theft or any conversion related to the theft of a chattel to any person from whom the chattel is stolen shall be disregarded for the purpose of applying section 3(1) or (2) of this Act to his case.

(4)    Where in any action brought in respect of the conversion of a chattel it is proved that the chattel was stolen from the plaintiff or anyone through whom he claims it shall be presumed that any conversion following the theft is related to the theft unless the contrary is shown.

(5)    In this section "theft" includes--

(a)    any conduct outside England and Wales which would be theft if committed in England and Wales; and

(b)    obtaining any chattel (in England and Wales or elsewhere) in the circumstances described in section 15(1) of the Theft Act 1968 (obtaining by deception) or by blackmail within the meaning of section 21 of that Act;

and references in this section to a chattel being "stolen" shall be construed accordingly.

**4A.    Time limit for actions for defamation or malicious falsehood**

The time limit under section 2 of this Act shall not apply to an action for--

(a)    libel or slander, or

(b)    slander of title, slander of goods or other malicious falsehood,

but no such action shall be brought after the expiration of one year from the date on which the cause of action accrued.

*Actions founded on simple contract*

**5    Time limit for actions founded on simple contract**

An action founded on simple contract shall not be brought after the expiration of six years from the date on which the cause of action accrued.

**6    Special time limit for actions in respect of certain loans**

(1)    Subject to subsection (3) below, section 5 of this Act shall not bar the right of action on a contract of loan to which this section applies.

(2)    This section applies to any contract of loan which--

(a)    does not provide for repayment of the debt on or before a fixed or determinable date; and

(b)    does not effectively (whether or not it purports to do so) make the obligation to repay the debt conditional on a demand for repayment made by or on behalf of the creditor or on any other matter;

except where in connection with taking the loan the debtor enters into any collateral obligation to pay the amount of the debt or any part of it (as, for example, by delivering a promissory note as security for the debt) on terms which would exclude the application of this section to the contract of loan if they applied directly to repayment of the debt.

(3)    Where a demand in writing for repayment of the debt under a contract of loan to which this section applies is made by or on behalf of the creditor (or, where there are joint creditors, by or on behalf of any one of them) section 5 of this Act shall thereupon apply as if the cause of action to recover the debt had accrued on the date on which the demand was made.

(4)    In this section "promissory note" has the same meaning as in the Bills of Exchange Act 1882.

**7      Time limit for actions to enforce certain awards**

An action to enforce an award, where the submission is not by an instrument under seal, shall not be brought after the expiration of six years from the date on which the cause of action accrued.

*General rule for actions on a specialty*

**8      Time limit for actions on a specialty**

(1)    An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.

(2)    Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.

*Actions for sums recoverable by statute*

**9      Time limit for actions for sums recoverable by statute**

(1)    An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued.

(2)    Subsection (1) above shall not affect any action to which section 10 of this Act applies.

**10     Special time limit for claiming contribution**

(1)    Where under section 1 of the Civil Liability (Contribution) Act 1978 any person becomes entitled to a right to recover contribution in respect of any damage from any other person, no action to recover contribution by virtue of that right shall be brought after the expiration of two years from the date on which that right accrued.

(2)    For the purposes of this section the date on which a right to recover contribution in respect of any damage accrues to any person (referred to below in this section as "the relevant date") shall be ascertained as provided in subsections (3) and (4) below.

(3)    If the person in question is held liable in respect of that damage--

(a)    by a judgment given in any civil proceedings; or

(b)    by an award made on any arbitration;

the relevant date shall be the date on which the judgment is given, or the date of the award (as the case may be).

For the purposes of this subsection no account shall be taken of any judgment or award given or made on appeal in so far as it

419

varies the amount of damages awarded against the person in question.

(4)    If, in any case not within subsection (3) above, the person in question makes or agrees to make any payment to one or more persons in compensation for that damage (whether he admits any liability in respect of the damage or not), the relevant date shall be the earliest date on which the amount to be paid by him is agreed between him (or his representative) and the person (or each of the persons, as the case may be) to whom the payment is to be made.

(5)    An action to recover contribution shall be one to which sections 28, 32 and 35 of this Act apply, but otherwise Parts II and III of this Act (except sections 34, 37 and 38) shall not apply for the purposes of this section.

*Actions in respect of wrongs causing personal injuries or death*

## 11    Special time limit for actions in respect of personal injuries

(1)    This section applies to any action for damages for negligence, nuisance or breach of duty (whether the duty exists by virtue of a contract or of provision made by or under a statute or independently of any contract or any such provision) where the damages claimed by the plaintiff for the negligence, nuisance or breach of duty consist of or include damages in respect of personal injuries to the plaintiff or any other person.

(1A)    This section does not apply to any action brought for damages under section 3 of the Protection from Harassment Act 1997.

(2)    None of the time limits given in the preceding provisions of this Act shall apply to an action to which this section applies.

(3)    An action to which this section applies shall not be brought after the expiration of the period applicable in accordance with subsection (4) or (5) below.

(4)    Except where subsection (5) below applies, the period applicable is three years from--

(a)    the date on which the cause of action accrued; or

(b)    the date of knowledge (if later) of the person injured.

(5)    If the person injured dies before the expiration of the period mentioned in subsection (4) above, the period applicable as respects the cause of action surviving for the benefit of his estate by virtue of section 1 of the Law Reform (Miscellaneous Provisions) Act 1934 shall be three years from--

(a)    the date of death; or

(b)    the date of the personal representative's knowledge;

whichever is the later.

(6)    For the purposes of this section "personal representative" includes any person who is or has been a personal representative of the deceased, including an executor who has not proved the will (whether or not he has renounced probate) but not anyone appointed only as a special personal representative in relation to settled land; and regard shall be had to any knowledge acquired by any such person while a personal representative or previously.

(7)    If there is more than one personal representative, and their dates of knowledge are different, subsection (5)(b) above shall be read as referring to the earliest of those dates.

## 11A    Actions in respect of defective products

(1)    This section shall apply to an action for damages by virtue of any provision of Part I of the Consumer Protection Act 1987.

(2)    None of the time limits given in the preceding provisions of this Act shall apply to an action to which this section applies.

(3)    An action to which this section applies shall not be brought after the expiration of the period of ten years from the relevant time, within the meaning of section 4 of the said Act of 1987; and this subsection shall operate to extinguish a right of action and shall do so whether or not that right of action had accrued, or time under the following provisions of this Act had begun to run, at the end of the said period of ten years.

(4)    Subject to subsection (5) below, an action to which this section applies in which the damages claimed by the plaintiff consist of or include damages in respect of personal injuries to the plaintiff or any other person or loss of or damage to any property, shall not be brought after the expiration of the period of three years from whichever is the later of--

(a)    the date on which the cause of action accrued; and

(b)    the date of knowledge of the injured person or, in the case of loss of or damage to property, the date of knowledge of the plaintiff or (if earlier) of any person in whom his cause of action was previously vested.

(5)    If in a case where the damages claimed by the plaintiff consist of or include damages in respect of personal injuries to the plaintiff or any other person the injured person died before the expiration of the period mentioned in subsection (4) above, that subsection shall have effect as respects the cause of action surviving for the benefit

of his estate by virtue of section 1 of the Law Reform (Miscellaneous Provisions) Act 1934 as if for the reference to that period there were substituted a reference to the period of three years from whichever is the later of--

    (a)    the date of death; and

    (b)    the date of the personal representative's knowledge.

(6)    For the purposes of this section "personal representative" includes any person who is or has been a personal representative of the deceased, including an executor who has not proved the will (whether or not he has renounced probate) but not anyone appointed only as a special personal representative in relation to settled land; and regard shall be had to any knowledge acquired by any such person while a personal representative or previously.

(7)    If there is more than one personal representative and their dates of knowledge are different, subsection (5)(b) above shall be read as referring to the earliest of those dates.

(8)    Expressions used in this section or section 14 of this Act and in Part 1 of the Consumer Protection Act 1987 have the same meanings in this section or that section as in that Part; and section 1(1) of that Act (Part I to be construed as enacted for the purpose of complying with the product liability Directive) shall apply for the purpose of construing this section and the following provisions of this Act so far as they relate to an action by virtue of any provision of that Part as it applies for the purpose of construing that Part.

## 12    Special time limit for actions under Fatal Accidents legislation

(1)    An action under the Fatal Accidents Act 1976 shall not be brought if the death occurred when the person injured could no longer maintain an action and recover damages in respect of the injury (whether because of a time limit in this Act or in any other Act, or for any other reason).

Where any such action by the injured person would have been barred by the time limit in section 11 or 11A of this Act, no account shall be taken of the possibility of that time limit being overridden under section 33 of this Act.

(2)    None of the time limits given in the preceding provisions of this Act shall apply to an action under the Fatal Accidents Act 1976, but no such action shall be brought after the expiration of three years from--

    (a)    the date of death; or

(b)     the date of knowledge of the person for whose benefit the action is brought;

whichever is the later.

(3)     An action under the Fatal Accidents Act 1976 shall be one to which sections 28, 33 and 35 of this Act apply, and the application to any such action of the time limit under subsection (2) above shall be subject to section 39; but otherwise Parts II and III of this Act shall not apply to any such action.

## 13     Operation of time limit under section 12 in relation to different dependants

(1)     Where there is more than one person for whose benefit an action under the Fatal Accidents Act 1976 is brought, section 12(2)(b) of this Act shall be applied separately to each of them.

(2)     Subject to subsection (3) below, if by virtue of subsection (1) above the action would be outside the time limit given by section 12(2) as regards one or more, but not all, of the persons for whose benefit it is brought, the court shall direct that any person as regards whom the action would be outside that limit shall be excluded from those for whom the action is brought.

(3)     The court shall not give such a direction if it is shown that if the action were brought exclusively for the benefit of the person in question it would not be defeated by a defence of limitation (whether in consequence of section 28 of this Act or an agreement between the parties not to raise the defence, or otherwise).

## 14     Definition of date of knowledge for purposes of sections 11 and 12

(1)     Subject to subsection (1A) below, in sections 11 and 12 of this Act references to a person's date of knowledge are references to the date on which he first had knowledge of the following facts--

(a)     that the injury in question was significant; and

(b)     that the injury was attributable in whole or in part to the act or omission which is alleged to constitute negligence, nuisance or breach of duty; and

(c)     the identity of the defendant; and

(d)     if it is alleged that the act or omission was that of a person other than the defendant, the identity of that person and the additional facts supporting the bringing of an action against the defendant;

and knowledge that any acts or omissions did or did not, as a matter of law, involve negligence, nuisance or breach of duty is irrelevant.

(1A)    In section 11A of this Act and in section 12 of this Act so far as that section applies to an action by virtue of section 6(1)(a) of the Consumer Protection Act 1987 (death caused by defective product) references to a person's date of knowledge are references to the date on which he first had knowledge of the following facts--

      (a)    such facts about the damage caused by the defect as would lead a reasonable person who had suffered such damage to consider it sufficiently serious to justify his instituting proceedings for damages against a defendant who did not dispute liability and was able to satisfy a judgment; and

      (b)    that the damage was wholly or partly attributable to the facts and circumstances alleged to constitute the defect; and

      (c)    the identity of the defendant;

but, in determining the date on which a person first had such knowledge there shall be disregarded both the extent (if any) of that person's knowledge on any date of whether particular facts or circumstances would or would not, as a matter of law, constitute a defect and, in a case relating to loss of or damage to property, any knowledge which that person had on a date on which he had no right of action by virtue of Part I of that Act in respect of the loss or damage.

(2)    For the purposes of this section an injury is significant if the person whose date of knowledge is in question would reasonably have considered it sufficiently serious to justify his instituting proceedings for damages against a defendant who did not dispute liability and was able to satisfy a judgment.

(3)    For the purposes of this section a person's knowledge includes knowledge which he might reasonably have been expected to acquire--

      (a)    from facts observable or ascertainable by him; or

      (b)    from facts ascertainable by him with the help of medical or other appropriate expert advice which it is reasonable for him to seek;

but a person shall not be fixed under this subsection with knowledge of a fact ascertainable only with the help of expert advice so long as he has taken all reasonable steps to obtain (and,

where appropriate, to act on) that advice.

*Actions in respect of latent damage not involving personal injuries*

## 14A    Special time limit for negligence actions where facts relevant to cause of action are not known at date of accrual

(1)    This section applies to any action for damages for negligence, other than one to which section 11 of this Act applies, where the starting date for reckoning the period of limitation under subsection (4)(b) below falls after the date on which the cause of action accrued.

(2)    Section 2 of this Act shall not apply to an action to which this section applies.

(3)    An action to which this section applies shall not be brought after the expiration of the period applicable in accordance with subsection (4) below.

(4)    That period is either--

(a)    six years from the date on which the cause of action accrued; or

(b)    three years from the starting date as defined by subsection (5) below, if that period expires later than the period mentioned in paragraph (a) above.

(5)    For the purposes of this section, the starting date for reckoning the period of limitation under subsection (4)(b) above is the earliest date on which the plaintiff or any person in whom the cause of action was vested before him first had both the knowledge required for bringing an action for damages in respect of the relevant damage and a right to bring such an action.

(6)    In subsection (5) above "the knowledge required for bringing an action for damages in respect of the relevant damage" means knowledge both--

(a)    of the material facts about the damage in respect of which damages are claimed; and

(b)    of the other facts relevant to the current action mentioned in subsection (8) below.

(7)    For the purposes of subsection (6)(a) above, the material facts about the damage are such facts about the damage as would lead a reasonable person who had suffered such damage to consider it sufficiently serious to justify his instituting proceedings for damages against a defendant who did not dispute liability and was

able to satisfy a judgment.

(8)     The other facts referred to in subsection (6)(b) above are--

    (a)     that the damage was attributable in whole or in part to the act or omission which is alleged to constitute negligence; and

    (b)     the identity of the defendant; and

    (c)     if it is alleged that the act or omission was that of a person other than the defendant, the identity of that person and the additional facts supporting the bringing of an action against the defendant.

(9)     Knowledge that any acts or omissions did or did not, as a matter of law, involve negligence is irrelevant for the purposes of subsection (5) above.

(10)    For the purposes of this section a person's knowledge includes knowledge which he might reasonably have been expected to acquire--

    (a)     from facts observable or ascertainable by him; or

    (b)     from facts ascertainable by him with the help of appropriate expert advice which it is reasonable for him to seek;

but a person shall not be taken by virtue of this subsection to have knowledge of a fact ascertainable only with the help of expert advice so long as he has taken all reasonable steps to obtain (and, where appropriate, to act on) that advice.

### 14B    Overriding time limit for negligence actions not involving personal injuries

(1)    An action for damages for negligence, other than one to which section 11 of this Act applies, shall not be brought after the expiration of fifteen years from the date (or, if more than one, from the last of the dates) on which there occurred any act or omission--

    (a)    which is alleged to constitute negligence; and

    (b)    to which the damage in respect of which damages are claimed is alleged to be attributable (in whole or in part).

(2)    This section bars the right of action in a case to which subsection (1) above applies notwithstanding that--

    (a)    the cause of action has not yet accrued; or

    (b)    where section 14A of this Act applies to the action, the date which is for the purposes of that section the starting date for reckoning the period mentioned in subsection (4)(b) of that section has not yet occurred;

before the end of the period of limitation prescribed by this section.

*Actions to recover land and rent*

### 15    Time limit for actions to recover land

(1)    No action shall be brought by any person to recover any land after the expiration of twelve years from the date on which the right of action accrued to him or, if it first accrued to some person through whom he claims, to that person.

(2)    Subject to the following provisions of this section, where--

    (a)    the estate or interest claimed was an estate or interest in reversion or remainder or any other future estate or interest and the right of action to recover the land accrued on the date on which the estate or interest fell into possession by the determination of the preceding estate or interest; and

    (b)    the person entitled to the preceding estate or interest (not being a term of years absolute) was not in possession of the land on that date;

no action shall be brought by the person entitled to the succeeding estate or interest after the expiration of twelve years from the date on which the right of action accrued to the person entitled to the

preceding estate or interest or six years from the date on which the right of action accrued to the person entitled to the succeeding estate or interest, whichever period last expires.

(3)    Subsection (2) above shall not apply to any estate or interest which falls into possession on the determination of an entailed interest and which might have been barred by the person entitled to the entailed interest.

(4)    No person shall bring an action to recover any estate or interest in land under an assurance taking effect after the right of action to recover the land had accrued to the person by whom the assurance was made or some person through whom he claimed or some person entitled to a preceding estate or interest, unless the action is brought within the period during which the person by whom the assurance was made could have brought such an action.

(5)    Where any person is entitled to any estate or interest in land in possession and, while so entitled, is also entitled to any future estate or interest in that land, and his right to recover the estate or interest in possession is barred under this Act, no action shall be brought by that person, or by any person claiming through him, in respect of the future estate or interest, unless in the meantime possession of the land has been recovered by a person entitled to an intermediate estate or interest.

(6)    Part I of Schedule 1 to this Act contains provisions for determining the date of accrual of rights of action to recover land in the cases there mentioned.

(7)    Part II of that Schedule contains provisions modifying the provisions of this section in their application to actions brought by, or by a person claiming through, the Crown or any spiritual or eleemosynary corporation sole.

## 16    Time limit for redemption actions

When a mortgagee of land has been in possession of any of the mortgaged land for a period of twelve years, no action to redeem the land of which the mortgagee has been so in possession shall be brought after the end of that period by the mortgagor or any person claiming through him.

## 17    Extinction of title to land after expiration of time limit

Subject to--

(a)    section 18 of this Act; and

(b)    section 75 of the Land Registration Act 1925;

at the expiration of the period prescribed by this Act for any person to bring an action to recover land (including a redemption action) the title of that person to the land shall be extinguished.

**18    Settled land and land held on trust**[2]

(1)    Subject to section 21(1) and (2) of this Act, the provisions of this Act shall apply to equitable interests in land, *including interests in the proceeds of the sale of land held upon trust for sale,* as they apply to legal estates.

Accordingly a right of action to recover the land shall, for the purposes of this Act but not otherwise, be treated as accruing to a person entitled in possession to such an equitable interest in the like manner and circumstances, and on the same date, as it would accrue if his interest were a legal estate in the land (and any relevant provision of Part I of Schedule 1 to this Act shall apply in any such case accordingly).

(2)    Where the period prescribed by this Act has expired for the bringing of an action to recover land by a tenant for life or a statutory owner of settled land--

(a)    his legal estate shall not be extinguished if and so long as the right of action to recover the land of any person entitled to a beneficial interest in the land either has not accrued or has not been barred by this Act; and

(b)    the legal estate shall accordingly remain vested in the tenant for life or statutory owner and shall devolve in accordance with the Settled Land Act 1925;

but if and when every such right of action has been barred by this Act, his legal estate shall be extinguished.

(3)    Where any land is held upon trust *(including a trust for sale)* and the period prescribed by this Act has expired for the bringing of an action to recover the land by the trustees, the estate of the trustees shall not be extinguished if and so long as the right of action to recover the land of any person entitled to a beneficial interest in the land *or in the proceeds of sale* either has not accrued or has not been barred by this Act; but if and when every such right of action has been so barred the estate of the trustees shall be extinguished.

(4)    Where--

(a)    any settled land is vested in a statutory owner; or

---

[2]    The words in this section in italics have been repealed by the Trusts of Land and Appointment of Trustees Act 1996, s 25(2) and Schedule 4, with effect from 1 January 1997, subject to the saving provisions in s 25(4) and 25(5).

(b)  any land is held upon trust *(including a trust for sale)*;

an action to recover the land may be brought by the statutory owner or trustees on behalf of any person entitled to a beneficial interest in possession in the land *or in the proceeds of sale* whose right of action has not been barred by this Act, notwithstanding that the right of action of the statutory owner or trustees would apart from this provision have been barred by this Act.

**19    Time limit for actions to recover rent**

No action shall be brought, or distress made, to recover arrears of rent, or damages in respect of arrears of rent, after the expiration of six years from the date on which the arrears became due.

*Actions to recover money secured by a mortgage or charge
or to recover proceeds of the sale of land*

**20    Time limit for actions to recover money secured by a mortgage or charge or to recover proceeds of the sale of land**

(1)  No action shall be brought to recover--

(a)  any principal sum of money secured by a mortgage or other charge on property (whether real or personal); or

(b)  proceeds of the sale of land;

after the expiration of twelve years from the date on which the right to receive the money accrued.

(2)  No foreclosure action in respect of mortgaged personal property shall be brought after the expiration of twelve years from the date on which the right to foreclose accrued.

But if the mortgagee was in possession of the mortgaged property after that date, the right to foreclose on the property which was in his possession shall not be treated as having accrued for the purposes of this subsection until the date on which his possession discontinued.

(3)  The right to receive any principal sum of money secured by a mortgage or other charge and the right to foreclose on the property subject to the mortgage or charge shall not be treated as accruing so long as that property comprises any future interest or any life insurance policy which has not matured or been determined.

(4)  Nothing in this section shall apply to a foreclosure action in respect of mortgaged land, but the provisions of this Act relating to actions to recover land shall apply to such an action.

(5)  Subject to subsections (6) and (7) below, no action to recover arrears of interest payable in respect of any sum of money secured by a mortgage or other charge or payable in respect of proceeds of the sale of land, or to recover damages in respect of such arrears shall be brought after the expiration of six years from the date on which the interest became due.

(6)  Where--

    (a)  a prior mortgagee or other incumbrancer has been in possession of the property charged; and

    (b)  an action is brought within one year of the discontinuance of that possession by the subsequent incumbrancer;

the subsequent incumbrancer may recover by that action all the arrears of interest which fell due during the period of possession by the prior incumbrancer or damages in respect of those arrears, notwithstanding that the period exceeded six years.

(7)  Where--

    (a)  the property subject to the mortgage or charge comprises any future interest or life insurance policy; and

    (b)  it is a term of the mortgage or charge that arrears of interest shall be treated as part of the principal sum of money secured by the mortgage or charge;

interest shall not be treated as becoming due before the right to recover the principal sum of money has accrued or is treated as having accrued.

*Actions in respect of trust property or the personal estate of deceased persons*

**21**    **Time limit for actions in respect of trust property**

(1)  No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action--

    (a)  in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or

    (b)  to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use.

(2)  Where a trustee who is also a beneficiary under the trust receives or retains trust property or its proceeds as his share on a distribution

of trust property under the trust, his liability in any action brought by virtue of subsection (1)(b) above to recover that property or its proceeds after the expiration of the period of limitation prescribed by this Act for bringing an action to recover trust property shall be limited to the excess over his proper share.

This subsection only applies if the trustee acted honestly and reasonably in making the distribution.

(3)     Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued.

For the purposes of this subsection, the right of action shall not be treated as having accrued to any beneficiary entitled to a future interest in the trust property until the interest fell into possession.

(4)     No beneficiary as against whom there would be a good defence under this Act shall derive any greater or other benefit from a judgment or order obtained by any other beneficiary than he could have obtained if he had brought the action and this Act had been pleaded in defence.

## 22     Time limit for actions claiming personal estate of a deceased person

Subject to section 21(1) and (2) of this Act--

(a)     no action in respect of any claim to the personal estate of a deceased person or to any share or interest in any such estate (whether under a will or on intestacy) shall be brought after the expiration of twelve years from the date on which the right to receive the share or interest accrued; and

(b)     no action to recover arrears of interest in respect of any legacy, or damages in respect of such arrears, shall be brought after the expiration of six years from the date on which the interest became due.

*Actions for an account*

## 23    Time limit in respect of actions for an account

An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account.

*Miscellaneous and supplemental*

## 24    Time limit for actions to enforce judgments

(1)    An action shall not be brought upon any judgment after the expiration of six years from the date on which the judgment became enforceable.

(2)    No arrears of interest in respect of any judgment debt shall be recovered after the expiration of six years from the date on which the interest became due.

## 25    Time limit for actions to enforce advowsons and extinction of title to advowsons

Repealed.

## 26    Administration to date back to death

For the purposes of the provisions of this Act relating to actions for the recovery of land and advowsons an administrator of the estate of a deceased person shall be treated as claiming as if there had been no interval of time between the death of the deceased person and the grant of the letters of administration.

## 27    Cure of defective disentailing assurance

(1)    This section applies where--

(a)    a person entitled in remainder to an entailed interest in any land makes an assurance of his interest which fails to bar the issue in tail or the estates and interests taking effect on the determination of the entailed interest, or fails to bar those estates and interests only; and

(b)    any person takes possession of the land by virtue of the assurance.

(2)    If the person taking possession of the land by virtue of the assurance, or any other person whatsoever (other than a person entitled to possession by virtue of the settlement) is in possession of the land for a period of twelve years from the commencement of the time when the assurance could have operated as an effective

bar, the assurance shall thereupon operate, and be treated as having always operated, to bar the issue in tail and the estates and interests taking effect on the determination of the entailed interest.

(3)     The reference in subsection (2) above to the time when the assurance could have operated as an effective bar is a reference to the time at which the assurance, if it had then been executed by the person entitled to the entailed interest, would have operated, without the consent of any other person, to bar the issue in tail and the estates and interests taking effect on the determination of the entailed interest.

## PART II

## EXTENSION OR EXCLUSION OF ORDINARY TIME LIMITS

### *Disability*

**28      Extension of limitation period in case of disability**

(1)     Subject to the following provisions of this section, if on the date when any right of action accrued for which a period of limitation is prescribed by this Act, the person to whom it accrued was under a disability, the action may be brought at any time before the expiration of six years from the date when he ceased to be under a disability or died (whichever first occurred) notwithstanding that the period of limitation has expired.

(2)     This section shall not affect any case where the right of action first accrued to some person (not under a disability) through whom the person under a disability claims.

(3)     When a right of action which has accrued to a person under a disability accrues, on the death of that person while still under a disability, to another person under a disability, no further extension of time shall be allowed by reason of the disability of the second person.

(4)     No action to recover land or money charged on land shall be brought by virtue of this section by any person after the expiration of thirty years from the date on which the right of action accrued to that person or some person through whom he claims.

(4A)    If the action is one to which section 4A of this Act applies, subsection (1) above shall have effect--

　　　　(a)     in the case of an action for libel or slander, as if for the words from "at any time" to "occurred)" there were substituted the words "by him at any time before the expiration of one year from the date on which he ceased to be under a disability"; and

434

(b)    in the case of an action for slander of title, slander of goods or other malicious falsehood, as if for the words "six years" there were substituted the words "one year".

(5)    If the action is one to which section 10 of this Act applies, subsection(1) above shall have effect as if for the words "six years" there were substituted the words "two years".

(6)    If the action is one to which section 11 or 12(2) of this Act applies, subsection (1) above shall have effect as if for the words "six years" there were substituted the words "three years".

(7)    If the action is one to which section 11A of this Act applies or one by virtue of section 6(1)(a) of the Consumer Protection Act 1987 (death caused by defective product), subsection (1) above--

(a)    shall not apply to the time limit prescribed by subsection (3) of the said section 11A or to that time limit as applied by virtue of section 12(1) of this Act; and

(b)    in relation to any other time limit prescribed by this Act shall have effect as if for the words "six years" there were substituted the words "three years".

**28A    Extension for cases where the limitation period is the period under section 14A(4)(b)**

(1)    Subject to subsection (2) below, if in the case of any action for which a period of limitation is prescribed by section 14A of this Act--

(a)    the period applicable in accordance with subsection (4) of that section is the period mentioned in paragraph (b) of that subsection;

(b)    on the date which is for the purposes of that section the starting date for reckoning that period the person by reference to whose knowledge that date fell to be determined under subsection (5) of that section was under a disability; and

(c)    section 28 of this Act does not apply to the action;

the action may be brought at any time before the expiration of three years from the date when he ceased to be under a disability or died (whichever first occurred) notwithstanding that the period mentioned above has expired.

(2)    An action may not be brought by virtue of subsection (1) above after the end of the period of limitation prescribed by section 14B of this Act.

*Acknowledgment and part payment*

**29      Fresh accrual of action on acknowledgment or part payment**

(1)     Subsections (2) and (3) below apply where any right of action (including a foreclosure action) to recover land or an advowson or any right of a mortgagee of personal property to bring a foreclosure action in respect of the property has accrued.

(2)     If the person in possession of the land, benefice or personal property in question acknowledges the title of the person to whom the right of action has accrued--

(a)     the right shall be treated as having accrued on and not before the date of the acknowledgment; and

(b)     in the case of a right of action to recover land which has accrued to a person entitled to an estate or interest taking effect on the determination of an entailed interest against whom time is running under section 27 of this Act, section 27 shall thereupon cease to apply to the land.

(3)     In the case of a foreclosure or other action by a mortgagee, if the person in possession of the land, benefice or personal property in question or the person liable for the mortgage debt makes any payment in respect of the debt (whether of principal or interest) the right shall be treated as having accrued on and not before the date of the payment.

(4)     Where a mortgagee is by virtue of the mortgage in possession of any mortgaged land and either--

(a)     receives any sum in respect of the principal or interest of the mortgage debt; or

(b)     acknowledges the title of the mortgagor, or his equity of redemption;

an action to redeem the land in his possession may be brought at any time before the expiration of twelve years from the date of the payment or acknowledgment.

(5)     Subject to subsection (6) below, where any right of action has accrued to recover--

(a)     any debt or other liquidated pecuniary claim; or

(b)     any claim to the personal estate of a deceased person or to any share or interest in any such estate;

and the person liable or accountable for the claim acknowledges the claim or makes any payment in respect of it the right shall be treated as having accrued on and not before the date of the acknowledgment or payment.

(6)     A payment of a part of the rent or interest due at any time shall not extend the period for claiming the remainder then due, but any payment of interest shall be treated as a payment in respect of the principal debt.

(7)     Subject to subsection (6) above, a current period of limitation may be repeatedly extended under this section by further acknowledgments or payments, but a right of action, once barred by this Act, shall not be revived by any subsequent acknowledgment or payment.

## 30      Formal provisions as to acknowledgments and part payments

(1)     To be effective for the purposes of section 29 of this Act, an acknowledgment must be in writing and signed by the person making it.

(2)     For the purposes of section 29, any acknowledgment or payment--

(a)     may be made by the agent of the person by whom it is required to be made under that section; and

(b)     shall be made to the person, or to an agent of the person, whose title or claim is being acknowledged or, as the case may be, in respect of whose claim the payment is being made.

## 31      Effect of acknowledgment or part payment on persons other than the maker or recipient

(1)     An acknowledgment of the title to any land, benefice, or mortgaged personalty by any person in possession of it shall bind all other persons in possession during the ensuing period of limitation.

(2)     A payment in respect of a mortgage debt by the mortgagor or any other person liable for the debt, or by any person in possession of the mortgaged property, shall, so far as any right of the mortgagee to foreclose or otherwise to recover the property is concerned, bind all other persons in possession of the mortgaged property during the ensuing period of limitation.

(3)     Where two or more mortgagees are by virtue of the mortgage in possession of the mortgaged land, an acknowledgment of the mortgagor's title or of his equity of redemption by one of the mortgagees shall only bind him and his successors and shall not bind any other mortgagee or his successors.

(4)     Where in a case within subsection (3) above the mortgagee by whom the acknowledgment is given is entitled to a part of the mortgaged land and not to any ascertained part of the mortgage debt the mortgagor shall be entitled to redeem that part of the land on payment, with interest, of the part of the mortgage debt which bears the same proportion to the whole of the debt as the value of the part of the land bears to the whole of the mortgaged land.

(5)     Where there are two or more mortgagors, and the title or equity of redemption of one of the mortgagors is acknowledged as mentioned above in this section, the acknowledgment shall be treated as having been made to all the mortgagors.

(6)     An acknowledgment of any debt or other liquidated pecuniary claim shall bind the acknowledgor and his successors but not any other person.

(7)     A payment made in respect of any debt or other liquidated pecuniary claim shall bind all persons liable in respect of the debt or claim.

(8)     An acknowledgment by one of several personal representatives of any claim to the personal estate of a deceased person or to any share or interest in any such estate, or a payment by one of several personal representatives in respect of any such claim, shall bind the estate of the deceased person.

(9)     In this section "successor", in relation to any mortgagee or person liable in respect of any debt or claim, means his personal representatives and any other person on whom the rights under the mortgage or, as the case may be, the liability in respect of the debt or claim devolve (whether on death or bankruptcy or the disposition of property or the determination of a limited estate or interest in settled property or otherwise).

*Fraud, concealment and mistake*

**32      Postponement of limitation period in case of fraud, concealment or mistake**

(1)     Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act, either--

(a)     the action is based upon the fraud of the defendant; or

(b)     any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

(c)     the action is for relief from the consequences of a mistake;

438

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

References in this subsection to the defendant include references to the defendant's agent and to any person through whom the defendant claims and his agent.

(2)    For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.

(3)    Nothing in this section shall enable any action--

    (a)    to recover, or recover the value of, any property; or

    (b)    to enforce any charge against, or set aside any transaction affecting, any property;

to be brought against the purchaser of the property or any person claiming through him in any case where the property has been purchased for valuable consideration by an innocent third party since the fraud or concealment or (as the case may be) the transaction in which the mistake was made took place.

(4)    A purchaser is an innocent third party for the purposes of this section--

    (a)    in the case of fraud or concealment of any fact relevant to the plaintiff's right of action, if he was not a party to the fraud or (as the case may be) to the concealment of that fact and did not at the time of the purchase know or have reason to believe that the fraud or concealment had taken place; and

    (b)    in the case of mistake, if he did not at the time of the purchase know or have reason to believe that the mistake had been made.

(4A)    Subsection (1) above shall not apply in relation to the time limit prescribed by section 11A(3) of this Act or in relation to that time limit as applied by virtue of section 12(1) of this Act.

(5)    Sections 14A and 14B of this Act shall not apply to any action to which subsection (1)(b) above applies (and accordingly the period of limitation referred to in that subsection, in any case to which either of those sections would otherwise apply, is the period applicable under section 2 of this Act).

*Discretionary exclusion of time limit for actions*
*for defamation or malicious falsehood*

**32A    Discretionary exclusion of time limit for actions for defamation or malicious falsehood**

(1)    If it appears to the court that it would be equitable to allow an action to proceed having regard to the degree to which--

(a)    the operation of section 4A of this Act prejudices the plaintiff or any person whom he represents, and

(b)    any decision of the court under this subsection would prejudice the defendant or any person whom he represents,

the court may direct that that section shall not apply to the action or shall not apply to any specified cause of action to which the action relates.

(2)    In acting under this section the court shall have regard to all the circumstances of the case and in particular to--

(a)    the length of, and the reasons for, the delay on the part of the plaintiff;

(b)    where the reason or one of the reasons for the delay was that all or any of the facts relevant to the cause of action did not become known to the plaintiff until after the end of the period mentioned in section 4A--

(i)    the date on which any such facts did become known to him, and

(ii)    the extent to which he acted promptly and reasonably once he knew whether or not the facts in question might be capable of giving rise to an action; and

(c)    the extent to which, having regard to the delay, relevant evidence is likely--

(i)    to be unavailable, or

(ii)    to be less cogent than if the action had been brought within the period mentioned in section 4A.

(3)    In the case of an action for slander of title, slander of goods or other malicious falsehood brought by a personal representative--

(a)     the references in subsection (2) above to the plaintiff shall be construed as including the deceased person to whom the cause of action accrued and any previous personal representative of that person; and

(b)     nothing in section 28(3) of this Act shall be construed as affecting the court's discretion under this section.

(4)     In this section "the court" means the court in which the action has been brought.

*Discretionary exclusion of time limit for actions in*
*respect of personal injuries or death*

## 33    Discretionary exclusion of time limit for actions in respect of personal injuries or death

(1)     If it appears to the court that it would be equitable to allow an action to proceed having regard to the degree to which--

(a)     the provisions of section 11 or 11A or 12 of this Act prejudice the plaintiff or any person whom he represents; and

(b)     any decision of the court under this subsection would prejudice the defendant or any person whom he represents;

the court may direct that those provisions shall not apply to the action, or shall not apply to any specified cause of action to which the action relates.

(1A)     The court shall not under this section disapply--

(a)     subsection (3) of section 11A; or

(b)     where the damages claimed by the plaintiff are confined to damages for loss of or damage to any property, any other provision in its application to an action by virtue of Part I of the Consumer Protection Act 1987.

(2)     The court shall not under this section disapply section 12(1) except where the reason why the person injured could no longer maintain an action was because of the time limit in section 11 or subsection (4) of section 11A.

If, for example, the person injured could at his death no longer maintain an action under the Fatal Accidents Act 1976 because of the time limit in Article 29 in Schedule 1 to the Carriage by Air Act 1961, the court has no power to direct that section 12(1) shall not apply.

(3)    In acting under this section the court shall have regard to all the circumstances of the case and in particular to--

    (a)    the length of, and the reasons for, the delay on the part of the plaintiff;

    (b)    the extent to which, having regard to the delay, the evidence adduced or likely to be adduced by the plaintiff or the defendant is or is likely to be less cogent than if the action had been brought within the time allowed by section 11, by section 11A or (as the case may be) by section 12;

    (c)    the conduct of the defendant after the cause of action arose, including the extent (if any) to which he responded to requests reasonably made by the plaintiff for information or inspection for the purpose of ascertaining facts which were or might be relevant to the plaintiff's cause of action against the defendant;

    (d)    the duration of any disability of the plaintiff arising after the date of the accrual of the cause of action;

    (e)    the extent to which the plaintiff acted promptly and reasonably once he knew whether or not the act or omission of the defendant, to which the injury was attributable, might be capable at that time of giving rise to an action for damages;

    (f)    the steps, if any, taken by the plaintiff to obtain medical, legal or other expert advice and the nature of any such advice he may have received.

(4)    In a case where the person injured died when, because of section 11, or subsection (4) of section 11A, he could no longer maintain an action and recover damages in respect of the injury, the court shall have regard in particular to the length of, and the reasons for, the delay on the part of the deceased.

(5)    In a case under subsection (4) above, or any other case where the time limit, or one of the time limits, depends on the date of knowledge of a person other than the plaintiff, subsection (3) above shall have effect with appropriate modifications, and shall have effect in particular as if references to the plaintiff included references to any person whose date of knowledge is or was relevant in determining a time limit.

(6)    A direction by the court disapplying the provisions of section 12(1) shall operate to disapply the provisions to the same effect in section 1(1) of the Fatal Accidents Act 1976.

(7) In this section "the court" means the court in which the action has been brought.

(8) References in this section to section 11 or 11A include references to that section as extended by any of the preceding provisions of this Part of this Act or by any provision of Part III of this Act.

PART III

MISCELLANEOUS AND GENERAL

**34    Application of Act and other limitation enactments to arbitrations**

Repealed.

**35    New claims in pending actions: rules of court**

(1) For the purposes of this Act, any new claim made in the course of any action shall be deemed to be a separate action and to have been commenced--

    (a) in the case of a new claim made in or by way of third party proceedings, on the date on which those proceedings were commenced; and

    (b) in the case of any other new claim, on the same date as the original action.

(2) In this section a new claim means any claim by way of set-off or counterclaim, and any claim involving either--

    (a) the addition or substitution of a new cause of action; or

    (b) the addition or substitution of a new party;

and "third party proceedings" means any proceedings brought in the course of any action by any party to the action against a person not previously a party to the action, other than proceedings brought by joining any such person as defendant to any claim already made in the original action by the party bringing the proceedings.

(3) Except as provided by section 33 of this Act or by rules of court, neither the High Court nor any county court shall allow a new claim within subsection (1)(b) above, other than an original set-off or counterclaim, to be made in the course of any action after the expiry of any time limit under this Act which would affect a new action to enforce that claim.

For the purposes of this subsection, a claim is an original set-off or an original counterclaim if it is a claim made by way of set-off or

443

(as the case may be) by way of counterclaim by a party who has not previously made any claim in the action.

(4)    Rules of court may provide for allowing a new claim to which subsection (3) above applies to be made as there mentioned, but only if the conditions specified in subsection (5) below are satisfied, and subject to any further restrictions the rules may impose.

(5)    The conditions referred to in subsection (4) above are the following--

    (a)    in the case of a claim involving a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on any claim previously made in the original action; and

    (b)    in the case of a claim involving a new party, if the addition or substitution of the new party is necessary for the determination of the original action.

(6)    The addition or substitution of a new party shall not be regarded for the purposes of subsection (5)(b) above as necessary for the determination of the original action unless either--

    (a)    the new party is substituted for a party whose name was given in any claim made in the original action in mistake for the new party's name; or

    (b)    any claim already made in the original action cannot be maintained by or against an existing party unless the new party is joined or substituted as plaintiff or defendant in that action.

(7)    Subject to subsection (4) above, rules of court may provide for allowing a party to any action to claim relief in a new capacity in respect of a new cause of action notwithstanding that he had no title to make that claim at the date of the commencement of the action.

This subsection shall not be taken as prejudicing the power of rules of court to provide for allowing a party to claim relief in a new capacity without adding or substituting a new cause of action.

(8)    Subsections (3) to (7) above shall apply in relation to a new claim made in the course of third party proceedings as if those proceedings were the original action, and subject to such other modifications as may be prescribed by rules of court in any case or class of case.

**36      Equitable jurisdiction and remedies**

(1)      The following time limits under this Act, that is to say--

        (a)      the time limit under section 2 for actions founded on tort;

        (aa)      the time limit under section 4A for actions for libel or slander, or for slander of title, slander of goods or other malicious falsehood;

        (b)      the time limit under section 5 for actions founded on simple contract;

        (c)      the time limit under section 7 for actions to enforce awards where the submission is not by an instrument under seal;

        (d)      the time limit under section 8 for actions on a specialty;

        (e)      the time limit under section 9 for actions to recover a sum recoverable by virtue of any enactment; and

        (f)      the time limit under section 24 for actions to enforce a judgment;

shall not apply to any claim for specific performance of a contract or for an injunction or for other equitable relief, except in so far as any such time limit may be applied by the court by analogy in like manner as the corresponding time limit under any enactment repealed by the Limitation Act 1939 was applied before 1st July 1940.

(2)      Nothing in this Act shall affect any equitable jurisdiction to refuse relief on the ground of acquiescence or otherwise.

## 37      Application to the Crown and the Duke of Cornwall

(1)      Except as otherwise expressly provided in this Act, and without prejudice to section 39, this Act shall apply to proceedings by or against the Crown in like manner as it applies to proceedings between subjects.

(2)      Notwithstanding subsection (1) above, this Act shall not apply to--

        (a)      any proceedings by the Crown for the recovery of any tax or duty or interest on any tax or duty;

        (b)      any forfeiture proceedings under the customs and excise Acts (within the meaning of the Customs and Excise Management Act 1979); or

        (c)      any proceedings in respect of the forfeiture of a ship.

In this subsection "duty" includes any debt due to Her Majesty under section 16 of the Tithe Act 1936, and "ship" includes every description of vessel used in navigation not propelled by oars.

(3)    For the purposes of this section, proceedings by or against the Crown include--

(a)    proceedings by or against Her Majesty in right of the Duchy of Lancaster;

(b)    proceedings by or against any Government department or any officer of the Crown as such or any person acting on behalf of the Crown; and

(c)    proceedings by or against the Duke of Cornwall.

(4)    For the purpose of the provisions of this Act relating to actions for the recovery of land and advowsons, references to the Crown shall include references to Her Majesty in right of the Duchy of Lancaster; and those provisions shall apply to lands and advowsons forming part of the possessions of the Duchy of Cornwall as if for the references to the Crown there were substituted references to the Duke of Cornwall as defined in the Duchy of Cornwall Management Act 1863.

(5)    For the purposes of this Act a proceeding by petition of right (in any case where any such proceeding lies, by virtue of any saving in section 40 of the Crown Proceedings Act 1947, notwithstanding the general abolition by that Act of proceedings by way of petition of right) shall be treated as being commenced on the date on which the petition is presented.

(6)    Nothing in this Act shall affect the prerogative right of Her Majesty (whether in right of the Crown or of the Duchy of Lancaster) or of the Duke of Cornwall to any gold or silver mine.

## 38    Interpretation[3]

(1)    In this Act, unless the context otherwise requires--

"action" includes any proceeding in a court of law, including an ecclesiastical court;

"land" includes corporeal hereditaments, tithes and rentcharges and any legal or equitable estate or interest therein, *including an interest in the proceeds of the sale of land held upon trust for sale*, but except as provided above in this definition does not include any incorporeal hereditament;

---

[3]    The words in this section in italics have been repealed by the Trusts of Land and Appointment of Trustees Act 1996, s 25(2) and Schedule 4, with effect from 1 January 1997, subject to the saving provisions in s 25(4) and 25(5).

"personal estate" and "personal property" do not include chattels real;

"personal injuries" includes any disease and any impairment of a person's physical or mental condition, and "injury" and cognate expressions shall be construed accordingly;

"rent" includes a rentcharge and a rentservice;

"rentcharge" means any annuity or periodical sum of money charged upon or payable out of land, except a rent service or interest on a mortgage on land;

"settled land", "statutory owner" and "tenant for life" have the same meanings respectively as in the Settled Land Act 1925;

"trust" and "trustee" have the same meanings respectively as in the Trustee Act 1925; and

*"trust for sale" has the same meaning as in the Law of Property Act 1925.*

(2)     For the purposes of this Act a person shall be treated as under a disability while he is an infant, or of unsound mind.

(3)     For the purposes of subsection (2) above a person is of unsound mind if he is a person who, by reason of mental disorder within the meaning of the Mental Health Act 1983, is incapable of managing and administering his property and affairs.

(4)     Without prejudice to the generality of subsection (3) above, a person shall be conclusively presumed for the purposes of subsection (2) above to be of unsound mind--

　　　　(a)     while he is liable to be detained or subject to guardianship under the Mental Health Act 1983 (otherwise than by virtue of section 35 or 89); and

　　　　(b)     while he is receiving treatment as an in-patient in any hospital within the meaning of the Mental Health Act 1983 or mental nursing home within the meaning of the Nursing Homes Act 1975 without being liable to be detained under the said Act of 1983 (otherwise than by virtue of section 35 or 89), being treatment which follows without any interval a period during which he was liable to be detained or subject to guardianship under the Mental Health Act 1959, or the said Act of 1983 (otherwise than by virtue of section 35 or 89) or by virtue of any enactment repealed or excluded by the Mental Health Act 1959.

(5)     Subject to subsection (6) below, a person shall be treated as claiming through another person if he became entitled by, through, under, or by the act of that other person to the right claimed, and any person whose estate or interest might have been barred by a person entitled to an entailed interest in possession shall be treated as claiming through the person so entitled.

(6)     A person becoming entitled to any estate or interest by virtue of a special power of appointment shall not be treated as claiming through the appointor.

(7)     References in this Act to a right of action to recover land shall include references to a right to enter into possession of the land or, in the case of rentcharges and tithes, to distrain for arrears of rent or tithe, and references to the bringing of such an action shall include references to the making of such an entry or distress.

(8)     References in this Act to the possession of land shall, in the case of tithes and rentcharges, be construed as references to the receipt of the tithe or rent, and references to the date of dispossession or discontinuance of possession of land shall, in the case of rent charges, be construed as references to the date of the last receipt of rent.

(9)     References in Part II of this Act to a right of action shall include references to--

    (a)     a cause of action;

    (b)     a right to receive money secured by a mortgage or charge on any property;

    (c)     a right to recover proceeds of the sale of land; and

    (d)     a right to receive a share or interest in the personal estate of a deceased person.

(10)    References in Part II to the date of the accrual of a right of action shall be construed--

    (a)     in the case of an action upon a judgment, as references to the date on which the judgment became enforceable; and

    (b)     in the case of an action to recover arrears of rent or interest, or damages in respect of arrears of rent or interest, as references to the date on which the rent or interest became due.

**39      Saving for other limitation enactments**

This Act shall not apply to any action or arbitration for which a period of limitation is prescribed by or under any other enactment (whether passed before or after the passing of this Act) or to any action or arbitration to which the Crown is a party and for which, if it were between subjects, a period of limitation would be prescribed by or under any such other enactment.

**40    Transitional provisions, amendments and repeals**

(1)    Schedule 2 to this Act, which contains transitional provisions, shall have effect.

(2)    The enactments specified in Schedule 3 to this Act shall have effect subject to the amendments specified in that Schedule, being amendments consequential on the provisions of this Act; but the amendment of any enactment by that Schedule shall not be taken as prejudicing the operation of section 17(2) of the Interpretation Act 1978 (effect of repeals).

(3)    The enactments specified in Schedule 4 to this Act are hereby repealed to the extent specified in column 3 of that Schedule.

**41    Short title, commencement and extent**

(1)    This Act may be cited as the Limitation Act 1980.

(2)    This Act, except section 35, shall come into force on 1st May 1981.

(3)    Section 35 of this Act shall come into force on 1st May 1981 to the extent (if any) that the section substituted for section 28 of the Limitation Act 1939 by section 8 of the Limitation Amendment Act 1980 is in force immediately before that date; but otherwise section 35 shall come into force on such day as the Lord Chancellor may by order made by statutory instrument appoint, and different days may be appointed for different purposes of that section (including its application in relation to different courts or proceedings).

(4)    The repeal by this Act of section 14(1) of the Limitation Act 1963 and the corresponding saving in paragraph 2 of Schedule 2 to this Act shall extend to Northern Ireland, but otherwise this Act does not extend to Scotland or to Northern Ireland.

Our Ref:    NTB/BZM SUN119-0507298
Your Ref:   RM/TW/MV/HIGH 00357 2008/C
23 June 2008

FAO Mr T Whelan
The Insolvency Service
Official Receiver's Office
2nd Floor
Abbeygate House
164-167 East Road
Cambridge
CB1 1DB

**By DX: 742320 Cambridge 17**


Dear Sirs,

**Opsys Limited  (In Liquidation)**

We write further to your letter to us dated 6 June 2008.

We enclose a copy of the petition and statement of truth which have been filed in the proceedings.

We do not know details of any assets or other liabilities of Opsys Limited.  Our client believes that the company sold a key asset at a time when it knew that a client was likely to be a major creditor of the company.  Our client believes that the proceeds of sale was transferred to the shareholders ahead of the creditors, which requires an investigation of issues that may result in a return to the creditors.  To this end, our client would like to request the Secretary of State's appointment of a liquidator.

Our client is not registered for value added tax as it is an American company.

Please do not hesitate to contact us if you have any other queries.

Yours faithfully



**Beachcroft LLP**
**Enc.**

Beachcroft LLP
100 Fetter Lane London EC4A 1BN UK
dir tel: **+44 (0) 20 7894 6406** tel: +44 (0) 20 7242 1011 fax: +44 (0) 20 7831 6630 dir fax: +44 (0) 20 7894 6550
email: bmanyera@beachcroft.co.uk DX 45 London

bm/H:\0\507\298\2306 LETTER TO OR .DOC

(d)   any creditor of the company who has tendered a proof or, in Scotland, submitted a claim in the winding up;

(e)   any contributory of the company.

## 134.— Enforcement of s. 133.

(1)  If a person without reasonable excuse fails, at any time to attend his public examination under section 133, he is guilty of a contempt of court and liable to be punished accordingly.

(2)  In a case where a person without reasonable excuse fails at any time to attend his examination under section 133 or there are reasonable grounds for believing that a person has absconded, or is about to abscond, with a view to avoiding or delaying his examination under that section, the court may cause a warrant to be issued to a constable or prescribed officer of the court—

(a)   for the arrest of that person; and

(b)   for the seizure of any books, papers, records, money or goods in that person's possession.

(3)  In such a case the court may authorise the person arrested under the warrant to be kept in custody, and anything seized under such a warrant to be held, in accordance with the rules, until such time as the court may order.

*Appointment of liquidator*

## 135.— Appointment and powers of provisional liquidator.

(1)  Subject to the provisions of this section, the court may, at any time after the presentation of a winding-up petition, appoint a liquidator provisionally.

(2)  In England and Wales, the appointment of a provisional liquidator may be made at any time before the making of a winding-up order; and either the official receiver or any other fit person may be appointed.

(3)  In Scotland, such an appointment may be made at any time before the first appointment of liquidators.

(4)  The provisional liquidator shall carry out such functions as the court may confer on him.

(5)  When a liquidator is provisionally appointed by the court, his powers may be limited by the order appointing him.

## 136.— Functions of official receiver in relation to office of liquidator.

(1)  The following provisions of this section have effect, subject to section 140 below, on a winding-up order being made by the court in England and Wales.

(2)  The official receiver, by virtue of his office, becomes the liquidator of the company and continues in office until another person becomes liquidator under the provisions of this Part.

(3)  The official receiver is, by virtue of his office, the liquidator during any vacancy.

(4)  At any time when he is the liquidator of the company, the official receiver may summon separate meetings of the company's creditors and contributories for the purpose of choosing a person to be liquidator of the company in place of the official receiver.

(5)  It is the duty of the official receiver—

    (a)   as soon as practicable in the period of 12 weeks beginning with the day on which the winding-up order was made, to decide whether to exercise his power under subsection (4) to summon meetings, and

    (b)   if in pursuance of paragraph (a) he decides not to exercise that power, to give notice of his decision, before the end of that period, to the court and to the company's creditors and contributories, and

    (c)   (whether or not he has decided to exercise that power) to exercise his power to summon meetings under subsection (4) if he is at any time requested, in accordance with the rules, to do so by one-quarter, in value, of the company's creditors;

and accordingly, where the duty imposed by paragraph (c) arises before the official receiver has performed a duty imposed by paragraph (a) or (b), he is not required to perform the latter duty.

(6)  A notice given under subsection (5)(b) to the company's creditors shall contain an explanation of the creditors' power under subsection (5)(c) to require the official receiver to summon meetings of the company's creditors and contributories.

## 137.—   Appointment by Secretary of State.

(1)  In a winding up by the court in England and Wales the official receiver may, at any time when he is the liquidator of the company, apply to the Secretary of State for the appointment of a person as liquidator in his place.

(2)  If meetings are held in pursuance of a decision under section 136(5)(a), but no person is chosen to be liquidator as a result of those meetings, it is the duty of the official receiver to decide whether to refer the need for an appointment to the Secretary of State.

(3)  On an application under subsection (1), or a reference made in pursuance of a decision under subsection (2), the Secretary of State shall either make an appointment or decline to make one.

(4)  Where a liquidator has been appointed by the Secretary of State under subsection (3), the liquidator shall give notice of his appointment to the company's creditors or, if the court so allows, shall advertise his appointment in accordance with the directions of the court.

(5)  In that notice or advertisement the liquidator shall—

    (a)   state whether he proposes to summon a general meeting of the company's creditors under section 141 below for the purpose of determining (together with any meeting of contributories) whether a liquidation committee should be established under that section, and

    (b)   if he does not propose to summon such a meeting, set out the power of the company's creditors under that section to require him to summon one.

## 138.—   Appointment of liquidator in Scotland.

(1)  Where a winding-up order is made by the court in Scotland, a liquidator shall be appointed by the court at the time when the order is made.

*(Represents Current Law in Force - for pending amendments see Prospective Law on Westlaw UK.)*

(2)  The liquidator so appointed (here referred to as "the interim liquidator") continues in office until another person becomes liquidator in his place under this section or the next.

(3)  The interim liquidator shall (subject to the next subsection) as soon as practicable in the period of 28 days beginning with the day on which the winding-up order was made or such longer period as the court may allow, summon separate meetings of the company's creditors and contributories for the purpose of choosing a person (who may be the person who is the interim liquidator) to be liquidator of the company in place of the interim liquidator.

(4)  If it appears to the interim liquidator, in any case where a company is being wound up on grounds including its inability to pay its debts, that it would be inappropriate to summon under subsection (3) a meeting of the company's contributories, he may summon only a meeting of the company's creditors for the purpose mentioned in that subsection.

(5)  If one or more meetings are held in pursuance of this section but no person is appointed or nominated by the meeting or meetings, the interim liquidator shall make a report to the court which shall appoint either the interim liquidator or some other person to be liquidator of the company.

(6)  A person who becomes liquidator of the company in place of the interim liquidator shall, unless he is appointed by the court, forthwith notify the court of that fact.

### 139.—  Choice of liquidator at meetings of creditors and contributories.

(1)  This section applies where a company is being wound up by the court and separate meetings of the company's creditors and contributories are summoned for the purpose of choosing a person to be liquidator of the company.

(2)  The creditors and the contributories at their respective meetings may nominate a person to be liquidator.

(3)  The liquidator shall be the person nominated by the creditors or, where no person has been so nominated, the person (if any) nominated by the contributories.

(4)  In the case of different persons being nominated, any contributory or creditor may, within 7 days after the date on which the nomination was made by the creditors, apply to the court for an order either—
>    (a)   appointing the person nominated as liquidator by the contributories to be a liquidator instead of, or jointly with, the person nominated by the creditors; or
>    (b)   appointing some other person to be liquidator instead of the person nominated by the creditors.

### 140.—  Appointment by the court following administration or voluntary arrangement.

[ (1)  Where a winding-up order is made immediately upon the appointment of an administrator ceasing to have effect, the court may appoint as liquidator of the company the person whose appointment as administrator has ceased to have effect. ]<sup>66</sup>

---

<sup>66</sup>  substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 17 para. 17

*(Represents Current Law in Force - for pending amendments see Prospective Law on Westlaw UK.)*

(2)  Where a winding-up order is made at a time when there is a supervisor of a voluntary arrangement approved in relation to the company under Part I, the court may appoint as liquidator of the company the person who is the supervisor at the time when the winding-up order is made.

(3)  Where the court makes an appointment under this section, the official receiver does not become the liquidator as otherwise provided by section 136(2), and he has no duty under section 136(5) (a) or (b) in respect of the summoning of creditors' or contributories' meetings.

*Liquidation committees*

## 141.—  Liquidation committee (England and Wales).

(1)  Where a winding-up order has been made by the court in England and Wales and separate meetings of creditors and contributories have been summoned for the purpose of choosing a person to be liquidator, those meetings may establish a committee ("the liquidation committee") to exercise the functions conferred on it by or under this Act.

(2)  The liquidator (not being the official receiver) may at any time, if he thinks fit, summon separate general meetings of the company's creditors and contributories for the purpose of determining whether such a committee should be established and, if it is so determined, of establishing it.
The liquidator (not being the official receiver) shall summon such a meeting if he is requested, in accordance with the rules, to do so by one-tenth, in value, of the company's creditors.

(3)  Where meetings are summoned under this section, or for the purpose of choosing a person to be liquidator, and either the meeting of creditors or the meeting of contributories decides that a liquidation committee should be established, but the other meeting does not so decide or decides that a committee should not be established, the committee shall be established in accordance with the rules, unless the court otherwise orders.

(4)  The liquidation committee is not to be able or required to carry out its functions at any time when the official receiver is liquidator; but at any such time its functions are vested in the Secretary of State except to the extent that the rules otherwise provide.

(5)  Where there is for the time being no liquidation committee, and the liquidator is a person other than the official receiver, the functions of such a committee are vested in the Secretary of State except to the extent that the rules otherwise provide.

## 142.—  Liquidation committee (Scotland).

(1)  Where a winding-up order has been made by the court in Scotland and separate meetings of creditors and contributories have been summoned for the purpose of choosing a person to be liquidator or, under section 138(4), only a meeting of creditors has been summoned for that purpose, those meetings or (as the case may be) that meeting may establish a committee ("the liquidation committee") to exercise the functions conferred on it by or under this Act.

(2)  The liquidator may at any time, if he thinks fit, summon separate general meetings of the company's creditors and contributories for the purpose of determining whether such a committee should be established and, if it is so determined, of establishing it.

**229.—  Provisions of this Part to be cumulative.**

(1)  The provisions of this Part with respect to unregistered companies are in addition to and not in restriction of any provisions in Part IV with respect to winding up companies by the court; and the court or liquidator may exercise any powers or do any act in the case of unregistered companies which might be exercised or done by it or him in winding up companies formed and registered under the Companies Act.

(2)  However, an unregistered company is not, except in the event of its being wound up, deemed to be a company under the Companies Act, and then only to the extent provided by this Part of this Act.

# PART VI

## MISCELLANEOUS PROVISIONS APPLYING TO COMPANIES WHICH ARE INSOLVENT OR IN LIQUIDATION

*Office-holders*

**230.—  Holders of office to be qualified insolvency practitioners.**

(1)  [...][81]

(2)  Where an administrative receiver of a company is appointed, he must be a person who is so qualified.

(3)  Where a company goes into liquidation, the liquidator must be a person who is so qualified.

(4)  Where a provisional liquidator is appointed, he must be a person who is so qualified.

(5)  Subsections (3) and (4) are without prejudice to any enactment under which the official receiver is to be, or may be, liquidator or provisional liquidator.

**231.—  Appointment to office of two or more persons.**

(1)  This section applies if an appointment or nomination of any person to the office of  **[...]** [82] administrative receiver, liquidator or provisional liquidator—
    (a)  relates to more than one person, or
    (b)  has the effect that the office is to be held by more than one person.

(2)  The appointment or nomination shall declare whether any act required or authorised under any enactment to be done by the  **[...]** [83]  administrative receiver, liquidator or provisional liquidator is to be done by all or any one or more of the persons for the time being holding the office in question.

---

[81]   repealed subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 26 para. 1

[82]   words repealed subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 26 para. 1

[83]   words repealed subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 26 para. 1

*(Represents Current Law in Force - for pending amendments see Prospective Law on Westlaw UK.)*

## 232.  Validity of office-holder's acts.

The acts of an individual as  **[…]** [84] administrative receiver, liquidator or provisional liquidator of a company are valid notwithstanding any defect in his appointment, nomination or qualifications.

*Management by administrators, liquidators, etc.*

## 233.—  Supplies of gas, water, electricity, etc.

(1)  This section applies in the case of a company where—

    (a)   the company enters administration, or

    (b)   an administrative receiver is appointed, or

    (ba)   a moratorium under section 1A is in force, or,

    (c)   a voluntary arrangement approved under Part I, has taken effect, or

    (d)   the company goes into liquidation, or

    (e)   a provisional liquidator is appointed;

and "the office-holder" means the administrator, the administrative receiver,the nominee, the supervisor of the voluntary arrangement, the liquidator or the provisional liquidator, as the case may be.

(2)  If a request is made by or with the concurrence of the office-holder for the giving, after the effective date, of any of the supplies mentioned in the next subsection, the supplier—

    (a)   may make it a condition of the giving of the supply that the office-holder personally guarantees the payment of any charges in respect of the supply, but

    (b)   shall not make it a condition of the giving of the supply, or do anything which has the effect of making it a condition of the giving of the supply, that any outstanding charges in respect of a supply given to the company before the effective date are paid.

(3)  The supplies referred to in subsection (2) are—

    (a)   a supply of gas by a gas supplier within the meaning of Part I of the Gas Act 1986:

    (b)   a supply of electricity by an electricity supplier within the meaning of Part I of the Electricity Act 1989,

    (c)   a supply of water by a water undertaker or, in Scotland, a water authority,

    (d)   a supply of communications services by a provider of a public electronic communications service.

(4)  "The effective date"for the purposes of this section is whichever is applicable of the following dates—

    [ (a)   the date on which the company entered administration, ] [85]

    (b)   the date on which the administrative receiver was appointed (or, if he was appointed in succession to another administrative receiver, the date on which the first of his predecessors was appointed),

    (ba)   the date on which the moratorium came into force,

    (c)   the date on which the voluntary arrangement took effect,

---

[84]  words repealed subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 26 para. 1

[85]  substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch. 17 para. 22(b)

**425.—  Provision which may be made by order under s. 423.**

(1)  Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(a)   require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b)   require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;

(c)   release or discharge (in whole or in part) any security given by the debtor;

(d)   require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e)   provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f)   provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2)  An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order—

(a)   shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b)   shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3)  For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4)  In this section "security" means any mortgage, charge, lien or other security.

## PART XVII

### MISCELLANEOUS AND GENERAL

**426.—  Co-operation between courts exercising jurisdiction in relation to insolvency.**

(1)  An order made by a court in any part of the United Kingdom in the exercise of jurisdiction in relation to insolvency law shall be enforced in any other part of the United Kingdom as if it were made by a court exercising the corresponding jurisdiction in that other part.

(2)  However, without prejudice to the following provisions of this section, nothing in subsection (1) requires a court in any part of the United Kingdom to enforce, in relation to property situated in that part, any order made by a court in any other part of the United Kingdom.

(3)  The Secretary of State, with the concurrence in relation to property situated in England and Wales of the Lord Chancellor, may by order make provision for securing that a trustee or assignee under the insolvency law of any part of the United Kingdom has, with such modifications as may be specified in the order, the same rights in relation to any property situated in another part of the United Kingdom as he would have in the corresponding circumstances if he were a trustee or assignee under the insolvency law of that other part.

(4)  The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

(5)  For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.
In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law.

(6)  Where a person who is a trustee or assignee under the insolvency law of any part of the United Kingdom claims property situated in any other part of the United Kingdom (whether by virtue of an order under subsection (3) or otherwise), the submission of that claim to the court exercising jurisdiction in relation to insolvency law in that other part shall be treated in the same manner as a request made by a court for the purpose of subsection (4).

(7)  Section 38 of the Criminal Law Act 1977 (execution of warrant of arrest throughout the United Kingdom) applies to a warrant which, in exercise of any jurisdiction in relation to insolvency law, is issued in any part of the United Kingdom for the arrest of a person as it applies to a warrant issued in that part of the United Kingdom for the arrest of a person charged with an offence.

(8)  Without prejudice to any power to make rules of court, any power to make provision by subordinate legislation for the purpose of giving effect in relation to companies or individuals to the insolvency law of any part of the United Kingdom includes power to make provision for the purpose of giving effect in that part to any provision made by or under the preceding provisions of this section.

(9)  An order under subsection (3) shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(10)  In this section "insolvency law" means—

    (a)  in relation to England and Wales, provision extending to England and Wales and made by or under this Act or sections 1A, 6 to 10, 12 to15, 19(c) and 20 (with Schedule 1 of the Company Directors Disqualification Act 1986 and sections 1 to 17 of that Act as they apply for the purposes of those provisions of that Act;

    (b)  in relation to Scotland, provision extending to Scotland and made by or under this Act, sections 1A, 6 to 10, 12 to 15, 19(c) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986[ and sections 1 to 17 of that Act as they apply for the purposes of those provisions of that Act][210]  , Part XVIII of the Companies Act or the Bankruptcy (Scotland) Act 1985;

---

[210]  words inserted by Insolvency Act 2000 c. 39 Sch. 4(II) para. 16(3)(b)(iii)

BAILII [Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> Inland Revenue v Hashmi & Anor [2002] EWCA Civ 981 (3 May 2002)
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2002/981.html*
Cite as: [2002] EWCA Civ 981, [2002] 2 BCLC 489, [2002] BPIR 974

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2002] EWCA Civ 981**

A2/2001/2254

**IN THE SUPREME COURT OF JUDICATURE**
**CIVIL DIVISION**
**ON APPEAL FROM THE HIGH COURT**
**CHANCERY DIVISION**
**(Mr Justice Hart)**

The Royal Courts of Justice
The Strand
London
Friday 3 May 2002

B e f o r e :

**LORD JUSTICE SIMON BROWN**
**Vice President of the Court of Appeal, Civil Division**
**LORD JUSTICE LAWS**
**LADY JUSTICE ARDEN**

_____

**Between:**

# THE COMMISSIONERS OF INLAND REVENUE

**Claimant/ Respondent**

## and:

## (1) MOHAMED AKRAM HASHMI

### (Executor of the Estate of Muzamil Ghauri Deceased)

**Defendant**

## (2) OMAR GHAURI

**Defendant/ Appellant**

_____

**MR N CADWALLADER (instructed by Emsleys, 35B Main Street, Garforth, Leeds) appeared on behalf of the Appellant**
**MISS K SELWAY (instructed by Commissioners of Inland Revenue, Solicitors Office, Somerset House, London WC2R) appeared on behalf of the Respondent**

_____

### HTML VERSION OF JUDGMENT
_____

Crown Copyright ©

<u>Friday 3 May 2002</u>

1. LADY JUSTICE ARDEN: This is an appeal by the second respondent ("Omar"), with the permission of the judge, against the order of Hart J dated 4 October 2001, setting side a written declaration of trust dated 20 February 1989 made by Mr Muzamil Ghauri ("Mr Ghauri"), whereby Mr Ghauri declared that he held the beneficial interest in the property known as 83 Buslingthorpe Lane, Leeds, on trust to Omar, pursuant to section 423 of the Insolvency Act 1986. The deed was stated to be in consideration of natural love and affection and in favour of Omar, the son of Mr Ghauri, who was then 16.

2. For some years Mr Ghauri had been carrying on the business of an Indian restaurant at 83 Buslingthorpe Lane ("the property"). Mr Ghauri had the opportunity of buying the freehold in the property in 1989 for £18,000. He bought it and executed the declaration of trust on the same day. In 1993 the Inland Revenue received information that Mr Ghauri had, either alone or with his eldest son, Karim, purchased properties in this country and in Spain with business profits which had not been declared to the Revenue. This led to an investigation. The investigation resulted in an agreement between Mr Ghauri and the Revenue for settlement of unpaid tax liabilities, interest and penalties. The amount of the admitted undeclared profits of the restaurant business were

£885,000 for the period from 6 April 1983 to 5 April 1994. The Revenue brought proceedings under section 423 of the Insolvency Act 1986 to set aside the declaration of trust, following disclosure of the declaration of trust which did not occur until after Mr Ghauri died in July 1997.

3.  I now turn to section 423. This provides:

> "(1) This section relates to transactions entered into at an undervalue, and a person enters into such a transaction with another person if -
>
> > (a) he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to provide no consideration; or
> >
> > . . .
> >
> > (c) he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.
>
> (2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for -
>
> > (a) restoring the position to what it would have been if the transaction had not been entered into, and
> >
> > (b) protecting the interests of persons who are victims of the transaction.
>
> (3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose -
>
> > (a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or
> >
> > (b) of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make."

4. I shall refer to the purpose which is required to be shown by virtue of subsection (3) as "the statutory purpose".

5. There is no direct evidence of Mr Ghauri's intention. The judge held that the evidence was sufficient to draw an inference that Mr Ghauri had the purpose in section 423(3). He relied on the fact that there had been "a persistent pattern of gross under declaration of profits" over the years preceding 1989. In his judgment the inescapable inference was that the defendant had acted deliberately and dishonestly and that the defendant would have known that, should his dishonesty be uncovered, he would be liable for tax, interest and penalties in very considerable amounts. The judge held that Mr Ghauri was therefore in 1989 sitting on "a potential financial bomb" although there was no inevitability that it would ever explode.

6. He found that the amount of unpaid liabilities up to and including the 1988/1989 tax year amounted to some £86,000 exclusive of penalties and interest. At the same time Mr Ghauri's assets consisted of the property, his dwelling-house at 160 Shadwell Lane (valued in the disclosure of assets to the Revenue at some £83,500 but later valued in 1998, so it appears, at £170,000) and various bank accounts of unknown amount. The judge held that it could hardly be supposed that after tax Mr Ghauri thought he would be likely to be left with a sufficient sum to discharge tax liabilities in respect of past years which had accrued as a result of his dishonest conduct. This was particularly so as his contemplation must have been that he would persist in his dishonest practices and therefore, in the judge's words, "clock up further potential liabilities". The judge also relied on the fact that the declaration did not have immediate effect. The restaurant carried on in the property was sold in December 1991. After it was sold the property was let and the rent was paid to Mr Ghauri. Moreover, in the course of the Revenue's investigation Mr Ghauri disclosed the property as his apparently unencumbered property. As I have explained, Mr Ghauri died on 23 July 1997. He had had serious health difficulties for many years before that and was ill in 1989.

7. The judge then turned to the question whether as a matter of law the statutory purpose had to be a dominant purpose. He accepted that so far as his family was concerned Mr Ghauri was a caring parent who honestly desired to secure his children's future, and the declaration of trust was a product of such a desire. He accordingly held that Mr Ghauri had two purposes in making the declaration. He wanted to give Omar the security of the property as an asset for the future. In addition, he wanted to put the property beyond the reach of creditors, should creditors emerge. The judge expressed himself satisfied that Mr Ghauri would have been alive to the fact that the transaction would have had that effect and therefore had that purpose at the date of the declaration.

8. The judge then turned to the authorities. In <u>Chohan v Saggar</u> [1992] BCC 306, Mr Evans-Lombe QC (as he then was), sitting as a Deputy High Court Judge of the Chancery Division, held that section 423(3) required a plaintiff to show a dominant purpose to remove assets from the reach of

actual or potential claimants or creditors, but not excluding the possibility that there might be other purposes behind the relevant transfer. In the later case of <u>Pinewood Joinery v Starelm Properties Limited</u> [1994] 2 BCLC 412, Judge Moseley QC, sitting as a Judge of the High Court, expressed doubt as to whether it was necessary to find a dominant purpose. In <u>Royscot Spa Leasing Ltd v Lovett</u> [1995] BCC 502 the matter was touched on in the judgment of Sir Christopher Slade in this court. He referred to the holding of Mr Evans-Lombe in <u>Chohan v Saggar</u> and added at 507G:

> "For the purposes of this appeal, though without deciding the point,
> I am content to assume in favour of the plaintiffs that the relevant
> purpose which has to be established in the application of s 423 is
> substantial purpose, rather than the stricter test of dominant purpose."

9. Sir Christopher Slade went on to point out that the actual point of the transfer had to be investigated and that the test was not solely an objective one. In <u>In re Brabon</u>, unreported, 3 March 2000, Jonathan Parker J held as follows:

> "I start with the words of section 423(3), set in the context of the
> mischief at which the section is directed. The subsection itself does
> not apply any epithet to the word 'purpose'. . . Once that is accepted,
> and given that, notwithstanding section 423 is entitled 'Transactions
> defrauding creditors', it is not necessary for the trustee to establish
> dishonesty, I confess that I find some difficulty in distinguishing
> between a 'dominant' purpose and a 'substantial' purpose. On the
> basis that there is a difference, however, and that 'substantial
> purpose' is indeed a lesser test than 'dominant purpose', I am content
> to proceed in the instant case on the footing that 'substantial purpose'
> is the correct test. I emphasise, however, that I do so on the same
> basis as the Court of Appeal in <u>Royscot Spa</u>: that is to say, on the
> basis that if the trustee cannot meet the lesser test, *a fortiori* he could
> not meet the stricter one."

10. In his judgment in this case Hart J also expressed the view that there was no warrant in the statutory language for any qualification of this statutory purpose as being the dominant purpose. Moreover, in his judgment, in the classic type of case to which this section is intended to apply it will frequently be the case that the motive to defeat the creditors and the motive to secure the family for the future will co-exist in such a way that even the transferor himself may be unable to say which was uppermost in his mind. The judge considered it was difficult to see why the statutory purpose should not exist where there are two purposes of equal power. However, the judge held on the evidence that if it was, as it was, necessary for him to find that the statutory purpose was the dominant purpose, there was material on which he could and did reach that conclusion. He relied particularly on the facts that no steps were taken after Mr Ghauri's death to ensure that the interest of Omar under the declaration of trust was protected by endorsement on

the land register. He held that did not show an overwhelming intention to benefit Omar as at the date of the trust deed. Accordingly the judge held that the statutory purpose was Mr Ghauri's dominant purpose in executing the declaration of trust and he proceeded to make the declaration to which I have referred.

11. The grounds of appeal may be summarised in the following way. The inference that Mr Ghauri had the statutory purpose was not supported by the evidence; alternatively, that the court was not entitled to draw the inference that the statutory purpose was Mr Ghauri's dominant purpose on the evidence before it.

12. I turn now to the appellant's submissions. Mr Neil Cadwallader, who appears for the appellant, submits that there was insufficient evidence on which the judge could find that Mr Ghauri was likely to be left with insufficient funds to discharge his tax liabilities. He also submits that it was necessary to find that Mr Ghauri thought about defrauding the Revenue positively. I can deal with that last point briefly. As I see it, it is sufficient if the court can draw the necessary inference as to the statutory purpose.

13. Mr Cadwallader submits that the evidence about assets was not comprehensive. I can deal with this point too at this stage. The answer to this point is that the judge had to do deal the best he could with the evidence available. It is accepted that Mr Ghauri's assets included Shadwell Road and the bank accounts, but Mr Cadwallader says that the judge did not take into account the ongoing profits; but he clearly did so because he refers to the sums admitted in respect of under-declared profits in the period 1983 to 1989. On the liabilities side, it is accepted that the tax liabilities were £86,000-odd at the date of the declaration of trust, to which there would have to be added penalties and interest, although we are told that the amount of penalties is a discretionary matter. Mr Cadwallader argues that the judge should have taken into account the lease of the property. He accepts, however, that the lease may have been merged into the freehold after it was acquired, and that the judge was entitled to take that view. Certainly no rent was paid by Mr Ghauri after the date of the purchase. Mr Cadwallader also submits that the judge failed to take into account the value of the business. But the judge did take into account the prospect of future profits with, of course, their concomitant tax liabilities. It would be double counting if the judge also took into account the goodwill of the business. Mr Cadwallader submits that the judge should have taken into account 104 Burley Road, but in 1994 this was Karim's property and the evidence did not show that Mr Ghauri had owned it in 1997.

14. Mr Cadwallader then submits that the judge was not entitled to find that the deed was not intended to have any immediate effect. On his submission, if it had been intended to have immediate effect, there could be no intent to defraud. In my judgment, this does not follow since it was intended that the deed should have effect at some point in time, at the latest on Mr Ghauri's death. Mr Ghauri could foresee that at that point in time creditors could be left unpaid if the Revenue discovered his fraud.

15. Mr Cadwallader submits that the judge did not consider the evidence as a whole and was wrong to ignore Mr Cadwallader's submission that Mr Ghauri did not intend to defraud the Revenue. Of course this was part of the evidence that the judge had to consider. Mr Cadwallader submits that the judge assumed that Mr Ghauri intended the deed to have the effect of defrauding the Revenue because he would have realised it could have that effect. I accept that the distinction between result and purpose must be clearly borne in mind when considering whether the statutory purpose is satisfied.

16. In short, Mr Cadwallader submits that the inference drawn by the judge as to Mr Ghauri's purpose was against the weight of the evidence. He also challenges the judge's finding that the intention to defraud the Revenue was Mr Ghauri's predominant purpose on the ground that the finding was not open to the judge on the evidence before him.

17. Miss Kate Selway for the respondent supports the judge's reasoning. She submits that the judge was entitled to find that the purpose to defraud was dominant for three reasons in particular. First, Mr Ghauri continued to receive the rent after the sale of the corner shop business carried on in the property in 1991; secondly, during the course of investigation Mr Ghauri disclosed the property as apparently his own and unencumbered; and, thirdly, Mr Ghauri did not protect the interest of Omar on the land register and accordingly he could have sold the property free of Omar's interest.

18. I turn to my conclusions.

19. I take first the question of law as to the requirement of the statutory purpose in 423(3). It is clear that the purpose need not be the sole purpose: see <u>Royscot Spa Leasing v Lovett</u> at 407D per Beldam and Nourse LJJ. In this court it is an open question as to whether as a matter of law the purpose specified in 423(3) as to which the court has to be satisfied must be a dominant purpose. I should add in relation to the question of sole purpose that it cannot sensibly be maintained that by using the definite article before the word "purpose" in 423(3) Parliament only intended to catch transactions where the statutory purpose was the sole purpose. That is established by the <u>Royscot Spa</u> case.

20. I now turn to the question of predominant purpose. In <u>Chohan v Saggar</u> Evans-Lombe J took the view that the statutory purpose should be a dominant purpose. This was doubted in <u>Royscot Spa</u>, where this court proceeded on the basis that it was sufficient if substantial purpose was shown. The matter has been considered by several judges at first instance, as Hart J explained in his judgment.

21. Section 423 is a new section. It stems from the Insolvency Act 1985. Its predecessor, section 172 of the Law of Property Act 1925, had a long history. According to the Annotated Guide to the 1986 Insolvency Legislation by Sealy and Milman, 5th Edn (2002) page 466, there had been a provision on these lines since 1571, and that ultimately its ancestry could be traced back to the Paulian action of Roman law. However, its judicial interpretation had not always been consistent

and it was heavily criticised by the report of the Review Committee on Insolvency Law and Practice (Cmnd 8558, 1982)(the Cork Report). That report explained that the meaning of the expression "intent to defraud" was not entirely clear and in consequence recommended that section 172 should be re-enacted in an amended form to make a number of matters clear. In this connection the report recommended that the necessary intent should be an intent on the part of the debtor to defeat, hinder, delay or defraud creditors, or to put assets belonging to the debtor beyond their reach (report, paragraph 1215(b). It is interesting to note that, as part of the same recommendation, the report also recommended that such intent should be capable of being inferred whenever it was the natural and probable consequence of the debtor's actions in the light of the financial circumstances of the debtor at the time, as known, or taken to have been known, to him.

22. Section 423 plays an important role in insolvency law. It can moreover apply even though the debtor is not in a formal insolvency. The counter-consideration is that, unlike transactions at an undervalue and preferences, which may be avoided only in a formal insolvency, under section 423 the stricter requirements of section 423(3) must be satisfied. In my judgment section 423(3) is a carefully calibrated section forming part of a carefully calibrated group of sections. It only applies to transactions which are gifts or have a gratuitous element (section 432(1)). The transaction is only set aside for the limited purposes of subsections (2)(a) and (b). The onus is on the claimant to show the statutory purpose (see (3)) and although there is very wide jurisdiction to make appropriate orders under 424, these may not prejudice the interests of bona fide purchasers for value under subsequent transactions. Even, however, as regards a party to a transaction potentially falling within section 423, there are significant checks and balances. This is not of course a comprehensive summary of the section: for a fuller description, see Muir Hunter on Personal Insolvency or Transactions Avoidance in Insolvency by R Parry, 2001, chapter 10.

23. The question arising on this appeal is whether on the true construction of section 423 the purpose shown must be a dominant purpose. In my judgment the answer to that question must be arrived at taking into account the role, as explained above, of section 423 in insolvency legislation. Accordingly it is not necessarily helpful to apply the construction placed on similar words in different provisions and none was suggested. In my judgment there is no warrant for excluding the situation where purposes of equal potency are concerned. That was pointed out by His Honour Judge Moseley QC in the Starelm Properties case and is in my judgment correct. Thus one purpose can co-exist with another. Moreover, as Jonathan Parker J said in In re Brabon, there is no epithet in the section and thus no warrant for reading one in. Accordingly, in my judgment, the section does not require the inquiry to be made whether the purpose was a dominant purpose. It is sufficient if the statutory purpose can properly be described as a purpose and not merely as a consequence, rather than something which was indeed positively intended. Moreover, I agree with the observation of the judge that it will often be the case that the motive to defeat creditors and the motive to secure family protection will co-exist in such a way that even the transferor himself may be unable to say what was uppermost in his mind.

24. To take a homely example, suppose that I need to post a letter and also need to take the dog for a walk, and combine both operations in the same outing. I approach this example on the footing that neither objective counts as trivial. It will be clear that I have two purposes in leaving the house. It is a meaningless enquiry to ask whether I regard one of those objects as superior to the other or regard them as of equal potency. By contrast, if I go out to post a letter and the dog gets out of the house, slips under the gate and runs after me, it could certainly not be said that I had two objects in that I was not intending to take the dog for a walk at the time. Likewise, if I go to take the dog for a walk, and going past the postbox find an unposted letter in my pocket and take the opportunity of posting a letter at the same time, it will not be correct to say that I had two objects in that walk. I had only the one object, that of walking with the dog, and the posting of the letter was but a consequence of it. On the other hand, if I decide to take the dog for a walk but take the view that I will use the opportunity to post the letter at the same time, it can be said that I had two objects in that outing even if I would not have posted the letter until another day but for the need to take the dog for a walk.

25. I cite these examples to emphasise that for something to be a purpose it must be a real substantial purpose; it is not sufficient to quote something which is a by-product of the transaction under consideration, or to show that it was simply a result of it, as in the Royscot Spa case itself, or an element which made no contribution of importance to the debtor's purpose of carrying out the transaction under consideration. I agree with the point made by Lord Justice Laws in argument, that trivial purposes must be excluded.

26. I now turn to apply the law as I have found it to be to the present appeal. In my judgment it was open to the judge to draw inferences which are appropriate, contrary to Mr Cadwallader's submission. As Bowen LJ said in Edgington v Fitzmaurice (1885) 29 ChD 459 at 483, the state of a man's mind is as much a fact as the state of his digestion. There then comes a consideration of this court's proper approach to the judge's evaluation of the facts. The point has often been made before that the appellate court should not interfere in the judge's evaluation of matters of fact unless he is plainly wrong. One such case is Pehrsson v von Greyerz, a Privy Council case, unreported, no 2 of 1998, 16 June 1999. Lord Hoffmann delivered the judgment of the Privy Council. The Privy Council criticised the Court of Appeal of Gibraltar for coming to a different view from the judge as to whether evidence of a gift should have been accepted. Lord Hoffmann continued:

> "Their Lordships consider that the Court of Appeal did not take sufficient account of the difficulty faced by an appellate court in making a verdict on the basis of evidence, which the trial judge has disbelieved. It may be the case that if the judge had known that one of the reasons that he gave for rejecting the evidence of a witness was wrong, he would have been willing to accept it. On the other hand, it may have made no difference. Not having seen the witnesses, the appellate court cannot easily form a view about their general credibility. It must be remembered that in reversing the

judgment of a civil court, the appellate court (unless it orders a new trial, which in this case is not a practical possibility) is substituting a positive finding in favour of the losing party. It has often been said on the highest authority that it should not take such a step unless it is satisfied that the judge's conclusion was 'plainly wrong'. As Page-Wood LJ said in *The Alice* (1868) LR 2 PC 245, 252:-

' ... we should be most unwilling to come to a conclusion different from that of the Judge of the Court below merely upon a balance of testimony; and on its being affirmed by the Appellant that the testimony ought not to have been credited by the Judge of the Court below. He had an opportunity of testing, in the most ample manner, the conduct and demeanour of the witnesses; and we should require evidence that would be overpowering in its effect on our judgment with reference to the incredibility of the statements made by any witness, and the general testimony to which credit has been so given, before we could venture to come to a conclusion not only in favour of an Appellant in a case of this kind, but of course a conclusion adverse to a Respondent; thus inflicting on the Respondent a loss occasioned by the Board coming to a conclusion different from that which was come to on evidence, as to the value of which we have not the same facilities and means of forming a judgment as were possessed by the learned Judge who decided in the first instance.'

The Court of Appeal noted that the judge had not expressly said that he attached importance to the demeanour of the witnesses. But their Lordships would not expect or require judges to make specific mention of so obvious a matter. As Lord Wright said in Powell v *Streatham Manor Nursing Home* [1935] AC 243, 267:-

' ... where the evidence is conflicting and the issue is one of fact depending on evidence, any judge who has had experience of trying cases with witnesses cannot fail to realize the truth of what Lord Sumner says: as the evidence proceeds through examination, cross-examination and re-examination, the judge is gradually imbibing almost instinctively, but in fact as a result of close attention and of long experience, an impression of the personality of the witness and of his trustworthiness and of the accuracy of his observation and memory or the reverse.'"

27. Although Lord Hoffmann was specifically dealing with the situation of conflict of oral testimony and the situation was an extreme one, the general point remains that the appellate court should be slow to differ from a trial judge who has heard all the evidence, particularly when witnesses have

given oral evidence and been cross-examined.

28. I now turn to the evidence in this case. Mr Cadwallader drew up in his submissions a formidable list of factors pointing against the judge's conclusion. He referred to the fact that the deed was expressed to be in consideration of natural love and affection for his son. It was explained in those terms at the time by Mr Ghauri to his lawyer, it was carried out through legal offices and documented as a gift when all kinds of attempts might have been made to dress it up as something else or conceal it altogether. It was not an unusual way of making provision for one's family members. The donee was a person to whom Mr Ghauri showed the deed and whom Mr Ghauri wished to interest in the family business, which was not a new venture but already established at the time of the deed. The deed was made at a time when Mr Ghauri was gravely ill but when there was no evidence that he thought he was about to become insolvent, and at a time when he had substantial assets and the prospect of ongoing profits from the business, the gift was also made four years before investigation by the Revenue and six years before the settlement report by the Revenue in November 1997 which led to the settlement between Mr Ghauri and the Revenue. So far as the intention of the deceased was concerned, the effect of the deed should have been to put assets out of the reach of the claimant, yet he appears to have relied upon it in the course of the investigation and appears not to have concealed the property from the Revenue in the course of their investigation. But the judge concluded otherwise. There was, in my judgment, material upon which he could do so. In particular, the only explanation for the consistent and considerable under-declarations of profit was an intention to defraud the Revenue. That was a matter which the judge was entitled to infer had been constantly in Mr Ghauri's mind for a number of years by the time of the declaration of trust. I reject the submission that the judge's findings with regard to Mr Ghauri's financial position were unsound for the reasons I have already given. The judge was entitled to reject the evidence of the family members that the purpose of the declaration of trust was family provision.

29. That leads to the question: was the judge entitled to find that the intent to defraud the Revenue was the dominant purpose? This does not now arise. However, it was clearly more difficult for this to be established. It was said that the declaration of trust was an unusual way to settle the property. Mr Ghauri retained the profits and dealt with the property as his own. I agree with Mr Cadwallader that this could have been seen as breach of trust. The judge relied on the fact that Mr Ghauri had received rent from the property after the business was sold. Mr Cadwallader submits that the facts are equally inconsistent with the inference that Mr Ghauri, who had been in occupation of the property when it was purchased, was entitled to occupy the property, perhaps by reason of some tenancy at will, and was acting in breach of trust. However, in my judgment, the judge was entitled to attach significance to the use by Mr Ghauri of the property as his own. Indeed, as part of the Revenue settlement Mr Ghauri offered to charge the property in favour of the Revenue. The fact that the property was included in Mr Ghauri's assets as disclosed to the Revenue, at first sight seems consistent with mistake, since Mr Ghauri was no doubt receiving rent from the property. There might seem to be no reason why he should have wanted to disclose the property as his asset at this stage. However, I accept Miss Selway's submission that it was open to the judge to conclude that Mr Ghauri's intention in so doing was to avoid an immediate

challenge by the Revenue.

30. So far as failure to register Omar's interest at the Land Registry was concerned, it can be said that the facts are equally consistent with Mr Ghauri not having appreciated the need to do this, and there is no suggestion that he thought to take advantage of this situation. However, it was a factor which the judge was entitled to consider was significant in the context of the evidence as a whole.

31. There are other factors which the judge did not expressly take into account, but they are not in my judgment such as to show that his conclusion was plainly wrong. In all, I consider that there was sufficient material for the judge to reach the conclusion that he did. In the circumstances I would dismiss this appeal.

32. LORD JUSTICE LAWS: I agree. It is clear that the statutory purpose referred to in section 423 (3) of the Insolvency Act 1986 need not be the only purpose for which the impugned transaction was entered into. Moreover, there is in my judgment no warrant for a construction of the statute which would qualify the term "purpose" by the adjective "dominant". No such qualification is required to make sense of the Act or to give it pragmatic efficacy. On the contrary, it is easy to envisage cases where more than one purpose is at hand between whose weight or influence it is on the evidence impossible to distinguish in practical terms.

33. In such a case, in my judgment, the application of section 423(3) is by no means necessarily excluded. What in my judgment is required is that the claimant show that the donor, vendor or settler was substantially motivated by one or other of the aims set out in section 423(3)(a) and (b) in entering into the transaction in question. There may be cases in which, even absent the statutory purpose, the transaction would or might have been entered into anyway. That would not necessarily negate the section's application; but the fact-finding judge on an application made to him under section 423 must be alert to see that he is satisfied that the statutory purpose has in truth substantially motivated the donor if he is to find that the section bites.

34. It seems to me to be manifest that an inference that Mr Ghauri entertained the statutory purpose was readily available from the primary facts here, certainly on the footing that the section is to be construed as I would construe it. This construction is, I apprehend, entirely consonant with my Lady's approach to the statute.

35. For these reasons and those given by my Lady I too would dismiss the appeal.

36. LORD JUSTICE SIMON BROWN: To have a transaction struck down under section 423 of the Insolvency Act the creditor ("the victim" in the language of the statute) must satisfy the court that the debtor entered into it "for the purpose of" putting assets beyond the creditor's reach or otherwise prejudicing his interests. Must that be the debtor's (a) sole purpose or (b) dominant purpose or (c) merely a substantial purpose; if the latter, how should the question be approached? As Lady Justice Arden and Lord Justice Laws have demonstrated, the arguments against the test

being one of sole or dominant purpose, and in favour of it being one of substantial purpose, are compelling.

37. Rather more difficult, however, as it seems to me, is the correct approach to that test. At an early stage in the argument I suggested that the question for the judge might be, "Am I satisfied that this transaction would not have been entered into (on the facts of the present case, that this gift would not have been made) but for the debtor's wish to put his assets beyond his creditors' (or prospective creditors') reach?" If, in other words, the judge were to conclude that the gift would or might have been made in any event, then on this approach the creditor's claim to set it aside would necessarily fail. Such an approach assumes that if the gift would have been made in any event, it could not properly be said to have been made for the purpose of putting it beyond the creditors' reach.

38. I became persuaded, however, that this is the wrong approach. Assume, say, that the debtor makes a gift partly out of a wish to avoid inheritance tax and partly to escape his creditors; and assume further that he would have made it in any event purely for inheritance tax purposes. That, to my mind, should not save the gift from being set aside. Escaping the creditors may well, after all, have been a substantial factor in the donor's thinking. No more should a gift, in my opinion, be saved merely because the debtor would in any event have made it to benefit the donee.

39. It therefore seems to me that the test cannot be refined beyond saying that in each case the question to be asked is: can the court be satisfied that a substantial purpose of the debtor's transaction was (putting it in shorthand) to escape his liabilities?

40. I would, however, add this. If in fact the judge were to find in any given case that the transaction is one which the debtor might well have entered into in any event, he should not then too readily infer that the debtor also had the substantial purpose of escaping his liabilities. The judge in the present case, although accepting that the debtor wanted to secure his son's future, found that his dominant purpose was to put the property beyond the Revenue's reach. For my part, I would question whether the evidence entitled him to go quite that far. He was, however, in my judgment certainly entitled to conclude that this was one of the debtor's purposes, and not a negligible one. Such a conclusion was, in my judgment, sufficient to sustain his decision.

41. I too, therefore, would dismiss this appeal.

ORDER: Appeal dismissed with costs, those costs to be subject to detailed assessment.
(Order not part of approved transcript)

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/2002/981.html*

PILLSBURY WINTHROP SHAW PITTMAN LLP
Maria T. Galeno, Esq. (MG-6189)
John E. Davis, Esq. (JD-1445)
1540 Broadway
New York, New York  10036
Telephone: (212) 858-1000
Telefax: (212) 858-1500

*Attorneys for Respondent Cambridge Display Technology, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUNNYSIDE DEVELOPMENT COMPANY, LLC,<br><br>Petitioner,<br><br>-against-<br><br>BANK OF NEW YORK (as escrow agent),<br>CAMBRIDGE DISPLAY TECHNOLOGY, INC., and<br>OPSYS MANAGEMENT LIMITED,<br><br>Respondents. | Case No. 07 CV 8825(LLS) |

**MEMORANDUM OF LAW OF
RESPONDENT CAMBRIDGE DISPLAY TECHNOLOGY, INC.
IN OPPOSITION TO TURNOVER PETITION
AND
IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

FACTS ................................................................................................................................... 3

    CDT Inc. and Its Affiliates................................................................................................ 3

    The 2002 Transactions ...................................................................................................... 4

    The 2004 Transactions ...................................................................................................... 5

    The Escrow Agreement...................................................................................................... 6

    The CDT Inc. Disbursement Notices ............................................................................... 8

    OML's Disclaimer of the Escrow Assets.......................................................................... 9

    The California Proceedings................................................................................................ 9

    The New York Proceedings – The Summons With Notice Proceeding ........................... 11

    The New York Proceedings  –  The Turnover Proceeding ............................................... 12

ARGUMENT ........................................................................................................................ 12

I.      THE TURNOVER PETITION SHOULD BE DISMISSED BECAUSE CDT
        INC., AND NOT SUNNYSIDE, IS ENTITLED TO THE ESCROW ASSETS ............. 12

      A.    Because Opsys Has No Interest in the Escrow Assets,  Sunnyside Cannot
             Reach Them Through This Proceeding ................................................................. 13

            1.    Opsys Is Neither a Party to, nor an Intended  Beneficiary of, the
                Escrow Agreement...................................................................................... 13

            2.    Any Right of Opsys to Have its Creditors Paid From the Escrow
                Assets Is Outside of the Reach of CPLR 5225(b) and 5227..................... 18

      B.    CDT Inc. Has the Superior Claim to the Escrow Assets ..................................... 19

II.    SUNNYSIDE IS COLLATERALLY ESTOPPED FROM RE-LITIGATING THE
      CALIFORNIA COURT'S RULING THAT THE PURPOSE OF THE ESCROW
      ACCOUNT IS TO INDEMNIFY CDT INC. .................................................................. 20

III.   CDT INC. IS NOT JUDICIALLY ESTOPPED FROM  ASSERTING ITS
      RIGHT TO THE ESCROW ASSETS ........................................................................... 22

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*AXA Marine & Aviation Insurance (UK) Ltd. v. Seajet Industrial Inc.*,
   84 F.3d 622 (2d Cir. 1996)..................................................................................22

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
   No. 03 Civ. 1537(MBM), 2003 WL. 23018888 (S.D.N.Y. Dec. 22, 2003),
   *aff'd*, 110 Fed. App'x 191 (2d Cir. 2004) ....................................................16

*Beauvais v. Allegiance Sec., Inc.*,
   942 F.2d 838 (2d Cir. 1991)..........................................................................13, 19

*Bridgeway Corp. v. Citibank*,
   201 F.3d 134 (2d Cir. 2000).............................................................................23

*Cargill, Inc. v. Sabine Trading & Shipping Co.*,
   756 F.2d 224 (2d Cir. 1985)................................................................................7

*Cortec Industries, Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991)...............................................................................13

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
   66 N.Y.2d 38, 485 N.E.2d 208, 495 N.Y.S.2d 1 (1985)...........................15, 17

*In re Gulf Oil/Cities Serv. Tender Offer Litigation*,
   725 F. Supp. 712 (S.D.N.Y. 1989) ..................................................................15

*Hickerson v. City of New York*,
   146 F.3d 99 (2d Cir. 1998)...............................................................................22

*John Hancock Mutual Life Insurance Co. v. Carolina Power & Light Co.*,
   717 F.2d 664 (2d Cir. 1983)..............................................................................17

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991).............................................................................13

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
   19 F. Supp. 2d 157 (S.D.N.Y. 1998).................................................................16

*Rent Stabilization Association of City of New York v. Dinkins*,
   5 F.3d 591 (2d Cir. 1993)..................................................................................13

*Sassower v. Abrams*,
   833 F. Supp. 253 (S.D.N.Y. 1993) ...................................................................22

*Sochor v. IBM Corp.*,
   60 N.Y.2d 254, 457 N.E.2d 696, 469 N.Y.S.2d 591 (1983).............................18

*Sunnyside Development Co., LLC v. Opsys Ltd.*,
   No. C-05-553-MHP, 2005 WL. 1876106 (N.D. Cal. Aug. 8, 2005) ...................4

*Sunnyside Development Co., LLC v. Opsys Ltd.*,
   No. C-05-553-MHP, 2007 WL. 2462142 (N.D. Cal. Aug. 29, 2007) ..................1

*U.S. Fidelity & Guaranty Co. v. Treadwell Corp.,*
    58 F. Supp. 2d 77 (S.D.N.Y. 1999) .......................................................................23

*United States v. American Vault Co.,*
    No. 77 CIV 260(CPS), 1980 WL. 1566 (E.D.N.Y. May 5, 1980)..............................14

*United International Holdings, Inc. v. The Wharf (Holdings) Ltd.,*
    988 F. Supp. 367 (S.D.N.Y. 1997) .......................................................13, 14, 15, 16, 17

*Van Emrik v. Chemung County Department of Social Services,*
    191 A.D.2d 143, 600 N.Y.S.2d 157 (1993) ............................................................22

## STATUTES & RULES

Fed. R. Civ. P. 12(b)(1)..............................................................................................1, 13

Fed. R. Civ. P. 12(b)(6)..............................................................................................1, 13

Fed. R. Civ. P. 69(a) ......................................................................................................13

Fed. R. Evid. 201 ...........................................................................................................13

N.Y. C.P.L.R. 5202(b) (McKinney 2007) ....................................................................20

N.Y. C.P.L.R. 5225(b) (McKinney 2007) ....................................................................12

N.Y. C.P.L.R. 5227 (McKinney 2007) .........................................................................12

N.Y. C.P.L.R. 5234(c) (McKinney 2007).....................................................................20

## MISCELLANEOUS

David D. Siegel, *Practice Commentaries to CPLR 5225*, C5225:1 at 261
    (McKinney 1995)........................................................................................................13

David D. Siegel, *New York Practice* § 508, at 862, § 510, at 869, § 518, at 879
    (4th ed. 2005).........................................................................................................13, 20

Respondent Cambridge Display Technology, Inc. ("CDT Inc."), by its attorneys Pillsbury Winthrop Shaw Pittman LLP, respectfully submits this memorandum of law in opposition to the Turnover Petition of Petitioner Sunnyside Development Company, LLC ("Sunnyside") brought by way of an Order to Show Cause dated October 5, 2007 (the "Turnover Petition"), and in support of the motion of CDT Inc. for an order dismissing the Turnover Petition pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

By its Turnover Petition, Sunnyside seeks to enforce against CDT Inc. a judgment (the "Judgment") that Sunnyside obtained against Opsys Limited ("Opsys"), a third-tier subsidiary of CDT Inc. Sunnyside does so despite the fact that a federal court in California (the "California Court") ruled in August 2007 that Sunnyside cannot enforce the Judgment against CDT Inc.[1]

CDT Inc. acquired Opsys in a stock-for-stock transaction in December 2004. As part of that transaction, CDT Inc. placed some of the consideration for Opsys into an escrow (the "Escrow Assets"). As the California Court found, the escrow was *to protect CDT Inc.* against unknown or contingent liabilities of Opsys. The escrow was not designed to protect Opsys. The Escrow Assets do not belong to Opsys. Therefore, and for the reasons set forth below, the Turnover Petition must be denied.

*First,* a turnover petition under CPLR 5225(b) and 5227 can have merit only if the judgment debtor (here, Opsys) has a proprietary interest in the assets sought or a right to receive

---

[1] This dispute has an extended history in the California Court. This is not the first time that Sunnyside has attempted to make CDT Inc. responsible for Opsys' debts. *See Sunnyside Dev. Co., LLC v. Opsys Ltd.,* No. C-05-553-MHP, 2007 WL 2462142 (N.D. Cal. Aug. 29, 2007) (the "Cal. Mem. & Order"). The background of Opsys' litigation against Sunnyside and CDT Inc. and its affiliate is chronicled in the Cal Mem. & Order, which is attached (in Slip Op. form) as Exhibit E to the Affirmation of Christoph Heisenberg dated October 5, 2007 ("Heisenberg Aff.") submitted by Petitioner in support of its Turnover Petition.

them. But Opsys has *no* interest in the Escrow Assets, nor any claim on them. Therefore, Sunnyside cannot pursue the Escrow Assets under CPLR 5225(b) and 5227. The Escrow Assets are governed by an Escrow Agreement to which neither Opsys nor Sunnyside is a party.[2] The Escrow Agreement allows only two potential claimants to the Escrow Assets: CDT Inc. and OML. *See* Escrow Agreement §§ 4(e), 5. Neither Opsys nor Sunnyside is a potential claimant under the Escrow Agreement.

Nor is Opsys an intended beneficiary of the Escrow Agreement, which expressly provides that the escrow *"shall be held in trust and shall not be subject to lien or attachment of any creditor* of any party hereto and shall be used solely for the purposes and subject to the conditions *set forth herein"* (Escrow Agreement § 2).[3] The Escrow Agreement comprehensively describes who can assert claims against the Escrow Assets and receive distributions. *Id.* §§ 4, 5. It restricts any encumbrance or other disposition of the Escrow Assets until they are "actually paid over to and received by" CDT Inc. or OML. *Id.* § 11. It expressly identifies to whose benefit the agreement inures (*id.* § 13). Under New York law (which governs), such provisions preclude any finding that CDT Inc. or any other party to the Escrow Agreement intended to give rights to Opsys.

It is not good enough that CDT Inc. *could* in its discretion use the Escrow Assets to compromise claims against Opsys and thus could use Escrow Assets to settle with Sunnyside. There is no agreement of CDT Inc. to pay Opsys' unknown or contingent liabilities from the Escrow Assets, so any benefit to Opsys or Sunnyside from the escrow would only be an incidental by-product of the parties' intent to maintain shares in escrow for the protection of *CDT Inc.*

---

[2] The Escrow Agreement, dated December 29, 2004, was entered into by the Bank of New York ("BNY"), as escrow agent, and by CDT Inc. and Opsys Management Limited ("OML"). *See* Heisenberg Aff. Ex. D. OML, which is not affiliated with CDT Inc., was created by the founders of Opsys to hold a portion of the consideration that CDT Inc. was paying for Opsys in trust *first,* for certain identified creditors and debt-holders of Opsys (not including Sunnyside) and, if the creditors and debt-holders were paid in full, *second,* for the shareholders of Opsys. *E.g., id.,* Ex. C at Recitals D-G.

[3] All emphasis herein is supplied unless otherwise noted. Exhibits attached to the accompanying Declaration of John E. Davis, dated October 25, 2007 are referred to and cited herein as "Davis Decl. Ex. __."

2

Incidental beneficiaries have no contractual rights under New York law. Further, a judgment creditor cannot pursue under CPLR 5227(b) or 5227 speculative, inchoate or unvested contract rights, such as are claimed by Sunnyside.

*Second*, the California Court has already decided the very issues raised by the Turnover Petition by denying Sunnyside's motion to add CDT Inc. as a party to the Judgment. The California Court stated that (i) CDT Inc. was not the successor to Opsys and was not responsible for Opsys' debts, (ii) the escrow was intended to "*indemnify CDT, Inc. for undisclosed or contingent liabilities*" and (iii) CDT Inc. properly obtained reimbursement of its legal fees and expenses from the account instead of paying Sunnyside's claim. *See* Cal. Mem. & Order at 6 (construing Escrow Agreement § 4(e)). Sunnyside's attempt to relitigate these determinations through the Turnover Proceeding is barred by the doctrine of collateral estoppel.

*Third*, contrary to Sunnyside's assertions, CDT Inc. did not advise the California Court that Opsys or Sunnyside were entitled to the Escrow Assets, nor did the California Court so find. Sunnyside's judicial estoppel argument – based on a misleading collection of elipsized and out-of-context quotations – is refuted by the record. CDT Inc. did not mislead the California Court, and the California Court was not misled: it found against Sunnyside. This Court should do likewise.

## FACTS

### CDT Inc. and Its Affiliates

CDT Inc. is headquartered in Cambridge, England. A public company from December 2004 to September 2007, its stock was traded on the NASDAQ Global Exchange until its recent acquisition by Sumitomo Chemical Co., Ltd.

CDT Inc. has a first-tier subsidiary called CDT Holdings Limited and a second-tier subsidiary called CDT Ltd. CDT Ltd. once was a defendant in the California action but was

dismissed with prejudice in August 2005. *Sunnyside Dev. Co., LLC v. Opsys Ltd.,* No. C-05-553-MHP, 2005 WL 1876106 (N.D. Cal. Aug. 8, 2005).

Since May 2005, CDT Ltd. has had several subsidiaries (which therefore are third-tier subsidiaries of CDT Inc.). One is Opsys. Another is CDT Oxford Limited ("CDT Oxford"), which until late 2002 was called Opsys UK Limited ("Opsys UK"). Heisenberg Aff. Ex. G at 2-3.

The 2002 Transactions

CDT Inc. is a developer of polymer organic light-emitting diode ("P-OLED") technology, used in creating energy-efficient, ultra-thin, lightweight displays in a variety of electronic devices. In 2002, CDT Inc. began negotiating to acquire control of certain UK-based intellectual property of Opsys thought to be useful in developing the next generation of P-OLED materials. Opsys had research facilities in the UK near Oxford, where it developed this intellectual property. Opsys, through its subsidiary (Opsys US) also had US operations in Fremont, California for the pilot manufacturing of displays. The US operations did not involve printable P-OLEDs but instead involved different technology licensed from Eastman Kodak ("Kodak"). Davis Decl. Ex. 1, Fyfe Decl. ¶¶ 3-6; Cal. Mem. & Order at 3.

CDT Inc. wanted Opsys' UK assets but did not want Opsys' US assets. *Id.* at 3. CDT Inc. made it clear to Opsys that any deal would require a clean separation of the US operations from the UK operations. Opsys agreed, so the transaction proceeded on that basis: the UK assets were put into one subsidiary, Opsys UK, with the US assets having already been placed by Opsys in Opsys US. Fyfe Decl. ¶¶ 4-8.

On October 23, 2002, CDT Inc., Opsys and others entered into a Transaction Agreement (the "2002 Transaction Agreement," Heisenberg Aff. Ex. B). CDT Inc. purchased a 16% interest in Opsys UK for $2.5 million in cash. *Id.* at 16 (clause 2.1). CDT ***Ltd. – not*** CDT ***Inc.*** – paid

4

Opsys $2 million in cash for a sublicense to Opsys' IP. *Id.* at 21, 32 (clauses 5.1(iii), 14.2); Cal.
Mem. & Order at 3-6.

The Transaction Agreement created two "put" options and one "call" option. Heisenberg
Aff. Ex. B at 16-20 & 25-30 (clauses 3 & 9). Only one option – one of the "put" options (the
"Opsys Option") – actually was exercised. It gave Opsys' shareholders the right to cause CDT
Inc. to buy Opsys where, among other conditions, (i) the aggregate liabilities, including contingent
liabilities, of Opsys and its subsidiaries (excluding Opsys UK), were less than $1.25 million (*id.* at
26 (clause 9.4(C)); (ii) the option exercise price would be reduced by the value of the aggregate
current liabilities; and (iii) CDT Inc. would withhold from the exercise price the amount of all
contingent liabilities until the liabilities materialized or until the statute of limitations expired (*id.*
at 27-28 (clauses 9.11(A) & 9.12)).

Opsys expressly warranted that it was not a party to any contract that could not readily be
performed by it on time; that it was not a party to, nor did it have any liability under, any lease;
that it was not a party to any contract "of a value of more than £10,000" or "of one year or greater
duration"; and that it had no unaccrued or undisclosed liabilities left over from operations in the
US. *Id.* Ex. B, at 59-60 (sched. 3, part 2, clauses 9.1-9.2, 9.7(a)-(b), & 9.9).

The structure was complex but its purposes were simple and straightforward: CDT Inc.
wanted Opsys' UK assets and not its US assets; and the parties wanted to avoid the punitive UK
taxes that would be levied on a sale of assets. There were sound business and tax reasons for the
structure, having nothing to do with disadvantaging Sunnyside or any other creditor. *See*
Heisenberg Aff. Ex. H, Black Decl. ¶¶ 7-13.

<u>The 2004 Transactions</u>

Disputes soon arose between Opsys and CDT Inc. concerning the 2002 Transaction
(specifically, whether CDT Inc.'s issuance of convertible preferred shares to third parties

implicated the anti-dilution provisions of the 2002 Transaction Agreement).  In 2004, CDT Inc.,

Opsys and OML, among others, entered into a Settlement and Amendment Agreement dated

August 2, 2004 and then an Amended Settlement and Amendment Agreement dated December 14,

2004 (the "Amended Settlement Agreement," Heisenberg Aff. Ex. C).  Cal. Mem. & Order at 5-6.

As part of the Amended Settlement Agreement, Opsys' shareholders exercised the Opsys Option,

thus requiring CDT Inc. to acquire the equity of Opsys in exchange for CDT Inc. stock.

Heisenberg Aff. Ex. H ¶¶ 21-22.[4]  With limited exceptions, the stock did not go to Opsys'

shareholders, but instead was withheld to provide a means of dealing with (a) known and identified

liabilities – which "did not include the [Fremont L]ease]" (Cal. Mem. & Order at 6); and

(b) contingent and unidentified liabilities of Opsys.  To that end, (i) 375,085 shares were issued to

OML in trust to be distributed pursuant to a Deferred Consideration Agreement between OML and

Opsys shareholders, which include former creditors such as Kodak; and (ii) 422,610 shares were

placed in escrow with BNY pursuant to the Escrow Agreement.  *Id.* at 5-6.

> The Escrow Agreement

The Escrow Agreement (Heisenberg Aff. Ex. D) was entered into pursuant to (and is an

exhibit to) the Amended Settlement Agreement (Heisenberg Aff. Ex. C).  The Escrow Agreement

governs the holding and disbursement of the CDT Inc. shares transferred to BNY in escrow.  *See*

Escrow Agreement at 1 and § 2 (the Escrow Assets are "to be held and disposed of as provided in

this Escrow Agreement.").  The Escrow Assets currently are worth about $1.5 million.[5]

---

[4]  The California Court incorrectly states that CDT Inc. exercised its option (Cal. Mem. & Order at 4), but then corrects itself to note that "[t]he remaining CDT, Inc. shares constituting the payment for the put option were distributed to Opsys management ...." (*id.* at 6).  This was not a contested issue.  Sunnyside does not dispute that Opsys' shareholders exercised the Opsys Option, as reflected in the 2004 Transaction Agreement (Heisenberg Aff. Ex. C § 9.15, at 6-7) and the Escrow Agreement (*id.* Ex. D at Recital B ("Opsys has exercised the Opsys Option")), and that CDT Inc. did not exercise its "call" option.

[5]  Prior disbursements were made to reimburse CDT Inc. for legal fees incurred in connection with Sunnyside's claims and to pay the "Reddy claim," which was a claim against Opsys by a former officer of Opsys or its former subsidiary.  Heisenberg Aff. Ex. G, CDT Inc.'s Opp. to Mot. to Add CDT Inc., filed May 7, 2007 ("CDT Inc. Opp.

CDT Inc. insisted on the escrow mechanism as a protection for CDT Inc. *See* Heisenberg

Aff. Ex. H, Black Decl. ¶¶ 19-32. Its primary purpose was to compensate CDT Inc. if, after its

acquisition of Opsys, additional creditors or claims surfaced that caused the value of Opsys to be

less than what CDT Inc. believed it to be in December 2004. *See* Heisenberg Aff. Ex. J, 9/4/07

Black Letter at 2. Accordingly, Section 4(e) of the Escrow Agreement permits CDT Inc. to seek

payment from the escrow account to defend against or compromise claims against Opsys, and to

indemnify CDT Inc. for its related litigation costs and expenses. Section 4(e) provides:

> In the event Buyer [CDT Inc.] determines that any liability, contingent liability,
> claim, obligation or damage (collectively, "Claim") exists or has been asserted
> against Opsys…, Buyer shall have the right (but not the obligation) to deliver to the
> Escrow Agent, with a copy to NewCo [OML], a written notice (a "Disbursement
> Notice"). A Disbursement Notice shall set forth (i) the amount of such Claim or a
> good faith estimate of the amount thereof together with an estimate of any costs and
> expenses to be incurred in resolving such Claim (including, without limitation,
> reasonable attorneys' fees and expenses) (the "Claimed Amount"); (ii) a brief
> description of the facts giving rise to such Damages to the extent then known to the
> Buyer and (iii) payment instructions specifying the number of CDT Shares to be
> transferred to the Buyer in respect thereof, which shall be equal to that number of
> CDT Shares…that when multiplied by the IPO Price…shall most nearly equal the
> amount of the Claimed Amount….

Heisenberg Aff. Ex. D § 4(e).

Significantly, the Escrow Agreement makes no provision for disbursements to entities

other than CDT Inc. or OML, and provides no means for non-parties to request disbursements, and

imposes no requirement on CDT Inc. or OML to pay unidentified creditors from the Escrow

Assets. Instead, Section 2 provides that the escrow "***shall be held in trust and shall not be subject***

***to lien or attachment of any creditor*** of any party hereto and shall be used solely for the purposes

and subject to the conditions set forth herein." *Id.* § 2. Sections 4 and 5 describe the method and

manner of claims and disbursements from the Escrow Assets. *Id.* §§ 4, 5. Section 11 states,

---

Mem.") at 6; *id.* Ex. H ¶ 16. The Escrow Agreement expressly contemplates payment of the Reddy Claim (*id.* Ex.
D § 4(b)-(d)) and CDT Inc.'s fees and expenses (*id.* § 4(e)).

7

"*Neither [CDT Inc.] or [OML] shall* sell, assign, transfer, or encumber, or *in any* other *manner anticipate or dispose of any portion of the Escrow Fund … until the same shall be actually paid over to and received by [CDT Inc.] or [OML]*," as the case may be, pursuant to the terms hereof."
*Id.* § 11.  Further, Section 13 states, "This Escrow Agreement shall be binding upon and *inure to the benefit of* the respective successors, assigns and legal representatives of [CDT Inc.], [OML] and [BNY]."  *Id.* § 13.

The CDT Inc. Disbursement Notices

Section 4(e) of the Escrow Agreement (quoted above) permits CDT Inc. to issue "Disbursement Notices."  CDT Inc. issued its first Disbursement Notice on February 2, 2005, notifying BNY that Sunnyside had asserted a claim against Opsys for an amount in excess of $35,000,000, estimating attorney's fees and expenses in connection with that claim in excess of $500,000, identifying a "Claimed Amount (as such term is defined in the Escrow Agreement)" of $35,500,000 and requesting transfer of all Escrow Assets to CDT Inc.  Davis Decl. Ex. 2.

On February 10, 2005, OML issued a "Contest Notice" objecting to the February 2, 2005 Disbursement Notice "until such time as the true cost of the claim can be established."  Davis Decl. Ex. 3.  But OML later agreed that CDT Inc. would disburse amounts needed to cover defense costs, and so CDT Inc. received disbursements from the escrow to cover defense costs and to fund the Reddy settlement.  *See* Heisenberg Aff. Ex. J (9/25/07 letter from Michael Black to Richard Eng at 2; 9/25/07 letter from Maria T. Galeno, Esq. to Christoph C. Heisenberg, Esq. at 2).

Similarly, on September 19, 2007, CDT submitted two additional Disbursement Notices for payment of its fees and expenses incurred since the 2005 notice (*see* Davis Decl. Ex. 4), and  OML on September 20, 2007 filed a Contest Notice objecting to disbursement "pending clarification from CDT as to the amounts claimed."  *Id.* Ex. 5.  On September 27, 2007, CDT Inc. submitted an amended Disbursement Notice, amending the September 19 notices.  *Id.* Ex. 6.

8

<u>OML's Disclaimer of the Escrow Assets</u>

On October 12, 2007, following the filing of the Turnover Petition, OML faxed a letter to

New York Supreme Court Judge Lewis Bart Stone, stating,

> Our position is that [CDT Inc.] has submitted a valid claim for all remaining
> assets ("the Assets") held in escrow under the terms of the Escrow Agreement ....
> OML is not entitled to contest this claim under the Escrow Agreement and, absent
> the Turnover Petition, the Assets would normally have been transferred to CDT
> according to the terms of that agreement.  ... [W]e are not an interested party in
> the outcome of this action, having relinquished any claim to the Assets under the
> Escrow Agreement ....

Davis Decl. Ex. 7.  Also on October 12, 2007, OML issued a "Contest Notice in response to

Disbursement Notice dated 27 September 2007," whereby OML "consent[s] to a disbursement of

assets from the General Sub-account of the Escrow Fund" and notes that "such disbursement will

constitute all remaining assets of the General Sub-account."  Davis Decl. Ex. 8.  OML states that it

accepts CDT Inc.'s request for reimbursement of the fees of the Orrick firm, Opsys' counsel in the

California action (which fees are approximately $1.3 million (*see* Davis Decl. Ex. 9 (attaching

email of H. Charles to A. Zervoglos dated October 11, 2007 at 2)) but not the fees of CDT Inc.'s

counsel (which are approximately $574,000 (*id.*)), but that such dispute is academic as CDT Inc.

has the right to receive the full contents of the escrow.  Davis Decl. Ex. 8 at 1-2.

<u>The California Proceedings</u>

In December 2004 — the same month as CDT Inc.'s IPO — Sunnyside filed a complaint

against Opsys and CDT Limited (CDT Inc.'s second-tier subsidiary) asserting claims for breach of

the Fremont lease and for fraud.  Cal. Mem. & Order at 1, 6 (Heisenberg Aff. Ex. E).  On August

8, 2005, the California Court dismissed the claims for breach of contract against CDT Limited and

for fraud against both defendants, with prejudice.  *Id.* at 2.  After trial, Sunnyside obtained a jury

verdict against Opsys for $4,853,017.  The Judgment (Heisenberg Aff. Ex. A) was entered on

May 29, 2007.  Cal. Mem. & Order at 1.

9

Following the jury verdict, Sunnyside moved to add CDT Inc. as a party to the California action and the Judgment. *Id.* at 2-3. In opposition, CDT Inc. did not – as claimed by Sunnyside (Pet. ¶ 13) – assert that the purpose of the 2004 transaction and the Escrow Agreement was to *benefit* creditors, but instead explained that the 2004 transaction "protected creditors in at least three ways." CDT Inc. Opp. Mem. at 6 (Heisenberg Aff. Ex. G).

> First, 133,938 shares of CDT Inc. stock ... were held back to cover known and identified liabilities, as set forth in Schedule A to the Amended Settlement Agreement ... The list in Schedule A did not include the Fremont Lease. . . .

> Second, 422,610 shares of CDT Inc. stock (at \$12 a share, \$5,071,320) went into escrow as security for contingent and unidentified liabilities of Opsys (including the Reddy claim in Schedule B). . . .

> Third, the remaining CDT Inc. shares paid for Opsys were issued to [OML]..., to be distributed pursuant to a 'Deferred Consideration Agreement' between OML and Opsys' shareholders. . . .

Heisenberg Aff. Ex. G at 6-7; *see* Cal. Mem. & Order at 6.[6]

CDT Inc. further explained that it had deposited part of the consideration for the Opsys shares "into an escrow account as security for any unidentified liabilities of Opsys, including contingent liabilities." Heisenberg Aff. Ex. G at 12. This was security for CDT Inc., as *it had "insisted on an escrow and a trust and set-asides* ... to ensure that the former Opsys shareholders would continue to bear responsibility for such claims [undisclosed contingent liabilities]." *Id.* (citing Heisenberg Aff. Ex. H ¶¶ 19-32). There is no evidence that the 422,610 shares were placed in escrow at Opsys' insistence.

CDT Inc. also submitted the declaration of its Chief Financial Officer, Michael Black, who stated, "422,610 shares of CDT Inc. stock went into an escrow to cover the Reddy claim referred

---

[6] The Deferred Consideration Agreement provides in essence that the assets of OML would be held in trust for certain creditors and debt holders of Opsys (such as Kodak) and, only if they were paid off, then be paid to the former shareholders of Opsys. Heisenberg Aff. Ex. H ¶ 29.

to in paragraph 16 above and unidentified liabilities, including unidentified contingent liabilities." Heisenberg Aff. Ex. H ¶ 28.

The California Court determined the purpose of the Escrow Assets. In denying Sunnyside's motion, Judge Patel stated that "a portion of the CDT, Inc. stock offered in exchange for the Opsys stock [*i.e.*, the Escrow Assets] *would indemnify CDT, Inc. for undisclosed or contingent liabilities*." Cal. Mem. & Order at 6 (construing Escrow Agreement § 4(e)). The court also rejected Sunnyside's argument that CDT Inc. had "invaded" the escrow account to finance the litigation, finding, instead, that "*the escrow shares were being used to cover a contingency as originally envisioned*." *Id.* at 10-11. On September 26, 2007, Sunnyside appealed this order to the Ninth Circuit.

<u>The New York Proceedings – The Summons With Notice Proceeding</u>

On September 19, 2007, Sunnyside served CDT Inc. and three of its subsidiaries with a Summons with Notice with annexed Notice of Claim in the Supreme Court of New York for the County of New York (No. 112617/07) (the "Summons with Notice Proceeding"). Sunnyside named as defendants Opsys, CDT Inc., Cambridge Display Technology Limited, CDT Oxford Limited, Sumitomo, OML and BNY (as escrow agent). Sunnyside evidently did not serve BNY, Sumitomo or OML. Sunnyside sought, *inter alia*, "to obtain the assets (shares of CDT stock) that are or were held in New York escrow for the purpose of satisfying claims against Opsys Limited." Summons with Notice at 3. On October 17, 2007, CDT Inc. removed the Summons with Notice Proceeding to this Court, receiving Index No. 07-CV-09320. On October 23, 2007, Sunnyside dismissed the proceeding as to all defendants except OML without prejudice pursuant to a stipulation between Sunnyside and the defendants that were served.

11

The New York Proceedings – The Turnover Proceeding

On October 5, 2007, Sunnyside initiated by way of Order to Show Cause a separate proceeding in the New York Supreme Court ("Turnover Proceeding"), naming as respondents CDT Inc., OML and BNY (as escrow agent). Davis Decl. Ex. 10. We understand that Sunnyside also delivered to BNY a restraining notice dated October 4, 2007 (the "Restraining Notice"), purporting to restrain BNY from transferring the Escrow Assets. *Id.* Ex. 11. On October 12, 2007, CDT Inc., with the consent of respondents BNY and OML, removed the Turnover Petition to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, based on complete diversity of citizenship. Dkt. No. 1.[7]

## ARGUMENT

## I. THE TURNOVER PETITION SHOULD BE DISMISSED BECAUSE CDT INC., AND NOT SUNNYSIDE, IS ENTITLED TO THE ESCROW ASSETS

Sunnyside's Petition does not meet the exacting requirements of CPLR 5225(b) and 5227.[8]

As a leading commentator described, "The primary burden of the judgment creditor under CPLR

[7] Sunnyside did not personally serve respondents or Opsys in the Turnover Proceeding. Rather, pursuant to the Order to Show Cause, Sunnyside delivered a copy of its papers to undersigned counsel, who is not authorized to accept service on CDT Inc.'s (or Opsys') behalf. CDT Inc. appears here specially pursuant to CPLR 320(c)(1) with respect to the Escrow Assets, and preserves all defenses based on the absence of personal jurisdiction and proper service. *See Cargill, Inc. v. Sabine Trading & Shipping Co.*, 756 F.2d 224, 227-29 (2d Cir. 1985). CDT Inc. further reserves and does not waive its rights to assert any and all defenses to the Turnover Petition and any other proceedings, including those based on improper venue and forum.

Although the Order to Show Cause directed Sunnyside to deliver the Turnover Petition and associated papers to undersigned counsel "for respondents [CDT Inc.] and Opsys Limited," Opsys is not a named respondent to the Turnover Petition and was not required by the Order to Show Cause to submit opposition papers or take any other action in response to the Turnover Petition. As discussed herein, Opsys has no interest in the Escrow Assets. It has not moved to intervene in this action and has not submitted to the personal jurisdiction of this Court. Accordingly, it provides no response to the Turnover Petition.

[8] N.Y. C.P.L.R. 5225(b) (McKinney 2007) permits a judgment creditor to commence a special proceeding against "a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee." N.Y. C.P.L.R. 5227 provides in pertinent part: "Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. ..."

12

5225 is one of proof. The court will not direct the judgment debtor to pay over money, for

example, unless it has been *clearly established* that the judgment debtor has money to pay over.

Nor will it compel the judgment debtor to deliver property that has not *clearly* been shown to be in

the judgment debtor's possession or control." David D. Siegel, *Practice Commentaries to CPLR*

*5225*, C5225:1, at 261 (McKinney 1995); *see Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 841

(2d Cir. 1991).[9]

### A. Because Opsys Has No Interest in the Escrow Assets, Sunnyside Cannot Reach Them Through This Proceeding

Sunnyside cannot demonstrate at all, much less "clearly," that the judgment debtor, Opsys,

has an "interest" in, or is "entitled to the possession of," the Escrow Assets under CPLR 5225(b).

Nor can Sunnyside demonstrate that BNY as escrow agent "is or will become indebted to" Opsys

under CPLR 5227. Because Opsys has no proprietary interest in the Escrow Assets or right to

require payment from BNY (as escrow agent), the Escrow Assets are beyond Sunnyside's reach.

#### 1. Opsys Is Neither a Party to, nor an Intended Beneficiary of, the Escrow Agreement

As Sunnyside admits, Opsys is not a party to the Escrow Agreement. Mem. in Supp. of

Pet. at 10. Opsys has no express rights to receive or compel payment under the Escrow

Agreement, and so has no property interest upon which Sunnyside can execute its Judgment.

Heisenberg Aff. Ex. D §§ 4, 5, 13. This was the holding in *United Int'l Holdings, Inc. v. The*

*Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 374 (S.D.N.Y. 1997), where the judgment creditor

---

[9] In support of its Opposition and Motion to Dismiss, CDT Inc. relies upon the pleadings and evidentiary materials submitted by Sunnyside as Exhibits to the Heisenberg Affirmation, as well as upon the Exhibits attached to the Davis Declaration. This Court may consider all of these materials under Rule 12(b)(6) because they are (i) exhibits to, or documents incorporated by reference into, the Petition (*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)), (ii) integral to Petitioner's claim (*id.* at 47-48), and/or (iii) subject to judicial notice under Federal Rule of Evidence 201 (*Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir.1991)). Further, all the Exhibits are properly considered in determining the Motion under Rule 12(b)(1) for lack of standing, based on Sunnyside's failure to show that Opsys has an interest in the Escrow Assets. *E.g.*, *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993). Finally, because the Turnover Petition is a special proceeding in the nature of a summary judgment motion, this Court may consider all submissions of the parties in making its determination. *E.g.*, Siegel, *New York Practice* § 554, 556 at 952-54 (4th ed. 2005); Fed. R. Civ. P. 69(a).

sought turnover of funds that were paid into the debtor's bank account in satisfaction of obligations owed to the debtor's subsidiary under a swap agreement. *Id.* at 371-72, 374. This Court denied the turnover petition, finding that the creditor could not establish that the debtor had an "enforceable interest" in the payments under CPLR 5225(b) and 5227 where it was not a party to the swap agreement and had no right to compel payments. *Id.* at 374.

Sunnyside's assertion that Opsys is an "intended beneficiary" of the Escrow Agreement and so is somehow entitled to the Escrow Assets (Mem. in Supp. of Pet. at 10-11) is also without basis. Neither the Escrow Agreement nor any other agreement requires CDT Inc. to use the Escrow Assets to pay contingent and unknown claims against Opsys. Instead, the intent of the escrow was to protect and indemnify CDT Inc. against such claims that could lower the value of Opsys to CDT Inc. *E.g.,* Heisenberg Aff. Ex. J, 9/4/07 Black Letter at 2; Cal. Mem. & Order at 6 (the purpose of the escrow is "*to indemnify CDT Inc.* for undisclosed and contingent liabilities" of Opsys). Such a fund – created by a buyer to protect *it* against contingent liabilities of the seller – does not create an interest in favor of a third party creditor. The court in *United States v. American Vault Co.*, No. 77 CIV 260(CPS), 1980 WL 1566, *2-4 (E.D.N.Y. May 5, 1980) faced a similar issue when the United States sought to collect on a tax deficiency judgment from an entity (AVCI) that had purchased all of the assets of the debtor (AVC). The United States sought to collect the judgment from a reserve fund created by AVCI at closing to "protect [it] and the individual defendants against the possibility that *they* might have to pay any tax liability for AVC." *Id.* at *3. The court found that, because there was no express agreement to use the funds to pay taxes owed by AVC and no evidence of assurances to do so that were not equally consistent with a more limited purpose of the buyer to protect *itself* from transferee liability (*id.* at *3-4), the United States was not an intended beneficiary of the acquisition (or any other) agreement and so not entitled to the fund. *Id.* at *4.

14

The Escrow Agreement (Section 14) is subject to New York law, which has adopted the Restatement (Second) of Contracts' test for intended beneficiaries, as follows:

> Unless otherwise agreed between promisor and promissee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*United Int'l Holdings*, 988 F. Supp. at 371 (quoting Restatement (Second) of Contracts § 302 (1979)); *see id.*, 988 F. Supp. at 371 ("When determining the intentions of the contracting parties, the intention of the promisee governs."), citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44, 485 N.E.2d 208, 212, 495 N.Y.S.2d 1, 4-5 (1985).  Any "intent to benefit a third party must be shown on the face of the agreement." *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F. Supp. 712, 733 (S.D.N.Y. 1989).

Sunnyside can point to no evidence on the "face" of the Escrow Agreement (or elsewhere) that CDT Inc. (the promisee) or any other party to the Escrow Agreement intended to benefit Opsys, or that giving Opsys a right to assert a claim against the Escrow Assets would effectuate CDT Inc.'s or any other parties' intent.  Instead, the Escrow Agreement's express terms demonstrate the contrary.  Thus, Section 2 provides that the escrow "***shall be held in trust and shall not be subject to lien or attachment of any creditor*** of any party hereto and shall be used solely for the purposes and subject to the conditions set forth herein."  Escrow Agreement § 2.  Section 4 identifies the only creditor (Damoder Reddy) whose claims are provided for in the Escrow Agreement, and Sections 4 and 5 set forth in detail the process by which CDT Inc. and OML may demand and receive disbursements of the Escrow Assets.

Sections 11 and 13 further contradict Sunnyside's theory.  Section 11 states,

> ***Neither [CDT Inc.] or [OML] shall*** sell, assign, transfer, or encumber, or in any other manner anticipate or ***dispose of any portion of the Escrow Fund … until***

15

> *the same shall be actually paid over to and received by [CDT Inc.] or [OML],* as the case may be, pursuant to the terms hereof.

*Id.* § 11.  Section 13 states,

> *This Escrow Agreement shall* be binding upon and *inure to the benefit of* the respective successors, assigns and legal representatives of *[CDT Inc.], [OML] and [BNY]*.

*Id.* § 13.  This Court has repeatedly held that such "succession" clauses which expressly identify to whose benefit the agreement inures and restrict assignability and encumbrances of the agreement are "inconsistent with the existence of an intention to confer a benefit upon a third party" and "manifest[] the parties' intention *not* to benefit third parties." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998) (granting motion to dismiss because "inurement clause, when taken together with a prohibition on assignments, … suggest that the parties did not intend that third parties benefit from the contract.") (citing cases); *see Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537(MBM), 2003 WL 23018888, *9 (S.D.N.Y. Dec. 22, 2003) (existence of such "succession" clauses "further undermine[] the claim that the parties to those agreements intended to benefit [non-party claimant]."), *aff'd,* 110 Fed. App'x 191 (2d Cir. 2004); *accord United Int'l Holdings*, 988 F. Supp. at 373.

Sunnyside's reliance on a excerpt from Paragraph 35.1 of the 2002 Transaction Agreement is misplaced.  This provision states, in full,

> Any person (*other than the parties to this agreement*) who is given rights or benefits under clause 9 (Opsys Limited Option) of this agreement … shall be entitled to enforce those rights or benefits against the parties in accordance with the Contracts (Rights of Third Parties) Act 1999.  Save as provided in Clause 9 (Opsys Limited Option) the parties to this agreement do not intend that any term of this agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this agreement.

16

Heisenberg Aff. Ex. B § 35.1.[10]

Here, Opsys *is* a party to the 2002 Transaction Agreement, and so by its terms is outside of the scope of Paragraph 35.1. Under CPLR 5225(b) and 5227, Sunnyside could not gain greater rights than had Opsys. Instead, Opsys' shareholders – which are represented by OML under the Escrow Agreement – are the clear intended beneficiaries of Paragraph 35.1. This is confirmed in the Amended Settlement Agreement (Heisenberg Aff. Ex. C), to which OML is a party, which provides for and attaches the Escrow Agreement.

Moreover, as discussed above, the parties expressly denied creditors any rights under the Escrow Agreement; this specific treatment of non-party rights controls over any inconsistency in the more general and prior transaction agreements. *See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.* 717 F.2d 664, 670 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

At most, Opsys would be an incidental beneficiary of the Escrow Agreement, as CDT Inc. *could* in its discretion use the Escrow Assets to compromise claims against Opsys. Because an incidental beneficiary has no rights under the Escrow Agreement, Sunnyside has no ability to obtain turnover of the Escrow Assets. *See Fourth Ocean Putnam Corp.*, 66 N.Y.2d at 44, 485 N.E.2d at 211-12, 495 N.Y.S.2d at 4-5 (finding plaintiff was merely an "incidental" beneficiary without rights under contract, even though work performed under contract satisfied plaintiff's obligation; work was intended to remedy plaintiff's default, and not to benefit plaintiff); *United Int'l Holdings*, 988 F. Supp. at 371 (finding creditor was not intended beneficiary of swap

---

[10] OML was not a party to the 2002 Transaction Agreement, and Section 35.1 was not amended in the 2004 Amended Settlement Agreement. Heisenberg Aff. Ex. C.

agreement between subsidiary of debtor and third party bank where there was no evidence that the subsidiary/promisee intended to benefit creditor, even assuming that the bank/promisor did).

> 2.  Any Right of Opsys to Have its Creditors Paid From the Escrow
>     Assets Is Outside of the Reach of CPLR 5225(b) and 5227

Even if Opsys had rights under the Escrow Agreement to have its creditors paid from the Escrow Assets (Mem. in Supp. of Pet. at 9, 10) – which it does not – the Petition must nonetheless be dismissed because CPLR 5225(b) and 5227 do not reach inchoate or unvested contractual rights to property. *See Sochor v. IBM Corp.*, 60 N.Y.2d 254, 260 & n.7, 457 N.E.2d 696, 699, 469 N.Y.S.2d 591, 594 (1983) (CPLR 5225(b) and 5227 do not reach proceeds of retirement plan where conditions required to result in distribution under the plan have not occurred and may never occur).  An unidentified creditor of Opsys could receive a distribution of the Escrow Assets only from CDT Inc. or—if CDT Inc. had not already claimed the entirety of the escrow—from OML, if they determined at their discretion to pay such a claim after receiving the distribution from BNY. *See* Escrow Agreement §§ 4(e), 5, 11.  Such an attenuated and speculative "interest" does not fall within CPLR Article 52.  For the same reason, Sunnyside cannot show that BNY as escrow agent "is or will become indebted to" Opsys under CPLR 5227. *See Sochor*, 60 N.Y.2d at 260 n.7, 457 N.E.2d at 699, 469 N.Y.S.2d at 594 ("there is no merit to the contention … that the husband's interest is reachable as a 'debt' under CPLR 5227 and 5201 (subd. [a]).").[11]

Sunnyside's argument that Opsys has a "vested interest" in the Escrow Assets being paid to its creditors because CDT Inc. issued Disbursement Notices asserting *CDT Inc.'s* right to indemnification based on Sunnyside's claim against Opsys (Pet. ¶¶ 15-20) does not follow.  Under Section 4(e) of the Escrow Agreement, CDT Inc.'s 2005 and 2007 Disbursement Notices directing

---

[11] Nor could Sunnyside bring its claim against BNY as "a transferee of money or other personal property from the judgment debtor" under CPLR 5225(b).  Sunnyside does not claim that Opsys transferred anything to BNY, nor could it, because CDT Inc., not Opsys, transferred the stock to BNY. *See Sochor*, 60 N.Y.2d at 260 n.7, 457 N.E.2d at 699, 469 N.Y.S.2d at 594 (holding that pension fund administrator could not be a "transferee" under CPLR 5225(b) because the judgment debtor never contributed to the fund).

payment to it, as well as OML's concession that it has no interest in or claim to the Escrow Assets (Davis Decl. Exs. 2, 4, 6), ensure that Opsys has no claim to the Escrow Assets.

## B. CDT Inc. Has the Superior Claim to the Escrow Assets

Because OML has disclaimed any interest in the Escrow Assets, CDT Inc. now has exclusive rights to the Escrow Assets. Furthermore, CDT Inc.'s rights were secured by the Escrow Agreement long before the date of the Judgment and trump any competing claimant. As the California Court stated in rejecting Sunnyside's assertion that CDT Inc. improperly "invaded" the escrow to finance its defense of that litigation (Heisenberg Aff. Ex. E at 10-11), the purpose of the escrow is "to indemnify CDT Inc. for undisclosed and contingent liabilities" of Opsys (*id.* at 6, citing Escrow Agreement § 4(e)). Sunnyside admits that CDT Inc. claimed the entirety of the escrow long before entry of the Judgment against Opsys (*see* Pet. ¶ 16), and cites no authority in support of its conclusory assertions that CDT Inc.'s claim to the Assets is "not ripe." OML's Contest Notices delaying payment "until such time as the true cost of the claim can be established" (Davis Decl. Ex. 3, 5, 8) did not alter CDT Inc.'s contractual right to the Escrow Assets or provide for any scenario where the assets would be disbursed by BNY to a non-party. *See, e.g., Beauvais*, 942 F.2d at 841 (bank's pre-existing contractual right to funds held in judgment debtor's account would have priority lien over judgment creditor's claim to the account under CPLR 5225(b)).

Sunnyside's insistence that its May 29, 2007 Judgment was "first in time" and should be satisfied before CDT Inc.'s claims (Mem. in Supp. of Pet. at 13) is not supported by the factual chronology and also is contradicted expressly by the Escrow Agreement (*see* Section 2, which precludes any creditor from preempting CDT Inc.'s rights to the Escrow Assets, and Section 13, which requires *any* disbursement to be made first to CDT Inc. or OML). The Judgment, the Petition and the Restraining Notice create no lien on the Escrow Assets in favor of Opsys or Sunnyside or otherwise give Sunnyside's claim priority over CDT Inc.'s contractual right to the

19

Escrow Assets. *See Siegel, New York Practice* § 508, at 862, § 510, at 869, § 518, at 879; CPLR

5202(b), 5234(c).

## II.     SUNNYSIDE IS COLLATERALLY ESTOPPED FROM RE-LITIGATING THE CALIFORNIA COURT'S RULING THAT THE PURPOSE OF THE ESCROW ACCOUNT IS TO INDEMNIFY CDT INC.

Sunnyside has it exactly wrong when it claims that the California Court held that "the

liabilities [sic] Opsys Limited are to be satisfied out of the escrowed amounts." Pet. ¶ 2. To the

contrary, the California Court found that the purpose of the escrow account was to indemnify

CDT, Inc. Sunnyside is collaterally estopped from asserting otherwise.

The California Court discussed the escrow account in only two places. In its factual

background discussion, the court found that, as part of the 2004 transaction, "it was agreed that a

portion of the CDT, Inc. stock offered in exchange for the Opsys Limited stock would *indemnify*

*CDT, Inc.* for undisclosed or contingent liabilities." Cal. Mem. & Order at 6 (Heisenberg Aff.

Ex. E) (construing Escrow Agreement § 4(e)). In the next paragraph (*id.*), the court stated:

> As part of the 2004 transaction, 133,938 shares of CDT, Inc. stock valued at a
> total of $1,607,256 were held back to cover known and identified liabilities.
> Bunzel Dec., Exh. D at 6 (clause 1.1(g)); Black Dec. ¶ 27. The list of identified
> liabilities did not include the lease. Bunzel Dec., Exh. D at 20–21. Additionally,
> 422,610 shares of CDT, Inc. stock, valued at $5,071,320 went into escrow as
> security for contingent and unidentified liabilities. Black Dec. ¶ 28, Exh. D at 9–
> 10 clause 1.1(h). The remaining CDT, Inc. shares constituting the payment for
> the put option were distributed to Opsys management to be distributed between
> management and shareholders. Black Dec. ¶ 29, Exh. B. CDT, Inc. claims that
> no shares have yet been distributed to shareholders, and will not be until other
> creditors are paid off.

The court went on to reject Sunnyside's contention that CDT Inc. assumed Opsys' liability

on the lease with Sunnyside when it acquired Opsys' stock, stating:

> In support of this claim [that the lease was a contingent liability assumed by CDT
> Inc.], plaintiff asserts that CDT, Inc. has "invaded" the shares in escrow to finance
> this litigation. Bunzel Dec. ¶ 11; Exh. G at 17–18 of 59. However, the passage of
> the SEC filing that plaintiff cites in support of this position states only that the
> shares in escrow would be forfeited to cover any loss or other costs *that may*

20

*incur to CDT, Inc.* as a result of the claim. There is nothing to suggest that CDT, Inc. "invaded" the escrow to "finance" this litigation. *Rather, the escrow shares were being used to cover a contingency as originally envisioned.* The fact that CDT, Inc. may have incurred some costs or losses as a result of a lawsuit involving one of its subsidiaries does not amount to an assumption of the subsidiary's liability. *In any case, the contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc.,* as indicated by the fact that CDT, Inc. withheld consideration owed to Opsys Limited in order to satisfy the contingencies. Plaintiffs [sic] have therefore failed to show that CDT, Inc. expressly or impliedly assumed the liabilities associated with this litigation.

*Id.* at 10-11 (emphasis added). The court said nothing further about the escrow account.

These passages make three points clear: (1) the Escrow Assets exist to indemnify CDT Inc.; (2) CDT Inc. has the right to withdraw assets from the escrow to cover costs incurred as a result of claims against Opsys, notwithstanding Sunnyside's claim of a right to the assets; and (3) Opsys is responsible for its own liabilities, including Sunnyside's claim, not CDT Inc.

These points also contradict Sunnyside's revisionist claims. The California Court did not hold that claimants such as Sunnyside are entitled to payment out of the escrow, or that CDT Inc. was required to satisfy claims against Opsys over its own costs incurred defending such claims.[12] To the contrary, it found that the shares in escrow would be forfeited "to cover any loss or other costs *that may incur to CDT, Inc.*" *Id.* at 10-11. OML has conceded as such, informing Judge Stone on October 12, 2007, that it has "relinquished any claim to the Assets under the Escrow Agreement." Davis Decl. Ex. 7.

The California Court did not base its ruling, as Sunnyside suggests, on any finding that either Opsys or Sunnyside had rights in the escrow funds. *See* Mem. in Supp. of Pet. at 7. To the contrary, the California Court specifically ruled that "contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc." Cal. Mem. & Order at 11. And it found that the purpose of the escrow was to indemnify CDT Inc. *Id.* at 6. Sunnyside's attempt to seize the

---

[12] Indeed, the Escrow Agreement provides that CDT Inc. "shall have the right (but not the obligation)" to submit disbursement requests to the escrow agent. Escrow Agreement § 4(e).

escrow funds, to which CDT Inc. is clearly entitled, is nothing more than an attempt to circumvent the California Court's ruling.

CDT Inc. and Sunnyside do agree on one point: "Opsys Limiteds [sic] ability to satisfy the Judgment out of the escrowed shares already has been resolved by the United States District Court for the Northern District of California." Mem. in Supp. of Pet. at 1. Under New York law, "an issue may not be relitigated if the identical issue was necessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." *Hickerson v. City of New York,* 146 F.3d 99, 104 (2d Cir. 1998); *accord Van Emrik v. Chemung County Dep't of Soc. Servs.*, 191 A.D.2d 143, 146, 600 N.Y.S.2d 157, 159 (1993). Here, the California Court held explicitly that the escrow "would indemnify CDT, Inc. for undisclosed or contingent liabilities" and rejected Sunnyside's claim that CDT Inc. was improperly drawing from the escrow account to reimburse its litigation expenses (Cal. Mem. & Order at 6, 10-11 (Heisenberg Aff. Ex. E)) – holdings that were necessary to its ruling that CDT Inc. is not responsible for, or a party to, the Judgment. Sunnyside is collaterally estopped from re-litigating this issue. *See, e.g., Sassower v. Abrams*, 833 F. Supp. 253, 265 (S.D.N.Y. 1993) (dismissing claims of misconduct against judicial officers and government officials based on collateral estoppel arising from other courts' rulings dismissing complaints asserting similar claims of misconduct against these officers).

## III.   CDT INC. IS NOT JUDICIALLY ESTOPPED FROM ASSERTING ITS RIGHT TO THE ESCROW ASSETS

Under New York law, "[a] party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.

1996). Only a "clear inconsistency between [the party's] present and former positions" will result in estoppel. *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2d Cir. 2000) (internal quotation and citation omitted); *see U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 92 (S.D.N.Y. 1999) (rejecting estoppel claim where claimed contrary position was not clearly inconsistent and, in any event, one of law, and not of fact). Sunnyside cannot meet these requirements.

Sunnyside's claim that CDT Inc. changed its position as to the escrow account has no support in the record. Contrary to Sunnyside's claims (*see* Mem. in Supp. of Pet. at 11), CDT Inc. never represented to the California Court that Opsys or its creditors could make direct claims against the escrow account to the detriment of CDT Inc. By noting that the escrow had been created as "security" (a word used in the Escrow Agreement) and to deal with creditors' claims, CDT Inc. never suggested that creditors had enforceable rights to access Escrow Assets.

The Escrow Agreement is a legal document, the full text of which the California Court had before it, and to which it rendered a legal interpretation. CDT Inc.'s alleged inconsistent statements as to the proper interpretation of the Escrow Agreement are not statements of fact, and so not subject to estoppel.

The statements of counsel are obviously argument. Most of the statements attributed to Mr. Black (Pet. at 4) are not about the escrow but about the shares issued directly to OML that were held in trust pursuant to the Deferred Consideration Agreement for the protection of Opsys' creditors and debt-holders. In contrast, the purpose of the shares placed in escrow under the Escrow Agreement was to indemnify CDT Inc., which, at its option, could use the shares to pay for litigation costs or to settle with Opsys' creditors. *See* Escrow Agreement § 4(e); *see also* Cal. Mem. & Order at 6. Where Mr. Black did generally discuss the escrow as "cover[ing] ... unidentified contingent liabilities [among other claims]" (Black Decl. ¶ 28), he never stated that

Opsys or its creditors had the right to payment from the escrow; certainly, he never stated that "the escrow was intended to benefit Opsys' creditors, such as Plaintiff's claim." Pet. at 4.

Sunnyside also relies on statements made by *Opsys* in opposing Sunnyside's motion to add CDT Inc. to the Judgment. Mem. in Supp. of Pet. 4.[13] CDT Inc., however, cannot be estopped by a statement that it did not make. As the California Court recognized, Opsys, which is not a party to this proceeding, is a different entity than CDT Inc. and had separate counsel in California. Furthermore, Opsys never said in its opposition that it had any right to the escrow account or that it was the intended beneficiary of the escrow account.

According to Sunnyside, "respondents … represented to the United States District Court for the Northern District of California that the escrow account was 'really where the plaintiff ought to be looking' to satisfy the judgment." Heisenberg Aff. ¶ 3; *see also* Mem. in Supp. of Pet. 2-3. In fact, at the hearing before the California Court, CDT Inc.'s counsel was referring to shares held directly by OML, not the Escrow, when he stated, "It's sitting in sort of escrow, sort of quasi escrow, basically sitting there because of creditor claims and the like, not been distributed to the former shareholders of Opsys Limited. I think, that's *really where the plaintiff ought to be looking* and that [sic: not] what they're attempting to do here." Tr. at 57 (emphasis added) (Heisenberg Aff. Ex. K). The "sort of quasi escrow" to which counsel referred was the OML shares, which are subject to the Deferred Consideration Agreement and will be paid to Opsys' former shareholders only if certain creditors and debt holders of Opsys are first paid in full. Those shares are not escrowed with BNY and are not the subject of this proceeding.

---

[13] In addition, the quotation on page 5 of Sunnyside's Turnover Petition is not from CDT Inc.'s opposition, as Sunnyside claims, but from Opsys' opposition. *See* Opsys Opp. Mem. at 5 (Heisenberg Aff. Ex. F).

## CONCLUSION

For the foregoing reasons, Respondent CDT Inc. respectfully requests that this Court enter an order pursuant to Rule 12(b)(1) and 12(b)(6) denying the Turnover Petition, dismissing this proceeding and vacating the Restraining Notice.

Dated:  New York, New York
         October 25, 2007

                      Respectfully submitted,

                      PILLSBURY WINTHROP SHAW PITTMAN LLP

              By: _____

                      Maria T. Galeno, Esq.
                      John E. Davis, Esq.
                      1540 Broadway
                      New York, New York  10036
                      Telephone: (212) 858-1000
                      Facsimile: (212) 858-1500

                      *Attorneys for Respondent*
                      *Cambridge Display Technology, Inc.*

OF COUNSEL:

Bruce A. Ericson, Esq.
Alice K. M. Hayashi, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

500180820v1