1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON #76342
2   ALICE KWONG MA HAYASHI #178522
    ELIANA P. KAIMOWITZ RODRIGUEZ #256712
3   50 Fremont Street
    Post Office Box 7880
4   San Francisco, CA  94120-7880
    Telephone:  (415) 983-1000
5   Facsimile:  (415) 983-1200
    bruce.ericson@pillsburylaw.com
6   alice.hayashi@pillsburylaw.com
    eliana.kaimowitz@pillsburylaw.com
7
    Attorneys for Defendants
8   CAMBRIDGE DISPLAY TECHNOLOGY LIMITED
    and CDT OXFORD LIMITED
9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15   SUNNYSIDE DEVELOPMENT              No. C-08-1780-MHP
     COMPANY LLC,
16                                      **REQUEST FOR JUDICIAL NOTICE**
                         Plaintiff,     **IN SUPPORT OF DEFENDANT**
17                                      **CAMBRIDGE DISPLAY**
           vs.                          **TECHNOLOGY LIMITED'S**
18                                      **MOTION TO STAY CASE**
     CAMBRIDGE DISPLAY TECHNOLOGY       **PENDING APPEAL**
19   LIMITED, CDT OXFORD LIMITED,
     OPSYS LIMITED, and JOHN DOES I     Date:    September 8, 2008
20   through V,                         Time:    2:00 pm
                                        Courtroom 15, 18th Floor
21                       Defendants.    Hon. Marilyn Hall Patel

22

23

24

25

26

27

28

1    Defendant **CAMBRIDGE DISPLAY TECHNOLOGY LIMITED** ("CDT Ltd.")

2  makes this request for judicial notice in support of its motion to stay case pending appeal

3  (Dkt. 30; filed July 28, 2008) and its reply memorandum in support of the motion (filed

4  herewith).  Pursuant to Rule 201 of the Federal Rules of Evidence, CDT Ltd. respectfully

5  requests that the Court take judicial notice of the documents attached hereto as Exhibits A

6  through C.  Exhibits A through C are the briefs that have been filed with the Court of

7  Appeals in *Sunnyside Development Co. v. Opsys Ltd.,* No. 07-16773 (9th Cir.).  Judicial

8  notice may be taken of pleadings filed and orders rendered in other courts.  *See, e.g.,*

9  *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank,* 136 F.3d 1360, 1364 (9th

10  Cir. 1998).

11

| Exhibit | Document |
|---------|----------|
| A | Principal Brief of Appellant Sunnyside Development Company (filed March 13, 2008) |
| B | Brief for Appellee Cambridge Display Technology, Inc. (filed April 14, 2008) |
| C | Reply Brief of Appellant Sunnyside Development Company (filed Apr. 29, 2008) |

18    Dated:  August 25, 2008.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON
ALICE KWONG MA HAYASHI
ELIANA P. KAIMOWITZ RODRIGUEZ
50 Fremont Street
Post Office Box 7880
San Francisco, CA  94120-7880


By _____/s/ Alice Kwong Ma Hayashi_____
        Alice Kwong Ma Hayashi
   Attorneys for Defendants
   CAMBRIDGE DISPLAY TECHNOLOGY
   LIMITED and CDT OXFORD LIMITED

# EXHIBIT A

APPEAL No. 07-16773

# United States Court of Appeals
# For The Ninth Circuit

SUNNYSIDE DEVELOPMENT COMPANY LLC,

*Plaintiff/Appellant,*

—against—

OPSYS LIMITED,

*Defendant/Appellee.*

Appeal from the United States District Court for the Northern District of
California, Judge Marilyn Hall Patel, District Judge, Presiding

## PRINCIPAL BRIEF OF APPELLANT
## SUNNYSIDE DEVELOPMENT COMPANY

TRAIGER & HINCKLEY LLP
Christoph C. Heisenberg, Esq.
880 Third Avenue
New York, New York 10022
(212) 752-1161

Attorneys for Appellant Sunnyside
Development Company LLP

# TABLE OF CONTENTS

Page

I.   DISCLOSURE STATEMENT ................................................................. 1

II.  JURISDICTIONAL STATEMENT ......................................................... 1

III. ISSUES PRESENTED ........................................................................... 1

IV.  SUMMARY OF ARGUMENT ............................................................... 2

V.   STATEMENT OF FACTS ...................................................................... 6

   A.   Opsys Limited's 2002 Transfer Of Assets To CDT ........................ 7

        1.   CDT's Financial Statements Showing A "Fair Value" Of
             $26.9 Million For Opsys UK ................................................. 8

   B.   CDT's 2004 Acquisition Of Opsys Limited ................................... 9

   C.   Opsys Limited's 2005 Transfer Of Opsys UK To CDT For No
        Consideration ................................................................................ 9

   D.   The Post-Trial Supplemental Proceedings ................................... 10

        1.   CDT's Acknowledgement Of The $26 Million Fair Value ... 11

        2.   CDT's "Extravagant Mischaracterization" To The
             Court About The 2004 Transactions .................................... 12

        3.   Sunnyside's Request For A Hearing In Which To Confront
             CDT's Witnesses ................................................................. 13

        4.   The Court's Order Denying Relief ....................................... 14

             a.   The Court's Evaluation Of The 2002 Transaction ...... 14

             b.   The Court's Evaluation Of The 2004 Transaction ...... 15

             c.   The Court's Evaluation Of The 2005 Transaction ...... 16

# TABLE OF CONTENTS

Page

ARGUMENT

I.    THE DISTRICT COURT ERRED BY RESOLVING THE RULE 25
      AND RULE 69 RELIEF WITHOUT CONDUCTING A HEARING
      ON THE DISPUTED FACTS.................................................................. 16

      A.    The Court Committed Error By Resolving Disputed Facts
            Without Conducting An Evidentiary Hearing. ............................... 17

      B.    The Court Committed Error In Denying Sunnyside
            Its Rule 69(a) Rights. ..................................................................... 18

      C.    The Court Erred By Denying Sunnyside
            Its Rule 69(b) Right To Discovery ................................................. 20

II.   THE COURT'S ERRONEOUS FACTUAL FINDINGS REQUIRE
      REVERSAL. ....................................................................................... 21

      A.    The Court's Acceptance Of CDT's Assertions
            Of Good Faith Was Erroneous ....................................................... 22

      B.    The Court's Analysis Of "Adequate Consideration"
            Was Erroneous................................................................................ 23

            1.    The Court Erred By Using Superceded "Historic Cost"
                  Rather Than "Fair Value" ..................................................... 23

            2.    The Court Committed Error By Evaluating What
                  CDT Paid, Not What Opsys Received.................................... 25

            3.    The Court Erred In Failing To Address Opsys Limited's
                  2005 Fraudulent Conveyance To CDT.................................. 27

III.  SUNNYSIDE ESTABLISHED THE BASIS FOR
      SUCCESSOR LIABILITY UNDER CALIFORNIA LAW. .................... 28

CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

<u>Page</u>

*Carnes v. Zamani*, 488 F.3d 1057 (9th Cir. 2007) ................................................. 19

*Dary v. Gilbert*, 2002 Cal. App. Unpub. LEXIS 8043 (Cal.App. Dist.1 2002) ... 25

*Filip v. Bucurenciu*, 129 Cal.App.4th 825 (2005) ................................................ 22

*Garrett v. City & County of San Francisco*, 818 F.2d 1515 (9th Cir. 1987) ....... 20

*In re Lucas Dallas, Inc.*, 185 B.R. 801 (B.A.P. 9th Cir. 1995) ........................ 6, 26

*In re Acushnet River & New Bedford Harbor*,
712 F. Supp. 1010 (D.Mass 1989) .................................................................... 29

*Katzier's Floor and Home Design, Inc. v. M-MLS.com*,
394 F.3d 1143 (9th Cir. 2004) ..................................................................... 29, 30

*Kline v. Johns-Manville*, 745 F.2d 1217 n.3 (9th Cir. 1984) .............................. 30

*Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30 (2d Cir. 1996) ...... 24

*Lippi v. City Bank*, 955 F.2d 599 (9th Cir. 1992) ......................................... 22, 29

*Luxliner P.L. Exp. Co. v. RDI/Luxliner, Inc.*,
13 F.3d 69 (3d Cir. 1993) .............................................................. 16, 17, 18, 21

*Mellon Bank v. Metro Communications, Inc. (In re Metro Communications, Inc.)*,
945 F.2d 635 (3rd Cir. 1991); cert. denied, 503 U.S. 937 (1992) ..................... 25

*Marquis Products, Inc. v. Conquest Mills, Inc. (In re Marquis Products, Inc.)*,
150 B.R. 487 (Bankr. D. Me. 1993) .................................................................. 27

*Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.*,
621 F.Supp. 198 (S.D.N.Y. 1985) .................................................................... 24

*Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental
Agency, Inc.)*, 174 B.R. 557 (Bankr. N.D. Cal. 1994) ..................................... 26

# TABLE OF AUTHORITIES

<u>Page</u>

*Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ................................................... 19

*Poller v. CBS, Inc.*, 368 U.S. 464, 464, 473 (1962) ............................................ 17

*Potlatch Corp. v. Superior Court*, 154 Cal. App. 3d 1144 (1984) ............... 28, 29

*Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) ................. 20

*Ray v. Alad Corp.*, 19 Cal.3d 22, 29 (1977) ................................................. 3, 6, 28

*Sunnyside Development Company LLC v. Bank of New York*,
2008 U.S. Dist. LEXIS 11800 (S.D.N.Y. Feb. 15, 2008) ............................... 4, 13

*Sierra Steel, Inc. v. Totten Tubes, Inc. (in re Sierra Steel, Inc.)*,
96 B.R. 275 (B.A.P. 9th Cir. 1989) ..................................................................... 24

*United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986),
cert. denied, 483 U.S. 1005 (1987), .................................................................... 22

*Wyzard v. Goller*, 23 Cal.App.4th 1183, 1191 (1994) ....................................... 23

## <u>Other Sources</u>

Fed. R. Civ. Pro. 12(b)(6) .................................................................................. 19

Fed. R. Civ. Pro. 56(c) .................................................................................... 2, 19

Fed. R. Civ. Pro. 69 .................................................................................... passim

Fed. R. Civ. Pro. 69, *Notes of Advisory Committee* ........................................ 20

Cal. Civ. Code § 708.210 ................................................................................. 19

Cal. Civ. Code § 720.310 ................................................................................. 19

Cal. Civ. Code § 3439.04(b) ............................................................................. 21

Cal. Civ. Code § 3439.05 ...................................................................... 21, 23, 26

## I.    DISCLOSURE STATEMENT

Appellant Sunnyside Development Company, LLC  ("Sunnyside") certifies that it has no corporate parents, affiliates and/or subsidiaries that are held publicly.

## II.    JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. §1332(a) based upon plaintiff's California citizenship and defendant's United Kingdom citizenship.

This Court has jurisdiction over Sunnyside's Appeal as the August 29, 2007 Memorandum and Order ("Mem. & Order") from which appeal is taken was a final order denying Post-Judgment relief.  The Notice of Appeal was filed on September 26, 2007. (Clerk's Record Tab 228 ("CR __")(Excepts of Record at p.1 ("ER-_")]

## III.    ISSUES PRESENTED

**A.**    Did The Court Commit Error By Dismissing Sunnyside's Request For Post-Judgment Relief On Affidavits, Without Affording Discovery, An Evidentiary Hearing, And The Ability To Examine Opposing Witnesses?

**B.**    Did The Court Err In Making Factual Findings On Conflicting Evidence?

   **1.**    Could The Court Disregard CDT's Financial Statements Showing Opsys UK Had A "Fair Value" Of $26.9 Million?

**C.**    Did The Court Commit Legal Error In Measuring The Adequacy Of Consideration By What CDT Paid, Rather Than By The $5 Million That Opsys Limited Received?

**D.**    Did The Court Commit Error By Refusing To Impose Successor Liability Against CDT?

1

## IV.  SUMMARY OF ARGUMENT

Appellant Sunnyside obtained a $4.9 million judgment against Opsys Limited in the underlying action, which remains unpaid.  This appeal involves an order by the United States District Court for the Northern District of California (Patel, C.J.) denying post-judgment relief against Cambridge Display Technology, Inc. ("CDT"), based on its acquisition of Opsys Limited's assets.  These assets were valued by CDT at more than $26 million, but Opsys Limited itself received only $5 million in the transaction.  In the post-trial motion, Sunnyside sought to impose successor liability upon CDT.  In the alternative, Sunnyside sought to "add a claim for fraudulent conveyance of the assets of Opsys Limited to [CDT] and to CDT Oxford Limited." [CR 179 at pp. 9, 31].

As explained herein, the District Court's summary dismissal of those claims, without allowing discovery or an evidentiary hearing on disputed facts, was clear error.  As the District Court acknowledged (Mem. & Order at 9), due process required that it apply a standard akin to that governing Rule 56 of the Federal Rules of Civil Procedure: granting relief prior to a hearing only if there was no genuine dispute about the facts.  However, after reciting that standard, the Court proceeded to resolve disputed facts.  It did so by refusing to acknowledge disputes, brushing off any analysis about the most-critical fact – the adequacy of consideration – with the statement that it was "undisputed" (*id.* at 16), or that "plaintiff makes no argument

2

that the payment . . . was objectively inadequate" (*id.* at 14). That was incorrect, as the lack of adequate consideration was **the** central dispute before the Court. *See, e.g.,* Tr. of Proceedings, May 16, 2007 [CR 218 at p.63; ER-26] ("So they put $2 million to liability satisfaction . . . and obtained assets that they valued at between 19 and $26 million and I don't think that's adequate consideration."). Without even addressing that contention, the Court then adopted a book value that even CDT had not proffered. Sunnyside requests that the Court vacate the erroneous findings, leaving Sunnyside free to pursue fraudulent conveyance claims, and impose successor liability upon CDT under the principles set forth in *Ray v. Alad Corp.*, 19 Cal.3d 22, 29 (1977).

The facts acknowledged by CDT established the basis for Sunnyside's post-judgment relief. Opsys Limited was an emerging high-tech company possessing valuable intellectual property rights (the "Opsys IP") in the field of flat panel screen technology. After entering into the Sunnyside lease in 2001, Opsys Limited transferred its assets (principally the Opsys IP) to CDT, which is now using that IP. The transfer was fraudulent, as it was made to avoid Sunnyside's claims, and also because Opsys Limited did not receive "adequate consideration." To show that inadequate consideration, Sunnyside presented CDT's own public audited financial statements placing a "fair value" of $26.9 million on the assets transferred by Opsys Limited. Opsys Limited received only $5 million in return.

3

Based upon those facts, not disputed by CDT, Sunnyside urged that the record suffced to establish successor liability. However, if the record was found not to be adequate to provide relief, Sunnyside requested that "prompt discovery and an evidentiary hearing pursuant to Rules 69(a) and 25(c) should be ordered with leave to file a fraudulent conveyance claim." [CR 179 at p.23].

CDT responded to the motion with factual contentions that subsequently were determined to have been an "extravagant mischaracterization." *Sunnyside Development Company LLC v. Bank of New York*, 2008 U.S. Dist. LEXIS 11800 (S.D.N.Y. Feb. 15, 2008)(Stanton, J). Sunnyside, however, could not contest those mischaracterizations, as Sunnyside was not even provided an opportunity to reply. As Sunnyside's counsel expressed at oral argument, "we haven't had a chance to respond to, factually or legally [to defendant's pleadings] . . . And it struck me that in order to really understand everything here we need to have some discovery against all of those CDT entities and get the documents related to where are the assets [sic]." Tr. at 51 [CR 218; ER-22].

On August 29, 2007 the District Court resolved the motion. The Court refused to impose Rule 25(c) successor liability on CDT. However, it went further, appearing to have denied Sunnyside's request to file a fraudulent conveyance claim, stating that "[a]t the very least, adding CDT, Inc. at this point would require discovery and additional evidentiary proceedings. In light of the weakness of

4

plaintiff's arguments, however, and the undisputed facts in the record, the Court

holds as a matter of law that CDT, Inc. is not a proper defendant in this action."[1]

Mem. & Order at 16, 17.  The assertion of "undisputed facts" is inexplicable, and

can be explained by nothing other than a misunderstanding of the claims and

evidence before the court – a byproduct of not having a pleading against which to

measure the dismissal.

Beyond the Court's due process errors, the Order contains three specific errors

that independently require reversal.  First, in assessing the value of the assets that

Opsys transferred, the District Court resolved a disputed issue, in the process

ignoring CDT's own financial statements that placed a "fair value" of $26.9 million

on the Opsys assets at the time of the acquisition. [ER-35].  Although the Court

made no finding about the value, its decision suggested a value of £2 million ($3

million), which was (1) book value, not fair value, and (2) not from the relevant date.

Second, in considering the adequacy of the consideration, the District Court

repeatedly mis-phrased the test as whether "the acquiring party pays inadequate

consideration." Mem. & Order at 16-17. See also id. at 15 ("Because CDT, Inc. paid

consideration which was adequate in light of the assets it received...")  This Court

---

[1]    The District Court's decision did not expressly address Sunnyside's request
for leave to file a fraudulent conveyance claim.  Nonetheless, for the avoidance of
doubt, this appeal will treat the Order as if it dismissed Sunnyside's Rule 69
fraudulent conveyance claims against CDT, Inc.

previously has held that that is not the proper test: "The question is not . . . whether the [] defendants gave reasonably equivalent value; it is whether the debtor received reasonably equivalent value." *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995). Using that erroneous test in determining the adequacy of consideration, the Court wrongly considered CDT's payments to parties other than Opsys, most notably the $11 million paid in 2004.

Third, in considering adequate consideration, the District Court completely failed to address the inadequate consideration involved in the 2005 transfer by Opsys of its 84% stake in Opsys UK for no consideration. Considering that CDT paid $2.5 million for the initial 16% stake, there was clearly value in the 84% remainder.

In the end, two facts are not subject to any dispute: (1) Opsys Limited transferred 100% of its assets, with a fair value of $26.9 million, and (2) in return Opsys itself received an aggregate of only $5 million (notwithstanding CDT's other payments to Opsys's shareholders to facilitate the transaction). Those facts establish the basis for fraudulent conveyance claims and successor liability under *Ray v. Alad Corp.*, 19 Cal.3d 22, 29 (1977). Even if not deemed conclusive proof of fair value, CDT's own $26.9 million valuation created an issue of fact requiring discovery, an ability to confront opposing witnesses, and ultimately a hearing.

## V.    STATEMENT OF FACTS

Opsys Limited is a United Kingdom company engaged principally in the

6

business of developing technology for flat panel displays. Through that work, Opsys possessed a valuable portfolio of intellectual property: scientists and know-how that resulted in the issuance of 25 patents. [CR 185-5]. In 2001, Opsys Limited and Sunnyside entered into a six-year, $6 million Commercial Lease with Sunnyside.

## A.    Opsys Limited's 2002 Transfer Of Assets To CDT

In 2002, as part of its IP expansion strategy, CDT approached Opsys Limited with a proposal to acquire control of Opsys's IP. As explained in CDT's Financial Statements, the transaction was structured in a manner to convey Opsys's assets to CDT – and thus place them beyond the reach of creditors:

> The terms of the Transaction Agreement were entered into by [CDT] so that it could gain control of and economic interest in the UK assets and operations of Opsys (which had been transferred to Opsys UK immediately prior to the transaction) in such a manner to avoid acquiring any interest in any other assets or liabilities of Opsys.

CDT, Inc.'s 2004 Form 10-K [CR-180-2] [ER-36] (emphasis added). To do so, CDT devised a two-step transaction by which Opsys transferred control of the IP assets to CDT. As a first step, Opsys Limited transferred its IP assets to a new subsidiary, Opsys UK Ltd. ("Opsys UK"). As a second, simultaneous, step CDT Ltd. paid Opsys UK $2 million for a license of the Opsys IP, and the right to 98% of its profits. Finally, Opsys sold to CDT a 16% stake in Opsys UK in return for $2.5 million, and CDT paid Opsys $500,000 in return for an option for CDT to purchase the remaining 84% of Opsys UK. In 2005, Opsys Limited transferred to CDT Ltd.

the remaining 84% for no consideration. Thus, by virtue of these transactions, CDT obtained 100% ownership of Opsys UK (and its Opsys IP) while Opsys Limited received $5 million.

### 1.    CDT's Financial Statements Showing A "Fair Value" Of $26.9 Million For Opsys UK

Having determined that Opsys received $5 million in return for transferring CDT Oxford (formerly Opsys UK) to CDT, the District Court had to determine the "fair value" of those assets. The only evidence in the record concerning that fair value showed that they were worth more than $26.9 million at the time of the 2002 transaction. This evidence came directly from CDT's audited financial statements:

> We have performed a valuation of CDT Oxford as of October 2002 in order to fairly allocate the assets and liabilities as if CDT Oxford had been acquired in a business combination and the fair value of CDT Oxford was the full price payable, . . .

CDT, Inc. 2006 Form 10-K [CR 184-2 at p.49; ER-38]. That valuation allocated the $26.9 million "fair value" of CDT Oxford at the time of the transfer as follows:

| | |
|---|---|
| Net assets at date of acquisition | $   602 |
| In-process research and development | 12,200 |
| Goodwill | 14,092 |

CDT, Inc. 2004 Form 10-K, at F-14 [CR 180-2; ER-35]. This evidence was affirmed by Sunnyside's expert, Mr. Paul Ainslie:

> Q.    ...what exactly is your opinion that you expect to render, which is described in opinion number 2?

A. That the fair value of Opsys Limited as of October
2002 was $26.8 million…

Ainslie Dep. at p.83 [CR 185-2; ER-39]. CDT's Chief Financial Officer, Michael

Black confirmed these numbers. Black Dec. ¶11(a) [CR 204; ER-27]. As Mr.

Ainslie explained, "these numbers reflect Cambridge's best determination of the

value of the transaction to Cambridge." Dec. of Paul Ainsle, filed April 2, 2007 ¶7

[CR 180; ER-32]. Coming from CDT's own documents, and confirmed by its

witness, this "fair value" could not be disregarded.

**B.     CDT's 2004 Acquisition Of Opsys Limited**

CDT began gearing up for its IPO at a time that it was apparent that the lease

assignment had failed, and that the $6 million lease liability to Sunnyside would

remain with Opsys Limited. In December 2004, CDT entered into a second

agreement, in which it agreed to purchase Opsys Limited's stock from its

shareholders, in return for approximately $11 million. Because this transaction was

structured as the acquisition of Opsys Limited's stock, CDT's payment went to

Opsys's shareholders, not Opsys.

**C.     Opsys Limited's 2005 Transfer Of Opsys UK To CDT For No
Consideration Whatsoever**

Following the 2004 transaction, Opsys Limited still retained ownership of the

remaining 84% share of Opsys UK. This stake had value, as CDT had paid $2.5

million for its initial 16% stake in Opsys UK, and CDT still maintained the value of

Opsys UK on its books at $19.7 million as of 2004 year-end. Ainslie Dec. ¶7 [CR

180; ER-32]. In May 2005, CDT caused Opsys Limited to transfer its remaining

84% stake to its affiliate, CDT Ltd. CDT provided Opsys Limited with **no**

consideration for that transfer, thereby depriving Opsys of its final asset. Black Dec.

¶36 [CR 204; ER-30].

### D.    The Post-Trial Supplemental Proceedings

By this scheme to strip Opsys Limited of its assets, Opsys Limited was

rendered judgment-proof, having transferred its 100% stake in Opsys UK (valued by

CDT at $26 million) in return for only $5 million. Accordingly, by the motion,

Sunnyside sought to amend the judgment pursuant to Rule 25(c) of the Federal Rules

of Civil Procedure to include CDT as a successor entity operating the assets.

Alternatively, Sunnyside invoked Rule 69 of the Federal Rules of Civil Procedure to

obtain discovery from CDT, and to add fraudulent conveyance claims against CDT

and CDT Oxford.

Without the benefit of any discovery from CDT, Sunnyside's motion relied

upon CDT's public filings. Sunnyside's expert, Mr. Ainslie, submitted a declaration

explaining the significance of CDT's financial statements, and that the $26.9 million

reflected CDT's own determination of "fair value." Ainslie Dec. ¶7 [CR 180; ER-

32]. He also explained that Opsys Limited received only $5 million in that transfer.

*Id.* ¶6. Therefore, he concluded that the transaction involved inadequate

consideration. *Id.* ¶ 11 ("my initial opinion is that the series of transactions were

either designed to or had the effect of impairing the interests of Opsys Limited

creditors including Sunnyside.") However, Mr. Ainslie also noted the need for

additional discovery to confirm his findings:

> I have not yet reviewed (since I understand Sunnyside does
> not have access) the actual contracts and records of
> Cambridge not attached to the SEC filings, and would
> expect to review them to complete an opinion as to
> whether Opsys Limited on behalf of its creditors received
> fair value for the transfers of (i) Opsys Limited assets to
> the control of Cambridge and (ii) CDT Oxford Limited and
> the assets to Cambridge.

*Id.* [CR 180; ER-33, 34].

Anticipating that CDT might dispute some evidence, Sunnyside demanded an

evidentiary hearing, and an opportunity to conduct discovery on the issues.

> we anticipate Cambridge will respond to this motion with a
> panoply of corporate <u>details, argument and data not
> previously seen or discovered by plaintiff</u>. No reply brief
> is envisioned per this Court's scheduling order .... If an
> evidentiary hearing is required, <u>plaintiff seeks leave under
> Rule 69(a) to conduct discovery related to the transfer of
> Opsys Limited assets</u> to Cambridge and CDT Oxford
> Limited.

Sunnyside's Memorandum In Support of Motion To Add CDT To Judgment, filed

April 2, 2007, at pp.30-31 [CR 179] (emphasis added). See also *id.* at p.31.

## 1.    CDT's Acknowledgement Of The $26 Million Fair Value

CDT responded to Sunnyside's motion by introducing testimony about the

transaction structure and the agreements, via declarations of its CEO, David Fyfe,

and its CFO, Mr. Black.  Relevant to this appeal, neither declaration disputed the

11

$26.9 fair value.  CDT also did not dispute the $5 million that Opsys received.

Instead, CDT relied upon arguments as to how to interpret those undisputed facts.

With respect to the $26.9 million fair value, Mr. Black did not challenge the

$12.8 million fair value for the real assets. Black Dec. ¶ 11(a).  He argued only that

the remaining $14 million in goodwill somehow was artificial, and noted that it

subsequently was adjusted. *id*.  However, Mr. Black's argument did not dispute that

CDT annually evaluated the goodwill for impairment, and only adjusted the value

down to **$19.7** million in 2004, which still would constitute a fraudulent conveyance.

*See* CDT, Inc. 2006 Annual Report, filed March 14, 2006. [CR 184-2; ER-38].

      **2.**     **CDT's "Extravagant Mischaracterization" To The Court About The 2004 Transactions**

In an attempt to disguise the fact that Opsys received only $5 million in these

transactions, CDT suggesting that Opsys somehow benefited from the $11 million it

paid to Opsys's shareholders in 2004:

- "most of the consideration paid to Opsys and its shareholders would be escrowed or <u>placed in trust for the protection of Opsys' creditors</u>, rather than simply be transferred outright to Opsys' shareholders."

Black Dec. ¶ 10 [ER-27]. See also *id*. at ¶24 ("the 2004 transaction was structured to

protect Opsys' creditors...") That argument was amplified by CDT's counsel during

oral argument of the motion:

      CDT's counsel:   <u>Most of it is still sitting there either in a formal escrow</u> or in something that is the equivalent of an escrow.

Judge Patel:       That can be used to satisfy any judgment in this
                   case?

CDT's Counsel:     ..the money is there, <u>its basically there for the sake of
                   creditors</u>.

Tr. at 56-57 [CR 218; ER-24, 25] (emphasis added).

Those representations proved to be absolutely false.  CDT recanted them when

Sunnyside filed a turnover proceeding in the United States District Court for the

Southern District of New York seeking to obtain payment from the escrow account.

In that proceeding, CDT took the position that creditors and Opsys itself had no

rights or interest in the escrow account.  *Sunnyside Dev. Co. LLC v. Bank of New

York, supra.*  The New York District Court examined CDT's statements to Judge

Patel and found them to be "an extravagant mischaracterization," (*Id.*, 2008 U.S.

Dist. LEXIS 11800 *7), and "mischaracterizations" (*id.* at *8).  It then ruled that

Opsys in fact had no enforceable contractual interest in the escrow fund. (*Id.*).

### 3.    Sunnyside's Request For A Hearing In Which To Confront CDT's Witnesses

Lacking a reply memorandum in which to rebut CDT's mischaracterizations,

Sunnyside's only ability to respond was during the May 16th argument on the

motion.  There, Sunnyside's counsel re-emphasized the need for discovery to

develop the facts:

> in terms of the pleadings that have been filed by the
> defendant, which <u>we haven't had a chance to respond to,</u>
> <u>factually or legally,</u> my reaction in reading it was reminded
> me of the three-card monte game, where are the assets,

13

under which shell of a CDT entity do they reside? <u>And it</u>
<u>struck me that in order to really understand everything here</u>
<u>we need to have some discovery</u> against all of those CDT
entities and get the documents related to where are the
assets

Tr. at 51 [ER-22]. That request was repeated throughout the hearing:

We may need discovery with respect to all of them. If their
position is that each one of these is an insulating layer and
has no assets, then that's a problem and I think we need to
address having all of them before the Court or at least for
purposes of discovery. ... Defendants are correct, that
obviously due process is implicated in a post-judgment or
post-verdict motion such as this and we brought up the
facts such as we know them . . .

*Id.* at 67-68.

### 4.    The Court's Order Denying Relief

On August 29, 2007 the District Court denied Sunnyside's motion, not only

denying Sunnyside the discovery that it sought, but also resolving the disputed facts.

With respect to successor liability, the Court determined that there was only one

relevant asset sale: the initial transfer of IP from Opsys to its subsidiary, Opsys UK.

The Court then made additional observations about the CDT/Opsys transactions.

### a.    The Court's Evaluation Of The 2002 Transaction

The District Court's decision hinged on two findings concerning the October

23, 2002 transfers. First, it noted that Opsys Limited received a total of $5 million in

cash. Second, it then compared this to the historic value of the Opsys IP, concluding

that it "exceeded the vale [sic] of the assets transferred to Opsys UK as set forth in

Opsys Limited's September 2002 Report and Financial Statements." Mem. & Order

14

at 4. However, the September 2002 financial statements did not purport to reflect "fair value." Instead, they were "prepared under the historical cost convention," (Opsys Sept. 2002 Financial Statements [CR 185-3 at OPS 07501; ER-42]), meaning that the IP assets were "stated at cost" *(id.* at 07502), *i.e.*, they showed only what Opsys had spent to develop the IP. Because of that lack of relevance, CDT had not even proffered this as reflecting the "fair value."

Moreover, the value in those Financial Statements was not event current. Under Generally Accepted Accounting Principles, the book value was adjusted to reflect the fair value upon acquisition. This led Mr. Ainslie to declare "[t]hat the fair value of Opsys Limited as of October 2002 was $26.8 million." [ER-40]. Indeed, Mr. Black acknowledged that the September 2002 value was adjusted at the October 2002 transaction date to reflect the new fair value, meaning that the $26.9 million was the "book value at the time of the transaction." Black Dec. ¶11(a) [ER-27].

The Court's opinion never referenced the $26.9 fair value. Instead, the Court deemed the assets' value to be "undisputed," adopting the irrelevant, and in any event, superceded value that neither party had ever proffered.

### b.    The Court's Evaluation Of The 2004 Transaction

With respect to the 2004 acquisition of Opsys Limited, the Court noted that "CDT, Inc. paid over $11 million worth of stock when it finally acquired Opsys Limited as a result of the settlement agreement." Mem. & Order at 14. The Court

then used that payment (not the amounts Opsys received) to justify its finding of adequate consideration. *Id.* at 15.

**c.**      **The Court's Evaluation Of The 2005 Transaction**

At no point did the District Court address the adequacy of the consideration in the May 2005 transfer to CDT of Opsys Limited's 84% stake in Opsys UK for no consideration. Rather, the Court simply adopted CDT's assertions of innocent intent (relevant only to an actual fraud) stating that "[t]hese facts do not support a finding of fraudulent transfer." *Id.* at 16.

***

Based on these findings, the Court concluded "[a] prerequisite for the various forms of fraudulent transfer is that the acquiring party pays inadequate consideration. Because plaintiff has failed to demonstrate this with respect to any of the transactions at issue, the fraudulent transfer exception does not apply." Mem. & Order at 16-17.

**ARGUMENT**

**I.**     <u>**THE DISTRICT COURT ERRED BY RESOLVING THE RULE 25 AND RULE 69 RELIEF WITHOUT CONDUCTING A HEARING ON THE DISPUTED FACTS.**</u>

Because post-trial relief implicates due process, it is well established that a court must conduct an evidentiary hearing when resolving disputed facts. *See Luxliner P.L. Exp. Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72-73 (3d Cir. 1993). As

16

explained below, those post-judgment procedures failed to come close to fulfilling the due process required to resolve Sunnyside's post-judgment claims.

### A.     The Court Committed Error By Resolving Disputed Facts Without Conducting An Evidentiary Hearing

Because of the due process requirements, courts may not resolve factual disputes through summary proceedings. The District Court's resolution of disputed facts failed to satisfy those legal standards, consequently depriving Sunnyside of its day in court by which to challenge CDT's version of facts, other discovery, and confront its witnesses.

The Supreme Court has spoken about the due process limitations to a "trial by affidavit":

> We believe that summary procedures should be used sparingly in complex . . . litigation where motive and intent play leading roles. . . . It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of even handed justice.

*Poller v. CBS, Inc.*, 368 U.S. 464, 464, 473 (1962).  These rules apply in resolving motions under Rule 25 of the Federal Rules of Civil Procedure.  In *Luxliner*, the Court of Appeal for the Third Circuit held that disputes on a Fed. R. Civ. Pro. 25(c) motion cannot be determined on affidavits alone:

> When competing sworn affidavits may result in one or more genuine issues of material fact, due process requires that a district court judge hear the evidence to assess for

> him or herself the credibility, or lack thereof, of one side as
> opposed to the other . . . . [W]here competing affidavits
> focus on a material issue, a district court may not decide
> factual issues arising in the context of Rule 25(c) motions
> simply by weighing the sworn affidavits against one
> another. Instead, at least in a context such as this in which
> a decision on a Rule 25(c) motion effectively imposes
> liability, the court must first determine whether the
> affidavits "show that there is no genuine issue as to any
> material fact and that the moving party is entitled to
> [joinder or substitution] as a matter of law." If they do, the
> court should grant the motion; if they do not, however, the
> court should conduct an evidentiary hearing to decide
> whether the motion should be granted.

*Luxliner, supra*, 13 F.3d at 72-73 (citations omitted). Here, the District Court

resolved the case on affidavits, crediting CDT's witnesses without addressing the

conflicting evidence. Without witnesses subject to examination, it is not surprising

that the Court was led into error by CDT's "extravagant mischaracterizations."

**B.    The Court Committed Error In Denying Sunnyside Its Rule 69(a) Rights.**

As an alternative to successor liability, Sunnyside's motion requested the

fraudulent conveyance remedy provided by Rule 69 of the Federal Rules of Civil

Procedure.[2] Rule 69 allows a "broad range of supplementary proceedings involving

third parties to assist in the protection of federal judgments, including attachment,

mandamus, garnishment, and the prejudgment avoidance of fraudulent transfers."

---

[2]    Successor liability differs from the fraudulent conveyance remedy because it
provides personal liability for the acquiring company, whereas fraudulent
conveyance law provides an *in rem* remedy against the property transferred. Here,
either remedy would suffice, as the value of the assets transferred to CDT exceeds
the judgment.

18

*Peacock v. Thomas*, 516 U.S. 349, 356 (1996). Here, the District Court ignored the standards governing Rule 12(b)(6), and refused to permit Sunnyside to pursue those Rule 69 remedies without even the benefit of a pleading.

Sunnyside's remedies under Rule 69 are governed by California's post-judgment procedures. *Carnes v. Zamani*, 488 F.3d 1057 (9th Cir. 2007). California post-judgment law expressly provides that "the judgment creditor may bring an action against the third person." Cal. Civ. Code § 708.210. The procedure for that claim is set forth in Cal. Civ. Code § 708 *et seq.*, which provides:

> If a third person has possession or control of property in which the judgment debtor has an interest or is indebted to the judgment debtor, the judgment creditor may bring an action against the third person to have the interest or debt applied to the satisfaction of the money judgment.

Cal. Civ. Code § 708.210.

This California post-judgment remedy expressly provides a right to a hearing on the claim. *Id.* § 720.310. In contravention of that express right, the District Court summarily disposed of the Rule 69 motion. Essentially, the District Court granted a motion to dismiss without even a pleading against which to measure the claim. That disposition was error, whether measured against the Rule 12 standard governing the dismissal of claims, or even the Rule 56 standard for dismissing claims prior to a hearing. Given the facts set forth in Sunnyside's motion, supported by the declaration of Sunnyside's expert, Sunnyside established a *prima facie* fraudulent conveyance, with Opsys having transferred assets worth $26.9 million, receiving

19

only $5 million in return.  At worst, there was a fact issue requiring discovery and additional supplemental proceedings.

### C.    The Court Erred By Denying Sunnyside Its Rule 69(b) Right To Discovery

It is particularly improper for a court to resolve disputed facts summarily without the parties having been permitted discovery into the facts. Thus, for example, a court cannot resolve a summary judgment motion where the parties have not yet conducted discovery so as to respond to the request for summary disposition. *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994); *Garrett v. City & County of San Francisco*, 818 F.2d 1515 (9th Cir. 1987).

Indeed, Rule 69 expressly ensured that the judgment creditor would have all forms of discovery from third parties such as CDT. Fed. R. Civ. Pro. 69(b).  The express purpose of this amendment was to permit the taking of discovery, including deposition and document discovery from third parties.  Fed. R. Civ. Pro. 69, *Notes of Advisory Committee on 1970 Amendments to Rules* ("The amendment assures that, in aid of execution on a judgment, all discovery procedures provided in the rules are available and not just discovery via the taking of a deposition.").  The District Court refused to allow Sunnyside to pursue discovery into the transactions, and that refusal constitutes clear error.

## II.   THE COURT'S ERRONEOUS FACTUAL FINDINGS REQUIRE REVERSAL

Under the California Civil Code, judgment creditors are entitled to levy against transfers that were made with actual intent to hinder, delay or defraud creditors (Cal. Civ. Code § 3439.04) and those in which the debtor receives less than adequate consideration (*id.* §3439.04 and 05).

On the incomplete record, the District Court stated that "CDT, Inc. paid consideration which was adequate in light of the assets if received, plaintiff has failed to demonstrate inadequate consideration." Mem. & Order at 15. That finding does not stand up, particularly when weighed against the acknowledged standard precluding the Court from resolve disputed factual issues during supplemental proceedings "simply by weighing the sworn affidavits against one another." *Luxliner*, supra. First, the record contained various "badges of fraud" that the Court could not dismiss simply based on CDT's opposing affidavits. Second, the evidence created a genuine dispute that the assets transferred by Opsys Limited had a fair value of $26.9 million. Third, the Court applied the wrong legal standard, thereby wrongly crediting Opsys with having received monies in excess of the $5 million that it received. Fourth, the Court failed to evaluate the 2005 transaction, in which Opsys Limited transferred the remaining 84% of Opsys UK for no consideration.

Any one of those errors requires reversal.

21

## A. The Court's Acceptance Of CDT's Assertions Of Good Faith Was Erroneous

"Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer." *Filip v. Bucurenciu*, 129 Cal.App.4th 825, 834 (2005). CDT's public filings disclosed its intention to obtain assets and avoid Sunnyside's liability, and that it had structured the transaction "in such a manner to avoid acquiring any interest in any other assets or liabilities of Opsys." CDT's 2004 Form 10-K [ER-36]. The Court found that "the transaction was structured to avoid both the assets and liabilities of the [sic] Opsys Limited's US business" (which included the Sunnyside claim). However, it dismissed this key admission as "unremarkable." Mem. & Order at 16. Instead, it accepted the benign version presented by CDT's unchallenged affidavits and refused to permit Sunnyside to develop the record of Opsys's intent and CDT's knowledge of that intent.[3]

Similarly, the Court simply accepted CDT's assertions of innocence with respect to the 2005 transfer, even though the transaction bore virtually all of the invidious "badges of fraud" codified in California's law. *See* Cal. Civ. Code

---

[3]    The test of fraudulent intent is whether the <u>debtor</u> intended to place assets outside the reach of its creditors. Liability is imposed on the transferee where, as here, it "was aware" that its payments would go to third-party shareholders, not the debtor, and the transferee participated "in structuring the transaction." *Lippi v. City Bank*, 955 F.2d 599, 607 (9th Cir. 1992). Accord *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 n. 8 (3rd Cir.1986), *cert. denied*, 483 U.S. 1005 (1987).

§3439.04(b) (transfers was (1) to insiders, (3) concealed, (4) made while a defendant in a suit, (5) of all of the assets, (8) without any consideration, (9) transfer made while insolvent). The presence of these badges of fraud is evidence from which an inference of actual fraudulent intent may be draw. *Wyzard v. Goller*, 23 Cal.App.4th 1183, 1191 (1994). The dismissal of that claim at the pre-pleading stage, based solely upon CDT's protests of innocence, was error.

**B.    The Court's Analysis Of "Adequate Consideration" Was Erroneous.**

The Court made two separate errors in evaluating the adequacy of the consideration received by Opsys. First, it used a book value that did not reflect the fair value of the Opsys assets – one that also was adjusted and therefore no longer operable. The Court committed error by ignoring the fair value that CDT itself placed on those assets. At a minimum that evidence requires reversal, and, we submit, is conclusive to show inadequate consideration. Second, in evaluating the adequacy of consideration, the Court considered what CDT had paid, not what Opsys received. It thus failed to take into account that Opsys did not receive the bulk of the payments made by CDT.

**1.    The Court Erred By Using Superceded "Historic Cost" Rather Than "Fair Value"**

The District Court's analysis of adequate consideration was undermined at its inception as it never sought to find the "fair value" of Opsys's assets, instead

23

referencing the pre-sale book value. Those values did not reflect fair value, as they were "stated at cost" and were "prepared under the historical cost convention." Oct. 2002 Financial Statements, at OPS 07501 [ER-42]. In addition to being conceptually irrelevant, that figure had been adjusted by CDT's valuation at the time of the transaction. Accordingly, the Court simply failed to make the required finding on "fair value" relevant to California's fraudulent conveyance law.

That reliance on historic cost was error. It is well established that the historic costs of developing the asset does not constitute its fair value, which is the relevant standard in a fraudulent conveyance analysis. *Sierra Steel, Inc. v. Totten Tubes, Inc. (in re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989). E.g., *Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.*, 621 F.Supp. 198, 200 (S.D.N.Y. 1985) (stating that under the UFCA, "[i]t is the fair saleable value of assets, not their book value, that determines insolvency"); *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 36 (2d Cir. 1996).

The District Court ignored CDT's own audited financial statements that expressly represented the asset's "fair value" at $26.9 million. That value was the product of CDT's own valuation analysis, and was conducted right at the time of the October 2002 transaction:

> We have performed a valuation of CDT Oxford **as of October 2002** in order to fairly allocate the assets and liabilities as if CDT Oxford had been acquired in a

24

business combination and the **fair value** of CDT Oxford
was the full price payable,

CDT Form 10-K at 49(CR Tab 184-2)[ER-38] (emphasis added). As Sunnyside's

expert, Mr. Ainslie, reiterated for the Court, CDT's financial statements reflected the

fair value, "[a]nd that's what FAS 141 requires that the assets to be recorded at their

fair value." Ainslie Dep. at 87 [CR-185-2].[4]

This evidence went un-rebutted by CDT, and un-addressed by the District

Court, which erroneously brushed aside any question with the incorrect assertion "it

is undisputed that Opsys Limited received adequate consideration for the assets

acquired, if any, by CDT, Inc." Mem. & Order at 16. Far from "undisputed," the

evidence was hotly contested, and the Court's failure to address CDT's own

valuation is itself error. At a minimum, these facts were not suitable for being

dismissed without discovery and without a hearing.

2.    **The Court Committed Clear Error By Evaluating What CDT
      Paid, Rather Than What Opsys Received**

In addition to making an erroneous factual determination about the value of

the assets transferred, the District Court also applied the wrong legal test in

evaluating the adequacy of the consideration, focusing on what CDT paid, rather

------

[4]    Goodwill is an asset within the meaning of the fraudulent conveyance acts,
and therefore the transfer of Opsys UK's goodwill is also subject to the analysis.
*Mellon Bank, NA v. Metro Communications, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991),
*cert. denied*, 503 U.S. 937 (1992) (goodwill is an asset that can be transferred.);
*Dary v. Gilbert*, 2002 Cal.App.Unpub. LEXIS 8043 (Cal.App. 1st Dist. 2002)(same).

than what Opsys Limited received. When measured against the correct legal standard, the undisputed facts compel a conclusion of <u>inadequate</u> consideration.

The District Court repeatedly stated that "[a] prerequisite for the various forms of fraudulent transfer is that the acquiring party <u>pays</u> inadequate consideration." (Mem. & Order at 16-17). See also *id.* at 15 ("Because <u>CDT, Inc.</u> <u>paid</u> consideration which was adequate in light of the assets it received...") (emphasis added). In defining "adequate consideration," however, the fraudulent conveyance law inquires about the consideration received by the debtor. Cal.Civ. Code § 3439.05 ("*<u>the debtor</u>* made the transfer or incurred the obligation *<u>without</u>* *<u>receiving</u>* a reasonably equivalent value in exchange for the transfer")(emphasis added). The test of adequate consideration involves "comparing what the debtor surrendered and what the debtor received." *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 578 (Bankr. N.D. Cal. 1994). This Court has noted that subtle but critical distinction:

> The legislative history to this statute notes that "consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." **The question is not, as the GE defendants frame it, whether the GE defendants gave reasonably equivalent value; it is whether the debtor received reasonably equivalent value**. . . . The debtor did not receive property, nor did the transfers satisfy a present or antecedent debt of the debtor. Therefore, the debtor did not receive "value."

*In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995)(citations omitted; emphasis added). The distinction becomes critical when, as here, the

26

transferee pays virtually all of the consideration to the third-party shareholders, not the debtor. In those circumstances, adequate consideration does not exist. *Marquis Products, Inc. v. Conquest Mills, Inc. (In re Marquis Products, Inc.)*, 150 B.R. 487, 491 (Bankr. D. Me. 1993) ("It may be said that, as a general rule, an insolvent debtor receives 'less than a reasonable equivalent value' where it transfers its property in exchange for a consideration which passes to a third party. In such a case, it ordinarily receives little or no value.")

By mis-framing the test as whether CDT paid adequate consideration, the District Court improperly included CDT's 2004 payment of $11 million to Opsys's shareholders, even though Opsys did not receive that value. Accordingly, the Court's analysis was erroneous.

### 3. The Court Erred In Failing To Address Opsys Limited's 2005 Fraudulent Conveyance To CDT.

Finally, the District Court's analysis of "adequate consideration" did not even address Opsys Limited's 2005 transfer to CDT of its remaining 84% stake in Opsys UK for no consideration. That failure independently requires reversal.

CDT acknowledged the transaction and the lack of consideration. Black Dec. ¶¶ 33, 36 [ER-31, 31]. The 84% stake had value, as CDT had paid $2.5 million for its initial 16% stake in Opsys UK, indicating a value of at least $13 million for the remaining 84%. Moreover, CDT carried Opsys UK on its books at more than $19

27

million in its 2004 year-end financial statements. The District Court's failure to address the inadequacy of the 2005 transaction requires reversal of its findings.

## III. SUNNYSIDE ESTABLISHED THE BASIS FOR SUCCESSOR LIABILITY UNDER CALIFORNIA LAW

The above facts also established the basis for amending the judgment under Rule 25 to join CDT, Inc. based upon successor liability. California law imposes successor liability where: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray v. Alad Corp.*, 19 Cal.3d 22, 28-29 (1977). Here, the record showed that the transfer was for the purpose of escaping liability, and that Opsys Limited did not receive adequate consideration in the transactions. Consequently, "no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors." *Ray*, 19 Cal.3d at 29.

However, relying upon *Potlatch Corp. v. Superior Court*, 154 Cal. App. 3d 1144, 1150-51 (1984), the District Court determined that California successor liability "requires the purchase of assets, not merely the purchase of stock." The District Court then noted that "the record discloses a single relevant transfer of business assets: the [2002] transfer of Opsys Limited's UK assets and operations to

Opsys UK, which later became CDT Oxford Limited." Mem. & Order at 10. It addressed only that initial transfer based upon *dicta* in this Court's decision in *Katzier's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir. 2004), which suggested that successor liability could not apply to subsequent transfers.

The District Court placed undue emphasis on *Katzir's dicta* limiting the remedy to initial transferees, and therefore disregarded the secondary transfer that occurred simultaneously. While the distinction between an initial and secondary transfer is rational when addressing transfers that are not simultaneous, here, the transfers were simultaneous and dependent, with CDT immediately gaining control over the assets. In those cases, courts do not hesitate to impose successor liability involving "formalistic corporate slight of hand." *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1010, 1014 (D.Mass 1989). Instead, courts "should 'collapse' the interrelated transactions into one aggregate transaction which had the overall effect of conveying [] property," meaning that "all transfers would then be treated as initial transfers." *Lippi, supra*, 955 F.2d at 612. It is submitted that the District Court's formalistic interpretation of *Potlatch* and *Katzir* was erroneous and contrary to the policy behind *Ray*.

The limitation of the doctrine is contrary to the purpose of the doctrine. As this Court has noted, the essence of successor liability hinges on harm to creditors:

> The requirement of inadequate consideration in a successor
> liability case is premised on the notion that when a
> successor corporation acquires the predecessor's assets
> without paying adequate consideration, the successor
> deprives the predecessor's creditors of their remedy.

*Katzier's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir.

2004).  See also *Kline v. Johns-Manville*, 745 F.2d 1217 n.3 (9th Cir. 1984) (the

fundamental policy advanced in *Ray* to prohibit transfers harming the prior

company's creditors: "the predecessor would have remained in business and been

clearly subject to suit if it had not been for the sale of the entire business.") Based on

these cases, the District Court's narrow focus on only the initial transfer was error.

## CONCLUSION

For the reasons set forth above, Sunnyside requests that the Court reverse the

August 29, 2007 Memorandum and Order on successor liability and amend the

judgment to add CDT Limited, or, alternatively, reverse and remand for further

supplemental proceedings.

Dated:  March 14, 2008              TRAIGER & HINCKLEY LLP

                                    By: _____
                                        Christoph C. Heisenberg

                                    880 Third Avenue, 9th Floor
                                    New York, New York 10022
                                    Tel. (212) 845-9094

                                    Attorneys for Appellant
                                    Sunnyside Development Company LLC

30

## CERTIFICATE OF COMPLIANCE RULE 32(a)(7)

**Certificate of Compliance Pursuant to Fed. R. App. P.**
**32(a)(7)(C) and Circuit Rule 32-1 for Case Number 07-16773**

I certify that the attached brief is **not** subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages;

March 11, 2008
_____
Date

## AFFIRMATION OF SERVICE

CHRISTOPH C. HEISENBERG, an attorney in this action admitted to the bar of this

Court, being over the age of 18 and not a party to this action, hereby certifies that on March 12,

2008, I delivered 2 copies of the annexed PRINCIPAL BRIEF OF APPELLANT SUNNYSIDE

DEVELOPMENT CO LLP by third-party commercial carrier (Federal Express) for next day

delivery, addressed to:

Bruce A. Ericson, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

Counsel for Cambridge Display Technology,
Inc.

Dated:  New York, New York
        March12, 2007

James E. Burns Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Counsel for Opsys Limited

_____
Christoph C. Heisenberg, Esq.

# EXHIBIT B

In the United States Court of Appeals

for the Ninth Circuit

SUNNYSIDE DEVELOPMENT
COMPANY, LLC,

No. 07-16773

(Northern District of California
No. C-05-00553-MHP)

　　　　　　　　Plaintiff-Appellant,

vs.

OPSYS LIMITED, a United Kingdom
Company,

　　　　　　　　Defendant-Appellee.

BRIEF FOR APPELLEE

CAMBRIDGE DISPLAY TECHNOLOGY, INC.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON
bruce.ericson@pillsburylaw.com
KEVIN M. FONG
kevin.fong@pillsburylaw.com
ALICE KWONG MA HAYASHI
alice.hayashi@pillsburylaw.com
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for Appellee
CAMBRIDGE DISPLAY TECHNOLOGY, INC.

# CORPORATE DISCLOSURE STATEMENT

Sumitomo Chemical Co., Ltd. is the direct parent corporation of Appellee **CAMBRIDGE DISPLAY TECHNOLOGY, INC.** ("CDT Inc."). No other company, whether its securities are publicly traded or not, directly owns ten percent (10%) or more of the stock of CDT Inc. Sumitomo Chemical Co., Ltd., a Japanese corporation, has securities traded on exchanges in Japan. It does not have securities traded on exchanges in the United States and does not file periodic reports with the United States Securities and Exchange Commission, but its securities are traded on the "Pink Sheets."

500226704v1

# TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................1

ISSUES PRESENTED FOR REVIEW ................................3

STATEMENT OF FACTS.....................................................3

    A.    Sunnyside, Opsys and the Fremont Lease of 2001. ........4

    B.    CDT Inc., its affiliates and the transactions with Opsys in 2002. ........................................................4

    C.    The IPO of CDT Inc. and the exercise of the Opsys Limited Option in December 2004. ...........................7

    D.    The equity transfers to CDT Ltd. in May 2005..............9

PROCEDURAL HISTORY ..................................................9

SUMMARY OF ARGUMENT ...........................................11

STANDARD OF REVIEW .................................................14

ARGUMENT ......................................................................15

I.    THE DISTRICT COURT CORRECTLY DENIED SUNNYSIDE'S RULE 25(c) MOTION BECAUSE SUNNYSIDE URGED THE COURT TO PROCEED ON A PAPER RECORD AND BECAUSE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT.................................................15

II.    THE DISTRICT COURT CORRECTLY RULED, BASED ON UNDISPUTED FACTS, THAT CDT INC. WAS NOT LIABLE AS A SUCCESSOR.....................................................18

    A.    Sunnyside did not present evidence sufficient to raise a genuine issue of material fact.......................................18

    B.    Because CDT Inc. did not purchase Opsys' assets, the successor liability doctrine does not apply....................23

500226704v1

C.    The successor liability doctrine does not apply even if the transactions could somehow be characterized as asset purchases.................................................................................27

    1.    CDT Inc. is not a mere continuation of Opsys...................29

        a.    The district court correctly ruled, based on undisputed facts, that adequate consideration was paid...................................................................31

        b.    It is circular to argue, as Sunnyside does, that the value of Opsys' assets is the value of the consideration paid for them but that consideration is inadequate. ......................................33

        c.    Sunnyside is wrong in asserting that the consideration was inadequate because payment for Opsys' stock was made to Opsys' shareholders rather than Opsys. ...............................34

        d.    Statements describing the disposition of the CDT Inc. stock exchanged for Opsys stock are not relevant in assessing the adequacy of the consideration. ...........................................35

        e.    The district court's ruling that CDT Inc. was not a mere continuation of Opsys is correct on other grounds as well. ...............................37

    2.    CDT Inc. has not fraudulently sought to escape liability for Opsys' debts. ...................................39

        a.    CDT Inc. had legitimate business reasons to acquire only Opsys' UK operations and not its US operations...........................................40

        b.    CDT Inc. made reasonable provisions for known liabilities.......................................42

        c.    Transferring equity from one defendant to another defendant cannot rationally be viewed as an attempt to defraud the plaintiff. ......................43

III.   THE DISTRICT COURT CORRECTLY DENIED
       SUNNYSIDE'S MOTION UNDER RULE 69. ..................................... 45

       A.   Sunnyside has no successor liability or alter ego argument. ......... 45

       B.   Sunnyside's new procedural argument was not made below
            and, in any event, lacks merit. ...................................................... 47

IV.    THE DISTRICT COURT CORRECTLY DENIED
       SUNNYSIDE'S REQUEST TO ADD A FRAUDULENT
       CONVEYANCE CLAIM UNDER RULE 18(b). ................................. 50

CONCLUSION ............................................................................................. 52

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abrego Abrego v. Dow Chem. Co.,*
    443 F.3d 676 (9th Cir. 2006) ........................................................... 15, 22

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.,*
    475 F.3d 1080 (9th Cir. 2007) ............................................................... 21

*California v. Campbell,*
    138 F.3d 772 (9th Cir. 1998) ....................................................... 15, 20, 22

*Cormier v. Pennzoil Exploration & Prod. Co.,*
    969 F.2d 1559 (5th Cir. 1992) .............................................................. 20

*Eberle v. City of Anaheim,*
    901 F.2d 814 (9th Cir. 1990) ................................................................ 23

*Franklin v. USX Corp.,*
    87 Cal. App. 4th 615 (2001) ........................................................... passim

*Gager v. United States,*
    149 F.3d 918 (9th Cir. 1998) ................................................................ 21

*Garrett v. City & County of San Francisco,*
    818 F.2d 1515 (9th Cir. 1987) .............................................................. 21

*Gen. Elec. Capital Auto Lease, Inc., v. Broach*
    *(In re Lucas Dallas, Inc.),*
    185 B.R. 801 (B.A.P. 9th Cir. 1995) ....................................................... 35

*Hilbrands v. Far East Trading Co.,*
    509 F.2d 1321 (9th Cir. 1975) .............................................................. 28

*In re Acushnet River & New Bedford Harbor Proceedings*
    *re Alleged PCB Pollution,*
    712 F. Supp. 1010 (D. Mass. 1989) ....................................................... 26

*Independent Towers of Wash. v. Washington,*
    350 F.3d 925 (9th Cir. 2003) ................................................................ 46

*Katzir's Floor & Home Design, Inc., v. M-MLS.com,*
    394 F.3d 1143 (9th Cir. 2004) .......................................................... passim

*Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),*
    78 F.3d 30 (2d Cir. 1996)............................................................... 32, 33

*LiButti v. United States,*
    178 F.3d 114 (2d Cir. 1999)................................................................ 28

*Lippi v. City Bank,*
    955 F.2d 599 (9th Cir. 1992) ............................................................. 26

*Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.,*
    13 F.3d 69 (3d Cir. 1993)............................................................. passim

*Maloney v. Am. Pharm. Co.,*
    207 Cal. App. 3d 282 (1988) ...................................................... 25, 30, 31

*Marks v. Minnesota Mining & Mfg. Co.,*
    187 Cal. App. 3d 1429 (1986) ........................................................ 24, 29

*Marquis Prods., Inc., v. Conquest Carpet Mills, Inc.*
    *(In re Marquis Prods., Inc.),*
    150 B.R. 487 (Bankr. D. Me. 1993) ...................................................... 35

*McClellan v. Northridge Park Townhome Owners Ass'n, Inc.,*
    89 Cal. App. 4th 746 (2001) .......................................................... 45, 46

*Monarch Bay II v. Prof'l Serv. Indus., Inc.,*
    75 Cal. App. 4th 1213 (1999) .............................................................. 38

*Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.,*
    621 F. Supp. 198 (S.D.N.Y. 1985) ..................................................... 32, 33

*Orthotec, LLC, v. REO Spineline, LLC,*
    438 F. Supp. 2d 1122 (C.D. Cal. 2006) ................................................... 30

*Pajaro Dunes Rental Agency, Inc., v. Spitters*
    *(In re Pajaro Dunes Rental Agency, Inc.),*
    174 B.R. 557 (Bankr. N.D. Cal. 1994) .................................................... 35

*Phillips v. Cooper Labs., Inc.,*
    215 Cal. App. 3d 1648 (1989) ............................................................. 24

*Potlatch Corp. v. Superior Court,*
    154 Cal. App. 3d 1144 (1984) ...................................................... 12, 23, 24

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ...................................................... 23

*Qualls v. Blue Cross of California, Inc.,*
    22 F.3d 839 (9th Cir. 1994) ...................................................... 21

*Ray v. Alad Corp.,*
    19 Cal. 3d 22 (1977) ...................................................... 12, 28, 29, 39

*Sierra Steel, Inc., v. Totten Tubes, Inc.*
    *(In re Sierra Steel, Inc.),*
    96 B.R. 275 (B.A.P. 9th Cir. 1989) ...................................................... 33

*Strick Corp. v. Thai Teak Products Co.,*
    493 F. Supp. 1210 (D.C. Pa. 1980) ...................................................... 49

*Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd. et al.,*
    No. CV-08-1780-MEJ (N.D. Cal.) ...................................................... 11

*Sunnyside Dev. Co., LLC, v. Bank of New York,*
    No. 07 Civ. 8825(LLS), 2008 WL 463722
    (S.D.N.Y. Feb. 19, 2008) ...................................................... 11, 36, 37

*Sweet v. Pfizer,*
    232 F.R.D. 360 (C.D. Cal. 2005) ...................................................... 23

*Tatum v. City & County of San Francisco,*
    441 F.3d 1090 (9th Cir. 2006) ...................................................... 14, 20, 22

*Tidewater Oil Co. v. Workers' Comp. Appeals Bd.,*
    67 Cal. App. 3d 950 (1977) ...................................................... 39

*Woods v. Interstate Realty Co.,*
    337 U.S. 535 (1949) ...................................................... 25

## Statutes and Codes

California Civil Code
    Section 3439.04(a) ...................................................... 39
    Section 3439.04(b) ...................................................... 44

Section 3439.04(b)(1) ................................................................ 45
Section 3439.04(b)(2) ................................................................ 44
Section 3439.04(b)(3) ................................................................ 44
Section 3439.04(b)(6) ................................................................ 44
Section 3439.04(b)(7) ................................................................ 44
Section 3439.04(b)(9) ................................................................ 44
Section 3439.04(b)(10) .............................................................. 44
Section 3439.04(b)(11) .............................................................. 44

California Code of Civil Procedure
    Section 187 ........................................................................ 45, 46
    Section 708.210 ...................................................................... 47
    Section 720.110 ...................................................................... 48
    Section 720.310 ...................................................................... 48

Comprehensive Environmental Response, Compensation, and
    Liability Act of 1980 ............................................................... 26

## Rules and Regulations

Federal Rules of Appellate Procedure
    Rule 42(b) ............................................................................ 11

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................. 51
    Rule 12(b)(6) ......................................................................... 48
    Rule 18(b) ................................................................ 14, 50, 51
    Rule 25(c) ........................................................................ passim
    Rule 56 ................................................................................ 48
    Rule 56(c) ............................................................................ 16
    Rule 56(f) ........................................................................ 20, 21
    Rule 69 ........................................................................... 45, 50
    Rule 69(a) ........................................................................ passim

# INTRODUCTION

After two years of discovery and motion practice, much of it devoted to an unsuccessful attempt to plead and prove fraud and bad faith, Plaintiff and Appellant Sunnyside Development Company, LLC ("Sunnyside") went to trial against Defendant and Appellee Opsys Limited ("Opsys") on a claim for breach of lease. Then, after obtaining a jury verdict against Opsys, Sunnyside sought by motion to join Appellee **CAMBRIDGE DISPLAY TECHNOLOGY, INC.** ("CDT Inc.") to the judgment. Sunnyside lost that motion. Now, repenting its decision to proceed by motion without first seeking yet more discovery, Sunnyside asks this Court to reverse and give it another shot at proving what it could not prove after two years of litigation.

Sunnyside and Opsys signed the lease in 2001, well before CDT Inc. acquired any interest in Opsys. Years later, CDT Inc. acquired the equity of Opsys, held it briefly and then transferred it to a second-tier subsidiary of CDT Inc., making Opsys a third-tier subsidiary of CDT Inc. Based on this, Sunnyside argues that CDT Inc. should be added post-trial to a judgment against Opsys and made liable for breaching a lease to which CDT Inc. was never a party.

The district court denied Sunnyside's motion, correctly holding that there were no genuine issues of material fact and that, as a result, no evidentiary hearing was necessary. The court correctly held that, as a matter of law, the successor liability doctrine did not apply. That doctrine applies only to asset purchases, but CDT Inc. purchased Opsys' stock rather than its assets. Even if

the transactions between CDT Inc. and Opsys could somehow be characterized as an asset purchase, the successor liability doctrine would not apply here. The doctrine creates several limited exceptions to the general rule that a corporation may purchase the assets of another corporation without assuming the selling corporation's debts. Sunnyside argues for two of those exceptions—"mere continuation" and "fraudulent purpose"—but neither applies here.

The "mere continuation" exception does not apply because undisputed evidence shows that CDT Inc. paid adequate consideration, whether one looks at the book value of Opsys' assets or at their market value. Nor is the consideration rendered inadequate because some might be paid to Opsys' shareholders rather than Opsys itself. That is the nature of a stock purchase: the consideration goes to the stockholders.

The "fraudulent purpose" exception does not apply because Opsys received adequate consideration and because Sunnyside failed to raise a genuine issue of material fact as to any intent to defraud Sunnyside. The district court correctly ruled that the May 2005 transfer by Opsys of its interest in a subsidiary, CDT Oxford Limited ("CDT Oxford"), to Cambridge Display Technology Limited ("CDT Ltd.") was not a basis for imposing successor liability on CDT Inc. Although CDT **Ltd.** is a second-tier subsidiary of CDT **Inc.**, the two are different companies. At the time of the transfer, CDT Ltd. was a defendant in this litigation, whereas CDT Inc. was not a party. It should be obvious that transferring assets from one defendant to another defendant does not work a fraud on the plaintiff by putting the assets out of reach. Far from it.

-2-

## ISSUES PRESENTED FOR REVIEW

1.    Whether the district court correctly denied Sunnyside's motion under Rules 25(c) and 69(a) of the Federal Rules of Civil Procedure to add CDT Inc. to the judgment, where Sunnyside sought to proceed by motion, did not press for discovery until midway through the hearing on its motion (when it became apparent that Sunnyside might lose the motion), and even then never specified what discovery it might want.  (All references to "Rule" are to the Federal Rules of Civil Procedure.)

2.    Whether the district court correctly held that CDT Inc. did not succeed to Opsys' liability on the judgment in favor of Sunnyside.

3.    Whether the district court properly denied Sunnyside's request under Rule 18(b) to add a fraudulent conveyance claim.

## STATEMENT OF FACTS

This is an action for unpaid rent on a commercial building in Fremont, California (the "Fremont Building").  Supplemental Excerpts of Record of CDT Inc., filed herewith ("SER"), 1216.  The lessor—Sunnyside—sued the lessee—Opsys—and recovered a jury verdict.  Then, after two years of discovery and a trial, Sunnyside renewed a motion to add CDT Inc. as a defendant and thus make it liable on the judgment—even though CDT Inc. had never been a party to that lease and had never agreed to acquire any of Opsys' US assets or assume any of Opsys' US liabilities.

**A.      Sunnyside, Opsys and the Fremont Lease of 2001.**

In February 2001, Sunnyside leased the Fremont Building (the "Fremont Lease") to Opsys.  SER 1217.  At that time, Opsys was an independently owned corporation that had no affiliation with CDT Inc. or any other CDT entity.  As shown below, the transactions that occurred in October 2002, in December 2004 and in May 2005 changed that picture, albeit not in a way that made CDT Inc. liable on the Fremont Lease.

**B.      CDT Inc., its affiliates and the transactions with Opsys in 2002.**

CDT Inc. is a Delaware corporation headquartered near Cambridge, England.  At all times relevant to this case, CDT Inc. had a first-tier subsidiary, CDT Holdings Limited, and a second-tier subsidiary, CDT Ltd.; both are located and incorporated in the United Kingdom ("UK").  SER 107.  CDT Holdings Limited does not feature in this story, but CDT Ltd. does.

CDT Inc. is a leading developer of polymer organic light-emitting diode ("P-OLED") technology, which makes possible energy-efficient, ultra-thin, lightweight displays in a variety of electronic devices.  *Id.*  In 2001-02, Opsys also was in the P-OLED business.

In 2002, CDT Inc. began negotiating to acquire control of certain UK-based assets of Opsys—namely, patents thought to be useful in developing P-OLED materials.  *Id.*  Opsys had research facilities in the UK near Oxford, where it developed intellectual property ("IP") based on these patents.  *Id.*  Opsys also had US operations in Fremont for the pilot manufacturing of

-4-

displays based on small molecule emitters—a different and competing technology licensed from the Eastman Kodak Company ("Kodak"). *Id.*

For a number of business reasons having nothing to do with Sunnyside or the Fremont Lease, CDT Inc. wanted Opsys' UK assets but not its US assets. SER 1374, 1377-78. The Kodak process differed fundamentally from the CDT Inc. process. CDT Inc. did not wish to endorse Kodak's technology in any way because Kodak competes with CDT Inc. in licensing OLED technology. SER 107-08. CDT Inc. had already invested in its own pilot manufacturing facility in the UK and did not need another such facility, particularly one using incompatible equipment. *Id.* CDT Inc. also wanted nothing to do with the highly competitive, low-profit, capital-intensive manufacturing business that Opsys' US operations sought to enter. CDT Inc. has never intended to be a volume manufacturer of displays; instead it seeks to license and transfer technology to companies that do manufacture displays. SER 108.

As a result, the transaction proceeded on the basis of a clean separation of Opsys' US operations from its UK operations. *Id.*; Excerpts of Record ("ER") 6. Opsys transferred its UK operations to Opsys UK. SER 108; *see* SER 316, 331 (recital F), & 358 (clause 11.1). Opsys transferred its US operations to Opsys US Corporation ("Opsys US"). SER 108. Opsys represented that it had assigned the Fremont Lease to Opsys US—but the jury in this case later found that the assignment never took effect. SER 1210.

Neither CDT Inc. nor any of its affiliates ever obtained any interest in (or liability for) Opsys US. SER 1374, 1377-78. Instead, CDT Inc. and CDT Ltd.

-5-

acquired various interests in Opsys' UK operations through a "Transaction Agreement" dated October 23, 2002.  SER 316, 328-443; ER 7.  The acquisition was structured to minimize Opsys' liability for the punitive UK taxes that would be levied on a sale of IP.  SER 112-13.  The terms are complex, but the essential points can be sketched briefly.  CDT Inc. acquired a 16% equity interest in Opsys UK for $2.5 million in cash.  SER 316, 342 (clause 2.1).  CDT **Ltd.** (*not* CDT **Inc.**) obtained management control of Opsys UK and 98% of Opsys UK's profits, if any, in exchange for CDT Ltd.'s agreement to manage and fund Opsys UK's operations.  SER 316, 348 (clause 7).  CDT **Ltd.** (*not* CDT **Inc.**) paid Opsys $2 million in cash for a sublicense to Opsys' IP.  SER 316, 347, 358 (clauses 5.1(iii), 14.2).  CDT **Inc.** did not get control of Opsys UK—CDT **Ltd.** did.

The Transaction Agreement created two "put" options and one "call" option.  SER 316, 342-46, 351-56 (clauses 3 & 9); ER 7.  CDT Inc. paid an additional $500,000 to Opsys for the call option.  SER 316, 342 (clause 3.1).  Of the three options, only one was actually exercised—the "put" option that gave Opsys' shareholders the right to force CDT Inc. to buy Opsys (the "Opsys Limited Option").  It was subject to the following conditions (among others): Opsys' shareholders could exercise this option only if the aggregate liabilities, including contingent liabilities, of Opsys and its subsidiaries (excluding Opsys UK) were less than $1.25 million (SER 316, 352 (clause 9.4(C)));  the option exercise price would be reduced by the value of the aggregate current liabilities; and CDT Inc. would withhold from the exercise price the amount of all

contingent liabilities until the liabilities materialized or until the statute of limitations expired (SER 316, 353-54 (clauses 9.11(A) & 9.12); ER 7).

CDT Inc. understood that the Fremont Lease had been assigned to Opsys US: Opsys expressly warranted that it was not a party to any contract that could not readily be performed by it on time; that it was not a party to, nor did it have any liability under, any lease; that it was not a party to any contract "of a value of more than £10,000" or "of one year or greater duration"; and that it had no unaccrued or undisclosed liabilities from operations in the US. SER 316, 386-87 (sched. 3, part 2, clauses 9.1-9.2, 9.7(a)-(b), & 9.9); ER 7-8. In its Disclosure Letter dated October 23, 2002, Opsys explicitly represented that the Fremont Lease had been assigned to Opsys US, and it attached the Assignment of Lease and Consent of Lessor. SER 114-15, 131; ER 8.

Two and one-quarter years passed during which Opsys US failed to gain financing, stopped paying rent on the Fremont Building and ultimately entered Chapter 11 bankruptcy.

C.    **The IPO of CDT Inc. and the exercise of the Opsys Limited Option in December 2004.**

On December 15, 2004, CDT Inc. went public at $12 a share.

Shortly thereafter, Opsys' shareholders exercised the Opsys Limited Option, thus requiring CDT Inc. to acquire the equity of Opsys in exchange for 931,633 shares of CDT Inc. stock, a number determined by an agreed formula. SER 116-17; *see also* SER 318, 604-05 (clause 1.1(c)) (the "Amended Settlement Agreement"). By exercising the Opsys Limited Option rather than

-7-

the other options, Opsys and its shareholders obtained significant tax benefits. SER 117. As noted, Opsys' shareholders could exercise the Opsys Limited Option only if Opsys' liabilities were below a specified level. CDT Inc. would not have allowed the exercise or purchased Opsys' stock if CDT Inc. had known that the assignment of the Fremont Lease was ineffective or that Sunnyside was planning legal action against CDT Inc. or CDT Ltd. on the Fremont Lease. SER 109, 118.

Although this was a stock-for-stock deal (CDT Inc. stock for Opsys stock), none of the CDT Inc. shares went directly to Opsys' shareholders as such (two shareholders received small payments in satisfaction of antecedent debt). Instead, the Transaction Agreement, as modified by the Amended Settlement Agreement, distributed the 931,633 shares of CDT Inc. stock into three buckets:

*First*, 133,938 shares (14.4%) were held back to cover known and identified liabilities, as set forth in Schedule A to the Amended Settlement Agreement. SER 117, 318, 606 (clause 1.1(g)), 620-21; ER 9.

*Second*, 375,085 shares (40.3%) were issued to a newly created entity, Opsys Management Limited ("Opsys Management") (SER 318, 610 (clause 1.1(h))), to be distributed pursuant to a "Deferred Consideration Agreement" between Opsys Management, Opsys' shareholders, Opsys' debt holders and Kodak (a trade creditor). SER 117-18, 205-36. The shares were to be paid first to Kodak, then to former debt holders who had provided venture capital to Opsys, and only then to the former shareholders. SER 117-18.

*Third*, 422,610 shares (45.4%) went into an escrow, to deal with any contingent and unidentified liabilities of Opsys.  SER 318, 609-10 (clause 1.1(h)); ER 9.

### D.    The equity transfers to CDT Ltd. in May 2005.

After the December 2004 transactions, CDT Inc. held the stock of Opsys for only a short time.  In May 2005, to simplify its corporate structure, CDT **Inc**. transferred both its 16% interest in CDT Oxford (formerly Opsys UK) and its 100% interest in Opsys to CDT **Ltd**.  In addition, Opsys transferred its 84% interest in CDT Oxford to CDT **Ltd**.  SER 118; ER 10.  Opsys' interest in CDT Oxford had negligible value because CDT Ltd. had been entitled since October 2002 to 98% of CDT Oxford's profits.  SER 119.

As a result of the May 2005 transfers, both CDT Oxford and Opsys became direct, wholly owned subsidiaries of CDT Ltd. and indirect third-tier subsidiaries of CDT Inc.  SER 119; ER 10.  These transfers were planned before Sunnyside filed its claim.  SER 118.  By the time of the transfers, the transferee—CDT **Ltd**.—was a defendant in this litigation.  SER 119; ER 10.  CDT **Inc**. was not a party, nor had anyone threatened to make it a party.

### PROCEDURAL HISTORY

Sunnyside sued Opsys and CDT **Ltd**. in December 2004 but did not serve the complaint until January 2005.  The original complaint, filed in state court, alleged breach of lease and fraud.  SER 1385-96.  Opsys and CDT Ltd. removed the case to district court and moved to dismiss.  SER 1356-57.  The district court dismissed both claims against CDT Ltd. and the fraud claim

-9-

against Opsys, with leave to amend. SER 1333-39. Sunnyside filed a first amended complaint, again accusing both defendants of fraud. SER 1325-32. Defendants moved to dismiss. SER 1308-09. The district court dismissed both claims against CDT Ltd. and the fraud claim against Opsys. This time, it did so with prejudice, leaving only the breach of lease claim against Opsys. SER 1297-1307. Sunnyside has not appealed these rulings.

Sunnyside then moved to file a second amended complaint, seeking to name CDT Inc. as an additional defendant on a successor liability theory. SER 1277-78, 1293-96. The district court ruled that Sunnyside's request to join CDT Inc. was premature and denied the request without prejudice, subject to renewal if and when Opsys' primary liability was established. SER 1227-35.

Meanwhile, the case proceeded through discovery. Sunnyside took extensive discovery about the transactions involving CDT Inc., Opsys and their affiliates, including the structure of the transactions and the amount of consideration paid. The case went to trial on Sunnyside's breach of lease and good faith claims. Sunnyside obtained a jury verdict against Opsys on the breach of lease claim. SER 1209-10.

Thereafter, Sunnyside moved under Rules 25(c) and 69(a) to add CDT Inc. as a party to the action and to the judgment ("Rule 25(c) Motion"). Sunnyside renewed its argument from 2005 that CDT Inc. was liable as a successor to or alter ego of Opsys. While the Rule 25(c) Motion was pending, the district court entered judgment against Opsys for $4.9 million plus costs. SER 79. Opsys timely filed a notice of appeal (No. 07-16219). SER 1-2.

-10-

On August 29, 2007, the district court denied Sunnyside's Rule 25(c) Motion. ER 4-21. On September 26, 2007, Sunnyside filed a notice of appeal from this order, and a cross-appeal from the judgment (No. 07-16773). ER 1-3. Subsequently, the parties (including CDT Inc.) filed a joint motion for partial dismissal of appeal under Federal Rule of Appellate Procedure 42(b), requesting that this Court dismiss Opsys' appeal from the judgment and Sunnyside's cross-appeal, leaving only Sunnyside's appeal from the denial of its Rule 25(c) Motion. On February 25, 2008, this Court granted this motion. On March 14, 2008, CDT Inc. filed an unopposed motion to appear as appellee.

Since the denial of its Rule 25(c) Motion, Sunnyside has sued CDT Inc. and others in other venues. It filed two actions in New York, one of which it voluntarily dismissed and one of which it lost (and has appealed to the Second Circuit). *Sunnyside Dev. Co., LLC, v. Bank of New York,* No. 07 Civ. 8825(LLS), 2008 WL 463722 (S.D.N.Y. Feb. 19, 2008). It filed insolvency proceedings in the UK against Opsys. And, on April 3, 2008, it filed a new action against CDT Ltd., Opsys and CDT Oxford, asserting fraudulent conveyance claims. *Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd. et al.,* No. CV-08-1780-MEJ (N.D. Cal.). All these lawsuits attempt to collect the judgment entered in this case.

## SUMMARY OF ARGUMENT

*Due process:* A district court may grant a Rule 25(c) motion without an evidentiary hearing unless doing so would effectively impose liability and there are genuine issues of material fact. *Luxliner P.L. Export Co. v. RDI/Luxliner,*

*Inc.,* 13 F.3d 69, 72-73 (3d Cir. 1993). Here, the district court's order denying Sunnyside's motion did not impose liability, and the district court found that there were no genuine issues of material fact. The district court was correct. Indeed, Sunnyside invited the district court to take the course it took. Sunnyside proceeded by motion. It told the court it could proceed without discovery and an evidentiary hearing—at least until, during oral argument, it became apparent that Sunnyside would lose.

*Successor liability:* The district court correctly ruled that, as a matter of law, CDT Inc. did not succeed to Opsys' liabilities. The successor liability doctrine applies only to asset purchases, not stock purchases. *Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144, 1150 (1984). The undisputed facts show that CDT Inc. did not purchase Opsys' assets. That without more provides ample ground to affirm the district court's order.

Even if the transactions could be characterized as an asset purchase, the general rule is that a corporation that purchases the assets of another corporation does not assume the seller's debts. There are four limited exceptions to this rule. While on appeal, Sunnyside does not clearly state which exception(s) it wishes to invoke, its principal argument is that the consideration paid for Opsys was inadequate, and inadequate consideration is an element of two—the "mere continuation" and "fraudulent purpose" exceptions. *See Ray v. Alad Corp.,* 19 Cal. 3d 22, 28 (1977); *Franklin v. USX Corp.,* 87 Cal. App. 4th 615, 625 (2001).

-12-

*Mere continuation:* The undisputed evidence shows that Opsys and its shareholders received $16.2 million ($5 million in cash in 2002, and $11.2 million in stock in 2004), a sum far in excess of book value ($2.9 million). Sunnyside argues that the Court should ignore book value and focus instead on what it says was the fair market value of Opsys' assets in 2002—$26.9 million. But this argument is circular: The figure of $26.9 million rests on a valuation of what the agreed number of CDT Inc. shares was worth in 2002, not on a valuation of Opsys' assets. Alternatively, Sunnyside argues that the consideration was inadequate because a portion was paid to Opsys' shareholders rather than Opsys. But this argument is a non-sequitur: one who buys all the equity in a company pays the selling stockholders, not the company.

*Fraudulent purpose:* Sunnyside must show inadequate consideration or an actual intent to defraud Sunnyside. As just stated, Sunnyside cannot show inadequate consideration. Nor, given the structure of the 2004 transaction, can Sunnyside show an intent to defraud any creditor. Of the CDT Inc. stock given for the equity in Opsys, 14.4% was set aside to satisfy Opsys' identified liabilities, 40.3% was subject to a "Deferred Consideration Agreement" to protect a creditor (Kodak) and former debt holders, and the rest (45.4%) went into escrow.

Likewise, the May 2005 transaction cannot serve as a basis for successor liability against CDT **Inc.** Opsys transferred its remaining interest in CDT

-13-

Oxford to CDT **Ltd.** (which then was a defendant in this action, facing a fraud claim), not to CDT Inc. (which was not a party).

*Rule 69:* Sunnyside was not entitled to discovery and an evidentiary hearing simply because it filed its motion under Rule 69(a) as well as Rule 25(c). Even if Rule 69(a) permitted Sunnyside to file a creditor's suit against CDT Inc. under California law, Sunnyside chose not to do so—that is, until after it lost in the district court. It then brought two actions in New York, one of which it dismissed and one of which it lost.

*Rule 18:* The district court correctly denied Sunnyside's request to add a fraudulent conveyance claim under Rule 18(b). Sunnyside did not identify any respect in which this claim would have differed from its unsuccessful successor liability claim based on fraud. Although Rule 18(b) permits a plaintiff to join a fraudulent conveyance claim to a claim for money, it does not permit a party to piggyback a fraudulent conveyance claim on a Rule 25(c) motion to add a third party to an existing judgment.

## STANDARD OF REVIEW

*Denial of the Rule 25(c) motion:* The district court's factual determinations are reviewed for clear error; "its application of the law, and the manner in which it finds facts under the law, are subject to plenary review." *Luxliner,* 13 F.3d at 72.

*Denial of additional discovery:* "We review a district court's order denying additional discovery for abuse of discretion." *Tatum v. City & County of San Francisco,* 441 F.3d 1090, 1100 (9th Cir. 2006) (citation omitted).

500226704v1

"District courts have wide 'latitude in controlling discovery, and [their] rulings

will not be overturned in the absence of a clear abuse of discretion.'"

*California v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998) (affirming denial of

request to continue discovery) (citation omitted); *see also Abrego Abrego v.*

*Dow Chem. Co.,* 443 F.3d 676, 690-92 (9th Cir. 2006) (holding that district

court did not abuse its discretion in denying defendant's request to conduct

jurisdictional discovery before remand).

## ARGUMENT

I.    **THE DISTRICT COURT CORRECTLY DENIED**

**SUNNYSIDE'S RULE 25(c) MOTION BECAUSE**

**SUNNYSIDE URGED THE COURT TO PROCEED ON A**

**PAPER RECORD AND BECAUSE THERE ARE NO**

**GENUINE ISSUES OF MATERIAL FACT.**

Sunnyside relies on the Third Circuit's opinion in *Luxliner* to argue that

the district court violated Sunnyside's due process rights by denying its Rule

25(c) Motion without affording it further discovery or an evidentiary hearing.

Appellant's Br. at 16-18. But *Luxliner* concerns the due process rights of the

entity that the moving party seeks to substitute or join under Rule 25(c)—not

the rights of the moving party. The plaintiffs in *Luxliner* moved under Rule

25(c), as Sunnyside did here, to join or substitute a corporation, Sturgis Lux-

Liner Homologation, Inc. ("Sturgis"), on a judgment previously entered against

another corporation, RDI/Luxliner, Inc. ("RDI"). Sturgis had purchased RDI's

assets before entry of judgment against RDI, making RDI judgment-proof.

-15-

13 F.3d at 71. The district court granted the motion, finding that Sturgis' purchase of RDI's assets had resulted in a de facto merger and that Sturgis was a mere continuation of RDI. But the Third Circuit reversed, holding that the district court should have held an evidentiary hearing to resolve conflicts in the affidavits about whether Sturgis was RDI's successor-in-interest. *Id.* at 70.

*Luxliner* held that "*[b]efore a party may be deprived of a property interest,* due process requires, at a minimum, notice and an opportunity to be heard." *Id.* at 72 (citations omitted) (emphasis added). The court said that Sturgis' due process interests were "particularly compelling" because Sturgis was joined "not merely in ongoing litigation but on a judgment already entered against RDI." *Id.* In such a context—"in which a decision on a Rule 25(c) motion effectively imposes liability"—a district court must determine "whether the affidavits 'show that there is no genuine issue as to any material fact and that the moving party is entitled to [joinder or substitution] as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). If there are genuine issues of material fact, the court must conduct an evidentiary hearing. *Id.* at 72-73.

Unlike the order *granting* plaintiffs' Rule 25(c) motion in *Luxliner*, the district court's order *denying* Sunnyside's Rule 25(c) Motion did not deprive a party of a property interest, join an entity on a judgment that had already been entered, or effectively impose liability on a nonparty. Unlike Sturgis, Sunnyside was not put in the position of being held liable for another company's actions without an opportunity to defend itself. *Cf. id.* at 72 ("Assuming the affidavits filed presented a genuine issue of material fact, to

-16-

join Sturgis on the judgment without conducting a hearing would be to deprive Sturgis of its only opportunity to develop the operative facts before being held liable for RDI's actions."). In short, *Luxliner* does not address what due process rights Sunnyside may or may not have.

Moreover, *Luxliner* does not require an evidentiary hearing in all circumstances. As Sunnyside concedes, *Luxliner* requires such a hearing only where there are "genuine issues of material fact." *See* Appellant's Br. at 17-18 (quoting *Luxliner,* 13 F.3d at 72-73). As discussed below, the district court correctly ruled that there were no genuine issues of material fact.

Indeed, in the district court Sunnyside agreed there were no genuine issues of material fact. Its moving papers asked the district court to decide the motion summarily. While stating that an "[e]videntiary [h]earing [a]fter [d]iscovery *[m]ay* [b]e [a]ppropriate" (SER 313, lines 4-5 (emphasis added)), it argued that such a hearing was unnecessary because CDT Inc. had been on notice of Sunnyside's successor liability claim since November 2005 (when Sunnyside first moved to join CDT Inc.) and CDT Inc. had allegedly controlled Opsys' defense of the litigation. SER 313, lines 8-10. Sunnyside observed that the "facts were disputed" in *Luxliner,* as well as the credibility of some of the explanations offered in that case. SER 313, lines 16-17. Sunnyside argued that, in contrast, its own motion was "supported by a large volume of publicly-filed documents and undisputed exhibits." SER 300, lines 5-7. Although it asked for leave to conduct discovery "[i]f an evidentiary hearing is required" (SER 313, lines 23-24), it stated, "Sunnyside believes the *public record facts* and

-17-

Cambridge's participation to date mandate that Cambridge should be added to the judgment." SER 313, lines 18-19 (emphasis added). It thus urged the court "to hold Cambridge responsible for the judgment," requesting discovery and an evidentiary hearing only as an alternative. SER 314, lines 15-18; *see also* Appellant's Br. at 4 ("Sunnyside urged that the record sufficed to establish successor liability").

## II. THE DISTRICT COURT CORRECTLY RULED, BASED ON UNDISPUTED FACTS, THAT CDT INC. WAS NOT LIABLE AS A SUCCESSOR.

### A. Sunnyside did not present evidence sufficient to raise a genuine issue of material fact.

In its Rule 25(c) Order, the district court stated that, "[w]hile the parties dispute the legal significance of these transactions, *the basic facts are largely undisputed.*" ER 6, lines 9-10 (emphasis added). The court concluded: "In light of the weakness of plaintiff's arguments...*and the undisputed facts in the record,* the court holds *as a matter of law* that CDT, Inc. is not a proper defendant in this action." ER 20, lines 5-7 (endnote omitted) (emphasis added). Simply stated, no further proceedings were necessary because there were no genuine issues of material fact.

"[W]here competing affidavits focus on a material issue, a district court may not decide factual issues arising in the context of Rule 25(c) motions simply by weighing the sworn affidavits against one another." *Luxliner,* 13 F.3d at 72. Here, there were no competing affidavits. Sunnyside filed only

two declarations in support of its Rule 25(c) Motion, that of its then lead counsel, Robert H. Bunzel, Esq., and that of its accounting expert, Paul R. Ainslie. *See* SER 300, note 3 ("Most of the facts supporting this motion are set forth as attachments to the Declarations of Robert H. Bunzel ('Bunzel Decl.') and Paul R. Ainslie ('Ainslie Decl.')...."). As stated in the declaration itself, Mr. Bunzel's declaration simply "attach[es] and highlight[s]" selected publicly available records and certain exhibits and transcripts from the litigation. SER 316. Similarly, Mr. Ainslie's declaration attaches and comments on excerpts from CDT Inc.'s annual reports on Form 10-K filed with the Securities and Exchange Commission ("SEC") for 2004 to 2006, and its Form S-1 registration statement and prospectus filed with the SEC in 2004. SER 1148-51, 1158-72. Neither declarant purports to have any personal knowledge of the transactions described in these documents. Although the parties may dispute the "legal significance" of these transactions (ER 6), the facts of the transactions—"the basic facts" (*id.*)—cannot be disputed.

Until the hearing on the Rule 25(c) Motion, Sunnyside agreed that there were no genuine issues of material fact. It asked the district court to decide the motion summarily. It argued that an evidentiary hearing was unnecessary because CDT Inc. had been on notice of Sunnyside's successor liability claim since November 2005. SER 313; see also Appellant's Br. at 4.

Midway through the hearing on the Rule 25(c) Motion, Sunnyside changed course and pushed for further proceedings, but only after it became apparent that the district court might deny the motion. Its about-face was

-19-

merely tactical. Sunnyside's counsel asserted only that Sunnyside needed to "have some discovery against all those CDT entities and get the documents related to where are the asserts." SER 56. It did not identify any particular documents or explain why the SEC filings and other public documents it had submitted with its moving papers did not suffice. Even now, Sunnyside argues that its moving papers sufficed: Its opening brief on appeal asks "that the Court…impose successor liability upon CDT." Appellant's Br. at 3.

If Sunnyside truly needed discovery, it had an obligation to demand discovery and specify the discovery it needed. It did neither. In the summary judgment context, parties requesting additional discovery under Rule 56(f) "must show (1) that they have set forth…the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resisting the summary judgment motion." *California v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998). In *Tatum v. City & County of San Francisco,* 441 F.3d 1090 (9th Cir. 2006), this Court held it no abuse of discretion to deny the plaintiff's request for a continuance under Rule 56(f) where the plaintiff had failed to show that "additional discovery would have revealed specific facts precluding summary judgment." *Id.* at 1101; *see also Cormier v. Pennzoil Exploration & Prod. Co.,* 969 F.2d 1559, 1561 (5th Cir. 1992) (affirming denial of request for additional discovery and grant of summary judgment where plaintiff's motion for continuance offered only a "vague discovery plan").

The cases cited by Sunnyside make clear that a party may not rely on vague assertions that it needs more discovery. *See* Appellant's Br. at 20. In *Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839 (9th Cir. 1994), this Court ruled that the district court did not abuse its discretion in denying plaintiff's Rule 56(f) request, where the information sought "would not have shed light on any of the issues upon which the summary judgment decision was based." *Id.* at 844; *see also Garrett v. City & County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987) ("an opposing party must make clear what information is sought and how it would preclude summary judgment") (citations omitted).

The rule is the same outside the summary judgment context. In *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007), a judgment creditor appealed a judgment dismissing garnishments filed against property of the judgment debtor held by a third party, and dismissing an action for writ of execution. *Id.* at 1084. This Court held that the district court did not abuse its discretion in terminating discovery on a key issue where the plaintiff "ha[d] not specified what additional discovery was warranted." *Id.* at 1096 (citation omitted). In *Gager v. United States*, 149 F.3d 918 (9th Cir. 1998), this Court held that the district court had acted within its discretion in denying plaintiffs' request for additional discovery before dismissing the action for lack of subject matter jurisdiction, because plaintiffs failed to "put forth sufficient facts to show that the evidence sought exists" and "specif[y] in any way where such additional evidentiary material might be found." *Id.* at 922 (internal quotation marks and citations omitted).

-21-

Furthermore, Sunnyside did have an opportunity to conduct pretrial discovery about the transactions at issue and availed itself of that opportunity. Sunnyside's second amended complaint devotes more than a page to allegations about the acquisition (as had the first amended complaint). SER 1222-23, 1327-28. Sunnyside demanded documents relating to the 2002 transaction and obtained a court order compelling their production. SER 1211-15. In deposition, Sunnyside questioned Opsys' witnesses extensively about the CDT transactions, focusing both on documents produced by Opsys and reports filed with the SEC. Sunnyside asked its accounting expert, Paul Ainslie, to analyze the information it had obtained about Opsys' acquisition and to opine on whether the acquisition had increased Sunnyside's damages. SER 1148.

The district court denied further discovery not only because there were no disputed issues but also because of "the weakness of plaintiff's arguments." ER 20. The district court's order was well within the court's discretion and should be affirmed on this ground as well. *Tatum,* 441 F.3d at 1100; *Campbell,* 138 F.3d at 779; *see also Abrego Abrego,* 443 F.3d at 690-92.

Thus, Sunnyside has failed to show any entitlement to further discovery. It made a tactical decision to proceed by motion rather than seeking discovery. When during oral argument it had second thoughts about that tactical decision, it did not specify what discovery it sought. It had already taken discovery about the transactions and had told the court that the relevant documents were publicly available. There were no genuine issues of material fact and, as

-22-

discussed below, the district court correctly ruled as a matter of law that CDT Inc. could not be held liable for the judgment against Opsys.[1]

**B.    Because CDT Inc. did not purchase Opsys' assets, the successor liability doctrine does not apply.**

Sunnyside's principal argument is that CDT Inc. is a successor to Opsys under the "successor liability" doctrine. This doctrine provides a limited exception to the principle that a corporation can normally sell assets, even all its assets, without also transferring its liabilities to the buyer. The district court correctly ruled that, as a matter of law, the successor liability doctrine does not apply here because CDT Inc. did not purchase assets from Opsys. ER 12-13. As stated in *Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144 (1984), the doctrine applies only to asset purchases, not stock purchases. *Id.* at 1150.

In *Potlatch,* the California Court of Appeal held that a corporation (Potlatch) was not liable for damages caused by a defective product manufactured by another company before Potlatch purchased all the outstanding stock of that company. The court observed that the difference

---

[1]    Beyond arguing that it was denied discovery, Sunnyside also argues that it was denied an opportunity to file a reply brief in support of its Rule 25(c) Motion. Appellant's Br. at 4. What it neglects to tell this Court is that both sides waived reply briefs on their post-trial motions. SER 1203-04. Besides, a party ordinarily may not introduce new evidence on reply. *See Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1996); *Sweet v. Pfizer,* 232 F.R.D. 360, 364 & n.7 (C.D. Cal. 2005); *Eberle v. City of Anaheim,* 901 F.2d 814, 818 (9th Cir. 1990). Sunnyside had ample opportunity to respond to CDT Inc.'s arguments at the hearing, where the district court allowed the parties to argue at length. SER 44-76.

between an acquisition of capital stock and an acquisition of physical assets is "no mere matter of form." *Id.* "It implicates fundamental concepts and principles of California and United States law: corporate identity and shareholder immunity." *Id.; see also Marks v. Minnesota Mining & Mfg. Co.,* 187 Cal. App. 3d 1429, 1436 (1986) (listing factors that indicate "whether a transaction cast in the form of *an asset sale* actually achieves the same practical result as a merger") (emphasis added); *Phillips v. Cooper Labs., Inc.,* 215 Cal. App. 3d 1648, 1660 (1989) (holding that *Marks* did not apply to stock sale). When Potlatch acquired all the capital stock of the manufacturer, it became the sole shareholder. "It is fundamental that a shareholder owns no part of the specific property of the corporation." *Potlatch,* 154 Cal. App. 3d at 1150.

Applying *Potlatch,* the district court here found only "a single relevant transfer of business assets: the [2002] transfer of Opsys Limited's UK assets and operations to Opsys UK" (ER 13), which did not involve CDT Inc. Although CDT **Ltd.** obtained management rights, an IP license, and an interest in Opsys UK's profits, the court noted that it would be "highly dubious" to characterize this transaction as an asset transfer. *Id.* Moreover, the transaction involved CDT **Ltd.,** not CDT **Inc.** *Id.* The district court concluded that, as a result, Sunnyside's attempt to impose successor liability on CDT Inc. failed. *Id.*

Sunnyside does not dispute that the successor liability doctrine applies only to asset sales. It argues only that the district court "placed undue emphasis" on *Katzir's Floor & Home Design, Inc., v. M-MLS.com,* 394 F.3d 1143 (9th Cir. 2004), in deciding not to consider transfers other than the transfer

-24-

of Opsys' UK assets and operations to Opsys UK. Appellant's Br. at 28-29. In
*Katzir's*, this Court held, *inter alia*, that a district court had erred in adding a
corporation as a judgment debtor to a judgment against another corporation.
This Court ruled that the alleged successor could not be considered a mere
continuation of the alleged predecessor where, among other factors, the alleged
predecessor had transferred the assets at issue to a separate, intervening
corporation, which had then independently transferred them to the alleged
successor. 394 F.3d at 1151; *see also Maloney v. Am. Pharm. Co.*, 207 Cal.
App. 3d 282, 288 (1988) ("a mere continuation contemplates a direct sale of
assets from the predecessor corporation to the successor corporation").
Contrary to Sunnyside's argument (Appellant's Br. at 29), this portion of
*Katzir's* is not *dicta*. There were also other reasons for this Court's ruling
(394 F.3d at 1151), but this does not transform the first reason into *dicta*. *See
Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("where a decision
rests on two or more grounds, none can be relegated to the category of obiter
dictum").

Even if it were *dicta*, however, that would not change the result here.
Sunnyside implies that there was a "secondary transfer" whereby CDT Inc.
"immediately gain[ed] control" over Opsys' assets. Appellant's Br. at 29. But
that is plainly wrong. After Opsys transferred its UK operations and assets to
Opsys UK, CDT **Ltd.** agreed to manage and fund the operations of Opsys UK
in exchange for 98% of Opsys UK's profits. Unlike *Katzir's*, where the alleged
predecessor transferred its assets to an intervening corporation that then

-25-

transferred the assets to the alleged successor, CDT **Ltd.** has never transferred its right to manage Opsys UK to CDT Inc.

It also is not true that the district court ignored other transfers. The district court considered the rights that CDT Ltd. acquired in the 2002 transaction, and it rejected the argument that there had been an asset transfer to CDT Ltd. ER 13. CDT Ltd. agreed to manage and fund Opsys UK, and it paid $2 million for a sublicense to Opsys' IP. These were management and license agreements, not asset purchases. The parties were CDT **Ltd.** and Opsys UK— not CDT **Inc.** and Opsys, the two companies now before the Court. Opsys UK is not the same as Opsys, and CDT Inc. is not the same as CDT Ltd. Sunnyside admits that CDT Inc. and CDT Ltd. are different companies (*e.g.,* SER 304, note 24), that the 2002 transaction involved Opsys UK (SER 309, note 32), and that CDT Inc. did not acquire Opsys itself until 2004 (*id).*[2]

---

[2]    Neither of the two cases that Sunnyside cites on this point is relevant. *See* Appellant's Br. at 29. *Lippi v. City Bank,* 955 F.2d 599, 611-14 (9th Cir. 1992), addresses, *inter alia,* whether a leveraged buy-out should be considered a fraudulent conveyance. *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution,* 712 F. Supp. 1010 (D. Mass. 1989), held that the common law successor liability doctrine could be applied to claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. The court reasoned that ruling otherwise would invite "corporations, both polluters and their acquirors, to avoid liability for past pollution through formalistic corporate slight of hand." *Id.* at 1014. Quoting this language, Sunnyside suggests that *Acushnet* addresses when simultaneous asset transfers should be treated as one transaction. It does not.

-26-

Nor can the remaining transactions properly be characterized as asset sales. CDT Inc. acquired a 16% equity interest in Opsys UK in 2002. Similarly, in 2004, CDT Inc. acquired all the stock of Opsys. Both were acquisitions of equity, not assets. Sunnyside admits that the 2004 transaction was a "100% stock deal." *Id.* This acquisition could not, as a matter of law, have given rise to successor liability. Finally, in 2005, Opsys transferred its 84% interest in Opsys UK (renamed CDT Oxford by then) to CDT Ltd. This, too, involved only the transfer of stock, not assets. In short, CDT Inc. never purchased Opsys' assets. None of the transactions at issue involved an asset purchase by CDT Inc. or even CDT Ltd. Accordingly, the successor liability doctrine cannot apply.

### C.   The successor liability doctrine does not apply even if the transactions could somehow be characterized as asset purchases.

The district court could have denied Sunnyside's Rule 25(c) Motion solely on the ground that the successor liability doctrine does not apply to stock purchases. This Court may affirm the Rule 25(c) Order on that ground alone.

Even if one of the transactions at issue could be characterized as an asset transfer from Opsys to CDT Inc., however, the successor liability doctrine still would not apply. A corporation that purchases the assets of another corporation

ordinarily does not assume the debts of the selling corporation.[3]  Only if one of

four recognized exceptions applies is the vendee liable for the vendor's debts.

As stated in *Ray v. Alad Corp.,* 19 Cal. 3d 22 (1977),[4] the four exceptions are:

"(1) there is an express or implied agreement of assumption, (2) the transaction

amounts to a consolidation or merger of the two corporations, (3) the

purchasing corporation is a mere continuation of the seller, or (4) the transfer of

assets to the purchaser is for the fraudulent purpose of escaping liability for the

seller's debts." *Id.* at 28.[5]  The district court correctly ruled that none of these

exceptions applied.  ER 13-20.

    In 2005, Sunnyside argued for one exception, de factor merger.

SER 1290-91.  In 2007, it argued for all four.  Now, on appeal, it does not

specify which exceptions it seeks to invoke.  By focusing mainly on the issue of

adequacy of consideration (*see, e.g.,* Appellant's Br. at 28), however, Sunnyside

necessarily must be raising the third exception (mere continuation) and the

---

[3]    In contrast, in a statutory merger, the surviving corporation assumes the disappearing corporation's liabilities.  Sunnyside concedes that there has been no statutory merger of CDT Inc. and Opsys.  SER 303, lines 15-17.

[4]    Because Rule 25(c) is purely procedural and does not confer any substantive rights, the district court applied California's law of successor liability.  ER 10 (citing *Hilbrands v. Far East Trading Co.,* 509 F.2d 1321, 1323 (9th Cir. 1975); *LiButti v. United States,* 178 F.3d 114, 124 (2d Cir. 1999)).

[5]    *Ray* created a fifth exception for claims against entities that acquire manufacturing businesses and continue to manufacture the same products. 19 Cal. 3d at 29-34.  That exception has since been limited to cases of strict tort liability for product defects.  *See Franklin,* 87 Cal. App. 4th at 627-29.

fourth (fraudulent purpose), as these are the only two exceptions for which adequacy of consideration clearly is an element. *See Ray,* 19 Cal. 3d at 29; Cal. Civ. Code § 3439.04(a)(2). Some cases state that adequacy of consideration also is relevant to the *de facto* merger exception, but others do not consider adequacy of consideration in analyzing this exception. *Compare Ray,* 19 Cal. 3d at 28, *with Marks,* 187 Cal. App. 3d at 1436. In any event, as discussed below, Sunnyside did not raise a genuine issue of material fact as to adequacy of consideration.

### 1.    CDT Inc. is not a mere continuation of Opsys.

"California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." *Ray,* 19 Cal. 3d at 29. Subsequent decisions suggest that the first of these elements usually is determinative. *Franklin,* 87 Cal. App. 4th at 625.

In *Franklin,* the California Court of Appeal observed that all the cases cited by *Ray* "involved the payment of inadequate cash consideration, and some also involved near complete identity of ownership, management or directorship after the transfer." *Id.* at 627. Because the consideration was adequate in the case before it, the court held that the buyer was not a mere continuation of the

-29-

seller even though the same individual was president and a board member of both corporations. *Id.* at 626-27. To the same effect are *Orthotec, LLC, v. REO Spineline, LLC,* 438 F. Supp. 2d 1122, 1128 n.6, 1133 (C.D. Cal. 2006), and *Maloney v. American Pharmaceutical Co.,* 207 Cal. App. 3d 282, 287 (1988) (refusing to find a corporation liable as a successor absent the "essential ingredient" of inadequate consideration, although the corporation held itself out as a continuation of another corporation and the two corporations shared a common officer).

Here, the district court concluded that Sunnyside had proved neither element. The court found that "[f]ailure to prove inadequate consideration is fatal to plaintiff's claim" that CDT Inc. was a mere continuation of Opsys. ER 18. The court also found that Sunnyside had failed to demonstrate a genuine issue as to continuity of management. Sunnyside identified only two individuals allegedly involved in both Opsys and CDT Inc. "One became a board member of CDT Oxford Limited, not CDT, Inc. itself, while another became an observer on the CDT, Inc. board. This is hardly the level of personnel continuity that courts look for when finding that an asset transfer amounts to a mere continuation." *Id.* Although CDT Inc. or CDT Ltd. employees have served as directors of Opsys, no director of CDT Inc. has ever been a director of Opsys or Opsys UK, and the principal shareholders and officers of Opsys have never worked for CDT Inc. or CDT Ltd. SER 115.

On appeal, Sunnyside has not challenged the district court's conclusion that there was insufficient continuity of management to support successor liability. It focuses solely on the adequacy of consideration.

a.    **The district court correctly ruled, based on undisputed facts, that adequate consideration was paid.**

The party asserting successor liability bears the burden of proving inadequate consideration. *Maloney,* 207 Cal. App. 3d at 288 & n.3; *Katzir's,* 394 F.3d at 1151 (citing *Maloney*). Here, Sunnyside did not offer enough evidence to create a genuine issue. The district court found that "plaintiff has failed to make any showing that CDT, Inc. paid inadequate consideration for Opsys Limited's assets." ER 16, lines 14-15. That finding clearly was correct.

CDT Inc. paid 931,633 shares of its common stock for Opsys' stock in 2004. At the IPO price of $12 per share, this amounts to $11,179,596. Two years earlier, in 2002, Opsys had received $5 million in cash: CDT Inc. had paid $2.5 million for its 16% equity interest in Opsys UK; CDT Ltd. had paid $2 million for a patent license; and CDT Inc. had paid $500,000 for its call option to acquire the remaining 84% interest in Opsys UK. Thus, the 2002 and 2004 transactions together resulted in payments totaling $16,179,596.

This amount far exceeds the book value of Opsys' assets. According to Opsys' audited financial statements dated September 30, 2002, just before execution of the Transaction Agreement, these assets were worth only £1.8

million ($2.9 million).  SER 323, 1110.[6]  Opsys' liabilities exceeded £17

million ($26.5 million).  *Id.*  Opsys had a negative net worth of £15.5 million

($24.1 million).  *Id.*  It had lost £19.7 million ($30.8 million) for the year

ending September 30, 2002.  SER 323, 1109; *see also* SER 249, 256-58.

Sunnyside argues that the Court should disregard the book value of

Opsys' assets, but the three cases cited by Sunnyside (Appellant's Br. at 24) do

not require the Court to do so.  In *Lawson v. Ford Motor Co. (In re Roblin*

*Industries, Inc.),* 78 F.3d 30 (2d Cir. 1996), the court held that a payment by a

debtor to a creditor was not void as a preferential transfer because the debtor

was not insolvent when the transfer was made.  The court explained that "[f]air

value, in the context of a going concern, is determined by the fair market price

of the debtor's assets that could be obtained if sold in a prudent manner within a

reasonable period of time to pay the debtor's debts."  *Id.* at 35-36 (citations

omitted).  In contrast, "book value" is the "historical cost [of the assets] less

accumulated depreciation."  *Id.* at 36.  Although "book values alone may be

inappropriate as a direct measure of the fair value of property…, such figures

are, in some circumstances, *competent evidence from which inferences about a*

*debtor's insolvency may be drawn.*"  *Id.* (citations omitted) (emphasis added).

In *Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.,* 621 F. Supp. 198

(S.D.N.Y. 1985), the plaintiffs contested the validity of certain ship mortgages

---

[6]     Amounts in British pounds have been converted to US dollars at the
September 30, 2002 rate of £1 to $1.56 (http://www.oanda.com/convert/
fxhistory).

on the ground, among others, that the mortgagor was insolvent when the mortgages were executed. Rejecting this claim, the court looked to the "fair saleable value" of the mortgagor's assets rather than their book value. *Id.* at 220. But unlike the court of appeals that later decided *Lawson,* the district court did not specifically decide whether book value could be considered in conjunction with market value.

In *Sierra Steel, Inc., v. Totten Tubes, Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275 (B.A.P. 9th Cir. 1989), the B.A.P. addressed whether deferred income taxes and a contingent liability should have been considered in determining whether a debtor was insolvent at the time of an alleged preferential transfer. *Sierra Steel* does not address valuation of assets.

Here, the price paid by CDT Inc.—$16.2 million—was many times the book value of Opsys' assets as of September 30, 2002—$2.9 million. As reported in CDT Inc.'s Final Prospectus, CDT Inc. valued Opsys' net assets at the time of the 2002 transaction at $602,000 and its in-process research and development at $12.2 million. SER 317, 594. The consideration paid far exceeds even these numbers.

**b.** **It is circular to argue, as Sunnyside does, that the value of Opsys' assets is the value of the consideration paid for them but that consideration is inadequate.**

Alternatively, Sunnyside argues that Opsys' assets were worth $26.9 million. Appellant's Br. at 24-25; SER 301. This is the value of Opsys UK (as shown on the books of CDT Inc., using purchase accounting) based on the

$5 million cash paid in 2002 plus a valuation of the stock to be paid by CDT
Inc. if the put or call options created by the Transaction Agreement were to be
exercised. SER 319, 739 (CDT Inc.'s 2004 Form 10-K); SR 114. As
Sunnyside concedes (Appellant's Br. at 12), this value was later reduced to
$19.7 million to reflect a decrease in the value of CDT Inc.'s common stock.
SER 319, 741. In fact, the actual value—based on the IPO price of $12 per
share of CDT Inc. stock—was $16.2 million. Thus, Sunnyside's argument that
Opsys' assets were worth $26.9 million fails to account in any way for
decreases in the value of CDT Inc.'s stock.

More important, this argument is circular: If the value of Opsys' assets is
determined by reference to the value of what was paid for them (cash plus CDT
Inc. stock), as Sunnyside argues, then the amount paid is necessarily adequate.
To argue otherwise would require some evidence—other than purchase price—
of the value of Opsys' assets. Sunnyside offers no such evidence.

c.    **Sunnyside is wrong in asserting that the consideration was
      inadequate because payment for Opsys' stock was made to
      Opsys' shareholders rather than Opsys.**

Sunnyside contends that the district court erred by focusing on what CDT
Inc. paid rather than what Opsys received, and that Opsys received only $5
million for assets worth $26.9 million. *E.g.,* Appellant's Br. at 2, 25. But this
argument is inherently flawed. As discussed, the $26.9 million valuation
*includes* the $5 million cash paid in 2002. Sunnyside proves nothing by taking
a fraction of the value, comparing it to the whole, and declaring that it is not as

-34-

big.  Indeed, by focusing on how CDT Inc. valued the transactions, Sunnyside

itself focuses on what CDT Inc. paid.  It is true that Opsys itself did not receive

all $16.2 million paid, because it did not receive the CDT Inc. stock exchanged

for Opsys stock in 2004.  In a stock purchase, however, payment for the stock is

necessarily made to sellers of the stock—*i.e.,* the former stockholders.

    None of Sunnyside's authorities is to the contrary.  *See* Appellant's Br. at

26-27.  All address whether transfers by debtors who had filed for bankruptcy

were fraudulent because the debtor did not receive a reasonably equivalent

value in exchange.  *See Gen. Elec. Capital Auto Lease, Inc., v. Broach (In re

Lucas Dallas, Inc.),* 185 B.R. 801 (B.A.P. 9th Cir. 1995); *Pajaro Dunes Rental

Agency, Inc., v. Spitters (In re Pajaro Dunes Rental Agency, Inc.),* 174 B.R. 557

(Bankr. N.D. Cal. 1994); *Marquis Prods., Inc., v. Conquest Carpet Mills, Inc.

(In re Marquis Prods., Inc.),* 150 B.R. 487 (Bankr. D. Me. 1993).  None

involves successor liability, and none discusses the distinction between asset

purchases and stock purchases.  Unlike the defendants in these cases, CDT Inc.

did not receive any property, payments or other assets from Opsys in 2004.  It

received only Opsys' stock, for which it paid CDT Inc. stock valued at

$11.2 million.

> **d.    Statements describing the disposition of the CDT Inc. stock
> exchanged for Opsys stock are not relevant in assessing the
> adequacy of the consideration.**

    As described (*supra,* pp. 8-9), none of the CDT Inc. stock was paid

directly to Opsys' shareholders as such.  Some of it was held back to cover

known and identified liabilities of Opsys. Some of it went into an escrow

account as security for contingent and unidentified liabilities of Opsys. The

remaining stock was issued to Opsys Management, to be distributed to a former

trade creditor of Opsys, former debt holders that had provided capital to Opsys,

and only then to Opsys' former shareholders.

Sunnyside takes issue with how CDT Inc. described the disposition of

this stock in the district court proceedings. *See* Appellant's Br. at 12-13. But

the statements have no bearing on the adequacy of the consideration paid by

CDT Inc. CDT Inc. stated, in its opposition to the Rule 25(c) Motion: "the

proceeds of the transactions were held in escrow and trust for the benefit of

creditors, known and unknown." SER 83, lines 1-2. In its ruling dismissing a

turnover petition filed by Sunnyside to seize the funds held in escrow, the

United States District Court for the Southern District of New York stated that,

*as regards the escrow account,* this statement and others to similar effect were

an "extravagant mischaracterization." *Sunnyside Dev. Co., LLC, v. Bank of

New York,* No. 07 Civ. 8825 (LLS), 2008 WL 463722, at *3 (S.D.N.Y. Feb. 19,

2008). This conclusion flowed from the New York court's holding that neither

Opsys nor any creditor of Opsys had any interest in or right to the escrow

account. *Id.* at *1-*2. It also assumes that the statement referred only to the

escrow and not to the stock held for creditors or the stock transferred to Opsys

Management for the benefit of a trade creditor and debt holders. But CDT

Inc.'s statement covered all three buckets. The New York court had no problem

with the statement viewed in this light. Thus, the court said, "Such a statement

-36-

[by CDT Inc.] may be a generally fair, even if rough, description of the $1,607,256 worth of shares set aside to cover the list of known and identified Opsys liabilities. That is not a matter before this Court." *Id.* at *3.

More important, the New York court found that the California district court had not relied on the challenged statements: "They were not germane to the decision Judge Patel reached." *Id.* The California district court had "held that, as a matter of California law, successor liability does not apply to a stock-for-stock acquisition like this [the Opsys and CDT Inc. transaction]." *Id.* (citing ER 12-13). Thus, the California district court gave the statements at issue "no weight, and did not rely upon them in its decision." *Id.* Indeed, the statements concern the *disposition* of the consideration paid by CDT Inc.—not the *amount* of the consideration. They are therefore irrelevant to the issue of the adequacy of consideration.

### e. The district court's ruling that CDT Inc. was not a mere continuation of Opsys is correct on other grounds as well.

Notwithstanding Sunnyside's unsupported claim to the contrary (Appellant's Br. at 9, 16, 27), Opsys did not transfer any **assets** to CDT **Inc.** in May 2005. As discussed, Opsys transferred its 84% equity interest in CDT Oxford (formerly Opsys UK) to CDT **Ltd.** For this reason alone, the 2005 transfer cannot serve as a basis for a successor liability finding against CDT **Inc.**, regardless of what consideration was paid.

To show inadequate consideration based on the 2002 and 2004 transactions, Sunnyside would have had to show "a causal relationship"

between CDT Inc.'s acquisition of Opsys' assets (if assets were acquired) and

Sunnyside's inability to get paid. ER 17 (citing *Katzir's*, 394 F.3d at 1151

(citing *Monarch Bay II v. Prof'l Serv. Indus., Inc.*, 75 Cal. App. 4th 1213, 1218

(1999))). Where it is a "lack of sufficient assets that deprive[s] the

predecessor's creditors of their remedy" rather than "the acquisition of the

predecessor's assets by another entity," successor liability cannot attach. *Id.*

(citing *Katzir's*, 394 F.3d at 1151; *Franklin*, 87 Cal. App. 4th at 627). The

district court concluded that Sunnyside had failed to "show more than Opsys

Limited's current inability to pay its debts." *Id.* The court rejected Sunnyside's

argument that CDT Inc. should have paid enough to settle Opsys' debts (ER 17-

18),[7] and stated that Sunnyside had not argued that the consideration paid was

"objectively inadequate" (ER 17). Sunnyside offered no evidence that Opsys

could have paid the judgment if CDT Inc. had not purchased Opsys' stock, or

even that Opsys would still be in business.

In addition to finding that Sunnyside had failed to create a genuine

dispute as to adequacy of consideration and continuity of personnel (*supra*,

pages 30-31), the district court also observed that "California courts generally

---

[7]    Sunnyside cited no authority supporting this argument below (*see* ER 17-
18), and has not made this argument on appeal. A rule requiring the purchaser
of a corporation's assets to pay enough to settle all of the corporation's
liabilities—regardless of the value of the assets themselves—would place such
a corporation's creditors in a better position than if there had been no
acquisition at all. *Cf. Katzir's*, 394 F.3d at 1151. It would mean that a
corporation in financial distress could never sell its assets—a senseless result.

hold that successor liability based on continuation is not established 'where the selling and purchasing corporations were completely separate and distinct entities both before and after sale.'" ER 17 (citing *Tidewater Oil Co. v. Workers' Comp. Appeals Bd.,* 67 Cal. App. 3d 950, 955-56 (1977)). The court stated: "[I]t is undisputed that CDT, Inc. and Opsys Limited remain separate legal entities." *Id.* Opsys has not challenged this finding on appeal.

For all the foregoing reasons, the district court correctly ruled that CDT Inc. was not the mere continuation of Opsys.

### 2. CDT Inc. has not fraudulently sought to escape liability for Opsys' debts.

A purchaser of a corporation's assets may be liable as a successor-in-interest if "the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray,* 19 Cal. 3d at 28. Under California law, a transfer by a debtor is not fraudulent as to a creditor unless the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor" or "[w]ithout receiving a reasonably equivalent value in exchange for the transfer...." Cal. Civ. Code § 3439.04(a). Here, as discussed, Opsys received ample consideration for its UK assets. In addition, Sunnyside failed to establish a genuine issue of fact as to any "actual intent to hinder, delay, or defraud" Sunnyside.

-39-

a.    **CDT Inc. had legitimate business reasons to acquire only Opsys' UK operations and not its US operations.**

The transactions at issue were driven by legitimate business considerations. CDT **Ltd.** acquired control of Opsys UK in 2002 to gain access to UK-based IP potentially useful to CDT Ltd.'s business. SER 107, 1374, 1377. CDT **Inc.** purchased the stock of Opsys in 2004 to obtain Opsys' 84% interest in Opsys UK. The structure of these transactions reflected reasonable business concerns and sound tax planning, not a plan to defraud creditors. A simpler structure, such as an asset purchase, would have created tax liability that Opsys probably could not have paid—a significant obstacle to completing the transaction. SER 112-13. Creating new unpaid tax obligations would have done nothing for Opsys' creditors.

Similarly, there is nothing improper or unlawful about CDT Inc.'s decision to acquire an interest in Opsys' UK assets and operations, but not its US assets and operations. SER 107-08, 113-14, 1374, 1377-78. Sunnyside relies on this passage from CDT Inc.'s 2004 annual report on Form 10-K:

> The terms of the Transaction Agreement were entered into by the Company so that it could gain control of and economic interest in the UK assets and operations of Opsys (which had been transferred to Opsys UK immediately prior to the transaction) in such a manner to avoid acquiring any interest in any other assets or liabilities of Opsys.

SER 1149, 1160. As the district court correctly observed, "This statement is unremarkable." ER 19. It is undisputed that CDT Inc. had no interest in Opsys' US operations; the transaction was structured to avoid both the assets

and liabilities of Opsys' US business—"in other words, the entire operation."
*Id.* The district court found, in addition, "There is no indication that Opsys
Limited's attempts to maintain its UK operations by seeking financing from
CDT, Inc. was specifically designed to dodge the liabilities of its US operations.
Rather, Opsys Limited unsuccessfully sought a financing partner for Opsys US
at the time same time it was working out its arrangement with CDT, Inc.
regarding Opsys UK." *Id.*

Sunnyside argues that what matters is whether *Opsys'* intent was
fraudulent, but that *CDT Inc.* may be held liable nevertheless if it "was aware"
and "participated in 'structuring the transaction.'" Appellant's Br. at 22 n.3.
Sunnyside then claims that CDT Inc. knew that Opsys' attempt to assign the
Sunnyside lease to Opsys US would fail—or had failed—and that the
transactions were structured to avoid this liability, but there is no evidence to
support this claim and Sunnyside cites none. *See* Appellant's Br. at 9 (claiming
that "CDT began gearing up for its IPO at a time [when] it was apparent that the
lease assignment had failed"), 22 (claiming that CDT intended "to obtain assets
and avoid Sunnyside's liability"); *see also id.* at 3 (claiming that Opsys' assets
were transferred "to avoid Sunnyside's claims"), 7 (claiming that the 2002
transaction was structured to "place [Opsys' assets] beyond the reach of
creditors"). It is undisputed that CDT Inc. did not know that the Sunnyside
lease assignment had been ineffective, and CDT Inc. would not have purchased
Opsys' stock if it had known that the assignment was ineffective. SER 109,
118.

### b.    CDT Inc. made reasonable provisions for known liabilities.

Although CDT Inc. was buying equity from Opsys' shareholders, rather than assets from Opsys, with limited exceptions, none of the consideration paid for Opsys' stock went directly to Opsys' shareholders. Rather, and as described above (p. 9), the stock went into three buckets: *First*, 133,938 shares (14.4%) were held back to cover known liabilities listed in Schedule A to the Amended Settlement Agreement. *Second*, 375,085 shares (40.3%) were issued to Opsys Management, to be paid first to a former trade creditor of Opsys (Kodak), then to former debt holders who had provided venture capital to Opsys, and only then to the former shareholders. *Third*, 422,610 shares (45.4%) went into an escrow, to deal with any contingent and unidentified liabilities of Opsys.

Buckets 1 and 2 explicitly benefit creditors. SER 117-18. Only bucket 3 (the escrow) has been the subject of some legal (rather than factual) dispute. Judge Patel had before her the full text of the escrow agreement (SER 318, 639-53), and could and did construe it correctly for herself. ER 9.[8] The meaning of the escrow is clear—and was clear both to Judge Patel and to the New York judge. The stock placed in escrow is available to CDT Inc. to defend against creditors' claims, to indemnify CDT Inc. against loss and (if CDT Inc. so

---

[8]    In a previous brief, we described the overall structure of the transaction in words the New York judge found to be "generally fair, even if rough" as applied to the overall transaction, albeit a mischaracterization if applied solely to bucket 3 (the escrow)—something we never intended. *See* SER 83, 87-88 (referring to all three buckets); *supra*, pp. 35-37.

500226704v1

chooses) to settle creditors' claims; if not used for one of these purposes, the stock would ultimately go to the sellers of the stock, Opsys' former shareholders. SER 640-46.

Taken together, the three buckets provide a perfectly reasonable means of dealing with creditors. Neither judge saw in this structure any intent to defraud Sunnyside or any other creditor of Opsys—and rightfully so. There is no competent evidence of any intent to defraud Sunnyside or anyone else. The structure itself and the operative documents—all of which were before Judge Patel—belie any such argument.

> **c.     Transferring equity from one defendant to another defendant cannot rationally be viewed as an attempt to defraud the plaintiff.**

Sunnyside claims that Opsys' May 2005 transfer of its 84% interest in CDT Oxford (formerly Opsys UK) to CDT **Ltd.** was fraudulent. But this transfer cannot create successor liability against CDT **Inc.** because the equity was transferred to CDT **Ltd.**, not CDT Inc. Furthermore, at the time of transfer, CDT Ltd. was a defendant in this litigation. (The district court did not finally dismiss CDT Ltd. until August 8, 2005. SER 1297-1307.) One does not hide assets from a plaintiff by transferring equity from one party defendant (Opsys) to another (CDT Ltd.). ER 19, lines 14-20. There is no ground to assert that this transaction defrauded anybody, or was intended to do so. SER 118-19. The transfer of assets from Opsys to CDT Ltd. was planned well before the filing of Sunnyside's complaint—before CDT Inc. knew of Sunnyside's

-43-

lawsuit—to simplify CDT Inc.'s corporate structure. *Id.* Contrary to
Sunnyside's claims (Appellant's Br. at 9), the equity interest in CDT Oxford
that Opsys transferred to CDT Ltd. had little value because CDT Ltd. already
had been entitled to 98% of CDT Oxford's profits since 2002. SER 119. An
84% interest in 2% of (non-existent) profits is not a valuable interest.

Sunnyside argues that the 2005 transfer bears "*virtually all* of the
invidious 'badges of fraud'" codified at section 3439.04(b) of the California
Civil Code. Appellant's Br. at 22-23 (emphasis added). But its rhetoric is not
supported by its own argument. Sunnyside does not contend that Opsys
retained possession or control of the property transferred after the transfer (Cal.
Civ. Code § 3439.04(b)(2)), that Opsys absconded (*id.* § 3439.04(b)(6)), that
Opsys removed or concealed assets (*id.* § 3439.04(b)(7)), that the transfer
occurred shortly before or shortly after a substantial debt was incurred (*id.*
§ 3439.04(b)(10)), or that Opsys transferred the essential assets of its business
to a lienholder who transferred the assets to an insider of the debtor (*id.*
§ 3439.04(b)(11)). Sunnyside contends that Opsys was insolvent in May 2005
(*id.* § 3439.04(b)(9)), but supplies no evidence to support this claim or its claim
that the 2005 transaction was concealed (*id.* § 3439.04(b)(3)).[9] Sunnyside also

---

[9]    The identity of CDT Inc.'s subsidiaries, and its subsidiaries' subsidiaries,
was a matter of public record. *See* SER 119, 237-45 (excerpts from CDT Inc.'s
annual report on Form 10-K from 2004 to 2006, showing that Opsys was a
subsidiary of CDT Inc., and CDT Oxford a subsidiary of Opsys, as of
December 31, 2004, but that both became subsidiaries of CDT Ltd. in 2005).

contends that the transfer was made to an insider. *Id.* § 3439.04(b)(1). Even if CDT Ltd. might be considered an "insider," it makes no sense to consider transfer to CDT Ltd. a "badge of fraud," since at the time it was a named defendant in litigation initiated by the creditor, facing exactly the same two causes of action as Opsys faced.

## III.  THE DISTRICT COURT CORRECTLY DENIED SUNNYSIDE'S MOTION UNDER RULE 69.

### A.  Sunnyside has no successor liability or alter ego argument.

Sunnyside filed its motion under Rule 69(a), as well as Rule 25(c). Sunnyside argued below that Rule 69(a) allows it to rely on California Code of Civil Procedure section 187 (SER 307-08), which courts have interpreted to permit the amendment of a judgment to add judgment debtors under certain circumstances. Two such circumstances have possible relevance here, but Sunnyside satisfied neither:

*First*, California courts have interpreted Code of Civil Procedure section 187 to permit the addition of successors-in-interest to a judgment. *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.,* 89 Cal. App. 4th 746, 753-54 (2001). This theory adds nothing to Sunnyside's Rule 25(c) Motion. As shown above, CDT Inc. is not a successor-in-interest to Opsys. The district court consolidated its analysis of successor liability under Rule 25(c) and its analysis under Rule 69(a) into "a single inquiry" because Sunnyside itself appeared to do so. ER 11. The fact that Sunnyside moved

under both Rule 25(c) and Rule 69(a) does not change the applicable law or the result:  CDT Inc. cannot be held liable as a successor to Opsys under either rule.

*Second*, California courts also have interpreted Code of Civil Procedure section 187 to permit the addition of others to a judgment where it is shown both "(1) that the new party [is] the alter ego of the old party *and* (2) that the new party . . . controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." *Katzir's*, 394 F.3d at 1148 (citations and internal quotations omitted) (emphasis added); *McClellan*, 89 Cal. App. 4th at 752.

The district court found that Sunnyside "never fully develop[ed]" a separate theory of alter ego liability, and expressed skepticism about whether such an argument would be viable.  ER 21, note 3.  The court also found that Sunnyside had not shown that CDT Inc. controlled the litigation: "At best, plaintiff has shown some degree of involvement and interest on the part of CDT, Inc., which is not surprising in light of the fact that its subsidiary was being sued."  *Id.*  Sunnyside has not argued on appeal that CDT Inc. is the alter ego of Opsys.  Nor has it argued that CDT Inc. controlled the litigation.  It has therefore waived these arguments.  *See Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("we 'review only issues which

500226704v1

are argued specifically and distinctly in a party's opening brief'") (citation omitted).[10]

**B.    Sunnyside's new procedural argument was not made below and, in any event, lacks merit.**

On appeal, Sunnyside argues that the district court should have permitted it to file a new pleading stating its claim under Rule 69(a). Appellant's Br. at 19. It cites California Code of Civil Procedure section 708.210, which provides: "If a third person has possession or control of property in which the judgment debtor has an interest or is indebted to the judgment debtor, the judgment creditor may bring an action against the third person to have the interest or debt applied to the satisfaction of the money judgment." But Sunnyside never mentioned section 708.210 in its moving papers below or at the hearing before the district court. Even if the rights set forth in section 708.210 were available to Sunnyside through Rule 69(a), Sunnyside chose to forego those rights by seeking to add CDT Inc. as a judgment debtor summarily, by motion in the pending action. Although it needed the district court's permission to file a new pleading in the existing action, it did not need leave to file a new action against CDT Inc. It simply chose not to. Section 708.210 is therefore irrelevant, as are the other authorities cited by Sunnyside.

---

[10]    In its papers below, Sunnyside also cited cases that supposedly imposed liability on a corporation solely because it controlled the litigation for the defendant. SER 303-04. Sunnyside has not raised this argument on appeal and therefore has waived it.

(It bears mentioning, however, that Sunnyside, after the denial of its Rule 25(c) Motion, brought two actions in New York raising somewhat similar theories under New York law. It voluntarily dismissed one such action and lost the other.)

The standards governing motions to dismiss for failure to state a claim under Rule 12(b)(6) are irrelevant because Sunnyside did not file a new claim. Code of Civil Procedure section 720.310 is irrelevant for the additional reason that it addresses claims brought by third parties, not claims brought by judgment creditors such as Sunnyside. *See* Cal. Civ. Proc. Code § 720.310 ("Not later than 15 days after the third-party claim is filed…, either the creditor or the third person may petition the court for a hearing…."); *see also id.* § 720.110 ("A third person claiming ownership or the right to possession of property may make a third-party claim under this chapter…if the interest claimed is superior to the creditor's lien on the property….").

Sunnyside also invokes Rule 56, which governs motions for summary judgment, but it has no grievance here because the district court *did* apply the standards governing summary judgment motions. *See* ER 12, lines 14-17 (citing *Luxliner,* 13 F.3d at 72-73, and its holding that "where a Rule 25(c) decision 'effectively imposes liability,' the court should conduct an evidentiary hearing unless the standards for summary judgment have been met"); ER 20, lines 5-7 ("In light of the weakness of plaintiff's arguments…and the *undisputed facts* in the record, the court holds *as a matter of law* that CDT, Inc. is not a proper defendant in this action.") (emphasis added).

For similar reasons, the Court should also reject Sunnyside's argument that it was entitled to discovery. *See* Appellant's Br. at 20. It is irrelevant that Sunnyside might have been permitted to conduct discovery before entry of summary judgment against it if it had filed an action against CDT Inc. because Sunnyside did not file such an action.[11] Whether or not a court may resolve disputed facts absent discovery, there were no genuine issues of disputed fact here. And, as shown above, it is not true that Sunnyside had no discovery of the transactions involving CDT Inc. and Opsys.

Sunnyside argues that Rule 69(a) provides for discovery. But Rule 69(a) is not a license to conduct unfettered discovery. In *Strick Corp. v. Thai Teak Products Co.,* 493 F. Supp. 1210 (D.C. Pa. 1980), which involved alter ego claims, the court stated that discovery of third parties requires "at least some demonstration of the alter ego relationship" between the third party and the judgment debtor. *Id.* at 1217; *see also id.* at 1218 ("discovery of assets of a nonparty is not generally contemplated by Rule 69(a)[,] but discovery would be permitted where the relationship between the judgment debtor and the nonparty is sufficient to raise a reasonable doubt about the bona fides of the transfer of

---

[11]    Neither of the cases cited by Sunnyside supports its broad, unqualified statement that a court "cannot resolve a summary judgment motion where the parties have not yet conducted discovery to respond to the request for summary disposition." *See* Appellant's Br. at 20. A party asking that a summary judgment motion be continued to allow further discovery must specify what information is sought and how that information would preclude summary judgment. *See supra*, p. 21 (discussing cases cited by Sunnyside).

assets") (citation and footnote omitted). Here, where the district court concluded that Sunnyside had not raised a genuine issue of material fact as to its successor liability claim, there was not a sufficient showing to warrant discovery under Rule 69(a).

## IV.    THE DISTRICT COURT CORRECTLY DENIED SUNNYSIDE'S REQUEST TO ADD A FRAUDULENT CONVEYANCE CLAIM UNDER RULE 18(b).

In Sunnyside's notice of its Rule 25(c) Motion, it sought leave "[a]lternatively...to add a claim for fraudulent conveyance of the assets of Opsys Limited to Cambridge [CDT Inc.] and to CDT Oxford Limited, pursuant to Rule 18(b)." SER 292, lines 12-13. Elsewhere, however, Sunnyside sought leave to file this claim only "if needed" (SER 293, lines 13-14), stating that it "*may* also seek leave to file a supplemental claim for relief for fraudulent conveyance against Cambridge and CDT Oxford Limited" (SER 314, lines 6-7) (emphasis added). The district court did not address this request, to the extent it can be considered actually to have been made. The court thereby effectively— and properly—denied the request.[12]

---

[12]    Sunnyside's statement that it "will treat the [Rule 25(c)] Order as if it dismissed Sunnyside's Rule 69 fraudulent conveyance claims against CDT, Inc." is confusing. *See* Appellant's Br. at 5 n.1. Sunnyside sought leave to file a fraudulent conveyance claim under Rule 18(b), not Rule 69. SER 292, line 13; SER 314, line 7. The district court did not grant leave to file such a claim. Because there was no such claim on file, the court could not have "dismissed" it.

Sunnyside did not offer sufficient evidence to create a genuine issue of fact as to its successor liability claim based on fraud. It did not identify any respect in which its fraudulent conveyance claim would have differed from its successor liability claim based on fraud. The fraudulent conveyance claim would have been defective for all the reasons that the successor liability claim is defective.

In addition, the district court properly rejected Sunnyside's request to add a fraudulent conveyance claim on procedural grounds. Rule 18(b) provides that "a plaintiff may state a claim for money and a claim to set aside a conveyance that is fraudulent as to that plaintiff, without first obtaining a judgment for the money." But Sunnyside did not seek leave to file a claim for money. Sunnyside has cited no authority permitting it to piggyback a fraudulent conveyance claim on top of a successor liability claim under Rule 25(c) or Rule 69(a). Because Sunnyside declined to file a new complaint, there was no pleading to which a fraudulent conveyance claim could have been added, much less a pleading that would have satisfied the heightened pleading standards of Rule 9(b). Because it did not even lodge a proposed complaint, Sunnyside did not even begin to comply with these rules.

## CONCLUSION

For the reasons stated above, appellee CDT respectfully submits that the order denying Sunnyside's Rule 25(c) Motion should be affirmed.

Dated:  April 14, 2008.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON
KEVIN M. FONG
ALICE KWONG MA HAYASHI
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880


By _____
Bruce A. Ericson

Attorneys for Appellee
CAMBRIDGE DISPLAY TECHNOLOGY, INC.

-52-

## STATEMENT OF RELATED CASES

Appellee Cambridge Display Technology, Inc. is not aware of any related cases pending in this Court within the meaning of Ninth Circuit Rule 28-2.6.

Since the district court denied Sunnyside's Rule 25(c) Motion, however, Sunnyside has filed related litigation against CDT Inc. and others in other venues:

1.    In September and October 2007, Sunnyside filed two actions in New York:

a.    It voluntarily dismissed one such action. *Sunnyside Dev. Co., LLC, v. Opsys Ltd., Cambridge Display Tech. Ltd., CDT Oxford Ltd., Sumitomo Chem. Co., Ltd., Opsys Mgmt. Ltd. & Bank of New York,* No. 112617/07 (N.Y. Sup. Ct., N.Y. County), *after removal,* Index No. 07-CV-09320 (S.D.N.Y.).

b.    It lost the other action and has appealed to the Second Circuit. *Sunnyside Dev. Co., LLC, v. Bank of New York et al.,* No. 07 Civ. 8825(LLS), 2008 WL 463722 (S.D.N.Y. Feb. 19, 2008).

2.    On January 15, 2008, Sunnyside filed a "Winding-Up Petition" against Opsys in the UK. *In the Matter of Opsys Ltd.,* No. 357 of 2008 (High Court of Justice, Companies Court).

3.    On April 3, 2008, Sunnyside filed a new action against CDT Ltd., Opsys and CDT Oxford, asserting fraudulent conveyance claims against them. *Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd. et al.,* No. CV-08-1780-MEJ (N.D. Cal.).

These lawsuits all attempt to collect the judgment rendered in this action.

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NUMBER 07-16773

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached brief is proportionately spaced, has a typeface of 14 points, and contains 13,479 words.

Dated:  April 14, 2008.


_____
Bruce A. Ericson

500226704v1

# ADDENDUM

**Federal Rules of Civil Procedure**

The Federal Rules of Civil Procedure were amended for stylistic reasons on December 1, 2007. Because these amendments were not substantive, CDT Inc. quotes the current version of the rules herein.

## *Rule 9(b)*

In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

## *Rule 18(b)*

A party may join two claims even though one of them is contingent on the disposition of the other; but the court may grant relief only in accordance with the parties' relative substantive rights. In particular, a plaintiff may state a claim for money and a claim to set aside a conveyance that is fraudulent as to that plaintiff, without first obtaining a judgment for the money.

## *Rule 25(c)*

If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party. The motion must be served as provided in Rule 25(a)(3).

### Rule 56(c)

The motion must be served at least 10 days before the day set for the hearing. An opposing party may serve opposing affidavits before the hearing day. The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

### Rule 56(f)

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken;

(3) issue any other just order.

### Rule 69(a)

(1) A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

500226606v1

(2) In aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located.

## California Civil Code

### Section 3439.04

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

(c) The amendment to this section made during the 2004 portion of the 2003-04 Regular Session of the Legislature, set forth in subdivision (b), does not constitute a change in, but is declaratory of, existing law, and is not intended to affect any judicial decisions that have interpreted this chapter.

**California Code of Civil Procedure**

*Section 187*

When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.

*Section 708.210*

If a third person has possession or control of property in which the judgment debtor has an interest or is indebted to the judgment debtor, the judgment creditor may bring an action against the third person to have the interest or debt applied to the satisfaction of the money judgment.

*Section 720.110*

A third person claiming ownership or the right to possession of property may make a third-party claim under this chapter in any of the following cases if the interest claimed is superior to the creditor's lien on the property:

(a) Where real property has been levied upon under a writ of attachment or a writ of execution.

(b) Where personal property has been levied upon under a writ of attachment, a writ of execution, a prejudgment or postjudgment writ of possession, or a writ of sale.

### *Section 720.310*

(a) Not later than 15 days after the third-party claim is filed with the levying officer pursuant to Section 720.120 or 720.220, or 15 days after filing an undertaking pursuant to Section 720.610, either the creditor or the third person may petition the court for a hearing to determine the validity of the third-party claim and the proper disposition of the property that is the subject of the claim.

(b) The hearing may be held whether or not an undertaking has been filed but not if a deposit has been made pursuant to Section 720.260.

(c) The hearing shall be held within 20 days after the filing of the petition unless continued by the court for good cause shown.

Docket No. 07-16773

<u>PROOF OF SERVICE BY OVERNIGHT COURIER</u>

I, Thomas E. Morgan, the undersigned, hereby declare as follows:

1.       I am over the age of 18 years and am not a party to the within cause.  I am employed by Pillsbury Winthrop Shaw Pittman LLP in San Francisco, California.

2.       My business address is 50 Fremont Street, San Francisco, CA 94105-2228.  My mailing address is 50 Fremont Street, P.O. Box 7880, San Francisco, CA 94120-7880.

3.       On April 14, 2008, in the city where I am employed, I served two true copies of the attached document titled exactly **BRIEF FOR APPELLEE CAMBRIDGE DISPLAY TECHNOLOGY, INC.**, by depositing them in a box or other facility regularly maintained by FedEx, an express service carrier providing overnight delivery, or delivering them to a courier or driver authorized by the express service carrier to receive documents, in an envelope or package designated by the express service carrier, with overnight delivery fees paid or provided for, clearly labeled to identify the person being served at the address shown below:

| | |
|---|---|
| Christoph Carl Heisenberg, Esq.<br>Traiger & Hinckley LLP<br>880 Third Avenue<br>New York, NY 10022<br>Tel: (212) 752-1161 | James E. Burns, Jr., Esq.<br>Justin M. Lichterman, Esq.<br>Orrick Herrington & Sutcliffe LLP<br>The Orrick Building<br>405 Howard Street<br>San Francisco, CA  94105<br>Tel: (415) 773-5700 |

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of April, 2008, at San Francisco, California.


_____
                          Thomas E. Morgan

# EXHIBIT C

APPEAL No. 07-16773

# United States Court of Appeals
# For The Ninth Circuit

SUNNYSIDE DEVELOPMENT COMPANY LLC,

*Plaintiff /Appellant,*

—against—

OPSYS LIMITED,

*Defendant/Appellee.*

Appeal from the United States District Court for the Northern District of California, Judge Marilyn Hall Patel, District Judge, Presiding

# REPLY BRIEF OF APPELLANT SUNNYSIDE DEVELOPMENT COMPANY

TRAIGER & HINCKLEY LLP
Christoph C. Heisenberg, Esq.
880 Third Avenue
New York, New York 10022
(212) 752-1161

Attorneys for Appellant Sunnyside
Development Company LLP

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT ................................................................................ 6

I.  CDT'S DEFENSE TO THE FRAUDULENT CONVEYANCE IS
    LEGALLY INADEQUATE ............................................................... 6

    A.  CDT Fails To Dispute That The UFTA Measures Equivalent
        Value By Weighing The $5 Million "Receiv[ed]" By Opsys,
        Not The $16 Million CDT Paid. .................................................... 6

    B.  The Only Evidence Of "Fair Value" In The Record
        Showed That The Fair Value Far Exceeded The $5 Million That
        Opsys Received. ................................................................... 8

        1.  CDT Fails To Address The Evidence Showing The
            UK Assets' "Fair Value" Of $26.9 Million, Which
            Precluded Summary Adjudication Against Sunnyside. ........... 9

        2.  CDT's Evidence of "Historic Cost" – "Book Value" –
            Is Not Probative Evidence of "Fair Value" ............................ 12

        3.  Even If Creditable, The Historic Cost Would Not
            Eliminate The Genuine Fact Issue. ...................................... 14

    C.  There Was A Genuine Dispute As To The Value Of
        Opsys UK, 84% Of Which Was Transferred To CDT For No
        Consideration In 2005. .......................................................... 14

II. CDT'S BRIEF DOES NOT OVERCOME THE GENUINE DISPUTE
    ABOUT OPSYS'S INTENTION TO PLACE CREDITORS AT A
    DISADVANTAGE. .................................................................... 16

    A.  The UFTA's Inquiry Is On Opsys's Intention To Harm
        Creditors, Not CDT's. ............................................................ 16

    B.  CDT's Factual Arguments About Having Provided
        For Creditors Are False. ......................................................... 17

i

# TABLE OF CONTENTS

Page

    C.    CDT Fails To Address The Badges Of Fraud
         In These Transactions.................................................................18

III.  THE DISTRICT COURT'S ORDER DENYING LEAVE
     TO FILE A FRAUDULENT CONVEYANCE CLAIM
     AGAINST CDT, INC. WAS IMPROPER...................................19

IV.  SUNNYSIDE ESTABLISHED THE BASIS FOR SUCCESSOR
     LIABILITY UNDER CALIFORNIA LAW ..............................20

V.   THERE IS NO MERIT TO CDT's ARGUMENT THAT SUNNYSIDE
     INSISTED ON SUMMARY AJUDICATION ...........................22

    A.    Contrary To CDT's Insinuation, The Fraudulent Transfers
         To CDT Never Were Subject To Any Discovery ............................23

    B.    The Due Process Rights Are Not Limited To Defendants...............24

    C.    Sunnyside Had An Independent Right To
         Discovery Under Rule 69 ...............................................................25

    D.    Sunnyside Did Not Waive Its Due Process Rights. .........................26

CONCLUSION .........................................................................................28

# TABLE OF AUTHORITIES

Page

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.,*
475 F.3d 1080 (9th Cir. 2007)................................................................25

*British International Ins. Co., Ltd. v. Seguros La Republica,*
200 F.R.D. 586, 591 (W.D.Tex. 2000) ...................................................26

*CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.),*
145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992)...........................................22

*Credit Lyonnais v. SGC International, Inc.,*
160 F.3d 428, 430 (8th Cir. 1998)..........................................................25

*DeRosa v. Buildex Inc. (In re F&S Central Mfg. Corp.),*
53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985)..............................................13

*In re Lucas Dallas, Inc.,* 185 B.R. 801 (B.A.P. 9th Cir. 1995) ...........3, 7

*Katzier's Floor and Home Design, Inc. v. M-MLS.com,*
394 F.3d 1143 (9th Cir. 2004)................................................................21

*Lippi v. City Bank,* 955 F.2d 599 (9th Cir. 1992) ...............................21, 22

*Luxliner P.L. Exp. Co. v. RDI/Luxliner, Inc.,*
13 F.3d 69 (3d Cir. 1993)........................................................................24

*Moody v. Security Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1067 (3d Cir. 1992).....9

*Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.,*
621 F.Supp. 198 (S.D.N.Y. 1985)...........................................................12

*Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144 (1984) .......21

*Ray v. Alad Corp.,* 19 Cal.3d 22, 29 (1977)..............................20, 22, 25

*Strick Corp. v. Thai Teak Products Co.,* 493 F.Supp. 1210 (D.C. Pa. 1980).......25

# TABLE OF AUTHORITIES

Page

*Sunnyside Development Company LLC v. Bank of New York,*
2008 U.S. Dist. LEXIS 11800 (S.D.N.Y. Feb. 19, 2008).................5, 17

*United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.),*
132 B.R. 247, 258 (Bankr. S.D.N.Y. 1991), *aff'd.,* 162 B.R. 410 (S.D.N.Y. 1993),
*rev'd. on other grounds,* 30 F.3d 385 (2d Cir. 1994), *cert. denied,* 513 US 1126
(1995) ..................................................................................13

*Wisden v. The Superior Court of Los Angeles County,*
124 Cal. App. 4th 750 (Cal.App. 2004) ................................25

## **Other Sources**

Fed. R. Civ. Pro. 69(a) ...............................................20

Cal. Civ. Code § 708.210 ............................................20

Cal. Civ. Code § 720.310 ............................................20

Cal. Civ. Code § 3439.02 ............................................12

Cal. Civ. Code § 3439.04(a)........................................16

Cal. Civ. Code § 3439.04(b) ....................................8, 19

Cal. Civ. Code § 3439.05 .........................................6, 8

11 U.S.C. § 548(a)(1)(B)(i)...........................................8

28 U.S.C. § 1610(a)...................................................25

## SUMMARY OF ARGUMENT

The core dispute remains the fraudulent conveyance of assets from Opsys Limited ("Opsys") to Cambridge Display Technology, Inc. ("CDT"). The fraudulent conveyance issue is at the fore because following the entry of the $5 million judgment against it, Opsys disclosed that it lacks the assets to satisfy the judgment: it had transferred its assets – valued <u>by CDT</u> at $26.9 million – to CDT and its affiliates. In return, Opsys received only $5 million. Because of these asset-depleting transfers, Sunnyside Development Company LLC ("Sunnyside") requires supplemental procedures to obtain any relief.

Sunnyside's Principal Brief showed that the District Court summarily determined factual issues without allowing Sunnyside discovery or conducting an evidentiary hearing. Based upon its determination of disputed facts, the District Court declined to impose successor liability, and made findings that could affect Sunnyside's fraudulent conveyance claims against CDT, Inc. Sunnyside's Brief demonstrated how the District Court's legal analysis of reasonably equivalent value is plainly incorrect, and that with respect to the facts, that it reached conclusions based on non-probative evidence and contrary to undisputed evidence. On appeal, CDT's Opposition Brief simply avoids the legal issue, and with respect to the factual analysis, CDT confirms the salient facts. Thus, reversal is required.

1

Even without the ability to obtain discovery from CDT or its affiliates, CDT's

own public filings established two undisputed facts showing the lack of equivalent

value: (1) Opsys transferred its 100% stake in Opsys UK, which had a fair value of

$26.9 million at the time of the transfer, and (2) Opsys received only $5 million in

return.  On appeal, CDT's Brief acknowledges those facts, but stakes its defense on

its interpretation of the legal test of equivalent value:

> Opsys and its shareholders received $16.2 million ($5
> million in cash in 2002, and $11.2 million in stock in
> 2004), a sum far in excess of book value ($2.9 million).

(CDT Brief "CDT Br." at 13).  Sunnyside's Brief explained that CDT's and the

District Court's legal test was plainly wrong:  First, the equivalency of value under

the California Uniform Fraudulent Transfer Act (the "UFTA") does not hinge on

amounts <u>paid</u> by CDT, but on the $5 million <u>received</u> by Opsys.  Second, the UFTA

utilizes the "fair valuation" of the assets Opsys transferred.  CDT's proffered historic

"book value" does not reflect fair value, and also was not from the relevant time

period.  Thus, the $2.9 million book value is not competent evidence to refute the

$26.9 million value in CDT's own financial statements, which represents (1) "fair

value" (2) at the time of the transaction.

CDT's Opposition Brief does nothing to validate CDT's proffered construct

that the District Court adopted.  <u>First</u>, CDT does not address that the UFTA explicitly

states that, for purposes of equivalent value, value must be "receiv[ed]" by the

debtor.  Dispelling all doubt on this issue, this Court previously answered the precise

question at issue here:

> The question is not [], whether the [] defendants gave
> reasonably equivalent value; it is whether the debtor
> received reasonably equivalent value.

*In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995).  CDT

acknowledges that of the amounts paid, Opsys received only $5 million.  In short,

judged against the correct legal standard, CDT provided only $5 million in value to

Opsys, not the $16.2 million credited by the District Court.

Second, CDT's comparison of the $5 million to Opsys UK's "$2.9 million

book value" is further error.  The UFTA standard is fair value, not book value.  The

only evidence of Opsys UK's fair value at the time of the transaction was CDT's own

valuation, placing that fair value at $26.9 million.  The book value that CDT

advances was not a relevant piece of evidence, as it reflected historic cost, and

further, had been adjusted up to the $26.9 million fair value at the time of transaction.

(CDT Br. at 33).  Thus, CDT's historic book value is not relevant, and the only

evidence in the record concerning fair value of Opsys UK was CDT's own valuation

at $26.9 million "at the date of the transaction." [ER-27].

More fundamentally, CDT acknowledges that the Rule 56 standard governs

the motion.  CDT's $26.9 million valuation – even if not the exclusive evidence of

3

fair value – still constitutes *prima facie* evidence sufficient to created a dispute about Opsys UK's fair value, precluding the adoption of the $2.9 million value.

With respect to the actual intent, CDT's brief fails to dispel the genuine dispute about Opsys's intention to place Opsys UK outside the reach of its creditors without Opsys receiving the benefit of the transfer. Sunnyside presented *prima facie* evidence – the UFTA's badges of actual fraud that create an inference of fraud. CDT does not join issue on those badges, choosing instead to point to the few badges that were not present, rather than confront those that were. (CDT Br. at 44). CDT also asserts a red-herring, making factual arguments about it having "legitimate business reasons" for the transaction. (CDT Br. at 40). Opsys and CDT could have achieved these legitimate purposes <u>and</u> structured the acquisition of Opsys UK so that the consideration went to Opsys UK's owner, Opsys. In that case, the transaction would not have hindered, delayed or defrauded Opsys's creditors, as Opsys would have received equivalent value for its ownership stake in Opsys UK. However, Opsys and CDT did not do so, choosing instead to structure the sale of Opsys UK so that Opsys did not receive the payment. The reasons for structuring the transactions in this creditor-harming way have never been subject to discovery or cross-examination.[1]

---

[1] CDT seeks to create the false impression that the District Court's decision was not made summarily, calling it the product of "two years of discovery and motion practice." (CDT Br. at 1). That is misleading, because CDT fails to disclose that the District Court deferred the asset transfer issue to post-trial. The asset transfer claims were not in the case, and never were the subject of discovery – CDT produced no

In the end, the District Court's vague conclusion that "plaintiff has failed to demonstrate [inadequate consideration] with respect to any of the transactions at issue" – the Court never specified which transactions it evaluated – has implications beyond the resolution of successor liability.  CDT has taken the position that the District Court's ruling also creates a collateral estoppel barring fraudulent conveyance claims against CDT, Inc. as well as CDT Ltd. and CDT Oxford (even though the District Court's reference to the "transactions at issue" would, by definition, pertain only to transactions with CDT, Inc.).  At least one court has cited the District Court's vague "findings" about the equivalent value. See *Sunnyside Dev. Co. LLC v. Bank of New York*, No. 07 Civ. 8825 (LLS), 2008 U.S. Dist. LEXIS 11800, *9 (S.D.N.Y., Feb. 19, 2008).  Thus, although they were "alternative bases" to the denial of successor liability, CDT claims that the District Court's disposition of the fraudulent conveyance issue has independent significance.  Being the product of clear error, Sunnyside asks this Court to clear away the erroneous underbrush found in the District Court's decision, leaving Sunnyside free to assert fraudulent conveyance claims to recapture its ownership in Opsys UK to satisfy the judgment.

---

documents, and none of its witnesses were deposed or subject to cross-examination. The case was about the lease claim, not asset transfers.  Thus, the District Court's understanding of the facts and the law was solely on unchallenged factual assertions and one brief, with Sunnyside having no ability to correct CDT's arguments.

# ARGUMENT

## I.  CDT'S DEFENSE TO THE FRAUDULENT CONVEYANCE IS LEGALLY INADEQUATE.

The core question – both for the independent fraudulent conveyance claim, and for the broader successor liability inquiry – is whether Opsys's transfer of Opsys UK was actually or constructively fraudulent.  As shown below, CDT's Brief fails to sustain the legal errors committed by the District Court in analyzing this issue.

### A.  CDT Fails To Dispute That The UFTA Measures Equivalent Value By Weighing The $5 Million "Receiv[ed]" By Opsys, Not The $16 Million CDT Paid.

CDT squarely frames the legal dispute concerning the equivalency of value: is it measured by the $16 million CDT <u>paid</u>, or by the $5 million portion that Opsys <u>received</u>?  The District Court relied on the former, and CDT now stakes its appeal on that legal position, arguing "[t]he district court correctly ruled, based on undisputed facts, that adequate consideration was paid." (CDT Br. at 31).  CDT's cursory attempts to sustain this legal position fall far short.[2]

Sunnyside's Brief cited California's UFTA, which defines a fraudulent conveyance as a transfer made by a debtor "without <u>receiving</u> a reasonably equivalent value in exchange." (Cal. Civ. Code §3439.05)(emphasis added).

---

[2] CDT acknowledges that Opsys received only $5 million in the two transactions transferring its subsidiary, Opsys UK.  The remaining $11 million paid by CDT was paid to Opsys's shareholders, unavailable to Opsys and its creditors. (CDT Br. at 34-35).

6

Moreover, Sunnyside's Principal Brief noted that this Court already has addressed this precise "paid" vs. "received" distinction:

> The question is not, as the GE defendants frame it, whether the GE defendants gave reasonably equivalent value; it is whether the debtor received reasonably equivalent value. . . . The debtor did not receive property, nor did the transfers satisfy a present or antecedent debt of the debtor. Therefore, the debtor did not receive "value."

*In re Lucas Dallas, Inc.*, 185 B.R. 801, 807-08 (B.A.P. 9th Cir. 1995).

CDT barely engages on the law. While CDT even quotes the UFTA's "receiving" standard (CDT Br. at 39), it fails to explain why a court should disregard the language. Instead, CDT defaults back to its argument about what it paid, perhaps hoping that the distinction will be lost on this Court, as it appears to have been by the District Court. (Op. Br. at 31)("[t]he district court correctly ruled, based on undisputed facts, that adequate consideration was paid."); (*id.* at 33)("The consideration paid far exceeds even these numbers."). With respect to this Court's controlling precedent in *Lucas Dallas*, CDT confines its treatment to a single paragraph, in which it tries to distinguish the case, and the other similar cases cited by Sunnyside, on the basis that they "address whether transfers by debtors who had filed for bankruptcy were fraudulent because the debtor did not receive a reasonably equivalent value in exchange" (CDT Br. at 35). However, that is also the precise question here, and CDT does not explain why the choice of forum would alter the substance of the "equivalent value" analysis. The outcome is not a product of quirk

7

in the Bankruptcy Code, as the standard is the same under the bankruptcy code as it is under the UFTA. *Compare* Cal.Civ. Code §§ 3439.04 and 3439.05 ("<u>receiving</u> a reasonably equivalent value" in the transfer) *with* 11 U.S.C. §548(a)(1)(B)(i) ("<u>received</u> less than a reasonably equivalent value in exchange for such transfer or obligation")(emphasis added).

The final attempt to distinguish these cases also fails. CDT argues that unlike these cases, "CDT, Inc. did not receive any property, payments or other assets from Opsys <u>in 2004</u>." (Opp. Br. at 35)(emphasis added). CDT's limitation to "in 2004" is telling, for the two transactions in which Opsys transferred its 100% ownership stake in Opsys UK occurred in 2002 and 2005. (Opsys transferred 16% of Opsys UK in 2002, and the remaining 84% in 2005).

**B.    The Only Evidence Of "Fair Value" In The Record Showed That The Fair Value Far Exceeded The $5 Million That Opsys Received.**

Having determined that Opsys received only $5 million in value, the sole remaining issue concerning reasonably equivalent value was whether the assets that Opsys transferred had a fair value greater than $5 million. The <u>only</u> evidence of fair value before the District Court – created by CDT itself – showed that the assets' fair value greatly exceeded this $5 million. Thus, the "fair value" issue had to be resolved in Sunnyside's favor.

1.    **CDT Fails To Address The Evidence Showing The UK Assets'
"Fair Value" Of $26.9 Million, Which Precluded Summary
Adjudication Against Sunnyside.**

CDT acknowledges the governing standard is whether Sunnyside offered
enough evidence of Opsys UK's fair value to create a genuine issue. (CDT Br. at 31).
Sunnyside's Brief showed the evidence of fair value consisted of: (1) CDT's
financial statements that expressly placed Opsys UK's fair value at $26.9 million
($12.2 million in R&D, $602,000 in net assets, and $14.4 million in goodwill), (2)
the testimony of Paul Ainslie, its expert, explaining that $26.9 was the fair value of
Opsys UK, (3) CDT's own discounted cash flow valuation of Opsys UK affirming
the $26.9 value, and (4) CDT's subsequent adjustment of Opsys UK's value to $19.7
million.  Each of these values far exceeds the $5 million that Opsys received for its
100% stake in Opsys UK, and therefore each establishes the lack of equivalent value.

Although CDT acknowledges each bit of evidence (*id.* at 33, 34), CDT argues
that "Sunnyside did not offer enough evidence to create a genuine issue." (*id.* at 31).
Yet, CDT's brief does nothing to dispel this evidence of fair value.  CDT claims that
Sunnyside did not offer "evidence – other than purchase price – of the value of
Opsys' assets." (*id.* at 34).  Although CDT apparently feels that the purchase price is
not relevant evidence of fair value, the law is to the contrary. See *Moody v. Security
Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) ("purchase price may be
highly probative of a company's value").  Thus, that CDT was willing to pay $26.9

million for Opsys UK is reflective of Opsys UK's fair value.  This argument is not "circular" (CDT Br. at 34) – Opsys UK's value is not altered by the fact that CDT paid this consideration to others, and not to Opsys UK's owner, Opsys.

CDT also creates a straw-man when it raises the 2004 transaction in which it acquired Opsys Limited, arguing "[i]n a stock purchase, however, payment for the stock is necessarily made to sellers of the stock." (Opp. Br. at 35).  CDT ignores that Sunnyside's present claim challenges Opsys Limited's 2002 and 2005 transactions in which Opsys (not its shareholders) sold its wholly-owned subsidiary, Opsys UK, valued at $26.9 million, and received only $5 million.  For those transactions, Sunnyside seeks exactly what CDT asserts should have happened – that CDT should have paid Opsys UK's shareholder, Opsys Limited, for acquiring its 100% share of its subsidiary, Opsys UK.

The remainder of CDT's argument is based on a misstatement.  CDT argues that the $26.9 fair value for Opsys UK was based solely on the purchase price, "not on a valuation of Opsys' assets." (CDT Br. at 13).  However, Sunnyside's expert, Mr. Ainslie, testified that the book value reflected fair value, because "FAS 141 requires that the assets to be recorded at their fair value." (Ainslie Dep. at 87) [CR-185-2].  Thus, Mr. Ainslie created the necessary link between Opsys UK's $26.9 book value and its fair value at the time of the transaction.

10

Moreover, CDT's protest that the $26.9 million value for Opsys UK (later

renamed CDT Oxford) was based "not on a valuation of Opsys' assets" is

demonstrably false:

> We have performed a valuation of CDT Oxford as of
> October 2002 in order to fairly allocate the assets and
> liabilities . . . and the fair value of CDT Oxford was the full
> price payable, . . .

(CDT Form 10-K at 49)[ER-38; CR Tab 184-2] (emphasis added).  CDT has not

produced these valuation reports sustaining these values because the District Court

denied discovery.  Nonetheless, CDT's financial statements show that this fair value

was determined independently by CDT's financial valuation of the assets' income

stream:

> In valuing the in-process research and development, an
> income approach was adopted. The Company measured the
> present value of future economic benefits over the
> remaining economic life of the acquired assets and
> discounted using a risk-adjusted discount rate of 25%. This
> rate was selected by taking into account time-value of
> money, inflation, forecast risk and the risk inherent in
> ownership of the subject assets.

[ER-35; CR Tab 180-2].  Thus, CDT's own records reveal its own discounted cash

flow valuation validating Opsys UK's $26.9 fair value in 2002.  CDT continued

monitoring this fair value, as required by the financial accounting rules governing

impairment, and in 2004 CDT adjusted Opsys UK's fair value to $19.7 million. CDT

even touts the fact that the fair value was "reduced to $19.7 million" in 2004 (*id.* at

11

34), without addressing the fact that this value further validates the lack of equivalent value, as $19.7 million > $5 million. Through to 2006, CDT assessed the value and concluded "no impairment is required." [ER-37, 38]. CDT does not explain why this evidence is not dispositive as to the lack of equivalent value (even if one were to compare this to the $16 million paid by CDT).

## 2.    CDT's Evidence of "Historic Cost" – "Book Value" – Is Not Probative Evidence of "Fair Value".

CDT does not dispute that the relevant valuation standard is "at a fair valuation." Cal. Civ. Code § 3439.02. See Sunnyside Brief at 24 (the "fair saleable value of assets, not their book value")(quoting *Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.*, 621 F.Supp. 198, 200 (S.D.N.Y. 1985). CDT does not offer up any evidence of fair value, and the District Court made no finding on fair value. Instead, CDT argues for, and the District Court appears to have used, "the book value of Opsys' assets as of September 30, 2002 – $2.9 million." (CDT Br. at 33)(emphasis added). That historic cost "book value" is not relevant evidence of fair value.

CDT attempts to dress-up this historic book value by claiming that "these assets were worth only £1.8 million ($2.9 million)." (CDT Br. at 32). The financial statements disclaim representing what the assets were "worth," staring that the $2.9 million merely reflects the historic cost invested in the assets. Because the $2.9 million represents historic cost, not fair value, the evidence was not relevant. Addressing Sunnyside's citations to cases that draw this clear distinction between

12

cost and value, CDT acknowledges that "book values alone may be inappropriate as a direct measure of the fair value of property" but CDT tries to extract the small redemption that the book value might "in some circumstances" serve as "competent evidence from which inferences" may be drawn. (CDT Br. at 32). However, those circumstances are not present here where the book value is historic cost, and thus has "no probative weight at all." *DeRosa v. Buildex Inc. (In re F&S Central Mfg. Corp.)*, 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985) ("Asset values carried on a balance sheet... do not necessarily reflect fair value. . . [A] balance sheet, such as that submitted by the defendant, which does not indicate how the debtor's assets were valued, has no probative weight at all." There is no presumption that the values are equivalent. *United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*, 132 B.R. 247, 258 (Bankr. S.D.N.Y. 1991) (cost or book value not presumptively equivalent to fair value), *aff'd*, 162 B.R. 410 (S.D.N.Y. 1993), *rev'd on other grounds*, 30 F.3d 385 (2d Cir. 1994), *cert. denied*, 513 US 1126 (1995). Notably, CDT's financial expert made no claim that this $2.9 represented fair value, and thus, CDT failed to make the necessary link between the $2.9 million book value and fair value. In contrast, Mr. Ainslie bridged the gap between CDT's $26.9 million current financial statement value and the fair value.

The lack of probative value of this historic cost is evidenced dramatically by the "Research and Development" assets (which includes the IP developed through

R&D).  Opsys showed no book value for R&D [ER-40], as the R&D had no cost

because "research expenditure is written off as it is incurred." [ER-42].  In fact, the

R&D had tremendous fair value, and CDT itself admits that this R&D and the patents

were the crown jewels that it sought to acquire. (CDT Br. at 4).  Upon acquisition,

CDT's own valuation determined that the R&D assets had a fair value of $12.2

million. [ER-27].[3]

> ### 3.    Even If Creditable, The Historic Cost Would Not Eliminate The Genuine Fact Issue.

Even if CDT could overcome the obstacles and prevail on its argument that the

$2.9 million is a relevant evidence of Opsys UK's fair value, the District Court still

committed error by adopting that evidence over the competing – and more

compelling – evidence of fair values ($26.9 and $19.7) from CDT's own financial

records.  By a Rule 56 standard, this was clear error.

> ### C.    There Was A Genuine Dispute As To The Value Of Opsys UK, 84% Of Which Was Transferred To CDT For No Consideration In 2005.

The District Court's Order is deficient for the further reason that it made no

finding concerning inadequate value in Opsys Limited's 2005 transfer to CDT of its

---

[3] The $2.9 book value upon which CDT relies was further irrelevant because it is not taken at the time of the transaction.  For that, CDT acknowledges that "at the time of the 2002 transaction" the IP assets had a value of at least $12.8 million, plus $14 million in goodwill. [ER-27].  Thus, even if the District Court considered book value as a proxy for fair value, it would be the October 2002 $26.9 million book value, not the September 2002 $2.9 million book value, that would be relevant.

14

remaining 84% stake in Opsys UK for no consideration. CDT acknowledges that it provided Opsys no value whatsoever in 2005. (CDT Br. at 34).

CDT's defense is that Opsys UK "had negligible value" in 2005. (CDT Br. at 9). That claim does not stand up to the evidence in the record: CDT carried CDT Oxford (f/k/a Opsys UK) on its books at more than $19.7 million in its 2004 year-end financial statements. [ER-37]. Further, CDT admits that it had paid $2.5 million for its initial 16% stake in Opsys UK, (CDT Br. at 6), a price that indicates a value of at least $13 million for the remaining 84% stake. Against this *prima facie* evidence, CDT's mere assertion that the value of this 84% stake was "negligible" (whatever that means) cannot prevail. At a minimum, there was a factual dispute.

CDT also argues that the District Court's Order did not address the 2002 transfer of profits and the 2005 transaction because both transactions were to CDT Ltd., not to CDT Inc. The District Court's Order made no such ruling. Instead, the Order's ambiguity leaves unclear what transactions it intended to include in its mistaken conclusion that CDT paid fair consideration.

Moreover, that assertion about what parties received transfers has not been subject to discovery. As Sunnyside's counsel remarked at argument, this was a game of corporate three-card monte, and Sunnyside had not been provided an opportunity to confirm CDT's contention that the valuable IP assets were now located under the "CDT Ltd." shell, or what the chain of title to that transfer was.

## II. CDT'S BRIEF DOES NOT OVERCOME THE GENUINE DISPUTE ABOUT OPSYS'S INTENTION TO PLACE CREDITORS AT A DISADVANTAGE.

CDT's Opposing Brief also fails to dislodge the evidence showing Opsys's actual intent to hinder, delay, or defraud Sunnyside's claims. Here, that evidence was in the form of CDT's statements about an intention to obtain Opsys UK outside of Sunnyside's claims, combined with the "badges of fraud" codified in the UFTA that created an inference of actual fraudulent intent. (Sunnyside Br. at 22-23).

### A. The UFTA's Inquiry Is On Opsys's Intention To Harm Creditors, Not CDT's.

CDT's opposition relies on a series of declaratory facts about its own supposed "legitimate" business purposes for acquiring only a portion of Opsys's assets. (CDT Br. at 40). As noted in Sunnyside's Brief, these arguments about CDT's intention miss the point, for the relevant question is Opsys's intention, not CDT's. (Sunnyside Br. at 22 n.3). Cal. Civ. Code § 3439.04(a) ("if the debtor made the transfer … (1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor")(emphasis added). Therefore, CDT's statements about its own intentions are not probative of the actual fraud claims.

Moreover, CDT's various claims of "legitimate" reasons for wanting only the UK assets are irrelevant, as they do not address why the transaction was structured to harm Opsys's shareholders. CDT could have achieved its "legitimate" purposes simply by paying Opsys equivalent value for its subsidiary, Opsys UK, leaving

16

Opsys's creditors unharmed.  Instead, the parties intentionally structured the transaction to pay Opsys's shareholders the money owed to Opsys, harming the creditors.  That is fraud.

## B.    CDT's Factual Arguments About Opsys Having Provided For Creditors Are False.

CDT also argues Opsys's "good faith" by suggesting that the parties made provision for Opsys's liabilities. (CDT Br. at 42).  This argument does nothing more than repackage an argument CDT made to Judge Patel, in which CDT touted the supposed "protections" to Opsys's creditors provided by the escrow.  That claim was found to be an "extravagant mischaracterization," that had no basis in fact.

Indeed, if at all probative, CDT's conduct revealed the lack of good faith toward creditors.  Months after telling Judge Patel about these supposed protections, and the amounts held in New York in trust and benefit for the creditor, CDT recanted those assertions before the District Court in New York.  The New York court found that Opsys secured <u>no protection</u> for its creditors.  *Sunnyside v. Bank of New York*, 2008 U.S.Dist.LEXIS 11800 *9.  Moreover, it found that CDT's insinuation to Judge Patel that Opsys's creditors were protected was an "extravagant mischaracterization." (*id.*)

CDT now backpedals from the mischaracterization, stating that although creditors have no right to the escrow, the escrow is available "if CDT chooses" to pay claims on behalf of Opsys.  Not surprisingly, it cites no authority that its concept

of "providing for creditors" – allowing the creditors to beg CDT for discretionary

payment – is evidence of providing for creditors. If this record is evidence of

anything, CDT's refusal to pay Opsys's claim is compelling evidence of the value of

CDT's "providing" for creditors – zero.

There also is no validity to CDT's argument that Opsys made provision for

known claims. (CDT Br. at 42). The 2002 transaction contained no provision for

creditors. Moreover, the District Court found that Opsys learned of Sunnyside's

claim "in late 2002 and early 2003," when Opsys created the "buckets" in 2004.

(February 6, 2007 Memorandum and Order at 15) [CR Tab 138]. Notwithstanding

this knowledge, the "buckets" that CDT claims "made reasonable provision for

known liabilities" made no provision for the largest known claim against Opsys --

that of Sunnyside. Thus, CDT cannot prevail on its present factual assertions that

Opsys's and CDT's actions reflect good faith.

## C.    CDT Fails To Address The Badges Of Fraud In These Transactions.

With respect to Opsys's intention, CDT is silent about the presence of several

badges of fraud, which are evidence from which an inference of actual fraudulent

intent may be draw. Rather than address these badges, CDT's argues a non-sequitur:

that some of the badges were not present. (CDT Br. at 44). Thus, CDT does not

engage on the existing badges: that the 2002 sale of Opsys UK was a sale of all of

Opsys's assets made while Opsys was insolvent, with the payment going not to

Opsys, but to its shareholders. Further, the 2005 transfer of the remaining 84% of Opsys UK was to insiders, concealed, made while a defendant in a suit, of all of Opsys's remaining assets, without any consideration, transfer made while Opsys was insolvent. *See* Cal. Civ. Code §3439.04(b).

Against these badges, CDT argues that it could not have had an invidious intent because CDT Ltd. also was still a defendant at the time of the transfer, and that the transfers were planned prior to this suit. Perhaps that defense ultimately might be credited – after a full opportunity to probe the veracity of the argument and review the documents behind it – but the argument cannot be accepted at the pleading stage. In the end, however, Opsys's intention is a question of fact, and CDT's admission that the transaction was structured to separate Opsys UK from Opsys's liabilities, combined with the badges of fraud, creates a genuine dispute of fact.

## III.  THE DISTRICT COURT'S ORDER DENYING LEAVE TO FILE A FRAUDULENT CONVEYANCE CLAIM AGAINST CDT, INC. WAS IMPROPER.

CDT's Brief contends that the District Court's "findings" concerning the fraudulent conveyance permitted the District Court to deny Sunnyside leave to file a fraudulent conveyance claim against CDT, Inc. As shown above, those findings were erroneous legally, and factually. Therefore, the denial of leave to bring the action was improper.

CDT's Brief raises a procedural defense to the ruling, arguing that the court could deny Sunnyside its statutory rights because "Sunnyside chose to forego those rights." (CDT Br. at 47). CDT does not explain how Sunnyside chose to forgo its rights when Sunnyside expressly invoked relief under a Rule 69 fraudulent conveyance action. Rule 69(a) incorporates California's State remedies, including the "creditors' remedies" and "creditor's suit" remedies against third-party transferees set forth in California Code of Civil Procedure §§ 708.210 and 720.310. (See CDT Br. at 47). As Sunnyside's counsel noted "if the Court believes [a new pleading] would be helpful, [] we could prepare a short supplemental complaint to the current complaint. . ." (Tr. at 62) [CR Tab 174].

Ultimately, CDT argues that the District Court nonetheless was able to deny leave to file the claim because "fraudulent conveyance claim would have been defective for all the reasons that the successor liability claim is defective." (CDT Br. at 51). CDT thereby argues that the claim rises and falls on the same arguments it raises to the fraudulent conveyance, and, as explained above, the claim was viable and should have been allowed to go forward.

## IV.    SUNNYSIDE ESTABLISHED THE BASIS FOR SUCCESSOR LIABILITY UNDER CALIFORNIA LAW

The above facts also established the basis for amending the judgment under Rule 25 to join CDT, Inc. based upon *Ray v. Alad Corp.*, 19 Cal.3d 22, 28-29 (1977).

Here, the record showed that the transfer was for the purpose of escaping liability, and that Opsys Limited did not receive equivalent value in the transactions.

Apart from disputing the elements of fraudulent conveyance and fraudulent intent, CDT's opposition hinges on the argument that it successfully structured the transaction to avoid "an asset" sale by transferring Opsys's assets to a newly created subsidiary, Opsys UK, and then giving CDT immediate control of Opsys UK. (CDT Br. at 23). Relying upon *Potlatch Corp. v. Superior Court*, 154 Cal. App. 3d 1144, 1150-51 (1984), CDT argues that it is immunized from successor liability because Opsys converted its real assets into a stock asset, and then simultaneously transferred that stock asset to CDT. *Potlatch*, and *Katzier's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143 (9th Cir. 2004) did not involve these simultaneous transactions. Rather, all involved the transfer of stock in a *bona fide* existing corporation, and founded their rationale on such grounds. Those are not the facts here.

As Sunnyside explained in its Principal Brief, this Court has held that it will look at substance, not form, when analyzing the fraudulent conveyance issue. Thus, courts should "collapse" the transactions in which (1) Opsys transferred its IP assets to Opsys UK, and (2) transferred Opsys UK to CDT, treating this as "one aggregate transaction which had the overall effect of conveying [] property." *Lippi v. City Bank*, 955 F.2d 599, 612 (9th Cir.1992). As articulated elsewhere:

21

> [r]egardless of the number of steps taken to complete a
> transfer of debtor's property, such as in a leveraged buyout
> transaction, if they reasonably collapse into a single
> integrated plan and either defraud creditors or leave the
> debtor with less than equivalent value post-exchange, the
> transaction will not be exempt from the Code's avoidance
> sections.

*CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131, 137 (Bankr.

S.D.N.Y. 1992). CDT's attempts to limit this principle to leveraged buyout

transactions is not supported by this language, which speaks broadly of any

transactions that "complete a transfer of debtor's property." Indeed, the court's

language ("such as... a leveraged buyout") makes clear that the principle is not

limited to leveraged buyout. In short, CDT's argument is not supported by *Lippi*'s

language, or the policy behind *Ray*.

## V.    THERE IS NO MERIT TO CDT's ARGUMENT THAT SUNNYSIDE INSISTED ON SUMMARY AJUDICATION.

As shown above, the District Court's erroneous conclusion about equivalent

value is the product of applying erroneous legal standards in choosing between

underlying facts (do you use value "paid" or value "received"; do you use the assets'

historic "book value" or their current "fair value"). Sunnyside submits that the

correct legal interpretation disqualifies CDT's evidence, and leaves no factual

disputes. However, if this Court affirms the District Court's legal framework (and

therefore does not disqualify CDT's evidence as irrelevant), then that still would

leave the valid evidence submitted by Sunnyside. That evidence precluded summary

disposition of factual questions – both the fair value of the assets transferred, and of

Opsys's fraudulent intention – without affording Sunnyside due process of discovery

and the right to confront witnesses.

### A.    Contrary To CDT's Insinuation, The Fraudulent Transfers To CDT Never Were Subject To Any Discovery.

CDT attempts to create the false impression that Sunnyside had no need for

"additional" discovery, arguing – without any citation whatsoever – that "Sunnyside

took extensive discovery about the transactions involving CDT Inc., Opsys and their

affiliates, including the structure of the transactions and the amount of consideration

paid." (CDT Br. at 10).  That claim is false.

To create the false impression of that discovery, CDT misleadingly notes that

the Second Amended Complaint contained allegations the fraudulent transfers.  CDT

omits to inform this Court that the District Court held these issues to be "premature"

and deferred them until post-trial:

> . . . joinder of [CDT] Inc. is premature. As an alleged
> successor in interest, [CDT] Inc. will only be involved in
> this lawsuit to the extent that plaintiff is unable to collect a
> judgment from Opsys Limited. It would therefore be
> inefficient to join [CDT] Inc. at this time.  Plaintiff's
> motion for leave to add [CDT] Inc. as a party is therefore
> denied without prejudice, subject to renewal if and when
> the primary liability of Opsys Limited is established.

(Memorandum & Order dated Jan. 4, 2006, at p. 7)[CR Tab 57].  In accordance with

the Order, the Second Amended Complaint noted that those issues were not being

pleaded and that "plaintiff will seek leave to add [CDT] as a defendant successor to

Opsys Limited at such time as the primary liability of Opsys Limited is established."

(Second Am. Cmpt., at ¶26)[CR Tab 58]. CDT's ambiguous references to

Sunnyside's discovery about "the transactions" seeks to obscure that the discovery

pertained to Opsys's attempt to assign the lease liability to Opsys US, and (1)

Opsys's conveyance of assets to CDT was not at issue, and (2) Sunnyside never

obtained any discovery from CDT or its affiliates (except Opsys).

As a consequence of this lack of discovery, Sunnyside has had no discovery of

assets transferred, or their value – including CDT's valuation report that showed the

$26.9 million value, or the subsequent valuation report that caused the write-down in

value to $19.7 million. Nor has CDT disclosed what planning went into the 2004 and

2005 transactions, and what Opsys's motives were in transferring its 84% stake in

CDT Oxford to CDT for no value.

## B.    The Due Process Rights Are Not Limited To Defendants.

Next, CDT places undue significance on the language of *Luxliner P.L. Exp.*

*Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72-73 (3d Cir. 1993) to argue that Sunnyside is

not entitled to any due process because the motion did not implicate its property

interest. (CDT Br. at 15). Because *Luxliner* involved an appeal where liability was

imposed on defendant, its language necessarily is geared toward the due process

owed to defendant. CDT does not cite any authority supporting its argument that the

24

language implies the lack of a reciprocal due process right to remedy against a

successor entity that the California Supreme Court recognized in *Ray v. Alad*, 19

Cal.3d 22, 28 (1977).  It has a right to have a jury determine those issues.  *Wisden v.*

*The Superior Court of Los Angeles County*, 124 Cal. App. 4th 750 (Cal.App. 2004).

### C.    Sunnyside Had An Independent Right To Discovery Under Rule 69.

CDT cites *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th

Cir. 2007) for the proposition that the District Court properly denied discovery from

CDT. (CDT Br. at 21).  That decision, however, does not address the discovery rights

provided by Rule 69(a).  Instead, the denial was based on a finding that California's

Civil Procedure Code § 708.110 was pre-empted by the Foreign Sovereign Immunity

Act, 28 U.S.C. § 1610(a). *Id.* at 1096.  Thus, the governing standard mandated that

"discovery against a foreign sovereign should be ordered 'circumspectly and only to

verify allegations of specific facts crucial to the immunity determination.'" *Id.* at

1095.  Expressly because of that exacting standard this Court held that a judge could

limit discovery after 15 months of prior discovery into the facts.  Here, there has been

no prior discovery from CDT.

CDT argues that the District Court properly denied Rule 69 discovery because

Sunnyside had not filed a new action.  However, "[t]he right to conduct discovery

applies both before and after judgment." *Credit Lyonnais v. SGC International, Inc.*,

160 F.3d 428, 430 (8th Cir. 1998).  Further, the decision in *Strick Corp. v. Thai Teak*

*Products Co.*, 493 F.Supp. 1210 (D.C. Pa. 1980), cited by CDT, has no application. There, the Court limited intrusive questions about an individual's personal finances, questions that the Court found to be unwarranted without a threshold showing. Here, the discovery focused on the assets of a public company. To the extent a threshold showing calling into doubt the *bona fides* of the transactions, Sunnyside made that showing. *British International Ins. Co., Ltd. v. Seguros La Republica*, 200 F.R.D. 586, 591 (W.D.Tex. 2000)(requiring no showing other than that transfers occurred between defendant and other entities.)

### D.    Sunnyside Did Not Waive Its Due Process Rights.

In a final defense to the summary proceedings, CDT argues that Sunnyside waived its due process rights, claiming that "Sunnyside urged the Court to proceed on a paper record" (CDT Br. at 15), and that "Sunnyside agreed that there were no genuine issues of material fact." (CDT Br. at 17). That argument is belied throughout the appellate record, which discloses that Sunnyside consistently demanded a hearing on disputed facts. This position was not a change "midway through the hearing," as CDT suggests. (CDT Br. at 3). Thus, in the initial post-trial status report, dated March 20, 2007, Sunnyside advised that "in the event defendants materially dispute Cambridge's addition as a party to the action and judgment, then an evidentiary hearing is appropriate, which may require discovery." (Sunnyside Status Report at p.4) [CR Tab 176].

26

Although CDT's public filings constituted evidence showing the $26.9 million value, Sunnyside did not know what defense, factual and legal, CDT would offer on the motion. Having had no discovery, and lacking a reply brief in which to respond to CDT's defenses or factual assertions, Sunnyside's initial brief could not take a position. Thus, Sunnyside reserved the right to discovery, noting that "Plaintiff will be prepared [at the May argument] to identify the discovery required against Cambridge and its affiliates, which would likely involve document requests and several depositions." (Sunnyside Mem. of Law, at p. 23) [CR Tab 179].

After seeing CDT's pleadings and factual assertions, Sunnyside concluded at the May 16th argument that discovery would be required. "I have to give it to defendants, they created triable issues of fact and I think that it's probably . . . We have to have further proceedings, . . .")(Tr. at 54-55) [CR Tab 174]. As counsel stated, "the pleadings that have been filed by the defendant, which we haven't had a chance to respond to, factually or legally, my reaction in reading it was reminded me of the three-card monte game, where are the assets, under which shell of a CDT entity do they reside? And it struck me that in order to really understand everything here we need to have some discovery against all of those CDT entities and get the documents related to where are the assets and how they are being exploited." (Tr. at 51).

In short, the request for discovery on disputed facts was not a sudden change in position, but rather the first opportunity to take a position after obtaining some facts from CDT.

## CONCLUSION

For the reasons set forth herein, Sunnyside requests that the Court reverse the August 29, 2007 Memorandum and Order and amend the judgment to add CDT Inc., or, alternatively, reverse and remand for further supplemental proceedings so that Sunnyside's fraudulent conveyance claims can be fully litigated.

Dated: April 28, 2008

TRAIGER & HINCKLEY LLP

By: _____
     Christoph C. Heisenberg

880 Third Avenue, 9th Floor
New York, New York 10022
Tel.: (212) 845-9094

Attorneys for Appellant
Sunnyside Development Company LLC

28

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1 for Case Number 07-16773

I certify that pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, the attached reply brief is:

Proportionately spaced, has a typeface of 14 points or more and contains 6,601 words. For purposes of this certification, I have relied on the word count of the word-processing system used to prepare the brief.

Date: April 28, 2008

Christoph C. Heisenberg

## AFFIRMATION OF FILING AND SERVICE

CHRISTOPH C. HEISENBERG, an attorney in this action admitted to the bar of this

Court, being over the age of 18 and not a party to this action, hereby certifies that on April 28,

2008, I:

**filed** the REPLY BRIEF OF APPELLANT SUNNYSIDE DEVELOPMENT CO LLP In

accordance with FRAP 25(a)(2)(B) by personally mailing to the clerk by Federal Express, 2nd

day delivery; and

**Served** 2 copies of the annexed REPLY BRIEF OF APPELLANT SUNNYSIDE

DEVELOPMENT CO LLP by third-party commercial carrier (Federal Express), 2nd day

delivery, addressed to:

Bruce A. Ericson, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228

Counsel for Cambridge Display Technology,
Inc.

James E. Burns Jr., Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

Counsel for Opsys Limited

Dated:  New York, New York
    April 28, 2008

Christoph C. Heisenberg, Esq.